# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| BAOYANG CHEN, | : | |
| Plaintiff; | : | |
| | : | Case No. 1:17-cv-460 |
| v. | : | |
| | : | |
| GSC OPPORTUNITIES, L.P.; | : | Judge Michael R. Barrett |
| GSC OPP MANAGEMENT, L.P.; TERRY | : | |
| CHAN; GARY CHAN; JACQUELYN | : | |
| CHAN; MASON HILL, LLC; JARDIN | : | |
| HILL, LLC; CLEARWATER | : | |
| HOSPITALITY GROUP, LLC; LUMEN | : | |
| POINT CAPITAL FUND I, LLC.; RG | : | |
| MGMT, LLC; RG OPPORTUNITIES I, L.P.; | : | |
| GOLD STAR CHILI, INC.; PHOENIX | : | |
| FRANCHISE GROUP, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

---

## PLAINTIFF BAOYANG CHEN'S AMENDED COMPLAINT

Now comes Plaintiff, Baoyang Chen ("Plaintiff"), and for his complaint ("Complaint") against Defendants, GSC Opportunities, L.P. ("GSC"); GSC OPP Management, L.P. ("GSC OPP"); Terry Chan; Gary Chan; Jacquelyn Chan; Mason Hill, LLC ("Mason Hill"); Jardin Hill, LLC ("Jardin"); Clearwater Hospitality Group, LLC ("Clearwater"); Lumen Point Capital Fund I, LLC ("LPCF"); RG MGMT, LLC ("RG MGMT"); RG Opportunities I, L.P. ("RG OPP") (collectively with Mason Hill, Jardin, Clearwater, LPCF, RG MGMT, RG OPP, the "Chan Entities"); Gold Star Chili, Inc. ("Gold Star"); Phoenix Franchise Group ("Phoenix") (collectively, "Defendants"), states as follows:

**THE PARTIES**

1.     Plaintiff is a citizen and resident of the People's Republic of China and a limited partner in GSC.  In 2013, Plaintiff joined GSC, a limited partnership organized to allow foreign investors to utilize the EB-5 Visa program.

2.     Defendant GSC is an Ohio limited partnership with its principal place of business located in Cincinnati, Hamilton County, Ohio.  GSC is controlled by its General Partner, GSC OPP, and Terry Chan, Gary Chan and Jacqueline Chan (collectively, the "Chans"), all of whom are officers and/or partners of GSC OPP and active in its management and control.

3.     GSC OPP is an Ohio limited partnership with its principal place of business in Ohio.  GSC OPP is the General Partner of GSC, an Ohio limited partnership.  GSC OPP was initially composed of multiple partners, including Gold Star and Mason Hill.  However, Gold Star withdrew from GSC OPP on or after November 14, 2016, leaving Mason Hill as the only remaining active partner.  As is detailed below, Mason Hill is actively controlled by the Chans.

4.     Defendant Terry Chan is a citizen of the State of Florida, and a resident of Orlando, Orange County, Florida.  Terry Chan is an officer, partner and/or principal in the Chan Entities.  Terry Chan was integral in the formation of GSC, GSC OPP, and other Chan Entities, and has actively managed, directed and controlled their activities such that they have no separate mind or will of their own.

5.     Defendant Gary Chan is a citizen of the State of Ohio, and a resident of Cincinnati, Hamilton County, Ohio.  Gary Chan is an officer, partner and/or principal in the Chan Entities, and/or was key to their formation. Gary Chan was integral in the formation of GSC, GSC OPP, and other Chan Entities, and has actively managed, directed and controlled their activities such that they have no separate mind or will of their own.

6.  Defendant Jacquelyn Chan is a citizen of the State of Florida, and a resident of Orlando, Orange County, Florida. Jacquelyn Chan is an officer, partner and/or principal in, and was integral in the formation of the Chan Entities. Jacquelyn Chan actively managed, directed and controlled the activities of all or some of the Chan Entities such that they have no separate mind or will of their own.

7.  Defendant Mason Hill is an Ohio limited liability company with its principal place of business located in Ohio. The Chans are members, officers, and/or principals of Mason Hill, and they actively manage, control and direct its activities such that it has no separate mind, will or existence of its own.

8.  Defendant Jardin Hill is an Ohio limited liability company with its principal place of business located in Ohio. The Chans are members, officers, and/or principals of Jardin Hill, and they actively manage, control and direct its activities such that it has no separate mind, will or existence of its own.

9.  Clearwater is an Ohio corporation with its principal place of business located in Cincinnati, Hamilton County, Ohio. Jacquelyn Chan is the sole owner of Clearwater. Clearwater is actively managed, controlled, and directed by the Chans such that it has no separate mind, will or existence of its own.

10.  LPCF is an Ohio corporation with its principal place of business located in Cincinnati, Hamilton County, Ohio. Gary Chan is the incorporator of LPCF. LPCF is owned by Clearwater, and is actively managed, controlled, and directed by the Chans such that it has no separate mind, will or existence of its own.

11.  RG MGMT is an Ohio corporation with its principal place of business located in Cincinnati, Hamilton County, Ohio. Gary Chan is the incorporator of RG MGMT. RG MGMT

is owned by Clearwater, and is actively managed, controlled, and directed by the Chans such that it has no separate mind, will or existence of its own.

12.     RG OPP is an Ohio limited partnership with its principal place of business located in Cincinnati, Hamilton County, Ohio.  RG MGMT is the general partner of RG OPP.  RG MGMT is owned by Clearwater, and RG OPP is managed, controlled, and directed by the Chans such that it has no separate mind, will, or existence of its own.

13.     Gold Star is an Ohio Corporation with its principal place of business located in Cincinnati, Hamilton County, Ohio.  Gold Star owns and operates Gold Star Chili restaurants in Ohio, Kentucky, and Indiana.  Gold Star controlled GSC OPP, the managing partner of GSC, until at least November 14, 2016.

14.     Phoenix is a Utah corporation with its principal place of business located in Sandy, Salt Lake County, Utah.  Phoenix is a franchisor of Rodizio Grill restaurants, including a number of Ohio Rodizio Grill restaurants owned, operated, or controlled by RG MGMT, RG OPP, Clearwater, and/or the Chans.  Phoenix received approximately $52,655.60 of Plaintiff's funds that were fraudulently transferred to it by the Chans and/or the Chan Entities.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action involves claims arising under the laws of the United States.  Specifically, a number of the Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and federal securities laws.

16.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## NATURE OF THE ACTION

17.     This is an action that Plaintiff asserts against Defendants for, among other things, breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, fraudulent conveyance, piercing the corporate veil, and punitive damages to remedy Defendants' unlawful actions, which include gross mismanagement, embezzlement, and self-dealing of Plaintiff's investment proceeds in GSC.

18.     The Chans have orchestrated a complex enterprise, run through the Chan Entities, to convert the funds of Plaintiff and other GSC investors.  The Chans have utilized this enterprise to enrich themselves, improperly pay off debts that have nothing to do with GSC, and inappropriately finance the operation of entities they control. This enterprise is ongoing and the Chans are still continuing to misappropriate the funds of other partners, investors, corporate entities, and/or businesses through the Chan Entities to carry on their fraudulent scheme.

## THE EB-5 PROGRAM

19.     Plaintiffs re-state paragraphs 1-21 as if fully rewritten.

20.     On or about March 28, 2013, Defendants, by and through their agent and Chinese immigration promoter, Goldlink, lured Plaintiff into investing in GSC as part of the EB-5 Visa Program administered by the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS").

21.     In 1990, Congress established the EB-5 Program in order to bring new investment capital into the United States and create new jobs for U.S. workers.

22.     Under the EB-5 Program, immigrants who invest their capital in job-creating business enterprises in the U.S. receive "conditional" permanent resident status in the U.S. for two (2) years after their I-526 application is approved. If, after the two-year period, the

immigrants satisfy the EB-5 Program conditions and other Program criteria, USCIS removes the conditions and the immigrant investors become lawful permanent residents. In other words, the immigrant investors obtain their "Green Cards."

23.     In essence, the EB-5 Program has three key components: (a) immigrant investment of capital; (b) in a new commercial enterprise; that (c) creates jobs.

24.     To avail oneself of the EB-5 Program, the immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs, unless the immigrant invests his or her capital in what is called a "targeted employment area." In that case, the immigrant must invest $500,000.

25.     Defendants used the EB-5 Program to lure Plaintiff into investing $500,000 in a purported redevelopment project in Ohio, Kentucky, and Indiana. As will be discussed more fully below, Plaintiff's $500,000 investment has been unlawfully converted by the Chans and diverted into the Chan Entities that they control and actively manage without his consent, and the Chan's refuse to return his investment proceeds despite repeated demands.

## GSC'S STRUCTURE

26.     In 2013, the Chans and Gold Star began collaborating on a possible EB-5 investment project. The Chans and Gold Star eventually agreed to develop 12 Gold Star Chili restaurants in Ohio, Kentucky, and Indiana through an EB-5 program.

27.     The Chans, through Mason Hill, created GSC to carry out this task.

28.     GSC was controlled by the Chans and Gold Star through GSC OPP. GSC OPP initially had two members, Mason Hill and Gold Star. GSC OPP was technically managed by GSC EB5 Investor LLC ("GSC EB5"), an entity controlled by Gold Star.

29.     The Chans, through Mason Hill, and Gold Star had separate obligations in

connection with GSC OPP.  Mason Hill was to ensure GSC qualified as an EB-5 investment program, that each EB-5 investor met program requirements, that GSC complied with all USCIS requirements, and that GSC followed all applicable federal and state securities laws.

30.     Gold Star, on the other hand, was required to provide services related to the operation and management of Gold Star Chili restaurants that GSC would eventually own, operate, and/or manage.  This included responsibilities related to the selection of potential restaurant sites, the day-to-day operation of each restaurant, management of GSC's funds, and ensuring GSC complied with all franchise agreements.

## PLAINTIFF'S SOLICITATION, INVESTMENT, AND RELEVANT MATERIALS

31.     All or some of the Defendants began marketing GSC to foreign investors eager to use the EB-5 visa process in or before 2013.

32.     In connection with the solicitation of Plaintiff, Terry and Gary Chan, for themselves and for many of the corporate Defendants named above, provided Plaintiff with a promotional booklet through Goldlink.  This promotional booklet detailed the scope of GSC, how it would operate, and how it would be managed.  Terry and Gary Chan created, directed, and/or otherwise approved the content in these materials and the statements therein, and were integrally involved in the marketing, distribution, and publication of these materials to Plaintiff. A true and accurate copy of the promotional booklet described in this paragraph (both Chinese and English translation versions) is attached hereto as Exhibit A.

33.     This promotional booklet highlighted Gold Star's connection to GSC, and provided potential investors with detailed descriptions of GSC's purpose and operation to entice their investment.  Among other things, the booklet explained that:

- GSC expected to repay investors' principal in three years;

- GSC would provide investors with written documents on a quarterly basis;

- GSC expected to develop and open 12 Gold Star restaurants within a 300 kilometer, or approximately 186 mile, radius of Cincinnati;

- GSC expected to create at least 156 jobs;

- GSC expected to complete the construction of 12 restaurants within two years;

- Gold Star was the main investor in GSC;

- Gold Star was expected to invest at least $250,000 in each Gold Star restaurant;

- GSC expected to open 12 restaurants within "16 months";

- GSC expected to create enough jobs to comply with USCIS requirements by approximately May 2015, the earliest date when a Green Card could be approved;

- GSC expected that investors could exit GSC approximately three years after their initial investment;

- GSC expected to create revenue by leasing property and operating Gold Star restaurants for a profit;

- EB-5 investors' funds would be repaid through the lease of real estate and/or through payment of 80% of GSC's annual profits;

- EB-5 investors would hold preferred shares and have the first right to repayment;

- GSC assured investors that there was no fear that the project would fail, in part, because fast food is a large part of the United States' food and beverage market; and,

- GSC had a professional management team and did not require investors to participate in GSC's management.

34. This promotional booklet made clear that GSC's explicit purpose was to: (1) open and operate 12 Gold Star restaurants; (2) in conjunction with Gold Star, which was supposed to be integrally involved in GSC; (3) in Cincinnati and/or the surrounding region; and, (4) that this project was supposed to be completed within three years. However, as is detailed below, GSC

has never fulfilled any of these promises to Plaintiff.

35.     Likewise, Terry and Gary Chan, for themselves and for the many of the Defendants named above, prepared a business plan explaining the structure, size, and operation of GSC.  A true and correct copy of GSC's business plan is attached hereto as Exhibit B.

36.     This business plan, which was provided to Plaintiff to encourage his investment in GSC, explained:

- GSC would be financed by a $6,000,000 investment from 12 EB-5 investors and a $3,000,000 investment from Gold Star;

- 12 Gold Star restaurants would be developed;

- Each restaurant would be "located within a 200-mile radius of Gold Star Chili's corporate headquarters";

- These restaurants would be located in a number of "target locations," in Ohio, Kentucky, and Indiana;

- These "target locations" were selected because of business and residential demographics that favor "low-cost, quick-serve restaurants";

- Investor funds would be released from escrow to the project by November 1, 2013;

- 3 Gold Star restaurants would be operational as of March 1, 2014, 6 restaurants by July 14, 2014, 9 restaurants by November 1, 2014, and 11 by March 1, 2015;

- Investors would be able to receive a visa to enter the United States in 2014 and would have a permanent Green Card by September 1, 2016;

- GSC would seek to return the EB-5 investors' funds "after the later of 3 years or once their I-829 applications have been approved by USCIS";

- GSC OPP would take commercially reasonable steps to value and sell subsidiary entities after the later of three years or once the GSC Limited Partners' I-829 applications were approved;

- GSC Limited Partners could "compel" GSC OPP to liquidate certain subsidiary entities and would receive 100% of the proceeds from this liquidation;

- GSC OPP, "with Gold Star Chili, Inc. as its managing member will oversee and control the disbursement of funds" from GSC to subsidiary entities "on a monthly basis once invested funds have been released from escrow"; and,

- A complex monthly draw process would be established to ensure that each disbursement of funds was necessary to accomplish GSC's purpose.

37.     GSC also provided interested investors, such as Plaintiff, with an "Agreement of Limited Partnership" ("Partnership Agreement") that states a number of terms.   A true and correct copy of the Partnership Agreement provided to Plaintiff is attached hereto as Exhibit C.

38.     The Partnership Agreement explains that GSC is controlled by GSC OPP as a General Partner.  The Partnership Agreement also details GSC's business purpose, and explains:

> The purpose and business of [GSC] shall be to invest in and/or loan money to various entities in Targeted Employment Areas that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owed [sic] subsidiaries to: (i) open and operate Gold Star Chili restaurant franchises in the Dayton-Cincinnati-Lexington region of Southwest Ohio and Kentucky, and (ii) own and lease real        estate        to        such        franchises[.]

This purpose was in accord with the terms of the GSC's business plan, which is attached as an exhibit to the Partnership Agreement.

39.     The Partnership Agreement defines a "Targeted Employment Area" as an area that has, "been designated by Steven R. Kelly or otherwise designated person(s) or entities by the Office of the Governor of the State of Ohio or Commonwealth of Kentucky that has experienced unemployment of at least 150% of the national average rate at the time a Limited Partner made his or her Capital Contribution."

40.     The Partnership Agreement states that investors, such as Plaintiff, will be admitted as a Limited Partner in GSC if they decided to invest.

41.     Importantly, no limited partner has "any right or power to take part in the management or control of the Partnership" under the Partnership Agreement.  Instead, GSC OPP

controlled the Partnership as its General Partner.

42.     GSC was designed to comply with EB-5 regulations as a vehicle for Plaintiff and other Limited Partners to obtain U.S. resident status. Plaintiff cannot be admitted into GSC if his I-526 petition is not approved. The Partnership Agreement mandates that Plaintiff's capital contribution be returned to him "within 90 days" if his I-526 petition is denied for any reason.

43.     Additionally, an EB-5 investor cannot be admitted to the partnership without the approval of the General Partner, GSC OPP.

44.     GSC OPP had a number of responsibilities under the Partnership Agreement. The "Management" section of the Partnership Agreement explains that GSC OPP "shall have the sole and exclusive right and responsibility to manage the business of the Partnership."

45.     GSC OPP must also care for GSC's funds, including Limited Partners' funds.

46.     Further, the "Duties and Obligations of [the] General Partner" section of the Partnership Agreement states that GSC OPP "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and its affiliates." This includes GSC OPP's responsibility to "segregat[e] Partnership assets" and to "not allow[] funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [GSC OPP] or any of its affiliates." This provision prohibits GSC OPP from engaging in self-dealing and bars GSC OPP from co-mingling GSC's assets with the assets of other companies. This section also explains that:

> The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Ohio . . . to protect the limited liability of the Limited Partners and to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance

with the provisions of [the Partnership Agreement] and applicable laws and regulations.

GSC OPP is accordingly required to take all actions necessary to ensure that GSC remains a valid entity and to accomplish GSC's purpose.

47.      GSC OPP must also ensure that "[a]ll property in the form of cash not otherwise invested" is deposited "for the benefit of the Partnership" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or left in escrow.

48.      The Partnership Agreement contains a section covering the dissolution and winding up of GSC if certain events occur ("Liquidating Events").  One of these Liquidating Events is the "happening of any . . . event that makes it unlawful, impossible or impractical to carry on the business of the Partnership."

49.      If a Liquidating Event occurs, the Partnership Agreement explains that GSC will continue to exist "solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Partners."  The Partnership Agreement also states that no Partner, including a General Partner, "shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of [GSC's] business and affairs" once a Liquidating Event occurs.

50.      The Partnership Agreement further requires that, once a Liquidating Event occurs, GSC OPP "shall": (1) take a full account of GSC's liabilities and property, (2) cause the property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and (3) distribute proceeds to creditors and other Partners.

51.      The Partnership Agreement requires that GSC OPP provide a notice of the occurrence of a Liquidating Event to a number of parties, including other Partners, within 30 days of that event occurring.

52.     The Partnership Agreement binds GSC OPP to specific performance of the contract, and explains that every Partner, including Plaintiff, "would be irreparably damaged if any of the provisions of this [Partnership] Agreement are not performed in their specific terms."

53.     Finally, the Partnership Agreement contains a Schedule of Partners ("Schedule"). This Schedule shows that GSC OPP, as the General Partner, will make a $3,000,000 capital contribution to GSC.

54.     This General Partner contribution was an essential and material representation to investors such as Plaintiff, as it indicated that EB-5 investments would not be the only basis of funding for GSC. Further, this contribution reduced Plaintiff's concerns that GSC OPP may breach the contract or abscond with investor funds, as GSC OPP would lose a substantial amount of funds if GSC failed.

55.     This schedule also says that 12 total EB-5 investors will be investing in the project, and that their combined investments will total $6,000,000.

56.      Overall, the Partnership Agreement says that $9,000,000 would be invested in GSC, and that Plaintiff's investment would represent 5.556% of all invested funds.

57.     Plaintiff signed a "Counterpart Signature Page and Attestation" on or before April 20, 2013, making him an investor in GSC.

## MATERIALS PROVIDED TO PLAINTIFF WERE FALSE

58.     As Plaintiff would later find out, the promotional booklet, business plan, and Partnership Agreement provided to him were false in significant and material ways. On or before May 7, 2013, GSC, GSC OPP, Gold Star, Mason Hill, Gary Chan, and Terry Chan knew that GSC would not be able to comply with a number of material representations contained in these documents.

13

59. For example, on May 7, 2013, Gold Star and Mason Hill executed GSC OPP's Management Agreement ("GSC OPP Operating Agreement"). A true and correct copy of the GSC OPP Operating Agreement is attached hereto as Exhibit D.

60. The GSC OPP Operating Agreement explained that Gold Star and Mason Hill were working to open and develop 6 Gold Star restaurants in Ohio, Kentucky, and Indiana.

61. The GSC Management Agreement also says that 5 EB-5 investors were expected to invest a total of $2,500,000 in GSC, a stark contrast from numerous representations made to Plaintiff that 12 EB-5 investors would invest a total of $6,000,000 in GSC.

62. Further, the GSC OPP Operating Agreement says that GSC OPP would only invest $1,250,000 in the project, and not $3,000,000 as noted in Plaintiff's promotional booklet, business plan, and Partnership Agreement.

63. Finally, the GSC OPP Operating Agreement says that GSC would be capitalized with $3,750,000 in total funds, not $9,000,000 as was represented to Plaintiff on numerous occasions.

64. In May 2013, GSC EB5 and Gary Chan, on behalf of Mason Hill, also executed an "Agreement of Limited Partnership of [GSC]," making GSC OPP a Limited Partner in GSC.

65. This Agreement contains many of the same representations stated in the GSC OPP Operating Agreement. A true and correct copy of the Agreement of Limited Partnership of GSC is attached hereto as Exhibit E.

66. Plaintiff was not informed about these significant differences in GSC before he became a GSC investor. He did not know, among other things, that: (1) GSC would purportedly build half of the restaurants that it had represented to him on numerous occasions; (2) that GSC would be capitalized in part by 5, and not 12, EB-5 investors; (3) that the entire project had only

$3,750,000 in financing and not $9,000,000; and, (4) that every GSC Limited Partner would have a 13.33% interest in GSC instead of a 5.556% interest.

67.     Plaintiff did not even know that GSC OPP was not a member of GSC at the time Plaintiff became a GSC investor.  GSC OPP did not execute a GSC partnership agreement until May 2013, which was after Plaintiff became a GSC investor.

68.     The Partnership Agreement provided to and executed by Plaintiff therefore contained numerous misrepresentations fraudulently designed to entice his investment.

## GOLD STAR WITHDRAWS FROM GSC

69.     GSC and GSC OPP were both created with the expectation that Gold Star restaurants could be developed quickly.  GSC's business plan called for 3 Gold Star restaurants to be opened by March 1, 2014, 6 restaurants by July 14, 2014, 9 restaurants by November 1, 2014, and 11 restaurants by March 1, 2015.

70.     GSC initially had some success developing restaurants.  A Gold Star Chili restaurant on Foreman Avenue in Lexington, Kentucky was developed in or about July 2013.

71.     A second Gold Star Chili restaurant opened in the Palomar shopping center in Kentucky in or about August 2013.

72.     Gold Star Chili restaurants in Cincinnati, Ohio and Florence, Kentucky were also developed by Gold Star on or before October 1, 2015.  It is not clear, however, if these were developed in connection with GSC.

73.     Tensions between Gold Star and the Chans eventually arose due to USCIS issues. Gary Chan, Terry Chan, and Mason Hill failed to timely ensure that GSC's business plan was approved by USCIS, and that USCIS approved GSC EB-5 investors.

74.     This delay was problematic because EB-5 investor funds could not be released

from escrow and used in the project without I-526 petition approval.  Gold Star therefore lacked the financing necessary to open and operate additional restaurants.

75.    On August 31, 2015, Gold Star, through GSC EB5, sent Mason Hill, Gary Chan, and Terry Chan a "Notice of Termination of Partnership EB5" via email or U.S. mail.  A true and correct copy of this August 31, 2015 notice is attached hereto as Exhibit F.

76.    GSC EB5 explained in this notice that it could not open and operate Gold Star Chili restaurants because it could not access the GSC investors' funds.  The delay caused by the lack of I-526 petition and business plan approval "made it practically impossible for [GSC EB5] to secure adequate locations for . . . additional Gold Star Chili franchise locations."  Gold Star terminated, or attempted to terminate, GSC OPP on August 31, 2015 as a result.

77.    GSC EB5's notice was addressed to a number of GSC Limited Partners, including Plaintiff.  This notice, however, was sent to each Limited Partner in the "care of" Mason Hill, which is controlled by Gary Chan and Terry Chan.  Thus, this notice was illusory as Mason Hill never provided the notice to Plaintiff.

78.    Despite the fact that it was "practically impossible" to perform the fundamental purpose of GSC, which is a Liquidating Event under the Partnership Agreement, GSC was not dissolved and still has not been dissolved.

79.    On October 8, 2015, counsel for Mason Hill, Terry Chan, and Gary Chan, informed Gold Star's counsel that Gold Star could not unilaterally dissolve GSC or GSC OPP.

80.    Gold Star, Mason Hill, Gary Chan, and Terry Chan thereafter began negotiating Gold Star's withdrawal from GSC and GSC OPP.   This was a lengthy process, and Gold Star did not withdraw from GSC OPP and GSC until, at the earliest, November 14, 2016.

81.     Gold Star did not want any GSC investors to be admitted as Limited Partners, or any GSC investor funds removed from escrow accounts, until Gold Star withdrew from GSC OPP and GSC.  Gold Star communicated this fact to Gary Chan, Terry Chan, and Mason Hill on and/or before August 3, 2016.

82.     Gary Chan, Terry Chan, and Mason Hill twice recognized this understanding.  On August 3, 2016, counsel, on behalf of Gary Chan, Terry Chan, and Mason Hill, wrote to Gold Star's counsel that "Terry and Gary are assuming that Gold Star would like to withdraw from [GSC and GSC OPP] prior to the admission of the Limited Partners . . . and the disbursement of funds from the escrow agent."  Gary Chan, Terry Chan, and Mason Hill's counsel reiterated this understanding in an email sent to Gold Star's counsel on August 11, 2016.   Gary Chan, Terry Chan, and Mason Hill made these representations knowing that they were false.

83.     On August 5, 2016, Gary Chan emailed or sent by U.S. mail a letter to U.S. Bank, National Association ("U.S. Bank"), the escrow agent for GSC, seeking to release GSC investor funds from escrow.  In this letter, Gary Chan stated that GSC wanted to release GSC investor funds, including Plaintiff's funds, from escrow "for the purposes of acquisition of real property, capital improvements, permanent improvements or purchase of equipment only."

84.     Pursuant to Gary Chan's request, U.S. Bank released Plaintiff's funds and the funds of another EB-5 investor from escrow on August 8, 2016.  The Chan's however, did not use Plaintiff's funds for the purposes represented to U.S. Bank.  Instead, as is demonstrated below, the Chans began converting Plaintiff's funds on August 10, 2016.

85.     On August 19, 2016, Gary Chan emailed or mailed via U.S. mail another letter to U.S. Bank.  In this letter, he again stated that GSC wanted to release one other GSC investor's

funds from escrow "for the purposes of acquisition of real property, capital improvements, permanent improvements or purchase of equipment only."

86. Pursuant to Gary Chan' request, U.S. Bank released the last GSC investor's funds from escrow on August 24, 2016. The Chans, however, did not use these funds for the purposes represented to U.S. Bank, as is detailed below.

87. Gold Star withdrew from GSC and GSC OPP on or after November 14, 2016. Prior to this time, Gold Star was still acting as GSC's General Partner while the Chans pilfered most, if not all, of GSC's funds. Gold Star, however, failed to detect the Chans' conduct and monitor GSC's funds despite having a duty to do so.

## THE CHANS USE AN ENTERPRISE TO CONVERT GSC INVESTOR FUNDS

88. As is noted above, Gary Chan transferred the Plaintiff's investment from escrow on August 8, 2016. These funds were transferred to a GSC account at First Financial Bank ("First Financial"). Gary, Terry, and/or Jacquelyn Chan opened this account earlier that month.

89. On August 10, 2016, Gary Chan wrote a check transferring $245,000 ($244,976 of which were Plaintiff's funds) from GSC's account to a First Financial account in the name of Jardin. This transfer did not comply with the draw procedure stated in GSC's business plan as it did not have the appropriate forms and was not reviewed by GSC's investment committee. This transfer was also made for improper purposes.

90. This unauthorized transfer was the first of many orchestrated by the Chans over a five month process, between August 10, 2016 and at least December 2016, during which time Plaintiff's funds were stolen and used for purposes that they were never intended and which Plaintiff never consented to.

91.     The Chans laundered these funds through a number of bank accounts owned by entities they controlled to disguise the source of these funds. These funds were then used by the Chan's to, among other things, enrich themselves, finance unrelated businesses, and pay the debts of the Chans and/or the businesses controlled by the Chans.

92.     The Chans generally laundered Plaintiff's funds through two different processes. The first process involved routing Plaintiff's funds through a number of bank accounts that belonged to various Chan entities that allegedly "managed" other "subsidiary" Chan entities. These bank accounts belonged to Mason Hill, Clearwater, and Jardin (the "Management Defendants"). The Chans routed Plaintiff's funds through Management Defendant bank accounts and then distributed these funds to themselves, affiliated businesses, or third parties to make it appear as if these funds were being paid by the Management Defendants.

93.     The Chans routed Plaintiff's funds through Management Defendant bank accounts to pay themselves directly for their alleged "services" to these entities. For example, as is noted above, $244,976 of Plaintiff's funds were transferred from GSC's bank account to an account belonging to Jardin on August 10, 2016. From there:

- On August 10, 2016, Gary Chan wrote a check to "CASH (Terry Chan)" for $12,800, which was paid from this Jardin bank account. That same day, $12,800 was deposited into a bank account belonging to Terry and Jacquelyn Chan.

- On August 10, 2016, $3,846.15 of Plaintiff's funds were transferred from this Jardin bank account to another Jardin bank account. That same day, Gary Chan cashed a check, payable to himself, for $3,846.15.

- On August 11, 2016, $200,000 of Plaintiff's funds were transferred from this Jardin bank account to a First Financial bank account belonging to Clearwater. On August 12, 2016, $21,000 of Plaintiff's funds were transferred from this Clearwater bank account to another Clearwater bank account. That same day, $8,768 of Plaintiff's funds were transferred to Jacquelyn Chan via a check, signed by Gary Chan, which was paid from this Clearwater account.

The Chans used Plaintiff's funds to purchase clothes, finance gambling expenses, and buy other personal goods. These transfers were not authorized under the Partnership Agreement or other applicable contract, and were made despite Gold Star's explicit instruction, and Defendants' confirmation, that no GSC Limited Partners' funds should be used until Gold Star withdrew from GSC and GSC OPP.

94. Overall, the Chan's transferred approximately $91,794 of Plaintiff's funds directly to themselves or their family members within approximately one month of these funds being released from escrow. Between August 10, 2016 and September 2, 2016, Jacquelyn Chan received approximately $34,506 of Plaintiff's funds, Terry Chan received approximately $31,982 of Plaintiff's funds, and Gary Chan received approximately $18,530 of Plaintiff's funds.

95. Further, Gary Chan utilized $2,278 of Plaintiff's funds to pay off personal debts, $3,200 of Plaintiff's funds were transferred to one of the Chans' family members, and $1,297 of Plaintiff's funds were withdrawn by one or all of the Chans in cash transactions.

96. Approximately $67,248 of Plaintiff's funds were used by the Chans to pay various Clearwater payroll, tax, and 401k contributions from Clearwater bank accounts. Most, if not all of these funds were used to benefit the Chans and not in furtherance of GSC.

97. The Chans therefore wrongfully converted at least $159,042 of Plaintiff's funds to benefit themselves or close family members, largely by laundering Plaintiff's funds through these Management Defendant bank accounts.

98. The Chans also paid a number of expenses unrelated to GSC's purpose using Plaintiff's funds paid from the Management Defendants' bank accounts. For example, on August 17, 2016, the Chans transferred Plaintiff's funds from one Jardin bank account to another. From there, the Chans transferred approximately $100 to "Lexington Law."

99.     John C. Health, PLLC d/b/a Lexington Law is a law firm that specializes in credit repair services.  Lexington Law attempts to ensure that an individual's credit reports are "fair, accurate, and substantiated."

100.    There is no legitimate reason why Plaintiff's funds should have been directed to Lexington Law for credit repair.  Instead, the Chans directed Plaintiff's funds to Lexington Law to rehabilitate their personal credit report(s).

101.    Similarly, on September 7, 2016, $3,000 of Plaintiff's funds were directed from one Jardin account to another Jardin account.  From there, the Chans paid a number of personal expenses, including credit card purchases, airfare, hotel costs, meal expenses and travel insurance policies.  These expenses were completely unrelated to GSC's purpose, had no business justification, and provided no benefit to Plaintiff or other Limited Partners.  Instead, bank records appear to demonstrate that Plaintiff's funds were used to finance a personal vacation to Destin, Florida.

102.    These transactions represent a small amount of Plaintiff's funds that were laundered to and paid from Management Defendant accounts.  For example, bank records show: (1) nearly $10,000 of Plaintiff's funds were routed to and paid from a Clearwater account to Grooms Road Complex, LLC, an entity that owns an industrial warehouse in Blue Ash, Ohio; (2) approximately $10,664 of Plaintiff's funds were routed to and paid from Clearwater and Jardin bank accounts to law firms for legal expenses unrelated to the operation of GSC; and, (3) thousands of dollars of Plaintiff's funds were routed to and paid from Clearwater and Jardin bank accounts for security expenses, cable and phone bills, heating and cooling bills, and uniform expenses even though GSC had no operations, restaurants or employees.

103. The second process used by the Chans to launder Plaintiff's and other GSC EB-5 investors' funds was related to Rodizio Grill restaurants owned, operated, and/or controlled by the Chans. The Chans routed Plaintiff's funds first through bank accounts belonging to the Management Defendants. These funds were then generally routed to a bank account belonging to LPCF. From there, Plaintiff's funds were routed to bank accounts belonging to RG MGMT and RG OPP (the "Rodizio Defendants").

104. The Chans then paid Rodizio Grill expenses, employee salaries, and other costs from these accounts to make it appear as if these funds were legitimately derived from Rodizio Grill business activities or investments. For example, Plaintiff's funds were used to pay:

- Approximately $50,133 to Phoenix, the franchisor of Rodizio Grill restaurants. $50,000 of this total amount was transferred to Phoenix in two $25,000 checks paid on August 25, 2016. The memo line on the first check notes that it was for the "Franchise Fee for RG Cleveland South," and the memo line on the second check notes it was for the "Franchise Fee for RG Carmel." The Chans, through Clearwater, RG MGMT, and/or RG OPP, own, operate, and/or control Rodizio Grill restaurants in Carmel, Indiana and Cleveland, Ohio;

- Approximately $32,130 to Padre Grill, LLC for various Rodizio Grill operating costs, including $16,065 paid on August 24, 2016 for "First Month's rent for Rodizio Grill – Carmel," and another $16,056 paid on August 24, 2016 for "Security Deposit for 2376 W 116th, Carmel – Rodizio Grill";

- Approximately $46,623 to Beckman Weil Shepardson, LLC, which was used to finance, in part, an equipment purchase for "RG Opportunities I, LP";

- Approximately $62,477 to ADP for various payroll, tax, and 401k expenses for Rodizio Grill employees, including a $38,000 wire transfer for the benefit of "RG Opportunities I, LP"; and,

- Approximately $10,637 in Ohio sales taxes incurred by Rodizio Grill restaurants.

All of the transfers of investor funds to and from Rodizio Grill-affiliated accounts were completely unrelated to GSC's purpose and therefore inappropriate. They also violated provisions in the Partnership Agreement that prohibited the co-mingling of funds.

22

105. Overall, banking records demonstrate that the Chans have used these two money laundering processes to: (1) enrich themselves in excess of hundreds of thousands of dollars; (2) pay gambling expenses; (3) finance a number of personal vacations; (4) pay legal fees related to another EB-5 investor lawsuit; (5) pay personal credit cards; and, (6) pay the business expenses of a number of unaffiliated businesses. These banking records demonstrate that the Chans used GSC as their own personal pocketbook.

### GSC CHANGES ITS FOCUS AND PLAINTIFF ATTEMPTS TO WITHDRAW

106. On or about May 7, 2015, Plaintiff's I-526 petition was approved. Accordingly, under the terms of the Escrow Agreement, Plaintiff should have been approved as a Limited Partner and his funds should have been released to the Partnership at that time.

107. On March 10, 2016, Plaintiff, through his immigration counsel, Pan-Pacific Immigration Law Group ("Pan-Pacific"), sent an email to Gary and Terry Chan asking for an audited financial report and an update regarding GSC. Pan-Pacific explained that they wished to receive a project update and assurances that Plaintiff's investment was safe. Pan-Pacific also asked that Gary and Terry Chan respond by March 17, 2016. A true and correct copy of the March 10, 2016, email is attached hereto as Exhibit G.

108. The March 17, 2016, deadline passed with no response from Gary and Terry Chan, so Pan-Pacific followed up with another email on March 29, 2016.

109. Terry Chan replied to Pan-Pacific's March 29, 2016 email later that same day, noting that he would respond to Pan-Pacific's requests by the end of the week and that GSC investors' funds were "in escrow for the GSC project."

110. Eventually, Terry and Gary Chan responded to Plaintiff's inquiries. In a letter dated April 13, 2016, more than one month after Plaintiff's initial email, GSC's counsel

23

explained that investor funds were still in an escrow account.  The reason for this was because GSC OPP purportedly had "decided to no longer participate in the Partnership and the proposed activities" of GSC.  The letter further noted:

> [Gold Star] was to provide the Partnership with locations for development of Gold Star Chili franchises and capital for development.  It decided, subsequent to receipt of . . . subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement.  The decision to withdraw from the Partnership has left the Partnership, with Mason Hill, LLC, as the only active member, with limited choices.

This letter did not explain when Gold Star had made these decisions, nor if GSC would seek to hold Gold Star liable for its breach of the Partnership Agreement.  A true and correct copy of the April 13, 2016, letter is attached hereto as Exhibit H.

111.    These statements were false.  Gold Star had already developed at least two Gold Star restaurant sites pursuant to the Partnership Agreement before this letter was sent.

112.    The Chans knew this fact, and even attempted to acquire these restaurants when first negotiating Gold Star's withdrawal from GSC and GSC OPP in 2015.  Further, Mason Hill was not the only active member of GSC OPP at that time because Gold Star remained involved with GSC and GSC OPP until at least November 14, 2016.

113.    Gold Star's decision to abandon the project was a Liquidating Event under the Partnership Agreement, as it was an "event that makes it unlawful, impossible or impractical to carry on the business of the Partnership."  GSC should have been liquidated when Gold Star decided to leave GSC in 2015.

114.    Instead of immediately liquidating the Partnership, this April 13, 2016 letter said that GSC OPP thought that two options remained on the table.  The first option was to "terminate the Partnership" and return funds to the investors.  The second option was to "utilize the funds in

the Partnership to invest in restaurants other than Gold Star franchises pursuant to a business plan similar to another project involving entities affiliated with Terry and Gary Chan."

115.    The business plan discussed in this letter appeared to involve the construction and operation of Buffalo Wings & Rings ("BWR") restaurants in the Pittsburgh, Pennsylvania area. Attached to this letter was a Private Placement Memorandum ("PPM") for Buffalo Wings & Rings Pittsburgh Opportunities, L.P. ("Pittsburgh Project"). This PPM stated that Defendants Terry Chan and Jacquelyn Chan were managing a project to fund and operate five BWR restaurants in Pennsylvania.

116.    The April 13, 2016 letter further stated that, while USCIS had approved the I-526 petition of an investor in the BWR Pennsylvania project, that GSC would not offer any opinion on the impact that investment in a BWR project would have on the status of the GSC EB-5 investors' standing with USCIS. The letter also said "[t]hat there is no assurance that investing in these other restaurants will result in the creation of sufficient jobs" to comply with immigration requirements.[1] This uncertainty undercut a fundamental purpose of GSC, which was to allow foreign investors to participate in the EB-5 immigration process through an investment in the Partnership.

117.    On July 27, 2016, approximately three months later, Pan-Pacific received another letter from GSC's counsel. This letter reiterated that Gold Star would no longer continue to be a member of GSC OPP, and explained that Gold Star "will not provide any economic contributions or support" to any restaurants GSC may decide to build. A true and correct copy the July 27, 2016, letter is attached hereto as Exhibit I.

---

[1] A substantial risk of Plaintiff investing in the Pittsburgh Project was that USCIS could view the change in investment as a material change in Plaintiff's immigration application and thereby revoke the I-526 approval.

118.    These statements were false.  Gold Star had provided economic contributions to GSC and had developed at least two restaurant locations in Kentucky.  Further, Gold Star was still a member of GSC and GSC OPP.

119.    Although the fundamental purpose of GSC was no longer possible, Defendants were adamant that they wanted to build BWR restaurants using GSC funds.  The letter explained that there were "imminent time sensitive time opportunities to build" at least one BWR restaurant.  Defendants did not provide any details about the location of this restaurant, whether the restaurant would comply with GSC's stated purpose, or the costs associated with building this restaurant in this letter.

120.    Defendants, ignoring the terms of the Partnership Agreement, explained that funds generated from the investments of Limited Partners in GSC (which amounted to $1,500,000 at that time), such as Plaintiff, would be the primary source of capital for the project. The General Partner would make *zero* contributions to the BWR project unless the Limited Partners' funds were "not sufficient to successfully complete and open" a BWR restaurant.  Only then would the General Partner provide funds.

121.    Defendants' letter cleverly hid the fact that the General Partner would have zero financial liability if the project were to fail, and that GSC investor funds were the only source of capital for GSC.  Gold Star's supposed removal from GSC therefore not only barred the very purpose of GSC from being completed, but also withdrew the single largest source of funding from GSC.  Defendants completely failed to advise Plaintiff about the ramification of Gold Star's withdrawal from GSC and about the consequences of this reduced capital.

122.     Finally, this letter stated that GSC would "invest in wholly owned subsidiaries that would operate two restaurant sites."  This letter did not indicate whether GSC or any GSC-affiliated company would own the properties where these BWR restaurants were located.

123.     This omission was crucial, as one of GSC's business purposes, as stated in the Partnership Agreement, was to "own and lease real estate to [Gold Star] franchises."  Ownership of properties protected GSC's investors, as they could liquidate subsidiary entities, including those that owned real property, to refund some or all of their investment.

124.     Defendants, implicitly acknowledging the problems the change in business purpose would have to Plaintiff's immigration application, represented to Plaintiff that Defendants had sought the advice of immigration counsel.  Counsel allegedly informed Defendants "that a change of the Partnership's brand of restaurant is not a material change under the USCIS Regulations."

125.     However, Defendants failed to provide an actual opinion letter from this purported immigration counsel or any other support for that advice, and failed to inform Plaintiff whether the change in the *location* of the investment would be a material change under USCIS regulations.  Thus, Defendants' proposed changes to GSC's purpose was not only inconsistent with the Partnership Agreement, but also threatened Plaintiff's ability to secure a Green Card.

126.     No prospectus, discussion of prospective investment, PPM, or details regarding the proposed BWR project was provided to Plaintiff with this July 27, 2016 letter.  Defendants, adamant that they were going to use Plaintiff's investment proceeds to invest in the BWR restaurants with or without Plaintiff's consent, gave Plaintiff a deadline of August 10, 2016, to withdraw from the Partnership.

127. On August 11, 2016, Pan-Pacific received an email from Defendants' counsel advising that GSC was moving forward with developing BWR locations, and that it would begin to release investor funds from escrow. However, Plaintiff's funds were released from escrow on August 8, 2016, and the Chans started converting Plaintiff's funds on August 10, 2016.

128. On September 2, 2016, after Defendants took Plaintiff's investment proceeds without his consent, Gary Chan sent a letter to Plaintiff and other investors via email informing them, for the first time, about the details of the proposed BWR project. Notably, this letter indicated that Defendants were planning on constructing and operating two potential BWR projects in Orlando, Florida; not in the Pittsburgh area as previously represented to Plaintiff. A true and correct copy of this letter is attached hereto as Exhibit J.

129. Notably, this letter represented that the three Limited Partners' funds, totaling $1,500,000, "remain[ed] in the partnership." This statement was false, as the Chans had already converted a over $100,000 of Plaintiff's funds to directly benefit themselves by September 2, 2016.

130. Attached to this letter is some information about one of these potential BWR restaurants, which mainly focused on the location of the restaurant and the characteristics of the surrounding area. No information was provided about the management, construction, or operation of this BWR restaurant. Plaintiff was also not provided with a PPM, subscription agreement, or other type of document discussing the proposed investment in the Orlando restaurant. Additionally, Defendants failed to provide any assurances that investing into a single BWR franchise in Orlando, Florida would meet EB-5 program regulations.

131. Accordingly, the Chans, without obtaining Plaintiff's consent and with Gold Star's acquiescence and/or involvement, transformed GSC from a partnership focused on

building multiple Gold Star restaurants in Kentucky, Ohio, and Indiana to a partnership focused on building one BWR location in Orlando, Florida. This transformation fundamentally breached the Partnership Agreement and the promises Defendants had made to Plaintiff.

132. On September 23, 2016, Pan-Pacific, on behalf of Plaintiff, contacted USCIS to inform them that Plaintiff had decided to withdraw his I-526 petition. USCIS revoked Plaintiff's I-526 petition on November 16, 2016.

133. On November 11, 2016, Plaintiff sent Gary Chan an email saying that he wanted to withdraw from GSC and have all of his funds returned. This request was based on GSC OPP's, Mason Hills', Gary Chan's, Terry Chan's, and Gold Star's breach of the Partnership Agreement, and on medical expenses Plaintiff was facing.

134. Gary Chan responded to this email on November 12, 2016, and attempted to set up a time that he and Plaintiff could discuss the matter.

135. Gary Chan refused to provide any comment about the reimbursement of Plaintiff's funds until December 12, 2016. On December 12, 2016, Gary Chan sent Plaintiff an email explaining that "it is not so easy to send you money from your invested funds immediately since they have already been invested in the project."

136. However, this statement was false. The Chans did not invest Plaintiff's funds in the project; rather, they converted the funds for their personal use and for the other business entities they controlled.

137. Plaintiff repeatedly attempted to talk to Gary Chan about the refund of his investment between December 12, 2016 and the middle of January 2017. However, Gary Chan evaded Plaintiff and refused to provide any firm commitment to a return of Plaintiff's money.

138.     On or about January 18, 2017, Plaintiff and Gary Chan discussed the return of Plaintiff's funds via telephone. During this conversation, Gary Chan told Plaintiff that he would draft a contract for the return of Plaintiff's funds.

139.     Plaintiff sent Gary Chan an email on January 29, 2017 asking for this contract. On January 30, 2017, Gary Chan responded and said that he hoped to have the contract done in the next day or so. No contract has ever been drawn up.

140.     Plaintiff did not receive any additional updates about this project until July 1, 2017. On that day, Gary Chan, on behalf of GSC OPP, sent a letter via email to GSC investors. This July 1, 2017 email contained a number material misrepresentations designed to conceal the Chans' fraudulent conduct. This email was written to deceive GSC investors and have them believe that GSC Limited Partner' funds were invested in the construction of a BWR restaurant in Orlando. However, the Chans had completely converted these funds months earlier. Moreover, the Chans never commenced construction of a BWR restaurant in Orlando. In fact, despite the investment of $1,500,000 in EB-5 funds, the restaurant location remains an undeveloped and abandoned shell of a former Bennigan's restaurant that has been closed for many years.

141.     This letter was written in a way that suggested that GSC Limited Partners' funds were invested in the construction of a BWR restaurant even though the Chans had completely converted these funds months earlier.

142.     At the end of this July 1, 2017 emailed letter was a signature block where limited partners could sign to "acknowledge that they ha[d]" received this letter and "are in agreement with the amended direction" of GSC. This came months too late, as GSC Limited Partners were

not given the opportunity to affirmatively consent to GSC's purported "new" direction until after their funds were converted by the Chans.

143.    In July 2017, the Chans also sent Plaintiff, via U.S. Mail or email, a business plan that stated, among other things:

- That GSC would operate one BWR restaurant in Orlando, Florida, although the business plan later said that GSC would operate 5 restaurants;

- GSC OPP would contribute $3,000,000 in equity to five BWR restaurant locations, although the business plan later says that GSC OPP would only provide $750,000;

- GSC would seek to return Limited Partner funds on the later of the three-year anniversary of their I-526 approval or once their I-829 application was approved by USCIS; and,

- Funds would be disbursed from GSC only through a complex draw process coordinated by GSC OPP.

144.    The BWR business plan also contained an alleged budget that detailed how funds were supposedly spent on the BWR restaurant up to that point in time.  This purported budget was materially false, as GSC investor funds had already been completely depleted by the Chans.

145.    Finally, on August 31, 2017, GSC sent Plaintiff, via U.S. Mail or email, another alleged project update for the Orlando BWR restaurant.  This update included a number of materials and, once again, a completely false and misleading project budget.

146.    Despite numerous requests, Plaintiff's funds have not yet been returned.

**<u>CONSTRUCTION OF THE FLORIDA BWR RESTAURANT</u>**

147.    Defendants' representation in the July 27, 2016 letter that there were "imminent opportunities" to develop two BWR restaurants in Orlando, Florida was false when it was made. Bank records, construction permits, and the current status of the BWR restaurant all demonstrate that the Chans are nowhere near opening a BWR restaurant.

148.    In fact, the Chans, through Clearwater, did not file a building permit application for the construction of a restaurant until February 28, 2017, more than seven months after the July 27, 2016 letter.

149.    In this application, Jacquelyn Chan is noted as the owner of the property, and "RG Opportunities" is listed as the coordinating company. Despite this language, the Chans and GSC do not own the property, but are instead leasing it from an unaffiliated company.

150.    This permit application expired on October 7, 2017, after a number of deficiencies were identified on the property and were not corrected.

151.    A second permit application for this property was filed on April 5, 2017. Clearwater is listed as the owner of the property in this application, although it does not own the property itself.

152.    A building permit for this property was issued on August 11, 2017, clearing the way for the construction of a BWR restaurant. The property, however, failed an inspection on August 24, 2017.

153.    On August 29, 2017, a Clearwater check to the Orange County Division of Building Safety for $5,272.03 was also returned for insufficient funds.

154.    On September 25, 2017, the general contractor for this project withdrew. In a communication to the Orange County Division of Building Safety, the general contractor explained that Clearwater was "not following through with their responsibilities as owner[.] I do not want to be associated with such firm."

155.    The building permit was cancelled on September 25, 2017, and a stop work order was issued on September 26, 2017.

156.    On October 12, 2017, over one year after the July 27, 2016 letter and Plaintiff's funds were released from escrow, the property's landlord applied for a third building permit to convert the property to a BWR restaurant.

157.    However, no substantial progress has been made on the conversion of the property, as demonstrated by the true and accurate photos of the property taken on October 25, 2017, attached hereto as Exhibit K.

158.    Importantly, given that GSC's funds were depleted by the Chans in December 2016, it appears that the Chans are financing the BWR project through another funding source. Upon information and belief, the Chans have been converting the funds of non-GSC investors, businesses, or other resources to finance this BWR restaurant construction.

## PHOENIX RECEIVED FRAUDULENT TRANSFERS OF PLAINTIFF'S FUNDS

159.    Phoenix received approximately $52,655.60 of Plaintiff's funds that were fraudulently transferred to it by the Chans.

160.    On August 5, 2016, Gary Chen sent a letter or email to U.S. Bank seeking to release Plaintiff's funds from escrow.  On August 8, 2016, Plaintiff's funds were released from escrow and deposited into a bank account belonging to GSC.

### First Transfer to Phoenix

161.    On August 10, 2016, Gary Chan prepared and signed a check transferring $244,976 of Plaintiff's funds from this GSC account to an account belonging to Jardin.

162.    On August 11, 2016, Gary, Terry, and/or Jacquelyn Chan caused $200,000 of Plaintiff's funds to be wired from this Jardin account to an account belonging to Clearwater.

163.     On August 12, 2016, Gary, Terry, and/or Jacquelyn Chan caused $20,000 of Plaintiff's funds to be wired from this Clearwater account to an account belonging to LPCF, then to an account belonging to RG MGMT, and then to an account belonging to RG OPP.

164.     On August 17, 2016, Gary, Terry, and/or Jacquelyn Chan caused $1,080.71 of Plaintiff's funds to be wired from this RG OPP account to another RG OPP account.  Gary, Terry, and/or Jacquelyn Chan thereafter wired $130.96 of Plaintiff's funds from this RG OPP account to Phoenix.

### Second and Third Transfers to Phoenix

165.     On August 22, 2016, Gary, Terry, and/or Jacquelyn Chan caused $146,743.91 of Plaintiff's funds to be wired from GSC's account to an account belonging to Jardin.

166.     That same day, Gary, Terry, and/or Jacquelyn Chan caused $146,743.91 of Plaintiff's funds to be wired from Jardin's account to an account belonging to Clearwater, then to an account belonging to LPCF, next to an account belonging to RG MGMT, and then to an account belonging to RG OPP.

167.     On August 24, 2016, Gary, Terry, and/or Jacquelyn Chan caused $34,654.64 of Plaintiff's funds to be wired from this RG OPP account to an account also belonging to RG OPP. From there, Gary, Terry, and/or Jacquelyn Chan caused $2,524.64 of Plaintiff's funds to be wired to Phoenix in two separate transfers.

### Fourth and Fifth Transfers to Phoenix

168.     On August 22, 2016, Gary, Terry, and/or Jacquelyn Chan caused $146,743.91 of Plaintiff's funds to be wired from GSC's account to an account belonging to Jardin.

169.     That same day, Gary, Terry, and/or Jacquelyn Chan caused $146,743.91 of Plaintiff's funds to be wired from Jardin's account to an account belonging to Clearwater, then to

an account belonging to LPCF, next to an account belonging to RG MGMT, and then to an account belonging to RG OPP.

170. On August 25, 2016, Gary, Terry, and/or Jacquelyn Chan caused $63,640.32 of Plaintiff's funds to be wired from this RG OPP account to an account also belonging to RG OPP. From there, Gary, Terry, and/or Jacquelyn Chan caused $50,000 of Plaintiff's funds to be wired to Phoenix in two separate transfers.

171. On August 25, 2016, a $25,000 check prepared and signed by Gary Chan was paid to Phoenix. The memo line on this check notes that this check was for the "[f]ranchise fee for RG Cleveland South."

172. On August 25, 2016, a second $25,000 check prepared and signed by Gary Chan was paid to Phoenix. The memo line on this check notes that this check was for the "[f]ranchise fee for RG Carmel."

173. Phoenix therefore received approximately $52,655.60 of Plaintiff's funds that were fraudulently transferred to it by the Chans.

174. Further, upon information and belief based on a review of applicable bank records, Phoenix received thousands of dollars belonging to other GSC limited partners in a number of fraudulent transfers.

### Count I – Violation of 18 U.S.C. § 1962(a)

### (Terry Chan, Gary Chan, and Jacquelyn Chan)

175. Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

176. 18 U.S.C. § 1962(a) prohibits any person who has received any income derived from a pattern of racketeering activity in which that person had participated in as a principal from using or investing, directly or indirectly, "any part of such income, or the proceeds of such

income, in acquisition or any interest in, or the establishment or operation of" any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

177.    The Chans engaged in a pattern of racketeering activity, including participating in bank fraud, mail fraud, wire fraud, money laundering, orchestrating monetary transactions involving the proceeds of unlawful activity, and the transmission, transference, and transportation of stolen goods.

178.    Bank fraud, which is prohibited under 18 U.S.C. § 1344, occurs when one engages in a scheme or artifice to obtain moneys and/or funds under the custody and control of bank by means of false or fraudulent pretenses, representations, or promises.

179.    Gary Chan committed bank fraud on at least two occasions. On August 5, 2016 and August 19, 2016, Gary Chan sent a letter to U.S. Bank saying GSC wanted to release GSC investor funds, including Plaintiff's funds, from escrow "for the purposes of acquisition of real property, capital improvements, permanent improvements or purchase of equipment only."

180.    These representations were false, as the Chans did not intend to use Plaintiff's funds, and the funds of other GSC investors, for those purposes.

181.    Further, Gold Star, which controlled GSC, did not want these funds released from escrow. Since Gold Star had not consented to Plaintiff's admission into GSC, Plaintiff was not a GSC Limited Partner at that time and his funds could not be released from escrow under the Partnership Agreement.

182.    These representations were part of the Chans' scheme or artifice to defraud not only Plaintiff and other GSC limited partners, but also U.S. Bank. Gary Chan's statements caused U.S. Bank to release Plaintiff's funds, and the funds of other GSC investors, from escrow. While in escrow, these funds were in the custody and control of U.S. Bank.

183.    The Chans also engaged in multiple instances of mail fraud to carry out their fraudulent scheme.  Mail fraud, which is prohibited under 18 U.S.C. §1341, occurs when one uses the U.S. mails to carry on a scheme or artifice to defraud, or to obtain money by means of false or fraudulent representations.

184.    The Chans caused at least the following to be mailed: (1) the April 13, 2016 letter from the Chans' counsel to Plaintiff's immigration counsel; (2) the July 27, 2016 follow-up letter sent by Chans' counsel to Plaintiff's immigration counsel; (3) the August 5, 2016, email and/or letter Gary Chan mailed and/or sent to U.S. Bank; (4) the August 19, 2016, email and/or letter Gary Chan mailed and/or sent to U.S. Bank; (5) the July 1, 2017 letter from GSC OPP to GSC's Limited Partners, which was signed by Gary Chan; (6) the first BWR project update sent via email or U.S. mail in July 2017; and, (7) the second BWR project update sent via email or U.S. mail in August 2017.

185.    This list is not exhaustive, as the Chans' likely used the mails to further their scheme or artifice to defraud in other ways by, among other things, mailing checks to third parties, sending false materials, and obtaining construction permits.

186.    The Chans' use of the U.S. mail was designed to carry on their scheme or artifice to defraud, and to obtain money by means of false or fraudulent representations.  The Chans used the U.S. mail to convince Plaintiff that he should not withdraw his funds from GSC, encourage U.S. Bank to release Plaintiff's funds from escrow, and hide the fact that the Chans had converted all of GSC's funds.

187.    The Chans also engaged in multiple instances of wire fraud to carry out their fraudulent scheme.  Wire fraud, which is prohibited under 18 U.S.C. §1341, occurs when one: (1) transmits, or causes something to be transmitted, (2) by means of wire, radio, or television,

(3) writings or sounds, (4) for purposes of executing a scheme or artifice to defraud.

188.     The Chans transmitted or caused the following transmissions discussed herein: (1) the August 3, 2016, email from the Chans' counsel to Gold Star's counsel; (2) the August 5, 2016, email and/or letter Gary Chan sent to U.S. Bank; (3) the August 11, 2016, email from Chans' counsel to Gold Star's counsel; (4) the August 11, 2016, email from the Chans' counsel to Plaintiff's immigration counsel; (5) the August 19, 2016, email and/or letter Gary Chan sent to U.S. Bank; (6) the September 2, 2016 letter sent via email by Gary Chan to Plaintiff; (7) a November 12, 2016 email from Gary Chan to Plaintiff; (8) a November 20, 2016, email from Gary Chan to Plaintiff; (9) a November 30, 2016, email from Gary Chan to Plaintiff; (10) a December 2, 2016 email from Gary Chan to Plaintiff; (11) a December 6, 2016 email from Gary Chan to Plaintiff; (12) a December 7, 2016 phone call between Gary Chan and Plaintiff; (13) a December 12, 2016 email from Gary Chan to Plaintiff; (14) a December 24, 2016, email from Gary Chan to Plaintiff; (15) a January 14, 2017 email from Gary Chan to Plaintiff; (16) a January 17, 2017 email from Gary Chan to Plaintiff; (17) a January 18, 2017 or January 19, 2017 telephone conversation between Gary Chan and Plaintiff; (18) a January 30, 2017 email from Gary Chan to Plaintiff; (19) the first BWR project update sent via email or U.S. mail in July 2017; and, (20) the second BWR project update sent via email or U.S. mail in August 2017.

189.     The transmissions detailed above are not exhaustive, as the Chans undoubtedly used the wires on a number of other occasions to carry out their scheme.

190.     The Chans' use of email and telephone was designed to carry out their fraudulent scheme or artifice to defraud.   These transmissions were sent to, among other things, convince Plaintiff that he should not withdraw his funds from GSC and hide the Chans' wrongful conduct.

191.     Additionally, the Chans engaged in money laundering to further their fraudulent

scheme.  Money laundering, which is prohibited under 18 U.S.C. § 1957, requires one to conduct financial transactions: (1) knowing that the funds were derived from specified unlawful activity; (2) with the intent to promote the carrying on of specified unlawful activity; and, (3) knowing that these transactions were designed to conceal or disguise the nature, location, source, ownership, or control of these funds.

192.    As is discussed above, the Chans knew Plaintiff's funds were derived from, among other things, bank fraud, mail fraud, and wire fraud.

193.    Knowing this information, the Chans engaged in hundreds, if not thousands, of individual financial transactions designed to promote the carrying on of unlawful activity.

194.    The Chans routed Plaintiff's funds through Jardin, Clearwater, Mason Hill, LPCF, RG MGMT, and RG OPP bank accounts for a clear purpose—to disguise the nature, location, source, ownership, or control of these funds.

195.    The Chans likewise engaged in monetary transactions in property derived from specified unlawful activity, which is prohibited under 18 U.S. § 1957.  Specifically, the Chans knowingly engaged, or attempted to engage, in a number of monetary transactions that involved criminally derived property that was both valued greater than $10,000.

196.    For example, the Chans, through bank fraud, caused U.S. Bank to release $500,080 of Plaintiff's funds from escrow on August 8, 2016, $500,160 of another GSC Limited Partners' funds from escrow on August 8, 2016, and $500,000 of a final GSC Limited Partners' funds from escrow on August 24, 2016.  The Chans knew that these funds were derived from not only bank fraud, but also mail and wire fraud.

197.    These were not the only qualifying transactions, as bank records demonstrate that the Chans orchestrated hundreds of financial transactions over $10,000 that were designed to

launder GSC Limited Partners' funds.

198.    Likewise, the Chans transmitted, transported, or transferred in interstate or foreign commerce goods, wares, or money in the value of $5,000 or more with knowledge that the same was stolen, converted, or taken by fraud, which is prohibited under 18 U.S. § 2314.

199.    As is detailed above, the Chan's caused Plaintiff's funds to be transmitted interstate knowing that these funds were stolen, converted, or taken by fraud.  For example, on August 25, 2016, the Chans caused $50,000 of Plaintiff's funds to be sent to Defendant Phoenix in Sandy, Utah in two separate checks.  The Chans also transmitted Plaintiff's funds to persons and entities in numerous other states, including California, New York, and Florida.  These examples represent a small fraction of the interstate transfers of funds caused by the Chans.

200.    All of the acts detailed above were carried out in the last 10 years.

201.    The Chans orchestrated a complex enterprise to carry out their scheme or artifice to defraud.  The Chans used certain Chan Entities, and their bank accounts, to invest Plaintiff's funds in other enterprises engaged in interstate or foreign commerce.

202.    For example, the Chans used Plaintiff's funds to finance the opening of Rodizio Grill restaurants in or around Cleveland, Ohio and Carmel, Indiana.  Plaintiff's funds were also used to finance the operation of at least one other Rodizio Grill restaurant in Ohio.

203.    The enterprises financed by the Chans are engaged in interstate and foreign commerce.

204.    The Chans' use of Plaintiff's funds, and other GSC Limited Partners' funds, to finance the operation of unrelated enterprises significantly harmed Plaintiff.  Among other things, the Chans' depletion of GSC's assets caused GSC to be functionally insolvent and prevented a BWR restaurant from being constructed with GSC's funds.

205.    The Chans' use of these funds also harmed Plaintiff because, upon information and belief, the Chans financed the partial construction of the Orlando, Florida restaurant using funds that were inappropriately obtained from other non-GSC investors or businesses.  This further compromises the viability of GSC.

206.    As a direct and proximate result of Defendants' RICO violation(s), Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

### Count II – Violation of 18 U.S.C. § 1962(b)

### (Terry Chan, Gary Chan, and Jacquelyn Chan)

207.    Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

208.    18 U.S.C. § 1962(b) prohibits any person, through a pattern of racketeering, from "acquir[ing] or maintain[ing], directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

209.    As is detailed above, the Chans engaged in a pattern of racketeering activity to carry out their scheme or artifice to defraud.  This pattern included: (1) at least 2 instances of bank fraud, (2) numerous instances of mail fraud; (3) many instances of wire fraud; (4) hundreds, if not thousands, of instances of money laundering; (5) hundreds of transactions in property derived from unlawful activity; and, (6) at least dozens of instances of the transmission, transportation, or transference of goods, wares, or money with the knowledge that the same was stolen, converted, or taken by fraud.

210.    Each of these acts occurred within the last 10 years.

211.    The Chans used this pattern of racketeering activity to take control of GSC and GSC OPP, which were both initially controlled by Gold Star.

212.    For example, through the use of the mail and/or wires, the Chans convinced Gold Star against liquidating GSC when it was no longer possible to complete GSC's purpose.

213.    The Chans further convinced Gold Star, through the use of the mail and/or wires, to exit both GSC and GSC OPP so GSC could purportedly construct and operate a BWR restaurant in Orlando, Florida.

214.    The Defendants' use of a pattern of racketeering activity allowed the Chans to acquire or maintain control of GSC and GSC OPP, which was vital to the Chans' fraudulent scheme.

215.    This enterprise is engaged in and performed activities that affected interstate or foreign commerce.

216.    The Chans' acquisition and maintenance of control over GSC and GSC OPP caused Plaintiff harm, as it provided the Chans with the opportunity to convert his investment and to cover up this conversion.  It also made the Chans' fraudulent scheme harder to detect, as Gold Star was no longer an independent check on the Chans.   Finally, the Chans' acquisition and maintenance of control over GSC has caused GSC to become functionally insolvent.

217.    As a direct and proximate result of Defendants' RICO violation(s), Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

**Count III – Violation of 18 U.S.C. § 1962(c)**

**(Terry Chan, Gary Chan, and Jacquelyn Chan)**

218.    Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

219.    18 U.S.C. § 1962(c) prohibits any person:

> Employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

220.    As is demonstrated above, the Chans intentionally engaged in a scheme to defraud Plaintiff and other GSC Limited Partners. The Chans did so to enrich themselves, pay debts, finance gambling expenses, and fund the operation of unrelated businesses.

221.    The Chans engaged in a pattern of racketeering activity to carry out their scheme to defraud. This pattern included: (1) at least 2 instances of bank fraud, (2) numerous instances of mail fraud; (3) many instances of wire fraud; (4) hundreds, if not thousands, of instances of money laundering; (5) hundreds of transactions in property derived from unlawful activity; and, (6) at least dozens of instances of the transmission, transportation, or transference of goods, wares, or money with the knowledge that the same was stolen, converted, or taken by fraud.

222.    Each of these acts occurred within the last 10 years.

223.    The Chans used an enterprise, consisting of GSC, GSC OPP, Mason Hill, Jardin, Clearwater, LPCF, RG MGMT, and/or RG OPP to execute their fraudulent scheme.

224.    The Chans' acts harmed a number of victims, including Plaintiff and the other two GSC Limited Partners. The Chans' pattern of conducting racketeering activity through the enterprise has caused Plaintiff to lose his entire investment, the functional insolvency of GSC, and has prevented Plaintiff from obtaining a Green Card.

225.    The Chans' acts have also infected other businesses, such as a number of Rodizio Grill Restaurants. The Chans' scheme is ongoing.

226.    The Chans have harmed other non-GSC investors and businesses by engaging in a similar scheme to deprive them of their investment funds. *See, e.g., Hu v. Chan*, Case No. 1:15-cv-709-SSB (S.D. Ohio Nov. 4, 2015). Defrauding foreign investors appears to be the Chans'

pattern and practice of doing business.

227.    As a direct and proximate result of Defendants' RICO violation(s), Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

### Count IV – Violation of 18 U.S.C. § 1962(d)

### (Terry Chan, Gary Chan, and Jacquelyn Chan)

228.    Plaintiff restates the paragraphs 1 through 174 as if fully rewritten, and fact.

229.    18 U.S.C. § 1962(d) makes it unlawful for any person to conspire to violate any of the provisions of 18 U.S.C. § 1962(a)-(c).

230.    The Chans knowingly performed services that facilitated the operation of the illegal enterprise noted above.  Among other things, the Chans orchestrated inappropriate transfers of Plaintiff's funds, prepared emails or other communications designed to facilitate the enterprise or prevent its detection, and allowed entities they control to be used in the enterprise.

231.    As a direct and proximate result of Defendants' facilitation of an enterprise under RICO, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

### Count V – Violation of R.C. 2923.31, *et. seq.*

### (Terry Chan, Gary Chan, and Jacquelyn Chan)

232.    Plaintiff restates the paragraphs 1 through 174 as if fully rewritten, and restates the allegations contained in Counts I through IV above as if fully rewritten.

233.    R.C. 2923.31, *et. seq.* closely tracks federal RICO provisions.  R.C. 2923.32 makes it unlawful for someone to: (1) conduct the affairs of an enterprise through a pattern of corrupt activity; (2) acquire or maintain any interest in or control of an enterprise through a

pattern of corrupt activity; or (3) use or invest proceeds derived from corrupt activity.

234. As is extensively detailed above, the Chans conducted the affairs of GSC and other entities through a lengthy pattern of criminal and corrupt activity. The Chans also acquired or maintained control of an enterprise, including GSC OPP, through a pattern of corrupt activity. Finally, the Chans used or invested proceeds derived from corrupt activity to finance Rodizio Grill restaurants.

235. The Chans also conspired to commit the activities detailed herein and facilitated the operation of an illegal enterprise.

236. As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

## Count VI – Federal Securities Law Violations

### (Terry Chan, Gary Chan, GSC OPP, Mason Hill, Gold Star)

237. Plaintiff restates the paragraphs 1 through 174 as if fully rewritten.

238. Terry Chan, Gary Chan, GSC OPP, Mason Hill, and Gold Star violated federal securities laws in connection with the actions discussed herein.

239. 15 U.S.C. § 78j(b), as well as Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibits any person from making any untrue statement of material fact, or from omitting certain material facts, in connection with the purchase or sale of any security.

240. As is explained above, Defendants Terry Chan, Gary Chan, GSC OPP, Mason Hill, and Gold Star provided Plaintiff, or caused Plaintiff to be provided, with promotional materials, a business plan, and a Partnership Agreement that contained a number of material misrepresentations or omissions about GSC. Defendants used means or instrumentalities of

interstate commerce, or the mails, to make these statements and/or omissions to Plaintiff.

241.    For example, Defendants misrepresented the number of EB-5 investors who would invest in GSC, the amount of GSC's capital, the amount of restaurants Gold Star would seek to operate, the amount Gold Star would contribute to GSC, and that GSC OPP was a Limited Partner in GSC at the time Plaintiff executed the Partnership Agreement.  Each of these false statements was knowingly made by Defendants with the intent to deceive, manipulate, or defraud.

242.    This is demonstrated by, among other things, the fact that on or about one month after Plaintiff executed his Partnership Agreement, GSC EB-5, on behalf of GSC OPP and Gold Star, and Gary Chan, on behalf of Mason Hill and Terry Chan, executed a GSC Partnership Agreement.  This agreement said, among other things, that: (1) less than 12 Gold Star restaurants were going to be constructed; (2) only 5, and not 12, limited partners would invest in GSC; (3) GSC would have only $3,750,000 in capital and not $9,000,000; and, (4) Gold Star would only invest $1,250,000 in GSC, and not $3,000,000.  Further, GSC OPP did not become a GSC partner until this agreement was signed.

243.    Plaintiff justifiably relied on these false statements and/or omissions when deciding to invest in GSC.  These were material representations about the size, scope, and financing of GSC, and about the risk of loss Plaintiff faced in this investment.

244.    Plaintiff is a purchaser of securities and Defendants are sellers of securities. Defendants not only held title of the security before it passed to Plaintiff, but they also played a substantial role in persuading Plaintiff to buy the security.

245.    Defendants' misrepresentations proximately caused Plaintiff's injuries and loss because Plaintiff would not have invested in GSC but for these misrepresentations.

246.    These material misrepresentations also cut to the very core of GSC's feasibility as stated in the Partnership Agreement, business plan, and promotional booklet.  Gold Star needed the capital provided by an adequate number of EB-5 investors to develop Gold Star restaurants, and specifically cited lack of EB-5 investor capital as a reason behind its decision to withdraw from GSC and GSC OPP.

247.    As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count VII – Fraud

**(Terry Chan, Gary Chan, GSC OPP, Mason Hill, Gold Star)**

248.    Plaintiff restates the paragraphs 1 through 174 as if fully rewritten.

249.    Defendants Terry Chan, Gary Chan, GSC OPP, Mason Hill, and Gold Star provided Plaintiff, or caused Plaintiff to be provided, with promotional materials, a business plan, and a Partnership Agreement that contained a number of material misrepresentations or omissions about GSC.

250.    For example, Defendants misrepresented the number of EB-5 investors who would invest in GSC, the amount of GSC's capital, the amount of restaurants Gold Star would seek to operate, the amount Gold Star would contribute to GSC, and that GSC OPP was a Limited Partner in GSC at the time Plaintiff executed the Partnership Agreement.

251.    Each of these false statements was made with knowledge, or which such disregard and recklessness as to whether they were true or false that knowledge may be inferred.

252.    These statements were made with the intent of misleading Plaintiff to rely on these statements.

253. Plaintiff justifiably relied on these false statements and/or omissions when deciding to invest in GSC. These were material representations about the size, scope, and financing of GSC, and about the risk of loss Plaintiff faced in this investment.

254. Defendants' misrepresentations proximately caused Plaintiff's injuries and loss because Plaintiff would not have invested in GSC but for these misrepresentations.

255. These material misrepresentations also cut to the very core of GSC's feasibility as stated in the Partnership Agreement, business plan, and promotional booklet. Gold Star needed the capital provided by an adequate number of EB-5 investors to develop Gold Star restaurants, and specifically cited lack of EB-5 investor capital as a reason behind its decision to terminate GSC and GSC OPP.

256. As a direct and proximate result of Defendants' fraud, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count VIII – Breach of Contract

**(GSC OPP, Gold Star, Mason Hill, Gary Chan, Terry Chan, and Jacquelyn Chan)**

257. Plaintiffs restate the paragraphs 1 through 174 as if fully rewritten.

258. GSC OPP, which is and was controlled by Gold Star and/or Mason Hill during all relevant times, entered into the Partnership Agreement with Plaintiff.

259. Mason Hill was controlled by the Chans such that it had no independent mind or will or its own. Instead, it acted as an instrument of the Chans.

260. The Partnership Agreement explicitly states that the purpose of GSC is to open and operate Gold Star restaurants in Ohio, Kentucky, and Indiana.

261. The Partnership Agreement also explains that if it is ever "impossible or

impractical to carry on the business of the Partnership," that GSC would be quickly liquidated by GSC OPP.

262.    If GSC OPP every determined that a Liquidating Event occurred, it had to provide all partners with a notice of occurrence of a Liquidating Event within 30 days.

263.    In addition, the Partnership Agreement says that, should a Limited Partner's I-526 petition be denied, GSC OPP would return that Partners' capital contribution in 90 days.

264.    The Partnership Agreement further notes, in a section titled "Duties and Obligations of General Partner," that GSC OPP "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and affiliates."  This includes GSC OPP's responsibility to "segregat[e] Partnership assets" and to ensure the "funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [GSC OPP] or any of its affiliates."

265.    GSC OPP further had an obligation to care for Plaintiff's funds, and could only maintain Partnership funds "not otherwise invested" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or in escrow accounts.

266.    As detailed in the foregoing paragraphs, Defendants have failed to conduct themselves in the best interests of the Partnership.  In doing so, Defendants have breached the Partnership Agreement by, among other things: (1)  failing to ensure that GSC only invested in projects that conformed to the purposes listed in the Partnership Agreement; (2) failing to wind up and dissolve GSC upon the occurrence of a Liquidating Event; (3) failing to provide Plaintiff and other Limited Partners with a notice of occurrence of a Liquidating Event when that event occurred; (4) failing to return Plaintiff's capital contribution upon the occurrence of a Liquidating Event; (5) failing to ensure the Partnership conducted its business and operations

separate and apart from GSC OPP or its affiliates; (6) failing to segregate Plaintiff's funds from the funds of GSC OPP or any of its affiliates; (7) engaging in self-dealing; (8) failing to care for Plaintiff's funds and allowing these funds to be converted; and, (9) failing to maintain Plaintiff's funds in accounts belonging to GSC OPP or its affiliates, in short-term liquid securities, or in escrow accounts.

267.    As a direct and proximate result of Defendants' numerous breaches of contract, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## Count IX – Breach of Fiduciary Duty

### (GSC OPP, Gold Star, Mason Hill, Gary Chan,

### Terry Chan, and Jacquelyn Chan)

268.    Plaintiff restates paragraphs 1 through 174 of the Complaint as if fully rewritten.

269.    Defendants GSC OPP, Gold Star, Mason Hill, and the Chans owe Plaintiff a statutory, contractual, and common law duty of the utmost good faith and loyalty in the handling of the Project and his investment funds.

270.    This fiduciary relationship is confirmed by the Partnership Agreement, which granted the General Partner "the sole and exclusive right and responsibility to manage the business" of GSC. Limited Partners, such as Plaintiff, did not "have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way." Plaintiff therefore relied on GSC OPP, the General Partner, to act for their benefit and protect the Partnership.

271.    Given the fundamental nature of this Partnership and specific references to immigration processes in the Partnership Agreement, Defendants were under a duty to use their

best efforts to run GSC in a manner that would result in the creation of jobs and to secure Plaintiff's EB-5 visa.  Defendants have breached this duty to Plaintiff and their actions caused Plaintiff to withdraw his EB-5 visa application.

272.    GSC OPP, Gold Star, Mason Hill, and the Chans through Mason Hill each owe or owed a fiduciary duty towards Plaintiff.

273.    GSC OPP, Mason Hill, and the Chans breached this fiduciary duty by, among other things, converting the funds of GSC Limited Partners and failing to ensure that GSC carried out the purposes defined in the Partnership Agreement.

274.    Gold Star breached its fiduciary duty by, among other things, allowing the Chans to convert GSC Limited Partners' funds while it was still controlling GSC OPP. Gold Star was on notice of the Chans' possible wrongful conduct, as Gold Star knew as early as May 13, 2016, that Terry and Gary Chan were involved in another lawsuit that argued they had converted investor funds in another EB-5 project.

275.    As a direct and proximate result of Defendants' numerous breaches of their fiduciary duties toward Plaintiff, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count X – Gross Negligence

**(GSC OPP, Gold Star, Mason Hill, Gary Chan, Terry Chan, and Jacquelyn Chan)**

276.    Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

277.    Defendants owed Plaintiff a duty of care to properly manage GSC and his investment funds consistent with the Partnership and Escrow Agreements, EB-5 rules and regulations, and the representations made to Plaintiff as described above.

278.    This standard of care of a general partner in a limited partnership is detailed in

R.C. § 1782.241(A), which says that a general partner "shall perform the duties of a general partner in good faith, in a manner the general partner reasonably believes to be in or not opposed to the best interests of the limited partnership, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."

279.    Defendants GSC OPP, Gold Star, Mason Hill, and the Chans through Mason Hill have violated their standard of care to Plaintiff by, among other things: (1) engaging in self-dealing transactions; (2) failing to ensure the Partnership conducted its business and operations separate and apart from GSC OPP or its affiliates; (3) failing to segregate Plaintiff's funds from the funds of GSC OPP or any of its affiliates; (4) failing to invest funds according to the stated purposes and intent of the Partnership; (5) failing to maintain Plaintiff's funds in accounts belonging to GSC OPP or its affiliates, in short-term liquid securities, or in escrow accounts; (6) failing to liquidate GSC once it became clear it was impossible or impractical to carry on the business of GSC; (7) failing to provide Limited Partners with a notice of the occurrence of a Liquidating Event; (8) failing to return Plaintiff's capital contribution upon the occurrence of a Liquidating Event; (9) failing to promptly ensure that Plaintiff's investment was moved from the escrow fund to GSC's operating fund promptly after Plaintiff's I-526 petition was initially approved; (10) failing to care for Plaintiff's funds; (11) failing to provide Plaintiff with a PPM or other information related to the Orlando project before Plaintiff's funds were invested into this project; and, (12) failing to obtain Plaintiff's, or other Limited Partners', affirmative consent to fundamentally change the nature, purpose, and scope of GSC.

280.    As a direct and proximate result of Defendants' gross negligence, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## Count XI - Conversion

## (GSC, GSC OPP, Mason Hill, Jardin, Clearwater, LPCF, RG MGMT,

## RG OPP, Gary Chan, Terry Chan, and Jacquelyn Chan)

281.    Plaintiffs restate Paragraphs 1 through 174 of the Complaint as if fully rewritten.

282.    Defendants have, without authorization, knowingly asserted dominion and control over Plaintiff's specific and identifiable property, the investment funds, that are owned and/or properly payable to Plaintiff.  Defendants' conversion is inconsistent with Plaintiff's rights and ownership of said property.

283.    Plaintiff has, over the course of many months, repeatedly made demands for the return of his property.  Plaintiff's funds, however, have not been returned, and Defendants recently advised Plaintiff that his funds were currently directed to another project.

284.    As a direct and proximate result of Defendants' conversion of Plaintiff's funds, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## Count XII – Breach of R.C. § 1782.242 and Rescission of the BWR Investment

## (GSC, GSC OPP, Gold Star, Mason Hill, Gary Chan, Terry Chan, and Jacquelyn Chan)

285.    Plaintiff restates paragraphs 1 through 174 of the Complaint as if fully rewritten.

286.    Partners in a partnership are generally prohibited from engaging in self-dealing transactions without the approval of other partners.

287.    Under Ohio law, "[n]o contract, action, or transaction shall be void or voidable with respect to a limited partnership" because of self-dealing if one of three exceptions applies. R.C. § 1782.242.   These exceptions apply when: (1) the material facts of the transaction are disclosed in writing to every partner before the partner is admitted in the partnership; (2) the

material facts of the transaction are disclosed in writing to all partners, the transaction is fair to the limited partnership, and a majority of disinterested partners authorize the transaction; or, (3) the transaction is fair, and is authorized and approved by a majority of the disinterested limited partners. R.C. § 1782.242(A)-(C).

288. As is detailed above, Defendants have engaged in a pattern of self-dealing to the detriment of Plaintiff. Defendants have directed all of Plaintiff's investments to entities controlled by the Chans for the exclusive benefit of the Chans.

289. These acts of self-dealing are prohibited because: (1) these transactions were not disclosed to Plaintiff before he joined the partnership; (2) the material facts of the transactions were never disclosed in writing to all partners, nor approved by a *disinterested* general partner; and, (3) these transactions were never approved by a majority of disinterested limited partners.

290. As a direct and proximate result of Defendants' pattern of self-dealing, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law. Plaintiff also seeks to rescind the investment that GSC made in any entities affiliated with Defendants.

### Count XIII – Unjust Enrichment/Quantum Meruit

### (GSC, GSC OPP, Mason Hill, Jardin, Clearwater, LPCF, RG MGMT,

### RG OPP, Gary Chan, Terry Chan, and Jacquelyn Chan)

291. Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

292. Plaintiff conferred a substantial benefit on Defendants by investing $500,000 with GSC.

293. Defendants have misappropriated and wasted Plaintiff's investment funds as alleged above.

294.    Under the circumstances, it would be unjust to Plaintiff to allow Defendants to retain the benefits conferred upon them by Plaintiff.

295.    Plaintiff has been damaged in excess of $500,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

## Count XIV – Violation of the Ohio Deceptive Trade Practices Act

### (Defendants GSC, GSC OPP, Mason Hill, Gary Chan, and Terry Chan)

296.    Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

297.    R.C. § 4165.02(A) provides that a person engages in a deceptive trade practice when, in the course of a person's business, vocation, or occupation, the person engages in certain conduct.  Prohibited conduct under the statute occurs when a person, "[c]auses likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;" "[c]auses likelihood of confusion or misunderstanding as to the affiliation, connection, or association with, or certification by, another," "[u]ses deceptive representations or designations of geographic origin in connection with goods or services," or "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, [or] benefits . . . that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have."

298.    Each Defendant is a "person" within the meaning of R.C. § 4165.01(D).

299.    Each Defendant engaged in trade and/or commerce.

300.    As is stated above, Defendants made false or misleading statements of fact and omissions of fact that caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.  For example, Defendants stated that GSC would be constructing Gold Star restaurants with the approval and involvement of Gold Star.  However,

GSC is currently is not sponsored, approved, certified, or sourced by Gold Star in any way, as Gold Star has withdrawn from any involvement in the Partnership.

301.   As is stated above, Defendants made false or misleading statements of fact and omissions of fact concerning GSC's affiliations, connections, and associations with certain entities.   For example, Defendants stated that Gold Star would be affiliated, connected, associated with, or certified by Gold Star.  However, GSC is currently not affiliated, connected, or associated with Gold Star in any way, as Gold Star has withdrawn from any involvement in the Partnership.

302.   As is stated above, Defendants made false or misleading representations, omissions, or designations of geographic origin in connection with goods or services.  For example, Defendants stated that GSC would be focused on building Gold Star restaurants in the Cincinnati, Ohio region.  However, GSC tried to construct a lone BWR restaurant in Florida and has no involvement in the Cincinnati, Ohio region.

303.   Defendants' statements and/or omissions materially involved Plaintiff's decision to invest with GSC.  But for these statements and/or omissions, Plaintiff would not have purchased any interest in GSC.

304.   Defendants unfair acts or practices were likely to, and did in fact, deceive reasonable customers about the true quality, characteristics, and benefits of GSC.

305.   Even after Plaintiff invested with GSC, Defendants continuously lied about or failed to update Plaintiff about, among other things, the status of Gold Star's involvement in GSC, the construction of restaurants, and the operation of GSC.

306.   As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any

other relief as provided by law.

## Count XV – Violation of Ohio Consumer Sales Practices Act

### (Defendants GSC, GSC OPP, Mason Hill, Gary Chan, and Terry Chan)

307. Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

308. The Ohio Consumer Sales Practices Act ("CSPA"), R.C. § 1345.01, *et seq.*, prohibits suppliers from committing unfair and deceptive acts or practices in connection with a consumer transaction. The CSPA prohibits unfair or deceptive acts or practices whether they occur before, during, or after the transaction.

309. Among other things, unfair or deceptive acts prohibited under the CSPA include stating that "the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have," and that "the supplier has a sponsorship, approval, or affiliation that the supplier does not have." R.C. § 1345.02(B)(1), (9).

310. Defendants are each a "supplier" as that term is defined in the CSPA. R.C. § 1345.01(C).

311. Plaintiff is a "consumer" as that term is defined in the CSPA. R.C. § 1345.01(D).

312. Plaintiff purchased the interest in GSC for personal, family, or household purposes.

313. Defendants' conduct as detailed herein violated the CSPA because, among other things, Defendants represented that GSC has the sponsorship, approval, performance, characteristics, or uses that GSC did not have, and Defendants represented that they had a sponsorship, approval, or affiliation that they did not have.

314. As is detailed above, Defendants made false or misleading representations and statements of fact concerning GSC, and these various representations and statements, combined

with the selective and intentional silence of Defendants at certain times, damaged Plaintiff.

315.    Defendants' unfair conduct and failure to disclose information as described above materially influenced Plaintiff's decision to purchase an interest in GSC and to stay in the Partnership for as long as he did.  But for Defendants' unfair and deceptive acts and practices, Plaintiff would not have invested with GSC or remained in GSC.

316.    Defendants' unfair and deceptive acts or practices were likely to and did in fact deceive reasonable customers, including Plaintiff, about the true nature, quality, characteristics, affiliation, sponsorship, and benefits of GSC.

317.    Defendants' conduct was, and is, unfair and deceptive acts and/or practices in violation of the CSPA.

318.    As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## Count XVI – Ohio Securities Law Violations

### (Defendants GSC, GSC OPP, Gold Star, Mason Hill, Gary Chan, and Terry Chan)

319.    Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

320.    Ohio law has many requirements that govern the sale of securities.  *See* R.C. 1707.01, *et seq.*

321.    Among other things, Ohio law requires that "the sale of securities representing an interest in a partnership . . . [or] limited partnership . . ." may be carried out only upon compliance with certain registration requirements.  R.C. § 1707.06(3).

322.    Upon information and belief, Defendants did not ensure that the sale of GSC limited partner interests were properly registered with Ohio Division of Securities.  *See* R.C. §

1707.08.

323. As is discussed herein, Plaintiff also received a promotional booklet, business plan, and Partnership Agreement from Defendants touting the structure, organization, and purpose of GSC. As is also discussed herein, many of the statements contained in these materials false, as GSC no longer even remotely resembles what was discussed in these materials.

324. Under R.C. § 1707.41(A), Defendants are liable for the "loss or damage" sustained by Plaintiff, who relied on these materials, the false material statements contained therein, and Defendants' omission of materials facts, to invest in GSC.

325. Further, under R.C. § 1707.43(A), "every sale or contract for sale made in violation of Chapter 1707 of the Revised Code is voidable at the election of the purchaser." Each person that participated in or aided the seller of these securities is jointly and severally liable to Plaintiff "for the full amount paid by [Plaintiff] and for all taxable court costs."

326. As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## Count XVII – Conspiracy

**(GSC, GSC OPP, Jardin, Mason Hill, Clearwater, LPCF, RG MGMT,**

**RG OPP, Gary Chan, Terry Chan, and Jacquelyn Chan)**

327. Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

328. Defendants, individually and on behalf of the entities they control, entered into a malicious combination to injure Plaintiff by fraudulently misrepresenting material facts to Plaintiff. These misrepresentations were made to obtain Plaintiff's investment and convert it for

Defendants' own personal gain rather than for the purpose of securing Plaintiffs EB-5 visas, and fulfilling the purposes of GSC.

As a direct and proximate result of Defendants' civil conspiracy, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count XVIII – Fraudulent Transfers

### (All Defendants but Gold Star)

329.    Plaintiff restates Paragraphs 1 through 174 of the Complaint as if fully rewritten.

330.    Under Ohio law, a transfer is fraudulent as to a creditor if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.  R.C. § 1336.04(A)(1).  A transfer is also fraudulent if the debtor did not receive reasonably equivalent value for the transfer and certain additional circumstances apply.  R.C. § 1336.04(A)(2).

331.    Plaintiff is one of GSC's creditors.  GSC is a debtor to Plaintiff and others.

332.    The Chans orchestrated a number of fraudulent transfers to Phoenix and other entities ("Fraudulent Transfer Recipients") with the intent to hinder, delay, or defraud Plaintiff and other GSC Limited Partners.

333.    Phoenix received $52,655.60 of Plaintiff's funds as a result of the fraudulent transfers detailed above. Other Fraudulent Transfer Recipients received a hundreds of thousands of dollars of Plaintiff's funds.

334.    These transfers were concealed and not disclosed.

335.    Defendants Gary Chan and Terry Chan, which were involved in these transfers, had been sued or were threatened with suit at the time of these transfers.

336. The Chans removed and concealed Plaintiff's funds, as evidence by the fact that Plaintiff's funds were laundered through multiple accounts before Plaintiff's funds were transferred to the Fraudulent Transfer Recipients.

337. GSC was insolvent at the time of these transfers or became insolvent shortly after these transfers were made.

338. The transfers to the Fraudulent Transfer Recipients occurred shortly before and shortly after substantial debt was incurred by GSC.

339. GSC did not receive any reasonably equivalent value in exchange for these transfers.

340. At the time Plaintiff's funds were transferred to the Fraudulent Transfer Recipients, GSC was engaged or about to engage in a business or transactions for which its remaining assets were unreasonably small, including the construction of a BWR restaurant.

341. GSC intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay them at the time the transfers were made to the Fraudulent Transfer Recipients.

342. As a direct and proximate result of these fraudulent transfers, Plaintiff has been damaged in an amount in excess of $109,921.89, plus interest.  Plaintiff seeks to rescind the transfers detailed above, recover these damages, and obtain any other relief as provided by law.

WHEREFORE, Plaintiff demands judgment against the Defendants for the following relief:

a.   Compensatory damages against Defendants in an amount in excess of $500,000, the exact amount to be proven at trial, and statutory damages;

b.   Forfeiture of any fees paid to Defendants in excess of $45,000;

c.   Punitive damages in an amount not less than three times compensatory damages, the exact amount to be determined at trial; and,

d.   Such other relief as the Court deems just and equitable, including pre-judgment and post-judgment interest, costs, and attorney's fees.

Respectfully submitted,


*/s/ Christopher D. Cathey*
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:   (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com
*Attorneys for Plaintiff*

<u>JURY DEMAND</u>

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Respectfully submitted,


*/s/ Christopher D. Cathey*
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:   (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com
*Attorneys for Plaintiff*

DMS/10612397v.2

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been served upon the following by regular mail on this 22nd day of November, 2017, and through the Court's ECF system.

Mason N. Floyd
Angelo D. DiBartolomeo
Matthew J. Ruza
Clark Hill, PLC
130 East Randolph Street, Suite 3900
Chicago, Illinois 60601
mfloyd@clarkhill.com
adibartolomeo@clarkhill.com
mruza@clarkhill.com

Jennifer K. Nordstrom
Garvey Shearer Nordstrom, PSC
2400 Chamber Center Drive, Suite 210
Ft. Mitchell, Kentucky 41017
jnordstrom@garveyshearer.com

*Attorneys for Defendants*
*GSC Opportunities, L.P., GSC OPP*
*Management, L.P., Terry Chan, Gary Chan,*
*Jacquelyn Chan, Mason Hill, LLC,*
*Clearwater Hospitality Group, LLC,*
*BWR Westwood, LLC*

*/s/ Christopher D. Cathey*
Christopher D. Cathey