# EXHIBIT D

# OPERATING AGREEMENT

## OF

## GSC OPP MANAGEMENT, LLC,

## AN OHIO LIMITED LIABILITY COMPANY

## EFFECTIVE AS OF MAY 7, 2013

# OPERATING AGREEMENT
# OF
# GSC OPP MANAGEMENT, LLC,

This Operating Agreement is effective as of this 7th day of May, 2013, by and between the Members whose signatures appear on the signature page hereof.

RECITALS:

WHEREAS, Articles of Organization for GSC OPP MANAGEMENT, LLC (the "**Company**") were filed with the Secretary of State of the State of Ohio on February 28, 2013; and

WHEREAS, Mason Hill, LLC, a Member of the Company, ("**Mason Hill**") and Gold Star Chili, Inc. ("**Gold Star**") have developed a Business Plan for the opening and development of up to 6 new Gold Star franchise restaurants (the "**Project**") within the Dayton-Cincinnati-Lexington region of Southwest Ohio, Kentucky and Indiana region that are not included in any current territory of any current Gold Star franchisee; and

WHEREAS, Mason Hill caused GSC Opportunities L.P., an Ohio limited partnership ("**Project Owner**") to be formed and the Company is the sole General Partner of the Project Owner; and

WHEREAS, the Project Owner will be capitalized with an anticipated amount of $3,750,000 ("**Project Capitalization**") to be provided to the Project Owner by the Company (by and through its Members as set forth in Exhibit A to this Agreement) in the total value amount of $1,250,000 ("**GP Capitalization**") in return for a General Partnership Interest equal to 33.3% of the Project Owner and by 5 individuals investing as EB-5 limited partner investors ("**EB-5 Investors**") in the individual amount of $500,000 each and a total amount of $2,500,000 ("**EB-5 Capitalization**") in return for a Limited Partnership Interest equal to 66.7% of the Project Owner; and

WHEREAS, the Company's purpose is to serve as the General Partner of the Project Owner and to accomplish all aspects of the Project, including but not limited to raising the EB5 Capitalization, securing restaurant locations and operating the locations and will receive a management fee from the Project Owner as set forth on **Exhibit D** ("**Management Fee**"); and

WHEREAS, the Company will enter into a management agreement with Mason Hill, LLC or affiliate ("**EB-5 Administrator**") for the EB-5 Administrator to provide certain services related to the qualification of the EB-5 Investors and qualifying the Project for the EB-5 Investment Program, including but not limited to compliance with all rules and regulations set forth in applicable Federal law and all rules and regulations promulgated by the United States Citizenship and Immigration Services ("**USCIS Requirements**") and compliance with all applicable Federal and state securities laws ("**EB-5 Management Agreement**") which will provide for the Company to pay the EB-5 Administrator for its services thereunder as set forth in **Exhibit D**; and

WHEREAS, the Company will enter into a management agreement with Gold Star for Gold Star to provide certain services related to the operation and management of the restaurants within the Project, including but not limited to the final selection of sites, day to day operations of each restaurant, and

1

compliance with franchise agreements for each location ("**Gold Star Management Agreement**") which will provide for the Company to pay Gold Star for its services thereunder as set forth in **Exhibit D**; and

WHEREAS, in addition to the Management Fee, the Company may receive certain distributions from the Project Owner and the Members wish to have all funds received by the Company to be allocated and distributed as set forth in this Agreement.

WHEREAS, the Project Owner will create a separate, wholly owned disregarded subsidiary limited liability company to own each of the 6 franchised restaurants in the Project and may elect to do so for any real estate owned as part of the Project (each an "**Owner Subsidiary**"); and

NOW, THEREFORE, the Members agree as follows:

## ARTICLE I

## DEFINITIONS

The recitals and the associated definitions set forth therein are incorporated herein by reference. The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein);

(a)    The "Act" shall mean the Ohio Limited Liability Company Act.

(b)    "Capital Account" as of any given date shall mean the account mentioned for each pursuant to Section 8.4.

(c)    "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

(d)    "Capital Interest" shall mean the percentage interest of each Member set forth on **Exhibit A.**

(e)    "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

(f)    "Deficit Capital Account" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(i)    credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-l(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the

2

minimum gain attributable to any partner nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

(ii)  debit to such Capital Account the items described in Sections 1.704-l(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.7041(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(g)  "Distributable Cash" means all cash, revenues and funds received by the Company, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business, including but not limited to fees due and owing under the EB5 Management Agreement and the Gold Star Management Agreement; and (iii) such reasonable reserves as the Manager deems necessary in its sole and absolute discretion to the proper operation of the Company's business.

(h)  "Economic Interest" shall mean a Member's or other Person's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

(i)  "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

(j)  "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

(k)  "Majority Interest" shall mean one or more Membership Interests which taken together exceed fifty percent (50%) of the Membership Interests.

(l)  "Manager" shall mean one or more managers. Initially, there shall be one (1) Manager, namely; GSC EB5 Investor LLC. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

(m)  "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become a Member.

(n)  "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the Capital Interest, and such other rights and privileges that the Member may enjoy by being a Member.

(o)  "Net Profits" and "Net Losses" shall mean for each taxable year of the Company an amount equal to the Company's net taxable income or loss for such year as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company and in accordance with Section 703 of the Code with the following adjustments:

3

(i)  Any items of income, gain, loss and deduction allocated to Members pursuant to **Exhibit B** shall not be taken into account in computing Net Profits or Net Losses of this Operating Agreement;

(ii)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits and Net Losses (pursuant to this definition) shall be added to such taxable income or loss;

(iii)  Any expenditure of the Company described in Section 705(a)(2)(B) of the Code and not otherwise taken into account in computing Net Profits and Net Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

(iv)  In the event the value of any Company asset is adjusted pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits and Net Losses;

(v)  Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the value of the asset on the Company's books, notwithstanding that the adjusted tax basis of such asset differs from such value;

(vi)  In the event that Company property is reflected on the Company's books at a value that differs from its tax basis, then Company income, gain, loss and deduction shall (in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g)) include Company income, gain, loss and deduction determined by reference to the value of such property on the Company's books, but shall exclude income, gain, loss and deduction determined by reference to the value of such property as determined for income tax purposes; and

(vii)  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Membership Interest or Economic Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses.

(p)  "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

(q)  "Person" shall mean an individual, a general partnership, a limited liability partnership, a limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation, or any other legal entity.

4

(r)    "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

## ARTICLE II

### FORMATION OF COMPANY

2.1    Formation.  On February 28, 2013, Mason Hill, LLC organized an Ohio Limited Liability Company by executing and delivering Articles of Organization to the Secretary of State of the State of Ohio in accordance with and pursuant to the Act.

2.2    Name.  The name of the Company is **GSC OPP MANAGEMENT, LLC**.

2.3    Principal Place of Business.  The principal place of business of the Company shall be 650 Lunken Park Drive, Cincinnati, Ohio 45226.  The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.4    Registered Office and Registered Agent.  The Company's registered office shall be at the office of its registered agent at 650 Lunken Park Drive, Cincinnati, Ohio 45226, and the name of its registered agent at such address shall be Michael E. Rohrkemper.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Ohio pursuant to the Act.

2.5    Term.  The term of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Act.

## ARTICLE III

### BUSINESS OF COMPANY

3.1    Permitted Businesses.  The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

(a)    To acquire, hold, sell, assign, transfer, pledge and otherwise deal with and own an interest in the Project Owner, and to serve as the Project Owner's sole general partner and to perform all tasks of the general partner of the Project Owner pursuant to a certain Limited Partnership Agreement dated May 7, 2013 ("Limited Partnership Agreement"), including but not limited to performing some of those duties by entering into the EB5 Management Agreement and the Gold Star Management Agreement.

5

(b)     To exercise all powers enumerated in the Act necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

## ARTICLE IV

## NAMES OF MEMBERS

The names and addresses of the Members are set forth in **Exhibit A**.

## ARTICLE V

## MANAGEMENT OF COMPANY

5.1     Management.

(a)     The business and affairs of the Company shall be managed by the Manager or Managers, appointed from time to time by the Members. The Company shall initially have one (1) Manager. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of Members holding a Majority Interest of the Membership Interests. A Manager shall hold office until the next annual meeting of Members or until his successor shall have been elected and qualified or until his earlier death, resignation or removal. Managers need not be residents of the State of Ohio or Members of the Company. In the event there is more than one Manager, such Managers shall act only by unanimous vote of all Managers. The Company shall have a President, a Vice President and such other officers as may be deemed necessary, each or any of whom may be appointed by the Manager. The same individual may simultaneously hold more than one office in the Company. Unless otherwise provided in the resolution of election or appointment, each officer shall hold office until such officer resigns or is removed by the Manager. Each officer of the Company has the authority and shall perform the duties prescribed by the Manager. The Manager may remove any officer at any time with or without cause. The initial officers are listed on **Exhibit C**. The Manager shall have full authority to manage the affairs of the Company in accordance with the Act and this Operating Agreement.

(b)     The business and affairs of the Company shall be managed by its Manager. The Manager shall direct, manage and control the business of the Company to the best of its ability. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. Unless otherwise provided, the unanimous consent of all Managers is required to authorize and/or approve any action.

5.2          Indemnification.

6

(a)   Each person who was or is a Member, Manager, or agent of the Company, or is or was serving at the request of the Company as a director, officer, partner, trustee, manager, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified by the Company to the full extent permitted by the law of the State of Ohio against any liability or loss (including attorneys' fees) reasonably incurred by such person in such capacity or arising out of acting in such capacity.

(b)   Expenses (including attorneys' fees) incurred by a Member or Manager in defending any civil, criminal, administrative, or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written agreement by or on behalf of such Member or Manager to repay such amount if it shall ultimately be determined that he, she or it is not entitled to be indemnified by the Company as authorized in this Section 5.2. Such expenses (including attorneys' fees) incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Manager deem appropriate.

5.3   Certain Powers of Manager.

(a)   Without limiting the generality of Section 5.1, the Manager shall have power and authority, on behalf of the Company to do any and all of the following, and in doing so, may delegate such powers and authorities to any such officers of the Company as the Manager deems prudent:

(i) To acquire property from any Person as the Manager may determine. The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(ii) To borrow money for the Company from banks, other lending institutions, the Manager, Members, or affiliates of the Manager or Members on such terms as the Manager deems appropriate, and in connection therewith, provided, however, the Manager must obtain the prior written consent of all Members to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums.  No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager;

(iii) To purchase liability and other insurance to protect the Company's property and business;

(iv) To hold and own any Company real and/or personal properties in the name of the Company;

(v) To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

7

(vi) To sell or otherwise dispose of all or substantially all of the assets of the Company, except for the general partnership interest in the Project Owner, as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(vii) To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; deeds; options; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company;

(viii) To execute on behalf of the Company and to take all actions on behalf of the Company as the general partner of the Project Owner, including but not limited to all actions authorized under the Limited Partnership Agreement, execution of the EB5 Management Agreement, the Gold Star Management Agreement, all documents necessary to form Subsidiary Owners, and to execute franchise agreements with Gold Star with 5% royalty and 4% marketing fees, and comply with all franchise requirements and for the Project Owner to guaranty such franchise agreement.

(ix) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(x) To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager may approve; and

(xi) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized or permitted to do so by this Operating Agreement, or by the Manager, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member or officer shall have any power or authority to bind the Company unless the Member or officer has been authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

5.4    Restrictions on Authority of the Manager(s).

(a) The Manager shall not have the authority to, and covenants and agrees that it shall not, do any of the following acts without the unanimous consent of the Members:

(i) Cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 3.1 hereof;

8

(ii)  Knowingly do any act in contravention of this Operating Agreement;

(iii)  Knowingly do any act which would make it impossible to carry on the ordinary business of the Company or the Project Owner, except as otherwise provided in this Operating Agreement; and

(iv)  Cause or permit the Project Owner to invest or expend any funds for additional Gold Star Chili franchises in excess of the 6 set forth in the Business Plan if such funds or a portion thereof include amounts held by the Project Owner for Limited Partner distributions, provided such consent will not be unreasonably withheld.

(v)  Cause the Project Owner to exercise its rights to purchase the Limited Partners' Units pursuant to Section 2.4 of the Limited Partnership Agreement.

5.5  Standard of Care.  A Manager shall perform his duties as Manager in good faith, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  A Manager who so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, willful misconduct, knowingly breaching this Agreement or a wrongful taking by the Manager.  In performing his or her duties, a Manager shall be entitled to rely upon such information, opinions, reports, or statements, including financial statements or other financial data, presented or prepared by (a) any of the Company's other Managers, officers, Members or employees who such Manager reasonably believes are reliable and competent in the matters prepared or presented, or (b) any other Person, including without limitation lawyers or accountants, as to matters which such Manager reasonably believes are within such Person's professional or expert competence.

5.6  Limitation of Liability.  A Manager shall not be personally liable to the Company in monetary damages for breach of a duty to the Company unless it is proved by clear and convincing evidence in a court of competent jurisdiction that his or her action or failure to act (a) was not in good faith, (b) was undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company, (c) resulted in an improper personal benefit to such Manager or any of his or her Affiliates at the expense of the Company, (d) constituted fraud or deceit, or (e) was a knowing violation of law.

5.7  Managers and Members Have No Exclusive Duty to Company. The Manager shall not be required to manage the Company as its sole and exclusive function and it (and any Manager and/or Member) may have other business interests and may engage in other activities in addition to those relating to the Company.  It is acknowledged that the Manager is a wholly owned subsidiary of Gold Star Chili, Inc. and as a result, both the Manager and Gold Star Chili, Inc. are permitted to continue with their normal business operations of being the franchisor for the Gold Star Chili restaurants and being an owner and operator of Gold Star Chili restaurants.  The Member, Mason Hill, LLC and its principal owners and affiliates each will enter into a specific non-competition agreement satisfactory to the Manager that prohibits such parties from competing with the Limited Partnership or Gold Star Chili, Inc.  Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or

participate in such other investments or activities of the Manager and/or Member or to the income or proceeds derived therefrom. Neither the Managers nor any Member shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture except as set forth in Sections 5.5 and 5.6 or in violation of any separate non-compete agreements.

5.8     Bank Accounts. The Manager may from time to time open bank accounts in the name of the Company. The Manager may authorize Mason Hill to open additional accounts and when it does, the Manager and Mason Hill shall mutually agree on a simple and efficient method of obtaining from each other prompt approval and/or pre-approval for all authority to take action with regard to such accounts so that Company expenses will be paid in a timely and expedited fashion.

5.9     Resignation. A Manager of the Company may resign at any time by giving written notice to the Members of the Company at which time the Members shall select a successor Manager. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.10     Removal. In the event GSC EB-5 Investor, LLC is serving as the Manager of the Company, and permits a default by Gold Star Chili, Inc. under the Gold Star Management Agreement to continue beyond the applicable cure period, if any, Mason Hill, LLC shall have the right to remove GSC EB-5 Investor, LLC as the Manager and appoint the Manager of its sole choice. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.11     Vacancies. Any vacancy occurring for any reason in the number of Managers shall be filled by the affirmative vote of the Members holding a Majority Interest of the Membership Interests. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of the Members holding a Majority Interest. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until his successor shall be elected and shall qualify, or until his earlier death, resignation or removal.

5.12     Right to Rely on the Managers.

(a) Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(i) The identity of any Manager, officer or any Member;

(ii) The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by any Manager or officer or which are in any other manner germane to the affairs of the Company;

10

(iii) The Persons and/or officers who are authorized to execute and deliver any instrument or document of the Company including any such deeds, mortgages and related documents; or

(iv) Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member or officer.

## ARTICLE VI

### RIGHTS AND OBLIGATIONS OF MEMBERS

6.1 _Limitation of Liability_. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law. In furtherance of the foregoing, none of the Members, Managers, officers or advisory board members of the Company shall be personally liable to satisfy any debt, obligation or liability of any kind of the Company solely by reason of being a Member, Manager, officer or advisory board member.

6.2 _Company Books_. The Company shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents. Upon reasonable request, each Member and Economic Interest Owner shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's and Economic Interest Owner's expense.

6.3 _Priority and Return of Capital_. Except as may be expressly provided in Article VIII, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

6.4 _Voting_. Notwithstanding anything contained herein to the contrary, when acting on matters subject to the vote of the Members, notwithstanding that the Company is not then insolvent, the Members and the Manager shall take into account the interest of the Company's creditors, as well as those of the Members.

6.5 _Preemptive Rights_. Each Member have pre-emptive rights to subscribe for or to purchase any Membership Interest of Company of any class, whether such Membership Interest or such class be now or hereafter authorized.

6.6 _Loans to Company_. All funds provided to the Company by a Member other than as a contribution of capital made in accordance with Article VIII, advances previously made by GSC EB5 Investor LLC for the Palomar and UK locations, and any loans from a member made in accordance with Section 5.3(a)(iii, shall be approved by the unanimous approval of the Members and treated as a loan which shall not enlarge the Member's Membership Interest in the Company but shall be a debt due from the Company to such Member. Any loans made by Member shall bear interest at the Applicable Federal Rate in effect at the time of the loan, provided that if such funds are borrowed from a third party institution by the Member, the rate shall be equal to the rate charged to the loaning Member by such third party institution..

11

Such loan shall constitute a liability of the Company and shall be repaid from Company funds subsequent to any payments of any operating expense but prior to any distributions under Article VIII.

6.7    Confidentiality and Other Restrictions.  Mason Hill agrees that upon the execution of a Franchise Agreement for any restaurant location by the Project Owner or any of its subsidiaries, that Mason Hill and each of its members shall be obligated to execute an agreement containing the non-competition, confidentiality provisions contained in Sections 11 and 12 of Gold Star Chili, Inc.'s standard franchise agreement. Mason Hill agrees that this is a material inducement to GSC EB5 Investments LLC entering this Operating Agreement and Gold Star Chili, Inc. entering into any franchise agreement.

## ARTICLE VII

## MEETINGS OF MEMBERS

7.1    Special Meetings.  Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Member.

7.2    Place of Meetings.  The Members may designate any place, either within or outside the State of Ohio, as the place of meeting for any meeting of the Members.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Manager in the State of Ohio.

7.3    Notice of Meetings.  Except as provided in Section 7.4, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten nor more than fifty days before the date of the meeting, either personally or by mail, by or at the direction of the person calling the meeting, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the Company, with postage thereon prepaid.

7.4    Meeting of all Members.  If all of the Members shall meet at any time and place, either within or outside of the State of Ohio, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

7.5    Quorum.  Members holding 100% of the Membership Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members.

7.6    Manner of Acting.  If a quorum is present, the affirmative vote of Members holding a Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, the Articles of Organization, or this Operating Agreement.

7.7    Waiver of Notice.  When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

7.8    Action Without A Meeting.  Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more consents describing the action taken, signed by such Members as would be required for approval at a meeting of Members if all Members were present and voting.

12

ARTICLE VIII

CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.1    Members' Capital Contributions.  Each Member's initial Capital Contribution is set forth in **Exhibit A**.

8.2    Additional Contributions.  To the extent unanimously approved by the Members, from time to time, the Members shall make additional Capital Contributions which shall be pro rata to all Members in accordance with the Capital Interests of the Members as set forth on **Exhibit A**.

8.3    No Withdrawal.  Except as provided in Article XI, no Member shall withdraw any part of his Capital Account without the consent of Members holding 100% of the Membership Interests.

8.4    Capital Accounts.

(a)  A separate Capital Account will be maintained for each Member.  Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of Net Profits; (4) any items in the nature of income and gain which are specially allocated to the Member pursuant to Paragraphs (a), (b), (c), (d), (e), (f), (g), and/or (h) of **Exhibit B**; and (5) allocations to such Member of income described in Section 705(a)(1)(B) of the Code.  Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of expenditures described in Section 705(a)(2)(B) of the Code; (4) any items in the nature of deduction and loss that are specially allocated to the Member pursuant to Paragraphs (a), (b), (c), (d), (e), (f), (g), and/or (h) of **Exhibit B**; and (5) allocations to the account of such Member of Net Losses.

(b)  The manner in which Capital Accounts are to be maintained pursuant to this Section 8.4 is intended to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.  If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.4 should be modified in order to comply with Section 704(b) of the Code and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.4, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(c)  Except as otherwise required in the Act (and subject to Section 8.2), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

13

ARTICLE IX

ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.1     Allocations of Profits and Losses from Operations.  Except as provided in **Exhibit B**, the Net Profits and Net Losses of the Company for each fiscal year will be allocated in accordance with the Capital Interests set forth on **Exhibit A**.

9.2     Distributions.  All distributions of Distributable Cash shall be made to the Members in the same manner as Net Profits and Net Losses are allocated pursuant to Section 9.1.  In the event of a refinancing of any debt of the Company or a sale or other disposition of Company property which does not result in a termination of the Company, any Net Cash From Refinancing (as defined herein) or net proceeds from such disposition that the Manager determines is available for distribution shall be distributed to the Members, not later than ninety (90) days after the refinancing or disposition, in the same manner as Net Profits and Net Losses are allocated pursuant to Section 9.1,.  Any proceeds from the sale of Company property which results in a termination of the Company shall be distributed in accordance with Article XV.

9.3     Accounting Principles.  The profits and losses of the Company shall be determined in accordance with accounting principles applied on a consistent basis using the method of accounting selected by the Manager.  It is intended that the Company will elect those accounting methods which provide the Company with the greatest tax benefits.

9.4     Interest On and Return of Capital Contributions.  No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein.

9.5     Accounting Period.  The Company's accounting period shall be the calendar year.

9.6     Election Under Section 754.  The Company may elect, pursuant to Section 754 of the Code, to adjust the basis of Company property when a Member sells his Membership Interest.  To the extent that any adjustments to the tax basis of any Company asset is made pursuant to Sections 734(b) or 743(b) of the Code as a result of such an election, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulation § 1.704-(b)(2)(iv)(m).

ARTICLE X

DEATH; WITHDRAWAL

10.1     Withdrawal.  A Member shall be permitted to withdraw from the Company without the unanimous approval of the remaining Members by providing at least sixty (60) days prior written notice of the effective date of its withdrawal.

10.2     Continuation of the Company.  Upon the death, expulsion, bankruptcy, or withdrawal of a Member (a **"Withdrawal Event"**), remaining Members shall have the right to continue the Company's business under its present name following the Withdrawal Event, provided they unanimously elect to

14

purchase the interest of such Member and continue the business of the Company. The dissolution of a Member shall not be a Withdrawal Event and any person receiving a dissolved Member's interest in the Company shall be Economic Interest Holders unless the remaining Members consent in writing to such parties becoming Members. The election to purchase the interest of such Member shall be exercised by written notice ("**Purchase Notice**") delivered within ninety (90) days after the effective date of the Withdrawal Event or if such Member is deceased or adjudicated incompetent, the appointment of the personal representative of a deceased or incompetent Member. Such Purchase Notice may be delivered in person or may be mailed by registered or certified mail, postage prepaid, to the last known address of the withdrawing Member or to the personal representative of the deceased or incompetent Member.

10.3     Method of Purchase. The remaining Members may upon their unanimous consent, cause the Company to purchase the interest of such Member within one year of the Withdrawal Event at in an amount equal to the Capital Account of such Member as of the date of the Withdrawal Event.

## ARTICLE XI
## INTENTIONALLY OMITTED

## ARTICLE XII

## TERMS OF PAYMENT UPON A WITHDRAWAL EVENT

12.1     Payments to a Withdrawing Member. When the Membership Interest of the Member causing the Withdrawal Event is purchased, payment for the value of his Membership Interest in the Company, as determined under Article XI, shall be paid, at the option of the Company over a period of not more than one (1) year beginning no later than four (4) months after the election to purchase the Membership Interest.

12.2     Interest on Payments. No interest shall be paid on the payments provided in this Article if the payments are made within (6) months after the Withdrawal Event. Any amount not paid within six (6) months after the Withdrawal Event shall thereafter bear interest on the unpaid balance thereof at a rate equal to the applicable federal rate under Section 1274(d)(2) of the Code, or any similar successor provision of law.

12.3     Income Tax Incidents of Payments. It is the intention of the parties that all payments described in Article X or Article XI to a Member causing a Withdrawal Event, to the personal representative or beneficiary of a deceased Member, or to an incompetent Member shall constitute payment for his Membership Interest in Company property to the extent of such Member's Capital Account as adjusted pursuant to Section 11.3, and to that extent shall be considered a distribution by the Company under Section 736(b) of the Code.

## ARTICLE XIII

## ADMISSION OF NEW MEMBERS;
## TRANSFERABILITY OF A MEMBERSHIP INTEREST

15

13.1    Admission of New Members Other Than Upon Sale of a Membership Interest.  Subject to the provisions of Section 13.2, new Members may be admitted to the Company at the beginning of each Company year by a unanimous vote of the Members.  In such case, a supplemental agreement shall be executed by all the Members and by the new Member setting forth (a) the amount of Company capital and the allocation thereof among the Members, (b) the allocation among all of the Members of items of income, gain, loss, deduction, or credit as specified in Section 9.1, and (c) a statement that all Members shall be bound by this Operating Agreement as amended by the supplemental agreement.  Each new Member shall pay in cash an amount determined by multiplying his share of the capital of the Company, as set forth in the supplemental agreement, by the total value of the Members' Membership Interests as determined in Article XII as of the date of admission of the new Member to and among the existing Members allocated according to the ratio of their Capital Accounts prior to the admission of the new Member.  If the new Member shall so request in writing within ten (10) days of his admission as a Member, the Members shall join with the new Members in causing the Company to file an election under Section 754 of the Code to adjust the basis of the Company property.

13.2    Sale of Membership Interest.  No Member shall sell, assign, transfer, or otherwise dispose of all or part of his Membership Interest except in compliance with the following provisions:

(a)    If a Member desires to sell, convey, assign, transfer, pledge or otherwise dispose of any or all of his Membership Interest and shall solicit or receive a *bona fide* offer from a third party (who may be another Member) to acquire such Membership Interest that such Member desires to accept (an "**Offer**"), then such Member shall promptly, but in any event not more than ten (10) business days after receipt of the Offer, give the Company and the other Members written notice of the Offer (the "**Notice**").  The Notice shall specify:  (i) the size of the Membership Interest that is the subject of the Offer (such Membership Interest being hereinafter referred to as the "**Offered Interest**"); (ii) the identity, residence address and resume of the proposed acquirer of the Offered Interest and of each person that will have a beneficial interest in the Offered Interest pursuant to the Offer; (iii) the price for the Offered Interest contained in the Offer, including a detailed description of the terms of payment and of any non-cash consideration to be received by such Member pursuant to the Offer (the "**Offer Price**"); and (iv) the proposed time and date of closing of the Offer purchase transaction.  During the period commencing on the date the Company receives the Notice and ending thirty (30) days thereafter (the "**Company Option Period**"), the Company shall have the exclusive right (but not the obligation) to acquire the Offered Interest for the Offer Price.  The Company may exercise its option by delivering, within the Company Option Period, to the Member who has given Notice and to the other Member a writing stating that the Company has elected to acquire the Offered Interest pursuant to this Section 13.2(a) (the "**Notice of Company Option Exercise**").  The Notice of Company Option Exercise shall stipulate a closing date for the Company's acquisition of the Offered Interest that shall not be later than ninety (90) days after the date on which the Company received the Notice.

(b)    If the Company Option Period shall have expired without the election by the Company to acquire the Offered Interest, then, for a period of thirty (30) days commencing thirty-one (31) days after the date on which the Company received the Notice (the "**Member's Option Period**"), the Members other than the Member who has given the Notice shall have the exclusive right (but not the obligation) to acquire the Offered Interest for the Offer Price.  Said Members may exercise this option by delivering, within the Member's Option Period, to the Member who has given the Notice and to the Company a writing stating that such Members have elected to acquire the Offered Interest pursuant to this

16

Section 13.2(b) (the **"Notice of Member's Option Exercise"**). The Notice of Member's Option Exercise shall stipulate a closing date for the acquisition of the Offered Interest that shall not be later than one hundred twenty (120) days after the date on which the Company received the Notice. To the extent that, hereafter, the number of Members total more than two, the option contained in this clause (b) shall be a pro rata option of each Member other than the Member desiring to sell any or all of his Membership Interest.

(c)     If, but only if, the Company Option Period and the Member's Option Period shall have expired without the election by the Company or the Members other than the Member who has given the Notice, respectively, to acquire the Offered Interest, then, upon receipt by the Company of a written instrument in form and substance satisfactory to the Company pursuant to which the party (or parties) to whom the Offer Interest are to be transferred pursuant to the Offered agree to be bound as a Member under this Operating Agreement, the Member shall be free to transfer the Offered Interest to said party (or parties) on the exact terms and conditions set forth in the Offer. Any variation of or amendment, modification or supplement to such terms and conditions in the Offer shall be deemed to create a new offer subject to the provisions of Sections 13.2(a) and 13.2(b).

(d)     The Member who shall have given the Notice shall not, and representatives of such Member serving as Manager or on the Company's advisory board, if any, shall not, participate in any deliberations with respect to the exercise of the Company's option to acquire the Offered Interest. If the Offer Price shall include non-cash consideration, either of the Company or the Member other than the Member giving the Notice, as the case may be, shall have the right (but not the obligation) to substitute cash in an amount equal to the approximate value of the non-cash consideration.

13.3     <u>Investment Intent</u>. Each Member, by signing this Operating Agreement, acknowledges that the Membership Interest of such Member will be acquired for investment for its own account, not as a nominee or agent, and not with a view to the resale or distribution thereof. Each Member acknowledges that no Membership Interest has been registered under the Securities Act of 1933, as amended (the **"Act"**), and, therefore, if the Membership Interests are deemed to be securities, in addition to the restrictions contained in Section 13.2 hereof, no Membership Interest may be resold unless subsequently registered under such Act or unless an exemption from such registration is available. Each Member, other than the two initial Members, represents and warrants that he is either an "accredited investor," as that term is defined in Regulation D promulgated under the Act or has such knowledge, experience and sophistication in the areas in which the Company intends to do business so as to be in a position to understand the risks associated with investment in the Company and bear the loss of such investment. Each Member acknowledges that he/it has been provided the opportunity to ask questions of and receive answers concerning Company. Each Member has conducted his/its own investigation of Company and is prepared to bear the financial risks of an investment therein for an indefinite period of time.

## ARTICLE XIV

## OPTION TO PURCHASE
## GSC EB5 INVESTOR LLC MEMBERSHIP INTEREST.

17

14.1    Provided Mason Hill has not been in default of this Agreement or the EB5 Management Agreement Mason Hill shall have the option, which shall not expire, to purchase all but not less than all of GSC EB5 Investor LLC's Membership Interest in the Company ("Mason Option"), at any time after the Project Owner's limited partners have received their respective permanent residency statuses, all applicable USCIS Regulations related to the Project have been satisfied and the EB5 Investors' interests in the Project Owner have been purchased by the Project Owner pursuant to Section 2.4 of the Limited Partnership Agreement ("Option Commencement Date"). Mason Hill shall exercise it's rights under this Section by delivering written notice to the GSC EB5 Investor LLC at least thirty (30) days prior to the date specified by Mason Hill in such notice as the closing date for such purchase ("Buyout Date").

18

14.2    The purchase price for the GSC EB5 Investor LLC's Membership Interest ("Buyout Price") shall be the amount determined as if the Project Owner is sold at fair market value (as hereinafter determined) and the proceeds distributed to the partners of the Project Owner and such amount received by the Company multiplied by the GSC EB5 Investor LLC's percentage of total membership interests owned.

14.3    The fair market value of the Project Owner shall be determined by agreement between the Members. Such fair market value shall either be agreed upon between the parties or, if they are unable to agree, then determined by a single appraiser acceptable to both parties. If, within thirty (30) days following the Manager's notice of exercise of the option, the parties have not reached agreement on fair market value or on a single appraiser to determine fair market value, then either party may demand arbitration to be conducted by three appraisers, one appointed by each party and the third appointed by the first two. If the third appraisal is less than either of the first two, then the fair market value shall be the average of the two lowest appraisals. If the third appraisal is greater than the first two, then the fair market value shall be the average of the two highest appraisals. If the third appraisal falls between the previous two appraisals, the fair market value shall be the value established by the third appraisal  Each appraiser shall be experienced in the valuation of operating businesses in the retail and restaurant industry. If either party shall demand arbitration, such demand shall be in writing and shall name the appraiser designated by such party. If the other party shall fail to name its appraiser within ten (10) days following such demand for arbitration, and if such failure shall continue for five (5) days after the other party shall have received notice demanding such appointment, then the first appraiser may appoint the third, and the two of them will appoint the second. The proceedings of such appraisers shall conform to the rules of the American Arbitration Association, as far as appropriate, and its decision shall be final and binding. The expense of the appraisals shall be paid by the Company.

14.4    The Buyout Price shall be paid in cash to GSC EB5 Investor LLC on the Buyout Date. GSC EB-5 Investor, LLC and Mason Hill shall execute and deliver all documents and instruments of assignment deemed necessary or appropriate for the consummation of such sale of Membership Interests. All agreements and obligations of the Project Owner, including any franchise agreements with Gold Star shall remain in full force and effect after the sale of interests pursuant to this section.

14.5 In the event Mason Hill has failed to exercise its Mason Option on or before a date which is five (5) years after the Option Commencement Date then GSC EB5 Investor LLC shall have the option, which shall not expire, to purchase all but not less than all of Mason Hill's Membership Interest in the Company on the same terms and conditions set forth for the Mason Option above and all but not less than all of Mason Hill's limited partnership interests in the Project Owner for fair market value determined in accordance with this paragraph 14 (but such determination of value shall be separate from the value of the Membership Interest in the Company).

ARTICLE XV

DISSOLUTION AND TERMINATION

15.1    Dissolution.

(a)    Except as otherwise provided herein, the Company shall be dissolved upon the occurrence of any of the following events:

19

(i) the written agreement of all the Members; or

(ii) the occurrence of a Withdrawal Event, unless, subject to Article XI, the business of the Company is continued by the consent of a unanimous vote of the remaining Members within 90 days after the Withdrawal Event and there is at least one remaining Member. Notwithstanding anything contained herein to the contrary, the Company shall continue and not dissolve whether as a consequence of the bankruptcy or insolvency of one or more of the Members, or otherwise, but the Company shall continue as long as there remains a solvent Member.

(b) Except as expressly permitted in this Operating Agreement, a Member shall not voluntarily resign or take any other voluntary action which directly causes a Withdrawal Event.

15.2 Effect of Filing of Certificate of Dissolution. Upon the filing by the Secretary of State of a certificate of dissolution, the Company shall continue its existence until the winding up of its affairs is completed.

15.3 Winding Up, Liquidation and Distribution of Assets.

(a) Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(i) Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members unanimously elect to receive distributions of any assets in kind),

(ii) Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are also creditors, and

(iii) Distribute the remaining assets in the following order:

(1) If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members holding 100% of the Membership Interests. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to Article XII to reflect such deemed sale.

(2) The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

20

(c) Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Treasury Regulations, if any Member or Economic Interest Holder has a negative balance in his Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member or Economic Interest Holder shall have no obligation to make any Capital Contribution, and the negative balance of such Capital Account shall not be considered a debt owed by such Member or Economic Interest Holder to the Company or to any other person for any purpose whatsoever.

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

16.1     Notices.  Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement.  Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

16.2     Application of Ohio Law.  This Operating Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Ohio, and specifically the Act.

16.3     Waiver of Action for Partition.  Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

16.4     Amendments.  This Operating Agreement may not be amended except by the written agreement of Members holding 100% of the Membership Interests.

16.5     Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

16.6     Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

16.7     Counterparts.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

16.8     Tax Matters Partner.  GSC EB5 Investor LLC shall serve as the tax matters partner as defined in Section 6231(a) of the Code, until such time that it resigns or is removed by vote of the Members

21

holding a Majority Interest. Upon such resignation or removal, a new tax matters partner shall be selected by unanimous vote of the Members holding a Majority Interest.

16.9    Arbitration.    All claims, demands, disputes, controversies and differences that may arise between or among any of Members, Managers and/or Company concerning any issue relating to the interpretation or enforcement of this Operating Agreement or relating to the rights or liabilities of any of Members, Managers and/or Company under this Operating Agreement, any management agreement, or cross indemnification agreement, shall be exclusively determined and settled by arbitration ("**Arbitration**") on the following terms:

(a)    Any party to such claim, demand, dispute, controversy or difference may, by written notice to all other parties to such claim, demand, dispute, controversy or difference, appoint an arbitrator who shall be a person experienced in serving as an arbitrator under the rules of the American Arbitration Association ("**AAA**").    Each other party to such claim, demand, dispute, controversy or difference shall, by written notice, within 10 days after receipt of such notice by the first party, appoint another arbitrator who shall have the same qualifications and, in default of any such appointment by any of such other parties, the first arbitrator appointed shall be the sole arbitrator.

(b)    If more than one arbitrator has been appointed in accordance with Section 16.9(a), but such number of arbitrators is an even number, such arbitrators shall, if possible, agree upon one more arbitrator with the same qualifications and shall appoint him/her by written notice signed by each of the initial arbitrators with a copy mailed to each party to the claim, demand, dispute, controversy or difference within 10 days after the appointment of the last of the initial arbitrators to be appointed.    If such 10 day period has elapsed without notice of appointment of the additional odd-numbered arbitrator, then any one or more parties to the claim, demand, dispute, controversy or difference may, in writing, request any Hamilton County, Ohio, Circuit Court Judge to appoint a third arbitrator.

(c)    In lieu of the foregoing, the parties to such claim, demand, dispute, controversy or difference may agree upon a single arbitrator who shall serve as the sole arbitrator for all purposes of this Section 16.9.

(d)    Within 30 days after the multiple arbitrators or single arbitrator are appointed as provided for above, such arbitrators or arbitrator shall hold an arbitration hearing in Cincinnati, Ohio.    At the arbitration hearing, the laws of evidence of the State of Ohio shall apply, and the arbitrators or arbitrator shall allow each party to present that party's case, evidence and witnesses, if any, in the presence of the other party or parties, and shall render an award, including a provision for payment of costs and expenses of arbitration to be paid by one or more parties to the claim, demand, dispute, controversy or difference, as the arbitrator or arbitrators deem just.

(e)    The award of the majority of the multiple arbitrators, or the award of the sole arbitrator, shall be binding on the parties to this Agreement, with no right to appeal with respect to any questions of law or any other issue to any court, and judgment may be entered on such award in any court having jurisdiction.

(f)    The parties request that the arbitrators or arbitrator include in the award explicit provision for the payment of all arbitration costs and expenses, including, without limitation, reasonable attorneys' fees and other costs and expenses incurred by the parties, on terms and conditions that the

22

arbitrators or arbitrator deem just. If the award does not include a complete determination with respect to such costs for any reason, then except to the extent otherwise provided by the award (i) the costs and expenses of the arbitration with respect to any arbitrator shall be borne by the party appointing that arbitrator, (ii) the costs and expenses of the arbitration with respect to any odd-numbered arbitrator appointed by the arbitrators or the sole arbitrator appointed by the parties if there shall be only one arbitrator, as the case may be, shall be evenly divided among all parties to such claim, demand, dispute, controversy or difference, and (iii) each party to such claim, demand, dispute, controversy or difference shall otherwise bear such party's own costs and expenses, including, without limitation, attorneys' fees.

        (g)    Except where in conflict with the terms of this Section 16.9, the rules and procedures of AAA shall govern the arbitration proceedings.

        The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement constitutes the Operating Agreement of Company adopted by the Members of the Company as of the date first written above.

**MEMBERS:**

**GSC EB5 INVESTOR LLC**

By: _Michael E. Rohrkemper_
Title: Michael E. Rohrkemper, Manager

**Mason Hill, LLC**

By: _____
Title: Gary Chan, Authorized Member

23

575459v1

## EXHIBIT A

| Initial Members | Initial Capital Contribution | Allocation of Profits and Losses | Capital Interest |
|---|---|---|---|
| GSC EB5 Investor LLC 650 Lunken Park Drive Cincinnati, Ohio 45226 | $1,212,500* | 97.00% | 97.00% |
| Mason Hill, LLC 1021 Delta Avenue Cincinnati, OH 45208 | $37,500* | 3.00% | 3.00% |

\*　　contributions will be made on a schedule as the capital is required per the following schedule

| GSC Opp Management Equity Contribution Plan | Date | GSC EB5 Investor LLC 97% Member | Mason Hill LLC 3% Member | | | | |
|---|---|---|---|---|---|---|---|
| development to date | 4/15/13 | $30,000 | $37,500 (in kind donation for costs of EB5 offering) | | | | |
| Completion of offering documents | 6/1/13 | $20,000 | | | | | |
| EB5 Investor subscription to the Project Owner | 7/1/2013 | $20,000 | | | | | |
| Admission of EB5 Investors to Project Owner and release of EB5 Investor funds to Project Owner | 8/1/2013 | $1,142,500# | | | | | |
| | | | | | | | |
| Total Capital | | $1,212,5000 | $37,500 | | | | |

# GSC EB5 Investor LLC shall make the $1,142,500 capital contribution to the Company ratably with contributions made by the EB5 Investors to the Project Owner and may include sums expended in advance to secure locations for the Project, other project expenses including franchise fees and royalty fees.

25

## EXHIBIT B

### Special Allocations to Capital Accounts
### and Certain Other Income Tax Allocations

Notwithstanding Section 9.1 hereof:

(a)     If there is a net decrease in "Company minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(d)) for a fiscal year, then, subject to the last paragraph of this **Exhibit B**, there shall be allocated to each Member items of income and gain for that year equal to that Member's share of the net decrease in minimum gain (within the meaning of Treasury Regulations Section 1.704-2(g)(2)).  The foregoing is intended to be a "minimum gain chargeback" provision as described in Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in all respects in accordance with that Treasury Regulations Section.

If during a fiscal year there is a net decrease in partner (Member) nonrecourse debt minimum gain (as determined in accordance with Treasury Regulations Section 1.704-2(i)(3)), then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, any Member with a share of that nonrecourse debt minimum gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the fiscal year shall, subject to the last paragraph of this **Exhibit B**, be allocated items of income and gain for that year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in such nonrecourse minimum gain.  The foregoing is intended to be the "chargeback of partner (Member) nonrecourse debt minimum gain" required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with that Treasury Regulations Section.

The allocations set forth in the two preceding paragraphs of this **Exhibit B** shall be subject to (1) the exceptions set forth in Treasury Regulations Section 1.704-2(f)(2) and (f)(3), and (2) any exceptions provided by the Commissioner of the Internal Revenue Service (**"Commissioner"**) pursuant to Treasury Regulations Section 1.704-2(f)(5) (except that if the Company shall have any discretion as to an exception set forth pursuant to Treasury Regulations Section 1.704-2(f)(5), the Manager may exercise such discretion on behalf of the Company), and (3) any exceptions set pursuant to Treasury Regulations Section 1.704-2(i)(4) including exceptions that such Treasury Regulations Section incorporates by reference to those provided pursuant to Treasury Regulations Sections 1.704-2(f)(2) and (f)(3) and including exceptions provided by the Commissioner pursuant to the Commissioner's authority provided by analogy to Treasury Regulations Section 1.704-2(f)(5) (and subject to the Manager's exercise of any Company discretion as to these exceptions).  The Manager shall, if the application of the minimum gain chargeback requirements would cause a distortion in the economic arrangement among the Members, ask the Commissioner to waive the minimum gain chargeback requirements pursuant to Treasury Regulations Sections 1.704-2(f)(4) and 1.704-2(i)(4).

(b)     If during any Fiscal Year of the Company a Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), which causes or increases a deficit balance in the Deficit Capital Account, there shall be allocated to the Member items of income and gain (consisting of a pro rata portion of each item of Company income,

26

including gross income, and gain for such year) in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. The foregoing is intended to be a "qualified income offset" provision as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d), and shall be interpreted and applied in all respects in accordance with such Regulation.

(c) If the allocation of any item of loss or deduction for any Fiscal Year pursuant to Section 9.1 would cause or increase a deficit balance in the Deficit Capital Account of any Member as of the end of such Fiscal Year, then, to the extent the allocation of such item of loss or deduction would have such effect, it shall instead be allocated (i) first, among those Members having positive balances in their Deficit Capital Accounts as of the end of such Fiscal Year in proportion to the positive balances in their respective Deficit Capital Accounts, and (ii) thereafter, as provided in Section 9.1.

(d) Notwithstanding anything to the contrary in this **Exhibit B**, any item of deduction, loss, or Section 705(a)(2)(B) of the Code expenditure that is attributable to "partner (Member) nonrecourse debt" shall be allocated in accordance with the manner in which the Members bear the economic risk of loss for such debt (determined in accordance with Treasury Regulations Section 1.704-2(i)).

(e) Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in the same manner as Net Profit or Net Loss is allocated for such period.

(f) All recapture of income tax deductions resulting from sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(g) Any credit or charge to the Capital Accounts of the Members pursuant to Sections (a), (b), (c), (d), and/or (e) of this **Exhibit B** hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.1 and 9.2 (a), (b), (c), (d), and/or (e) and shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of Article IX if the special allocations required by Sections (a), (b), (c), (d), and/or (e) of this **Exhibit B** had not occurred.

27

## EXHIBIT C

#### Officers

Michael E. Rohrkemper  - President

Michael Mason         - Vice President

28

<u>Exhibit D</u>

<u>Management Fees</u>