# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| BAOYANG CHEN, | : | |
| Plaintiff; | : | |
| | : | Case No. 1:17-cv-460 |
| v. | : | |
| | : | |
| GSC OPPORTUNITIES, L.P.; | : | Judge Michael R. Barrett |
| GSC OPP MANAGEMENT, LLC; GARY | : | |
| CHAN; MASON HILL, LLC; JARDIN | : | |
| HILL, LLC; CLEARWATER | : | |
| HOSPITALITY GROUP, LLC; LUMEN | : | |
| POINT CAPITAL FUND I, LLC.; RG | : | |
| MGMT, LLC; RG OPPORTUNITIES I, L.P.; | : | |
| GOLD STAR CHILI, INC.; GSC EB5 | : | |
| INVESTOR, LLC | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

---

## PLAINTIFF BAOYANG CHEN'S SECOND AMENDED COMPLAINT

Now comes Plaintiff, Baoyang Chen ("Plaintiff"), and for his Second Amended Complaint ("Complaint") against Defendants, GSC Opportunities, L.P. ("GSC"); GSC OPP Management, LLC[1] ("GSC OPP"); Gary Chan; Mason Hill, LLC ("Mason Hill"); Jardin Hill, LLC ("Jardin"); Clearwater Hospitality Group, LLC ("Clearwater"); Lumen Point Capital Fund I, LLC ("LPCF"); RG MGMT, LLC ("RG MGMT"); RG Opportunities I, L.P. ("RG OPP") (collectively with Mason Hill, Jardin, Clearwater, LPCF, RG MGMT, RG OPP, the "Chan Entities"); Gold Star Chili, Inc. ("Gold Star"); and GSC EB5 Investor, LLC ("GSC EB5") (collectively, "Defendants"), states as follows:

---

[1] This Defendant has previously been referred to as a limited partnership instead of a limited liability corporation.

## THE PARTIES

1.      Plaintiff is a citizen and resident of the People's Republic of China and a limited partner in GSC.  In April 2013, Plaintiff joined GSC, a limited partnership organized to allow foreign investors to utilize the EB-5 Visa program.

2.      Defendant GSC is an Ohio limited partnership with its principal place of business located in Cincinnati, Hamilton County, Ohio.  GSC was controlled at various points between 2013 and today by its General Partner, GSC OPP, and by GSC EB5, Gold Star, Terry Chan, Gary Chan, and Jacqueline Chan.

3.      Defendant GSC OPP is an Ohio limited liability company with its principal place of business in Ohio.  GSC OPP is the General Partner of GSC, an Ohio limited partnership.  GSC OPP was initially composed of multiple members, including GSC EB5 (which is completely controlled by Gold Star) and Mason Hill.  However, GSC EB5 and Gold Star withdrew from GSC OPP on or after November 20, 2016, leaving Mason Hill as the only remaining active partner.  As is detailed below, Mason Hill is actively controlled by Gary Chan, Terry Chan, and Jacquelyn Chan (collectively, "the Chans").

4.      Defendant Gary Chan is a citizen of the State of Florida, and a resident of Orlando, Orange County, Florida.  Gary Chan is an officer, partner and/or principal in the Chan Entities. Gary Chan was also integral in the formation of GSC, GSC OPP, and other Chan Entities, and has actively managed, directed, and controlled their activities such that they have no separate mind or will of their own.

5.      Defendant Mason Hill is an Ohio limited liability company with its principal place of business located in Ohio.  The Chans are members, officers, and/or principals of Mason Hill, and they actively manage, control, and direct its activities such that it has no separate mind,

will or existence of its own.

6.      Defendant Jardin is a Kentucky limited liability company with its principal place of business located in Ohio. The Chans are members, officers, and/or principals of Jardin, and they actively manage, control, and direct its activities such that it has no separate mind, will or existence of its own.

7.      Defendant Clearwater is an Ohio limited liability company with its principal place of business located in Ohio. Clearwater is actively managed, controlled, and directed by the Chans such that it has no separate mind, will, or existence of its own.

8.      Defendant LPCF is an Ohio limited liability company with its principal place of business located in Cincinnati, Hamilton County, Ohio. Gary Chan is the incorporator of LPCF. LPCF is owned by Clearwater and is actively managed, controlled, and directed by the Chans such that it has no separate mind, will or existence of its own.

9.      Defendant RG MGMT is an Ohio limited liability company with its principal place of business located in Cincinnati, Hamilton County, Ohio. Gary Chan is the incorporator of RG MGMT. RG MGMT is owned by Clearwater and is actively managed, controlled, and directed by the Chans such that it has no separate mind, will or existence of its own.

10.     Defendant RG OPP is an Ohio limited partnership with its principal place of business located in Cincinnati, Hamilton County, Ohio. RG MGMT was the general partner of RG OPP. RG MGMT was owned by Clearwater and RG OPP was managed, controlled, and directed by the Chans such that it has no separate mind, will, or existence of its own.

11.     Defendant Gold Star is an Ohio Corporation with its principal place of business located in Cincinnati, Hamilton County, Ohio. Gold Star owns and operates Gold Star Chili restaurants in Ohio, Kentucky, and Indiana. Gold Star owned 97% of and controlled GSC OPP,

the managing partner of GSC, until at least November 20, 2016. As is detailed herein, Gold Star managed, controlled, and directed GSC OPP such that it had no separate mind, will, or existence of its own.

12.     Defendant GSC EB5 is an Ohio limited liability company with its principal place of business located in Cincinnati, Hamilton County, Ohio. GSC EB5 is a wholly-owned subsidiary of Gold Star. Gold Star so dominated and controlled GSC EB5 that the two entities were indistinguishable.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action involves claims arising under the laws of the United States. Specifically, a number of the Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and federal securities laws.

14.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## NATURE OF THE ACTION

15.     This is an action that Plaintiff asserts against Defendants for, among other things, breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, fraudulent conveyance, piercing the corporate veil, and punitive damages to remedy Defendants' unlawful actions, which include gross mismanagement, embezzlement, and self-dealing of Plaintiff's investment proceeds in GSC.

16.     The Chans have orchestrated a complex enterprise, run through the Chan Entities, to convert the funds of Plaintiff and other GSC investors. The Chans utilized this enterprise to

enrich themselves, improperly pay off debts that have nothing to do with GSC, and inappropriately finance the operation of other entities they control.

17.     The Chans were able to execute this complex enterprise because Gold Star, GSC OPP, and GSC EB5 abdicated contractual and fiduciary duties to Plaintiff and other GSC investors.  Further, as is detailed below, many of these defendants were involved in preparing false materials provided to Plaintiff and potential GSC investors, and failed to correct misleading communications sent to Plaintiff.

## THE EB-5 PROGRAM

18.     Plaintiffs re-state paragraphs 1-17 as if fully rewritten.

19.     On or about March 28, 2013, Gold Star, Terry Chan, Gary Chan, and Mason Hill, by and through their agent and Chinese immigration promoter, Goldlink, lured Plaintiff into investing in GSC as part of the EB-5 Visa Program administered by the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS").

20.     In 1990, Congress established the EB-5 Program in order to bring new investment capital into the United States and create new jobs for U.S. workers.

21.     Under the EB-5 Program, immigrants who invest their capital in job-creating business enterprises in the U.S. receive "conditional" permanent resident status in the U.S. for two (2) years after their I-526 application is approved. If, after the two-year period, the immigrants satisfy the EB-5 Program conditions and other Program criteria, USCIS removes the conditions and the immigrant investors become lawful permanent residents. In other words, the immigrant investors obtain their "Green Cards."

22.     In essence, the EB-5 Program has three key components: (a) immigrant investment of capital; (b) in a new commercial enterprise; that (c) creates jobs.

23. To avail oneself of the EB-5 Program, the immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs, unless the immigrant invests his or her capital in what is called a "targeted employment area." In that case, the immigrant must invest $500,000.

24. Gold Star, Terry Chan, Gary Chan, and Mason Hill used the EB-5 Program to lure Plaintiff into investing over $500,000 in GSC. Plaintiff's investment has since been converted by the Chans and diverted into the Chan Entities without his consent.

## GSC'S INITIAL MANAGEMENT AND STRUCTURE

25. In early 2013, Terry Chan, Gary Chan, Mason Hill, Jardin, and Gold Star began collaborating on a possible EB-5 investment project. This project involved the development of Gold Star Chili restaurants in Ohio, Kentucky, and Indiana.

26. GSC was the brainchild of Gold Star, Gold Star's board, Gold Star's Chief Executive Officer, Mike Rohrkemper ("Rohrkemper"), and Mike Mason ("Mason"), Gold Star's former Vice President of Operations and Franchise Development.

27. By February 2013, discussions between the parties were far enough along that Terry Chan, Gary Chan, Mason Hill, Gold Star, Rohrkemper, and Mason exchanged key project documents with one another, including proposed business plans, operating agreements, management agreements, and materials that would be submitted to potential EB-5 investors.

28. Gold Star, Rohrkemper, and Mason were very involved in creating these documents and in structuring the potential project. They also reviewed and approved materials exchanged between the parties.

29. In fact, "most of the entity formation" related to this EB-5 project was done by Gold Star and its legal counsel.

30. On April 15, 2013, Gold Star and Mason Hill executed a Memorandum of Understanding ("the Memorandum") that detailed the proposed structure for this EB-5 project.

31. The Memorandum explained that Gold Star and Mason Hill would develop restaurants through GSC, which was "to be formed by Gold Star and Mason Hill."

32. The Memorandum further said that:

- GSC would be capitalized with $9,000,000; $3,000,000 of which was supposed to be provided by "Gold Star, or a wholly owned subsidiary." The remaining $6,000,000 was to be provided by Mason Hill "through 12 EB-5 immigrant limited partner investors";

- "[T]he ownership [of GSC] will be split between the EB-5 Investors and Gold Star on a 2:1 ratio," and that Gold Star would therefore own "33.3% of [GSC]";

- "Gold Star, or its wholly owned subsidiary, and Mason Hill will form a limited liability company to be the General Partner of [GSC]";

- "Gold Star will be the Managing Member of the General Partner and own 97% of the membership interests";

- Mason Hill and Gold Star would "work cooperatively to finalize [GSC's] Business Plan … to conform [it] to Gold Star operation standards";

- GSC's business plan had to be "mutually agreeable" to both Gold Star and Mason Hill;

- Gold Star would review and approve GSC's private placement memorandum, the Operating Agreement for GSC's general partner, GSC's subscription agreement, and other documents "necessary to take [GSC] to potential EB-5 Investors";

- Gold Star agreed to "manage and operate [GSC]," to provide accurate information that would be included in materials provided to potential investors, and to help ensure that GSC met all EB-5 requirements; and,

- "As managing member of [GSC's] General Partner," Gold Star was expected to receive "$15,000 per franchise restaurant location per year … to pay for various administrative, accounting and compliance costs related" to the operation of GSC.

33.     Gold Star's "duties and responsibilities" in connection with GSC OPP also included contributing the "Gold Star Capitalization," a term defined in the Memorandum as the $3,000,000 capital contribution.

34.     Gold Star also had the duty and responsibility to "[m]anage and operate the Project Owner." The term, "Project Owner," was defined in the Memorandum as GSC OPP.

35.     Rohrkemper executed the Memorandum on behalf of Gold Star.

36.     Gold Star, Rohrkemper, Mason, and the Chans continued working together after the Memorandum was signed to finalize key documents, including GSC's partnership agreement, private placement memorandum ("PPM"), and business plan.

37.     Gold Star, Rohrkemper, and Mason reviewed, commented on, edited, and ultimately approved all of the materials sent to prospective GSC investors.

38.     On or before May 7, 2013, Gold Star, Rohrkemper, Mason, and the Chans finalized GSC's management and operational structure, and created GSC OPP to serve as GSC's general partner.

39.     Gold Star initially owned 97% of GSC OPP through GSC EB5, Gold Star's wholly-owned subsidiary. Mason Hill owned the remaining 3% of GSC OPP.

40.     This 97% interest shows GSC's control of GSC OPP. This control is further confirmed by a litany of other communications and materials.

41.     For example, Gold Star previously said that it "via its wholly owned subsidiary [GSC EB5] will be the General Partner of the Project Owner (GSC Opportunities, LP) with **total control of the project**." (Emphasis Added).

42. Gold Star's attorney also said in an email that he did not want to use Gold Star's name in certain materials, but that this was not a huge issue "during the time Gold Star is in control of the GP [GSC OPP]."

43. Rohrkemper also represented that Gold Star was "the one in control" of GSC OPP, that he and Gold Star's board made decisions for GSC OPP, and that Gold Star controlled GSC OPP and GSC's funds.

44. Gold Star's own materials defined the overall structure of these entities, along with the agreements governing these entities, as follows:



"GSC, Inc.," as used in this document and others, was shorthand for Gold Star Chili, Inc.

45. Gold Star, through GSC EB5, initially managed GSC OPP pursuant to the terms of GSC OPP's Operating Agreement.

46.     GSC OPP's Operating Agreement confirmed that Gold Star was integrally involved in the creation of GSC and GSC OPP.  For example, GSC OPP's Operating Agreement starts by saying that Mason Hill "and Gold Star Chili, Inc. … have developed a Business Plan for the opening and development of" Gold Star restaurants.

47.     GSC OPP's Operating Agreement also shows that Gold Star completely controlled GSC, GSC OPP, and GSC EB5.  For example, the agreement said that GSC OPP's principal place of business and registered office was 650 Lunken Park Drive in Cincinnati, Ohio.  This is the same address as GSC EB5 and Gold Star's headquarters.

48.     GSC OPP's Operating Agreement also said that Rohrkemper was GSC OPP's President and registered agent.  Mason was GSC OPP's Vice President.

49.     Rohrkemper executed the agreement on behalf of Gold Star and GSC EB5.

50.     As GSC OPP's manager, Gold Star had the "full and complete authority, power and discretion to manage and control the business, affairs, and properties of GSC OPP."

51.     Gold Star, however, eventually delegated some of its responsibilities under the Operating Agreement to itself and Mason Hill.

52.     Specifically, Gold Star executed an Operations Management Agreement ("Management Agreement") with itself.  It also executed an EB-5 Services Management Agreement ("EB-5 Agreement") with Mason Hill.

53.     Under the Management Agreement, Gold Star had to provide "services related to the management and operations of certain matters involving the administrative, accounting and compliance and operations of the restaurants owned by GSC [OPP]."  This included Gold Star's responsibility to "[p]rovide executive level and strategic oversight for GSC [OPP] as a whole."

10

54.     This agreement again demonstrated Gold Star's control over GSC OPP and GSC EB5.  For example, the address listed for both GSC OPP and Gold Star in this agreement was listed as 650 Lunken Park Drive.  This is the address of Gold Star's headquarters.

55.     Rohrkemper also signed this agreement for Gold Star, GSC OPP , and GSC EB5.

56.     The EB-5 Agreement required that Mason Hill handle the EB-5 aspects of GSC.

57.     This authority was not unlimited, however, and Gold Star still had significant control of key EB-5 issues.  For example, Mason Hill could not transfer escrow account funds to GSC without Gold Star's authorization.

58.     The EB-5 Agreement also required that Mason Hill prepare a number of documents "for Gold Star's review and approval," including GSC's business plan, PPM, and other documents necessary to take GSC to potential EB-5 investors.

59.     Rohrkemper executed the EB-5 Agreement on behalf of Gold Star, GSC OPP, and GSC EB5.  Gary Chan executed the EB-5 Agreement on behalf of Mason Hill.

60.     GSC OPP and GSC EB5 were both grossly inadequately capitalized after their formation.  GSC EB5 had no independent source of funds and was entirely reliant on Gold Star for capitalization.  GSC OPP's funding mostly, if not entirely, also came from Gold Star.

61.     GSC OPP and GSC EB5 also failed to observe corporate formalities after their formation, including the failure to hold mandated meetings. Mason did not even know he was listed as GSC OPP's purported Vice President until 2019.

62.     GSC OPP and GSC EB5 similarly have no independent corporate records despite having a duty to create and maintain them.

63.     Gold Star also represented that it was personally liable for certain of GSC OPP's and GSC EB5's obligations, including the $3,000,000 contribution to GSC.

64.     Both GSC OPP and GSC EB5 were alter egos of Gold Star during relevant time periods.  Gold Star so dominated and controlled both entities that they had no separate mind or will of their own during relevant time periods.

65.     Gold Star, GSC OPP, GSC EB5, Gary Chan, and Mason Hill had significant management roles in connection with GSC.  They each had fiduciary and contractual duties to GSC limited partners pursuant to these roles, and were responsible for the successful operation of GSC.  As is demonstrated below, however, each of these individuals and entities failed to adhere to duties and fiduciary obligations they had to Plaintiff, which caused Plaintiff injury.

66.     Further, as is detailed below, Gold Star used its control over GSC OPP and GSC EB5 to commit fraud and illegal acts.

### PLAINTIFF'S INVESTMENT WAS SOLICITED BASED ON FALSE AND MISLEADING MATERIALS

67.     Terry and Gary Chan, for themselves and for many of the Defendants named above, provided Plaintiff with a promotional booklet through an immigration agent and/or promoter.  This promotional booklet detailed the scope of GSC, how it would operate, and how it would be managed.

68.     As is mentioned above, Terry Chan, Gary Chan, Mason Hill, Gold Star, Rohrkemper, and Mason created, directed, and/or otherwise approved the content in this booklet and the statements contained therein, or were integrally involved in the marketing, distribution, and publication of these materials to Plaintiff.

69.     This promotional booklet highlighted Gold Star's connection to GSC, and provided potential investors with detailed descriptions of GSC's purpose and operation to entice their investment.  Among other things, the booklet explained that:

- GSC expected to develop and open 12 Gold Star restaurants within a 300

12

kilometer, or approximately 186 mile, radius of Cincinnati;

- Gold Star was the main investor in GSC;

- and, Gold Star was expected to invest at least $250,000 in each Gold Star restaurant.

70.     This promotional booklet made it clear that GSC's explicit purpose was to: (1) open and operate 12 Gold Star restaurants; (2) in conjunction with Gold Star; and, (3) in Cincinnati and/or the surrounding region.

71.     Plaintiff also received GSC's business plan ("Business Plan"), a true and correct copy of which is attached hereto as **Exhibit A**.

72.     As is detailed above, Terry Chan, Gary Chan, Mason Hill, Gold Star, Rohrkemper, and Mason created, directed, and/or otherwise approved the content in this Business Plan and the statements contained therein, or were integrally involved in the marketing, distribution, and publication of these materials to Plaintiff.

73.     Gold Star diligently reviewed the Business Plan, significantly edited this document, and knew that the Business Plan would be shown to potential investors.

74.     This Business Plan explained, among other things, that:

- GSC would be financed by a $6,000,000 investment from 12 EB-5 investors and a $3,000,000 investment from Gold Star;

- 12 Gold Star restaurants would be developed;

- Each restaurant would be "located within a 200-mile radius of Gold Star Chili's corporate headquarters"; and,

- A complex monthly draw process would be established to ensure that each disbursement of funds was necessary to accomplish GSC's purpose.

75.     The Business Plan consistently informed Plaintiff and other GSC investors that Gold Star would be integrally involved in the management and operation for GSC.  For example,

GSC's Business Plan represented that "[GSC OPP] will serve as the General Partner of [GSC, and] **Gold Star Chili, Inc. will be the managing member of GSC OPP**." (Emphasis added.)

76.     The Business Plan also explained that "**[i]n addition to managing [GSC], as managing member of [GSC OPP], Gold Star Chili, Inc.** will manage and oversee the start up and stabilization of each restaurant in the [GSC] portfolio." (Emphasis Added.)

77.     The Business Plan further said, "**[a]s the General Partner of [GSC, GSC OPP,] with Gold Star Chili, Inc. as its managing member**[,] **will oversee and control the disbursement of funds from**" GSC to subsidiary entities." (Emphasis Added.)

78.     The Business Plan even contained an organizational chart that highlighted Gold Star's integral involvement in GSC and GSC OPP:



79.     Gold Star employees were identified in the Business Plan as a part of GSC's "Operational Management Team." This team included Rohrkemper, Mason, and Gold Star's Vice President of Marketing and Brand Development, Charlie Howard.

80.     In addition to the Business Plan, GSC provided interested investors, such as Plaintiff, with an "Agreement of Limited Partnership" ("Partnership Agreement"). A true and

correct copy of the Partnership Agreement provided to Plaintiff is attached hereto as **Exhibit B**.

81.     Gold Star, Rohrkemper, and Mason were all involved in creating, reviewing, and editing GSC's Partnership Agreement.

82.     The Partnership Agreement explains that GSC is controlled by its General Partner, GSC OPP.

83.     The Partnership Agreement also states that:

> The purpose and business of [GSC] shall be to invest in and/or loan money to various entities . . . that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owed [sic] subsidiaries to: (i) open and operate Gold Star Chili restaurant franchises in the Dayton-Cincinnati-Lexington region of Southwest Ohio and Kentucky . . . .

84.     This purpose was in accord with the terms of the GSC's Business Plan, which was attached as an exhibit to the Partnership Agreement.

85.     The Partnership Agreement defines a "Targeted Employment Area" as an area that has, "been designated by Steven R. Kelly or otherwise designated person(s) or entities . . . [and] that has experienced unemployment of at least 150% of the national average rate at the time a Limited Partner made his or her Capital Contribution."

86.     The Partnership Agreement states that investors, such as Plaintiff, will be admitted as a limited partner in GSC if they decided to invest.

87.     GSC was designed to comply with EB-5 regulations as a vehicle for Plaintiff and other Limited Partners to obtain U.S. resident status.  Plaintiff could not be admitted into GSC if his I-526 petition is not approved.  The Partnership Agreement mandates that Plaintiff's capital contribution be returned to him "within 90 days" if his I-526 petition is denied for any reason.

88.     Importantly, no limited partner has "any right or power to take part in the

management or control of the Partnership" under the Partnership Agreement. Instead, GSC OPP controlled the Partnership as its General Partner.

89. GSC OPP had a number of responsibilities under the Partnership Agreement. The "Management" section of the Partnership Agreement explains that GSC OPP "shall have the sole and exclusive right and responsibility to manage the business of the Partnership."

90. GSC OPP must also care for GSC's funds, including Limited Partners' funds.

91. Further, the "Duties and Obligations of [the] General Partner" section of the Partnership Agreement states that GSC OPP "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and its affiliates." This includes GSC OPP's responsibility to "segregat[e] Partnership assets" and to "not allow[] funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [GSC OPP] or any of its affiliates." This provision prohibits GSC OPP from engaging in self-dealing and bars GSC OPP from co-mingling GSC's assets with the assets of other companies.

92. This section also explains that:

> The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Ohio . . . and to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance with the provisions of [the Partnership Agreement] and applicable laws and regulations.

GSC OPP is accordingly required to take all actions necessary to ensure that GSC remains a valid entity and to accomplish GSC's purpose.

93. GSC OPP must also ensure that "[a]ll property in the form of cash not otherwise

16

invested" is deposited "for the benefit of the Partnership" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or left in escrow.

94.    The Partnership Agreement contains a section covering the dissolution and winding up of GSC if certain events occur ("Liquidating Events"). One of these Liquidating Events is the "happening of any … event that makes it unlawful, impossible or impractical to carry on the business of the Partnership."

95.    If a Liquidating Event occurs, the Partnership Agreement explains that GSC will continue to exist "solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Partners."

96.    The Partnership Agreement also states that no Partner, including a General Partner, "shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of [GSC's] business and affairs" once a Liquidating Event occurs.

97.    The Partnership Agreement further requires that, once a Liquidating Event occurs, GSC OPP "shall": (1) take a full account of GSC's liabilities and property, (2) cause the property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and (3) distribute proceeds to creditors and other Partners.

98.    The Partnership Agreement mandates that GSC OPP provide a notice of the occurrence of a Liquidating Event to a number of parties, including other Partners, within 30 days of that event occurring.

99.    The Partnership Agreement binds GSC OPP to specific performance of the contract, and explains that every Partner, including Plaintiff, "would be irreparably damaged if any of the provisions of this [Partnership] Agreement are not performed in their specific terms."

100.    Finally, the Partnership Agreement contains a Schedule of Partners ("Schedule").

This Schedule shows that GSC OPP, as the General Partner, will make a $3,000,000 capital contribution to GSC.

101.    Gold Star was supposed to pay this $3,000,000 contribution through GSC EB5.

102.    This General Partner contribution was an material representation to investors such as Plaintiff, as it showed that EB-5 investments would not be the only funding source for GSC.

103.    Further, this contribution reduced Plaintiff's concerns that GSC OPP may breach the Partnership Agreement or abscond with investor funds, as GSC OPP would lose a substantial amount of funds if GSC failed.

104.    This schedule also says that 12 total EB-5 investors will be investing in the project, and that their combined investments will total $6,000,000.

105.    Overall, the Partnership Agreement says that $9,000,000 would be invested in GSC, and that Plaintiff's investment would represent 5.556% of all invested funds.

106.    Plaintiff signed a "Counterpart Signature Page and Attestation" on or before April 20, 2013, making him an investor in GSC.

107.    As Plaintiff would later find out, the materials provided to him were false in significant and material ways.

108.    On or about May 7, 2013, less than three weeks after Plaintiff became a GSC investor, Gold Star, GSC OPP, GSC EB5, Rohrkemper, Mason Hill, Gary Chan, and Terry Chan signed a number of documents materially altering GSC's size, scope, and financing.

109.    For example, on or about May 7, 2013, Rohrkemper executed GSC OPP's Operating Agreement on behalf of Gold Star, GSC OPP, and GSC EB5.

110.    Gold Star and its Board approved Rohrkemper executing this document and binding Gold Star to responsibilities contained therein.

18

111.    In this agreement, Mason Hill and Gold Star both represented that they had created a business plan to open and develop "up to 6 new Gold Star franchise restaurants."

112.    This agreement also said that GSC would be capitalized with an "anticipated amount," of $3,750,000; far below the $9,000,000 that was touted in materials Plaintiff received.

113.    The agreement finally explained that Gold Star only had to contribute $1,250,000 to GSC, far below the $3,000,000 that was stated in materials Plaintiff received.

114.    On or about May 7, 2013, Rohrkemper, on behalf of Gold Star, also executed a GSC Agreement of Limited Partnership that made GSC OPP the general partner of GSC.

115.    The partnership agreement signed by GSC OPP contained a number of material and significant differences to the Partnership Agreement Plaintiff signed.

116.    For example, this partnership agreement said that GSC would only have five limited partners, that it would be capitalized by a total of $3,750,000, and that GSC OPP would only make a $1,250,000 contribution to GSC.

117.    This $1,250,000 contribution was not solely in cash, but would include $212,000 of "in kind" contributions. This included soft costs and the payments of fees to GSC OPP's members, Gold Star and Mason Hill. Accordingly, a portion of Gold Star's contribution to GSC would ultimately be rerouted back to it in the form of management fees and other expenses.

118.    Plaintiff was not informed about these material differences in GSC's structure, size, and scope, which occurred after he invested. He did not know, among other things, that: (1) GSC would purportedly build half of the restaurants that it had represented to him on numerous occasions; (2) that GSC would be capitalized in part by 5, and not 12, EB-5 investors; (3) that the entire project had only $3,750,000 in financing and not $9,000,000; and, (4) that every GSC Limited Partner would have a 13.33% interest in GSC instead of a 5.556% interest.

119.    Gary Chan, Gold Star, GSC OPP, and GSC EB5 never disclosed the updated materials they created to Plaintiff, nor otherwise informed him of these materials changes. Plaintiff was never given the opportunity to determine if he wanted to move forward with GSC given these substantial changes to the project's size, scope, and financing.

120.    Plaintiff did not even know that GSC OPP was not a member of GSC at the time Plaintiff invested in GSC. GSC OPP did not execute a GSC partnership agreement until May or June 2013, which was after Plaintiff became a GSC investor.

121.    The Partnership Agreement, Business Plan, and other marketing materials provided to Plaintiff therefore contained numerous misrepresentations fraudulently designed to entice his investment.

122.    Gary Chan, Mason Hill, Gold Star, GSC EB5, and GSC OPP knew that the materials provided to Plaintiff were false, as is demonstrated by the massive modifications made to relevant agreements only a few weeks after Plaintiff signed the Partnership Agreement.

123.    On June 18, 2013, Gold Star's counsel even asked why two GSC investors, which included Plaintiff, could not be admitted to the partnership "now" despite the fact that key documents, including investor documents, had not been finalized.

124.    Despite this knowledge, Defendants never provided Plaintiff with updated, and correct, materials.

### GOLD STAR ABANDONS ITS RESPONSIBILITIES AND LEAVES GSC

125.    GSC and GSC OPP were both created with the expectation that Gold Star restaurants could be developed quickly.

126.    GSC initially had some success developing restaurants. A Gold Star Chili restaurant on Foreman Avenue in Lexington, Kentucky was developed in or about July 2013.

127.    A second Gold Star Chili restaurant opened in the Palomar shopping center in Kentucky in or about August 2013.

128.    These restaurants were controlled by Gold Star directly and through GSC OPP, GSC EB5, and other entities Gold Star created named GSC Foreman Ave, LLC and GSC Palomar, LLC.

129.    Under penalty of perjury, Rohrkemper certified in filings with the Kentucky Secretary of State that these entities were managed by "GSC Opportunities, LP … by and through its general partner, GSC OPP Management, LLC, by and through its manager, EB-5 Investor, LLC its managing member, by and through Michael E. Rohrkemper, its President."

130.    These restaurants were considered Gold Star "company stores," meaning that Gold Star had total control of these restaurants, including day-to-day operations.

131.    Gold Star even considered costs that it advanced to open and operate these stores as part of their contribution to GSC.

132.    Due to its management of GSC directly and through GSC EB5 and GSC OPP, Gold Star initially had significant internal controls over GSC funds. Gold Star "controlled the flow of funds" while Rohrkemper was Gold Star's CEO.

133.    Rohrkemper, however, left Gold Star in 2015.

134.    In 2015, tensions between Gold Star and the Chans arose due to, in Gold Star's words, USCIS and other issues.  Gold Star contended that Gary Chan, Terry Chan, and Mason Hill failed to timely ensure that USCIS approved GSC's Business Plan and GSC EB-5 investors.

135.    Gold Star argued that this delay was problematic because EB-5 investor funds could not be released from escrow and used in the project without I-526 petition approval.  Gold Star therefore claimed that it lacked the capital necessary to open and operate additional

restaurants.

136.    On August 31, 2015, Gold Star sent Mason Hill, Gary Chan, and Terry Chan a "Notice of Termination of Partnership EB5" via email.

137.    Gold Star explained in this notice that Gold Star and GSC EB5 could not open and operate Gold Star Chili restaurants because they could not access GSC investors' funds, and the delay caused by the lack of USCIS I-526 petition and business plan approval "made it practically impossible for [GSC EB5] to secure adequate locations for … additional Gold Star Chili franchise locations."

138.    In other words, Gold Star and GSC EB5 wanted to terminate GSC.

139.    This notice was addressed to GSC investors, including Plaintiff.  This notice, however, was sent to each investor in the "care of" Mason Hill, which never provided the notice to Plaintiff.

140.    Despite the fact that it was "practically impossible" to perform the purpose of GSC, which is a Liquidating Event under the Partnership Agreement, GSC was not liquidated.

141.    On October 8, 2015, counsel providing services to GSC OPP, GSC, Mason Hill, Terry Chan, and Gary Chan informed Gold Star's counsel that Gold Star could not unilaterally dissolve GSC or GSC OPP.

142.    Gold Star, Mason Hill, Gary Chan, and Terry Chan thereafter began negotiating Gold Star's withdrawal from GSC and GSC OPP.   This was a lengthy process, and Gold Star did not withdraw from GSC OPP and GSC until, at the earliest, November 20, 2016.

143.    When it withdrew, Gold Star did not allow GSC to keep the Gold Star Chili restaurants that Gold Star had opened for, and which were owned by, GSC.  Instead, Gold Star took possession of these restaurants and continued to them as company stores.

144.    Gold Star, Gary Chan, GSC OPP, and Mason Hill never told Plaintiff that Gold Star was taking both restaurants owned by GSC, nor did Gold Star adequately compensate GSC or its Limited Partners for these restaurants.

145.    These restaurants were integral to each Limited Partner getting USCIS approval because they had employees.  When Gold Star took these restaurants from GSC, Gold Star stripped GSC of its only assets and of job creating entities that could have been counted to meet the job creating figures necessary for Plaintiff to secure a Green Card.

146.    Gold Star, GSC OPP, GSC EB5, Mason Hill, and Gary Chan also did not inform GSC investors that GSC had generated significant revenues before Gold Star's withdrew from the project, nor that Gold Star and GSC EB5 would breach multiple agreements by withdrawing from GSC.

147.    Before it withdrew, Gold Star informed Gary Chan, Terry Chan, and Mason Hill that it did not want GSC investor funds removed from escrow accounts until Gold Star's withdrawal from GSC and GSC OPP was complete.

148.    Gary Chan, Terry Chan, and Mason Hill twice recognized this understanding.  On August 3, 2016, counsel providing services to GSC, GSC OPP, Gary Chan, Terry Chan, and Mason Hill, wrote to Gold Star's counsel that "Terry and Gary are assuming that Gold Star would like to withdraw from [GSC and GSC OPP] prior to … the disbursement of funds from the escrow agent."

149.    This counsel reiterated this understanding in an email sent to Gold Star's counsel on August 11, 2016.

150.    Gary Chan and Mason Hill, however, did not wait until Gold Star withdrew from GSC to begin removing GSC's funds.

151.     On August 5, 2016, Gary Chan emailed or sent by U.S. mail a letter to U.S. Bank, National Association ("U.S. Bank"), the escrow agent for GSC, seeking to release GSC investor funds from escrow.  In this letter, Gary Chan stated that GSC wanted to release GSC investor funds, including Plaintiff's funds, from escrow "for the purposes of acquisition of real property, capital improvements, permanent improvements or purchase of equipment only."

152.     Pursuant to Gary Chan's request, U.S. Bank released Plaintiff's funds and the funds of another EB-5 investor from escrow on August 8, 2016.  The Chans, however, did not use Plaintiff's funds for the purposes represented to U.S. Bank.  Instead, as is demonstrated below, the Chans began converting Plaintiff's funds on August 10, 2016.

153.     On August 19, 2016, Gary Chan sent another letter to U.S. Bank wherein he again stated that GSC wanted to release funds from escrow "for the purposes of acquisition of real property, capital improvements, permanent improvements or purchase of equipment only."

154.     Pursuant to Gary Chan' request, U.S. Bank released the last GSC investor's funds from escrow on August 24, 2016.  The Chans, however, did not use these funds for the purposes represented to U.S. Bank, as is detailed below.

155.     U.S. Bank honored Gary Chan's requests because, prior to August 10, 2016, Rorhkemper signed, on behalf of Gold Star, GSC OPP, and GSC EB5, a written authorization permitting Gary Chan to transfer funds out of U.S. Bank escrow accounts.

156.     Gold Star completely failed to monitor these escrow accounts in August 2016 to ensure that investors funds were not being released.

157.     This was in stark contrast to its previous practices, where Gold Star had monitored these escrow accounts and Rohrkemper talked with U.S. Bank on a number of occasions to make sure "that money was still in escrow."

158.    When Rohrkemper left Gold Star, however, Gold Star stopped monitoring these escrow accounts, which eliminated the sole safeguard protecting Plaintiff's funds.

159.    Prior to its withdrawal, Gold Star, GSC EB5, and GSC OPP were acting as or for GSC's General Partner.  These defendants had a duty to monitor GSC's funds, monitor funds that were in escrow, communicate true and accurate information to investors, and refrain from self-dealing.  Each defendant breached these duties.

160.    Gold Star, GSC EB5, and GSC OPP each abdicated their management responsibility for GSC despite the fact that they acted as GSC's General Partner until at least November 20, 2016.  Their failure to monitor GSC and its funds allowed the Chans to steal all of Plaintiff's investment in GSC.

### THE CHANS USE AN ENTERPRISE TO CONVERT GSC INVESTOR FUNDS

161.    As is stated above, Gary Chan transferred the Plaintiff's investment from escrow on August 8, 2016.  These funds were transferred to a GSC account at First Financial Bank ("First Financial").

162.    On August 10, 2016, Gary Chan wrote a check transferring $245,000 ($244,976 of which were Plaintiff's funds) from GSC's account to a First Financial account in the name of Jardin.  This transfer did not comply with the draw procedure stated in GSC's Business Plan and was made for improper purposes.

163.    This unauthorized transfer was the first of many orchestrated by the Chans between August 10, 2016 and at least December 2016.  These transfers were made to steal investor funds and use them for purposes unrelated to GSC.

164.    The Chans laundered these funds through a number of bank accounts owned by entities they controlled to disguise the funds' source.  These funds were then used by the Chan's

to, among other things, enrich themselves, finance unrelated businesses, pay state and federal income taxes, and pay the debts of the Chans and/or the businesses controlled by the Chans.

165. The Chans generally laundered Plaintiff's funds through two different processes. The first process involved routing Plaintiff's funds through a number of bank accounts that belonged to various Chan entities that allegedly "managed" other "subsidiary" Chan entities. These bank accounts belonged to Mason Hill, Clearwater, and Jardin (the "Management Defendants"). The Chans routed Plaintiff's funds through Management Defendant bank accounts and then distributed these funds to themselves, affiliated businesses, or third parties to make it appear as if these funds were being paid by the Management Defendants.

166. The Chans routed Plaintiff's funds through Management Defendant bank accounts to pay themselves directly for their alleged "services" to these entities. $244,976 of Plaintiff's funds were transferred from GSC's bank account to an account belonging to Jardin on August 10, 2016. From there:

- On August 10, 2016, Gary Chan wrote a check to "CASH (Terry Chan)" for $12,800, which was paid from this Jardin bank account. That same day, $12,800 was deposited into a bank account belonging to Terry and Jacquelyn Chan.

- On August 10, 2016, $3,846.15 of Plaintiff's funds were transferred from this Jardin bank account to another Jardin bank account. That same day, Gary Chan cashed a check, payable to himself, for $3,846.15.

- On August 11, 2016, $200,000 of Plaintiff's funds were transferred from this Jardin bank account to a First Financial bank account belonging to Clearwater. On August 12, 2016, $21,000 of Plaintiff's funds were transferred from this Clearwater bank account to another Clearwater bank account. That same day, $8,768 of Plaintiff's funds were transferred to Jacquelyn Chan via a check, signed by Gary Chan, which was paid from this Clearwater account.

The Chans used Plaintiff's funds to purchase clothes, finance gambling expenses, and buy other personal goods. These transfers were not authorized under the Partnership Agreement or other applicable contract.

167.    Overall, the Chan's transferred approximately $91,794 of Plaintiff's funds directly to themselves or their family members within approximately one month of these funds being released from escrow.  Between August 10, 2016 and September 2, 2016, Jacquelyn Chan received approximately $34,506 of Plaintiff's funds, Terry Chan received approximately $31,982 of Plaintiff's funds, and Gary Chan received approximately $18,530 of Plaintiff's funds.

168.     Further, Gary Chan utilized $2,278 of Plaintiff's funds to pay off personal debts, $3,200 of Plaintiff's funds were transferred to one of the Chans' family members, and $1,297 of Plaintiff's funds were withdrawn by one or all of the Chans in cash transactions.

169.    Approximately $67,248 of Plaintiff's funds were used by the Chans to pay various Clearwater payroll, tax, and 401k contributions from Clearwater bank accounts.  Most, if not all, of these funds were used to benefit the Chans and not in furtherance of GSC.

170.    The Chans therefore wrongfully converted at least $159,042 of Plaintiff's funds to benefit themselves or close family members, largely by laundering Plaintiff's funds through Management Defendant bank accounts.

171.    The Chans also paid a number of expenses unrelated to GSC's purpose using Plaintiff's funds paid from the Management Defendants' bank accounts.  For example, on August 17, 2016, the Chans transferred Plaintiff's funds from one Jardin bank account to another.  From there, the Chans transferred approximately $100 to "Lexington Law."

172.    John C. Health, PLLC d/b/a Lexington Law is a law firm that specializes in credit repair services.  Lexington Law attempts to ensure that an individual's credit reports are "fair, accurate, and substantiated."

173.     There is no legitimate reason why Plaintiff's funds should have been directed to Lexington Law for credit repair.  Instead, the Chans directed Plaintiff's funds to Lexington Law to rehabilitate their personal credit report(s).

174.     Similarly, on September 7, 2016, $3,000 of Plaintiff's funds were directed from one Jardin account to another Jardin account.  From there, the Chans paid a number of personal expenses, including credit card purchases, airfare, hotel costs, meal expenses and travel insurance policies.  These expenses were completely unrelated to GSC's purpose, had no business justification, and provided no benefit to Plaintiff or other Limited Partners.  Instead, bank records appear to demonstrate that Plaintiff's funds were used to finance a personal vacation to Destin, Florida.

175.     These transactions represent a small amount of Plaintiff's funds that were laundered to and paid from Management Defendant accounts.  For example, bank records show: (1) nearly $10,000 of Plaintiff's funds were routed to and paid from a Clearwater account to Grooms Road Complex, LLC, an entity that owns an industrial warehouse in Blue Ash, Ohio; (2) approximately $10,664 of Plaintiff's funds were routed to and paid from Clearwater and Jardin bank accounts to law firms for legal expenses unrelated to the operation of GSC; and, (3) thousands of dollars of Plaintiff's funds were routed to and paid from Clearwater and Jardin bank accounts for security expenses, cable and phone bills, heating and cooling bills, and uniform expenses even though GSC had no operations, restaurants, or employees.

176.     The second process used by the Chans to launder Plaintiff's and other GSC EB-5 investors' funds was related to Rodizio Grill restaurants owned, operated, and/or controlled by the Chans.  The Chans routed Plaintiff's funds first through bank accounts belonging to the Management Defendants.  These funds were then generally routed to a bank account belonging

to LPCF.  From there, Plaintiff's funds were routed to bank accounts belonging to RG MGMT and RG OPP (the "Rodizio Defendants").

177.    The Chans then paid Rodizio Grill expenses, employee salaries, and other costs from these RG MGMT and RG OPP accounts to make it appear as if these funds were legitimately derived from Rodizio Grill business activities or investments.  For example, Plaintiff's funds were used to pay:

- Approximately $50,133 to Phoenix Franchise Group, the franchisor of Rodizio Grill restaurants.  $50,000 of this total amount was transferred to Phoenix in two $25,000 checks paid on August 25, 2016.  The memo line on the first check notes that it was for the "Franchise Fee for RG Cleveland South," and the memo line on the second check notes it was for the "Franchise Fee for RG Carmel."  The Chans, through Clearwater, RG MGMT, and/or RG OPP, owned, operated, and/or controlled Rodizio Grill restaurants in Carmel, Indiana and Cleveland, Ohio;

- Approximately $32,130 to Padre Grill, LLC for various Rodizio Grill operating costs, including $16,065 paid on August 24, 2016 for "First Month's rent for Rodizio Grill – Carmel," and another $16,056 paid on August 24, 2016 for "Security Deposit for 2376 W 116th, Carmel – Rodizio Grill";

- Approximately $46,623 to Beckman Weil Shepardson, LLC, which was used to finance, in part, an equipment purchase for "RG Opportunities I, LP";

- Approximately $62,477 to ADP for various payroll, tax, and 401k expenses for Rodizio Grill employees, including a $38,000 wire transfer for the benefit of "RG Opportunities I, LP"; and,

- Approximately $10,637 in Ohio sales taxes incurred by Rodizio Grill restaurants.

All of the transfers of investor funds to and from Rodizio Grill-affiliated accounts were completely unrelated to GSC's purpose and therefore inappropriate. They also violated provisions in the Partnership Agreement that prohibited the co-mingling of funds.

178.    Overall, banking records demonstrate that the Chans have used these two money laundering processes to: (1) enrich themselves in excess of hundreds of thousands of dollars; (2) pay gambling expenses; (3) finance a number of personal vacations; (4) pay legal fees related to

another EB-5 investor lawsuit; (5) pay personal credit cards; and, (6) pay the business expenses of a number of unaffiliated businesses. These banking records demonstrate that the Chans used GSC as their own personal pocketbook.

## GSC CHANGES ITS FOCUS AND PLAINTIFF ATTEMPTS TO WITHDRAW

179. On March 10, 2016, Plaintiff, through his immigration counsel, Pan-Pacific Immigration Law Group ("Pan-Pacific"), sent an email to Gary and Terry Chan asking for an audited financial report and an update regarding GSC. Pan-Pacific explained that they wished to receive a project update and assurances that Plaintiff's investment was safe. Pan-Pacific also asked that Gary and Terry Chan respond by March 17, 2016.

180. The March 17, 2016, deadline passed with no response from Gary and Terry Chan, so Pan-Pacific followed up with another email on March 29, 2016.

181. Terry Chan replied to Pan-Pacific's March 29, 2016 email later that same day, noting that he would respond to Pan-Pacific's requests by the end of the week and that GSC investors' funds were "in escrow for the GSC project."

182. Eventually, Terry and Gary Chan responded to Plaintiff's inquiries. In a letter dated April 13, 2016, more than one month after Plaintiff's initial email, an attorney providing services to GSC, GSC OPP, Terry Chan, and Mason Hill explained that investor funds were still in an escrow account. The reason for this was because GSC OPP, "controlled by Gold Star Chili, Inc.," had "decided to no longer participate in" GSC. The letter further explained:

> Gold Star Chili, Inc. was to provide the Partnership with locations for development of Gold Star Chili franchises and capital for development. It decided, subsequent to receipt of … subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement. The decision to withdraw from the Partnership has left the Partnership, with Mason Hill, LLC, as the only active member, with limited choices.

This letter did not explain when Gold Star made these decisions, nor if GSC or GSC OPP would seek to hold Gold Star liable for its breach of the Partnership Agreement or other agreements.

183. These statements were also false. Gold Star, for example, had developed multiple restaurants for GSC by the time this letter was sent, and GSC was generating significant income.

184. Gold Star received a copy of this letter and failed to correct any of the misrepresentations contained therein. It also failed to independently contact Plaintiff to discuss the circumstances behind Gold Star's withdrawal, to explain that GSC owned assets and restaurants, and to explain that GSC was generating revenue.

185. Gold Star's decision to abandon the project was a Liquidating Event under the Partnership Agreement, as it was an "event that makes it unlawful, impossible or impractical to carry on the business of the Partnership." GSC should have been liquidated when Gold Star decided to leave GSC in 2015.

186. Instead of immediately liquidating the Partnership, this April 13, 2016 letter said that GSC OPP thought that two options remained on the table. The first option was to "terminate the Partnership" and return funds to the investors. The second option was to "utilize the funds in the Partnership to invest in restaurants other than Gold Star franchises pursuant to a business plan similar to another project involving entities affiliated with Terry and Gary Chan."

187. The business plan discussed in this letter appeared to involve the construction and operation of Buffalo Wings & Rings ("BWR") restaurants in the Pittsburgh, Pennsylvania area. Attached to this letter was a PPM for Buffalo Wings & Rings Pittsburgh Opportunities, L.P. ("Pittsburgh Project"). This PPM stated that Defendants Terry Chan and Jacquelyn Chan were managing a project to fund and operate five BWR restaurants in Pennsylvania.

188.    The April 13, 2016 letter further stated that, while USCIS had approved the I-526 petition of an investor in the BWR Pennsylvania project, that GSC would not offer any opinion on the impact that investment in a BWR project would have on the status of the GSC EB-5 investors' standing with USCIS.  The letter also said "[t]hat there is no assurance that investing in these other restaurants will result in the creation of sufficient jobs" to comply with immigration requirements.  This uncertainty undercut a fundamental purpose of GSC, which was to allow foreign investors to participate in the EB-5 immigration process through an investment in the Partnership.

189.    Further, a substantial risk of Plaintiff investing in the Pittsburgh Project was that USCIS could view the change in investment as a material change in Plaintiff's immigration application and thereby revoke the I-526 approval.

190.    On July 27, 2016, approximately three months later, Pan-Pacific received another letter from this counsel, which reiterated that Gold Star would no longer continue to be a member of GSC OPP and explained that Gold Star "will not provide any economic contributions or support" to any restaurants GSC may decide to build in the future.

191.    Although the fundamental purpose of GSC was no longer possible, the letter explained that there were "imminent time sensitive time opportunities to build" at least one BWR restaurant.  The letter, however, provided no details about the location of this restaurant, did not explain whether the restaurant would comply with GSC's stated purpose, or discuss the costs associated with building this restaurant.

192.    The letter, ignoring the terms of the Partnership Agreement, explained that funds generated from the investments of Limited Partners in GSC, such as Plaintiff, would be the primary source of capital for the project.  GSC OPP would make *zero* contributions to the BWR

project unless the Limited Partners' funds were "not sufficient to successfully complete and open" a BWR restaurant. Only then would the GSC OPP provide funds.

193. This letter cleverly hid the fact that GSC OPP would have zero financial liability if the project were to fail under this arrangement, and that GSC investor funds were the only source of capital for GSC.

194. Gold Star's supposed removal from GSC therefore not only barred the very purpose of GSC from being completed, but also withdrew the single largest source of funding from GSC. Gold Star, GSC OPP, GSC EB5, the Chans, and Mason Hill completely failed to advise Plaintiff about the ramification of Gold Star's withdrawal from GSC and about the consequences of this reduced capital.

195. The letter, implicitly acknowledging the problems the change in business purpose would have to Plaintiff's immigration application, represented to Plaintiff that GSC, GSC OPP, Terry Chan, Gary Chan, and/or Mason Hill had sought the advice of immigration counsel. Counsel allegedly informed them "that a change of the Partnership's brand of restaurant is not a material change under the USCIS Regulations."

196. However, the letter failed to provide an actual opinion letter from this purported immigration counsel or any other support for that advice, and failed to inform Plaintiff whether the change in the *location* of the investment would be a material change under USCIS regulations. Thus, the proposed changes to GSC's purpose was not only inconsistent with the Partnership Agreement, but also threatened Plaintiff's ability to secure a Green Card.

197. No prospectus, discussion of prospective investment, PPM, or details regarding the proposed BWR project was provided to Plaintiff with this July 27, 2016 letter. The letter instead gave Plaintiff a deadline of August 10, 2016, to withdraw from the Partnership.

198.     On August 11, 2016, Pan-Pacific received an email from the same counsel advising that GSC was moving forward with developing BWR locations, and that it would begin to release investor funds from escrow.  However, Plaintiff's funds were released from escrow on August 8, 2016, and the Chans started converting Plaintiff's funds on August 10, 2016.

199.     On September 2, 2016, after the Chans took Plaintiff's investment proceeds without his consent, Gary Chan sent a letter to Plaintiff and other investors via email informing them, for the first time, about the details of the proposed BWR project.  Notably, this letter indicated that the Chans were planning on constructing and operating two potential BWR projects in Orlando, Florida; not in the Pittsburgh area as previously represented to Plaintiff.

200.     This letter represented that funds from three Limited Partners, totaling $1,500,000, purportedly "remain[ed] in the partnership."

201.     This statement was false, as the Chans had already converted at least $100,000 of Plaintiff's funds to directly benefit themselves by September 2, 2016.

202.     Attached to this letter was some information about one of these potential BWR restaurants, which mainly focused on the location of the restaurant and the characteristics of the surrounding area.  No information was provided about the management, construction, or operation of this BWR restaurant.  Plaintiff was also not provided with a PPM, subscription agreement, or other type of document discussing the proposed investment in the Orlando restaurant.  Additionally, the Chans failed to provide any assurances that investing into a single BWR franchise in Orlando, Florida would meet EB-5 program regulations.

203.     Accordingly, the Chans, without obtaining Plaintiff's consent and with Gold Star's acquiescence and/or involvement, transformed GSC from a partnership focused on building multiple Gold Star restaurants in Kentucky, Ohio, and Indiana to a partnership focused

on building one BWR location in Orlando, Florida. This transformation fundamentally breached the Partnership Agreement and the promises Defendants made to Plaintiff.

204.    On September 23, 2016, Pan-Pacific, on behalf of Plaintiff, contacted USCIS to inform them that Plaintiff had decided to withdraw his I-526 petition. USCIS revoked Plaintiff's I-526 petition on November 16, 2016.

205.    On November 11, 2016, Plaintiff sent Gary Chan an email saying that he wanted to withdraw from GSC and have all of his funds returned.

206.    Gary Chan responded to this email on November 12, 2016, and attempted to set up a time that he and Plaintiff could discuss the matter.

207.    Gary Chan refused to provide any comment about the reimbursement of Plaintiff's funds until December 12, 2016. On December 12, 2016, Gary Chan sent Plaintiff an email explaining that "it is not so easy to send you money from your invested funds immediately since they have already been invested in the project."

208.    This statement was false. The Chans did not invest Plaintiff's funds in the project; they converted the funds for their personal use and for other entities they controlled.

209.    Plaintiff repeatedly attempted to talk to Gary Chan about the refund of his investment between December 12, 2016 and the middle of January 2017. However, Gary Chan evaded Plaintiff and refused to provide any firm commitment to return Plaintiff's money.

210.    On or about January 18, 2017, Plaintiff and Gary Chan discussed the return of Plaintiff's funds via telephone. During this conversation, Gary Chan told Plaintiff that he would draft a contract for the return of Plaintiff's funds.

211.    Plaintiff sent Gary Chan an email on January 29, 2017 asking for this contract. On January 30, 2017, Gary Chan responded and said that he hoped to have the contract done in the next day or so.  No contract has ever been drawn up.

212.    Plaintiff did not receive any additional updates about this project until July 1, 2017.  On that day, Gary Chan, on behalf of GSC OPP, sent a letter via email to GSC investors. This July 1, 2017 email contained a number material misrepresentations designed to conceal the Chans' fraudulent conduct.  This email was written to deceive GSC investors and have them believe that GSC Limited Partner' funds were invested in the construction of a BWR restaurant in Orlando.  However, the Chans had completely converted these funds months earlier.

213.    In July 2017, the Chans sent Plaintiff, via U.S. Mail or email, a business plan that stated, among other things:

- That GSC would operate one BWR restaurant in Orlando, Florida, although the business plan later said that GSC would operate 5 restaurants;

- GSC OPP would contribute $3,000,000 in equity to five BWR restaurant locations, although the business plan later says that GSC OPP would only provide $750,000;

- GSC would seek to return Limited Partner funds on the later of the three-year anniversary of their I-526 approval or once their I-829 application was approved by USCIS; and,

- Funds would be disbursed from GSC only through a complex draw process coordinated by GSC OPP.

214.    The BWR business plan also contained an alleged budget that detailed how funds were supposedly spent on the BWR restaurant up to that point in time.  This purported budget was materially false, as GSC's funds, provided by Plaintiff and other GSC Limited Partners, had already been completely depleted by the Chans.

215. Finally, on August 31, 2017, GSC sent Plaintiff, via U.S. Mail or email, another alleged project update for the Orlando BWR restaurant. This update included a number of materials and, once again, a completely false and misleading project budget.

216. Despite numerous requests, Plaintiff's funds have not yet been returned.

## FAILED CONSTRUCTION OF THE FLORIDA BWR RESTAURANT

217. Defendants' representation in the July 27, 2016 letter that there were "imminent opportunities" to develop two BWR restaurants in Orlando, Florida was false when made. In fact, the Chans, through Clearwater, did not file a building permit application to construct a restaurant until February 28, 2017, more than seven months after the July 27, 2016 letter.

218. This permit application expired on October 7, 2017, after a number of deficiencies were identified on the property and were not corrected.

219. A second permit application for this property was filed on April 5, 2017. Clearwater is listed as the owner of the property in this application.

220. A building permit for this property was issued on August 11, 2017, clearing the way for the construction of a BWR restaurant. The property, however, failed an inspection on August 24, 2017.

221. On August 29, 2017, a Clearwater check to the Orange County Division of Building Safety for $5,272.03 was also returned for insufficient funds.

222. On September 25, 2017, the general contractor for this project withdrew. In a communication to the Orange County Division of Building Safety, the general contractor explained that Clearwater was "not following through with their responsibilities as owner[.] I do not want to be associated with such firm."

223.    The building permit was cancelled on September 25, 2017, and a stop work order was issued on September 26, 2017.

224.    On October 12, 2017, over one year after the July 27, 2016 letter and Plaintiff's funds were released from escrow, the property's landlord applied for a third building permit to convert the property to a BWR restaurant.

225.    However, no such restaurant was ever opened.   In fact, the landlord of this property has since barred the Chans from opening any restaurants on this property.  It is therefore impossible to accomplish GSC's purpose.

### Count I – Violation of 18 U.S.C. § 1962(a)

### (Gary Chan)

226.    Plaintiff restates Paragraphs 1 through 225 of the Complaint as if fully rewritten.

227.    18 U.S.C. § 1962(a) prohibits any person who has received any income derived from a pattern of racketeering activity in which that person had participated in as a principal from using or investing, directly or indirectly, "any part of such income, or the proceeds of such income, in acquisition or any interest in, or the establishment or operation of" any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

228.    Gary Chan engaged in a pattern of racketeering activity, including participating in bank fraud, mail fraud, wire fraud, money laundering, orchestrating monetary transactions involving the proceeds of unlawful activity, and the transmission, transference, and transportation of stolen goods.

229.    Bank fraud, which is prohibited under 18 U.S.C. § 1344, occurs when one engages in a scheme or artifice to obtain moneys and/or funds under the custody and control of bank by means of false or fraudulent pretenses, representations, or promises.

230.    Gary Chan committed bank fraud on at least two occasions.  On August 5, 2016 and August 19, 2016, Gary Chan sent a letter to U.S. Bank saying GSC wanted to release investor funds, including Plaintiff's funds, from escrow "for the purposes of acquisition of real property, capital improvements, permanent improvements or purchase of equipment only."

231.    These representations were false, as Gary Chan did not intend to use Plaintiff's funds, and the funds of other GSC investors, for those purposes.

232.    These representations were part of the Chans' scheme or artifice to defraud not only Plaintiff and other GSC limited partners, but also U.S. Bank.  Gary Chan's statements caused U.S. Bank to release Plaintiff's funds, and the funds of other GSC investors, from escrow. While in escrow, these funds were in the custody and control of U.S. Bank.

233.    Gary Chan also engaged in multiple instances of mail fraud to carry out the fraudulent scheme.  Mail fraud, which is prohibited under 18 U.S.C. §1341, occurs when one uses the U.S. mails to carry on a scheme or artifice to defraud, or to obtain money by means of false or fraudulent representations.

234.    Gary Chan caused at least the following to be mailed: (1) the April 13, 2016 letter; (2) the July 27, 2016 follow-up letter; (3) the August 5, 2016, email and/or letter Gary Chan mailed and/or sent to U.S. Bank; (4) the August 19, 2016, email and/or letter Gary Chan mailed and/or sent to U.S. Bank; (5) the July 1, 2017 letter to GSC's Limited Partners, which was signed by Gary Chan; (6) the first BWR project update sent via email or U.S. mail in July 2017; and, (7) the second BWR project update sent via email or U.S. mail in August 2017.

235.    This list is not exhaustive, as Gary Chan likely used the mails to further his scheme or artifice to defraud in other ways by, among other things, mailing checks to third parties, sending false materials, and obtaining construction permits.

236.     Gary Chan's use of the U.S. mail was designed to carry on his scheme or artifice to defraud, and to obtain money by means of false or fraudulent representations.  Gary Chan used the U.S. mail to convince Plaintiff he should not withdraw from GSC, encourage U.S. Bank to release Plaintiff's funds from escrow, and hide that the Chans had converted all of GSC's funds.

237.     Gary Chan also engaged in multiple instances of wire fraud to carry out the fraudulent scheme.  Wire fraud, which is prohibited under 18 U.S.C. §1341, occurs when one: (1) transmits, or causes something to be transmitted, (2) by means of wire, radio, or television, (3) writings or sounds, (4) for purposes of executing a scheme or artifice to defraud.

238.     Gary Chan transmitted or caused the following transmissions discussed herein: (1) the August 3, 2016, email; (2) the August 5, 2016, email and/or letter Gary Chan sent to U.S. Bank; (3) the August 11, 2016, email; (4) the August 11, 2016, email; (5) the August 19, 2016, email and/or letter Gary Chan sent to U.S. Bank; (6) the September 2, 2016 letter sent via email by Gary Chan to Plaintiff; (7) a November 12, 2016 email from Gary Chan to Plaintiff; (8) a November 20, 2016, email from Gary Chan to Plaintiff; (9) a November 30, 2016, email from Gary Chan to Plaintiff; (10) a December 2, 2016 email from Gary Chan to Plaintiff; (11) a December 6, 2016 email from Gary Chan to Plaintiff; (12) a December 7, 2016 phone call between Gary Chan and Plaintiff; (13) a December 12, 2016 email from Gary Chan to Plaintiff; (14) a December 24, 2016, email from Gary Chan to Plaintiff; (15) a January 14, 2017 email from Gary Chan to Plaintiff; (16) a January 17, 2017 email from Gary Chan to Plaintiff; (17) a January 18, 2017 or January 19, 2017 telephone conversation between Gary Chan and Plaintiff; (18) a January 30, 2017 email from Gary Chan to Plaintiff; (19) the first BWR project update sent via email or U.S. mail in July 2017; and, (20) the second BWR project update sent via email or U.S. mail in August 2017.

239.    The transmissions detailed above are not exhaustive, as Gary Chan undoubtedly used the wires on a number of other occasions to carry out their scheme.

240.    Gary Chan's use of email and telephone was designed to carry out the Chans' fraudulent scheme or artifice to defraud.   These transmissions were sent to, among other things, convince Plaintiff that he should not withdraw his funds and hide the Chans' wrongful conduct.

241.    Additionally, Gary Chan engaged in money laundering to further the Chans' fraudulent scheme.  Money laundering, which is prohibited under 18 U.S.C. § 1957, requires one to conduct financial transactions: (1) knowing that the funds were derived from specified unlawful activity; (2) with the intent to promote the carrying on of specified unlawful activity; and, (3) knowing that these transactions were designed to conceal or disguise the nature, location, source, ownership, or control of these funds.

242.    As is discussed above, Gary Chan knew Plaintiff's funds were derived from, among other things, bank fraud, mail fraud, and wire fraud.

243.    Knowing this information, Gary Chan engaged in hundreds, if not thousands, of individual financial transactions designed to promote the carrying on of unlawful activity.

244.    Gary Chan routed Plaintiff's funds through Jardin, Clearwater, Mason Hill, LPCF, RG MGMT, and RG OPP bank accounts for a clear purpose—to disguise the nature, location, source, ownership, or control of these funds.

245.    Gary Chan likewise engaged in monetary transactions in property derived from specified unlawful activity, which is prohibited under 18 U.S. § 1957.  Specifically, Gary Chan knowingly engaged, or attempted to engage, in a number of monetary transactions that involved criminally derived property that was both valued greater than $10,000.

246.    For example, Gary Chan, through bank fraud, caused U.S. Bank to release

$500,080 of Plaintiff's funds from escrow on August 8, 2016, $500,160 of another GSC Limited Partners' funds from escrow on August 8, 2016, and $500,000 of a final GSC Limited Partners' funds from escrow on August 24, 2016.  Gary Chan knew that these funds were derived from not only bank fraud, but also mail and wire fraud.

247.    These were not the only qualifying transactions, as bank records demonstrate that Gary Chan and the Chans orchestrated hundreds of financial transactions over $10,000 that were designed to launder GSC Limited Partners' funds.

248.    Likewise, Gary Chan transmitted, transported, or transferred in interstate or foreign commerce goods, wares, or money in the value of $5,000 or more with knowledge that the same was stolen, converted, or taken by fraud, which is prohibited under 18 U.S. § 2314.

249.    As is detailed above, Gary Chan caused Plaintiff's funds to be transmitted interstate knowing that these funds were stolen, converted, or taken by fraud.  For example, on August 25, 2016, Gary Chan caused $50,000 of Plaintiff's funds to be sent to Phoenix Franchise Group in Sandy, Utah in two separate checks.  The Chans also transmitted Plaintiff's funds to persons and entities in numerous other states, including California, New York, and Florida. These examples represent a small fraction of the interstate transfers of funds caused by Gary Chan.

250.    All of the acts detailed above were carried out in the last 10 years.

251.    The Chans orchestrated a complex enterprise to carry out their scheme or artifice to defraud.  The Chans used certain Chan Entities, and these entities' bank accounts, to invest Plaintiff's funds in other enterprises engaged in interstate or foreign commerce.

252.    For example, the Chans used Plaintiff's funds to finance the opening of Rodizio Grill restaurants in or around Cincinnati, Ohio, Cleveland, Ohio, and Carmel, Indiana.

253. The enterprises financed by the Chans were engaged in interstate and foreign commerce.

254. The Chans' use of Plaintiff's funds, and other GSC Limited Partners' funds, to finance the operation of unrelated enterprises significantly harmed Plaintiff. Among other things, the Chans' depletion of GSC's assets caused GSC to be functionally insolvent and prevented any restaurant from being constructed with GSC's funds.

255. The Chans' use of these funds also harmed Plaintiff because the Chans completely spent all of Plaintiff's funds on projects unrelated to Gold Star Chili restaurants.

256. As a direct and proximate result of Gary Chan's RICO violation(s), Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

## Count II – Violation of 18 U.S.C. § 1962(b)

### (Gary Chan)

257. Plaintiff restates Paragraphs 1 through 225 of the Complaint as if fully rewritten.

258. 18 U.S.C. § 1962(b) prohibits any person, through a pattern of racketeering, from "acquir[ing] or maintain[ing], directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

259. As is detailed above, the Chans engaged in a pattern of racketeering activity to carry out their scheme or artifice to defraud. This pattern included: (1) at least 2 instances of bank fraud, (2) numerous instances of mail fraud; (3) many instances of wire fraud; (4) hundreds, if not thousands, of instances of money laundering; (5) hundreds of transactions in property derived from unlawful activity; and, (6) at least dozens of instances of the transmission, transportation, or transference of goods, wares, or money with the knowledge that the same was

43

stolen, converted, or taken by fraud.

260. Each of these acts occurred within the last 10 years.

261. Gary Chan used this pattern of racketeering activity to take control of GSC and GSC OPP, which were both initially controlled by Gold Star.

262. Gary Chan's use of a pattern of racketeering activity allowed the Chans to acquire or maintain control of GSC and GSC OPP, which was vital to the Chans' fraudulent scheme.

263. This enterprise was engaged in and performed activities that affected interstate or foreign commerce.

264. The Chans' acquisition and maintenance of control over GSC and GSC OPP caused Plaintiff harm, as it provided the Chans with the opportunity to convert his investment and to cover up this conversion. It also made the Chans' fraudulent scheme harder to detect, as the Chans completely controlled relevant entities. Finally, the Chans' acquisition and maintenance of control over GSC has caused GSC to become insolvent.

265. As a direct and proximate result of Gary Chan's RICO violation(s), Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

## Count III – Violation of 18 U.S.C. § 1962(c)

### (Gary Chan)

266. Plaintiff restates Paragraphs 1 through 225 of the Complaint as if fully rewritten.

267. 18 U.S.C. § 1962(c) prohibits any person:

> Employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

268. As is demonstrated above, Gary Chan intentionally engaged in a scheme to

defraud Plaintiff and other GSC Limited Partners.  Gary Chan did so to enrich himself, pay debts, finance gambling expenses, and fund the operation of unrelated businesses.

269.    Gary Chan engaged in a pattern of racketeering activity to carry out their scheme to defraud.  This pattern included: (1) at least 2 instances of bank fraud, (2) numerous instances of mail fraud; (3) many instances of wire fraud; (4) hundreds, if not thousands, of instances of money laundering; (5) hundreds of transactions in property derived from unlawful activity; and, (6) at least dozens of instances of the transmission, transportation, or transference of goods, wares, or money with the knowledge that the same was stolen, converted, or taken by fraud.

270.    Each of these acts occurred within the last 10 years.

271.    Gary Chan used an enterprise, consisting of GSC, GSC OPP, Mason Hill, Jardin, Clearwater, LPCF, RG MGMT, and/or RG OPP to execute the fraudulent scheme.

272.    Gary Chan's acts harmed a number of victims, including Plaintiff and the other GSC Limited Partners.  Gary Chan's pattern of conducting racketeering activity through the enterprise has caused Plaintiff to lose his entire investment, the insolvency of GSC, and has prevented Plaintiff from obtaining a Green Card.

273.    Gary Chan has also harmed other non-GSC investors and businesses by engaging in a similar scheme to deprive them of their investment funds.  Defrauding foreign investors appears to be the Gary Chan's pattern and practice of doing business.

274.    As a direct and proximate result of Gary Chan's RICO violation(s), Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

## Count IV – Violation of 18 U.S.C. § 1962(d)

### (Gary Chan)

275.    Plaintiff restates the paragraphs 1 through 225 as if fully rewritten.

276.    18 U.S.C. § 1962(d) makes it unlawful for any person to conspire to violate any of the provisions of 18 U.S.C. § 1962(a)-(c).

277.    Gary Chan knowingly performed services that facilitated the operation of the illegal enterprise noted above.   Among other things, Gary Chan orchestrated inappropriate transfers of Plaintiff's funds, prepared emails or other communications designed to facilitate the enterprise or prevent its detection, and allowed entities they control to be used in the enterprise.

278.    As a direct and proximate result of Gary Chan's facilitation of an enterprise under RICO, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

## Count V – Violation of R.C. 2923.31, *et. seq.*

### (Gary Chan)

279.    Plaintiff restates the paragraphs 1 through 225 as if fully rewritten, and restates the allegations contained in Counts I through IV above as if fully rewritten.

280.    R.C. 2923.31, *et. seq.* closely tracks federal RICO provisions.   R.C. 2923.32 makes it unlawful for someone to: (1) conduct the affairs of an enterprise through a pattern of corrupt activity; (2) acquire or maintain any interest in or control of an enterprise through a pattern of corrupt activity; or (3) use or invest proceeds derived from corrupt activity.

281.    As is extensively detailed above, Gary Chan conducted the affairs of GSC and other entities through a lengthy pattern of criminal and corrupt activity.   Gary Chan also acquired or maintained control of an enterprise, including GSC OPP, through a pattern of corrupt activity.

Finally, Gary Chan used or invested proceeds derived from corrupt activity to finance Rodizio Grill restaurants.

282.    Gary Chan also conspired to commit the activities detailed herein and facilitated the operation of an illegal enterprise.

283.    As a direct and proximate result of Gary Chan's conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, treble damages, attorney's fees, and costs, and any other relief as provided by law.

**Count VI – Federal Securities Law Violations**

**(Gary Chan, GSC OPP, Mason Hill, Gold Star, and GSC EB5)**

284.    Plaintiff restates the paragraphs 1 through 225 as if fully rewritten.

285.    The Defendants identified in the caption above violated federal securities laws in connection with the actions discussed herein.

286.    Gold Star not only committed securities law violations through acts of its own employees and officers, but also through acts committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used to commit fraud and other illegal acts.

287.    15 U.S.C. § 78j(b), as well as Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibits any person from making any untrue statement of material fact, or from omitting certain material facts, in connection with the purchase or sale of any security.

288.    As is explained above, Gary Chan, GSC OPP, Mason Hill, Gold Star, and GSC EB5 provided Plaintiff, or caused Plaintiff to be provided, with promotional materials, a Business Plan, and a Partnership Agreement that contained a number of material misrepresentations or omissions about GSC.  These defendants used means or instrumentalities

of interstate commerce, or the mails, to make these statements and/or omissions to Plaintiff.

289.    For example, these defendants misrepresented the number of EB-5 investors who would invest in GSC, the amount of GSC's capital, the amount of restaurants GSC would seek to operate, the amount Gold Star would contribute to GSC, and that GSC OPP was a Limited Partner in GSC at the time Plaintiff executed the Partnership Agreement.  Each of these false statements was knowingly made with the intent to deceive, manipulate, or defraud.

290.    This is demonstrated by, among other things, the fact that on or about three weeks after Plaintiff executed his Partnership Agreement, these defendants prepared materials showing that: (1) less than 12 Gold Star restaurants were going to be constructed; (2) only 5, and not 12, limited partners would invest in GSC; (3) GSC would have only $3,750,000 in capital and not $9,000,000; and, (4) Gold Star would only invest $1,250,000 in GSC, and not $3,000,000.

291.    Plaintiff justifiably relied on false statements and/or omissions when deciding to invest in GSC.  These were material representations about the size, scope, and financing of GSC, and about the risk of loss Plaintiff faced in this investment.

292.    Plaintiff is a purchaser of securities and these defendants are sellers of securities. These defendants not only held title of the security before it passed to Plaintiff, but also played a substantial role in persuading Plaintiff to buy the security.

293.    These defendants' misrepresentations proximately caused Plaintiff's injuries and loss because Plaintiff would not have invested in GSC but for these misrepresentations.

294.    These material misrepresentations also cut to the very core of GSC's feasibility as stated in the Partnership Agreement, Business Plan, and promotional booklet.

295.    As a direct and proximate result of these defendants' conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any

other relief as provided by law.

### Count VII – Fraud

**(Gary Chan, Mason Hill, GSC OPP, Gold Star, and GSC EB5)**

296.    Plaintiff restates the paragraphs 1 through 225 as if fully rewritten.

297.    The Defendants named in the caption above provided Plaintiff, or caused Plaintiff to be provided, with promotional materials, a Business Plan, and a Partnership Agreement that contained a number of material misrepresentations or omissions about GSC.

298.    Gold Star not only committed fraud through acts and omissions of its own employees and officers, but also through acts and omissions committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used to commit other illegal acts.

299.    For example, these defendants misrepresented the number of EB-5 investors who would invest in GSC, the amount of GSC's capital, the amount of restaurants Gold Star would seek to operate, the amount Gold Star would contribute to GSC, and that GSC OPP was a Limited Partner in GSC at the time Plaintiff executed the Partnership Agreement.

300.    Each of these false statements was made with knowledge, or which such disregard and recklessness as to whether they were true or false that knowledge may be inferred.

301.    These statements were made with the intent of misleading Plaintiff to rely on these statements.

302.    Plaintiff justifiably relied on these false statements and/or omissions when deciding to invest in GSC.  These were material representations or omissions about the size, scope, and financing of GSC, and about the risk of loss Plaintiff faced in this investment.

303.    These defendants' misrepresentations proximately caused Plaintiff's injuries and

loss because Plaintiff would not have invested in GSC but for these misrepresentations.

304.    These material misrepresentations also cut to the very core of GSC's feasibility as stated in the Partnership Agreement, Business Plan, and promotional booklet.

305.    Furthermore, these defendants provided Plaintiff with materials littered with false statements after he invested in GSC.

306.    For example, some of these defendants caused the mailing of a number of letters to Plaintiff in 2016 regarding Gold Star's withdrawal from GSC, as is discussed above.  These letters, among other things, falsely stated the circumstances of Gold Star's withdrawal from GSC, and that GSC had no assets or property.

307.    These letters also omitted key and necessary information regarding, among other things, the circumstances of Gold Star's withdrawal from GSC and GSC OPP.

308.    Gold Star and GSC EB5 knew that these letters were sent to Plaintiff and failed to correct any misrepresentations contained therein.  Gold Star and GSC EB5 also failed to provide information about omissions contained in the letter.

309.    These misrepresentations and omissions caused Plaintiff to remain invested in GSC, which ultimately led to his funds being embezzled by the Chans.

310.    As a direct and proximate result of the these defendants' fraud, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count VIII – Breach of Contract

**(GSC OPP, Gold Star, GSC EB5, Mason Hill, and Gary Chan)**

311.    Plaintiffs restate the paragraphs 1 through 225 as if fully rewritten.

312.    GSC OPP, which used to be controlled by GSC EB5 and Gold Star, and which is

now controlled by Mason Hill and the Chans, entered into the Partnership Agreement with Plaintiff in 2013.

313.    The Partnership Agreement explicitly states that the purpose of GSC is to open and operate Gold Star restaurants in Ohio, Kentucky, and Indiana.

314.    The Partnership Agreement also explains that if it is ever "impossible or impractical to carry on the business of the Partnership," that GSC would be quickly liquidated by GSC OPP.

315.    If GSC OPP ever determined that a Liquidating Event occurred, it had to provide all partners with a notice of occurrence of a Liquidating Event within 30 days.

316.    In addition, the Partnership Agreement says that, should a Limited Partner's I-526 petition be denied, GSC OPP would return that Partners' capital contribution in 90 days.

317.    The Partnership Agreement further notes, in a section titled "Duties and Obligations of General Partner," that GSC OPP "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and affiliates." This includes GSC OPP's responsibility to "segregat[e] Partnership assets" and to ensure the "funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [GSC OPP] or any of its affiliates."

318.    GSC OPP further had an obligation to care for Plaintiff's funds, and could only maintain Partnership funds "not otherwise invested" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or in escrow accounts.

319.    As detailed in the foregoing paragraphs, defendants named in the caption above have failed to conduct themselves in the best interests of the Partnership. In doing so, Defendants have breached the Partnership Agreement by, among other things: (1)  failing to

ensure that GSC only invested in projects that conformed to the purposes listed in the Partnership Agreement; (2) failing to wind up and dissolve GSC upon the occurrence of a Liquidating Event; (3) failing to provide Plaintiff and other Limited Partners with a notice of occurrence of a Liquidating Event when that event occurred; (4) failing to return Plaintiff's capital contribution upon the occurrence of a Liquidating Event; (5) failing to ensure GSC conducted its business and operations separate and apart from GSC OPP or its affiliates; (6) failing to segregate Plaintiff's funds from the funds of GSC OPP or any of its affiliates; (7) engaging in self-dealing; (8) failing to care for Plaintiff's funds and allowing these funds to be converted; and, (9) failing to maintain Plaintiff's funds in accounts belonging to GSC OPP or its affiliates, in short-term liquid securities, or in escrow accounts.

320. Gold Star not only committed contractual breaches through acts and omissions of its own employees and officers, but also through acts and omissions committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used to commit fraud and other illegal acts.

321. As a direct and proximate result of these defendants' numerous breaches of contract, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count IX – Breach of Fiduciary Duty

**(GSC OPP, Gold Star, GSC EB5, Mason Hill, and Gary Chan)**

322. Plaintiff restates paragraphs 1 through 225 of the Complaint as if fully rewritten.

323. Defendants in the caption above owe Plaintiff a statutory, contractual, and common law duty of the utmost good faith and loyalty in the handling of the Project and his investment funds.

324. This fiduciary relationship is confirmed by the Partnership Agreement, which granted the General Partner "the sole and exclusive right and responsibility to manage the business" of GSC. Limited Partners, such as Plaintiff, did not "have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way." Plaintiff therefore relied on GSC OPP, the General Partner, and those that controlled GSC OPP to act for his benefit and protect the Partnership.

325. Given the fundamental nature of this Partnership and specific references to immigration processes in the Partnership Agreement, these defendants were under a duty to use their best efforts to run GSC in a manner that would result in the creation of jobs and to secure Plaintiff's EB-5 visa. These defendants have breached this duty to Plaintiff and their actions caused Plaintiff to withdraw his EB-5 visa application.

326. For example, these defendants breached their fiduciary duty to Plaintiff by, among other things, converting GSC Limited Partner funds, failing to ensure that GSC carried out the purposes defined in the Partnership Agreement, failing to provide Plaintiff with accurate information about GSC, failing to correct misrepresentations made to GSC Limited Partners, failing to protect Plaintiff's or GSC's funds, failing to ensure that GSC OPP satisfied its duties as GSC's General Partner, causing GSC OPP to breach the GSC OPP Operating Agreement and GSC's Agreement of Limited Partnership, and failing to liquidate GSC upon the occurrence of a liquidating event.

327. Gold Star not only breached fiduciary duties through acts and omissions of its own employees and officers, but also through acts and omissions committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used to commit fraud and other illegal acts.

328.     As a direct and proximate result of these defendants' numerous breaches of their fiduciary duties toward Plaintiff, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count X – Gross Negligence

### (GSC OPP, Gold Star, GSC EB5, Mason Hill, and Gary Chan)

329.     Plaintiff restates Paragraphs 1 through 225 of the Complaint as if fully rewritten.

330.     Defendants in the caption above owed Plaintiff a duty of care to properly manage GSC and his investment funds consistent with the Partnership and Escrow Agreements, EB-5 rules and regulations, and the representations made to Plaintiff as described above.

331.     This standard of care of a general partner in a limited partnership is detailed in R.C. § 1782.241(A), which says that a general partner "shall perform the duties of a general partner in good faith, in a manner the general partner reasonably believes to be in or not opposed to the best interests of the limited partnership, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."

332.     These defendants have violated their standard of care to Plaintiff by, among other things: (1) engaging in self-dealing transactions; (2) failing to ensure GSC conducted its business and operations separate and apart from GSC OPP or its affiliates; (3) failing to segregate Plaintiff's funds from the funds of GSC OPP or any of its affiliates; (4) failing to invest funds according to the stated purposes and intent of GSC; (5) failing to maintain Plaintiff's funds in accounts belonging to GSC OPP or its affiliates, in short-term liquid securities, or in escrow accounts; (6) failing to liquidate GSC once it became clear it was impossible or impractical to carry on the business of GSC; (7) failing to provide Limited Partners with a notice of the occurrence of a Liquidating Event; (8) failing to return Plaintiff's capital contribution upon the

occurrence of a Liquidating Event; (9) failing to care for Plaintiff's funds; (10) failing to provide Plaintiff with a PPM or other information related to the Orlando project before Plaintiff's funds were invested into this project; and, (11) failing to obtain Plaintiff's, or other Limited Partners', affirmative consent to fundamentally change the nature, purpose, and scope of GSC.

333.    Gold Star not only committed gross negligence through acts and omissions of its own employees and officers, but also through acts and omissions committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used to commit fraud and other illegal acts.

334.    As a direct and proximate result of Defendants' gross negligence, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

### Count XI - Conversion

### (GSC, GSC OPP, Mason Hill, Jardin, Clearwater, LPCF, RG MGMT, RG OPP, and Gary Chan)

335.    Plaintiffs restate Paragraphs 1 through 225 of the Complaint as if fully rewritten.

336.    Defendants in the caption above have, without authorization, knowingly asserted dominion and control over Plaintiff's specific and identifiable property, the investment funds, that are owned and/or properly payable to Plaintiff.  These defendants' conversion is inconsistent with Plaintiff's rights and ownership of said property.

337.    Plaintiff has repeatedly made demands for the return of his property.  Plaintiff's funds, however, have not been returned.

338.    As a direct and proximate result of these defendants' conversion of Plaintiff's funds, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's

fees, and costs, and any other relief as provided by law.

**Count XII – Breach of R.C. § 1782.242 and Rescission of the BWR Investment**

**(GSC OPP, Gold Star, GSC EB5, and Gary Chan)**

339.     Plaintiff restates paragraphs 1 through 225 of the Complaint as if fully rewritten.

340.     Partners in a partnership are generally prohibited from engaging in self-dealing transactions without the approval of other partners.

341.     Under Ohio law, "[n]o contract, action, or transaction shall be void or voidable with respect to a limited partnership" because of self-dealing if one of three exceptions applies. R.C. § 1782.242.    These exceptions apply when: (1) the material facts of the transaction are disclosed in writing to every partner before the partner is admitted in the partnership; (2) the material facts of the transaction are disclosed in writing to all partners, the transaction is fair to the limited partnership, and a majority of disinterested partners authorize the transaction; or, (3) the transaction is fair, and is authorized and approved by a majority of the disinterested limited partners.  R.C. § 1782.242(A)-(C).

342.     As is detailed above, defendants in the caption above have engaged in a pattern of self-dealing to the detriment of Plaintiff.  These defendants have either directed all of Plaintiff's investments to entities controlled by the Chans for the exclusive benefit of the Chans, have controlled entities that permitted these transfers, or have failed to stop the embezzlement of Plaintiff's funds.  These defendants have also transferred GSC property, including restaurants, to themselves for their benefit.

343.     Gold Star not only breached this statute through acts and omissions of its own employees and officers, but also through acts and omissions committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used

to commit fraud and other illegal acts.

344.    These acts of self-dealing are prohibited because: (1) these transactions were not disclosed to Plaintiff; (2) the material facts of the transactions were never disclosed in writing to all partners, nor approved by a *disinterested* general partner; and, (3) these transactions were never approved by a majority of disinterested limited partners.

345.    As a direct and proximate result of these defendants' pattern of self-dealing, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.  Plaintiff also seeks to rescind the investment that GSC made in any entities affiliated with these defendants.

## Count XIII – Unjust Enrichment/Quantum Meruit

### (GSC, GSC OPP, Mason Hill, Jardin, Clearwater, LPCF, RG MGMT, RG OPP, and Gary Chan)

346.    Plaintiff restates Paragraphs 1 through 225 of the Complaint as if fully rewritten.

347.    Plaintiff conferred a substantial benefit on defendants named in the caption above by investing $500,000 with GSC.

348.    These defendants have misappropriated and wasted Plaintiff's investment funds as alleged above.

349.    Under the circumstances, it would be unjust to Plaintiff to allow these defendants to retain the benefits conferred upon them by Plaintiff.

350.    Plaintiff has been damaged in excess of $500,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

**Count XIV – Ohio Securities Law Violations**

**(Gary Chan, GSC OPP, Mason Hill, Gold Star, and GSC EB5)**

351.    Plaintiff restates Paragraphs 1 through 225 of the Complaint as if fully rewritten.

352.    Ohio law has many requirements that govern the sale of securities.  *See* R.C. 1707.01, *et seq.*

353.    Among other things, Ohio law requires that "the sale of securities representing an interest in a partnership … [or] limited partnership …." may be carried out only upon compliance with certain registration requirements.  R.C. § 1707.06(3).

354.    Upon information and belief, defendants named in the caption above did not ensure that the sale of GSC limited partner interests were properly registered with Ohio Division of Securities.  *See* R.C. § 1707.08.

355.    As is discussed herein, Plaintiff also received a promotional booklet, Business Plan, and Partnership Agreement from these defendants touting the structure, organization, and purpose of GSC.  As is also discussed herein, many of the statements contained in these materials were false, as GSC did not resemble what was discussed in these materials.

356.    Gold Star not only breached these securities laws through acts and omissions of its own employees and officers, but also through acts and omissions committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used to commit fraud and other illegal acts.

357.    Under R.C. § 1707.41(A), these defendants are liable for the "loss or damage" sustained by Plaintiff, who relied on these materials, the false material statements contained therein, and these defendants' omission of materials facts, to invest in GSC.

358.    Further, under R.C. § 1707.43(A), "every sale or contract for sale made in

violation of Chapter 1707 of the Revised Code is voidable at the election of the purchaser." Each person that participated in or aided the seller of these securities is jointly and severally liable to Plaintiff "for the full amount paid by [Plaintiff] and for all taxable court costs."

359.   As a direct and proximate result of these defendants' conduct, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## Count XV – Conspiracy

### (GSC, GSC OPP, Gold Star, GSC EB5, Jardin, Mason Hill, Clearwater, LPCF, RG MGMT, RG OPP, and Gary Chan)

360.   Plaintiff restates Paragraphs 1 through 225 of the Complaint as if fully rewritten.

361.   Defendants named in the caption above, individually and on behalf of the entities they control, entered into a malicious combination to injure Plaintiff by fraudulently misrepresenting material facts to Plaintiff.   These misrepresentations were made to obtain Plaintiff's investment and convert it for these defendants' own personal gain rather than for the purpose of securing Plaintiffs EB-5 visas, and fulfilling the purposes of GSC.

362.   Gold Star not only conspired against Plaintiff through acts and omissions of its own employees and officers, but also through acts and omissions committed by and through GSC OPP and GSC EB5, entities that Gold Star dominated and controlled, and which Gold Star used to commit fraud and other illegal acts.

363.   As a direct and proximate result of Defendants' civil conspiracy, Plaintiff has been damaged in an amount in excess of $500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

WHEREFORE, Plaintiff demands judgment against the Defendants for the following relief:

a.  Compensatory damages against Defendants in an amount in excess of $500,000, the exact amount to be proven at trial, and statutory damages;

b.  Forfeiture of any fees paid to Defendants in excess of $45,000;

c.  Punitive damages in an amount not less than three times compensatory damages, the exact amount to be determined at trial;

d.  Piercing GSC, GSC OPP, and GSC EB5's corporate veil to the extent necessary to provide complete relief; and,

e.  Such other relief as the Court deems just and equitable, including pre-judgment and post-judgment interest, costs, and attorney's fees.

Respectfully submitted,


/s/ Christopher D. Cathey
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:   (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com
*Attorneys for Plaintiff*

<u>JURY DEMAND</u>

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Respectfully submitted,

<u>/s/ Christopher D. Cathey</u>
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone: (513) 369-4214
Facsimile: (513) 421-0991
Email: ccathey@porterwright.com
Email: jjoyce@porterwright.com
*Attorneys for Plaintiff*

13219275v1

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been served upon the following by regular mail on this 26th day of March, 2020, and through the Court's ECF system.

GSC Opportunities, L.P.
Incorporator: GSC OPP Management, LLC
c/o Corporation Service Company
50 W. Broad Street, Suite 1330
Columbus, Ohio 43215

Gary Chan
899 N. Orange Avenue, Apt. 301
Orlando, Florida 32803
changaryk@gmail.com

Jardin Hill, LLC
c/o CT Corporation System
306 W. Main Street, Suite 512
Frankfort, KY 40601

Lumen Point Capital Fund I, LLC
c/o Benson Law Firm
1422 Euclid Avenue, Suite 970
Cleveland, Ohio 44115

RG Opportunities I, L.P.
c/o Incorp Services, Inc.
9435 Waterstone Boulevard, Suite 140
Cincinnati, Ohio 45249

Michael P. Cussen
McCaslin, Imbus & McCaslin
632 Vine Street, Suite 900
Cincinnati, Ohio 45202
mpcussen@mimlaw.com

Blake Ostler
57 West 200 South, Suite 350
Salt Lake City, UT 84101
Supes00@gmail.com
*Attorneys for Phoenix Franchise Group*

GSC OPP Management, LLC
c/o Corporation Service Company
50 W. Broad Street, Suite 1330
Columbus, Ohio 43215

Mason Hill, LLC
c/o Gary Chan
899 N. Orange Avenue, Apt. 301
Orlando, Florida 32803
changaryk@gmail.com

Clearwater Hospitality Group, LLC
c/o Jacquelyn Chan
918 East Central Boulevard
Orlando, Florida 32801

RG MGMT, LLC
c/o Benson Law Firm
1422 Euclid Avenue, Suite 970
Cleveland, Ohio 44115

Paul T. Saba
Jeffrey M. Nye
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
pts@sspfirm.com
jmn@sspfirm.com
*Attorneys for Defendant Gold Star Chili, Inc.*

GSC EB5 Investor, LLC
c/o Michael S. Barron
3074 Madison Road
Cincinnati, Ohio 4509

*/s/ Christopher D. Cathey*_____
Christopher D. Cathey