## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| BAOYANG CHEN, | : | Case No. 1:17-cv-460 |
| Plaintiff; | : | |
| | : | Judge Michael R. Barrett |
| v. | : | |
| | : | **PLAINTIFF BAOYANG CHEN'S** |
| GSC OPPORTUNITIES, L.P., et al. | : | **RESPONSE TO GOLD STAR** |
| Defendants. | : | **CHILI, INC.'S MOTION TO** |
| | : | **DISMISS** |

Defendant Gold Star Chili, Inc. ("Gold Star") filed a Motion to Dismiss ("Motion") (Doc. 114) arguing that Plaintiff Baoyang Chen ("Plaintiff") failed to state claims against Gold Star in his Second Amended Complaint ("SAC") (Doc. 110). Gold Star's Motion, however, minimizes, obfuscates, and completely ignores allegations in the SAC to try and build a narrative Gold Star believes will win the day. Like a magician relying on misdirection, Gold Star's Motion is nothing more than an attempt to distract the Court from the well-pleaded SAC. This Court should resist any temptation to follow Gold Star's incorrect and self-serving narrative, and should instead focus on the SAC, which states valid and claims against Gold Star.

Gold Star, for example, argues in its Motion that the SAC never alleged that "Gold Star ever executed the Partnership Agreement" for GSC Opportunities, L.P. ("GSC"), a limited partnership Plaintiff invested in. (Mot. at 6, PageID 1731.) The SAC, however, did include this allegation. (SAC at ¶ 114, PageID 1565.) Gold Star further argues that Plaintiff and Gold Star were never partners (Mot. at 9, PageID 1734), despite the fact that the SAC alleges that Gold Star repeatedly represented it was GSC's general partner (e.g., SAC at ¶¶ 75-77, PageID 1559-60), and that Gold Star so controlled GSC's nominal general partner, GSC Opp Management, L.P. ("GSC OPP"), that GSC OPP "had no separate mind, will, or existence of its own" (SAC at

¶ 11, PageID 1549-50).  As is demonstrated repeatedly *infra*, Gold Star is simply wrong about what the SAC does and does not say, and Gold Star's Motion should be denied.

## I.   <u>FACTUAL BACKGROUND</u>

In 2013, Gold Star agreed to collaborate with Gary Chan, Terry Chan, and Jacquelyn Chan (collectively, "the Chans") on an EB-5 investment project designed to develop Gold Star Chili restaurants.  (*E.g.*, SAC at ¶ 19, PageID 1551.)  GSC was the brainchild of Gold Star, Gold Star's board, Gold Star's Chief Executive Officer, Mike Rohrkemper ("Rohrkemper"), and Mike Mason ("Mason"), Gold Star's Vice President of Operations and Franchise Development.  (*Id.* at ¶ 26, PageID 1552.)

On April 20, 2013, Gold Star executed a Memorandum of Understanding ("Memorandum") with Mason Hill, LLC ("Mason Hill"), an entity controlled by the Chans, identifying projects terms and saying:

> • GSC would be capitalized with $9,000,000, $3,000,000 of which was supposed to be provided by "Gold Star, or a wholly owned subsidiary." The remaining $6,000,000 was to be provided by "12 EB-5 immigrant limited partner investors";
>
> • "[T]he ownership [of GSC] will be split between the EB-5 Investors and Gold Star on a 2:1 ratio," and Gold Star would therefore own "33.3% of [GSC]";
>
> • "Gold Star, or its wholly owned subsidiary, and Mason Hill will form a limited liability company to be the General Partner of [GSC]";
>
> • "Gold Star will be the Managing Member of the General Partner [of GSC] and own 97% of the membership interests" [of the general partner];
>
> • Gold Star would review and approve GSC's private placement memorandum, the Operating Agreement for GSC's general partner, GSC's subscription agreement, and other documents "necessary to take [GSC] to potential EB-5 Investors";

> • Gold Star agreed to "manage and operate [GSC]," to provide information that would be included in materials provided to potential investors, and to help ensure that GSC met all EB-5 requirements; and,
>
> • "As managing member of [GSC's] General Partner," Gold Star expected to receive "$15,000 per franchise restaurant location per year … to pay for various administrative, accounting and compliance costs related" to the operation of GSC.

(*Id.* at ¶ 32, PageID 1553.)  Gold Star further represented that it would contribute the "Gold Star Capitalization" to GSC, a term defined in the Memorandum as the $3,000,000 contribution above, and that it would "[m]anage and operate" GSC's general partner.  (*Id.* at ¶¶ 33-34.)

After this Memorandum was signed, Gold Star, Rohrkemper, Mason, and the Chans continued working together to finalize GSC's organizational structure and key documents.  (*Id.* at ¶ 36.)  In fact, "most of the entity formation" for this project was done by Gold Star and its legal counsel.  (*Id.* at ¶ 29, PageID 1552.)

On or before May 7, 2013, Gold Star, Rohrkemper, Mason, and the Chans finalized GSC's management and operational structure, and created GSC OPP to serve as GSC's general partner.  (*Id.* at ¶ 38, PageID 1554.)  While Gold Star formally owned 97% of GSC OPP through GSC EB5 Investor, LLC ("GSC EB5"), Gold Star's wholly-owned subsidiary, it in practice dominated both GSC OPP and GSC EB5 during key time periods  (*Id.* at ¶ 39-40.)  Indeed, Gold Star represented that it via GSC EB5 "will be the General Partner" of GSC "with total control of the project."  (*Id.* at ¶ 41.)  Gold Star's attorney also said in an email that Gold Star was "in control" of GSC OPP.  (*Id.* at ¶ 42, PageID 1555.)  And Rohrkemper represented that Gold Star was "the one in control" of GSC OPP, that he and Gold Star's board made decisions for GSC OPP, and that Gold Star controlled the funds of GSC OPP and GSC.  (*Id.* at ¶ 43.)  Gold Star's own materials referred to the entire project as a "Gold Star Chili, Inc. and Eb-5 Investor Joint

Venture," and noted that "GSC, Inc.," shorthand for Gold Star, would be at the top of the management pedigree. (*Id.* at ¶ 44.)

Gold Star's control of GSC OPP was again confirmed in GSC OPP's Operating Agreement, which starts by saying that Mason Hill "and Gold Star Chili, Inc. . . . have developed a Business Plan for the opening and development of" Gold Star restaurants. (*Id.* at ¶ 46, PageID 1556.) It also identified Rohrkemper as GSC OPP's president and registered agent, and Mason as GSC OPP's Vice President. (*Id.* at ¶ 47.) As the one in control of GSC OPP, Gold Star had "full and complete authority, power and discretion to manage and control the business, affairs, and properties of GSC OPP." (*Id.* at ¶ 50.)

Gold Star even formally delegated some of GSC OPP's duties to itself when it executed an Operation Management Agreement with itself. (*Id.* at ¶ 51.) Under this agreement, Gold Star had to provide "services related to the management and operations of certain matters involving the administrative, accounting and compliance and operations" of the restaurants owned by GSC OPP. (*Id.* at ¶ 53.) This included Gold Star's responsibility to "[p]rovide executive level and strategic oversight for GSC [OPP] as a whole." (*Id.*) This formal designation represented some of the control Gold Star had over GSC and GSC OPP during relevant times.

Gold Star also helped prepare, review, and approve documents related to GSC that were provided to Plaintiff and other investors, including GSC's business plan, promotional booklet, and private placement memorandum. (*E.g.*, *id.* at ¶¶ 58, 68, PageID 1557, 1558.) The business plan explained that, among other things, GSC would be financed with a $3,000,000 investment from Gold Star and that a draw process would be established to ensure funds were used correctly. (*Id.* at ¶ 73, PageID 1559.) The business plan touted Gold Star's integral involvement in the project, explaining that "[GSC OPP] will serve as the General Partner of [GSC,] and Gold

4

Star Chili, Inc. will be the managing member of GSC OPP." (*Id.* at ¶ 75, PageID 1559-60.)  The business plan repeated that Gold Star would be the managing member of GSC OPP and manage GSC, and represented that Gold Star "will oversee and control the disbursement" of GSC's funds.  (*Id.* at ¶¶ 76-77, PageID 1560.)  Rohrkemper, Mason, and a third Gold Star employee were also identified as part of GSC's "Operational Management Team."  (*Id.* at ¶ 79.)

Gold Star, Rohrkemper, and Mason were also involved in creating, reviewing, editing, and approving GSC's Agreement of Limited Partnership ("Partnership Agreement").  (*Id.* at ¶ 81, PageID 1561.)  This Partnership Agreement defined GSC's purpose, and confirmed that GSC OPP, which Gold Star controlled at this time, would act as GSC's general partner.  (*E.g.*, *id.* at ¶¶ 88-89, PageID 1561-62.)  GSC OPP was required to, among other things, care for the funds of GSC and its limited partners.  (*Id.* at ¶ 90, PageID 1562.)  The Partnership Agreement also defined when GSC should be liquidated, which included if an event occurred that made it impossible or impractical to construct and operate Gold Star Chili restaurants.  (*Id.* at ¶ 94, PageID 1563.)  The Partnership Agreement also confirmed that Gold Star was supposed to invest $3,000,000 into GSC, explained that GSC would be funded with $9,000,000 total, and represented that 12 total EB-5 investors would invest.  (*Id.* at ¶¶ 100-105, PageID 1563-64.)

Plaintiff signed the Partnership Agreement on April 20, 2013 (*id.* at ¶ 106, PageID 1564), and Rohrkemper executed the agreement on May 7, 2013 (*id.* at ¶ 114, PageID 1565).  Plaintiff subsequently invested $500,000 in GSC, which was deposited into an escrow account at U.S. Bank.  (*E.g., id.* at ¶ 161, PageID 1571.)  Plaintiff did not know at that time, however, that the documents he received were false, and that GSC would contain less investors, have less funding, and would be smaller than represented to him.  (*See id.* at ¶¶ 108-124, PageID 1564-66.)

GSC initially had success developing two restaurants.  (*Id.* at ¶¶ 126-127, PageID 1566-

67.)  These restaurants were considered Gold Star "company stores," meaning Gold Star had total control over both.  (*Id.* at ¶ 130, PageID 1567.)  Gold Star even considered the costs that it had expended to open these stores to be part of its contribution to GSC.  (*Id.* at ¶ 131.)  In 2015, however, tensions between Gold Star and Mason Hill arose, and on August 31, 2015, Gold Star sent a "Notice of Termination of Partnership EB5" letter to Mason Hill, Gary Chan, and Terry Chan by email.  (*Id.* at ¶ 136, PageID 1568.)  Gold Star explained in this letter that it wanted to terminate GSC because it was "practically impossible" to find additional locations for Gold Star Chili restaurants.  (*Id.* at ¶ 137.)  Despite it being impossible to carry out GSC's stated purpose, however, Gold Star did not liquidate or dissolve GSC, and instead began negotiating with the Chans to withdraw from the project.  (*Id.* at ¶¶ 138-142.)  When Gold Star eventually withdrew, it took both restaurants it had opened for GSC with it and did not compensate Plaintiff or GSC for these restaurants, leaving GSC with nothing.  (*Id.* at ¶ 143.)

Rohrkemper left Gold Star in 2015 (*id.* at ¶ 133, PageID 1567), and his departure created a significant problem.  When Rohrkemper was at Gold Star, Gold Star had significant internal control over GSC's funds and Rohrkemper himself monitored investor escrow accounts to make sure "that money was still in escrow."  (*E.g., id.* at ¶ 157, PageID 1570.)  This was needed because Gold Star had given Gary Chan unfettered access to Plaintiff's funds.  (*Id.* at ¶ 155, PageID 1571.)  Once Rohrkemper left Gold Star, however, Gold Star's oversight of these funds stopped and the safeguard against theft was removed.  (*Id.* at ¶¶ 156-57.)  In August 2016, Gary Chan used the access Gold Star provided to him, and Gold Star's lack of oversight, to remove all of Plaintiff's funds from an escrow account and to begin using these funds for inappropriate purposes.  (*Id.* at ¶¶ 152-163, PageID 1570-71.)  Gold Star, which still acted as GSC's general partner at that time, did nothing to guard Plaintiff's funds and, as a result, the Chans stole all of

Plaintiff's investment. (*Id.* at ¶¶ 158-160, PageID 1571.)

As a result of Gold Star's wrongful conduct, Plaintiff filed the SAC against Gold Star and others on March 26, 2020. (Doc. 110.) Plaintiff brings claims against Gold Star for federal securities law violations (Count VI), fraud (Count VII), breach of contract (Count VIII), breach of fiduciary duty (Count IX), gross negligence (Count X), breach of R.C. § 1782.242 (Count XII), Ohio securities law violations (Count XIV), and conspiracy (XV). On May 21, 2020, Gold Star filed the Motion seeking to dismiss each of these claims. (Doc. 114.)

## II.   **ARGUMENT**

Plaintiff's SAC must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this plausibility determination, this Court must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 513, 619 (6th Cir. 2002). Plaintiff's SAC should not be dismissed because it contains specific and detailed factual allegations demonstrating, among other things, that Gold Star breached fiduciary duties, committed fraud, was grossly negligent, and caused Plaintiff harm.

### A.   **Gold Star Cannot Hide Behind Subsidiaries to Avoid Liability Because it has Not Challenged Plaintiff's Piercing the Corporate Veil Allegations.**

Gold Star's first argument—that counts eight, nine, ten, and twelve should be dismissed because Gold Star "was not a partner of the plaintiff" (Motion at 5, PageID 1730)—should be rejected because it ignores Plaintiff's piercing the corporate veil allegations. Gold Star's argument is premised on its theory that GSC OPP and/or GSC EB5, and not Gold Star, owed duties to Plaintiff because those entities, and not Gold Star, signed certain documents. (*See* Mot. at 5-8, PageID 1730-33.) This entire argument ignores that Plaintiff alleged that GSC OPP and GSC EB5's corporate veils should be pierced to hold Gold Star liable for the actions and inaction

of GSC OPP and GSC EB5. (SAC at 60, PageID 1606.) These allegations, which Gold Star does not challenge, must be accepted as true at this stage.[1]

Nor could Gold Star argue that Plaintiff's piercing the corporate veil allegations are inadequate. Under Ohio law, the corporate form can be disregarded when: (1) the entity controlled by others has no separate mind, will, or existence of its own; (2) those controlling the entity used it to commit fraud or an illegal act against the plaintiff; and, (3) injury or unjust loss resulted. *See Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos.*, 67 Ohio St. 3d 274, 289 (Ohio 1993). Plaintiff alleges that Gold Star committed fraud and other illegal acts and that he was harmed, so the only factor the could be possibly debated is the first one—control. When determining if an entity was controlled by others, courts looks to non-exhaustive factors including: (1) whether the subservient entity was inadequately capitalized; (2) whether the subservient entity was insolvent; (3) whether shareholders held themselves out as personally liable for subservient entity obligations; (4) the diversion of funds or other property of the subservient entity for use by those controlling that entity; and, (5) the fact that the subservient entity was a mere façade. *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005).

Plaintiff's SAC alleges GSC was inadequately capitalized and insolvent because Gold Star did not contribute $3,000,000 to GSC as promised. (*E.g.*, SAC at ¶ 60, PageID 1557.) Further, as is explained *infra*, Gold Star repeatedly held itself out as the one responsible for GSC OPP's obligations, including its obligations to manage GSC. Likewise, Gold Star diverted GSC's property to itself for its own purposes when it took GSC's restaurants when it left GSC. (*Id.* at ¶ 143, PageID 1568.) And the SAC repeatedly demonstrates that GSC OPP and GSC EB5 were mere façades of Gold Star as (among other things) Gold Star's own CEO testified that Gold

---

[1] This Court has repeatedly held that is premature to rule on piercing the corporate veil arguments at the motion to dismiss stage because discovery is essential to weigh the merits of these allegations. *Orrand v. Kin Contrs., LLC,* No. 2:09CV1129, 2011 U.S. Dist. LEXIS 34303, at *11 (S.D. Ohio Mar. 29, 2011).

Star controlled those entities. (*Id.* at ¶ 43, PageID 1555.) These allegations, and many more detailed in the SAC (including that these entities shared officers and headquarters), confirm that Gold Star so dominated GSC OPP and GSC EB5 that those entities had no separate minds, wills, or identities of their own.

Plaintiff's well-pleaded piercing the corporate veil allegations prevent Gold Star from using GSC OPP and GSC EB5 as liability shields. Instead, Gold Star, GSC OPP, and GSC EB5 are considered one and the same, and Gold Star will be held accountable for the wrongful acts or omissions of GSC OPP and/or GSC EB5. *See Transition Healthcare Assocs. v. Tri-State Health Investors, LLC*, 306 Fed. Appx. 273, 280 (6th Cir. 2009) (explaining courts can pierce the corporate veil to treat a parent and its subsidiary as a single entity). Gold Star therefore cannot avoid liability by contending that only GSC OPP signed an agreement (*see* Mot. at 6, PageID 1731), or that only GSC OPP owed fiduciary duties to Plaintiff (*see id.* at 7-8, PageID 1732-33). Instead, due to Gold Star's control over GSC EB5 and GSC OPP during relevant times, Gold Star stands in the shoes of both entities and is liable for Plaintiff's damages.

**B.      Gold Star is Also Directly Liable for its Conduct.**

Furthermore, Plaintiff has stated claims against Gold Star that do not rely on piercing GSC OPP and GSC EB5's corporate veils. Plaintiff's SAC alleges that Gold Star itself has engaged in wrongful conduct, and the Sixth Circuit has held that parent companies are liable for their own wrongful conduct even if a subsidiary is also involved. *E.g., Shelton v. Great Western Sugar Co.*, 701 F.2d 180 (6th Cir. 1982); *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 663 (6th Cir. 1979) ("The parent [company] should be liable under customary principles of common law for harm resulting from its own negligent or reckless conduct."). Plaintiff also alleged that Gold Star represented that it would accept responsibility for the obligations of both GSC OPP

and GSC EB5, and this Court has held that parent companies can be liable for their subsidiary's unlawful conduct when they are willing to accept responsibility for the subsidiary's obligations. *Gutter Topper, Ltd. v. Hart & Cooley, Inc.*, No. 1:04-cv-656, 2005 U.S. Dist. LEXIS 10271, at *3-4 (S.D. Ohio May 27, 2005). Importantly, "the question whether a parent corporation may be liable for the acts of its subsidiary is a fact-sensitive issue," and should not be decided on a motion to dismiss. *See id.* at *3.

Plaintiff's SAC alleges that Gold Star engaged in wrongful conduct in connection with GSC. Plaintiff alleges, among other things, that Gold Star created, reviewed, and approved materials at the heart of Plaintiff's securities fraud claims (*see* SAC at ¶ 81, PageID 1561), that Gold Star failed to contribute $3,000,000 to capitalize GSC as it had promised (*see id.* at ¶ 101, PageID 1557), and that Gold Star improperly tried to dissolve GSC and take GSC's restaurants (*see id.* at ¶¶ 136-146, PageID 1568-69). These properly pled allegations form an independent basis for bringing fraud, breach of fiduciary duty, gross negligence, and breach of contract claims against Gold Star. *See Gutter Topper*, 2005 U.S. Dist. LEXIS 10271 at *4-5 (denying motion to dismiss when complaint alleged that parent and subsidiary companies both committed tortious conduct). And while Gold Star argues that Plaintiff never alleged Gold Star signed certain documents (Mot. at 6, PageID 1731), Plaintiff's SAC did contain such allegations. (SAC at ¶¶ 35, 49, 59, 109, 114, 155, PageID 1554, 1556, 1557, 1564, 1565, 1571.) These allegations must be accepted as true at this stage.

Indeed, Plaintiffs' allegations concerning Gold Star's conduct are not based on guesses, but on documents and testimony previously obtained from Gold Star, Rohrkemper, and others. Plaintiff isn't alleging out of thin air that Gold Star acted as GSC's general partner, for example, but instead bases such allegations on materials Gold Star created, including one saying:

> GSC (though a wholly owned subsidiary, GSC EB-5 ltd. [sic] "The Manager") **will be the general partner of GSC Opportunities, LLP and its role as General Partner will be defined by an operating agreement.** The Manager will provide oversight and services to the operating entities, for a fee . . ., similar to the services and oversight provided to GSC Company owned stores.

(Joyce Decl. at 1) (emphasis added.)[2] This document outlines the EB-5 project and explains that "A joint venture (JV) entity (GSC Opportunities, LP) will be formed in which Gold Star Chili, Inc. (or a wholly owned subsidiary of GSC, Inc. [a term earlier defined in the document as Gold Star Chili, Inc.]) **is a General Partner**." (*Id.*) And, in case any doubt remained, the document said for *a third time* that "GSC, Inc. via its wholly owned subsidiary will be the General Partner of the Project Owner (GSC Opportunities, LP) with total control of the project." (*Id.*) Plaintiff alleges Gold Star was GSC's general partner because Gold Star repeatedly said the same thing.

The SAC also establishes that Gold Star accepted responsibility for obligations of GSC OPP and GSC EB5, thereby creating another basis for liability. The SAC alleges, for example, that Gold Star represented that it was personally liable for GSC OPP and GSC EB5's obligation to contribute $3,000,000 to GSC. (SAC at ¶ 63, PageID1557). Gold Star also represented that it, via GSC EB5, would be GSC's general partner and would have "total control of the" EB-5 project. (SAC at ¶ 41, PageID 1555.) Gold Star additionally signed an Operations Management Agreement whereby it agreed to assume some of GSC OPP's responsibilities and agreed to provide "executive level and strategic oversight" for GSC OPP. (*Id.* at ¶¶ 51-53, PageID 1556.) And in materials Gold Star helped create, Gold Star boasted that it would be the backstop for GSC and GSC OPP, and that "[i]n addition to managing [GSC], as managing member of [GSC OPP], Gold Star Chili, Inc. will manage and oversee the start up [sic] and stabilization of each"

---

[2] This document can be considered without converting this to a motion for summary judgment because it is extensively cited in the SAC, is central to Plaintiff's claims, and the third page is even excerpted in the SAC. *E.g., KSR Int'l Co. v. Delphia Auto. Sys., LLC*, 523 Fed. App'x. 357, 359 (6th Cir. 2013).

GSC restaurant.  (SAC Ex. 1 at 4, PageID 1612.)  Like the parent company in *Gutter Topper*, Gold Star cannot avoid liability now when it previously told Plaintiff that it would back GSC, GSC OPP, and GSC EB5.  *See* 2005 U.S. Dist. LEXIS 10271 at 4-5 (denying parent company's motion to dismiss because materials boasted that the subsidiary was backed by the parent).  Gold Star's Motion should accordingly be denied.

### C.     Count Twelve of the SAC Asks for Rescission of Plaintiff's GSC Investment.

Gold Star, seizing on a typo, argues that count twelve of the SAC does not apply to Gold Star because Gold Star was not involved in any investment with Buffalo Wings & Rings.  (Mot. at 9, PageID 1734.)  The SAC and count twelve as a whole, however, show that this count relates to Plaintiff's investment in GSC and that Plaintiff wishes to rescind his investment in GSC due to self-dealing and other inappropriate conduct.   (SAC at Count XII, PageID 1602-03.)  Indeed, Plaintiff only invested in GSC, so he could not try to rescind any other investment.  This Court should not dismiss an otherwise valid claim because of a typo in the count's title.

### D.     The Statute of Limitations for the Breach of Fiduciary Claim Has Not Run.

Gold Star incorrectly argues that the discovery rule does not apply to breach of fiduciary duty claims.  (Mot. at 8, PageID 1733.)  The Ohio Supreme Court has held that the discovery rule applies when claims for breach of fiduciary duty are "based on fraud."  *Cundall v. U.S. Bank*, 122 Ohio St. 3d 188, 193 (Ohio 2009).  Plaintiff's allegations relating to conduct occurring in 2013, such as Gold Star's preparation and dissemination of false offering materials, relate to fraud and the discovery rule therefore applies.  Any portion of Plaintiffs' breach of fiduciary duty premised on conduct occurring before November 22, 2013, is accordingly not time-barred.

### E.     The Statute of Limitations for Plaintiff's Securities Law Claims Did Not Run.

Plaintiff's securities fraud claims are subject to a two-year statute of limitations.  *Norfolk*

*Cty. Ret. Sys. v. Cmty. Health Sys.*, 877 F.3d 687, 693 (6th Cir. 2017).[3]  This statute of limitations does not begin to run until either: (1) Plaintiff actually discovers fraud, or (2) a reasonably diligent plaintiff would have "discovered the facts constituting the violation."  *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010).  Importantly, under this second trigger, the statute of limitations does not begin to run if a plaintiff only suspects fraud, but instead begins to run when a reasonably diligent plaintiff would have discovered the facts giving rise to the securities law violation, including defendant's scienter.  *Id.*; *see also Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 547 (6th Cir. 2012).  In other words, the statute of limitations begins at the point "a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,'" *not* when a "reasonable 'plaintiff would have *begun* investigating.'"  *Nolfi*, 675 F.3d at 547.

The statute of limitations is an affirmative defense, and it is Gold Star's burden to demonstrate the statute of limitations has run.  *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).  Further, if a defendant argues that plaintiff was on inquiry notice at the motion to dismiss stage, which Gold Star does here, a claim is barred "only when uncontroverted evidence *irrefutably* demonstrates when plaintiff discovered or should have discovered" the violation.  *In re EveryWare Global, Inc. Securities Litigation*, 175 F. Supp. 3d 837, 863 (S.D. Ohio 2016) (emphasis added).  Gold Star accordingly faces a high hurdle to prevail.

Gold Star fails to clear this hurdle.  Gold Star argues that Plaintiff was on inquiry notice of securities fraud as early as 2013 or 2014 because certain construction and immigration deadlines were not met.  (*See* Mot. at 12, PageID 1737.)[4]  Gold Star ignores, however, that these

---

[3] Ohio also has a two year statute of limitations for securities fraud claims.  *Hater v. Gradison Div. of McDonald & Co. Sec.*, 101 Ohio App. 3d 99, 113 (Ohio Ct. App. 1995).  Gold Star's Motion conflates state and federal securities law issues, and generally treats the two claims as largely identical.  (*See* Mot. at 16, PageID 1741.)  Plaintiff will do the same here unless otherwise indicated for the Court's convenience.

[4] Gold Star's argument that the statute of limitations ran when "changes are alleged to have been made to the partnership structure" fail because Plaintiff alleged he did not know that these changes were made.  (*E.g.*, SAC at ¶¶

deadlines could have been missed for non-fraudulent reasons (such as construction delays), and neglects to point out that in *In re EveryWare*, a case Gold Star cites to, the court used this precise reasoning to deny a similar motion to dismiss. 175 F. Supp. 3d at 862-63 (rejecting argument that investors should have known of fraud when a company adjusted financial projections downward because "there are many reasons why a company might underperform . . . that had nothing to do with fraud"). Gold Star also ignores allegations in the SAC detailing how Gold Star and the Chans' fraud was kept hidden from Plaintiff, including that Plaintiff received false budgets and other materials as late as August 31, 2017. (SAC at ¶ 215, PageID 1583.)

Construction projects notoriously can take longer than projected and construction delays do not show that fraud is afoot. Likewise, an immigrant investor cannot predict when they will receive approval of the forms needed to obtain a Green Card. An I-526 form, one of the many forms Plaintiff had to complete[5], took on average 15.9 months to process in fiscal year 2016, 18.8 months in 2017, 22.2 months in 2018, 19.8 months in 2019, and about 13.1 months to process this year (a calculation made before workplaces shut down due to COVID-19). Historical National Average Processing Time (in Months) for All USCIS Offices for Select Forms by Fiscal Year, *available at* https://egov.uscis.gov/processing-times/historic-pt (last visited June 25, 2020). Missed construction or immigration deadlines do not "irrefutably demonstrate" that a reasonable plaintiff should have suspected fraud.

Further, these deadlines are irrelevant to the core of Plaintiff's securities law claims because Plaintiff is not contending Gold Star's failure to adhere to these deadlines constituted securities fraud. Plaintiff instead alleges that Gold Star committed securities fraud by, among other things, misrepresenting the amount of restaurants that would be constructed, the number of

---

108, 118, PageID 1564, 1565.) Plaintiff also did not know, nor did he have any reason to know, when funds were released from escrow, meaning the release or failure to release escrow funds cannot be a trigger date.
[5] (*See* SAC at ¶ 135, PageID 1567.)

investors in GSC, Gold Star's contribution to GSC, and GSC's overall funding. (*See* SAC at ¶ 290, PageID 1594.) Defendants fail to "irrefutably" demonstrate that missed deadlines would have alerted a reasonably diligent plaintiff to the possibility of Gold Star's fraud.

### F. Plaintiff has Stated Plausible Federal Securities Fraud Claims.

Gold Star's assertion that Plaintiff did not allege securities fraud with particularity is similarly unavailing. (*See* Mot. at 12, PageID 1737.) Gold Star's Motion never discusses the elements of a securities fraud claim nor does Gold Star argue why it believes Plaintiff did not meet these elements. Instead, Gold Star appears to contend that Plaintiff never plead that Gold Star did anything wrong. (*See id*. at 13-14, PageID 1738-39.) Gold Star's argument ignores that Plaintiff's SAC alleges a securities law claim against Gold Star in great detail.

To state a claim for federal securities fraud[6], Plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase and sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[7] *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014). This Court should analyze the SAC as a whole, and not individual allegations in isolation, to determine if Plaintiff's SAC properly alleges a securities law claim. *See id.* at 473 (discussing scienter).

Plaintiff's SAC pleads all of these elements. Plaintiff alleges among other things that Gold Star, through its officers (including its chief executive officer), created, reviewed, edited,

---

[6] Claims for violations of Ohio securities laws do not require proof of the same elements. *See, e.g., Stuckey v. Online Res. Corp.*, 909 F. Supp. 2d 912, 928 (S.D. Ohio 2012). While Gold Star argues in one sentence that Plaintiff's Ohio securities claim "fail for the same reasons" as his federal claim, this cursory argument cannot stand. Gold Star has not provided this Court with a basis to conclude that Plaintiff failed to allege a plausible state law claim, nor could it in light of Plaintiff's detailed SAC, so this claim should not be dismissed.

[7] Gold Star's Motion cites to *Western & Southern Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888 (S.D. Ohio 2014) to try and argue that federal securities fraud claims also require pleading and proof of an "intent to mislead or deceive." (Mot. at 15, PageID 1740). The portion of *Western & Southern* that Gold Star cites to, however, discusses Ohio common law fraud and Ohio securities law claims, not federal securities claims. Regardless, Plaintiff alleged Gold Star acted with scienter and Gold Star intended to deceive him, as argued *supra*.

and approved GSC's Business Plan (SAC at ¶ 73, PageID 1559), Partnership Agreement (*id.* at ¶ 81, PageID 1561), and private placement memorandum (*id.* at ¶ 36, PageID 1554). The SAC then highlights in a section titled "Plaintiff's Investment was Solicited Based on False and Misleading Materials" specific representations made in these documents and why these representations were false. (SAC at ¶¶ 67-124, PageID 1558-1566.) The SAC likewise alleges that Gold Star knew these representations were false and, as evidence of Gold Star's scienter, pointed to modifications made to certain documents shortly after Plaintiff signed GSC's Partnership Agreement along with statements made by Gold Star officers and its attorney. (*See id.*) The SAC then alleges that Plaintiff relied on these misrepresentations and would not have invested in GSC but for these misrepresentations. (*Id.* at ¶ 293, PageID 1594.) And the SAC alleges Gold Star caused Plaintiff's harm. (*E.g.*, *id.* at ¶ 295, PageID 1594.) Plaintiff properly alleges federal securities fraud and Gold Star's argument to the contrary should be rejected.

**G.    Plaintiff's Investment is a Security.**

Gold Star's Motion next argues that Plaintiff's investment in GSC was not a security. (Mot. at 16, PageID 1741.) Limited partnership interests, however, are securities. *See Mayer v. Oil Field Systems Corp.*, 721 F.2d 59, 65 (2d Cir. 1983); *Sorenson v. Tenura*, 62 Ohio App. 3d 696, 702 (Ohio Ct. App. 1989) (holding that a limited partnership interest was a security under Ohio law). So too are EB-5 investments. *See SEC v. Feng*, No. 15-cv-09420, 2017 U.S. Dist. LEXIS 103592, *11-16 (C.D. Cal. June 29, 2017); *SEC v. Kameli*, No. 17 C 4686, 2017 U.S. Dist. LEXIS 142842, *15 n.9 (N.D. Ill. Sep. 5, 2017); *Farhad Dastranj v. Mehdi Deghgan*, No. PX 15-2436, 2017 U.S. Dist. LEXIS 131879, *10 (D.Md. Aug. 17, 2017). GSC's Partnership Agreement even explicitly references relevant securities laws. (Doc. 110-2 at 30-31, PageID 1717-18.) Gold Star's argument accordingly fails.

**H. Plaintiff's Losses Are Attributable to Gold Star's Securities Fraud.**

Gold Star next contends that Plaintiff's securities fraud claims fail because the SAC does not tie Gold Star's fraud to Plaintiff's loss. (Motion at 17, PageID 1742.) Gold Star cites to no case law in support of its argument, and essentially contends that its securities violations made no difference because, at the end of the day, Gary Chan stole Plaintiff's money. (*See id.*) This argument ignores that Plaintiff alleged Gold Star conspired with the Chans (SAC at Count XV, PageID 1605-06), that Gold Star gave Gary Chan access to Plaintiff's escrow account (*id.* at ¶ 155, PageID 1570), and that Gold Star breached fiduciary duties when it stopped monitoring Plaintiff's escrow account (*id.* at ¶ 156, PageID 1570). Gold Star also forgets that the SAC alleges Gold Star promised Plaintiff it would "oversee and control the disbursement of funds." (*Id.* at ¶ 77, PageID 1560.) Ultimately, if a guard agrees to watch a person's funds, gives a thief the keys to a safe holding these funds, and then takes a nap while those funds are stolen, the guard cannot say that they are blameless because they did not actually steal the money. The guard has liability for breaching the promise they made to watch the person's funds.

More critically, Gold Star's argument ignores Plaintiff's allegation that he would not have invested in GSC but for Gold Star's fraud (SAC at ¶ 293, PageID 1594), and that Plaintiff's funds could not have been stolen by Gary Chan had Plaintiff not invested in GSC. Plaintiff has adequately tied Gold Star's wrongful conduct to his losses, and his securities claims survive.

**I. Gold Star Was an Offeror of Securities.**

Gold Star's contention that it should escape liability because it did not offer securities similarly fails. (Mot. at 18, PageID 1743.) Ohio law has long recognized that general partners can be liable under R.C. 1707.41 when they offer securities themselves, or when they act as the general partner of a partnership making the offer. *Baker v. Conlan*, 66 Ohio App. 3d 454, 461

(Ohio Ct. App. 1990). R.C. 1707.41 is to be construed liberally to provide relief to the victims of fraud, and the statute would be rendered meaningless if a plaintiff's only avenue of recovery was from a limited partnership that was defunct (much like GSC here). *Id.* It is also important to note that directors of offering entities are also liable under this statute. *Id.* GSC accordingly can be found liable under R.C. 1707.41 if a jury determines: (1) Gold Star acted as GSC's general partner; (2) Gold Star otherwise stands in GSC OPP's shoes (such as by piercing GSC OPP's corporate veil); (3) Gold Star acted as GSC OPP's managing member; or, (4) Gold Star otherwise stands in GSC EB5's shoes (as GSC EB5 was the managing member, or director, of GSC OPP). Gold Star's cursory argument that it did not offer securities is incorrect.

**J.    Gold Star's Motion Fails to Address Plaintiff's Entire Ohio Securities Claim.**

Gold Star's Motion to Dismiss challenges some, but not all, of the grounds supporting Plaintiff's Ohio securities law claim, meaning that unchallenged parts of the claim survive. Plaintiff's SAC alleges, for example, that Gold Star violated O.R.C. § 1707.06(3), which requires that parties meet certain registration requirements when selling securities representing an interest in a limited partnership. (SAC at 58, PageID 1604.) Plaintiff also alleges Gold Star did not ensure these securities were registered with the Ohio Division of Securities, which is a separate violation of Ohio securities laws. (*Id.*) Under Ohio law, "every sale or contract for sale" in violation of these provisions "is voidable by the election of the purchaser," and every person that participated in or aided the seller of these securities is jointly and severable liable to Plaintiff "for the full amount paid" and all taxable court costs. O.R.C. § 1707.43(A). Defendants do not move to dismiss Plaintiff's Ohio securities law claim based on these statutory violations, and therefore this claim should not be dismissed.

**K.**     **Plaintiff's Conspiracy Claim Should Not be Dismissed.**

Gold Star's Motion concludes with its argument that Plaintiff's conspiracy claims should be dismissed because: (1) there was no agreement or plan between Gold Star and the Chans; (2) there was no underlying tort; (3) the statute of limitations for the underlying tort claims ran; and, (4) there can be no conversion because Plaintiff's funds are not specific or traceable. (Mot. at 18-20, PageID 1743-45.) Each of these arguments is wrong.

First, Plaintiff's SAC alleges that the Chans and Gold Star conspired to, among other things, commit securities fraud and convert Plaintiff's funds. (SAC at ¶ 362, PageID 1605.) Civil conspiracy consists of: (1) a malicious combination; (2) of two or more persons; (3) injury to person or property; and, (4) existence of an unlawful act independent from the conspiracy. *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 446 (6th Cir. 2012).[8] A plaintiff "need not demonstrate an explicit agreement but only an understanding or common design between the parties to commit an improper act." *Id.* Here, Plaintiff alleged that Gold Star and the Chans combined to commit securities fraud. (SAC at ¶ 361, PageID 1605.) Plaintiff also alleged both sides of this conspiracy actively and knowingly prepared, edited, and approved materials containing materially false information. (*E.g., id.* at ¶¶ 36-37, PageID 1554.) This shows Gold Star's agreement to join the conspiracy and active participation in the conspiracy, and is sufficient to state a conspiracy claim under Ohio law.

Second, Plaintiff has alleged that Gold Star conspired to commit fraud, securities fraud, breach fiduciary duties, and convert Plaintiff's funds, torts that can support a conspiracy claim. *See Grubbs v. Sheakley Group, Inc.*, No. 1:13-cv-246, 2014 U.S. Dist. LEXIS 6536, at *36-37

---

[8] Gold Star's citation to *State v. Perkins*, 2004-Ohio-4915 (Ohio Ct. App. Sep. 16, 2004), has no relevance here. (*See* Mot. at 18, PageID 1743.) *Perkins* involved criminal conspiracy and, more importantly, the portion of *Perkins* quoted in Gold Star's Motion came from proposed jury instructions that the court rejected. *Perkins*, 2004-Ohio-4915, at ¶¶ 48-50.

(S.D. Ohio Jan. 17, 2014) (conspiracy to commit fraud); *De Boer Structures (U.S.A.) v. Shaffer Tent & Awning Co.*, 233 F. Supp. 2d 934, 945-46 (S.D. Ohio 2002) (conspiracy to breach fiduciary duties). Plaintiff's conspiracy claim is therefore supported by underlying torts.

Third, the statute of limitations for the conspiracy claim has not run because the statute of limitations for the underlying tort claims have not run. Gold Star never moved to dismiss Plaintiff's conversion or fiduciary duty claims on statute of limitations grounds, and the statute of limitations has not expired on Plaintiff's fraud or securities fraud claims as discussed *supra*.

Fourth, Plaintiff's conversion claims survives because Plaintiff's funds were earmarked and are traceable. Gold Star relies on *Dice v. White Family Cos.*, 173 Ohio App. 3d 472 (Ohio Ct. App. 2007), to try and argue that Plaintiff's conversion claim does not survive because, Gold Star contends, Plaintiff's investment "has long since lost the point of traceability." (Mot. at 20, PageID 1745.) Gold Star's incorrect guess about the traceability of these funds is contradicted by the SAC, which exhaustively traces fund transfers. (*See* SAC at ¶¶ 161-178, PageID 1571-75.) Regardless, determining the traceability of Plaintiff's funds touches on matters outside of the SAC and will require a jury to weigh evidence; matters beyond the scope of a motion to dismiss. Gold Star's argument, like all of its other arguments, should be rejected.

## III.   CONCLUSION

Gold Star's Motion should be denied because Plaintiff's SAC states valid claims against Gold Star. As is demonstrated above and in Plaintiff's SAC, Gold Star was instrumental in forming GSC and GSC OPP, actively controlled both entities until at least November 2016, and even tried to dissolve both entities in 2015. Despite this, Gold Star now wishes to avoid the consequences of its own actions. This Court should deny Gold Star's Motion because Plaintiff's SAC unequivocally states claims against Gold Star.

Respectfully submitted,

/s/ Justin J. Joyce
_____
Christopher D. Cathey (0071231)
Justin J. Joyce (0090683)
PORTER, WRIGHT, MORRIS &
ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:   (513) 421-0991
Email:  ccathey@porterwright.com
Email:  jjoyce@porterwright.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been served by ECF filing, if available, or by regular U.S. mail on June 25, 2020 upon the following:

Jardin Hill, LLC
c/o CT Corporation System
306 W. Main Street, Suite 512
Frankfort, KY 40601

Lumen Point Capital Fund I, LLC
c/o Benson Law Firm
1422 Euclid Avenue, Suite 970
Cleveland, Ohio 44115

RG Opportunities I, L.P.
c/o Incorp Services, Inc.
9435 Waterstone Boulevard, Suite 140
Cincinnati, Ohio 45249

Gary Chan
899 N. Orange Avenue, Apt. 301
Orlando, Florida 32803
changaryk@gmail.com

GSC EB5 Investor, LLC
c/o Michael S. Barron
3074 Madison Road
Cincinnati, Ohio 45209

GSC OPP Management, LLC
c/o Corporation Service Company
50 W. Broad Street, Suite 1330
Columbus, Ohio 43215

Mason Hill, LLC
c/o Gary Chan
899 N. Orange Avenue, Apt. 301
Orlando, Florida 32803
changaryk@gmail.com

Clearwater Hospitality Group, LLC
c/o Jacquelyn Chan
735 Edgewater Drive
Orlando, Florida 32804

RG MGMT, LLC
c/o Benson Law Firm
1422 Euclid Avenue, Suite 970
Cleveland, Ohio 44115

GSC Opportunities, L.P.
Incorporator: GSC OPP Management, LLC
c/o Corporation Service Company
50 W. Broad Street, Suite 1330
Columbus, Ohio 43215

Paul T. Saba
Jeffrey M. Nye
Stagnaro, Saba & Patterson Co., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
pts@sspfirm.com
jmn@sspfirm.com
*Attorneys for Defendant Gold Star Chili, Inc.*

*/s/ Justin J. Joyce*
Justin J. Joyce