**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| **BAOYANG CHEN,** | : | Case no. 1:17-cv-460 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | **DEFENDANT GOLD STAR CHILI,** |
| | : | **INC.'S ANSWER TO PLAINTIFF'S** |
| **GSC OPPORTUNITIES, L.P.,** et al., | : | <u>**SECOND AMENDED COMPLAINT**</u> |
| | : | |
| Defendants. | : | <u>**AND COUNTERCLAIM FOR**</u> |
| | : | <u>**DECLARATORY JUDGMENT**</u> |
| | : | |
| | : | (<u>***Jury Demand Herein***</u>) |

Now comes Defendant Gold Star Chili, Inc. ("Gold Star"), by and through

counsel, and for its Answer to Plaintiff's Second Amended Complaint, hereby states as

follows:

1.     Gold Star denies for lack of knowledge Plaintiff's citizenship and denies

that Plaintiff ever became a limited partner in GSC Opportunities, L.P. ("GSC").

Although Plaintiff executed a Subscription Agreement and paid money into an escrow

account so that he could possibly become a limited partner in GSC, by the time the

conditions precedent for Plaintiff to become a limited partner ("Conditions Precedent")

were satisfied in August 2015, Gold Star had: (i) already tested the business concept, (ii)

invested over the amount it committed, and (iii) determined that the business was

neither successful nor practical and that the partnership needed to be dissolved; and

1

therefore (iv) notified the investors at their option needed to either invest in another venture or get a refund.

Further answering, Gold Star states that while Plaintiff was waiting for those Conditions Precedent to be satisfied, his investment was held in an escrow account that was subject to the terms of both (i) a Master Escrow Agreement, and (ii) a Joinder in Master Escrow Agreement ("Joinder Agreement"). True and accurate copies of the Master Escrow Agreement, Subscription Agreement, and Joinder Agreement are attached hereto as **Exhibits A, B, and C** respectively.

According to Section 4(a) of Attachment I of the Master Escrow Agreement, the escrow agent could not release Plaintiff's funds until at least two (2) EB-5 Investors' I-526 Petitions had been approved by the United States Citizenship and Immigration Services ("USCIS"). As such, until that occurred, Plaintiff was only a subscriber, not a limited partner in GSC, and Plaintiff's money could not be released from escrow. And although the Conditions Precedent were satisfied in August 2015, GSC had already failed and was in the process of winding up its assets by July 31, 2015, so for Plaintiff's benefit, he never became a limited partner of GSC.

Gold Star further states that by executing the Master Escrow Agreement and Joinder Agreement, Plaintiff authorized Gary Chan to: (i) be the Issuer Representative, as that term is defined in the Escrow Agreement, and (ii) act on Plaintiff's behalf for purposes of the escrow. As such, if Gary Chan stole Plaintiff's funds from the Escrow

Account, as Plaintiff alleges, that occurred because Plaintiff authorized Gary Chan to act on the behalf of the Issuer and agreed to providing Gary Chan access to the funds.

Gold Star further states that according to the Subscription Agreement, Plaintiff represented and warranted to GSC, GSC EB5 Investor, LLC (hereinafter, "GSC EB5 Investor"), Gold Star, and all other investors and interested parties that he was "an a*ccredited Investor* as the term is defined within the Securities Laws," meaning Plaintiff represented that he was an investor that was financially sophisticated with little need for the protection provided by regulatory disclosure filings. Additionally, Plaintiff represented that he had received, reviewed, and relied upon the Private Placement Memorandum dated May 7, 2013 (the "May 7th PPM," a copy of which is attached hereto as **Exhibit D**), which expressly stated that (i) there would be a maximum of five (5) other EB-5 Investors, and (ii) Gold Star, through its subsidiary, would invest only $1,250,000 into GSC—not the $3,000,000.00 Plaintiff alleges. Of course, Plaintiff reviewed the May 7th PPM, because the form Subscription Agreement referenced the PPM but was blank, placing Plaintiff on notice that the PPM had not been finalized on April 20, 2013, when he executed the Subscription Agreement, and the date needed to be handwritten into the Subscription Agreement.

Now Plaintiff claims—notwithstanding the representations and warranties he made in the Subscription Agreement—that he never saw the May 7th PPM, and he alleges that a bait-and-switch occurred when GSC implemented the May 7th PPM.

3

Despite these specious allegations, however, Gold Star notes that although Plaintiff signed the Subscription Agreement on April 20, 2013, and could have immediately deposited his funds into the escrow account (which had been previously set up), since Plaintiff was an sophisticated *accredited investor* as he represented himself to be, he waited 41 days (April 20 – May 31, 2013)—until after the May 7th PPM and the May 7th operating agreements had been executed—to pay his money into escrow. A copy of US Bank's acknowledgment of Plaintiff's May 31, 2013, deposit is attached hereto as **Exhibit E**. Obviously, Plaintiff's payment was consistent with his representation that he was a sophisticated investor who knew to wait until the business plan had been finalized before paying the money, so he represented and warranted in the Subscription Agreement that he relied upon the May 7th PPM.

By July 31, 2015, before any of the EB-5 Investors could become limited partners in GSC, Gold Star's subsidiary had already invested over 2 million dollars, which substantially exceeded the amount it committed to invest, and GSC was losing money and was going to continue to lose money. Indeed, as reflected in **Figures 1 and 2** below, Gold Star or its subsidiary ultimately lost well over 4 million dollars on its GSC investment, and it never received any the of EB-5 Investors' money, including Plaintiff's.

4



*Figure 1*



*Figure 2*

5

In short, notwithstanding Gold Star's best efforts, the restaurants were not successful (even great restaurant brands like Gold Star have that happen on occasion). After operating them long enough to fairly evaluate them, and having accumulated substantial losses well beyond its committed investment, it was determined that GSC was neither successful nor practical; as such, a notice of dissolution (the "Notice of Dissolution")was sent out on July 31, 2015, before the Conditions Precedent for any subscriber to become a limited partner were satisfied. This Notice of Dissolution was sent in accordance with the notice requirements of GSC's operating agreement, and it placed all interested parties on notice that: (i) "as a result of the USCIS's failure to approve the EB-5 applications for the Business Plan or any of the Proposed Investors, the Manager on behalf of the General Partner (which is also currently the sole limited partner of GSC Opportunities) hereby terminates GSC Opportunities," and (ii) "the Manager believes it has no other option due to the delays in funding caused by the USCIS inaction." A true and accurate copy of the Notice of Dissolution is attached hereto as **Exhibit F**. As explained above, at least two (2) EB-5 Investors' I-526 Petitions had to be approved by the USCIS before the money could be released from escrow, and since that process was delayed (for reasons beyond Gold Star's control), by the time that money was released, GSC had already incurred such large debts that the business was not sustainable.

6

After the Notice of Dissolution was issued, Plaintiff's attorney, Fred Voigtmann, Esq ("Voigtmann") emailed Gary Chan and Terry Chan to ask for an audited financial report and a project update. A copy of that email is attached hereto as **Exhibit G**. Voigtmann didn't ask Gold Star for the information because Plaintiff looked to the Chans as his point of contact for all communications.

On April 13, 2016, Thomas E. Martin, Esq., as counsel for GSC, sent Voigtmann a response ("Martin's April 13 Letter"), a true and accurate copy of which is attached hereto as **Exhibit H**. In Martin's April 13 letter, Martin notified Plaintiff of the following:

(i)      That all of Plaintiff's funds were still in Escrow [indeed, had they been released from Escrow, they would have been engulfed by the staggering operational losses, but instead they were still being held in Escrow];

(ii)      That GSC OPP Management, LLC ("GSC OPP"), had decided it would no longer participate in the Partnership because it had to cut its losses and stop the unprofitable venture;

(iii)      That Plaintiff was not a limited partner in GSC, but still just a subscriber;

(iv)      That Plaintiff had to elect whether to receive a refund of all his money or invest in a completely separate partnership with the Chans (involving a Buffalo Wings & Rings EB-5 venture in Pittsburgh);

    (v) That fraud claims that were pending against the Chans regarding a different EB-5 venture and a detailed description of the same was attached, and that Plaintiff should consider that information when making his decision;

    (vi) That upon electing to invest in the Chans' other venture, Plaintiff's funds would be released from Escrow directly to the Chans [not held in a different escrow account, but released to fraudsters] to purportedly invest in the Chans' Buffalo Wings & Rings Partnership; and

    (vii) That Gold Star was not a part of the Chan's Buffalo Wings & Rings.

More specifically, Martin's April 13 Letter stated as follows:

> The Partnership is prepared to act in the manner your clients choose. If any of them wish to rescind their subscription and receive a refund of the subscription price, the General Partner will have the escrow agent return their funds. If any of the investors are interested in continuing in the Partnership to invest in other restaurants, Terry and Gary Chan have suggested the model described in Buffalo Wings & Rings Pittsburgh Opportunities, L.P. A copy of the Private Placement Memorandum, Limited Partnership Agreement, Subscription Documents and Business Plan for that project are attached. USCIS has approved the 1-526 Petition of a limited partner/investor in this project.

In other words, the Buffalo Wings & Rings venture was a completely different partnership than GSC, and to make sure that was clear, Martin's April 13 Letter included the Private Placement Memorandum, Limited Partnership Agreement, Subscription Documents and Business Plan for that separate partnership.

On April 19, 2016, Voigtmann forwarded a copy of Martin's April 13 Letter to Plaintiff and the other EB-5 Investors ("Voigtmann's April 19 Email) and explained that

Plaintiff had two options—(i) rescind his subscription and receive a refund, or (ii) invest in a different partnership that involved Buffalo Wings & Rings. A true and accurate copy of Voigtmann's April 19 Email is attached hereto as **Exhibit I**.

As such, by the end of April 2016, Plaintiff had been informed by his own counsel (Voigtmann), as well as by GSC's counsel (Martin), that he had two options and that he must decide between receiving a refund or investing in a new partnership with the Chans—people he had been notified were facing pending fraud allegations involving a different EB-5 partnership. Indeed, all of the EB-5 Investors except Plaintiff elected to—and did—receive a refund.

On July 27, 2016, Martin, who was not aware of Plaintiff's decision, sent another letter to Voigtmann ("Martin's July 27 Letter"). In Martin's July 27 Letter, a true and accurate copy of which is attached hereto as **Exhibit J**, Martin reiterated that Gold Star was no longer participating in the partnership and that unless Plaintiff decided to receive a refund, (i) he was electing to invest in the Chans' Buffalo Wings & Rings partnership in Pittsburgh, and (ii) his money would be released to the Chans, not held in escrow.

Additionally, Martin's July 27 Letter informed Plaintiff that the Buffalo Wings & Rings restaurants were not built and that if the funds were not sufficient to complete the Buffalo Wings & Rings concept, Mason Hill, LLC ("Mason Hill")—one of the Chans' companies, against which fraud claims were pending—would have to make up the

shortfall. In other words, the Chans' Buffalo Wings & Rings partnership was extremely

risky.

Finally, Martin cautioned Voigtmann as follows:

Because of the time constraints involved, if any of your clients wish to
rescind their investment, notification must be received no later than August
10, 2016. Otherwise, the General Partner will proceed as indicated above
with investments in Buffalo Wings & Rings restaurant locations.

On August 2, 2016, Voigtmann sent Plaintiff another email ("Voigtmann's

August 2 Email," a copy of which is attached hereto as **Exhibit K**), in which Voigtmann

did two things: (i) confirmed a recent telephone call that Voigtmann had had with

Plaintiff, providing actual notice of the two options; and (ii) forwarded Martin's July 27

Letter.

Voigtmann's August 2 Email began with the following:

As you will recall, we recently had a telephone conference with you
regarding information we received from the general partner/project
developer of your EB-5 project, GSC Opportunities, L.P. As you know, your
investment in a Gold Star Chili restaurant will not be able to continue as
originally planned.

Had Plaintiff told Voigtmann during that phone call that Plaintiff wanted a refund,

Voigtmann would have immediately demanded one. Instead, Plaintiff clearly elected to

invest with the Chans, because instead of demanding a refund, Voigtmann's August 2

Email ended with the following: "[i]f you wish to rescind your investment in this

project or if you have any questions, please contact us immediately."

In other words, Plaintiff had actual knowledge, no later than August 2, 2016, that Gold Star had pulled out of the deal and that he must act immediately to demand a refund, or his decision to invest with the Chans in a different partnership would be implemented. Moreover, Plaintiff had actual knowledge that unless he immediately requested a refund, his money would not be held in escrow but would be released to the Chans.

On August 13, 2016, Voigtmann sent another email to Plaintiff ("Voigtmann's August 13 Email"), in which he forwarded another correspondence from Martin to Plaintiff—this time an email dated August 11, 2016 ("Martin's August 11 Email"). A copy of Voigtmann's August 13 Email, which includes Martin's August 11 Email, is attached hereto as **Exhibit L**. In Voigtmann's August 13 Email, Voigtmann: (i) confirmed a second phone call with Plaintiff (proving Plaintiff's actual knowledge that his decision to invest with the Chans had been implemented); (ii) confirmed that his office had provided Plaintiff with advance notice of what would occur and advised Plaintiff of his options; and (iii) communicated his belief that "the general partner intends to proceed with investing in a new partnership in Buffalo Wings & Rings restaurants in Pittsburgh instead of the Gold Star Chili restaurants that were initially contemplated to be your EB-5 project." Voigtmann went on to advise Plaintiff that "[t]he partnership intends to release your funds from escrow and use the capital to create jobs in these restaurant locations. Should you have any questions or concerns,

please contact us immediately." Importantly, Voigtmann's August 13 Email did *not* say that Plaintiff's money would be held in escrow (either the existing account or a new one), and it did *not* say that Plaintiff demanded a refund; instead, it confirmed that Plaintiff's decision had been implemented, that Plaintiff's money would be released to the Chans (again, people he knew were facing pending fraud claims regarding a similar project), and that Plaintiff's money would be used for another venture.

It is important to remember that Martin's July 27 Letter (Exhibit J) informed Plaintiff that the Buffalo Wings & Rings restaurants were not built and that if the investors' funds were insufficient to complete the concept, the Chans—against whom fraud claims were pending—or their entity, Mason Hill, would have to make up the shortfall. In other words, the Buffalo Wings & Rings concept was highly speculative.

The foregoing documents clearly prove that Plaintiff had actual knowledge that (i) Gold Star had pulled out of the partnership, (ii) fraud claims were pending against Gary, Terry, and Jacquie Chan; and (iii) Plaintiff had the option to elect between a refund or invest in a new project with the Chans.

Despite this, Plaintiff went ahead with it anyway, apparently without inquiring as to any other investors or requiring his funds be held in a different escrow account. Indeed, confirming Plaintiff's agreement to invest in the Chan's new venture, on February 3, 2017, Plaintiff sent Gary Chan an email in which he asked Chan to "confirm…the details of your project that our money is in." He went on to say "[a]s we

have discussed in last conversation [*last*—meaning they had more than one], I am mostly concerned about the status of my money in your project. Since I did not sign the investment contract, I am worried my money is not protected in your project…" A true and accurate copy of Plaintiff's email to Chan is attached hereto as **Exhibit M**.

Plaintiff's February 3 email to Gary Chan proves that Plaintiff decided not to obtain a refund, but instead to put all his funds at risk and release the same to the Chans to purportedly invest in a new partnership involving a new Buffalo Wings & Rings concept in Pittsburgh. Moreover, his email proves that he knew that Gold Star was not involved in the new venture—he is not asking Gold Star about the status of his money, he is reaching out to Gary Chan alone, confirming both his agreement to invest in the new venture and his understanding that the Chans were now in control of his money. Indeed, this is the only reason he was asking about signing new documents— there would have been no need to do so if he thought the new venture was part of the GSC venture, as he had already signed that Subscription Agreement. Clearly, Plaintiff was concerned because (i) he knew he had agreed to enter into the Buffalo Wings & Rings venture with the Chans and would need to sign new documents (since the old ones would no longer apply), and (ii) he knew that his money had been released to the Chans, with his authorization, but that it had not yet been deposited into a new escrow account.

In short, Plaintiff agreed to become a partner in a Buffalo Wings & Rings EB-5 venture in Pittsburgh, Pennsylvania with just the Chans (without Gold Star's involvement), and he knowingly allowed his $500,080.00 to be released from the US Bank Escrow Account associated with GSC to the Chans (people he knew to be facing pending fraud claims) to purportedly invest in the Chans' Buffalo Wings & Rings EB-5 Venture in Pittsburgh. And unsurprisingly, after Plaintiff knowingly released his money to the Chans, they allegedly misappropriated it, just as they had done to other investors in a different EB-5 venture, as Martin's April 13 Letter warned Plaintiff. To the extent not admitted above, Gold Star denies the allegations in paragraph 1.

2.     In response to paragraph 2, Gold Star admits that GSC is an Ohio limited partnership with a principal place of business in Cincinnati, Hamilton County, Ohio. Further answering, Gold Star states that at one point in time, GSC EB5 Investor was a general partner of GSC, as reflected on the organization chart attached hereto as **Exhibit N**, which shows the relationships between the various GSC and Chan entities. Finally, Gold Star denies that it ever controlled GSC.

3.     In response to paragraph 3, Gold Star admits that GSC OPP Management, LLC ("GSC OPP") is an Ohio limited liability company with its principal place of business in Ohio, that GSC OPP was the General Partner of GSC, and that GSC OPP was initially composed of multiple members. However, Gold Star denies that it withdrew from GSC OPP on or after November 20, 2016—instead, Gold Star terminated

its involvement in the project in July, 2015. Further answering, Gold Star admits that after its involvement was terminated, Mason Hill was the only remaining partner in GSC. Gold Star states that it believes that Mason Hill had several affiliates, members, or employees, and that it was controlled by Gary Chan, Terry Chan, and Jacquelyn Chan (collectively, "the Chans"). Gold Star further states that **Figure 3** reflects that Mason Hill was not just two crooks and a cell phone.



*Figure 3*

Indeed, it was represented to Gold Star that Mason Hill was a legitimate business with an actual team that was going to perform the tasks and contribute as indicated in **Figures 4 and 5**.



*Figure 4*



*Figure 5*

4.      In response to paragraph 4, Gold Star admits that Defendant Gary Chan, through Mason Hill, was involved in GSC but denies for lack of knowledge what other

entities Chan may have been a part of. Further answering, Gold Star admits that Gary Chan was involved in the formation of GSC and GSC OPP but denies the remainder of the allegations.

5. Gold Star denies for lack of knowledge the allegations in paragraphs 5 through and including 10.

6. In response to paragraph 11, Gold Star admits that it is an Ohio Corporation with a principal place of business in Cincinnati and that it owns and operates Gold Star Chili restaurants in Ohio, Kentucky, and Indiana. Further answering, Gold Star denies that it owned 97% of GSC OPP but admits that one of its subsidiaries (GSC EB5 Investor) was a general partner in GSC. Gold Star denies that it or its subsidiary controlled GSC OPP until at least November 20, 2016, as it withdrew in July 2015, and Gold Star denies that it managed, controlled, and directed GSC OPP such that GSC OPP had no separate mind, will, or existence of its own.

7. In response to paragraph 12, Gold Star admits that GSC EB5 Investor is an Ohio limited liability company with a principal place in Cincinnati and a wholly-owned subsidiary. However, Gold Star denies that it so dominated and controlled GSC EB5 Investor that the two entities were indistinguishable.

8. In response to paragraph 13, Gold Star denies for lack of knowledge whether the Court has subject matter jurisdiction. Further answering, Gold Star denies

that it has violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, et seq. ("RICO"), or any federal securities laws.

9.      Gold Star denies for lack of knowledge the allegations in paragraph 14.

10.     In response to paragraph 15, Gold Star admits that Plaintiff has asserted fifteen claims against Defendants, eight of which are against Gold Star, but Gold Star denies all the allegations. Further answering, Gold Star states that for all the reasons explained within its Motion to Dismiss (Doc. # 114), Plaintiff has failed to state a claim against Gold Star. Additionally, Gold Star denies any liability for any of Plaintiff's claims, denies that it acted unlawfully in any way, and denies that it mismanaged, embezzled, or self-dealt any of Plaintiff's investment proceeds in GSC. Furthermore, Gold Star states that it did *not* owe Plaintiff any contractual or fiduciary duties (and even if it did, if fulfilled the same).

11.     In response to paragraph 16, Gold Star admits that Plaintiff agreed to release his funds to the Chans instead of getting a refund and that upon getting the funds, the Chans converted Plaintiff's money to their own. Further answering, Gold Star states that after GSC EB5 Investor withdrew as GSC's General Partner, Plaintiff agreed to become a partner in a new and completely different partnership with just the Chans. In connection with that new venture, Plaintiff agreed to release his $500,080.00 from the US Bank Escrow Account associated with GSC to purportedly invest in the

Chan's highly speculative and risky venture, and his money was allegedly stolen by the Chans.

12.     Gold Star denies the allegations in paragraph 17 and further states that Plaintiff is knowingly making false allegations, as demonstrated by the Exhibits and the facts detailed above.

13.     In response to paragraph 18, Gold Star restates each and every admission and denial stated above.

14.     In response to paragraph 19, Gold Star admits that Mason Hill, through a third party, promoted its EB-5 partnership with GSC, but Gold Star denies that Plaintiff became a subscriber on March 28, 2013; Plaintiff did not become a subscriber until May 31, 2013—well after the May 7th PPM, which Plaintiff represented and warranted that he received, reviewed, and relied upon.

15.     In response to the allegations in paragraphs 20, 21, 22, and 23, Gold Star states that the statutes and regulations speak for themselves, denies Plaintiff's legal interpretations of the same, and denies any alleged wrongdoing by Gold Star.

16.     Gold Star denies the allegations in paragraph 24. As stated above, Plaintiff elected to invest in a new, highly speculative partnership with the Chans to purportedly build Buffalo Wings & Rings restaurants in Pittsburgh, he was aware that his funds were going to be released from the escrow account associated with Gold Star, and he

was aware that his funds were going to be given to the Chans to purportedly be used for the Chans' new venture.

17.     Gold Star admits the allegations in paragraph 25.

18.     Gold Star denies the allegations in paragraph 26.

19.     Gold Star admits the allegations in paragraph 27.

20.     In response to paragraphs 28 and 29, Gold Star admits that it was involved in preparing the documents that were finalized on May 7, 2013, but denies any remaining allegations, except to the extent admitted above.

21.     In response to paragraphs 30 through and including 35, Gold Star admits that Mike Rohrkemper executed the Memorandum of Understanding ("MOU") on its behalf on April 15, 2013, states that the MOU speaks for itself, and denies Plaintiff's interpretation of the same. Further answering, Gold Star notes that the MOU expressly states that except for each party's good faith in working to finalize necessary documents,

> …this Memorandum of Understanding is not intended to be binding on either party and nothing set forth herein shall be deemed to survive the termination of this Agreement and the purpose of this Agreement is to permit the parties to move forward with negotiation and finalization of documents necessary to effect [sic] the Project, including but not limited to the Project Owner's Operating Agreement, EB-5 Management Agreement, Business Plan and similar documents.

Additionally, Gold Star states that the MOU was just a concept at that point—Plaintiff did not invest until May 31, 2013, after the May 7, 2013, plans had been finalized.

Finally, Gold Star notes that (i) Chen does *not* allege that he ever saw, much less relied on, any statement in the MOU, so it cannot form the basis of any fraud claim, and (ii) Chen is not a party to the MOU, so it cannot serve as the basis for any breach of contract or breach of fiduciary duty claim.

22.    In response to paragraphs 36 through and including 66, Gold Star (i) admits that the operating agreement and financial arrangements were executed on May 7 2013, (ii) admits that Plaintiff represented that he received, reviewed, and relied upon the May 7th PPM and any other company documents, records, or agreements that Plaintiff requested, and (iii) admits that Plaintiff invested in GSC on May 31, 2013, after he had represented that he received and reviewed the May 7th PPM. Additionally, Gold Star states that it fulfilled all its obligations under the operating agreement and the partnership, states that the operating agreement and the private placement memorandum ("PPM") speak for themselves, and denies Plaintiff's characterization of the same. Except to extent expressly admitted herein, Plaintiff expressly denies the allegations contained in paragraphs 36 through and including 66.

23.    In response to paragraph 67, Gold Star admits that it was Gary and Terry Chan—not Gold Star—that solicited Plaintiff's investment. Further answering, Gold Star denies that the Chans solicited Plaintiff's investment on behalf of Gold Star.

24.    In response to paragraph 68, Gold Star denies that it created, directed, and/or otherwise approved the content in this booklet and the statements contained

therein, or that it was integrally involved in the marketing, distribution, and publication of these materials to Plaintiff. Furthermore, Gold Star states that Plaintiff did not invest until May 31, 2013, after the parties had finally agreed upon the operating agreement and financial terms.

25.     In response to paragraphs 69 and 70, Gold Star states that the promotional booklet speaks for itself and denies Plaintiff's characterization of the same.

26.     Gold Star denies the allegations in paragraph 71 for lack of knowledge.

27.     In response to paragraph 72, Gold Star denies that it created, directed, or otherwise approved the content in the Business Plan and the statements contained therein, and Gold Star denies that it was integrally involved in the marketing, distribution, and publication of these materials to Plaintiff.

28.     Gold Star denies the allegations in paragraph 73 and states that according to the Subscription Agreement, Plaintiff received, reviewed, and relied upon the May 7th PPM.

29.     In response to paragraphs 74 through and including 79, Gold Star states that the Business Plan speaks for itself. Further answering, however, even if the alleged statements in the Business Plan about planning to open twelve restaurants between 2013 and 2014 were materially inaccurate and intended to deceive, and even if those statements were made by Gold Star, all of which Gold Star denies, they had no bearing on what ultimately happened to Plaintiff's money. More importantly, Plaintiff's

representation that he received, reviewed, and relied upon the May 7th PPM defeats the allegations in these paragraphs, and consistent with Plaintiff's representations and warranties in the Subscription Agreement, Plaintiff waited 41 days (April 20 to May 31) before paying his money, so he had time to review the May 7th PPM and the other corporate documents he requested.

30.     In response to paragraph 80, Gold Star states that GSC's Agreement of Limited Partnership ("Partnership Agreement") speaks for itself but notes that the Partnership Agreement attached to the Second Amended Complaint as Exhibit B is an unexecuted draft. Further answering, Gold Star reiterates that Plaintiff waited 41 days (April 20 to May 31) before paying his money, so he had time to review the May 7th PPM and the other corporate documents he requested.

31.     Gold Star denies the allegations in paragraph 81.

32.     In response to paragraphs 82 and 83, Gold Star states that the Partnership Agreement attached to the Second Amended Complaint as Exhibit B speaks for itself but notes that it is an unexecuted draft.

33.     In response to paragraph 84, Gold Star states that the documents speak for themselves.

34.     In response to paragraph 85, Gold Star states that the unexecuted Partnership Agreement attached to the Second Amended Complaint as Exhibit B speaks for itself. Further answering, Gold Star denies that the executed Partnership Agreement

defines Targeted Employment Area in the same way as the unexecuted copy and

reiterates that Plaintiff represented that he received, reviewed, relied upon the May 7th

PPM.

35.    In response to paragraph 86, Gold Star states that the executed

Partnership Agreement speaks for itself and that the Conditions Precedent to Plaintiff

becoming a limited partner never occurred before it was determined that GSC was not a

viable business enterprise.

36.    Gold Star denies the allegations in paragraph 87, except to the extent

admitted above.

37.    In response to paragraph 88, Gold Star admits that the Partnership

Agreement states that no limited partner has "any right or power to take part in the

management or control of the Partnership."

38.    In response to paragraphs 89 through and including 100, Gold Star states

that the Partnership Agreement attached to the Second Amended Complaint as Exhibit

B speaks for itself but notes that it is unexecuted. Further answering, Gold Star

reiterates that Plaintiff (i) represented and warranted that he relied upon the May 7th

PPM and the May 7th executed operating agreement, and (ii) waited until May 31, 2013,

to fund his investment.

39.    Gold Star denies the allegations in paragraphs 101 and 102.

40.    Gold Star denies the allegation in paragraph 103 for lack of knowledge.

24

41.     In response to paragraphs 104 and 105, Gold Star states that the
Partnership Agreement attached to the Second Amended Complaint as Exhibit B speaks
for itself but notes that it is unexecuted. Further answering, Gold Star reiterates that
Plaintiff (i) represented and warranted that he relied upon the May 7th PPM and the
May 7th executed operating agreement, and (ii) waited until May 31, 2013, to fund his
investment.

42.     Gold Star denies the allegations in paragraph 106, except to the extent
admitted above. Further answering, Gold Star states that Plaintiff became a subscriber
on May 31, 2013, when he funded his money, and that if certain Conditions Precedent
were satisfied, Plaintiff could have become a limited partner, but that the Conditions
Precedent were not satisfied before it was determined that GSC was not a viable entity.

43.     Gold Star denies the allegations in paragraph 107.

44.     In response to paragraph 108, Gold Star admits that the May 7 PPM and
the operating agreements were executed on May 7, 2013, and that Plaintiff represented
receiving the same before paying his investment on May 31, 2013. Gold Star denies any
remaining allegations except to the extent admitted above.

45.     In response to paragraphs 109 through and including 113, Gold Star first
denies Plaintiff's blatantly false allegation that it or GSC OPP executed GSC OPP's
Operating Agreement. That document, which is attached to Plaintiff's First Amended
Complaint as Exhibit D (Doc. 26-4), was signed by only two parties—GSC EB5 Investor

and Mason Hill. Further answering, Gold Star denies the implied allegation that it was a party to GSC OPP's Operating Agreement—it was not. As such, Gold Star could not have made any representations therein, and it could not have had any responsibilities thereunder. Moreover, as repeated several times above, Plaintiff represented that he received, reviewed, and relied upon the May 7th PPM and the May 7th operating agreements before paying his investment on May 31, 2013.

46.     Gold Star denies the allegations in paragraph 111.

47.     In response to paragraphs 112 and 113, Gold Star states that GSC OPP's Operating Agreement speaks for itself. Further answering, Gold Star states that Plaintiff received a copy of GSC OPP's Operating Agreement before he deposited his money into escrow.

48.     In response to paragraph 114, Gold Star once again denies Plaintiff's blatant misrepresentation that it signed a document—this time, GSC's Agreement of Limited Partnership.

49.     Gold Star denies the allegations in paragraph 115.

50.     In response to paragraphs 116 and 117, Gold Star states that the executed copy of GSC's Agreement of Limited Partnership speaks for itself and denies any remaining allegations.

51.     In response to paragraphs 118 and 119, Gold Star denies that Plaintiff was not informed about the differences in GSC's structure, size, and scope until after he

invested, because Plaintiff only funded his investment until after he received, reviewed, and relied upon the May 7th PPM and May 7th operating agreements. Further answering, Gold Star denies for lack of knowledge what Plaintiff did or did not know. However, Gold Star reiterates that according to the Subscription Agreement, Plaintiff represented and warranted to GSC, GSC EB5 Investor, Gold Star, and the other investors and interested parties that he was an accredited investor, so of course he would not invest his money until he had received, reviewed, and relied upon the May 7th PPM, which expressly stated that (i) there would be a maximum of five (5) other EB-5 Investors, and (ii) Gold Star, through its subsidiary, would invest only $1,250,000 into GSC.

52. Gold Star denies the allegations in paragraph 120, except to the extent admitted above.

53. Gold Star denies the allegations in paragraphs 121 and 122.

54. Gold Star denies the allegations in paragraph 123, except to the extent admitted above.

55. Gold Star denies the allegations in paragraph 124. Again, according to the Subscription Agreement, Plaintiff represented and warranted to GSC, GSC EB5 Investor, Gold Star, and the other investors and interested parties that he had received, reviewed, and relied upon the May 7th PPM, which expressly stated that (i) there

would be a maximum of five (5) other EB-5 Investors, and (ii) Gold Star, through its subsidiary, would invest only $1,250,000 into GSC.

56.     Gold Star denies the allegations in paragraph 125, except to the extent admitted above.

57.     Gold Star admits the allegations in paragraphs 126 and 127.

58.     Gold Star denies the allegations in paragraph 128, except to the extent admitted above.

59.     In response to paragraph 129, Gold Star states that those filings speak for themselves.

60.     Gold Star denies the allegations in paragraphs 130, 131, and 132, except to the extent admitted above.

61.     Gold Star admits the allegation in paragraph 133.

62.     Gold Star denies the allegations in paragraphs 134 and 135, except to the extent admitted above.

63.     In response to paragraphs 136, 137, and 138, Gold Star admits that it sent the Notice of Dissolution but denies that it was sent on August 31, 2015—as shown on Exhibit F, the Notice of Dissolution was sent on July 31, 2015. Further answering, Gold Star states that the Notice of Dissolution speaks for itself, and Gold Star denies any remaining allegations except to the extent admitted above.

64.     In response to paragraph 139, Gold Star states that the Notice of Dissolution speaks for itself and denies for lack of knowledge whether Mason Hill provided the same to Plaintiff.

65.     Gold Star denies the allegations in paragraph 140, except to the extent admitted above. Further answering, Gold Star states that (i) the process of liquidating GSC started by notifying the EB-5 investors that GSC was being dissolved, (ii) thereafter, the EB-5 investors were notified that they had an option to either get a refund or invest in a different venture with just the Chans, and (iii) all of the EB-5 investors except Plaintiff elected to get a refund.

66.     Gold Star denies the allegations in paragraph 141. The email in question did not say that Gold Star could not unilaterally dissolve GSC or GSC OPP, only that "…it does not appear you have the unilateral authority to dissolve either." Gold Star further states that the email speaks for itself and that any authority necessary to dissolve GSC was obtained.

67.     Gold Star denies the allegations in paragraphs 142, 143, and 144, except to the extent admitted above.

68.     Gold Star denies the allegations in paragraphs 145 and 146, except to the extent admitted above.

69.     Gold Star admits the allegations in paragraphs 147, 148, and 149.

70.　　Gold Star denies the allegations in paragraph 150, except to the extent admitted above.

71.　　In response to paragraph 151, Gold Star admits that Gary Chan—the individual whom Plaintiff designated as the Issuer's Representative—sent US Bank, National Association a request to release GSC investor funds from escrow on August 5, 2016. Further answering, Gold Star states that correspondence speaks for itself.

72.　　Gold Star denies the allegations in paragraph 152 for lack of knowledge, as it does not know how the Chans may have used Plaintiff's funds.

73.　　In response to the allegations in paragraphs 153 through and including 160, Gold Star admits that Plaintiff authorized Chan to be the Issuer Representative of the escrow account and that Chan then used that authority to send letters to US Bank. Gold Star further admits that although neither required nor expected to do so by Plaintiff, as he authorized Chan to the Issuer Representative, Gold Star checked the escrow account on occasion, without Plaintiff's knowledge. Except as admitted herein, Gold Star denies the remaining allegations in these paragraphs.

74.　　Gold Star denies the allegations in paragraphs 161 through and including 178 for lack of knowledge.

75.　　In response to the allegations in paragraphs 179 through and including 203, Gold Star states that the exhibits above defeat and correct Plaintiff's false allegations and, except to the extent admitted above, denies the allegations. Gold Star

30

further states that the allegations prove that all of Plaintiff's communications went through the Chans and immigration counsel and that Gold Star's communications were to follow the same path.

76.     Gold Star states that the allegations in paragraphs 204 through and including 225 are not against Gold Star, so no response is needed. Further answering, however, to the extent that these allegations could be construed as being against Gold Star, they are denied for lack of knowledge.

77.     In response to paragraph 226, Gold Star restates each and every admission and denial stated above.

78.     In response to paragraph 227, Gold Star states that 18 U.S.C. § 1962(a) speaks for itself and denies Plaintiff's interpretation or attempted application of that statute to these facts.

79.     Gold Star states that the allegations in paragraphs 228 though and including 256 are not against Gold Star, so no response is needed. Further answering, however, to the extent that these allegations could be construed as being against Gold Star, they are denied for lack of knowledge.

80.     In response to paragraph 257, Gold Star restates each and every admission and denial stated above.

81.     Gold Star states that the allegations in paragraphs 258 though and including 265 are not against Gold Star, so no response is needed. Further answering,

however, to the extent that these allegations could be construed as being against Gold Star, they are denied for lack of knowledge.

82.     In response to paragraph 266, Gold Star restates each and every admission and denial stated above.

83.     Gold Star states that the allegations in paragraphs 267 though and including 274 are not against Gold Star, so no response is needed. Further answering, however, to the extent that these allegations could be construed as being against Gold Star, they are denied for lack of knowledge.

84.     In response to paragraph 275, Gold Star restates each and every admission and denial stated above.

85.     Gold Star states that the allegations in paragraphs 276, 277, and 278 are not against Gold Star, so no response is needed. Further answering, however, to the extent that these allegations could be construed as being against Gold Star, they are denied for lack of knowledge.

86.     In response to paragraph 279, Gold Star restates each and every admission and denial stated above.

87.     Gold Star states that the allegations in paragraphs 280, 281, 282, and 283 are not against Gold Star, so no response is needed. Further answering, however, to the extent that these allegations could be construed as being against Gold Star, they are denied for lack of knowledge.

88.     In response to paragraph 284, Gold Star restates each and every admission and denial stated above.

89.     Gold Star denies the allegations in paragraphs 285 though and including 295 and states that the exhibits defeat Plaintiff's claims.

90.     In response to paragraph 296, Gold Star restates each and every admission and denial stated above.

91.     Gold Star denies the allegations in paragraphs 297 through and including 310, except to the extent admitted above.

92.     In response to paragraph 311, Gold Star restates each and every admission and denial stated above.

93.     Gold Star denies the allegations in paragraphs 312 though and including 321, except to the extent admitted above.

94.     In response to paragraph 322, Gold Star restates each and every admission and denial stated above.

95.     Gold Star denies the allegations in paragraphs 323 through and including 328, except to the extent admitted above.

96.     In response to paragraph 329, Gold Star restates each and every admission and denial stated above.

97.     Gold Star denies the allegations in paragraphs 330 through and including 334. Further answering, Gold Star reiterates that, as explained above, Plaintiff was never a limited partner, but just a subscriber.

98.     In response to paragraph 335, Gold Star restates each and every admission and denial stated above.

99.     In response to the allegations in paragraphs 336 though and including 338, Gold Star states that the allegations are not against Gold Star and that no response is needed but to the extent they could be construed as being against Gold Star, they are denied for lack of knowledge.

100.    In response to paragraph 339, Gold Star restates each and every admission and denial stated above.

101.    Gold Star denies the allegations in paragraphs 340 through and including 345, and as explained above, Plaintiff weas never a limited partner just a subscriber.

102.    In response to paragraph 346, Gold Star restates each and every admission and denial stated above.

103.    In response to the allegations in paragraphs 347 though and including 350, Gold Star states that the allegations are not against Gold Star and that no response is needed but to the extent they could be construed as being against Gold Star, they are denied for lack of knowledge.

34

104.    In response to paragraph 351, Gold Star restates each and every admission and denial stated above.

105.    Gold Star denies the allegations in paragraphs 352 though and including 359, except to the extent admitted above.

106.    In response to paragraph 360, Gold Star restates each and every admission and denial stated above.

107.    Gold Star denies the allegations in paragraphs 361, 362, and 363, except to the extent admitted above.

108.    Gold Star denies each and every allegation in Plaintiff's Second Amended Complaint not expressly admitted herein.

## FIRST AFFIRMATIVE DEFENSE

109.    For all the reasons set forth in Gold Star's Motion to Dismiss (Doc. # 114), which is incorporated herein by reference, the Second Amended Complaint fails to state a claim upon which relief can be granted herein and, therefore, should be dismissed.

## SECOND AFFIRMATIVE DEFENSE

110.    Plaintiff has no standing to pursue any claim based upon the GSC Partnership, as Plaintiff never became a limited partner and instead was only a subscriber.

### THIRD AFFIRMATIVE DEFENSE

111.    Plaintiff's alleged breach of fiduciary duty claim fails as a matter of law because no special trust, fiduciary relationship or contractual relationship ever existed between him and Gold Star.

### FOURTH AFFIRMATIVE DEFENSE

112.    Plaintiff's alleged breach of fiduciary duty claim is also barred by the four-year statute of limitations pursuant to R.C. 2305.09(D), and no discovery rule applies. As such, the claim arises—if at all—when the alleged relationship was formed, which would have been May 31, 2013, more than 4 years before the Complaint was filed.

### FIFTH AFFIRMATIVE DEFENSE

113.    The Chans' alleged theft of Plaintiff's money was a superseding and intervening act or occurrence which bars a claim against Gold Star.

### SIXTH AFFIRMATIVE DEFENSE

114.    Plaintiff's right of recovery, if any, is barred by the doctrine of impossibility of performance.

### SEVENTH AFFIRMATIVE DEFENSE

115.    Plaintiff's gross negligence claims under R.C. 1782.241(A) fail as a matter of law because Gold Star was never in a partnership with Plaintiff.

### EIGHTH AFFIRMATIVE DEFENSE

116.    Plaintiff's fraud claim fails as matter of law, as Plaintiff has failed to plead with specificity any alleged fraudulent conduct by Gold Star.

## NINTH AFFIRMATIVE DEFENSE

117.    Plaintiff's alleged securities violations are barred because the fraud claim fails as matter of law, as Plaintiff has failed to plead with specificity any alleged fraudulent conduct by Gold Star.

## TENTH AFFIRMATIVE DEFENSE

118.    Plaintiff has failed to allege facts sufficient to state a claim for the award of attorneys' fees or punitive damages.

## TWELFTH AFFIRMATIVE DEFENSE

119.    Plaintiff's conspiracy claim fails because it requires a plan and participation between the Chans and Gold Star, but no such plan or participation exist. Additionally, conspiracy requires an underlying tort, but none exists in this case.

## THIRTEENTH AFFIRMATIVE DEFENSE

120.    The exhibits attached to this Answer preclude all of Plaintiff's claims against Gold Star.

## THIRTENTH AFFIRMATIVE DEFENSE

121.    Gold Star hereby gives notice of its intention to rely upon such additional affirmative defenses as may become apparent during the discovery of this action and reserve the right to amend its Answer.

## COUNTERCLAIM

Now comes Gold Star, by and through counsel, and for its Counterclaim hereby states as follows:

1.      Gold Star restates each and every allegation set forth above as if fully restated herein.

2.      According to the Subscription Agreement, attached hereto as Exhibit D, Plaintiff represented and warranted to GSC, GSC EB5 Investor, Gold Star, and all other investors and interested parties that he was "an a*ccredited Investor* as the term is defined within the Securities Laws" meaning Plaintiff represented that he was an investor that was financially sophisticated with little need for the protection provided by regulatory disclosure filings.

3.      According to the Subscription Agreement, Plaintiff further represented and warranted as follows:

- The undersigned has such knowledge and experience in financial and business matters that the undersigned is able to evaluate the risks in any investment in the Fund. The undersigned acknowledges that the undersigned has been advised to discuss this investment with the undersigned's legal or other professional advisors, or with other investment representatives who have knowledge of business and financial matters. If the undersigned has not done so it is because, in the undersigned's opinion, the undersigned is personally capable of evaluating this investment and the Fund and does not need the advice of other persons. The undersigned and, to the extent deemed necessary by the undersigned, any of the persons mentioned above have been afforded the opportunity to ask questions concerning this investment of officers of the Fund and its general partner and have been furnished with such information with respect to the Fund and its proposed operations as the undersigned has requested to the undersigned's satisfaction.[1]

---

[1] *See* Subscription Agreement, attached hereto as Exhibit B, at ¶3.

- The undersigned understands that the Fund is expressly relying on the truth and accuracy of the representations, declarations, and warranties made by the undersigned in this Subscription Agreement in offering the Units for sale to the undersigned and in determining the availability of certain exemptions under applicable Securities Laws.[2]

- The undersigned is an "*accredited investor*" as such term is defined in the Securities Laws.[3]

- The foregoing representations, warranties and undertakings are made by the undersigned with the intent that they be relied upon by the Fund in determining the undersigned's suitability as an investor in the Fund. The undersigned hereby agrees that such representations and warranties shall survive the undersigned becoming an interest holder in the Fund.[4]

- Furthermore, if the I-526 petition filed by the undersigned is denied, the undersigned will not become a limited partner of the Fund and his subscription amount will be returned within 90 days after receipt of written notification of such denial.[5]

- The undersigned acknowledges that the undersigned has received and reviewed copies of the Fund's Private Placement Memorandum dated as of May 7, 2013, together with the exhibits listed therein and any other company documents, records, or agreements the undersigned has requested from the Fund.[6]

4.      Additionally, Plaintiff agreed in Section 9 of the Subscription Agreement

that:

The undersigned further agrees to indemnify and hold harmless the Fund, its partners, officers, attorneys, agents, and each other interest holder from any damages, claims, expenses, losses, or actions resulting from the untruth

---

[2] *Id*. at ¶ 5.

[3] *Id*. at ¶ 8 (emphasis in original).

[4] *Id*., page 3.

[5] *Ibid*.

[6] *Ibid*.

of any of the warranties and representations contained in this Subscription Agreement.

5.      The "Fund" is defined in the Subscription Agreement to mean GSC.

6.      Plaintiff alleges throughout the Second Amended Complaint that Gold Star, GSC and GSC EB5 Investor are all one and the same, such that Gold Star would be entitled to indemnity, since it is allegedly one and the same as GSC.

7.      Regardless of Plaintiff's allegations, which Gold Star denies, it is undisputed that Gold Star is an interest holder, as the franchisor of the restaurants in which Plaintiff hoped to invest, as the parent company of the subsidiary that invested in GSC, as the parent company of the general partner of GSC, and as an intended third-party beneficiary of the Subscription Agreement.

8.      Recognizing Gold Star as an intended third-party beneficiary of the Subscription Agreement would effectuate the intention of the parties and either (a) the performance of the promise will satisfy and fulfill Plaintiff's representations and warranties to the beneficiary; or (b) the circumstances indicate that Plaintiff intended to give Gold Star the benefit of the promised performance. Clearly, the parties intended the indemnity to be broad—that is why even an "interest holder" like Gold Star is entitled to be indemnified.

***May 7th PPM***

9.      According to the Subscription Agreement, Plaintiff represented that he had received, reviewed, and relied upon the May 7th PPM, a copy of which is attached hereto as Exhibit D.

10.     The May 7th PPM expressly stated that (i) there would be a maximum of five (5) other EB-5 Investors, and (ii) Gold Star, through its subsidiary, would invest only $1,250,000 into GSC—not the $3,000,000.00 Plaintiff alleges.

11.     Although Plaintiff signed the Subscription Agreement on April 20, 2013, and could have immediately deposited his funds into the escrow account that was set up on April 15, 2021, since Plaintiff was a sophisticated *accredited investor*, as he represented himself to be, Plaintiff waited 41 days until May 31, 2013—after the May 7th PPM and operating agreements had been executed—to pay his money into escrow. A copy of US Bank's acknowledgment of Plaintiff's deposit on May 31, 2013, is attached hereto as Exhibit E. Obviously, Plaintiff's payment was consistent with his representation that he was a sophisticated investor who knew to wait until the business plan had been finalized before paying the money, and indeed he waited until he reviewed the final PPM until paying the money.

12.     If Plaintiff's representations and warranties in the Subscription Agreement are true and accurate, then Plaintiff knows that his allegations against Gold Star are false and frivolous.

13.     Notwithstanding the representations and warranties Plaintiff made in the Subscription Agreement or the fact that he waited until May 31, 2013, to pay his money into escrow so he had time to review the final documents, Plaintiff claims in paragraphs 67 through and including 124 of the Second Amended Complaint that he never received the May 7th PPM and further alleges that a bait-and-switch occurred when GSC implemented the May 7th PPM. Plaintiff has attempted to allege several different claims and legal theories based upon these allegations.

14.     Either Plaintiff's representations and warranties in the Subscription Agreement are false, and Plaintiff needs to indemnify and hold Gold Star harmless, or Plaintiff is intentionally making false and frivolous claims and allegations, and he should be sanctioned.

15.     Under either scenario, Gold Star is entitled to a full recovery of its attorneys' fees.

### *Limited Partner*

16.     Plaintiff represented in the Subscription Agreement that he is a sophisticated "accredited investor" and either sought the advice of professionals or had the experience to evaluate the offer and therefore knew and understood that the Conditions Precedent existed.

17.     Plaintiff represented that he understood that one of the Conditions Precedent was USCIS' acceptance of his I-526 petition. Specifically, Plaintiff represented

in the Subscription Agreement that "if the I-526 petition filed by the undersigned is denied, the undersigned will not become a limited partner of the Fund and his subscription amount will be returned within 90 days after receipt of written notification of such denial." As such, Plaintiff obviously knew that (i) he was not a limited partner, but just a subscriber, until his I-526 Petition was approved and was just a subscriber, and (ii) his "subscription [not limited partnership interest] would be returned" if his petition was not approved.

18.     Likewise, Plaintiff represented in the Joinder in Master Escrow Agreement—a document Plaintiff requested as part of the subscription—that his funds would not be released from escrow, and hence he would not be a limited partner, until the I-526 petitions of at least two (2) EB-5 Investors had been approved.

19.     As Plaintiff knows, two EB-5 Investors' I-526 Petitions were not approved until August 2015, and by that point it had already been decided that it was impractical to operate GSC and that GSC needed to be dissolved and wound down, so Plaintiff never became—and would never become—a limited partner.

20.     Notwithstanding the foregoing, Plaintiff alleges throughout the Second Amended Complaint that he was a limited partner, that Gold Star owed him a fiduciary duty, and that Gold Star breached the same.

21.     Regardless of the Conditions Precedent to Plaintiff becoming a limited partner or two EB-5 Investors I-526 petitions that needed to be approved, if Plaintiff is

an accredited, sophisticated investor, as he represented himself to be in the Subscription

Agreement, then he knows and understands that there was never a fiduciary

relationship between Plaintiff and Gold Star.

22.     Either Plaintiff's representations and warranties in the Subscription

Agreement are false, and Plaintiff must indemnify and hold Gold Star harmless, or

Plaintiff is intentionally making false and frivolous claims and allegations and should

therefore be sanctioned.

23.     Under either scenario, Gold Star is entitled to a full recovery of its

attorneys' fees.

### ***Other Documents***

24.     According to the Subscription Agreement, in addition to representing that

Plaintiff received, reviewed, and relied upon the May 7, PPM, Plaintiff also represented

that he received and reviewed copies of "any other company documents, records, or

agreements the undersigned has requested from the Fund."

25.     As part of the Subscription Agreement, Plaintiff requested a copy of not

only the Master Escrow Agreement, but also the Joinder Agreement. And according to

the Joinder Agreement, Plaintiff expressly agreed to be bound by and rely upon the

terms of the Master Escrow Agreement, the terms of which expressly appoint Gary

Chan as Issuer's Representative for purposes of the escrow account and managing the

escrow funds.

26.     Notwithstanding the fact that Plaintiff executed the Joinder Agreement, thereby appointing Gary Chan to be the Issuer's Representative, Plaintiff now alleges that Gary Chan only got access to the escrow funds because of some wrongdoing by Gold Star.

27.     Notwithstanding his allegations, it is Plaintiff's own authorization that provided Gary Chan with access to the funds.

28.     As such, either (i) Plaintiff's representations and warranties in the Subscription Agreement—namely that he was a sophisticated investor and that he knew and understood that he provided Gary Chan the access necessary to steal his funds—are false, and Plaintiff must indemnify and hold Gold Star harmless, or (ii) Plaintiff is intentionally making false and frivolous claims and allegations, and he should be sanctioned.

29.     Under either scenario, Gold Star is entitled to a full recovery of its attorneys' fees.

**WHEREFORE**, Gold Star respectfully requests that the Second Amended Complaint be dismissed with prejudice at Plaintiffs' sole cost and expense, and, with respect to the Counterclaim, Gold Star respectfully demands that it be fully and completely indemnified and held harmless and that it be entitled to a full and complete refund and recovery of all its attorneys' fees.

Respectfully Submitted,

/s/ Paul T. Saba
Paul T. Saba (0063723)
Jeffrey M. Nye (0082247)
STAGNARO, SABA & PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-2703
(513) 533-2999 – fax
pts@sspfirm.com
jmn@sspfirm.com
*Attorneys for Defendant Gold Star Chili, Inc.*

## JURY DEMAND

Defendant Gold Star requests a trial by jury on all matters so triable.

/s/ Paul T. Saba
Paul T. Saba (0063723)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served upon all

parties through the court's CM/ECF system on the date of filing.

/s/ Paul T. Saba
Paul T. Saba (0063723)