

**EXHIBIT**

**A**

## MASTER ESCROW AGREEMENT

**THIS MASTER ESCROW AGREEMENT,** dated as of <u>April 15</u>, 2013 ("Master Escrow Agreement"), is initially by and between GSC Opportunities, L.P. an Ohio Limited Partnership ("Issuer") and U.S. Bank National Association, a national banking association, as Escrow Agent hereunder ("Escrow Agent"). In addition, any Person (defined below) who executes a Joinder Agreement (defined below) shall become an Investor under this Master Escrow Agreement for all periods from and after the date of such Joinder Agreement to the same extent as if such Person had originally executed this Master Escrow Agreement.

## BACKGROUND

A.  The Issuer is seeking investments from individuals under the provisions of the USCIS EB-5 immigrant investor program (the "Investor Program").

B.  The Investor Program, described in the Private Placement Memorandum (the "Memorandum") provided, or to be provided, by Issuer to potential investors, permits an investor to make a qualifying investment that may provide a means to attain lawful permanent residence in the United States.

C.  The Issuer has or will offer investments as described in the Memorandum provided to potential Investors (as defined herein).

D.  Each person who wishes to invest in Issuer under the terms of the Memorandum is required to execute a subscription agreement (the "Subscription Agreement") prior to Escrow Agent's acceptance of the Investor's funds in accordance with the terms herein established.

E.  Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Master Escrow Agreement.

F.  The Investor (by way of his/her Joinder Agreement) and the Issuer appoint the Representatives (defined below) to represent them for all purposes in connection with the funds to be deposited with Escrow Agent under this Master Escrow Agreement.

G.  In order to establish the escrow of funds, the parties hereto have entered into this Master Escrow Agreement.

## STATEMENT OF AGREEMENT

USBANK000015

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1. <u>Definitions</u>. The following terms shall have the following meanings when used herein:

"Escrow Funds" shall mean the funds deposited with Escrow Agent pursuant to a Joinder Agreement but shall not include Interest Income.

"Interest Income" shall mean all interest and other income earned on the Escrow Funds.

"Investor" shall mean a person who executes a Joinder Agreement.

"Investor Representative" shall mean the person so designated on <u>Attachment I</u> hereof or as so designated on an executed Joinder Agreement as an Investor Representative; or any other person designated an Investor Representative in a writing signed by the Investor and delivered to Escrow Agent and the Issuer Representative in accordance with the notice provisions of this Master Escrow Agreement.

"Issuer Representative" shall mean the person so designated on <u>Attachment I</u> hereof or any other person designated in a writing as an Issuer Representative signed by the Issuer and delivered to Escrow Agent and the Investor Representatives in accordance with the notice provisions of this Master Escrow Agreement.

"Joinder Agreement" shall mean that certain agreement in substantially the form attached hereto as Attachment IV pursuant to which an individual agrees to become an Investor and deposits funds in the escrow account(s) in the amount set forth in the Joinder in the Master Escrow Agreement, which funds shall, upon deposit, become Escrow Funds to be held and administered pursuant to the terms of this Master Escrow Agreement, and to otherwise be bound by the terms of this Master Escrow Agreement.

"Person" shall mean and include individuals, corporations, limited liability companies, limited partnerships, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts and other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

-2-

USBANK000016

"Representatives" shall mean the Investor Representatives and the Issuer Representatives.

"Underlying Agreement" shall mean collectively the Memorandum and the Subscription Agreement as defined herein.

"Written Direction" shall mean a Written Direction executed by the Issuer Representative directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking an action pursuant to this Master Escrow Agreement. In regard to any Written Direction to disburse all or a portion of the Escrow Funds as provided for herein, such Written Direction shall be substantially in the form of Attachment II hereof.

2.  <u>Appointment of and Acceptance by Escrow Agent</u>.  Investor (by his/her Joinder Agreement) and Issuer hereby appoint Escrow Agent to serve as escrow agent hereunder. Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with <u>Section 3</u> below, agrees to hold, invest and disburse the Escrow Funds in accordance with this Master Escrow Agreement.

3.  <u>Deposit of Escrow Funds.</u>  After the execution and delivery of this Master Escrow Agreement and an applicable Joinder Agreement and upon receipt of Escrow Agent's written approval to do so, Investor will transfer the Escrow Funds in the amount set forth on <u>Attachment I</u> hereof to Escrow Agent, by wire transfer of immediately available funds, to the account of the Escrow Agent referenced on <u>Attachment I</u> hereof.

4.  <u>Disbursements of Escrow Funds</u>.  Escrow Agent shall disburse Escrow Funds at any time and from time to time, upon receipt of, and in accordance with a Written Direction. Such Written Direction shall contain wiring instructions or an address to which a check shall be sent. All disbursements of funds from the Escrow Funds shall be subject to the fees and claims of Escrow Agent and the Indemnified Parties (as defined below) pursuant to <u>Section 10</u> and <u>Section 11</u> below.

5.  <u>Suspension of Performance; Disbursement Into Court</u>.  If, at any time, (i) any dispute exists between or among an Investor, the Issuer or the Representatives with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder, (ii) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) the Representatives have not within 30 days of the furnishing by Escrow Agent of a notice of resignation pursuant to <u>Section 7</u> hereof, appointed a successor Escrow Agent to act hereunder, or (iv) the Escrow Agent determines that the Investor may have engaged in any activity that in Escrow Agent's sole judgment may be inconsistent with any of the Escrow Agent's policies, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

-3-

USBANK000017

a.    suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Master Escrow Agreement until such matter shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed (as the case may be).

b.    petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction identified in Section 13 hereof, for instructions with respect to such matter and, to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, the relevant portion of the Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and reasonable attorneys' fees) payable to or incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to an Investor, the Issuer, their respective shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent, except for its gross negligence or willful misconduct.

6.    <u>Investment of Funds:</u> Escrow Agent is herein directed and instructed by Issuer to initially invest and reinvest the Escrow Funds in the investment indicated on <u>Attachment I</u> hereto. Issuer acknowledges receipt of prospectuses and/or disclosure materials associated with the selected investment vehicle, either through means of hardcopy or via access to the website associated with the investment selected by the parties to this Master Escrow Agreement.  The Issuer may provide instructions changing the investment of the Escrow Funds (subject to applicable minimum investment requirements) by furnishing a Written Direction to the Escrow Agent; *provided, however,* that such investments are consistent with the Escrow Agent's investment criteria and that no investment or reinvestment may be made except in the following:

a.    direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United State of America;

b.    certificates of deposit issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates);

c.    U.S. dollar denominated money market deposit accounts or time deposits, of any bank, trust company, or national banking association (including Escrow Agent and its affiliates);

d.    any institutional money market fund offered by Escrow Agent, including any institutional money market fund managed by Escrow Agent or any of its affiliates.

-4-

USBANK000018

If Escrow Agent has not received Written Direction the funds shall be deposited and remain in a non-interest bearing account, as identified on Attachment I. All investments shall be made in the name of Escrow Agent. Notwithstanding anything to the contrary contained herein, Escrow Agent may, without notice to the Representatives, sell or liquidate any of the foregoing investments at any time if the proceeds thereof are required for any disbursement of Escrow Funds permitted or required hereunder. All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds. The Escrow Agent shall distribute to the Issuer the amount of Interest Income, if any, earned on investment of Escrowed Funds.

Any such distribution shall be made in accordance with a Written Direction, except that the Escrow Agent shall not distribute such amounts if such amounts are necessary to satisfy, in whole or in part, any then-outstanding invoice for the Escrow Agent's fees and expenses payable hereunder in accordance with Section 10 hereunder. Escrow Agent shall not be liable or responsible for loss in the value of any investment made pursuant to this Master Escrow Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the Escrow Funds. With respect to any Escrow Funds received by Escrow Agent after ten o'clock, a.m., Eastern Time, Escrow Agent shall not be required to invest such funds or to effect any investment instruction until the next day upon which the Escrow Agent is open for business. The parties acknowledge that to the extent regulations of the Comptroller of Currency or other applicable regulatory entity grant a right to receive brokerage confirmations of security transactions of the escrow, the parties waive receipt of such confirmations, to the extent permitted by law.

7. Resignation of Escrow Agent. Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving sixty (60) days prior written notice to the parties hereto as of the time such notice is sent specifying a date when such resignation shall take effect. Upon any such notice of resignation, Escrow Agent may in its sole discretion refuse any further deposits hereunder and the Issuer Representative shall appoint a successor Escrow Agent prior to the effective date of such resignation. The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and reasonable attorneys' fees) payable to or incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Agent's resignation, the provisions of this Master Escrow Agreement shall inure to its benefit and establish its responsibilities as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Master Escrow Agreement. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's corporate trust line of business may be transferred, shall be the Escrow Agent under this Master Escrow Agreement without further act.

USBANK000019

8.  Liability of Escrow Agent.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied.  The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Master Escrow Agreement.  The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to an Investor or Issuer.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Master Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Master Escrow Agreement or the Underlying Agreement, or to appear in, prosecute or defend any such legal action or proceeding.  Escrow Agent shall not be responsible or liable in any manner for the performance by any party of their respective obligations under the Underlying Agreement nor shall Escrow Agent be responsible or liable in any manner for the failure of any party to honor any of the provisions of this Master Escrow Agreement or a Joinder Agreement.  Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel.  Each Investor and the Issuer, jointly and severally, shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel.

The Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Escrow Funds, without determination by the Escrow Agent of such court's jurisdiction in the matter.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

USBANK000020

9.     Indemnification of Escrow Agent. From and at all times after the date of this Master Escrow Agreement, the Issuer and each Investor, jointly and severally, shall, to the fullest extent permitted by law, upon demand defend, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation the Issuer and any Investor, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Master Escrow Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; *provided, however*, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party. Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by the Investor and Issuer jointly and severally.  The obligations of the Issuer and Investors under this Section 9 shall survive any termination of this Master Escrow Agreement and the resignation or removal of Escrow Agent.

The parties agree that no payment by an Investor or Issuer of any claim by Escrow Agent for indemnification hereunder nor the disbursement of any amounts to Escrow Agent from the Escrow Funds in respect of a claim by Escrow Agent for indemnification shall impair, limit, modify, or affect, as between an Investor and Issuer, the respective rights and obligations of a Investor, on the one hand, and a Issuer, on the other hand, under the Underlying Agreement.

10.   Compensation to Escrow Agent.

a.     Fees and Expenses.  Issuer shall compensate Escrow Agent for its services hereunder in accordance with a separate Fee Attachment I agreed to between Issuer and Escrow Agent and, in addition, Issuer shall reimburse Escrow Agent for all of its reasonable out-of-pocket expenses, including reasonable attorneys' fees, travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), copying charges and the like.  All of the compensation and reimbursement obligations set forth in this Section 10 shall be payable by Issuer within 30 days of invoice by Escrow Agent. The obligations of Issuer under this Section 10

USBANK000021

shall survive any termination of this Master Escrow Agreement and the resignation or removal of Escrow Agent.

      b.    <u>Disbursements from Escrow Funds to Pay Escrow Agent</u>.  If any compensation or reimbursement of out-of-pocket expenses are not paid when due, after the time period set forth in <u>Section 10 (a)</u> above, then the Escrow Agent is authorized to, and may, disburse to itself from the Interest Income, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent is entitled to seek indemnification pursuant to <u>Section 9</u> hereof). Escrow Agent shall notify the Issuer Representative prior to any disbursement from the Interest Income to itself in respect of any compensation or reimbursement hereunder and shall furnish to the Issuer Representative copies of all related invoices and other statements.

      c.    <u>Security and Offset</u>.  Issuer hereby grants to Escrow Agent and the Indemnified Parties a security interest in and lien upon the Interest Income to secure all obligations hereunder, and Escrow Agent and the Indemnified Parties shall have the right to offset the amount of any compensation or reimbursement due any of them hereunder (including any claim for indemnification pursuant to <u>Section 9</u> hereof) against the Interest Income. If for any reason the Interest Income available to Escrow Agent and the Indemnified Parties pursuant to such security interest or right of offset are insufficient to cover such compensation and reimbursement, the Issuer shall promptly pay, jointly and severally, such amounts to Escrow Agent and the Indemnified Parties upon receipt of an itemized invoice.

     11.   <u>Representations and Warranties; Legal Opinions</u>. The Issuer makes all of the following representations and warranties to Escrow Agent and each Investor makes representations and warranties (iii) through (vi):

      (i)   It is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or organization, and has full power and authority to execute and deliver this Master Escrow Agreement and to perform its obligations hereunder.

      (ii)   This Master Escrow Agreement has been duly approved by all necessary action, including any necessary shareholder or membership approval, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.

      (iii)   The execution, delivery, and performance of this Master Escrow Agreement is in accordance with the Underlying Agreement and will not violate, conflict with, or cause a default under its articles of incorporation, articles of organization, bylaws, management agreement or other organizational document, as applicable, any applicable law or regulation, any court order or administrative ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture, or other binding arrangement, including

-8-

without limitation the Underlying Agreement, to which it is a party or any of its property is subject.

(iv) The applicable persons designated on Attachment I hereto have been duly appointed to act as its representatives hereunder and have full power and authority to execute and deliver any Written Direction, to amend, modify or waive any provision of this Master Escrow Agreement and to take any and all other actions as the Representatives under this Master Escrow Agreement, all without further consent or direction from, or notice to, it or any other party.

(v) No party other than the parties hereto has, or shall have, any lien, claim or security interest in the Escrow Funds or any part thereof. No financing statement under the Uniform Commercial Code is on file in any jurisdiction claiming a security interest in or describing (whether specifically or generally) the Escrow Funds or any part thereof.

(vi) All of its representations and warranties contained herein are true and complete as of the date hereof and will be true and complete at the time of any disbursement of the Escrow Funds.

12. **IMPORTANT INFORMATION FOR OPENING AN ACCOUNT.**

*To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.*

*For a non-individual person such as a business entity, a charity, a Trust, or other legal entity, we ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.*

Investor and the Issuer acknowledge that a portion of the identifying information set forth on Attachment I is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "Act"), and each agree to provide any additional information requested by the Escrow Agent in connection with the Act or any similar legislation or regulation to which Escrow Agent is subject, in a timely manner. The Investor and the Issuer each represent that all identifying information set forth on Attachment I, including without limitation, its Taxpayer Identification Number assigned by the Internal Revenue Service or any other taxing authority, is true and complete on the date hereof and will be true and complete at the time of any disbursement of the Escrow Funds.

-9-

USBANK000023

13. <u>Consent to Jurisdiction and Venue</u>. In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Master Escrow Agreement, the parties hereto agree that the Hamilton County Court of Common Pleas shall have jurisdiction over any such proceeding. If such court lacks federal subject matter jurisdiction, the parties agree that <u>The United States District Court for the Southern District of Ohio</u> shall have jurisdiction. Any of these courts shall be proper venue for any such lawsuit or judicial proceeding and the parties hereto waive any objection to such venue. The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

14. <u>Notice</u>. All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be deemed to have been given when the writing is delivered if given or delivered by hand, overnight delivery service or facsimile transmitter (with confirmed receipt) to the address or facsimile number set forth on <u>Attachment I</u> hereto, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given three (3) days after the date deposited in the mail, if mailed, by first-class, registered or certified mail, postage prepaid, addressed as set forth on <u>Attachment I</u> hereto, or to such other address as each party may designate for itself by like notice.

15. <u>Amendment or Waiver</u>. This Master Escrow Agreement may be changed, waived, discharged or terminated only by a writing signed by the Representatives and Escrow Agent. No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

16. <u>Severability</u>. To the extent any provision of this Master Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Master Escrow Agreement.

17. <u>Governing Law</u>. This Master Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of Ohio without giving effect to its conflict of laws principles.

18. <u>Entire Agreement</u>. This Master Escrow Agreement, together with each related Joinder Agreement executed by the parties hereto, constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of the Escrow Agent with respect to the Escrow Funds, superseding all prior oral and written agreements related to such matters.

-10-

USBANK000024

19. Binding Effect. All of the terms of this Master Escrow Agreement, as amended from time to time, shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of each Investor, the Issuer, and Escrow Agent.

20. Execution in Counterparts. This Master Escrow Agreement and any Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction. The exchange of copies of this Master Escrow Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Master Escrow Agreement as to the parties and may be used in lieu of the original Master Escrow Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

21. Termination. Upon the first to occur of the disbursement of all amounts in the Escrow Funds pursuant to Written Direction or the disbursement of all amounts in the Escrow Funds into court pursuant to Section 5 or Section 8 hereof, this Master Escrow Agreement shall terminate, Escrow Agent shall be released from its obligations hereunder and Escrow Agent shall have no further liability with respect to the Escrow Funds, this Master Escrow Agreement, or any action or refusal to take action hereunder, to Investor and Issuer, their respective shareholders or members, the Representatives, or any other person.

22. Dealings. The Escrow Agent and any stockholder, director, officer or employee of the Escrow Agent may buy, sell, and deal in any of the securities of the Investor or Issuer and become financially interested in any transaction in which any other Party may be interested, and contract and lend money to any other Party and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement. Nothing herein shall preclude the Escrow Agent from acting in any other capacity for any other Party or non-Party.

-11-

USBANK000025

IN WITNESS WHEREOF, the parties hereto have caused this Master Escrow Agreement to be executed as of the date first above written.

ISSUER

By: _____
Title: _AUTHORIZED AGENT_

U.S. BANK NATIONAL ASSOCIATION
as Escrow Agent

By: _____
Title: Assistant Vice President

-12-

USBANK000026

ATTACHMENT I

1.  Escrow Funds.

    Escrow Funds amount:                    Cumulative amounts evidenced by acceptance
                                            of Joinders in Master Escrow Agreement

2.  Escrow Account.

    [insert wiring instructions for escrow account]

3.  Acceptance of Funds: Pursuant to the Subscription Agreement, each Investor shall deposit
    the minimum qualifying investment of $500,000 required by the Investor Program for
    Targeted Employment Areas (the "Capital Contribution") directly into the Escrow Account
    by wire transfer sent to:

                    [insert wiring instructions for escrow account]

            (a)  Funds received by wire transfer shall be immediately available to be drawn upon
    or disbursed in accordance with section 4 below.

            (b)  As described in the Subscription Agreement, the amount of $500,000 constitutes
    a minimum amount of qualifying investment by each Investor. If the wire transferred amount
    is less than $500,000, Escrow Agent shall immediately notify Issuer and Investor of such fact
    and shall reject the wire.

4.  Release of Escrowed Funds:   The Escrow Agent shall release the Capital Contribution in
    accordance with the following:

    (a) Release Conditions : The Escrow Agent shall not release the Capital Contribution to the
    Issuer until it receives from the Issuer written notice that (i) the I-526 Petitions of at least two
    (2) Investors have been approved; and (ii) the I-526 Petition for the applicable Investor has
    been filed (collectively, the "Escrow Release Conditions").

    (b)  Release of Escrow Funds – In General: The Escrow Agent shall release the Capital
    Contribution, and shall be fully protected in releasing such Escrow Funds, upon the delivery
    to the Escrow Agent of a Written Direction substantially in the form of Attachment II and in
    accordance with subsections (c) through (f) below.

    (c) Release of Escrow Funds upon Filing of Investor's I-526 Petition Filing: In the case of an
    I-526 petition filing and subject to the Issuer's certification that the Escrow Release
    Conditions have been met, the Escrow Agent shall continue to hold 10% of the applicable

USBANK000027

Investor's Capital Contribution (the "Holdback") and release 90% of the applicable Investor's Capital Contribution to the Issuer upon Escrow Agent's receipt of (1) a Form I-526 Receipt Notice by USCIS evidencing Investor's I-526 petition filing; and (2) a Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions.

(d) Release Upon Investor's I-526 Petition Approval: In the case of an I-526 petition approval, the Escrow Agent shall, subject to the Issuer's certification that the Escrow Release Conditions have been met, release the Capital Contribution or Holdback Amount to the Issuer upon Escrow Agent's receipt of (1) a Form I-797 Notice of Action evidencing Investor's I-526 petition approval; and (2) a Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions. Notwithstanding anything to the contrary herein Master Escrow Agreement, no Holdback with respect to any Investor shall be released until Escrow Agent receives Form I-797 Notices of Action evidencing the approval of I-526 petitions of five Investors hereunder.

(e) Release Upon Investor's I-526 Petition Denial: In the case of an I-526 petition denial, Escrow Agent shall release to the Investor any remaining funds, after taking into account all other disbursements authorized by the Master Escrow Agreement, which are then held by Escrow Agent on behalf of the Investor upon Escrow Agent's receipt of (1) a Form I-797 Notice of Action evidencing Investor's I-526 petition denial; and (2) a Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions.

(f) Release Upon Investor's I-526 Petition Withdrawal: Notwithstanding the foregoing, the Escrow Agent shall release to the Investor any remaining funds, after taking into account all other disbursements authorized by the Master Escrow Agreement, which are then held by Escrow Agent on behalf of the Investor upon Escrow Agent's receipt of (1) Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions and signed by Investor Representative (2) direction letter provided by Investor stating that he or she has voluntarily withdrawn his or her I-526 Petition from USCIS for adjudication after the I-526 Petition has been filed.

5. Termination. Unless earlier terminated by the provisions of the Master Escrow Agreement, the Escrow Period shall terminate and cease to be of further force or effect on the date that the last of the Escrowed Funds have been released or distributed pursuant to Section 4 of this Attachment I.

6. Investment Instructions:

USBANK000028

Issuer instructs Escrow Agent to deposit Escrow Funds in a non - interest bearing account until Issuer gives Escrow Agent alternative instructions by Written Direction as outlined in Section 6 of the Master Escrow Agreement

7.    Representatives.

The following persons are hereby designated and appointed as Issuer Representatives under the Master Escrow Agreement:

| Name | Specimen signature |
|------|--------------------|

| Name | Specimen signature |
|------|--------------------|

8.    Investor Information.  The following documentation must be provided to Escrow Agent separately by each Investor and any future Investor.  Receipt and processing of the Investor Information by the Escrow Agent is required prior to the delivery of the Escrow Funds to the Escrow Agent.  This process is further described on Attachment III.

- Passport; and one of the following:
- United States issued Visa
- Credit Card;
- Student Identification Card;
- Workplace Identification Card; or

Foreign Driver's License. 9.   Notice Addresses.

If to Issuer at:        [Issuer address and contact information]

USBANK000029

If to the Escrow
Agent at:

U.S. Bank National Association, as Escrow Agent
Corporate Trust Services
425 Walnut Street
6th Floor, M/L CN-OH-W6CT
Cincinnati, OH 45202

USBANK000030

**ATTACHMENT II**
Written Instructions; Release of Investor Escrow Funds

[Issuer Letterhead]

[DATE]

U.S. Bank National Association
[address]

GSC Opportunities, L.P. the Issuer under the MASTER ESCROW AGREEMENT, dated as of
_____, 20___ ("Master Escrow Agreement"), by and between GSC Opportunities, L.P.,
("Issuer'), [RELEASED INVESTOR NAME] ("Investor") and U.S. Bank National Association
as Escrow Agent thereunder ("Escrow Agent"), hereby directs the release of the Escrow Funds
deposited by [RELEASED INVESTOR NAME] in the amount of [$RELEASED AMOUNT].
Issuer certifies that this direction to release is in accordance with the Underlying Agreement and
the Master Escrow Agreement and is being directed upon the satisfaction of one of the following
[select one only]:

_____ (a) Investor's I-526 Petition Filing: attached hereto is Form I-526 Receipt Notice by
USCIS evidencing Investor's I-526 petition filing. $500,000 less the Holdback Amount is
to be wired to the Issuer as follows:

[INSERT WIRING INSTRUCTIONS]

USBANK000031

## ATTACHMENT II
### Written Instructions; Release of Investor Escrow Funds

_____ (b) Investor's I-526 Petition Approval: attached hereto is the form I-797 Notice of Action evidencing the approval of Investor's petition. Any portion of Investor's Capital Contribution currently held by Escrow Agent is to be wired to the Issuer as follows:

[INSERT WIRING INSTRUCTIONS FOR ISSUER FUND]

_____ (c) Investor's I-526 Petition Denial: attached hereto is the form I-797 Notice of Action evidencing the denial of Investor's petition. Any portion of Investor's Capital Contribution currently held by Escrow Agent is to be wired to the Investor as follows:

[INSERT WIRING INSTRUCTIONS FOR INVESTOR]

_____ (d) Investor's Withdrawal of I-526 Petition: attached hereto is Investor's letter confirming that Investor has withdrawn his/her I-526 Petition and requesting return of Investor's Capital Contribution. Any portion of Investor's Capital Contribution currently held by Escrow Agent is to be wired to the Investor as follows:

[INSERT WIRING INSTRUCTIONS FOR INVESTOR]

Sincerely,

Issuer Representative
Title [_____]

USBANK000032

**ATTACHMENT III**
Receipt of and Processing Instructions of Investor/Investor Representative Information

1) Each prospective Investor and/or Investor Representative must submit the following documentation to the Issuer, for submission to the Escrow Agent prior to the execution of the Escrow Agreement or Joinder Agreement, as applicable, and submission of Escrow Funds:

- Passport; and one of the following:
- United States issued Visa
- Credit Card;;
- Student Identification Card;
- Workplace Identification Card; or
- Foreign Drivers' License.

2) In addition and also prior to the execution of the Escrow Agreement or Joinder Agreement, as applicable, and submission of Escrow Funds and upon receipt of the above information, the Escrow Agent will perform a search against The Department of Treasury's Office of Foreign Assets Control (OFAC) sanctions and prohibited persons lists, and the Specially Designated Nationals (SDN) list issued by OFAC (the "OFAC Search")

3) The Escrow Agent will notify the Issuer of Escrow Agent's acceptance or rejection of the Investor after the completion of steps 1 and 2 above.

4) The Issuer will contact the prospective Investor/Investor Representative with the results of the acceptance or rejection of the Investor.. If the Escrow Agent rejects the Investor, no deposit can be made by such Investor under the Escrow Agreement. Only upon the acceptance of an Investor by the Escrow Agent will the Escrow Agent be able to accept the Escrow Funds from the prospective Investor/Investor Representative.

5) Upon acceptance by the Escrow Agent (as described above) the Issuer, Investor/Investor Representative and the Escrow Agent will execute the Joinder Agreement.

6) After execution of the Joinder Agreement by all parties and receipt of Escrow Agent's written approval to do so, the Investor/Investor Representative may wire funds for deposit into the escrow account using the wiring instructions below:

[insert wiring instructions for Escrow account]

USBANK000033



Name: **Chen Baoyang**

Amount of Investment: usd500,000.00

Number of Units: _____

Accredited (Yes or No): _____

# GSC OPPORTUNITIES, L.P.,

### an Ohio Limited Partnership
### 1021 Delta Avenue
### Cincinnati, OH 45208

### SUBSCRIPTION AGREEMENT
### (Purchase of Limited Partnership Units)

### HOW TO SUBSCRIBE:

In order to subscribe for Limited Partnership Interests ("Units"), each prospective investor should complete, sign and deliver all of the following documents or items to GSC OPPORTUNITIES, L.P.:

(1)    Signature Page to Subscription Agreement [attached], and

(2)    For each Unit purchased, wire transfer or checks payable to "GSC OPPORTUNITIES, L.P." in the amount of $500,000; and

(3)    Confirmation that the administrative fee, as described in Program Management Agreement that is among the Investor, Mason Investments, LLC ("Mason"), and/or third parties has been paid.

# GSC OPPORTUNITIES, L.P.
## SUBSCRIPTION AGREEMENT
### (Purchase of Limited Partnership Units)

By execution hereof, the undersigned offers to purchase limited partnership interests ("Units") of GSC OPPORTUNITIES, L.P., an Ohio limited partnership (the "Fund"), at a price of $500,000 per Unit.

The undersigned represents and warrants that in making the undersigned's decision to purchase the Units, the undersigned has relied solely upon statements or information, whether written or oral, provided by the Fund. The undersigned understands that much of such information cannot be guaranteed.

The undersigned understands that the Units have not been registered under the Federal Securities Act of 1933, as amended (the "Act"), or under the securities laws of any jurisdiction, and that the Units are being offered and sold pursuant to exemptions from registration under Section 4(2) of the Act and/or Regulation D thereunder, and from applicable securities laws. The undersigned further understands that this transaction has not been reviewed by, passed on, or submitted to the Securities and Exchange Commission (the "SEC"), nor has that agency or any other agency made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Units. Accordingly, the undersigned further represents and warrants to the Fund that:

1.    The undersigned understands that: (i) the Units constitute a speculative investment involving a high degree of risk of loss by the undersigned of the undersigned's investment therein, and (ii) there are substantial restrictions on the transferability of the Units. Accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Fund in case of emergency.

2.    The undersigned is able: (i) to bear the complete loss of this investment, and (ii) to hold the Units for an indefinite period of time. The undersigned represents that the undersigned has adequate means of providing for the undersigned's current needs and possible personal contingencies and that the undersigned has no need for liquidity in this particular investment.

3.    The undersigned has such knowledge and experience in financial and business matters that the undersigned is able to evaluate the risks in any investment in the Fund. The undersigned acknowledges that the undersigned has been advised to discuss this investment with the undersigned's legal or other professional advisors, or with other investment representatives who have knowledge of business and financial matters. If the undersigned has not done so it is because, in the undersigned's opinion, the undersigned is personally capable of evaluating this investment and the Fund and does not need the advice of other persons. The undersigned and, to the extent deemed necessary by the undersigned, any of the persons mentioned above have been afforded the opportunity to ask questions concerning this investment of officers of the Fund and its general partner and have been furnished with such information with respect to the Fund and its proposed operations as the undersigned has requested to the undersigned's satisfaction.

4.    The Units are being acquired for the undersigned's own personal account for investment and not with a view toward dividing the undersigned's interests therein with others or reselling or otherwise disposing of all or any part of the same, or toward the distribution thereof within the meaning of the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or applicable securities laws of any other jurisdiction (which, together with the Act and the Exchange Act, and all rules and regulations promulgated thereunder, are hereinafter referred to as the "Securities Laws").

5.    The undersigned understands that the Fund is expressly relying on the truth and accuracy of the representations, declarations, and warranties made by the undersigned in this Subscription Agreement in

784525.6                                        2

offering the Units for sale to the undersigned and in determining the availability of certain exemptions under applicable Securities Laws.

6.   If the undersigned is a corporation, partnership, trust, employee benefit plan, individual retirement account, Keogh plan, or other tax-exempt entity, it is authorized and qualified to become an interest holder of, and authorized to make its capital contribution to, the Fund, and the person signing this Agreement on behalf of such entity has been duly authorized by such entity to do so.

7.   If the undersigned is, or is acting on behalf of, a Keogh or corporate pension or profit-sharing plan, or an individual retirement account, the undersigned represents and warrants to the Fund that to the best of the undersigned's knowledge the undersigned's investment in the Units will not result in a *prohibited transaction* as defined in Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986.

8.   **The undersigned is an *"accredited investor"* as such term is defined in the Securities Laws.**

9.   The undersigned shall pay all administration fees required by the Program Management Agreement between the undersigned and Mason Investments, LLC and or third parties. If the I-526 petition of the undersigned is denied, the return of the administration fee shall be in accordance with the Program Management Agreement.

The foregoing representations, warranties, and undertakings are made by the undersigned with the intent that they be relied upon by the Fund in determining the undersigned's suitability as an investor in the Fund. The undersigned hereby agrees that such representations and warranties shall survive the undersigned becoming an interest holder in the Fund. The undersigned further agrees to indemnify and hold harmless the Fund, its partners, officers, attorneys, agents, and each other interest holder from any damages, claims, expenses, losses, or actions resulting from the untruth of any of the warranties and representations contained in this Subscription Agreement.

The undersigned agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that any assignment and transfer of the securities acquired pursuant hereto shall be made only in accordance with this Subscription Agreement, and all then-applicable Securities Laws.

The undersigned acknowledges that the undersigned has received and reviewed copies of the Fund's Private Placement Memorandum dated as of ___May___, 2013, together with all exhibits listed therein and any other company documents, records or agreements that the undersigned has requested from the Fund.

The undersigned acknowledges that this Subscription Agreement is not effective unless and until it is executed by the Fund. Furthermore, if the I-526 petition filed by the undersigned is denied, the undersigned will not become a limited partner of the Fund and his subscription amount will be returned within 90 days after receipt of written notification of such denial. The undersigned further acknowledges and agrees that this Subscription Agreement, if and when executed and delivered by the undersigned and accepted by the Fund, will operate as a joinder agreement to the Fund's limited partnership agreement, and as a consequence, the undersigned's Units will be subject thereto and governed thereby, and the undersigned will be a *"Limited Partner"* thereunder, with the rights, duties, obligations and privileges described therein.

*   *   *   *   *   *

3

**IN WITNESS WHEREOF**, the undersigned has caused this Subscription Agreement to be executed himself or herself or itself, or by its duly authorized representative, on this ___ day of April___, 2013__.

SUBSCRIBER:

陈·宝洋
Signature

_CHEN Bao yang_
Please print your name

_N/A_
Title and the name of the entity on whose behalf
you are signing (for offerees other than individuals)

_No.605, Unit 1, 6/F, Building 7, Yard 88, Saolinju Road, Fengtai District,_
Street Address

_Beijing, P.R. China      100073_
City, Region, Country, Postal Code

_86 - 155 0106 6289_
Telephone

_huayangchen@ yahoo.com_
Email

Amount of Investment:   _USD 500,000.00_

Number of Units:   _1_

Accredited (Yes or No):   _Yes_


Accepted for
GSC OPPORTUNITIES, L.P.

By: _____
Name: _GREGLY CHEBU_
Title: _AUTHORIZED SIGNATORY_



**EXHIBIT**

**C**

## ATTACHMENT IV

## JOINDER IN MASTER ESCROW AGREEMENT

This Joinder in Master Escrow Agreement (the "Joinder Agreement") dated as of _Apr_ _20_, 20 _13_, is by and between _CHEN Baoyu_, an individual ("Investor"); _____, (the "Issuer"); and U.S. Bank National Association, a national banking association, as Escrow Agent hereunder ("Escrow Agent"). Terms not defined herein have the meanings given to them in the Master Escrow Agreement (defined below).

### BACKGROUND

A. Issuer has entered into the attached Master Escrow Agreement dated as of _____, 20___, (the "Master Escrow Agreement") to facilitate the investments contemplated by the Memorandum.

B. Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of the Master Escrow Agreement.

C. Investor has entered into a Subscription Agreement with Issuer.

D. In order to establish the escrow of funds pursuant to the Subscription Agreement, the parties hereto have entered into this Joinder Agreement.

**NOW, THEREFORE,** in consideration of the premises and agreements contained herein and for other good and valuable consideration, the Investor, Issuer and the Escrow Agent hereby agree as follows:

### AGREEMENTS

1. Joinder in Master Escrow. By execution hereof, the Investor hereby joins in and becomes an Investor under the Master Escrow Agreement. The Investor has received and read a copy of the Master Escrow Agreement and understands its provisions. Investor hereby adopts and agrees to be bound by all of the provisions of the Master Escrow Agreement, all of which are incorporated herein and further agrees that such Escrow Funds shall be administered and disbursed as an integral part of the escrow in accordance with the provisions of the Master Escrow Agreement as supplemented by this Joinder Agreement. Investor hereby appoints the Representative identified in Schedule I hereto to represent him/her for all purposes in connection with the funds to be deposited with Escrow Agent and the Master Escrow Agreement.

2. Escrow Funds. After the execution and delivery of this Joinder Agreement by all parties, and upon Escrow Agent's prior written approval as described in Schedule I hereto, Investor will

transfer the funds in the amount and to the account set forth on Schedule I hereto to Escrow Agent, by wire transfer of immediately available funds.

3.  Important Disclaimer.

Investor Initials Required:

C B Y. AFTER ESCROW AGENT RELEASES INVESTOR'S FUNDS PURSUANT TO THE ISSUER'S WRITTEN DIRECTION, INVESTOR AGREES THAT ESCROW AGENT WILL HAVE NO RESPONSIBILITY OF ANY KIND TO INVESTOR WITH RESPECT TO SUCH RELEASED FUNDS, INCLUDING BUT NOT LIMITED TO ANY RESPONSIBILITY FOR THE RETURN OF SUCH FUNDS.

4.  General Provisions.

(a)  Effect of Agreement. This Agreement shall be binding upon the Investor, the Issuer and the Escrow Agent and their respective, successors and assigns.

(b)  Severability. Every provision hereof is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement, provided, however, that all provisions hereof shall be enforced to the fullest extent permitted by law.

(c)  Entire Agreement. This Joinder Agreement, together with the Master Escrow Agreement, constitutes the entire agreement between the parties relating to the holding, investment

and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of

the Escrow Agent with respect to the Escrow Funds.

(d)  Governing Law. This Joinder Agreement shall be construed and interpreted in accordance with the same law that governs the Master Escrow Agreement.

(e)  Execution in Counterparts. This Joinder Agreement may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Joinder Agreement as to the parties and may be

USBANK000808

used in lieu of the original Joinder Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

IN WITNESS WHEREOF, the parties hereto have caused this Joinder Agreement to be executed as of the date first above written.

INVESTOR

By: 陈 宝阳 CHEN Baoyang

Name: 陈宝阳 CHEN Baoyang

GSC OPPORTUNITIES, L.P.

By:

Title: ISSUER REPRESENTATIVE

U.S. BANK NATIONAL ASSOCIATION
as Escrow Agent

By: Carla W Hofman

Title: Assistant Vice President & Trust Officer

USBANK000809

<u>SCHEDULE A TO JOINDER AGREEMENT</u>

1.   <u>Escrow Funds</u>.

     Escrow Funds amount:                         $_____

2.   <u>Investor and Investor Representative Information</u>.  The following documentation must be
     provided to Escrow Agent separately by each Investor and Investor Representative prior
     to execution of a Joinder Agreement:

          (a)  Passport; and

          (b)  one of the following:

               • U.S. issued Visa
               • Credit Card
               • Student Identification Card
               • Workplace Identification Card or
               • Foreign Driver's License.

     Only after the Escrow Agent has reviewed the Investor and Investor Representative
     documentation and advised the Issuer that Investor has been accepted may the Investor
     deposit funds with Escrow Agent. This process is further described on Attachment III of
     the Master Escrow Agreement.

3.   <u>Acceptance of Funds</u>.  Pursuant to the Subscription Agreement and upon Escrow Agent's
     written consent, each Investor shall deposit the minimum qualifying investment of
     $500,000 required by the Investor Program for Targeted Employment Areas (the
     "Qualifying Investment") directly into the Escrow Account by wire transfer sent to:

               [insert escrow account wiring instructions]

          (a)  Funds received by wire transfer shall be immediately available to be drawn
     upon or disbursed in accordance with section 4 below.

          (b)  As described in the Subscription Agreement, the amount of $500,000
               constitutes a minimum amount of qualifying investment by each Investor.  If
               the wire transferred amount is less than $500,000, Escrow Agent shall
               immediately notify Issuer and Investor of such fact and shall reject the wire.

USBANK000810

4.   Release of Funds.

(a) Release Conditions: The Escrow Agent shall not release the Capital Contribution to the Issuer until it receives from the Issuer written notice that (i) the I-526 Petitions of at least two (2) Investors have been approved; and (ii) the I-526 Petition for the applicable Investor has been filed; and (iii) evidence that the funds requested are for the purposes of acquisition of real property, capital improvements, permanent improvements or purchase of equipment only (collectively, the **"Escrow Release Conditions"**).

(b) Release of Escrow Funds – In General: The Escrow Agent shall release the Capital Contribution, and shall be fully protected in releasing such Escrow Funds, upon the delivery to the Escrow Agent of a Written Direction substantially in the form of Attachment II and in accordance with subsections (c) through (f) below.

(c) Release of Escrow Funds upon Filing of Investor's I-526 Petition Filing: In the case of an I-526 petition filing and subject to the Issuer's certification that the Escrow Release Conditions have been met, the Escrow Agent shall continue to hold 10% of the applicable Investor's Capital Contribution (the "Holdback") and release 90% of the applicable Investor's Capital Contribution to the Issuer upon Escrow Agent's receipt of (1) a Form I-526 Receipt Notice by USCIS evidencing Investor's I-526 petition filing; and (2) a Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions.

(d) Release Upon Investor's I-526 Petition Approval:  In the case of an I-526 petition approval, the Escrow Agent shall, subject to the Issuer's certification that the Escrow Release Conditions have been met, release the Capital Contribution or Holdback Amount to the Issuer upon Escrow Agent's receipt of (1) a Form I-797 Notice of Action evidencing Investor's I-526 petition approval; and (2) a Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions.

USBANK000811

(e) Release Upon Investor's I-526 Petition Denial: In the case of an I-526 petition denial, Escrow Agent shall release to the Investor any remaining funds, after taking into account all other disbursements authorized by the Master Escrow Agreement, which are then held by Escrow Agent on behalf of the Investor upon Escrow Agent's receipt of (1) a Form I-797 Notice of Action evidencing Investor's I-526 petition denial; and (2) a Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions.

(f) Release Upon Investor's I-526 Petition Withdrawal: Notwithstanding the foregoing, the Escrow Agent shall release to the Investor any remaining funds, after taking into account all other disbursements authorized by the Master Escrow Agreement, which are then held by Escrow Agent on behalf of the Investor upon Escrow Agent's receipt of (1) Written Direction provided by Issuer Representative setting forth appropriate wire transfer instructions and signed by Investor Representative (2) direction letter provided by Investor stating that he or she has voluntarily withdrawn his or her I-526 Petition from USCIS for adjudication after the I-526 Petition has been filed.

If the Escrow Agent is holding only the Holdback Amount or other portion of the Investor's Capital Contribution after a release pursuant to paragraph (e) above, Investor shall look solely to the Issuer for the return of any such previously released amounts.

5.     Termination.  Unless earlier terminated by the provisions of the Master Escrow Agreement, the Escrow Period shall terminate and cease to be of further force or effect on the date that the last of the Escrow Funds have been released or distributed pursuant to Section 4 of this Schedule A to Joinder Agreement.

6.     Representatives.

The following person is hereby designated and appointed as Investor Representative under the Master Escrow Agreement:

_Helen Zhou_
Name                                                    Specimen signature

7.     Notice Addresses.

If to Investor at:      No. 603, Unit 1, b/F, Building 7,
                              Yard 88, Sudajia Road,
                              Longtai District, Beijing, P.R. China
                              ATTN: _Helen Zhang_
                              Facsimile: 86-10-88706587
                              Telephone: 86-15901046289

USBANK000812

E-mail: huayang chen @ yahoo.com .

If to Issuer at:

GSC Opportunities, LP
650 Lunken Park Drive
Cincinnati, OH 45226

If to the Escrow
Agent at:

U.S. Bank National Association, as Escrow Agent
Corporate Trust Services
425 Walnut Street
6th Floor, M/L CN-OH-W6CT
Cincinnati, Ohio 45202

USBANK000813



EXHIBIT

**D**

tabbies

**Private Placement
Memorandum**

# GSC Opportunities, L.P.,

**an Ohio Limited Partnership
1021 Delta Avenue
Cincinnati, OH 45208**

Maximum Offering Amount: $2,500,000
$500,000 per Unit

---

GSC OPPORTUNITIES, L.P., an Ohio limited partnership (the "Fund"), is a newly-organized Ohio limited partnership which intends to raise capital to open and operate Gold Star Chili franchise restaurants in Cincinnati, Ohio, USA, as described in the business plan (Exhibit [C]) distributed together with this Private Placement Memorandum. The Fund proposes to sell to eligible investors up to 5 units of limited partnership interests (the "Units") for $500,000 per Unit. Each Unit represents a 13-1/3% limited partnership interest of the Fund. The Fund's general partner is GSC Opp Management, LLC, an Ohio limited liability company ("GP").

The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion.

The primary investors targeted by this offering are immigrants seeking to enter the United States under
the fifth employment based visa preference category ("EB-5"). The EB-5 category is available to immigrants investing in a new commercial enterprise that will benefit the U.S. economy and create at least 10 full-time jobs.

---

**An investment in Units involves risks. See "Risk Factors."**

Neither the Securities and Exchange Commission nor the securities commission of any other jurisdiction has approved or disapproved of these securities or passed upon the adequacy or accuracy of this memorandum. Any representation to the contrary is a criminal offense.

Prospective investors should not construe the contents of this memorandum as legal or tax advice. Each prospective investor should consult his or her own legal and tax advisers.

**ALL INVESTORS ARE REQUIRED TO SECURE AND RETAIN INDEPENDENT IMMIGRATION COUNSEL.**

---

The date of this Private Placement Memorandum is May 7, 2013.

1

This memorandum is for review by the recipient only. The recipient, by accepting delivery of this memorandum, agrees to return this memorandum, all enclosed or attached documents, and all other documents, if any, provided in connection with the offering to the GP if the recipient does not undertake to purchase any of the securities offered hereby. This memorandum is furnished for the sole use of the recipient, and for the sole purpose of providing information regarding the offer and sale of Units. Neither the GP nor the Fund has authorized any other use of this information. Any distribution of this memorandum to a person other than representatives of the recipient is unauthorized, and any reproduction of this memorandum or the divulgence of any of its contents, without the prior written consent of the Fund or the GP is prohibited. The delivery of this memorandum or other information does not imply that the memorandum or other information is correct as of any time subsequent to the date appearing on the cover of this memorandum.

The delivery of this memorandum does not constitute an offer in any jurisdiction to any person to whom such offer would be unlawful in such jurisdiction. The recipient should rely only on the information contained in this memorandum. The information contained in this memorandum supersedes any other information provided to potential investors. Neither the GP nor the Fund has authorized any person to provide any information or to make any representations except to the extent contained in this memorandum. If any such representations are given or made, such information and representations must not be relied upon as having been authorized by the Fund or the GP. This memorandum is not an offer to sell, nor is it seeking an offer to buy, securities in any jurisdiction where the offer or sale is not permitted. The information in this memorandum is accurate as of the date on the front cover, but the information may have changed since that date.

The price of the Units as described in this memorandum has been arbitrarily determined by the Fund and the GP, and each prospective investor should make an independent evaluation of the fairness of such price under all the circumstances as described in this memorandum.

No representations or warranties of any kind are intended nor should any be inferred with respect to the economic viability of this investment or with respect to any benefits which may accrue to an investment in the Units. Neither the GP nor the Fund in any way represents, guarantees or warrants an economic gain or profit with regard to this investment or that favorable income tax consequences will flow therefrom. Neither the GP nor the Fund in any way represents or warrants the advisability of buying Units. Any projections or other forward-looking statements or opinions contained in this memorandum constitute estimates based upon sources deemed to be reliable, but the accuracy of this information is not guaranteed nor all-inclusive.

No person is authorized to give any information or make any representation in connection with this memorandum, except such information as is contained or referenced in this memorandum. Only information or representations contained or referenced herein may be relied upon as having been made by the Fund and the GP. Prospective investors who have questions concerning the terms and conditions of this memorandum or who desire additional information or documentation to verify the information contained herein should contact the GP. Projections or forecasts contained in this memorandum, or other materials, must be viewed only as estimates. Although any projections contained in this memorandum are based upon assumptions, which the Fund and the GP believes to be reasonable, the actual performance of the Fund may depend upon factors beyond its control. No assurance can be given that the Fund's actual performance will match its intended results.

## FORWARD-LOOKING STATEMENTS

All statements other than statements of historical facts included in this memorandum or in any exhibits hereto, including without limitation, statements regarding financial position, business strategy, growth strategy and other plans and objectives for future operations, are forward-looking statements as such term is defined in the Private Securities Litigation Reform Act of 1995. The words "anticipate," "believe," "estimate," "expect," "intend," "plan," and similar expressions that may tend to suggest a future event or outcome are not guarantees of performance, which cannot be predicted or anticipated. These forward- looking statements are based largely on expectations and are subject to a number of risks and uncertainties, many of which are beyond the control of the Fund or the GP. Actual results could differ materially from these forward-looking statements for a number of reasons, including, but not limited to, the matters discussed under "Risk Factors" and elsewhere in this memorandum. As a result, potential investors should not unduly rely on forward-looking statements. Additionally, no party related to this offering undertakes any obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this memorandum.

## INVESTOR SUITABILITY STANDARDS

THE PURCHASE OF UNITS INVOLVES AN INVESTMENT RISK AND IS NOT A SUITABLE INVESTMENT FOR ALL POTENTIAL INVESTORS.

Each prospective purchaser of Units will be required to make certain representations and supply certain information to the GP in order that it may determine the suitability of persons who have subscribed for Units. The suitability standards referred to herein, however, represent minimum suitability requirements for a prospective purchaser, and the satisfaction of such standards by a prospective purchaser does not necessarily mean that the Units are a suitable investment for the purchaser. Accordingly, each prospective purchaser must rely on his or her own judgment and advisors in making a decision to contribute capital to the Fund. Each prospective purchaser should consider whether the purchase of a Unit is suitable in light of each prospective purchaser's individual investment objectives and present and expected future financial and tax position and needs.

A purchase of Units involves a high degree of risk. For the reasons set forth in this memorandum, the purchase of Units offered hereby is suitable only for certain persons who (i) can afford to hold their Units for an indefinite period and do not expect that they will be required to sell their Units in the foreseeable future, and (ii) have a sufficient net worth to sustain a loss of their entire investment in the Fund in the event such loss should occur.

## ELIGIBLE INVESTORS

### Who May Invest

The Units have not been registered under the Securities Act of 1933, as amended (the "Act"), or the securities laws of any other jurisdiction and are being offered for sale in reliance upon exemptions from registration in Section 4(2) of the Act and/or Rule 506 of Regulation D promulgated thereunder. Units will be sold only to persons who qualify as *accredited investors* (as defined in Rule 501 of Regulation D).

An "accredited investor" is a person who has a net worth, or joint net worth with the person's spouse, of over $1 million (excluding the value of the person's primary residence) or who had individual income in excess of $200,000, or joint income with the person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects the same income level in the current year.

3

**Subscriptions**

An investor may subscribe for a Unit by completing, signing and delivering to the GP the following:

- Subscription Agreement (see Exhibit A attached hereto); and
- For each Unit purchased, wire transfer or checks payable to "GSC OPPORTUNITIES, L.P." in the amount of $500,000; and

- Confirmation that the administrative fee, if any, as described in a Program Management Agreement that is among the Investor, Mason Investments, LLC ("Mason"), and/or third parties has been paid("Administrative Fee").

The GP has the right to accept or reject subscriptions on behalf of the Fund, in whole or in part, for any reason or to request additional information to determine investor eligibility. The investor can become a limited partner only after the approval of his I-526 petition by the United States Citizenship and Immigration Services ("USCIS"). Acceptance by the Fund is not conclusive of whether an investment in Units is suitable for the investor. Suitability can be determined only by the investor and then only after discussion with the investor's tax, legal and investment advisers. Any investment in Units should be made only after a careful review of the provisions of this memorandum and attached documents.

## THE OFFERING

The Fund is offering up to 5 Units to eligible investors at a purchase price of $500,000 per Unit. All Units will be sold on a best-efforts basis for a total maximum offering of $2,500,000 (exclusive of Administrative Fees).

All funds received by the General Partner from investors will initially be deposited into an escrow account. Funds will be released from the escrow account as the investor's I-526 petition is approved. Upon approval of the first two investors' I-526 petitions, all funds then held in escrow, and from any subsequent subscriptions, will be released to the Limited Partnership upon notification that the investor's I-526 petition has been filed with the USCIS; provided that 10% of each investor's funds will remain in escrow until his I-526 petition is approved. If an investor's I-526 petition is denied, the GP will return such investor's subscription amount within 90 days of receipt of written notification of such denial.

The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion. The GP may, in its sole discretion, accept subscriptions, admit investors as partners, commence Fund operations, and offer and continue to offer Units for sale. The GP reserves the right to purchase, or cause affiliates to purchase, Units for its own account, for cash or contributions of property. The GP may accept subscriptions for fractions of a Unit in its discretion. If the GP terminates the offering, all funds will be returned to investors. There will be no minimum offering size.

**Administrative Fees**

Mason, an affiliate of Mason Hill, LLC, a member of the GP, will be responsible for the exclusive program management in China. Mason will collect an administration fee as described in the Program Management Agreement at the time the investor submits his subscription agreement. If an I-526

petition is denied by the USCIS and the Fund rejects the subscriber's subscription agreement, any refund of the non-expended portion of the subscriber's Administrative Fee will be subject to the terms of the Program Management Agreement. EB-5 investors should proceed under the understanding that little to none of his or her Administrative Fee will be refunded should the Fund reject the investor's subscription agreement based on denial of the investor's I-526 Petition.

## SUMMARY

| | |
|---|---|
| The Fund | GSC OPPORTUNITIES, L.P., a newly organized Ohio limited partnership. The Fund will continue in existence until terminated as provided in the partnership agreement. |
| General Partner or GP | GSC Opp Management, LLC, an Ohio limited liability company owned by Mason Hill, LLC and GSC EB-5 Investor, LLC, the Managing Member of the GP and a subsidiary of Gold Star Chili, Inc. The GP will be responsible for the management of the Fund. See "General Partner." |
| Limited Partners | Persons subscribing to purchase Units who are accepted as partners in the Fund (the "Partners"). |
| Fund Objectives | The Fund's objectives are to provide its Partners and the GP with cash distributions through returns on investments in Gold Star Chili franchises. To the extent funds are available, the Fund intends, but is not required to, make a 2% annual cumulative preferred return for each Limited Partner's and General Partner's respective capital contribution ("Preferred Return"). There is no guarantee that the Fund will be able to make any distributions to the Partners or the General Partner. |
| | It is the intent of the GP to accumulate 80% of theDistributable Cash in excess of the Preferred Return and any distribution for the payment of income taxes for distribution to the Partners upon approval of their I-829 petition. The Fund is not required to and there is no guaranty that the Fund will be able to accumulate any such funds or to make any distributions to a Partner. |
| Offering Size | Up to $2,500,000 through the sale of up to 5 Units at a price per Unit of $500,000. There will be no minimum offering size. |
| Minimum Commitment | One Unit ($500,000). An investor applying for approval of an I-526 Petition through the EB-5 Program by the USCIS must subscribe for at least one full Unit. |
| Closing | The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion. |

5

Allocations and Distributions

Losses will be allocated to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement. Income, up to the extent of previously allocated losses, and also up to the amount of the Preferred Return, will be allocated to the Partners in the same manner.

Thereafter, income will be allocated 80% to the Partners and 20% to the GP.

Distributions of cash will be made at the sole discretion of the GP as follows:

1) First, an amount equal to the Preferred Return;

2) Second, an amount determined by the GP to reimburse the GP and the Partners for the income tax consequences attributable to the income allocated to the GP and the Partners in excess of the Preferred Return; and

3) Thereafter, any distributions shall be made 80% to the Partners and 20% to the GP; provided that the GP intends to accumulate any such distributions to the Partners in an account or accounts for the possible purchase of their Units as provided in Section 2.4 of the Partnership Agreement.

Upon the later of the approval date of each Partner's I-829 Petition or the 3 year anniversary of each Partner's I-526 Approval, the Partnership has the right, but not the obligation to use all funds from this account to purchase each Partner's Unit or to reinvest in additional Gold Star Chili franchises. There is no guaranty that the Partnership will actually use these funds in this manner or that there will be any funds available to do so.

Investment Strategy

The Fund anticipates investing the capital raised in this offering in one or more wholly-owned limited liability companies ("InvestCo").

Each InvestCo will be organized to own one or more Gold Star Chili franchise restaurant establishments (collectively the "Project") in Ohio, Kentucky and Indiana, USA. In addition, one or more InvestCos may

6

be organized to own and lease real estate ("RealCo") to certain InvestCos as determined on a case-by-case basis.

Upon the approval of the Partners' I-829 petitions, the GP has the right, but not the obligation to purchase the Partners' Units and to liquidate the assets of RealCo to provide funds for such action, in addition to the Partners' Distributable Cash retained by the Fund.  Any such purchase of the Units by the GP would be on a first in first out basis. In no event is the GP obligated to liquidate the assets of RealCo or use the proceeds therefrom to acquire the Partners' Units.

| | |
|---|---|
| Payments to the GP and Affiliates | The GP shall receive a management fee equal to $15,000 for each franchise restaurant location per year (with an annual increase tied to the consumer price index (this portion of the fee will be used to pay Gold Star Chili, Inc. for its services under the operations management agreement) plus 3% of the Partnership's gross revenues (this portion of the fee will be used to pay Mason Hill, LLC for its services under an EB-5 Management Agreement)). In addition, the GP will receive and pay Project Consultant Fees and Management Fees as defined in the Business Plan's budget (see Section 8.3 of the Business Plan) which will be used by Mason Hill, LLC and/or affiliates to pay for costs and management and consulting services which include but are not limited to project structuring, site evaluation, financial analysis, demographic research, case processing, marketing, operational management and responsibilities of franchises on an on-going basis. |
| Term | The Fund shall have a perpetual term, provided that the GP may elect to terminate and liquidate the Fund at any time in its sole discretion  after the approval of the Partners' I-829 petitions. |
| Risk Factors | See "Risk Factors Relating to the Offering" and "Risk Factors Relating to the EB-5 Program." |

## THE EB-5 PROGRAM

## ALL INVESTORS ARE REQUIRED TO SECURE AND RETAIN INDEPENDENT IMMIGRATION COUNSEL.

### The EB-5 Immigrant Investor Program

The EB-5 Immigrant Investor Program (the "EB-5 Investor Program") grants lawful permanent resident status in the United States to foreign investors who make a qualifying investment ("Qualifying Investment") under the provisions of 8 U.S.C. §1153(b)(5)(A)(i)-(iii), (C) (the "Act"). To take advantage of the EB-5 Program, qualified investors must make a Qualifying Investment and complete the required immigration procedures.

An investor must invest at least $500,000 if the project is located in a targeted employment area ("TEA"), which is defined by the USCIS as a *"rural"* or *"high unemployment area."* Otherwise, an investment must be at least $1,000,000.

The Project is located in an approved TEA.

### General Investor Eligibility

The capital investment requirement for any EB-5 investor is $1,000,000. The capital investment requirement for an EB-5 investor in a TEA is $500,000.

### EB-5 Approval under the EB-5 Program

To seek status as an immigrant investor, applicants must file USCIS Form I-526, Immigrant Petition by Alien Entrepreneur. The I-526 Petition must be filed with supporting documentation that clearly demonstrates that the individual's investment meets all EB-5 requirements, such as:

- investing the requisite capital amount;
- proving the investment comes from a lawful source of funds;
- demonstrating that the investment will be at risk of loss for the purpose of generating a return on the investment;
- creating the requisite number of jobs; and, where applicable,
- demonstrating investment within a targeted employment area.

Once the USCIS approves the I-526 Petition, an immigrant investor may obtain status as a conditional resident by filing Form I-485, Application to Register Permanent Residence or Adjust Status, if already residing within the United States in a lawful non-immigrant status. If the investor is outside the United States, he or she will obtain a conditional immigrant visa through a U.S. embassy or consulate.

To become a lawful permanent resident, eligible investors must file a Form I-829, Petition by Entrepreneur to Remove Conditions. The I-829 Petition must be filed within 90 days before the second anniversary of an alien investor's admission to the United States as a conditional resident.

### Important Terms

*High Unemployment Area:* A high unemployment area is a geographic area or political subdivision

8

located within a metropolitan statistical area or within a city or town with a population in excess of 20,000 with an unemployment level at least 150% of the national unemployment rate. High unemployment areas within a state are identified and designated by a state agency appointed by the governor (for a high unemployment area within the District of Columbia, designation is made by the Mayor). Typically, a Regional Center seeks to encompass one or more high unemployment areas. One example of a high unemployment area is a Regional Center that encompasses a large city which contains clearly delineated census tracts that have been designated as a high unemployment area by the State based on the measured unemployment rates for the population residing within those locations.

*Rural Area:* A rural area is a geographical area that is outside a metropolitan statistical area, or part of the outer boundary of any city or town having a population of 20,000 or less as shown by population indicators. In certain areas, an approved statewide Regional Center may encompass both high unemployment areas and rural areas.

*Required Amount of Investment:* Depending on the location of the project, the required amount of the investment may be either $1,000,000 or $500,000. If the project is located within a TEA, the requisite minimum threshold for investment is $500,000. Otherwise, an alien must invest a minimum of $1,000,000 to qualify.

*Required Commercial Enterprise:* To qualify under the EB-5 Program, an investment of the requisite amount ($500,000 or $1,000,000) must be made in a new commercial enterprise located within an approved Regional Center.

*Risk:* The regulations and precedent decisions require an investor to place their investment at risk for the purpose of generating a return on his or her capital investment. As such, the USCIS does not permit the capital contribution to be subject to guarantees, buy back arrangements, unsecured promissory notes or other agreements that mitigate the at risk requirement.

*Engagement of the Alien Investor in the Enterprise:* The regulations require that the alien investor is or will be *"engaged"* in the management of the new commercial enterprise, either through day-to-day managerial control or through participation in policy-making decisions for the commercial enterprise. As a limited partner of the Fund, an investor is deemed to satisfy this requirement.

## THE PROJECT

**General**

The Fund's objectives are to provide investors with cash distributions through returns on investments.

The Fund anticipates investing the capital raised in this offering in one or more InvestCos. A separate InvestCo will be formed to own and operate each Gold Star Chili franchise restaurant and RealCo may be formed to own and lease real estate to operating InvestCos in certain situations determined on a case-by-case basis. The GP anticipates liquidating the assets of RealCo at some point during or over the course of 3-5 years, although the GP is not required to do so. If the GP does liquidate such assets then it may, but is not obligated to, use the proceeds thereof to purchase the Partners' Units but only after the approval of their I-829 petitions. In no event is the GP obligated to liquidate the assets of RealCo or return the proceeds to the Partners. There is no guarantee that the Fund will be able to make any distributions to the Partners.

## GENERAL PARTNER

GSC Opp Management, LLC, an Ohio limited liability company, will serve as the GP of the Fund. The GP is owned by Mason Hill, LLC and GSC EB-5 Investor, LLC, a subsidiary of Gold Star Chili, Inc. GSC EB-5 Investor, LLC will be the managing member of the GP. The GP will have control and be responsible for the management of the Fund, overseeing day-to-day operations of the Fund and

investments made by the Fund.  The GP will have sole and absolute authority to invest, hold, sell or exchange Fund assets and properties, provided that the GP shall use its best efforts to cause the Fund to operate in accordance with the then applicable EB-5 Program requirements.  The Partners will have no control over the operations of the Fund. The GP will enter into an EB-5 Management Agreement with Mason Hill, LLC for the supervision and administration of EB-5 program related matters.  The GP will enter into an Operations Management Agreement with Gold Star Chili, Inc. for the supervision and administration of the franchise restaurants' operations.

The GP will be paid  management fees from the Fund. See "Payments to the GP and Affiliates", page 7 hereof.   In addition, Mason may receive an Administrative Fee in accordance with the Program Management Agreement.

**CONFLICTS OF
INTEREST**

The GP will be subject to various conflicts of interest in managing the Fund.  Those conflicts include:

1.        **Other Activities of the GP.**  The GP was formed to operate the Fund or other similar funds and its affiliates have acquired, financed, operated and sold businesses and expect to continue to do so in the future.  Such businesses may be managed by the GP. The GP is not required to, and will not, devote its full time efforts to the Fund but will devote only so much of its time to the business of the Fund as in its judgment is reasonably required.  In this regard, certain owners of the GP are also owners and/or operators of other businesses and/or real estate assets.

2.        **Other Financing Options.**  The GP and its affiliates may finance an acquired business or the purchase of real estate without borrowing or otherwise receiving capital from the Fund.

3.        **Receipt of Fees and Other Benefits by the GP.**  The operation and management of businesses acquired by the GP and financed by the Fund may result in fees and compensation to the GP and its affiliates.

4.        **No Independent Counsel.**  The Fund and the GP are represented by the same legal counsel. No independent counsel has been selected to represent the interests of any of the investors.  The foregoing disclosure does not limit the right of any investor to select independent legal counsel to represent its interests in connection with its subscription for Units.

**RISK FACTORS RELATING TO THE OFFERING**

The purchase of the Units offered hereby involves various risks.  In addition to the factors set forth elsewhere in this memorandum, investors should consider the following:

1.          The business of identifying, acquiring, operating and selling Gold Star Chili franchises  is highly competitive and subject to numerous inherent risks, including changes in general or local economic conditions.  The Project may not succeed, and one or all of the InvestCos or RealCo may not succeed.  The GP may not succeed in identifying suitable opportunities, and the franchises identified for investment by the GP may fail.  The restaurant industry is highly competitive and subject to multiple risks beyond the control of the GP, including but not limited to food costs, energy costs, employment costs and other factors.  The RealCo is subject to additional risks beyond the control of the GP, including but not limited to changes in values based on market conditions or other conditions.

2.          The GP will have complete discretion in identifying, acquiring and selling franchises and assets of RealCo.  Partners in the Fund will not have the opportunity to evaluate the merits of any investment in any franchise nor will they be able to influence the decision to make an  investment in any particular franchise.

10

3.      The proceeds used from investments made by the Fund to InvestCo will be used for working capital, development, sales initiatives and other expenses that may not result in the generation of significant revenue to the Project.  A f r a n c h i s e  may also need additional capital in the future. It is possible that the franchise may be unable to raise additional capital on terms that are attractive to or that protect the Fund.  There can be no assurance that the GP  will be able to  raise additional funds for the Project.

4.      The Fund may experience a deficiency in cash flow.  Revenues may be insufficient to pay expenses. The GP is not obligated to fund shortfalls in cash flows.

5.      Units should only be purchased as a long-term investment and by investors who have a substantial net worth and no need for liquidity.

6.       There is no assurance that the Fund will be profitable or successful.  Units should be purchased only by persons who can afford the entire loss of their investment.

7.       There is no assurance there will be any cash distributions to the Partners.  Except as otherwise provided by law, the GP will not be liable for the return of any contribution by an investor.

8.       All decisions with respect to the management of the Fund will be made exclusively by the GP. The Partners have no right or power to take part in the management or control of the business of the Fund. Accordingly, no person should purchase any of the Units offered unless he or she is willing to entrust all aspects of the Fund to the GP.

9.       The Units have not been registered under the Act or the securities laws of any other jurisdiction, and may not be sold or transferred unless the sale is registered or qualified under the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or applicable securities laws of any other jurisdiction (which, together with the Act and the Exchange Act, and all rules and regulations promulgated thereunder, are hereinafter referred to as the "Securities Laws"), or unless an opinion of counsel, satisfactory to the GP and its counsel, is obtained that registration is not required.  While a partner may assign his or her economic interest in the Fund, the transferee may not become a substitute partner without the approval of the GP. There is no public market for the Units, and it is not expected that a public market will develop.  Adverse tax effects also may result from a transfer of Units.

10.      The Fund may generate taxable income for the Partners without generating the necessary cash flow to allow for distributions by the Fund to the Partners to pay the tax liability.

## RICK FACTORS RELATING TO THE EB-5
## PROGRAM

In addition to the factors set forth elsewhere in this memorandum, investors should consider the following:

1.       Congress and/or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an investor or the Fund.

2.       It is impossible to predict visa-processing times. Investors should not physically move to the United States until their visa has been issued.

3.       Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Conditional or permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status.

4.      USCIS requires proof of direct employment creation as part of the removal of conditions process. There is no assurance that the actual number of qualified direct employees will be the same as the number predicted in the Business Plan. Depending upon the disparity, there may be insufficient employment to remove conditional resident status.

5.      The process of obtaining conditional and permanent resident status involves several factors and circumstances which are not within the control of the Fund. These include the investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking permanent resident status under the EB-5 Program. Although the Fund has been structured so that each Unit holder may maximize eligibility for conditional and permanent residency under the EB-5 Program, no assurance can be given that each investor will obtain approval of his or her particular immigrant petition. Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no advice can be given that conditions to permanent residency will be removed. Each prospective investor should consult competent immigration counsel to review the likelihood that the investor's immigrant petition will be granted.

6.      The investment must be at risk to qualify for the EB-5 Program. As part of the green card application, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

7.      Each investor who purchases a Unit with the intention of obtaining permanent or conditional residence from the USCIS is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 Program and the various risk factors relating to the process in obtaining permanent or conditional residence in the United States to determine if an investment in the Unit is a suitable approach for such investor.

8.      As part of the I-526 Petition, an investor must present to the USCIS clear documentary evidence of the source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For investors who do not have such records, there may be other records that can be provided to the USCIS by an investor to demonstrate that the investment funds came from legal sources. All such matters regarding the investor's I-526 Petition should be discussed with his or her immigration counsel.

9.      The EB-5 Program requires an investor to hold a policymaking or management position within the Fund. The Fund believes that each Partner, as a limited partnership partner, is provided with the powers and duties under applicable law and the Partnership Agreement which satisfy the EB-5 requirements.

10.     USCIS rules and regulations relating to the EB-5 Program require that to maintain the validity of its approval and designation, an approved Regional Center must continue to meet the statutory requirements of the EB-5 Program by serving the purpose of promoting economic growth, improved regional productivity, job creation and increased domestic capital investment. The USCIS thus requires Regional Centers to monitor all investment activities under its sponsorship and to maintain records, data and information on a quarterly basis to report to the USCIS, upon request, year-to-date information for each federal fiscal year. Such records, data and information include, but are not limited to, the Regional Center's administration, oversight and management plan, biographical and other relevant investor data, total regional center investment and job creation totals.

## SUMMARY OF PARTNERSHIP AGREEMENT

The following is a summary of certain provisions of the partnership agreement of the Fund. This summary is qualified in its entirety by reference to the full text of the Partnership Agreement.

**Capital Contributions**

Each Partner will make a capital contribution of $500,000 for each full Unit purchased. The GP will make a capital contribution to the Fund of One Million Two Hundred Fifty Thousand Dollars ($1,250,000). Contributions from the GP will be in the form of cash, property, real property and the waiver of certain franchise fees.

Partners have no right to a return of any capital contribution.

**Allocation of Profits and Losses**

Losses will be allocated to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement. Income, up to the extent of previously allocated losses, and also up to the amount of the Preferred Return, will be allocated to the Partners in the same manner.

Thereafter, income will be allocated 80% to the Limited Partners and 20% to the GP.

**Purchase of Partner's Units in the Fund**

At any time on or after the later of (i) 3 years following the date of the approval of the Partner's I-526 petition or (ii) approval of the Partner's I-829 petition, the Partnership, at the sole discretion of the GP shall have the right, which shall not expire, but not the obligation, to and may in its discretion, purchase the Units of each Partner at fair value, exercised on a first in, first out basis. Each Partner agrees to and shall sell all of his or her Unit, should this right be exercised, at a price determined by agreement of the Partnership and the Partner.

**Management of the Fund**

The management of the Fund and all decisions concerning the business affairs of the Fund will be made by the GP. The GP is owned by Mason Hill, LLC and by GSC EB-5 Investor, LLC, a subsidiary of Gold Star Chili, Inc. GSC EB-5 Investor, LLC will be the managing member of the GP. Mason Hill, LLC will be responsible for providing all EB-5 and securities and USCIS regulatory compliance services to the GP. No Partner other than the GP shall take part in the management of the Fund's business and affairs or have any right or authority to act for or to bind the Fund.

The GP and its affiliates will receive certain management fees from the Fund. See "Payments to the GP and Affiliates", page 7 hereof. In addition, Mason will receive an Administration Fee in accordance with the Program Management Agreement.

**Voting Rights, Amendments and Meetings**

The vote of the Partners owning a majority in interest of the Units in the Fund is required to amend the Partnership Agreement.

Meetings of the Partners may be called by the GP at its discretion or upon written request of Partners owning a majority in interest of the Units in the Fund.

**Restrictions on Assignment of Partner Interests**

The ownership interest of a Partner in the Fund may be assigned only as permitted by the Partnership . The assignment, transfer or pledge of an interest in the Fund by a Partner is prohibited unless (i) the Fund causes the interest to be registered under the Securities Laws, which the Fund has no obligation or intention to do, or (ii) counsel satisfactory to the Fund has rendered an opinion that an exemption from registration is available and that the transfer will not otherwise violate the Securities Laws.

The GP may defer the effectiveness of any transfer or assignment of an interest in the Fund if necessary to avoid a termination of the Fund for federal income tax purposes.

**Substitute partner**

An assignee of a Partner's interest in the Fund will be admitted as a substitute partner only upon the written consent of the GP, delivery of an executed instrument of assignment, the assignee's agreement to be bound by the terms of the partnership agreement, the execution of such other instruments as the GP deems necessary or desirable to effect the admission, the assignee's agreement to pay all expenses in connection with the admission, and compliance with the Securities Laws.

**Non-compete, Confidentiality and Trade Secrets**

Each Partner will agree to certain non-competition, confidentiality and trade secret provisions for the benefit of Gold Star Chili, Inc. See Section 12.14 and Exhibit A to the Limited Partnership Agreement.

**Term**

The Fund shall have a perpetual term, provided that the GP may elect to terminate and liquidate the Fund at any time in its sole discretion after the approval of the Limited Partners' I-829 petitions.

## SUMMARY OF SALES MATERIAL

In addition to this memorandum, the Fund, the GP or any of its affiliates may utilize a supplemental brochure, an executive summary, business plan or fund outline in connection with the offering of Units. The GP may also respond to specific questions from prospective investors and their representatives. The offering of Units is made only by means of this memorandum. Except as described herein, the Fund has not authorized the use of other supplemental literature in connection with this offering. The information in such literature does not purport to be complete, may conflict with information in this memorandum, and shall not be considered a part of this memorandum, or as incorporated in this memorandum by reference, or as forming the basis of the offering or sale of Units.

List of Exhibits:

Exhibit A: Subscription Agreement
Exhibit B: Limited Partnership Agreement
Exhibit C: Business Plan
Exhibit D: Investor Questionnaire
Exhibit E: Escrow Agreement





May 31, 2013

CHEN Baoyang
No 2 Huashengdian
Changxindian, Fengtai District, Beijing

RE: Gold Star Chili Opportunities, L.P., EB-5 Escrow

Dear Sir:

U.S. Bank National Association serves as Escrow Agent on the above referenced transaction verifies that a wire in the amount of $500,000 from CHEN Baoyang was deposited to the respective escrow account on May 31, 2013. I have also attached a screen print from our Trust System evidencing the receipt of the previously referenced wire.

Please do not hesitate to contact me with any questions.

Regards,

Carla D Hofmann
Assistant Vice President
US Bank
Corporate Trust Services
425 Walnut Street
Cincinnati, OH 45202
Tel: 513-632-2032
carla.hofmann@usbank.com

usbank.com

CHEN000095



All of **us** serving you



Page: 1 Document Name: untitled

```
          TRANSACTIONS FROM 05/31/13 TO 05/31/13 - ALL PORTFOLIOS        PAGE 1 OF 2
203804002    GSC OPPORTUNITS LP EB-5 CHEN BAOYANG  PRIN. CASH     INCOME CASH
COMMAND ===>

05/30 BALANCES CARRIED FORWARD                              0.00             0.00

05/31 CASH RECEIPT                                    500,080.00
      TRANSFER FROM ANOTHER TRUST
      JH 001626
      RECEIPT OF FUNDS
      CHEN BAOYANG QUALIFYING INVESTMENT
      -------------------------------------------------------------------------

05/31 ENDING BALANCE - PRINCIPAL PORTFOLIO          500,080.00

05/31 ENDING BALANCE - INCOME PORTFOLIO                                     0.00

05/31 ENDING BALANCE - INVESTED INCOME PORTFOLIO                            0.00




    F1-HELP   F2-HINT   F3-END   F5-RFIND   F6-PRINT   F7-UP   F8-DOWN   F10-LEFT
```

CHEN000097



**From:** Roger David
**Sent:** Fri Jul 31 15:36:25 2015
**To:** Gary Chan; Terry
**Cc:** Tom Fisher; Mike Rohrkemper
**Subject:** Notice
**Importance:** High
**Attachments:** Notice of Termination of Partnership EB5.pdf

Terry,

Per our phone conversation as a safety measure.

Roger



GSC000270

# GSC EB5 Investor LLC

650 Lunken Park Drive
Cincinnati, Ohio 45226

July 31, 2015

VIA CERTIFIED MAIL AND EMAIL :

Mason Hill, LLC
Attn: Gary Chan
11285 Grooms Road
Cincinnati, Ohio 45242
Gary.chan@jardinhill.com
Terry.chan@jardinhill.com

Chen Baoyang
C/O Mason Hill, LLC

Liu Jihong
C/O Mason Hill, LLC

Yin Lijun
C/O Mason Hill, LLC

Yu Jing
C/o Mason Hill, LLC

Zhao Junru
C/O Mason Hill LLC

RE: DISSOLUTION OF GSC OPPORTUNITIES, L.P.

Mr. Chan,

     GSC EB5 Investor LLC ("Manager") is the Manager of GSC Opp Management LLC, an
Ohio limited liability company ("General Partner") whose members are the Manager and Mason
Hill, LLC ("Mason Hill") pursuant to an operating agreement effective May 7, 2013 ("Operating
Agreement"). GSC Management is the general partner and currently the only admitted limited
partner of GSC Opportunities, L.P., an Ohio limited partnership ("GSC Opportunities") pursuant
to an Agreement of Limited Partnership effective May 7, 2013 ("LP Agreement"). Except as
otherwise set forth in this letter, all capitalized but undefined terms shall have the same meaning
as set forth in the LP Agreement.

     GSC Opportunities was formed more than two years ago for the purpose of investing in
Gold Star Chili restaurant franchises in Targeted Employment Areas in the Dayton-Cincinnati-
Lexington region of Southwest Ohio, Kentucky and Southeast Indiana pursuant to the Business

GSC000271

Plan attached to the LP Agreement. The individuals listed above, Chen Baoyang, Liu Jihong, Yin Lijun, Yu Jing and Zhao Junru (collectively the "Proposed Investors") have under the sole guidance and direction of Mason Hill, submitted $500,000 to an escrow account and submitted EB-5 applications for admission to the United States under USCIS EB-5 guidelines. Pursuant to the LP Agreement, the Proposed Investors are not Limited Partners until the approval of the initial EB-5 applications by the USCIS. Unfortunately, as of the date of this letter, the USCIS has not made a determination regarding the EB-5 application for the Business Plan or any of the Proposed Investors.

The Manager, by its sole member, Gold Star Chili, Inc., has continued to seek new locations and open and operate locations pursuant to the Business Plan, however, with no foreseeable decision from USCIS to approve the EB-5 application for the Business Plan or any of the Proposed Investors, the Manager has made a determination that it cannot continue to proceed with the Business Plan without the additional $2,500,000 USD to be provided by the Proposed Investors' admission as Limited Partners. The delay has made it practically impossible for the Manager to secure adequate locations for the additional Gold Star Chili franchise locations as it cannot sign leases and expend funds with no guaranty that the additional $2,500,000 USD to be provided by the Proposed Investors will be available for the Business Plan. As a result of the USCIS's failure to approve the EB-5 application for the Business Plan or any of the Proposed Investors, the Manager on behalf of the General Partner (which is also currently the sole limited partner of GSC Opportunities) hereby terminates GSC Opportunities. Further, upon the final dissolution of GSC Opportunities, the Manager will withdrawal from the General Partner pursuant to Section 10.1 of the Operating Agreement.

While we understand this is not the result the parties hoped would occur when this project was started over two years ago, the Manager believes it has no other option due to the delays in funding caused by the USCIS inaction. The Manager is providing this notice to you and the Proposed Investors so that you may work to find other investments for in which they may participate. We will work with you to smoothly transition such activities and will forward a plan of dissolution for the General Partner and GSC Opportunities shortly.

Sincerely,

GSC EB5 Investor LLC


_____

Roger David, Manager

GSC000272

**EXHIBIT**

**G**

tabbies

**Request for Audited Financial Report and Project Update**

发件人: **Fred Voigtmann <fred@panpacificimmigration.com>**

时 间: **2016 年 3 月 10 日(星期四)** 下午 **2:00 (UTC-08:00** 温哥华、洛杉矶、西雅图时间**)**

收件人:

terry.chan **<terry.chan@jardinhill.com>;** gary.chan **<gary.chan@jardinhill.com>;** christine **<christine@panpacificimmigration.com>**

抄 送:

anya **<anya@can-goldlink.com>;** jackson.cheng **<jackson.cheng@ailyun.com>;** 天

天 **<1332875113@qq.com>;** 18611198428 **<18611198428@163.com>;** fish19841203 **<fish19841203@hotmail.com>;** ljh_68 **<ljh_68@163.com>;** 786099462 **<786099462@QQ.com>**

Dear Gary and Terry:

This email is to request on behalf of our EB-5 investor clients, CHEN Baoyang, YU Jing, LIU Jihong, and JIA Guofeng, an audited financial report and project update on GSC Opportunities, L.P.

Although we are not retained to represent these investors in their financial matters, we believe that it is in their best interests to receive assurances that their investments are safe and to receive an update as to the status of the project.

Please let us hear from you no later than March 17th with respect to complying with our request.

CHEN000103

Thank you.


Sincerely,

Fred Voigtmann, Esq.

*Of Counsel*

PAN-PACIFIC IMMIGRATION LAW GROUP

TEL  310-929-5288  |

FAX  866-476-0089  |  EMAIL  fred@panpacificimmigration.com

1875 Century Park East, Suite 700, Los Angeles, CA 90067

www.panpacificimmigration.com

CHEN000104

EXHIBIT

H

# LINDHORST & DREIDAME

### A LEGAL PROFESSIONAL ASSOCIATION

JAMES L. O'CONNELL
JAY R. LANGENBAHN (1)
JAMES H. SMITH III
MICHAEL F. LYON
THOMAS E. MARTIN
JAMES F. BROCKMAN
BARRY F. FAGEL (1)
BRADLEY D. McPEEK
DAVID E. WILLIAMSON (1)
CHRISTOPHER H. HURLBURT (1)
MATTHEW C. CURRAN
MATTHEW A. MIKHAIL (1)
MATTHEW J. KARAS

312 Walnut Street, Suite 3100
Cincinnati, Ohio 45202-4048
Telephone: (513) 421-6630
Facsimile: (513) 421-0212
www.lindhorstlaw.com

AMBROSE H. LINDHORST 1913-1997
ROBERT F. DREIDAME 1914-1978
WILLIAM J. WALSH 1919-1996
LEO J. BRESLIN 1926-2000

_____

WRITER'S DIRECT DIAL

(1) ALSO ADMITTED IN KENTUCKY

(513) 345-5769
tmartin@lindhorstlaw.com

April 13, 2016

Fred Voigtmann, Esq.
Pan-Pacific Immigration Law Group
1875 Century Park East, Ste. 700
Los Angeles, CA 90067

      In re: GSC Opportunities, L.P.
      Our File No.: 005543/0001

Dear Mr. Voigtmann:

     I am writing in response to your request to Gary Chan and Terry Chan for a project update and financial report for GSC Opportunities, L.P. ("Partnership") on behalf of the individuals who have subscribed to purchase limited partnership interests in the Partnership.

     Our client has advised us that your clients' funds remain in escrow and have not been distributed to the Partnership. The reason for this inactivity is that the Partnership's general partner, GSC Opp Management, LLC, controlled by Gold Star Chili, Inc., has decided to no longer participate in the Partnership and the proposed activities described in the Private Placement Memorandum for it.

     Gold Star Chili, Inc. was to provide the Partnership with locations for development of Gold Star Chili franchises and capital for development. It decided, subsequent to receipt of your client's subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement. The decision to withdraw from the Partnership has left the General Partner, with Mason Hill, LLC, as the only active member, with limited choices. At this point in time, our client believes the options are as follows:

     1.    Terminate the Partnership and return all money to the investors to allow them to pursue other opportunities; or

     2.    Utilize the funds in the Partnership to invest in restaurants other than Gold

GSC000092

Fred Voightmann, Esq.
April 13, 2016
Page 2

     2.     Utilize the funds in the Partnership to invest in restaurants other than Gold Star Chili franchises pursuant to a business plan similar to another project involving entities affiliated with Terry and Gary Chan in the management of the limited partnership.

     The Partnership is prepared to act in the manner your clients choose. If any of them wish to rescind their subscription and receive a refund of the subscription price, the General Partner will have the escrow agent return their funds. If any of the investors are interested in continuing in the Partnership to invest in other restaurants, Terry and Gary Chan have suggested the model described in Buffalo Wings & Rings Pittsburgh Opportunities, L.P. A copy of the Private Placement Memorandum, Limited Partnership Agreement, Subscription Documents and Business Plan for that project are attached. USCIS has approved the I-526 Petition of a limited partner/investor in this project.

     Also attached is a description of the legal proceedings that involve Terry Chan and Gary Chan and should be considered by your clients in making their decision.

     After consulting with your clients, please let me know which of them would like to rescind their subscription and which would prefer to move forward with the Partnership investing in the Buffalo Wings & Rings restaurants. The General Partner will prepare and forward to you appropriate documentation to implement your client's choice.

     Please note, as we are not immigration counsel, we offer no opinion on the impact of either of these courses of action upon the status of your clients with USCIS. There is no assurance that investing in these other restaurants will result in the creation of sufficient jobs to remove their conditional status.

     If you have any questions or would like to discuss these matters further, please contact me at your convenience.

                     Sincerely,

                     LINDHORST & DREIDAME

                     Thomas E. Martin

TEM/mh
Enc.

cc:    Gary Chan
       Terry Chan
       (via email)

GSC000093

## LEGAL PROCEEDINGS

On November 15, 2015, ten limited partners ("Plaintiffs") of KRC Fund I, LP, an Ohio limited partnership (the "KRC Fund") filed a Complaint in the United States District Court for the Southern District of Ohio Western Division at Cincinnati, Ohio against Terry Chan, Gary Chan (the "Chans") and Kentucky Regional Center, LLC, a Kentucky limited liability company doing business as Midwest EB-5 Regional Center ("MERC") together with certain other named defendants (collectively, the "Defendants"). The Complaint alleges claims against the Chans, MERC and the other Defendants for breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, piercing the corporate veil, gross mismanagement, embezzlement and self-dealing of KRC Fund assets and violations of the Securities and Exchange Act of 1934 for fraud, misrepresentation and deception.

The Plaintiffs allege that the money invested by them as limited partners was improperly utilized by the Defendants in violation of the Private Placement Memorandum utilized by the KRC Fund. The Plaintiffs seek compensatory and punitive damages against the Defendants in excess of $5,000,000.00. The Chans were the owners of MERC during the period that some of the claims alleged in the Complaint arose, and the Plaintiffs are seeking to pierce the corporate veil of MERC to recover against the Chans individually. The Complaint alleges that other Defendants purchased MERC from the Chans in January, 2014.

The Plaintiffs further allege that, while nine of them had their I-526 Applications approved, based on the activities of the Defendants, MERC was subsequently terminated as a regional center and the Plaintiffs' petitions were denied and/or their I-526 approvals were revoked.

Terry Chan is the husband of Jacquie Chan, the sole owner of Clearwater Hospitality Group, LLC, which controls the Partnership through its ownership of Lumen Point Capital Fund, LLC and RG MGMT, LLC, the general partner of the Partnership. Gary Chan is Terry Chan's brother and the brother-in-law of Jacquie Chan. The Chans are actively involved in the management and operations of the Partnership and its subsidiaries. The Chans filed a Motion to Dismiss the Complaint on January 25, 2016. The Chans deny the allegations contained in the Complaint and intend to defend against all of the claims of the Plaintiffs.

GSC000094

**EXHIBIT**

**I**

Case Status Update

发件人: **Fred Voigtmann <fred@panpacificimmigration.com>**

时 间: **2016 年 4 月 19 日(星期...) 下午 4:24 (UTC-07:00 休斯顿、底特律时间)**

收件人:

天天 **<1332875113@qq.com>**; anya **<anya@can-goldlink.com>**; christine **<christine@panpacificimmigration.com>**

附 件:

1 个 ( [ ] 04.13.2016.Thomas.Martin.Letter.pdf 即将过期)

Dear Chen Baoyang:

   Attached you will find a letter from the lawyer for Gary and Terry Chan, the developers in the EB-5 project into which you invested, called "GSC Opportunities, L.P." This letter is in response to a recent inquiry I made to the Chan brothers, asking them to provide a case status update. This is the first time I became aware that your funds are still in escrow and were not transferred to the partnership bank account as required by the Escrow Agreement. The letter explains that the reason for this is because Gold Star Chili, Inc., the entity that controls the General Partner, has decided to no longer participate in the partnership or to provide the partnership with sites for its restaurants. The letter gives you two options:

1.      Terminate the partnership and receive your invested funds back from the partnership; or

2.      Proceed with the partnership and seek another restaurant entity to receive the partnership's investment. The attachment to the lawyer's letter provides a PPM for an another such restaurant entity.

Please review the attached documents carefully with your financial advisor. We, as immigration attorneys, do not provide any financial advice, nor do we offer any opinion as to which of the two options you should pursue. We will continue to represent you in your immigration matters under the terms of the engagement agreement you have with our firm. We also will provide you with individual legal advice with respect to your pending immigration case, depending upon which option you choose

We look forward to hearing from you soon and we look forward to continuing our immigration representation of you.

Sincerely,

Fred Voigtmann, Esq.

*Of Counsel*

PAN-PACIFIC IMMIGRATION LAW GROUP

CHEN000105

CHEN000106


**EXHIBIT J**

# LINDHORST & DREIDAME

**A LEGAL PROFESSIONAL ASSOCIATION**

JAMES L. O'CONNELL
JAY R. LANGENBAHN (1)
JAMES H. SMITH III
MICHAEL F. LYON
THOMAS E. MARTIN
JAMES F. BROCKMAN
BARRY F. FAGEL (1)
BRADLEY D. McPEEK
DAVID E. WILLIAMSON (1)
CHRISTOPHER H. HURLBURT (1)
MATTHEW C. CURRAN
MATTHEW A. MIKHAIL (1)
MATTHEW J. KARAS

312 WALNUT STREET, SUITE 3100
CINCINNATI, OHIO 45202-4048
TELEPHONE: (513) 421-6630
FACSIMILE: (513) 421-0212
WWW.LINDHORSTLAW.COM

AMBROSE H. LINDHORST 1913-1997
ROBERT F. DREIDAME 1914-1978
WILLIAM J. WALSH 1919-1996
LEO J. BRESLIN 1928-2000

**WRITER'S DIRECT DIAL**

(1) ALSO ADMITTED IN KENTUCKY

(513) 345-5769
tmartin@lindhorstlaw.com

July 27, 2016

**VIA EMAIL**
fred@panpacificimmigration.com

Fred Voigtmann, Esq.
Pan-Pacific Immigration Law Group
1875 Century Park East, Ste. 700
Los Angeles, CA 90067

     In re: GSC Opportunities, L.P. (the "Partnership")
               Our File No.: 005543/0001

Dear Fred:

Over 3 months have elapsed since our initial notification. Given the amount of time required to build and open a restaurant for a Buffalo Wings & Rings location, it is important that your clients make a decision as soon as possible, but no later than August 10, 2016, about whether to rescind or continue their investment in the Partnership. Our clients are concerned that the approval of their I-526 petitions was over a year ago and would like to leave enough time to create the jobs necessary to support their application. There are currently imminent time sensitive opportunities at the table to build two Buffalo Wings & Rings locations that would create at least 100% more jobs than required by USCIS. We anticipate that each restaurant will create approximately 35 jobs.

Our clients have sought and received advice from immigration counsel that a change in the Partnership's brand of restaurant is not a material change under the USCIS Regulations. However, you and your clients should make your own determination in that regard.

As I indicated in my earlier correspondence, Gold Star Chili, Inc. will not continue as a member of the General Partner of the Partnership and will not provide any economic contributions or support to these Buffalo Wings & Rings Restaurants. To the extent the funds from the Limited Partners ($1,500,000.00) are not sufficient to successfully complete and open the restaurants, the only remaining Member of the General Partner, Mason Hill, LLC, would have to provide the resources to complete and open the locations. The intent

CHEN000098

Fred Voightmann, Esq.
July 27, 2016
Page 2

at this time is for the Partnership to invest in wholly owned subsidiaries that would operate two restaurant sites.

Because of the time constraints involved, if any of your clients wish to rescind their investment, notification must be received no later than August 10, 2016. Otherwise, the General Partner will proceed as indicated above with investments in Buffalo Wings & Rings restaurant locations.

Please contact me if you have any questions or if you would like any additional information concerning the proposed activities of the Partnership.

Very truly yours,

LINDHORST & DREIDAME

Thomas E. Martin

TEM/mh
Enc.

619353

EXHIBIT

K

**Fwd: GSC Opportunities, L.P.**

发件人: chlp <chlp543@sina.com>

时 间: 2016 年 8 月 4 日(星期四) 上午 9:47

收件人:

大夫 <1332875113@qq.com>

附 件:

1 个 ( 📄 SKMBT_75116072714350.pdf 即将过期)

发自我的 iPhone

以下是转发的邮件:

发件人: "Fred Voigtmann" <fred@panpacificinmigration.com>

日期: 2016 年 8 月 2 日 GMT+8 23:22:20

收件人: <chlp543@sina.com>, "anya" <anya@can-goldlink.com>, "Terence Wang" <twang@agacapital.cn>, "C. Christine Hayashi" <christine@panpacificinmigration.com>

主题: GSC Opportunities, L.P.

Dear Chen Bao Yang:

As you will recall, we recently had a telephone conference with you
regarding information we received from the general partner/project
developer of your EB-5 project, GSC Opportunities, L.P.   As you know,
your investment in a Gold Star Chili restaurant will not be able to
continue as originally planned.

Attached you will find a new letter from the developer's attorney
concerning your decision about your EB-5 investment.   Please note that

CHEN000109

there is an August 10th deadline to rescind your investment if you wish
to do so.


If you wish to rescind your investment in this project, or if you have
any questions, please contact us immediately.


Best regards,


Fred Voigtmann, Of Counsel

Pan-Pacific Immigration Law Group


From: Thomas Martin [mailto:TMartin@lindhorstlaw.com]

Sent: Wednesday, July 27, 2016 12:37 PM

To: fred@panpacificimmigration.com

Subject: GSC Opportunities, L.P.


Dear Fred:

CHEN000110

Please see the attached letter concerning GSC Opportunities, L.P.    Thank

you.

Thomas E. Martin, Esq.

LINDHORST & DREIDAME

312 Walnut Street, Suite 3100

Cincinnati, OH   45202-4048

(513) 421-6630

(513) 421-0212 (fax)

tmartin@lindhorstlaw.com

附件(1 个)

普通附件



SKMBT_75116072714350.pdf (65.43K)

下载 预览 收藏 转存



上一封 下一封

CHEN000111

« 返回回复回复全部转发删除彻底删除 举报拒收

标记为...

移动到...

CHEN000112

**EXHIBIT**

tabbies'

**L**
_____

**Fwd: GSC Opportunities, LP**

发件人: **chlp <chlp543@sina.com>**

时 间: **2016 年 8 月 13 日(星期六) 上午 6:25**

收件人:

夫夫 **<1332875113@qq.com>**

发自我的 iPad

以下是转发的邮件:

发件人: "Fred Voigtmann" <fred@panpacificimmigration.com>

日期: 2016 年 8 月 13 日 GMT+800:42:10

收件人: "Terence Wang" <twong@agacapital.cn>, "anya" <anya@csn-goldlink.com>, "C. Christine Hayashi" <christine@panpacificimmigration.com>

主题: FW: GSC Opportunities, LP

Dear Client:

Below you will find an email from the lawyer for the general partner in
GSC Opportunities, L.P., the EB-5 project into which you made your EB-5
investment.   As we notified you by phone earlier, the general partner
intends to proceed with investing in Buffalo Wings & Rings restaurants
instead of the Gold Star Chili restaurants that were initially
contemplated to be your EB-5 project.   The partnership intends to
release your funds from escrow and use the capital to create jobs in these
restaurant locations.    Should you have any questions or concerns, please
contact us immediately.   We are available to answer your questions by
email or by phone, as you prefer.

CHEN000116

We will keep you informed of any new developments.


Best regards,


Fred Voigtmann, Of Counsel

Pan-Pacific Immigration Law Group



From: Thomas Martin [mailto:TMartin@lindhorstlaw.com]

Sent: Thursday, August 11, 2016 11:31 AM

To: fred@panpacificimmigration.com

Cc: 'Gary Chan'; terry.chan@jardinhill.com

Subject: GSC Opportunities, LP



Dear Fred:



Based upon the absence of a response from you or your clients concerning
the offer to rescind their investment in GSC Opportunities, LP, the
General Partner intends to proceed with the plan to invest in Buffalo Wings
& Rings Restaurant locations to attempt to create the jobs sufficient to
support your clients' pending applications with USCIS.   Our clients are
taking steps to move forward and will begin to release the investors'

CHEN000117

funds from escrow and admit them as Limited Partners to the Partnership.  As the stores are being developed, the General Partner will provide you and your clients with periodic updates on their status.  Please let me know if you have any questions.  Thank you.

Thomas E. Martin, Esq.

LINDHORST & DREIDAME

312 Walnut Street, Suite 3100

Cincinnati, OH   45202-4048

(513) 421-6630

(513) 421-0212 (fax)

tmartin@lindhorstlaw.com

CHEN000118



标记为...

移动到...

转发：回复： 催款，疑问？

发件人：　　　　天天 <1332875113@qq.com>

时　间：2017 年 2 月 28 日(星期二) 中午 11:11

收件人：

pengchen <pengchen@hotmail.com>

发自我的 iPhone

------------------ 原始邮件 ------------------

发件人: 天天 <1332875113@qq.com>

发送时间: 2017 年 2 月 3 日 07:06

收件人: gary.chan <gary.chan@jardinhill.com>

主题: 转发: 回复： discuss return my money

Hi Gary

How are you? Hope you had a wonderful Chinese New Year !

Just want to follow up on our last conversation regarding the detailed refund contract. I was under the impression that you would put together the refund contract within 10 days since our last conversation on 1/18. Do you happen to have that document almost ready? would you expect to have the document for our lawyer to review within the next week or so? Another thing I would like to confirm with you is the details of your project that our money is in. I had my nephews checked the USCIS web site for the project but was not able to find it. We were only able to find one regional center in Ohio: Cleveland International Fund (CIF), and only 7 projects listed on that fund's web site:"**http://www.clevelandinternationalfund.com/cif-projects.php**," Could you please send me the link of your project so I can learn more detail about it?

As we have discussed in last conversation, I am mostly concerned about the status of my money in your project. Since I did not sign the investment contract, I am worried my money is not protected in your project so I really hope we can get that money back to me either in one lump sum as soon as possible, or over a steady payment plan in the next 2 years. Thank you very much, Gary!

Sincerely,

Baoyang Chen

------------------ 原始邮件 ------------------

发件人: "gary.chan";<gary.chan@jardinhill.com>;

发送时间: 2017 年 1 月 30 日(星期一) 凌晨 2:27

收件人: "天天"<1332875113@qq.com>;

主题: Re: discuss return my money

Hi Mr. Chen,

新年快乐！I hope you are able to spend some good quality time with your family during this holiday.

I have been working on an agreement, I hope to have it done in the next day or two. Thank you for your patience, and you will receive it soon.

Best regards,
Gary

CHEN000199

**EXHIBIT**

**N**

# EB-5

| | | |
|---|---|---|
| 5-12 Foreign National Investors | → EB-5 Investors, Limited Partners | → GSC Opportunities, Limited Partnership |
| Chan Brothers/Family | → Mason Hill LLC (MERC) | → GSC Opportunities, Limited Partnership |
| Gold Star Chili, Inc. (GSCI/franchisor) | → GSC EB5 Investor LLC | → GSC Opportunities, Limited Partnership |