Michael Rohrkemper, 10/14/2019

(Pages 1 to 4)

1

**Page 1**

```
 1          UNITED STATES BANKRUPTCY COURT
              MIDDLE DISTRICT OF FLORIDA
 2                ORLANDO DIVISION
 3    In re:               :
 4    TERRY HONG-YIN CHAN  :
      and                  :
 5    JACQUELYN ANGIULLI   :
      CHAN,                : Judge Karen S.
 6                         : Jennemann
      Debtor.             :
 7    _____   : Case No.
                          : 6:18-BK-03297
 8    BAOYANG CHEN,        :
 9    Plaintiff,          :
10    vs.                  :
11    TERRY HONG-YIN CHAN  :
      and JACQUELYN        :
12    ANGIULLI CHAN,       :
13    Defendants.          :
14      Deposition of MICHAEL ROHRKEMPER, a
15    witness herein, taken by the plaintiff as
16    upon cross-examination, pursuant to the
17    Federal Rules of Civil Procedure and pursuant
18    to Notice of counsel as to the time and place
19    and stipulations hereinafter set forth, at
20    the offices of 250 E. 5th Street, Suite 220,
21    Cincinnati, Ohio, at 10:00 a.m., Monday,
22    October 14, 2019, before Julie Patrick, a
23    Notary Public within and for the State of
24    Ohio.
25                    - - -
```

**Page 2**

```
 1    APPEARANCES
 2
      On behalf of Plaintiff:
 3
      JUSTIN J. JOYCE, ESQ.
 4    Porter Wright
      250 E. Fifth St.
 5    Suite 2200
      Cincinnati, OH 45202
 6
      On behalf of Defendant:
 7
      BARRY A. RUDELL, II, ESQ.
 8    Markesbery & Richardson, Co., LPA
      2368 Victory Parkway
 9    Suite 200
      Cincinnati, OH 45206
10
      On behalf of Defendant:
11
      MICHAEL A. NARDELLA, ESQ. (By phone)
12    135 W. Central Blvd.
      Suite 300
13    Orlando, FL 32801
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1          S T I P U L A T I O N S
 2      It is stipulated by counsel for the
 3    respective parties that the deposition of
 4    MICHAEL ROHRKEMPER, a witness herein, may be
 5    taken at this time by the plaintiffs as upon
 6    cross-examination and pursuant to the Federal
 7    Rules of Civil Procedure and Notice to take
 8    deposition, all other legal formalities being
 9    waived by agreement; that the deposition may
10    be taken in stenotype by the Notary Public
11    Reporter and transcribed by her out of the
12    presence of the witness; that the transcribed
13    deposition was made available to the witness
14    for examination and signature and that
15    signature may be affixed out of the presence
16    of the Notary Public-Court Reporter.
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                  INDEX
 2    WITNESS    DIRECT  CROSS  RE-    RE-
                               DIRECT CROSS
 3
      MICHAEL
 4    ROHRKEMPER
      MR. JOYCE:       5
 5    MR. NARDELLA:      149
 6
      EXHIBIT IDENTIFIED            PAGE
 7
      Exhibit 1 e-mail 3/21/13         33
 8    Exhibit 2 e-mail 4/8/13          38
      Exhibit 3 GSC Opportunities Executive  40
 9    Summary of Costs
      Exhibit 4 Memorandum of Understanding  55
10    Exhibit 5 e-mail 4/18/13         73
      Exhibit 6 Operations Management       80
11    Agreement
      Exhibit 7 e-mail 6/18/13         87
12    Exhibit 8 Agreement of Limited        98
      Partnership
13    Exhibit 9 Operating Agreement     102
      Exhibit 10 letter to U.B. Bank   112
14    Exhibit 11 Private Placement      118
      Memorandum
15    Exhibit 12 A Direct EB-5 Investment  119
      Project
16    Exhibit 13 GSC212 to GSC218      129
      Exhibit 14 e-mail 7/31/15        141
17
      OBJECTIONS                   PAGE LINE
18
      MR. RUDELL:          91   3
19
20
21
22
23
24
25
```

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Michael Rohrkemper, 10/14/2019

(Pages 5 to 8)                                    2

---

5

1          MICHAEL ROHRKEMPER,
2    a witness herein, of lawful age, having been
3    first duly sworn as hereinafter certified,
4    was examined and testified as follows:
5               CROSS-EXAMINATION
6    BY MR. JOYCE:
7         Q.   Good morning, Mr. Rohrkemper.
8    Could you please state and spell your name
9    for the record, please.
10:10 10       A.   Michael, M-I-C-H-A-E-L,
11   Rohrkemper, R-O-H-R-K-E-M-P-O-R.
12        Q.   And just for the sake of
13   brevity, do you mind if I call you Mike
14   during the deposition?
15        A.   Not at all.
16        Q.   Thank you.  I just wanted to
17   very quickly introduce myself.  My name is
18   Justin Joyce.  I'm an attorney for Baoyang
19   Chen in a lawsuit against Terry Chan and
10:10 20  Jacquelyn Chan which is being pursued in the
21   Middle District of Florida.  It's a
22   bankruptcy proceeding because those two have
23   filed for bankruptcy.  And so the -- Mr. Chen
24   was an investor in GSC Opportunities, LP,
25   which I might refer to as GSC during the

---

6

1    deposition.  And so before we get too far
2    along, I did want to ask, have you ever been
3    deposed before?
4         A.   To the best of my knowledge, I
5    have not.
6         Q.   Have you ever testified in court
7    before?
8         A.   To the best of my knowledge, I
9    have not.  I don't remember ever being sworn
10:11 10  in.
11        Q.   Thank you.  So just to explain a
12   little bit of ground rules that might make it
13   a little easier for all of us today.  As you
14   can see, the court reporter here is recording
15   everything that we say and, so to make this
16   process a little easier, I ask that you wait
17   until I finish asking a question before you
18   respond and I will give you the same
19   courtesy.
10:11 20       A.   (Affirmative head shake.)
21        Q.   And, similarly, she cannot
22   record non-verbal responses, such as head
23   shakes or nods.
24        A.   I nod a lot.
25        Q.   We'll keep an eye on that if we

---

7

1    can, but luckily she usually does a very good
2    job of catching those things, because it's
3    not uncommon.  And so, to the best of your
4    ability, if you can just give verbal
5    responses, yeses and nos, instead of uh-huhs
6    or huh-uhs or anything like that.  Does that
7    sound fair?
8         A.   It does, yes.
9         Q.   If you answer the question
10:12 10  that's being asked I'm going to assume that
11   you understood the question; is that fair?
12        A.   That's fair.
13        Q.   If you ever need any question
14   rephrased, you don't understand what I'm
15   asking, feel free to tell me that.  During
16   the course of the day you'll probably think
17   that I'm going to ask some ridiculous
18   questions.  Don't worry about it.  It just
19   happens.  It's the nature of the thing.  If
10:12 20  you do remember something later in the
21   deposition, please let me know.  If you would
22   like to change an answer or you have some
23   other information that you just didn't recall
24   at that time, feel free to let me know.
25            In that same vein, if you ever

---

8

1    need a break feel free to go ahead and say,
2    hey, I need a pause.  This isn't an endurance
3    competition.  The only thing I ask is that
4    you answer any outstanding question.  Does
5    that all sound fair?
6         A.   It does.
7         Q.   Thank you.  And so now getting
8    into it.  Where do you currently reside, Mr.
9    Rohrkemper?
10:13 10       A.   In Anderson Township, 738
11   Dunwoodie Drive, Cincinnati, 45230.
12        Q.   Thank you.  Where did you go to
13   high school?
14        A.   Bishop Fenwick High School in
15   Middletown at the time, which is now in
16   Franklin.
17        Q.   When did you graduate?
18        A.   1964.
19        Q.   Did you go to any colleges or
10:13 20  secondary education after that?
21        A.   I did.
22        Q.   Where did you go?
23        A.   Miami University.
24        Q.   A fellow Red Hawk.  Good to
25   hear.  What year did you graduate?

---

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 9 to 12)                    3

---

**9**

1      A.   1974.  I had a stint in the
2  Marine Corps between high school and college.
3      Q.   What was the highest rank that
4  you obtained in the Marine Corps?
5      A.   E5 Sergeant.
6      Q.   And how long were you in the
7  Marine Corps?
8      A.   Three and a half years.
9      Q.   Were you awarded any
10:13  10  accommodations or anything like that for your
11  service?
12      A.   A good service award, Vietnam
13  service award, and that's pretty much it, I
14  think.
15      Q.   And then was it, after your
16  service, that's when you went to Miami
17  University?
18      A.   Yes.
19      Q.   And what did you study at Miami?
10:14  20      A.   Accounting.
21      Q.   And did you receive your degree
22  in accounting?
23      A.   I did.
24      Q.   Did you receive any other
25  education after Miami University?

---

**10**

1      A.   You know, just conferences,
2  seminars, that type of thing.  No other
3  degrees.
4      Q.   Do you hold any professional
5  licenses?
6      A.   A CPA certificate, inactive
7  currently.
8      Q.   Okay.  And then, after you
9  graduated from Miami University, did you
10:14  10  enter the workforce?
11      A.   I did.
12      Q.   Where did you start?
13      A.   I started at Arthur Young and
14  Company.  One of the Big 8 CPA firms.
15      Q.   And what was your role there?
16      A.   An audit senior.
17      Q.   And, to the best of your
18  recollection, do you know when you started
19  that job?
10:15  20      A.   April 1st, 1974.
21      Q.   Very good recollection.
22      A.   April Fools Day.
23      Q.   Hopefully that wasn't a sign of
24  the job.
25      A.   It was not.

---

**11**

1      Q.   How long were you at Arthur
2  Young?
3      A.   Four years.
4      Q.   Did you stay in that audit
5  senior role that entire time?
6      A.   Well, I started out as a junior
7  auditor and at the time I left I was a senior
8  auditor.
9      Q.   As a junior auditor, what were
10:15  10  your job responsibilities?
11      A.   Working on a variety of
12  primarily closely held corporate audits.
13      Q.   By closely held, is that the --
14  like a closely held corporation?
15      A.   Yes.
16      Q.   Do you know roughly by head
17  count how big those corporations would be?
18      A.   They varied in size.  A couple
19  of non-profits which were fairly small to
10:16  20  some companies that were probably 200,000,000
21  in sales.
22      Q.   And did you maintain those same
23  audit responsibilities when you were a senior
24  auditor?
25      A.   Well, the responsibilities

---

**12**

1  changed somewhat.  I was, you know, hands-on
2  as a junior auditor and more oversight and
3  supervisory as a senior auditor.
4      Q.   And as an auditor, and I'm sorry
5  if this is a broad question, but when you're
6  looking at these companies, are you looking
7  at their -- the financial health of those
8  companies?
9      A.   It depends on the engagement,
10:16  10  the definition of the engagement.
11      Q.   So -- and apologies again for
12  the breadth of this, but what kind of task
13  would you do for these companies when they
14  were engaged?
15      A.   Again, it depends on the
16  engagement.  If it was just a pure audit, I
17  would do everything from, you know, reviewing
18  bank reconciliations, to verifying accounts
19  receivable, to verifying inventory values.
10:17  20  On a couple of occasions we had a fraud audit
21  assignment that -- I was involved in a couple
22  of those kinds of things.
23      Q.   What is a fraud audit?
24      A.   If there's been an embezzlement
25  in a company to determine the material

---

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 13 to 16)                                    4

---

13

1    magnitude of that.
2    Q.  In that situation would a
3    company retain you to investigate the fraud?
4    A.  The company would retain our
5    firm.
6    Q.  So retained Arthur Young to
7    investigate?
8    A.  Uh-huh.
9    Q.  And I'm making an assumption
10:17 10  here, but in that investigation you would try
11  to recreate the finances of the entity and
12  find out if any money had been embezzled?
13    A.  In the cases I was involved with
14  there was somewhat of a definition as to say
15  what the cause of the fraud was.  So we would
16  follow that path and just try to primarily
17  determine the magnitude.
18    Q.  So a company might say, we're
19  having an accounts receivable issue.  Can you
10:18 20  look into that.  Or we think so and so is
21  embezzling.  Can you look into that?
22    A.  Yes.
23    Q.  And you mentioned that you did
24  eventually leave Arthur Young.  Where did you
25  go to after that?

---

14

1    A.  I went to Rippe & Kingston.
2    Q.  And what type of company was
3  that?
4    A.  A CPA firm.
5    Q.  And what were your start and end
6  dates there?
7    A.  I was there approximately six
8  years.  The start date would have been, I
9  guess, '78 to '84.
10:18 10    Q.  And at Rippe, did you have --
11  what was your job title at Rippe?
12    A.  I was primarily director of
13  management consulting.
14    Q.  And what type of job
15  responsibilities did you have?
16    A.  A variety.  More along the lines
17  that you had discussed before.  We were
18  looking at the health of companies and trying
19  to determine ways and provide guidances to
10:19 20  how they could improve.
21    Q.  In this role would a company
22  engage you or engage your CPA firm to look at
23  sort of the overall entity or certain aspects
24  of their company and then give your
25  recommendations about ways that it might be

---

15

1    improved?
2    A.  Again, it was a pretty wide
3  variety.  Sometimes there would be very
4  specific focus in an engagement and sometimes
5  the engagements were just fairly broad to see
6  what we could come up with.
7    Q.  And you left Rippe in '84.
8  Where did you go to after that?
9    A.  I went to a client of Rippe,
10:20 10  which was Monarch Construction Company.
11    Q.  And how long were you there for?
12    A.  I was there for two years.
13    Q.  What was your role at Monarch?
14    A.  I was the chief financial
15  officer and treasurer.
16    Q.  Okay.  And what job
17  responsibilities did you have in those roles?
18    A.  Overall reporting, financial
19  reporting responsibilities, bank relations,
10:20 20  job cost, oversight, project oversight.
21    Q.  In this capacity would you look
22  at the individual construction projects that
23  were going on in the company and look at the
24  finances there?
25    A.  Yes.

---

16

1    Q.  Okay.  What type of construction
2  was Monarch involved with?
3    A.  Commercial construction,
4  primarily sizeable real estate projects.
5    Q.  Did they -- were they mostly --
6  were they a general contractor,
7  subcontractor, sort of the overall --
8    A.  Primarily a general contractor,
9  but on some of large jobs could be a
10:21 10  subcontractor also.
11    Q.  And so in this capacity, would
12  you be looking at the -- you know, as the
13  general contractor would you be looking at
14  various materials submitted by various
15  subcontractors for work that was performed?
16    A.  Yes.
17    Q.  And you would be looking to see,
18  you know, whether or not there were cost
19  overruns or whether work was being performed
10:21 20  in the scope of the engagement?
21    A.  Primarily on the cost side.
22    Q.  At Monarch was your focus mostly
23  the financial aspect of it?
24    A.  Yes.
25    Q.  And so you were at Monarch for

---

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 17 to 20)                                          5

---

17

1    two years, which I believe puts that about
2    1986; does that sound correct?
3        A.   Yeah, it sounds about right.
4        Q.   And what did you do after you
5    left Monarch?
6        A.   I went into a private practice
7    of my own.
8        Q.   What was the name of that
9    practice?
10:22 10     A.   Rohrkemper and Ossege.
11       Q.   And do you mind spelling the
12   second name?
13       A.   O-S-S-E-G-E.
14       Q.   And how long were you in private
15   practice?
16       A.   I was there until 2001, when I
17   left and I went to work for -- I sold my
18   interest and went to work for one of our
19   larger clients, which was Pomeroy IT
10:22 20   Solutions.
21       Q.   When you were in private
22   practice, were you ever retained by Gold Star
23   Chili?
24       A.   Yes.
25       Q.   Do you know when you were

---

18

1    retained by Gold Star Chili?
2        A.   Approximately, I would say,
3    1988.
4        Q.   Was that the first time that you
5    had ever been -- ever had a sort of a
6    relationship with Gold Star?
7        A.   Yes.
8        Q.   Okay.  What kind of work did you
9    perform for Gold Star initially?
10:23 10     A.   Initially we performed audits,
11   financial audits.
12       Q.   And did the scope of work you
13   performed for Gold Star ever expand?
14       A.   We would do some consulting work
15   before there were the separations of
16   responsibilities required by the AICPA, but I
17   would attend board meetings and provide them
18   with general counsel.  Not legal, but
19   accounting.
10:23 20     Q.   Financial?
21       A.   Yeah, financial.
22       Q.   And I believe it was Pomeroy you
23   mentioned that you left your private company
24   for.  How do you spell Pomeroy?
25       A.   P-O-M-E-R-O-Y.

---

19

1        Q.   And what job title did you have
2    at Pomeroy?
3        A.   CFO.
4        Q.   How long were you there?
5        A.   I was actually on the board of
6    directors there for, before I joined the
7    company as an employee, from, I would say,
8    early '90s until 2005.  So I was there from
9    2001 through 2005.
10:24 10     Q.   And in 2005 is that when you
11   departed for Gold Star Chili?
12       A.   No, I retired in 2005.
13       Q.   How long did your retirement
14   last?
15       A.   A couple of years.
16       Q.   When did you join Gold Star?
17       A.   In 2008.
18       Q.   And I know during the deposition
19   here today a variety of entities might get
10:25 20   mentioned.  If I refer to Gold Star, I'm
21   referring to Gold Star Chili, Incorporated,
22   sort of the corporate entity.
23       A.   Okay.
24       Q.   So you joined Gold Star in 2008.
25   In what capacity did you join that company?

---

20

1        A.   CEO/president.
2        Q.   Did you have differing
3    responsibilities as a CEO and as a president
4    or was it just sort of one job title?
5        A.   Pretty much one job title.
6        Q.   And what were your
7    responsibilities as CEO/president?
8        A.   Reported to the board of
9    directors and responsible for, you know,
10:26 10   performance of the company and oversight of
11   the company.
12       Q.   Did you have -- in 2008, did
13   Gold Star Chili have a chief financial
14   officer?
15       A.   They had a gentleman who left
16   just before I started.
17       Q.   And did you have one after you
18   started?
19       A.   No.  Oh, you mean after I left?
10:26 20   Q.   I'm sorry.  After you started as
21   CEO/president, did they hire another CFO?
22       A.   No, they retained the same
23   person they had before and I would say my
24   responsibilities overlapped a bit in the CFO
25   role.

---

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 21 to 24)

6

21

1    Q.  Given your experience?
2    A.  Yes.
3    Q.  What was the name of that
4  individual?
5    A.  Kim Olden, O-L-D-E-N.
6    Q.  And how long was she retained
7  for, to the best of your knowledge?  Or how
8  long did she -- well --
9    MR. RUDELL:  How did she stay
10:27 10  involved?
11    Q.  Yeah, how long did she stay
12  involved?  How long was she involved?
13    A.  Well, she was involved with the
14  company for many years and I believe she's
15  still there.  And she was probably a 30-year
16  employee when I started.
17    Q.  Was she involved at all with GSC
18  Opportunities, LP?
19    A.  I would say, yes, to some
10:27 20  extent.
21    Q.  And you mentioned to some
22  extent.  What kind of things was she doing?
23    A.  Well, she would have been
24  involved somewhat in formulating the
25  organization and some basic accounting.

22

1  There wasn't a lot of accounting for GSC
2  Opportunities because things didn't really
3  get off of the ground, but --
4    Q.  And -- I'm trying to think.  Did
5  you work with an individual named Mike or
6  Michael Mason --
7    A.  Yes.
8    Q.  -- at Gold Star?  Was he there
9  when you joined in 2008?
10:28 10    A.  He was.
11    Q.  Do you know what his -- and was
12  he there when you left Gold Star Chili?
13    A.  He was not.
14    Q.  And when did you leave Gold Star
15  Chili?
16    A.  I left Gold Star Chili -- my
17  role as CEO ended, let me make sure I get the
18  date right, in 2015, 4/30/2015.  And I had a
19  one-year advisory agreement reporting to the
10:29 20  board which ended in April 30th of 2016.
21    Q.  And in this one-year advisory
22  capacity, what were your job
23  responsibilities?
24    A.  There weren't any definitive
25  responsibilities.  I was supporting the new

23

1  CEO as he got started in the company and
2  attended board meetings.
3    Q.  And was the CEO Roger David?
4    A.  Yes.
5    Q.  When did you first hear of an
6  individual named Terry Chan?
7    A.  I would say approximately 2012.
8    Q.  And in what context did you hear
9  his name brought up?  What was it connected
10:30 10  with?
11    A.  The EB-5 program.
12    Q.  Was it with a specific EB-5
13  restaurant concept or just the EB-5 program
14  generally?
15    A.  We were exploring the EB-5
16  program for Gold Star and in our research we
17  came up with his organization.
18    Q.  And what organization was that?
19    A.  M-E-R-C, MERC.
10:30 20    Q.  I think that is -- would Midwest
21  Employment Regional Center or something along
22  the lines?  Do you know what that stands for?
23    A.  Midwest EB-5 Regional Center.
24    Q.  Okay.  When did you or Gold Star
25  first start looking into the EB-5 process?

24

1    A.  You know, it was a long time
2  ago, and this is an educated guess.  I would
3  say it would have been some time during 2012.
4    Q.  What did you hear about the EB-5
5  process to sort of start that search going?
6    A.  We had an innovation committee
7  in our company that was comprised of a
8  handful of people that would work on the
9  business and try to think outside of the box
10:31 10  a bit on growth areas and EB-5 became a
11  subject we became aware of in this meeting.
12  And in doing the research, one of the
13  only regional centers that we could identify
14  locally was MERC and that was just a Google
15  search and that's how we identified them.
16    Q.  And at the time was MERC doing
17  work connected with, I believe it's the Short
18  Vine project?
19    A.  They were.
10:32 20    Q.  Were they also doing Manhattan
21  Harbor at that time, to your knowledge?
22    A.  I'm not certain of that.
23    Q.  Have you ever heard the name
24  Manhattan Harbor?
25    A.  It's vaguely familiar, but I

Electronically signed by Julie Patrick (501-060-398-1480)

a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 25 to 28)

25

```
  1    couldn't tell you anything about it.  So I
  2    don't recall anything about that.
  3        Q.   Okay.  But the Short Vine
  4    project you were aware of?
  5        A.   Yes.
  6        Q.   What's your understanding of
  7    what they were doing in the Short Vine
  8    project?
  9        A.   Well, I know that there was
10:32 10    litigation involved in that project and we
 11    were concerned about that.  And we did our
 12    due diligence on the reason for that.
 13        Q.   And what did you find as a
 14    result of that due diligence was the reason
 15    for the litigation?
 16        A.   Well, you know, it was a family
 17    matter, quite frankly.  It was fairly
 18    complicated.  And we had legal counsel
 19    involved in helping us do the due diligence.
10:33 20    And I think we were available to get by that
 21    and that did not preclude us from transacting
 22    an EB-5 business with them.
 23        Q.   And what attorney and firm did
 24    you retain in connection with that due
 25    diligent?
```

26

```
  1        A.   Tom Fisher, Barron, Peck &
  2    Bennie.
  3        Q.   And so, Mr. Fisher, do you know
  4    what he did in connection with the due
  5    diligence he was performing?
  6        A.   I would say we did most of the
  7    work and we ran our conclusions by him to see
  8    if there was -- the due diligence was
  9    sufficient in his mind.
10:33 10        Q.   What kind of due diligence did
 11    you perform or did Gold Star perform?
 12        A.   Reviewing the filings that had
 13    been made.
 14        Q.   The filings in the lawsuit?
 15        A.   In the lawsuit, yes.
 16        Q.   Was that a one-time review or
 17    did you periodically check on the lawsuit to
 18    see if anything had been updated?
 19        A.   You know, I'm going back a long
10:34 20    way on this.  I believe that at the time we
 21    were looking at it that lawsuit had kind of
 22    run its course.
 23        Q.   I can't remember what I ate for
 24    breakfast yesterday, so your memory so far is
 25    much better --
```

27

```
  1        A.   Yeah, this was like seven years
  2    ago so --
  3        Q.   Did you do any other due
  4    diligence in connection with MERC?
  5        A.   Yeah, we did.  I mean, we
  6    contacted a law firm that had done EB-5 work
  7    and had dealt with them.  And I couldn't tell
  8    you the name of that firm now.  There was a
  9    female lawyer that I spoke with and I just
10:34 10    don't remember her name.  I mean, it was a
 11    couple of phone conversations.
 12        Q.   Does Bechman, Weil, Shepardson
 13    ring a bell at all?
 14        A.   Who was the attorney, do you
 15    remember?
 16        Q.   Unfortunately not.
 17        A.   Possibly, but I don't know.
 18        Q.   Does Fredrick Volgtmann sound
 19    familiar?
10:35 20        A.   No.
 21        Q.   Martin Lawler?
 22        A.   Martin Lawler, I've heard that
 23    name.
 24        Q.   Did you hear that name in
 25    connection with MERC or in a different
```

28

```
  1    connection?
  2        A.   I believe in connection with
  3    MERC.
  4        Q.   Did you ever talk to Mr. Lawler?
  5        A.   You know, I don't recall ever
  6    speaking with him.
  7        Q.   So you spoke with an attorney
  8    about EB-5, sort of the EB-5 process
  9    generally or any specific components, to your
10:35 10    recollection?
 11        A.   Just -- I think just generally
 12    how the EB-5 program worked.
 13        Q.   And what's your understanding of
 14    how the EB-5 program works?
 15        A.   Well, it's a program that is
 16    overseen by Homeland Security and USCIS and
 17    it is a job creation -- domestic job creation
 18    program.  At the time, you know, not long
 19    after 2008 when things were tough there were
10:36 20    a lot of programs to try to generate job
 21    creation.  This is one of them.  And,
 22    basically, a foreign individual who qualified
 23    and contributed capital of X dollars, and
 24    there were different varieties of
 25    contributions, and created X number of jobs
```

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 29 to 32)

8

---

29

1 would qualify for a green card. And at the
2 end of the program a permanent green card for
3 the individual and their direct family
4 members.
5     Q. And you mentioned USCIS. Is
6 that United States Customs and Immigration
7 Services, I think?
8     A. Yes.
9     Q. So you spoke with this female
10:37 10 attorney about the EB-5 process. You looked
11 at the legal filings in connection with that
12 Short Vine project. Did you do any other due
13 diligence in connection with MERC?
14     A. No, that was pretty much it, I
15 believe.
16     Q. Before talking to Terry Chan or
17 anyone directly, did you look into -- did you
18 do a background check on them or anything
19 like that?
10:37 20     A. No.
21     Q. And did you conduct this due
22 diligence on MERC before talking to Terry
23 Chan in any capacity or was that going along
24 with those conversations?
25     A. Our first contact was with Terry

---

30

1 Chan.
2     Q. And do you remember when that
3 first contact was?
4     A. I believe it was in 2012 at some
5 point.
6     Q. And do you recall what was said
7 during that first contact?
8     A. What can you tell us about the
9 EB-5 program.
10:38 10     Q. And did that first contact
11 become a second contact with Terry Chan?
12     A. Yes.
13     Q. And eventually it sounds like
14 the ideas behind GSC Opportunities, LP,
15 started as a result of this conversation?
16     A. Yes.
17     Q. Do you recall whether GSC
18 Opportunities, LP, was sort of being
19 formulated for the first time between you and
10:38 20 Terry Chan?
21     A. I would say most of the entity
22 formulation took place between Gold Star and
23 our legal counsel, as far as the entity
24 structures.
25     Q. And was Mr. Fisher your legal

---

31

1 counsel?
2     A. Yes.
3     Q. And we've talked about Terry
4 Chan. Did you ever have any conversations
5 with Gary Chan in 2012?
6     A. Yes.
7     Q. What were those conversations
8 about, to your recollection?
9     A. Just about the EB-5 program.
10:39 10     Q. Did you ever have any
11 conversations with Jacquelyn Chan in 2012?
12     A. Yes.
13     Q. What were those conversations
14 about?
15     A. Well, those conversations were
16 primarily -- her role was going to be
17 involved in actually operating the
18 restaurants under the GSC Opportunities
19 umbrella and she had some restaurant
10:39 20 experience, limited.
21     Q. Was that Martino's?
22     A. Yes.
23     Q. And by operating restaurants
24 under the umbrella, what do you mean by
25 Jackie's role or anticipated role?

---

32

1     A. Well, basically, the restaurants
2 that we would open under the EB-5 program
3 would be -- we would look at them as being
4 franchised restaurants. So she would be --
5 have a role similar to a store manager.
6     Q. So, as a store manager, would
7 she be responsible for the day-to-day
8 operation of a restaurant?
9     A. Well, that was the goal, but
10:40 10 that never really came to fruition. So I
11 would say that was kind of a wait and see
12 direction.
13     Q. And so in that wait and see
14 approach -- why was it a wait and see
15 approach? Why wasn't she just sort of given
16 those capacities out of the gate?
17     A. Probably because we wanted to
18 see how she would perform.
19     Q. And you mentioned those -- she
10:40 20 was never really given full control?
21     A. Well, there were never any
22 stores under her control, yeah.
23     Q. Was there going to be a
24 different relationship with the restaurants I
25 believe in the Palomar Shopping Center in

---

Electronically signed by Julie Patrick (501-060-398-1480)          a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

33

1  Kentucky and also Lexington, Kentucky?
2      A.  Well, Palomar and Lexington I
3  think are the same.  That's one and the same.
4  We looked at that restaurant as being of
5  our -- part of our contribution to the Gold
6  Star GSC Opportunities.
7      Q.  Was there another restaurant?
8      A.  I believe the restaurant by
9  Xavier University was another one.
10:41 10     MR. RUDELL:  Tennessee and
11  Reading?
12     A.  No, not Tennessee and Reading.
13  That's a franchise restaurant.  At the time.
14  This was all -- it was a new construction.
15  All of that new work they did at Xavier
16  University where the bookstore is, right
17  there.  Dana.
18     Q.  So I'm going to hand you the
19  first exhibit.
10:42 20     MR. JOYCE:  Michael, just so you
21  know, it's at LIND263 is what I'm going to
22  hand him.
23     MR. NARDELLA:  Thank you.
24  (Plaintiff's Exhibit 1 was marked for
25  identification.)

34

1      Q.  So Mr. Rohrkemper, you've been
2  handed what's been marked as Exhibit 1.  To
3  the best of your knowledge, what is this
4  document?
5      A.  I have to read it.
6      Q.  Certainly.  Take your time.
7      A.  I don't recall this document --
8  seeing this document before, but it's
9  basically questions about formulating the
10:43 10  applications and the time line for approval
11  for an EB-5 program and a question about a
12  direct deal, which is -- I have to think
13  about that for a minute.  Our program was a
14  direct program, where we were looking at
15  specific locations.
16      There was another EB-5 direction
17  that was I think called indirect investment,
18  where you didn't have to pick specific
19  investments, that you were just investing in
10:44 20  an area.  So our investments were direct
21  deals.  And the -- I can tell you that the
22  approval period did not fall within the
23  guidelines of this letter.
24      Q.  And so this is -- does this
25  appear to be an e-mail exchange between

35

1  Thomas Martin and Tom Fisher, as that first
2  top e-mail?
3      A.  Yes.
4      Q.  And is this an e-mail on
5  March 21, 2013, by the looks of it?
6      A.  Yes.
7      Q.  Who's Thomas Martin?
8      A.  He was an attorney that
9  represented MERC with Dinsmore -- or, no, not
10:44 10  Dinsmore.
11      Q.  Lindhorst & Dreidame?
12      A.  Lindhorst & Dreidame, yes.
13     MR. RUDELL:  And just so you
14  know, Mike, when -- he's going to hand you a
15  series of documents today and at the bottom
16  he's going to reference these as Bates
17  numbers.  And I'm going to take a guess that
18  the L-I-N-D means they were produced by
19  Lindhorst.  And that will help you know where
10:45 20  they're coming from.
21     THE WITNESS:  Okay.  Gotcha.
22      Q.  Certainly.  We subpoenaed
23  Lindhorst for a few materials and this is one
24  of them.  So it looks like -- so March 2013,
25  is that about the time period when you were

36

1  talking with Terry and Gary about this
2  program?
3      A.  Yeah.  There were a lot of
4  documents that were generated around that
5  time.
6      Q.  And you mentioned, was this
7  something that Tom Fisher mostly took
8  responsibility for or were there other
9  members of --
10:45 10     A.  I would say Tom and I worked
11  very closely on these matters.
12      Q.  So Tom and you.  Anybody else
13  with Gold Star?
14      A.  Probably Mike Mason.
15      Q.  And so, when you were
16  structuring this program, at least very
17  initially, you were talking with both Terry
18  and Gary Chan; is that correct?
19      A.  I would say we looked at Terry
10:46 20  as being the leader and Gary was the
21  subordinate.
22      Q.  What gave you that impression?
23      A.  I think that's what they told
24  us, basically.  Maybe a little more
25  diplomatically.

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 37 to 40)

10

---

**37**

1      Q.   Did Terry take point in these
2   conversations with you?
3      A.   He did.
4      Q.   And did he review and comment on
5   the materials that I know you mentioned that
6   were being worked on in connection with this
7   program?
8      A.   I'm sorry. Ask that again.
9      Q.   Thank you. Did he review a
10:46 10   business plan or a partnership agreement?
11      A.   Terry or Gary?
12      Q.   Terry.
13      A.   Terry, yes, would have -- he
14   would have -- they actually did a lot of the
15   work on formulating those documents.
16   Obviously, we made contributions to that, but
17   I would say they generated the business plan
18   and the private offering memorandum and all
19   of those types of documents.
10:47 20      Q.   So going into that, we'll hand
21   you what's being marked as LIND234.
22      MR. JOYCE: And, Michael, this
23   says page one of two, but I think that's a
24   production error just so you know. We're
25   just only handing him the first one.

---

**38**

1      MR. NARDELLA: Okay.
2   (Plaintiff's Exhibit 2 was marked for
3   identification.)
4      Q.   Mike, you've been handed what's
5   been marked as Exhibit 2. After taking a
6   little time to get familiar with this
7   document, can you just describe what it is,
8   to the best of your recollection or your
9   knowledge?
10:48 10      A.   You mean the substance of the
11   document or -- I mean, it's an e-mail from --
12   it appears from Tom Fisher to Tom Martin.
13      Q.   And is this e-mail dated April
14   8, 2013?
15      A.   Yes.
16      Q.   And there are a number of e-mail
17   addresses cc'ed on there. There's a
18   Terry.Chan@midwestEB-5.com. Is that Terry
19   Chan's e-mail address?
10:48 20      A.   I believe it is.
21      Q.   There's a Michael E. Rohrkemper,
22   miker@Goldstarstarchili.com. Is that your
23   e-mail address?
24      A.   That is not my e-mail address.
25      Q.   Okay. Do you have any idea of

---

**39**

1   what --
2      A.   Well, there's two stars in
3   there. I mean, mine was
4   Miker@GoldStarChili.com.
5      Q.   Do you ever recall receiving the
6   first e-mail on the top?
7      A.   Let's see. It looks like it's
8   just nuts and bolts types of things related
9   to a business plan.
10:49 10      Q.   Okay. There's a mention, it's
11   the second to last sentence there, and it
12   says, when will you provide documentation
13   regarding the expenses on Exhibit D that have
14   been incurred to date. Do you see that
15   e-mail -- or, sorry, do you see that
16   sentence?
17      A.   In the first paragraph?
18      Q.   Yes. I believe it's of Tom
19   Fisher's e-mail.
10:50 20      A.   I'm sorry, what is that again?
21      MR. RUDELL: It's right here.
22      A.   Oh, when will you provide --
23   okay. Yeah, I don't know what Exhibit D is.
24      Q.   Were there any expenses that
25   were being incurred by either party, either

---

**40**

1   the Terry Chan side or the Gold Star side, in
2   about March or April of 2013?
3      A.   Likely there were.
4      Q.   Possibly some legal expenses
5   created or generated for document creation,
6   things of the like?
7      A.   I would say minor expenses of
8   that nature.
9      Q.   Okay.
10:51 10      MR. JOYCE: Michael, we're
11   moving to LIND225, that GSC Opportunities
12   Executive Summary of Costs.
13      MR. NARDELLA: Thank you.
14   (Plaintiff's Exhibit 3 was marked for
15   identification.)
16      Q.   Mr. Rohrkemper, you've just been
17   handed what's been marked as Exhibit 3.
18   After taking some time to look through the
19   document, is this a document that you've seen
10:51 20   before?
21      A.   I don't recall seeing this
22   document.
23      Q.   Do you know who Mason Hill is?
24      A.   Yes.
25      Q.   What is that?

---

Electronically signed by Julie Patrick (501-060-398-1480)         a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 41 to 44)          11

---

**41**

1  A.  When I say, yes, I'll temper
2  that.  I know it's an organization that the
3  Chans were involved with that were going to
4  be the partners in the EB-5 transaction.  And
5  I believe that it's an investment banking
6  firm.
7  Q.  Do you know who the officers of
8  that company might be or might have been?
9  A.  I don't remember who the
10:52 10  officers were.  It wasn't anyone that we had
11  much, if any, direct contact with.
12  Q.  Do you know a company called
13  Mason Investments?
14  A.  You know, I've heard that name,
15  but I can't really tell you anything about
16  them.
17  Q.  Okay.  So we mentioned and, I
18  guess, just to get a little more detail about
19  the creation of the entities, do you know
10:53 20  whose -- whose thought was it to create an
21  entity known as GSC Opportunities, LP?
22  A.  I would say it was likely a
23  collaborative decision between the Chans and
24  Gold Star Chili.
25  Q.  Okay.  And do you know roughly

---

**42**

1  when that decision was made, when that
2  decision of, hey, let's work together and try
3  to structure this EB-5 investment program was
4  made?
5  A.  I'm going to say 2013, but it
6  could have been earlier.
7  Q.  Okay.  But based on the
8  documents you've sort of looked at already
9  and on your recollection, do you think those
10:54 10  efforts really being continued in
11  earnest in about 2013?
12  A.  Yes.
13  Q.  And I know you mentioned, I
14  believe, a business plan, there was a
15  partnership agreement, and you mentioned
16  those were materials that were created on
17  Terry Chan's side mostly, right?
18  A.  The business plan was, they were
19  responsible for the creation of that.  We
10:54 20  certainly were involved in that in reviewing
21  that and with, you know, the financial
22  aspects of it.  But that was their
23  responsibility to prepare that business plan.
24  Q.  And were those materials
25  prepared in anticipation of showing those

---

**43**

1  materials to potential investors?
2  A.  Yes.
3  Q.  And who was responsible for
4  finding investors for this project?
5  A.  The Chans.
6  Q.  And did they ever talk to you
7  about what they would be doing to find these
8  investors?
9  A.  We had conversations, just how
10:55 10  will you find investors, that type of
11  conversation.  We will go to China.  We'll
12  work with our Mason Hill contacts.  But
13  beyond that, we had no involvement with any
14  interaction with potential investors.
15  Q.  Do you know, did Terry Chan ever
16  travel to China to meet with any potential or
17  actual investors?
18  A.  I believe he did.
19  Q.  Do you know when that might have
10:56 20  occurred?
21  A.  I don't know that for certain.
22  Q.  Do you know, did Gary Chan ever
23  travel to China to meet with investors?
24  A.  That would be the same answer
25  for Terry.

---

**44**

1  Q.  To your knowledge, did Terry or
2  Gary Chan ever hire a company in China to
3  distribute materials to investors?
4  A.  I don't know that.
5  Q.  Does an entity called Gold Link
6  ring a bell?
7  A.  No.  Other than what I saw in
8  the discovery documents.
9  Q.  Certainly.  Would materials have
10:56 10  to be translated to be shown to investors?
11  A.  I don't know that for a fact.  I
12  would think so.
13  Q.  Were the investors that GSC
14  Opportunities was targeting, were those
15  Chinese investors mostly?
16  A.  Yes.
17  Q.  Were they focused only on
18  Chinese investors or from any other location?
19  A.  My understanding is they were
10:57 20  focused on only Chinese investors.
21  Q.  Did Gold Star translate any of
22  these materials to Chinese?
23  A.  No.
24  Q.  Is that something that you would
25  have expected Terry or Gary Chan to do?

---

Electronically signed by Julie Patrick (501-060-398-1480)          a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 45 to 48)                                    12

45

```
         1       A.  Them or their advisers or their
         2  contractors.
         3       Q.  Do you know any advisors or
         4  contractors they may have worked with in
         5  connection with marketing to investors?
         6       A.  No.
         7       Q.  And we mentioned or we talked
         8  about Martin Lawler.  And it looks like
         9  there's an Estelle McKee, is that maybe the
10:57   10  lawyer you spoke with?  It's on the last
        11  page, 229.
        12       A.  No, that wasn't who I spoke
        13  with.
        14       Q.  Did you ever see any e-mails or
        15  anything from Martin Lawler?
        16       A.  I cannot specifically recall any
        17  e-mails I saw from Martin Lawler.
        18       Q.  And, to your knowledge, was
        19  Martin Lawler someone who was working with
10:58   20  Terry and Gary Chan to advise them?
        21       A.  Yes.
        22       Q.  Okay.  Did you ever see any
        23  advice that he provided to Terry or Gary
        24  Chan?
        25       A.  Possibly.  I would say, if we
```

46

```
         1  had any contact with that organization, we
         2  had spoken with that Lili Wang before.
         3       Q.  Who is Lili Wang?
         4       A.  I believe she -- yeah, she works
         5  for Mason Investments.
         6       Q.  And what kind of conversations
         7  did you have with her?
         8       A.  How it's going?  How is the
         9  project going?
10:59   10       Q.  Anything about marketing to
        11  investors or anything like that?
        12       A.  No.
        13       Q.  So from your understanding of
        14  how this project operated, did Mason Hill
        15  have one set of responsibilities and another
        16  entity have another set of responsibilities?
        17       A.  I don't believe so.  I mean, I
        18  think all of the responsibility for the EB-5
        19  side of the program was Mason Hill.
10:59   20       Q.  So it was Mason Hill was
        21  responsible for the EB-5?
        22       A.  Yes.
        23       Q.  And would those responsibilities
        24  have included structuring the entity, GSC
        25  Opportunities, LP, to comply with applicable
```

47

```
         1  regulation?
         2       A.  Well, it would have been
         3  responsible for that organization to not be
         4  in conflict with any EB-5 regulations.
         5       Q.  And they -- were they the ones
         6  who were handling contacts with potential
         7  investors?
         8       A.  Yes.
         9       Q.  Were they the ones handling
11:00   10  contacts with investors once they did invest
        11  with GSC Opportunities?
        12       A.  Yes.  But there was never any
        13  investment that flowed through to GSC
        14  Opportunities.
        15       Q.  Oh, never any from the foreign
        16  investors?
        17       A.  My understanding was that there
        18  were a couple of escrowed investments, but
        19  those escrows were not released.
11:00   20       Q.  Okay.  So the escrow funds were
        21  in a different bank account than GSC
        22  Opportunities?
        23       A.  Yes.
        24       Q.  When could those funds in the
        25  escrow accounts have been released to the
```

48

```
         1  partnership?
         2       A.  When the applications were
         3  approved by USCIS.
         4       Q.  So the I-526 applications?
         5       A.  Yeah.
         6       Q.  Whose responsibility was it to
         7  monitor those escrow accounts, to your
         8  knowledge?
         9       A.  Well, they were in the hands of
11:01   10  a third party.
        11       Q.  Do you know what third party
        12  that was?
        13       A.  I think it was First National
        14  Bank at the time.
        15       Q.  Would it have potentially been
        16  U.S. Bank?
        17       A.  Well, it could have been U.S.
        18  Bank.  In fact, it was U.S. Bank now that I
        19  recall, yeah.
11:01   20       Q.  And why are those funds put into
        21  an escrow account instead of just invested
        22  directly into the partnership?
        23       A.  Because everything wasn't in
        24  place on the transaction on the approval of
        25  the applications and that.
```

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

49

1      Q.   So it was only after the
2   application is approved?
3      A.   And I think it had to be a
4   certain number of applications. I mean,
5   there were five investors that was part of
6   the program and I think it's in that summary
7   I gave you, but it was either two or three
8   applications had to be approved before the
9   funds would be releases to GSC Opportunities.
11:02 10      Q.   So there were, you mentioned,
11   five investors. Was there ever a --
12      A.   Targeted five investors.
13      Q.   Targeted five. Was there ever a
14   time period where Gold Star thought that
15   there were going to be more than five
16   investors in the project?
17      A.   There was a period early on when
18   we were having conversations, before any
19   structure was put in place, that we talked
11:02 20   about 12 investors. And our board of
21   directors thought that was too big of a bite
22   to start out with, so we ratcheted that --
23   structured that deal down to five investors.
24   So there had been discussions at one point in
25   time, but that was modified pretty quickly.

50

1      Q.   And then you mentioned too big
2   of a bite. Was that just too big of a
3   financial commitment or --
4      A.   Just, it was such an unusual
5   transaction, the board wanted to see a
6   scaled-down version to see how it worked.
7   And then we would have considered a phase
8   two.
9      Q.   So when this -- when GSC
11:03 10   Opportunities was being formulated, did you
11   ever report to Gold Star's board of directors
12   about what was going on?
13      A.   Yes.
14      Q.   How often were those reports?
15      A.   Quarterly.
16      Q.   Quarterly reports. And what
17   sort of information would you share with
18   them, to the best of your recollection?
19      A.   You know, information on
11:03 20   structure of the entities, the state of the
21   potential investors, restaurant evaluations
22   for what stores might be built when the funds
23   came in, those kinds of things.
24      Q.   Did anyone on the board of
25   directors ever ask about Terry Chan or Gary

51

1   Chan directly, ask who they were or what they
2   were doing?
3      A.   I'm sure that we discussed the
4   due diligence project that we did before we
5   engaged them.
6      Q.   And going back to that, do you
7   recall any of the allegations that were made
8   in connection with that lawsuit?
9      A.   You know, just very high level,
11:04 10   I know Jackie's father, I think, was the --
11   initiated the litigation. I think he was the
12   plaintiff. And I don't really recall
13   anything other than that. I know it was a
14   family thing and it was kind of convoluted.
15      Q.   Were there allegations that --
16   that certain businesses weren't being created
17   on time?
18      A.   I don't know.
19      Q.   Do you know, was there any
11:05 20   allegation that money was being used for
21   wrong purposes?
22      A.   I don't recall that.
23      Q.   Or funds might have been moved
24   from one company to another where they
25   shouldn't have been moved to?

52

1      A.   I don't recall that.
2      Q.   If there were those allegations,
3   is that something that you would have looked
4   for or looked at when you were doing the due
5   diligence?
6      A.   Yes.
7      Q.   Did you, and I apologize if I
8   asked this before, but I think I asked it in
9   the context of when you first started out,
11:05 10   but after you had started having some more
11   serious conversations with Terry or Gary
12   Chan, did you ever do a credit check on
13   either of them?
14      A.   I'm not sure.
15      Q.   Did you ever do -- you know,
16   review books and records of MERC?
17      A.   No.
18      Q.   Did you ever review any of the
19   books or records with the Short Vine project?
11:06 20      A.   No.
21      Q.   And I think we mentioned looking
22   at the legal proceedings. Did you ever go to
23   Martino's to see how that restaurant was
24   being operated?
25      A.   We went to Martino's, yeah.

Michael Rohrkemper, 10/14/2019

(Pages 53 to 56)

14

53

1 Informal --
2 Q. To grab lunch or grab dinner and
3 see it?
4 A. Yeah. And, you know, again,
5 part of the due diligence was, and I
6 apologize, I can't remember the name of that
7 attorney, but she had worked with the Chans
8 on a couple of transactions, so she didn't
9 tell us anything that precluded us from doing
11:07 10 business with them.
11 Q. Did she mention what other
12 transactions she worked with them on?
13 A. Well, no. She may have
14 mentioned, but it wasn't anything I was
15 familiar with.
16 Q. If -- I'm trying to see what
17 stage the litigation was in 2013. But if you
18 had heard or seen filings that mentioned that
19 Terry or Gary Chan was being accused of
11:07 20 embezzling funds, is that something that
21 would have given you pause?
22 A. Absolutely.
23 Q. Is that something that would
24 have given the Gold Star board pause?
25 A. Yes.

54

1 Q. Is something that you would have
2 investigated further or inquired more about?
3 A. Yes.
4 Q. Did Terry Chan ever talk to you
5 about how the Short Vine businesses were
6 doing?
7 A. I'm sure we had conversations
8 about that, but there was nothing that we
9 gleaned from those conversations that caused
11:08 10 us to move away from the Chans.
11 Q. No red flags or anything that
12 you saw?
13 A. No.
14 Q. Did he ever talk to you about
15 any other projects that MERC might have been
16 involved with?
17 A. I don't recall any other
18 projects that MERC was involved with.
19 Q. Okay. Did you know that Terry
11:08 20 Chan and Jacquelyn Chan were involved with
21 EB-5 projects connected with the Rodizio
22 Grill?
23 A. I'm aware that they were
24 involved in Rodizio Grill. It was after I
25 was gone. But I didn't know anything about

55

1 the structure of that. I didn't know it was
2 EB-5.
3 Q. Did you know that in 2013?
4 A. No.
5 Q. After you left in 2013?
6 MR. JOYCE: Just going to take a
7 quick pause for some water.
8 (Off the record.)
9 (Plaintiff's Exhibit 4 was marked for
11:10 10 identification.)
11 MR. JOYCE: Now that we're back
12 on the record, we've just marked as Exhibit 4
13 a document starting with GSC349 and going for
14 GSC362.
15 Q. Mr. Rohrkemper, you've just been
16 handed what's been marked as Exhibit 4 and
17 it's labeled Memorandum of Understanding at
18 the top; do you see that?
19 A. I do.
11:10 20 Q. Have you ever seen this document
21 before? And take some time to get familiar
22 with it, if you need to.
23 A. I have seen a Memorandum of
24 Understanding. I can't guarantee it's the
25 one that I have in front of me, but I do

56

1 recall a Memorandum of Understanding.
2 Q. If you flip to the back page of
3 this, is that your signature under Gold Star
4 Chili, Inc.?
5 A. It appears to be my signature.
6 Q. And so you've mentioned you've
7 seen this -- you've seen a Memorandum of
8 Understanding?
9 A. I do recall a Memorandum of
11:11 10 Understanding, yes.
11 Q. I know there's a good bit of
12 information in the memorandum, but roughly,
13 to your recollection, what does this
14 memorandum reflect?
15 A. I would have to flip through it,
16 but I would believe that it defines whose
17 roles are what, how the EB-5 program will
18 work, what documents are needed to be
19 generated. I don't know if it's got a time
11:11 20 table at all in it. Fees, its addresses
21 fees, I'm sure.
22 Q. So, I guess, in -- just to go
23 sort of through it a little bit, just to get
24 more info. If we look at the first page
25 under Recitals, the first sentence mentions

Michael Rohrkemper, 10/14/2019

(Pages 57 to 60)                                    15

---

### 57

1   Mason Hill and Gold Star have developed a
2   business plan, and it looks like for 12 new
3   Gold Star franchise restaurants.  Do you see
4   that?  Those are the first two lines under A.
5       A.   I do see that.
6       Q.   And you mentioned that was sort
7   of the first iteration before it was drawn
8   back?
9       A.   Yes.
10      Q.   So from your understanding, with
11  12 investors, do you know how much money each
12  investor was expected to contribute?
13      A.   500,000.
14      Q.   So 12 investors would have made
15  it a 6,000,000 contribution by the investors?
16      A.   Yes.
17      Q.   Was Gold Star expected to make
18  any contribution?
19      A.   Yes, a $3,000,000 contribution,
20  one-third, which was cash and some other
21  contributed costs.
22      Q.   And was that money supposed to
23  come from Gold Star directly?
24      A.   Well, through a subsidiary of
25  Gold Star, which was GSC EB-5 Investor, a

*11:12* 10
*11:13* 20

### 58

1   wholly owned subsidiary.
2       Q.   And so that would be -- the
3   3,000,000 would be routed through that
4   subsidiary entity?
5       A.   Correct.
6       Q.   This GSC EB-5, you mentioned
7   it's a subsidiary of Gold Star?
8       A.   It's a wholly owned subsidiary,
9   yes, and for tax purposes non-recognized.  It
10  wasn't a separate entity for filing taxes.
11  An LLC, yeah.
12      Q.   Would their taxes have been
13  under Gold Star Chili's taxes?
14      A.   Yes.
15      Q.   Okay.  If Gold Star sort of uses
16  that entity for tax reporting purposes, did
17  it control that entity?
18      A.   Yes.
19      Q.   Would it make decisions on
20  behalf of that entity?
21      A.   Yes.
22      Q.   Okay.  Why was that separate
23  layer created?
24      A.   Just legal protection.
25      Q.   Okay.  And so, they were

*11:13* 10
*11:14* 20

### 59

1   supposed to make, or this Gold Star through
2   this EB-5 entity were supposed to make a
3   3,000,000 contribution initially?
4       A.   Yes.  Ratably with the limited
5   partner contributions.
6       Q.   And roughly a two to one ratio?
7       A.   Yeah.
8       Q.   And was that two to one ratio
9   drawn down along with the 12 to 5 investor
10  draw down?  Or, excuse me, was the $3,000,000
11  contribution drawn down?
12      A.   Yes.
13      Q.   Okay.  I think to start, bullet
14  point B, it says, Gold Star, or its wholly
15  owned subsidiary, and Mason Hill will form a
16  limited liability to be the general partner
17  of the project owner.  Is that GSC EB-5?
18      A.   That would be GSC Opportunities.
19      Q.   Okay.  And so -- oh, sorry, the
20  project owner is GSC Opportunities?
21      A.   Yes.
22      Q.   And the sentence mentions that
23  an entity is going to be formed to be the
24  general partner of GSC Opportunities.  Do you
25  know what entity that was?

*11:14* 10
*11:15* 20

### 60

1       A.   GSC Opportunities Management,
2   LLC.
3       Q.   Do you mind if I just called
4   that GSC MGMT or Management?
5       A.   That's fine.
6       Q.   So this GSC Management, was that
7   an entity Gold Star or Mason Hill was in
8   charge of?
9       A.   Gold Star was a 97 percent
10  owner, Mason Hill three percent owner.
11      Q.   And was that -- was Gold Star a
12  direct owner of that or did they own that
13  through GSC EB-5?
14      A.   Through GSC EB-5.
15      Q.   Who made the decisions for the
16  general partner for this GSC Management?
17      A.   Well, I would have made the
18  decision, approved by our board of directors.
19      Q.   So you would have -- what kind
20  of decisions would need to be approved by the
21  board of directors?
22      A.   Well, I would say any capital
23  contribution kinds of things, any significant
24  expenditures, material expenditures, any
25  contractural relationships.

*11:15* 10
*11:16* 20

---

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 61 to 64)                    16

61

1      Q.   So if -- sorry, excuse me.  So
2    would the two to one contribution, is that
3    something that would have had to have been
4    approve by the Gold Star board of directors?
5      A.   Yes.
6      Q.   And that 3,000,000 --
7      A.   Two to one -- it would be one to
8    two, yeah.
9      Q.   So they would have -- the board
11:17 10    of directors would have had to approve the
11    $3,000,000 contribution in a 12 partnership
12    and then a drawn down in the five?
13      A.   Correct.
14      Q.   Okay.  Did they have to -- would
15    they have to approve any agreements that were
16    entered into by this GSC Management entity?
17    And to sort of maybe refresh your
18    recollection, like an EB-5 management
19    agreement?
11:17 20      A.   Again, I was the CEO of the
21    company, so a lot of that was under -- I was
22    responsible for those kinds of decisions,
23    but -- especially on a transaction like this,
24    as complex as it was, I would have gotten
25    board approval on anything that was done,

62

1    pretty much.
2      Q.   And who was on the board of Gold
3    Star Chili at this time in 2013?
4      A.   It would have been -- there were
5    four families that formed Gold Star, so it
6    would be one representative for each family.
7    So it would have been, at this time --
8    Basheer David passed away and I can't
9    remember when that was.  But it would have
11:18 10    been Basheer David, Roger David, Frank David
11    and Bassam Daoud and myself.
12      Q.   So you were also on the board?
13      A.   Yeah.
14      Q.   And now if we go to --
15      A.   Let me correct that.  I think
16    Basheer David was deceased.  So his son, John
17    David, would have been the other board
18    membership at this time.
19      Q.   Thank you.  And if anything else
11:19 20    comes up during the deposition that you would
21    like to correct, feel free.  Now, I'd direct
22    you to page four, which is GSC352.  And
23    specifically the last bullet point there that
24    starts, prepare for Gold Star's review and
25    approval; do you see that paragraph?

63

1      A.   Yes.
2      Q.   So this -- can you just read
3    sort of this bullet point for me, please.
4      A.   Prepare for Gold Star's review
5    and approval the following the documents: 1,
6    business plan, private placement memorandum,
7    limited partnership agreement for the project
8    owner, subscription agreement form --
9    subscription agreement, form subsidiary
11:19 10    operating agreement, feasibility studies, and
11    other documents necessary to take the project
12    to potential EB-5 investors (collectively the
13    offering documents) which shall be delivered
14    to Gold Star within 30 days of the date of
15    this agreement for final approval within
16    15 days of such delivery (delivery of
17    completed offering documents).
18      Q.   And so does this bullet point
19    essentially say that Gold Star had ability to
11:20 20    review and approve the materials that were
21    listed?
22      A.   Yes.
23      Q.   So they would -- or Gold Star
24    had the ability to review and approve the
25    business plan?

64

1      A.   Yes.
2      Q.   And that's the business plan of
3    GSC Opportunities, right?
4      A.   The project business plan.
5    Yeah, I would say it would be the business
6    plan of GSC Opportunities.
7      Q.   Yeah, they can sort of --
8    earlier the project owner is defined as GSC
9    Opportunities, LP?
11:21 10      A.   Yes.
11      Q.   Did you or anyone else at Gold
12    Star ever review these business plans,
13    private placement memorandum, limited
14    partnership agreement, et cetera, that was
15    prepared in connection with this project?
16      A.   I'm sure we did.
17      Q.   And when it says Gold Star's
18    review, is that Gold Star Chili, Inc., the
19    company?
11:21 20      A.   Yes.
21      Q.   Okay.  And just I'll direct
22    you -- sorry about this.  I'll direct you to
23    the first page, the very intro, the
24    Memorandum of Understanding.  It says, Gold
25    Star Chili, Inc.?

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 65 to 68)                    17

65

1      A.   Yeah.
2      Q.   So Gold Star, in that context,
3  is Gold Star Chili, Inc.?
4      A.   Yeah.  And there would have been
5  a lot of formulations of this transaction
6  which would have taken place subsequent to
7  this Memorandum of Understanding.
8      Q.   And so what is -- was the
9  Memorandum of Understanding created after
11:22 10  many of these other materials -- other
11  materials were created or was it sort of one
12  of the first things created?
13      A.   I would say this would be one of
14  the initial things.
15      Q.   And what was the purpose of this
16  Memorandum of Understanding?
17      A.   To make a determination as to
18  whether we would move forward on the
19  transaction.
11:22 20      Q.   Is this something that you would
21  have taken to the board of directors and had
22  them look at for approval?
23      A.   Yes.  Which probably resulted in
24  the scale down of the transaction.
25      Q.   Was the main hesitancy the

66

1  possibility of having to contribute
2  $3,000,000 to this entity?
3      A.   It was a transaction that is
4  outside the normal scope of what Gold Star
5  Chili had done in the past.
6      Q.   Was this the first EB-5 project
7  that Gold Star had done?
8      A.   Yes.
9      Q.   Is Gold Star typically either --
11:23 10  are their restaurants either owned by the
11  entity itself or by franchises?
12      A.   Yes.
13      Q.   Are there any other type of
14  dynamics in play there?
15      A.   As far as like ownership?  No,
16  it's either franchise or company owned.
17      Q.   And are those restaurants owned
18  directly by Gold Star Chili, Inc., or are
19  subsidiary entities created, or can it
11:23 20  depend?
21      A.   On this transaction?
22      Q.   Just generally.
23      A.   Well, the restaurant would be
24  owned by a third party, but they would
25  operate under a franchise agreement.

67

1      Q.   Okay.  Did Terry Chan or Gary
2  Chan ever have to execute a franchise
3  agreement?
4      A.   No.
5      Q.   Did Jacquelyn Chan ever have to?
6      A.   No.  There weren't any -- I
7  mean, if we had opened a store under this
8  program when everything came together, there
9  would have been a franchise agreement.
11:24 10  Because each individual store would have
11  their franchise agreement.  There would be
12  a separate LLC for each store that was opened
13  and each one would operate under an
14  individual franchise agreement.
15      Q.   If I can direct you to page 13,
16  which has GSC361 at the bottom.  And so
17  this -- I won't make you read it again, but
18  so this has a bolded and underlined, it looks
19  like, sentence that started with a star.  Do
11:25 20  you see the sentence that says, the parties
21  acknowledge?
22      A.   Yes.
23      Q.   It mentions that a subsidiary of
24  the project owner -- or, excuse me, that Gold
25  Star may cause a subsidiary of the project

68

1  owner, which is defined as GSC Opportunities,
2  to acquire franchise locations prior to I-526
3  approval.  Is that a fair characterization of
4  what that sentence says?
5      A.   It is but -- in fact, in the
6  business plan, there were a number of
7  locations that were submitted, but the
8  reality of the matter is is that those
9  locations, potential locations, don't stay
11:25 10  around if you don't execute on them.  So
11  that's one of the main reasons that there was
12  a problem with this transaction, is it went
13  on and on for years and when we would find a
14  choice location or a sufficient location, we
15  couldn't execute because we didn't have the
16  capitalization.
17      Q.   And what was causing the problem
18  with the execution?
19      A.   The investors weren't in place
11:26 20  and the applications weren't approved.
21      Q.   Did you ever talk with Terry
22  Chan about those issues?
23      A.   Yes.
24      Q.   When did you begin having those
25  conversations?

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 69 to 72)                                18

69

1      A.   Probably late 2013 when we were
2   expecting this to take place over a period of
3   months, not years.
4      Q.   Did he ever offer you any
5   explanations for what was going on?
6      A.   Politics -- just a lot of
7   excuses.
8      Q.   I mean, like, the political
9   situation in China or --
11:26 10      A.   Oh, just a lot of things that
11   were going on in our government, really, with
12   manpower, you know.  We never really got
13   clear-cut answers to those questions.
14      Q.   Do you remember how many
15   conversations you might have had with Terry
16   Chan about those issues?
17      A.   I couldn't quantify them, but I
18   would say monthly we would have
19   conversations.
11:27 20      Q.   And did he ever discuss with you
21   efforts they were making in trying to get
22   more investors into the program?
23      A.   Only that they were making
24   efforts.
25      Q.   Did he ever tell you, oh, hey,

70

1   we've got this investor signed up, or did he
2   notify you when investors joined?
3      A.   No.  And when my contract ended
4   I believe that there were maybe two investors
5   that were escrowed at the time, but the
6   applications weren't approved yet.
7      Q.   And those are the I-526
8   approvals?
9      A.   Yeah.
11:28 10      Q.   Okay.  And it mentions that Gold
11   Star might have, sort of, and please correct
12   me if this is a mischaracterization, but
13   might have fronted some money to develop some
14   franchise locations?
15      A.   You could characterize it as
16   that.  I mean, again, there were a couple of
17   locations that we would have opened whether
18   or not we had EB-5, so we opened them and put
19   them in the EB-5 organization, knowing that,
11:28 20   if it didn't come to fruition, we would just
21   collapse that and we would own those stores.
22      Q.   How were those restaurants
23   operated?  Did Jacquelyn Chan operate them or
24   did someone --
25      A.   No, Gold Star did.

71

1      Q.   Do you know who operated those
2   restaurants?
3      A.   They probably would have been
4   under Mike Mason's wing.
5      Q.   Did -- to your knowledge, did
6   Gold Star have a franchise agreement with
7   anybody for those restaurants or were they
8   directly operated by Gold Star?
9      A.   I believe that those were, at
11:29 10   the time, considered company owned stores.
11      Q.   Were Terry, Gary or Jacquelyn
12   Chan at all involved in operating those
13   restaurants?
14      A.   No.  Well, they may have
15   trained, they may have gone in and trained,
16   but they had no responsibility for operating
17   those restaurants.
18      Q.   They couldn't hire or fire
19   employees or anything like that?
11:29 20      A.   No.
21          MR. JOYCE:  I guess if we want
22   to go off the record for a quick sec.
23          (Off the record.)
24      Q.   So you mentioned that the
25   Memorandum of Understanding was sort of a

72

1   preliminary document that was created; is
2   that a fair characterization?
3      A.   Yes.
4      Q.   And the Memorandum of
5   Understanding mentions a number of documents,
6   including the business plan, partnership
7   agreement, as well, doesn't it?
8      A.   I believe it does.
9      Q.   And so, just to go -- and I
11:43 10   believe you earlier testified that it was
11   sort of Terry and Gary taking the point,
12   they created a lot of the documents with GSC
13   Opportunities?
14      A.   Correct.
15      Q.   Did Gold Star take point in
16   creating the GSC Opportunities, LP, operating
17   agreement?
18      A.   I'm not absolutely certain of
19   that.  We were very interested in it, so we
11:44 20   would have, at minimum, made sure that we
21   were extremely comfortable with it.
22      Q.   Okay.  So when the -- after this
23   Memorandum of Understanding was executed, did
24   you begin having conversations with Terry
25   Chan, Gary Chan or Tom Martin about what

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

73

1    these various materials would look like and
2    what they would say?
3          A.   Yes.
4    (Plaintiff's Exhibit 5 was marked for
5    identification.)
6          Q.   And apologies, sir.
7               MR. JOYCE:  Mike, I've just
8    handed him what's been marked as LIND218.
9               MR. NARDELLA:  Okay.
11:45 10         Q.   Mr. Rohrkemper, the document
11   that I've handed to you, it has three pages
12   of materials affixed to it, doesn't it?
13         A.   Yes.
14         Q.   And those are materials from
15   LIND00218 to LIND000220?
16         A.   Yes.
17         Q.   So we'll start with the very
18   first document, which is LIND218.  After
19   giving -- after taking some time to take a
11:46 20    look at it, this appears to be an e-mail sent
21   April 18, 2013, from Tom Fisher to Terry Chan
22   and to you; does it not?
23         A.   Yes.
24         Q.   And after sort of reviewing this
25   e-mail, it starts with, Terry, thank you for

74

1    the letter.  This letter does not ease Gold
2    Star's concerns.  Gold Star's concern is that
3    there are possible securities law
4    ramifications from releasing information
5    regarding the offering prior to the release
6    of the private placement memorandum; is that
7    what the first two sentences say?
8          A.   Yes.
9          Q.   Do you know what prompted this
11:47 10    e-mail?
11         A.   I would say what prompted it is
12   exactly what it says.  We were advised by our
13   counsel, based on --
14              MR. RUDELL:  Well --
15         Q.   No, no.  We're going to -- he's
16   being instructed not answer due to
17   attorney/client privilege.  And so, do you
18   know what -- I guess, do you recall receiving
19   this e-mail?
11:47 20         A.   I don't specifically recall.
21         Q.   And then, if you flip to the
22   second page, there's an e-mail from Terry
23   Chan to you dated April 17, 2013; is that
24   correct?
25         A.   Yes.

75

1          Q.   And it looks like it has a PDF
2    attachment to it?
3          A.   The one thing I would mention
4    though, is the last e-mail I saw directed to
5    me did not have my correct e-mail address.
6          Q.   And so, yeah, we did not know if
7    this is your correct one or incorrect one,
8    but, I guess, do you recall ever receiving
9    this e-mail from Terry Chan?
11:48 10         A.   I don't recall, no.
11         Q.   And if you flip to the last page
12   there's a -- it looks to be a copy of a
13   letter from Mason Investments; is that
14   correct?
15         A.   Yes.
16         Q.   Do you know who Allen Chi is?
17         A.   I remember the name and I
18   believe that he is involved with, what's the
19   entity, Mason Hill.
11:49 20         Q.   It looks like he's with Mason
21   Investments on the letterhead?
22         A.   Yeah.  Which I -- yeah.
23         Q.   And in this -- the first
24   sentence of this document references the
25   declarations memo; do you see that?

76

1          A.   I see that.
2          Q.   Do you have any idea what the
3    declarations memo is?
4          A.   I do not.
5          Q.   Do you know if that's the
6    Memorandum of Understanding?
7          A.   I don't know that.
8          Q.   And so if we refer back to the
9    e-mail referenced as Lindhorst 218, so
11:49 10    this -- as I read earlier, there's a
11   sentence -- the third sentence of this
12   document mentions concerns related to
13   securities law ramifications from releasing
14   information about the offering prior to the
15   release of the private placement memorandum.
16   Are you aware of any circumstances where GSC
17   Opportunities investors might have been
18   solicited prior to the private placement
19   memorandum being finalized by you?
11:50 20         A.   I don't know of that.
21         Q.   Based on this e-mail, do you
22   think that there was possibly some concern
23   that that's what was happening?
24         A.   I'm just reading the e-mail from
25   what it says and that would be a reasonable

Michael Rohrkemper, 10/14/2019

(Pages 77 to 80)          20

---

77

1    conclusion.
2         Q.   What are -- are there any
3    problems with releasing information about an
4    offering prior to the materials getting
5    finalized?
6         A.   I refer that to our legal
7    counsel.
8         Q.   Is that possibly why Tom Fisher
9    was noting it in an e-mail to Terry Chan?
11:50 10       A.   That's possible.
11        Q.   Now, this -- the second
12   paragraph this e-mail mentions Huntington
13   Bank.  What was Huntington Bank's
14   involvement?
15        A.   Well, Huntington Bank was our
16   primary bank and any additional entities that
17   we would create, if they had banking needs,
18   we would set up accounts with Huntington
19   Bank.
11:51 20       Q.   And did you set up an account
21   with Huntington Bank for the GSC EB-5 entity?
22        A.   I'm not sure.
23        Q.   Did you do it with GSC Opp
24   Management, LLC, which I believe was the
25   general partner of GSC Opportunities?

---

78

1         A.   I'm not sure.
2         Q.   Did you ever -- did you create
3    one for GSC Opportunities itself?
4         A.   I'm not sure.
5         Q.   The second to last sentence
6    starting with, depending on how quickly, do
7    you mind reading that sentence?
8         A.   Depending on how quickly
9    Huntington will allow the funds to move from
11:52 10   account to account, we may be able to have a
11   check from the limit partnership to Mason
12   Hill today.  We will let you know as soon as
13   it is ready.  There were some fees that were
14   paid, not material fees, and this could be
15   what this is addressing.
16        Q.   Do you know was this -- because
17   it references a check from the limited
18   partnership to Mason Hill.  Would that have
19   been a check from GSC Opportunities to Mason
11:52 20   Hill?
21        A.   I would assume that's correct.
22        Q.   Did you or anyone at Gold Star
23   have the authority to -- or ability to sort
24   of create bank accounts for GSC
25   Opportunities?

---

79

1         A.   Yes.
2         Q.   Did you have the authority to
3    transfer funds to and from GSC Opportunities?
4         A.   Yes.
5         Q.   And it looks like that might
6    have happened or it's being referenced in
7    this e-mail?
8         A.   Yes.
9         Q.   And did you have this authority
11:53 10   sort of throughout and until GSC
11   Opportunities was terminated?
12        A.   Yes.
13        Q.   So going into the structure of
14   the entities again and the various
15   responsibilities, just to clarify a bit, the
16   EB-5 component, that was to be handled by
17   Mason Hill, right?
18        A.   As far as the raising of the
19   capital and the dealings with investors and
11:54 20   the responsibility to make sure that
21   everything was in compliance with the
22   government, yes.
23        Q.   And who was responsible for the
24   restaurant operations themselves?
25        A.   It would have been Mason Hill

---

80

1    under a management agreement, with oversight
2    by Gold Star, Inc.
3         Q.   To your knowledge, did Gold Star
4    Chili ever execute a management agreement
5    related to GSC Opportunities?
6         A.   Yes.  What looks like the
7    management agreement would have been between
8    Mason Hill, GSC Opportunities Management, the
9    general partner, and GSC, Inc.  So I don't
11:55 10   know if that's three management agreements
11   or --
12        Q.   Rather than talking about it
13   esoterically, we'll just go ahead and refer
14   to it.
15        MR. JOYCE:  All right.  Michael,
16   I'm going to jump ahead a bit.  I think it's
17   the second to last document -- or, sorry,
18   it's LIND46, the operations Management
19   Agreement is what we're referring to.
11:55 20       MR. NARDELLA:  Okay.
21        MR. JOYCE:  And for Barry, I
22   think it's the second to last in the stack
23   that you have.
24        MR. RUDELL:  Thank you.
25        (Plaintiff's Exhibit 6 was marked for

---

Michael Rohrkemper, 10/14/2019

(Pages 81 to 84)

21

---

81

1      identification.)

2      Q. Mr. Rohrkemper, you've just been

3 handed what's been marked as Exhibit 6 and

4 that should be a document that goes from

5 LIND000046 to 49?

6      A. Correct.

7      Q. Have you seen this document

8 before?

9      A. I couldn't say it's this

11:56 10 specific document, but I have seen an

11 operations management agreement before.

12      Q. Okay. If I can direct you to

13 page four, which is LIND49, there are two

14 signatures which appear on that document,

15 correct?

16      A. Correct.

17      Q. Are those your signatures?

18      A. They appear to be my signature.

19      Q. And in one, it looks like you're

11:57 20 executing as the manager of Gold Star Chili,

21 Inc., and that's the one on the right,

22 correct?

23      A. Correct.

24      Q. And then there's -- the one on

25 the left is for -- you're executing by GSC

---

82

1 EB-5 Investor, correct?

2      A. Correct.

3      Q. And it looks like that's for GSC

4 Management, LLC, which is the general partner

5 of GSC Opportunities; is that correct?

6      A. Yes.

7      Q. Okay. Would anyone else at GSC

8 EB-5 Investor, LLC, have the authority to

9 execute a document like this? I guess to put

11:57 10 it more plainly. Could Gary or Terry Chan

11 have signed a document on behalf of EB-5

12 Investor?

13      A. No.

14      Q. Could they sign a document on

15 behalf of GSC Opp Management?

16      A. They were a three percent owner

17 of that entity, so I would say, no.

18      Q. And that was the 97 that was

19 Gold Star through GSC EB-5, right?

11:58 20      A. Correct.

21      Q. And is Gold Star's corporate

22 headquarters, is it at 650 Lunken Park Drive?

23      A. Yes.

24      Q. And that's Cincinnati, Ohio?

25      A. Yes.

---

83

1      Q. So -- and I apologize to make

2 you read again, but if we go up to the first

3 page under A, starting with the -- it's fifth

4 sentence or of the fifth line from the bottom

5 that starts with, GSC will rely?

6      A. Okay.

7      Q. Do you mind just reading that

8 sentence alone? No need to continue to the

9 next one.

11:59 10      A. Okay. GSC will rely exclusively

11 on the expertise and knowledge of Manager in

12 connection with the management and operation

13 of all matters involving the administrative

14 accounting and compliance and operations of

15 the restaurants owned by GSC. Manager has

16 agreed to enter into this agreement and to

17 assist GSC with the management and

18 administration of these matters as herein

19 described.

11:59 20      Q. And if we go up to before the

21 Recitals there's a bolded Gold Star Chili,

22 Inc., it mentions, Gold Star Chili, Inc., an

23 Ohio corporation, and then it defines in

24 quotes "Manager"; do you see that?

25      A. Yes.

---

84

1      Q. To your understanding, would

2 references to the Manager in this agreement

3 refer to Gold Star Chili, Inc.?

4      A. Yes.

5      Q. And so this agreement mentions

6 that the Manager, which is defined -- or Gold

7 Star Chili, Inc., is defined as, will rely

8 on -- excuse me, relies exclusively -- will

9 be relied on exclusively -- I'm just going to

12:00 10 go ahead and strike this entire thing. So

11 going back to the sentence that you read or

12 the very first sentence that you read where

13 it mentions that, GSC will rely exclusively

14 on the expertise and knowledge of Manager; do

15 you see that?

16      A. Yes.

17      Q. And it relies, in connection

18 with the management and operations of all

19 matters involving the administrative

12:00 20 accounting and compliance and operation of

21 the restaurant. To your knowledge, what does

22 that sentence mean? I guess, what were Gold

23 Star Chili's role in connection with GSC?

24      MR. RUDELL: Well, can we

25 clarify that, in this particular instance,

---

Michael Rohrkemper, 10/14/2019

(Pages 85 to 88)                                    22

---

**85**

1  because we earlier defined GSC as GSC
2  Opportunities, LLC, that the GSC that we're
3  referencing right now for this testimony is
4  GSC Opp Management or I'm going to say
5  Management?
6           MR. JOYCE:  Yeah, that's
7  correct.
8      Q.   For this question we're
9  referring to GSC Opp Management.  And so I'll
12:01 10  rephrase my question completely.  And I'll
11  say, to your understanding of this sentence,
12  is it that GSC Opp Management will rely on
13  the expertise and knowledge of Gold Star
14  Chili, Inc.?
15      A.   Yes.
16      Q.   Okay.  And that's the expertise
17  and knowledge related to administrative,
18  accounting and compliance, right?
19      A.   Yes.
12:01 20      Q.   And so, was this, essentially,
21  the GSC Management, which is the general
22  partner of GSC Opportunities, saying that
23  we're going to rely on Gold Star for the
24  administrative, accounting and compliance?
25      A.   Yes.

---

**86**

1      Q.   What sort of tasks would be
2  involved in the administrative, accounting
3  and compliance and operations?
4      A.   Creating financial statements,
5  making sure payroll is paid, oversight as to
6  store management.
7      Q.   Would these be duties that are
8  only in place after restaurants have been
9  constructed and are opened or did Gold Star
12:02 10  have any responsibilities to restaurants as
11  they were being constructed?
12      A.   We would certainly have
13  responsibility for restaurants that were
14  being constructed also.
15      Q.   Would Gold Star be involved in
16  the construction process itself?
17      A.   Yes.
18      Q.   Would it look to make sure that
19  the restaurant being constructed looks like a
12:02 20  Gold Star Chili?
21      A.   Yeah, protect the brand.
22      Q.   Would they look to see any draws
23  that are being paid to any contractors in
24  connection with the construction of the
25  restaurants?

---

**87**

1      A.   I would say, yes.
2      Q.   And, to your recollection, was
3  another document sort of similar to this
4  agreement executed with Mason Hill regarding
5  EB-5 services?
6      A.   That would have been defined
7  somewhere and I would guess it would be in
8  another management agreement, unless it's
9  defined in the operating agreement, and maybe
12:03 10  both places.
11           (Plaintiff's Exhibit 7 was marked for
12           identification.)
13           MR. JOYCE:  Michael, just so you
14  know, we've moved to LIND000210.  It's been
15  marked as Exhibit 7.
16           MR. NARDELLA:  Gotcha.
17      Q.   So, Mr. Rohrkemper, you've been
18  handed what's been marked as Exhibit 7.  Does
19  this appear to be an e-mail that was sent on
12:04 20  June 18, 2013?
21      A.   Yes.
22      Q.   To the best of your
23  recollection, in March and April and June of
24  2013, is that when discussions about GSC
25  Opportunities were being had between you and

---

**88**

1  Terry Chan and Gary Chan?
2      A.   Probably before that, but, yes.
3      Q.   And these are continuations of
4  the discussion?
5      A.   Continuation, yes.
6      Q.   And, potentially, the parties
7  are sort of getting closer and closer to what
8  this entity is eventually going to look like,
9  correct?
12:05 10      A.   Yes.
11      Q.   And this e-mail is sent by Tom
12  Fisher to Tom Martin, correct?
13      A.   Correct.
14      Q.   And you are cc'ed on this
15  e-mail, but I'll note that it has
16  miker@goldstarstarchili.com on it as well?
17      A.   Yeah.
18      Q.   Do you ever recall receiving
19  this e-mail?
12:05 20      A.   I remember these kinds of
21  conversations.  I couldn't say for sure that
22  I saw this e-mail.
23      Q.   The second sentence of this
24  e-mail says that, please note that Michael
25  Rohrkemper has not had a chance to review

---

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 89 to 92)                    23

89

1    some of the language in the LPA. Were you
2    looking at the limited partnership agreement
3    drafts that were being exchanged and
4    commenting on language being used?
5        A.   I, in conjunction with our legal
6    counsel, Tom Fisher, would have.
7        Q.   And not going into the content
8    of the dialogue that you had with Mr. Fisher,
9    were you discussing various edits to the
10   partnership agreement?
11       A.   I would have relied on him
12   primarily for those kinds of edits.
13       Q.   Given your background as a CPA,
14   do you have a bit -- are you more comfortable
15   with sort of the financial terms of these
16   agreements?
17       A.   Yes.
18       Q.   But, obviously, you're not a
19   lawyer and so Mr. Fisher would comment on
20   that respect, right?
21       A.   Right.
22       Q.   Okay.  He mentions at bullet
23   point number two, I would prefer not to use
24   Gold Star in the name of one of the limited
25   partnerships.  And he says, in addition to

90

1    creating an expectation for investors, it
2    will require an additional license agreement.
3    To your understanding, what does that mean,
4    in addition to creating an expectation for
5    investors?  Do you know what he was
6    commenting on there?
7        A.   I don't.
8        Q.   Do you think that maybe
9    investors, if they saw that Gold Star Chili
10   name in the name of one of these entities
11   might think, oh, hey, this is a Gold Star
12   controlled entity?
13       A.   Possibly.
14       Q.   And he does mention that there
15   are licensing agreement issues as well and
16   it's the second part of that sentence.
17       A.   Yeah.
18       Q.   But it looks like in the context
19   of this e-mail, as you're reviewing these
20   materials, you're thinking about what the
21   investors might expect when reading the
22   materials, right?
23       A.   Right.
24       Q.   And this is something that do
25   you believe that Terry and Gary Chan were

91

1    also thinking about when creating these
2    materials?
3            MR. RUDELL:  Objection.
4        Q.   You can go ahead and answer.
5        A.   I don't know what they were
6    thinking about.
7        Q.   Now, if we go down, five lines
8    down, there's a sentence that starts with,
9    this isn't a huge issue; do you see that?
10       A.   I do.
11       Q.   Do you mind reading that
12   sentence for me?
13       A.   This isn't a huge issue during
14   the time Gold Star is in control of the GP,
15   but after it is an issue and I would prefer
16   not to make exceptions to our franchise
17   process.
18       Q.   And just focusing on that, isn't
19   a huge issue during the time Gold Star is in
20   control, is it your understanding and based
21   on your earlier testimony that Gold Star was
22   the one in control, the general partner of
23   this relationship, GSC Management?
24       A.   Yes.
25       Q.   Do you know, had there been any

92

1    investors in GSC at this time period, in June
2    of 2013?
3        A.   I think not.
4        Q.   I'll give you a little time.  It
5    looks like they mentioned later in this
6    e-mail, it says, why can't we take on the two
7    investors and admit them now?  Would that
8    change your answer at all?
9        A.   Where do you see that?
10       Q.   It is the seventh line down, it
11   starts with, why can't we?
12       A.   In that same paragraph?
13       Q.   Yes.
14           MR. RUDELL:  It's in
15   paragraph two.
16       A.   Oh, yeah.  I gotcha.
17       Q.   I guess, do you recall Gary or
18   Terry Chan telling you that they had
19   investors in the project yet?
20       A.   I don't recall that.  I know
21   that that is in conflict with our
22   understanding as to how the EB-5 approval
23   process works.
24       Q.   That investors wouldn't be in
25   there yet until --

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 93 to 96)                    24

93

1     A.   Yeah, you couldn't take oneies,
2  twozies.  They had to have a certain
3  percentage of investors in place before you
4  could move any money.
5     Q.   Okay.  And I think you might
6  have mentioned this earlier, but are there
7  concerns with starting to provide information
8  to investors before that -- you know, these
9  materials are finalized?
12:10 10     A.   Yes.
11     Q.   What kind of concerns are there
12  in that situation?
13     A.   Well, I mean, until there's an
14  agreement on all of the registration kinds of
15  documents and solicitation types of
16  documents, I don't think it would be
17  appropriate to circulate those.
18     Q.   So if, for example, an investor
19  received materials that had that six million,
12:11 20  three million, nine million --
21     A.   That would be a problem.
22     Q.   That would be a problem because
23  that wasn't ultimately what that entity was;
24  is that correct?
25     A.   Correct.

94

1     Q.   Do you know what materials were
2  being shown to these potential investors?
3     A.   I do not.  I assumed it was the
4  business plan.
5     Q.   How involved was Gold Star in
6  the preparation of that business plan?
7     A.   I think the responsibility for
8  preparation was with Mason Hill, but we were
9  very diligent in our review of the business
12:11 10  plan.
11     Q.   And by Mason Hill, do you mean
12  Gary Chan and Terry Chan?
13     A.   Yes.
14     Q.   Is there any individual of those
15  two who was sort of taking the point or being
16  the primary person in connection with these
17  entities?
18     A.   Yeah, my impression is that most
19  of the technical aspects of it were with Gary
12:12 20  Chan.
21     Q.   And by technical aspects, what
22  do you mean?
23     A.   Financial presentations,
24  narratives, anything that's beyond just the
25  sales side of it.

95

1     Q.   And what was Terry Chan's role
2  to your understanding?
3     A.   I think contacts and sales.
4     Q.   Was he involved in sort of
5  structuring these entities and figuring out
6  what entity did what?
7     A.   I think high level, yes, but
8  when you drilled down I think it was more
9  Gary who -- and I think we corrected -- I
12:12 10  mean, again, when you look at the flow chart,
11  they weren't this sophisticated.
12     Q.   Oh, who do you mean?
13     A.   The Chans.
14     Q.   The Chans.  Who was that
15  sophisticated?
16     A.   Well, I think it was a
17  collaborative effort, but we changed a lot of
18  documents.
19     Q.   Okay.  So what the documents
12:13 20  first looked like were very different?
21     A.   Yes.
22     Q.   And that was a process you
23  mentioned yourself, Mike Mason.  Was anybody
24  else involved with that?
25     A.   Tom Fisher.

96

1     Q.   Tom Fisher.  Anyone else at Gold
2  Star?
3     A.   I would say, like, on marketing
4  aspects, would have been Charlie Howard, the
5  marketing director.
6     Q.   And would he -- by marketing, is
7  that foreign investor marketing or --
8     A.   Just how Gold Stars work for
9  investors' understanding, how they market and
12:13 10  how the sales are driven.
11     Q.   So he might comment on maybe
12  like the business plan which details that
13  kind of information?
14     A.   Correct.  And Kim Olden, too, I
15  would say from the financial summaries in
16  there and the projections.
17     Q.   And so we're in about June of
18  2013.
19     A.   One other thing, let me correct.
12:14 20  In addition to the team I mentioned, we
21  worked pretty closely with Von Lehman on
22  this, too, our CPA firm, with Brian Malthaus.
23     Q.   Do you know the full name of
24  that company, Von Lehman?
25     A.   Von Lehman.

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 97 to 100) 25

---

**97**

MR. RUDELL: That is it.

1 Q. And do you spell -- can you
2 please spell who -- that individual that you
3 worked with?
4 A. I could be incorrect. I think
5 it's M-A-L-T-H-A-U-S.
6 Q. Were they involved in the
7 overall -- these discussions occurring in --
8 A. Primarily oversight.
9 Q. Oversight of?
12:14 10 A. Reviewing documents, reviewing
11 structure, reviewing tax aspects.
12 Q. Okay. And so you had Mr. Fisher
13 on the one hand with legal, you had Gold Star
14 as well, and then you had the Von Lehman with
15 sort of finance sort of tax commentary as
16 well?
17 A. Correct.
18 Q. Did Von Lehman review all of the
12:15 19 materials that were created?
20 A. Probably not. Probably just
21 materials that would have been in their area
22 of expertise, tax assumptions and that kind
23 of thing.
24 Q. Would they have reviewed a

---

**98**

1 partnership agreement?
2 A. That would have been more Tom
3 Fisher. There were plenty of eyes on this.
4 Q. Do you know how many -- do you
5 know how long this process took to sort of go
6 from start to finish?
7 A. Well, it depends on your
8 definition of finished.
9 Q. I guess, from when the limited
12:16 10 partnership agreement was signed?
11 A. I would say that the discussion
12 started in 2012 and upon my departure from
13 Gold Star in 2015 it was still a work in
14 process.
15 Q. Okay. I'm going to hand you
16 some additional materials as well.
17 MR. JOYCE: Please mark this as
18 Exhibit 8.
19 (Plaintiff's Exhibit 8 was marked for
12:16 20 identification.)
21 MR. JOYCE: So, Michael, we're
22 moving to the document with the Bates number
23 of LIND102 to 136, the Agreement of Limited
24 Partnership.
25 Q. Mr. Rohrkemper, you've just been

---

**99**

1 handed what's been marked as Exhibit 8. Have
2 you ever seen this document before?
3 A. I have.
4 Q. What is this document?
5 A. A limited partnership agreement.
6 Q. And this is a limited
7 partnership agreement of GSC Opportunities,
8 correct?
9 A. Correct.
12:17 10 Q. And you mentioned earlier that
11 this was a document that you were involved
12 with with editing and commenting on, correct?
13 A. Correct.
14 Q. Mr. Fisher as well?
15 A. Correct.
16 Q. Do you know, was Terry Chan
17 involved with creating and editing this
18 document?
19 A. I would say that, yes, they
12:17 20 would have been involved, yes.
21 Q. And, to your understanding, what
22 does an agreement of limited partnership do?
23 A. It defines the rights and -- of
24 limited partners in the investment.
25 Q. Does it also define obligations

---

**100**

1 of the general partner of the partnership?
2 A. There certainly are aspects of
3 the general partner reflected in here in
4 looking at the index.
5 Q. And to direct you to -- I'm not
6 going to make you read, but to direct you to
7 page 11, LIND115, it mentions management and
8 authority of the general partner.
9 A. Yeah.
12:18 10 Q. And the general partner was this
11 GSC Opp Management, LLC, right?
12 A. Correct.
13 Q. To your understanding, what can
14 a general partner of a limited partnership
15 do?
16 A. Make most of the decisions.
17 Q. Could it review and execute
18 documents on behalf of the limited
19 partnership?
12:19 20 A. Yes.
21 Q. Could it determine whether or
22 not limited partners can be admitted subject
23 to that being permitted in the partnership
24 agreement?
25 A. Well, there are EB-5 rules and

---

Electronically signed by Julie Patrick (501-060-398-1480)    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 101 to 104)                                    26

---

101

1    regulations, too, that come into play, so I
2    would say that would be a joint
3    responsibility.
4        Q.   Would the general partner be
5    responsible for the financial aspects of the
6    partnership, reviewing the finances?
7        A.   Yes.
8            MR. RUDELL:  Are you asking him
9    generally or specifically as to this
12:19 10  document?
11           MR. JOYCE:  Just generally.
12       Q.   And if I direct you to -- sorry,
13   one moment.  Do you recall ever executing
14   this document?
15           MR. RUDELL:  Page 130?
16           MR. JOYCE:  Yes, perfect.  Thank
17   you.
18       Q.   Can I direct you to LIND130,
19   please.
12:20 20     A.   That appears to be my signature.
21       Q.   And that's your signature on
22   behalf of the general partner, GSC Opp
23   Management, LLC, by and through its members
24   GSC EB-5 Investor, LLC, correct?
25       A.   Correct.

---

102

1        Q.   And it mentions that you're the
2    president.  Does that mean you're the
3    president of GSC EB-5 Investor, LLC?
4        A.   Yes.
5        Q.   And you execute that in the same
6    capacity down below as well, correct?
7        A.   Correct.
8        Q.   All right.
9    (Plaintiff's Exhibit 9 was marked for
12:21 10  identification.)
11           MR. JOYCE:  Michael, we're
12   moving to the GSC Opp Management Operating
13   Agreement, LIND72.
14           MR. NARDELLA:  Gotcha.  Thank
15   you.
16       Q.   Mr. Rohrkemper, you've just been
17   handed what's been marked as Exhibit
18   Number 9.  Have you ever seen this document
19   before?
12:21 20     A.   I'm not certain.  I've seen an
21   operating agreement.  Yeah, I've seen an
22   operating agreement.  I'm not sure if this is
23   the specific one I've seen, but I have seen
24   an operating agreement.
25       Q.   If I can direct you to LIND --

---

103

1        A.   95.
2        Q.   -- 95, is that your signature on
3    the document?
4        A.   It appears to be my signature.
5        Q.   To your understanding, what is
6    this document?
7        A.   It's an agreement which
8    basically defines the roles of everybody
9    involved in the project, the general
12:22 10  partner --
11       Q.   So this is, essentially, how GSC
12   Opp Management would have been operated?
13       A.   Yes.
14       Q.   And this document mentions
15   that -- in the second whereas clause on
16   LIND73 there's a reference to six new Gold
17   Star franchise restaurants.  Was the plan to
18   operate one restaurant for every EB-5
19   investor or --
12:23 20     A.   Not necessarily.  It would be
21   how many restaurants could be opened with the
22   investment of the five investors.
23       Q.   Okay.  And would those five
24   investor investments also be combined with
25   the Gold Star Chili capital that would be

---

104

1    contributed?
2        A.   Yes.
3        Q.   So for a five limited partner
4    entity, that would be a contribution of 2.5
5    million dollars, correct?
6        A.   Correct.
7        Q.   Using the two to one ratio, what
8    was Gold Star's expected contribution to the
9    project going to be?
12:23 10     A.   1.250 million.
11       Q.   Did Gold Star ever contribute
12   1.250 million to the partnership?
13       A.   No.
14       Q.   Did it ever contribute capital
15   to the fund directly or to the partnership
16   directly?
17       A.   It, again, opened -- indirectly
18   opened two stores and the capital used to
19   open those two stores was contributed to that
12:24 20  partnership.  And I think two stores.  It
21   could have been three, but I think it was
22   two.
23       Q.   So would those costs incurred in
24   opening the stores, could that be counted as
25   Gold Star's capital contribution?

---

Electronically signed by Julie Patrick (501-060-398-1480)                a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 105 to 108)                                    27

---

105

1    A.  Yes.
2    Q.  In whole or in part, depending
on the expenses?
4    A.  Yes.
5    Q.  And there were between one and
three Gold Star restaurants that were created
for this partnership, correct?
8    A.  Correct.
9    Q.  Now, would those restaurants be
12:24 10  owned directly by GSC Opp -- Opportunity, the
11  partnership, or were other entities created
12  to sort of be holding?
13    A.  There would be single member
14  LLCs that would own each of those restaurants
15  that would roll up to -- disregarded entities
16  that would roll up to GSC Opportunities.
17    Q.  Were any of these entities ever
18  created, to your knowledge?
19    A.  I'm not certain.
12:25 20    Q.  Who would be in charge of those
21  entities that were holding or controlling
22  these individual restaurants?
23    A.  Gold Star, Inc.
24    Q.  So the Gold Star, Inc.?
25    A.  (Affirmative head shake.)

---

106

1    Q.  Okay. So Gold Star would hold
those individual restaurants in those
capacities and then it also sort of
controlled the general partner through GSC
5  EB-5?
6    A.  Correct.
7    Q.  And so that control could be
expected given the amount of contribution
that Gold Star was providing, correct?
12:25 10    A.  Correct.
11    Q.  It just wouldn't contribute
12  1.25 million to a partnership and let someone
13  else have it?
14    A.  Right. Yeah, again, you know,
15  this is a work in process so -- and, you
16  know, there was no other owners of this
17  business as designed until the other capital
18  came in, which did not happen.
19    Q.  And the other capital was the
12:26 20  limited partner?
21    A.  Yes.
22    Q.  The EB-5. And so what was the
23  understanding of when Jacquelyn Chan could
24  sort of step into the role of being the
25  operator of these restaurants?

---

107

1    A.  I think when the limited
2  partners were in place.
3    Q.  So Gold Star would manage these
restaurants until the investors came in?
5    A.  Yes.
6    Q.  And would it manage the general
partner in the partnership until those
investors came in?
9    A.  Yes.
12:26 10    Q.  Would it manage it after the
11  investors came in, to your knowledge?
12    A.  Well, it would be, you know,
13  based on the management agreement, what it
14  dictates.
15    Q.  So it wasn't just, as soon as
16  the investors came in, Terry Chan, Gary Chan,
17  Jacquelyn Chan, whoever could take control
18  have these restaurants wholesale, to your
19  knowledge?
12:26 20    A.  No, it was not.
21    Q.  That would be dictated by the
22  operations management agreement or any other
23  contracts that were signed?
24    A.  Correct.
25    Q.  Did the -- did Terry or Gary or

---

108

1  Jacquelyn Chan have any authority to approve
2  or reject contributions made by Gold Star in
developing those early franchises? Could
they say, no, no, no, we don't want you to
5  build this restaurant? We want these
different supplies. Anything like that?
7    A.  They probably had a
collaboration potential and I'm certain we
had those conversations with them.
12:27 10    Q.  Did they have any authority over
11  any funds that -- or, I guess, to strike
12  that. Did Gold Star ever contribute any
13  funds into an escrow account for this
14  partnership?
15    A.  No.
16    Q.  Did it ever give -- hold any
17  funds in sort of an investment account or
18  otherwise leave funds in an account for use
19  in the partnership?
12:28 20    A.  No.
21    Q.  Did Terry, Gary or Jacquelyn
22  Chan have any authority over Gold Star funds
23  before any funds might have been paid to them
24  directly?
25    A.  No.

---

Michael Rohrkemper, 10/14/2019

(Pages 109 to 112)

28

109

1    Q.   So the funds that were used for
2    those early restaurants, those would have
3    been Gold Star funds?
4    A.   Yes.
5    Q.   Okay.  Who, to your
6    understanding, had authority to create bank
7    accounts for GSC Opportunities, the limited
8    partnership?
9    A.   I would say GSC Management, the
12:29 10   general partner.
11   Q.   Okay.  And then that's the Gold
12   Star entity?
13   A.   Yeah.
14   Q.   Did Gold Star have any say in
15   the creation of the escrow accounts at U.S.
16   Bank?
17   A.   No.
18   Q.   Did Gold Star ever have the
19   ability to monitor limited partner investor
12:29 20   accounts?
21   A.   Yes.
22   Q.   What were those capabilities?
23   A.   Informal.  I knew the person at
24   U.S. Bank that worked in that department and
25   I had talked to her on a couple of occasions,

110

1    just making sure that money was still in
2    escrow.
3    Q.   Do you know who that individual
4    was?
5    A.   No, I don't remember.
6    Q.   I'm trying to think of, in the
7    materials, a Sonia Thampi; does that ring a
8    bell?
9    A.   That doesn't ring a bell.
12:29 10   Q.   But you mentioned you had these
11   informal conversations with her about the
12   accounts?
13   A.   Yeah, just to make sure that
14   everything was as advertised.
15   Q.   Did you have any concerns that
16   money might have been used for incorrect
17   purposes?
18   A.   No.  At the time, no.
19   Q.   Just wanted to verify that they
12:30 20   were there?
21   A.   (Affirmative head shake.)
22   Q.   Do you know how many escrow
23   accounts there were?
24   A.   I want to say two.
25   Q.   Do you know when you were

111

1    checking on the status of these accounts?
2    Was it from 2013 to 2015 or any specific
3    range?
4    A.   I would say that it would have
5    been closer to the last year I was in place
6    as the CEO.  Probably 2015.
7    Q.   Did anyone at Gold Star ever ask
8    about the escrow accounts or look into them?
9    A.   Mike Mason was aware of it.
12:30 10   Q.   Okay.  Did you ever receive
11   account statements about those escrow
12   accounts?
13   A.   No.
14   Q.   Did you ever direct the transfer
15   of funds into and out of those accounts?
16   A.   No.
17   Q.   Did you ever know that accounts
18   at First Financial Bank were established for
19   GSC Opportunities?
12:31 20   A.   I'm not aware of that.
21   Q.   To your understanding, who had
22   the authority to direct fund transfers to and
23   from those escrow bank accounts?
24   A.   Well, again, I think that fell
25   under the EB-5 capitalization plan, which I

112

1    think was clearly in Mason Hill's
2    responsibility.
3    Q.   Do you recall ever executing an
4    authorization that gave Gary Chan the ability
5    to move those funds?
6    A.   No.
7    (Plaintiff's Exhibit 10 was marked for
8    identification.)
9    MR. JOYCE:  And, Mike, we're
12:31 10   moving to LIND2.
11   Q.   All right.  Mr. Rohrkemper,
12   you've been handed what's been marked as
13   Exhibit 10.  Have you ever seen this document
14   before?
15   A.   I see my name on it.  Let me
16   read it real quick.
17   Q.   Take your time.
18   MR. RUDELL:  Off the record.
19   (Off the record.)
12:33 20   A.   I do not recall this.
21   Q.   Do you have any idea when this
22   might have been signed?
23   A.   I don't.
24   Q.   And so, does this authorization
25   allow Gary Chan to sign documents, deposit

Michael Rohrkemper, 10/14/2019

(Pages 113 to 116)                                        29

---

113

1  funds and provide written direction and
2  authorization on behalf of GSC Opportunities,
3  LP?
4      A.  That's what the document says.
5      Q.  And you don't recall executing
6  this document?
7      A.  I don't.
8      Q.  And so, to your understanding,
9  was U.S. Bank the entity that held these
12:33 10  escrow accounts?
11      A.  Yes.
12      Q.  Okay.  Do you know why this
13  document would have been executed?
14      A.  I don't.
15      Q.  Do you remember any
16  conversations related to this document at
17  all?
18      A.  I don't.  It's unusual that I
19  would sign this as -- without my full name, a
12:34 20  document like this, but --
21      Q.  As in your full name is --
22      A.  Like Michael Rohrkemper.  I
23  mean, I typically don't sign Mike Rohrkemper
24  on a formal kind of document, but that's
25  probably embellished.

---

114

1      Q.  Do you know of any situations
2  you might have signed a material as Mike
3  Rohrkemper?
4      A.  You know, probably it's happened
5  before.
6      Q.  Okay.  But just to sort of wrap
7  it up, you don't remember anything
8  surrounding this document?
9      A.  I don't.
12:34 10      MR. RUDELL:  Is there another
11  version of this document, like with a
12  letterhead or --
13      MR. JOYCE:  So, I guess, off the
14  record.
15      (Off the record.)
16      MR. JOYCE:  Back on the record.
17      Q.  Would you have sort of any
18  objection to giving Gary Chan full access to
19  those accounts?  Is there anything --
12:35 20      A.  Well, I'll say this.  They were
21  responsible for procuring capital investments
22  from limited partners.  They set up the
23  escrow accounts with U.S. Bank.  We may or
24  may not have had a discussion about where the
25  escrow went.  We didn't care.  So, you know,

---

115

1  as far as Gary Chan interacting with U.S.
2  Bank and the escrow accounts, that doesn't --
3  that isn't a problem.  Had this said,
4  authorized withdrawals, I don't know that it
5  says that, I might have been a little bit
6  more concerned.  I mean, it says deposit
7  funds and provide written direction and
8  authorization on behalf of GSC Opportunities.
9  Yeah, I think this is an odd document, quite
12:36 10  frankly, and it's -- I don't know what more I
11  can say about it.
12      Q.  You mentioned it would have been
13  concerning to allow Gary Chan to withdraw.
14  What kind of concerns would that have been?
15      A.  We were very focused on making
16  sure that we controlled the flow of funds in
17  this transaction, I'll just put it that way.
18      Q.  Why did you have that focus?
19      A.  Just because there's a lot of
12:37 20  money at stake and we just wanted to have a
21  good internal control in place over how this
22  worked.
23      Q.  And before your departure from
24  Gold Star in 2015, did you feel that you had
25  this sort of control over the funds?

---

116

1      A.  We did.  I did.
2      Q.  Were you aware of any
3  circumstances in which investor funds were
4  used for inappropriate purposes?
5      A.  No.
6      Q.  Did you -- you mentioned that
7  you spoke informally with individuals at U.S.
8  Bank.  Did you do anything else to monitor
9  the finances of the partnership?
12:37 10      A.  Financial statements, reviewed
11  financial statements.
12      Q.  Was that in connection with the
13  restaurants that were being operated?
14      A.  Well, there were other -- or
15  certain fees that were paid also.  I think we
16  paid Mason Hill some fees.  I don't -- 37,000
17  I believe.  So there were transactions that
18  went to Mason Hill from this organization.
19      Q.  From -- the limited partnership
12:38 20  would pay Mason Hill?
21      A.  Yes.
22      Q.  And those were -- to your
23  recollection, were those fees owed under
24  these various agreements?
25      A.  Yes.  Yes, there's definition of

---

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 117 to 120)

30

---

117

```
        1    them.
        2        Q.   And were those transfers
        3    initiated by Gold Star to pay those
        4    obligations?
        5        A.   Probably were initiated by Mason
        6    Hill, but with our approval and our being the
        7    entity that could transact the payments.
        8        Q.   And would that have been out of
        9    Huntington Bank accounts most likely?
12:38  10        A.   Yes.  Yes, most likely.
       11        Q.   And so, essentially, Mason Hill
       12    could say, hey, these fees are owed and then
       13    you would approve the transfer funds to them?
       14        A.   Yes.
       15        Q.   Because that was in sort of, to
       16    your understanding, your bailiwick or Gold
       17    Star's bailiwick in this transaction?
       18        A.   Yeah.  I mean, we controlled the
       19    flow of funds.
12:39  20        Q.   And so you had the capability
       21    of, if these funds were being
       22    misappropriated, you could have spotted it?
       23            MR. RUDELL:  What are "these
       24    funds"?
       25        Q.   Sorry.  The funds in escrow?
```

118

```
        1        A.   Well, no, I couldn't say that I
        2    could have spotted it.  And possibly the
        3    reason I called U.S. Bank is they said we
        4    have two investors and I wanted to make sure
        5    that the money was escrowed.
        6        Q.   To your knowledge, was there
        7    ever three investors in GSC?
        8        A.   There could have been, but I
        9    remember two.
12:40  10        (Plaintiff's Exhibit 11 was marked for
       11        identification.)
       12            MR. JOYCE:  And this is, for
       13    everybody, this is LIND32, it's the GSC
       14    Opportunities Private Placement Memorandum.
       15        Q.   Mr. Rohrkemper, having some --
       16    and take your time to sort of get familiar
       17    with this document, but have you ever seen
       18    this document before?
       19        A.   Yes.
12:40  20        Q.   What is this document?
       21        A.   It's a limited partnership
       22    private placement memorandum which,
       23    basically, is an overview of the offering
       24    made to limited partners.
       25        Q.   Was this a document that would
```

119

```
        1    have been provided to potential investors, to
        2    your knowledge?
        3        A.   I believe, yes, but I don't know
        4    what the sequencing was of when documents
        5    could be presented to investors.
        6        Q.   Was this a document that, to
        7    your knowledge, Terry Chan was involved in
        8    preparing or editing?
        9        A.   Yes.
12:41  10        Q.   Was this a document that you
       11    reviewed and edited and commented on?
       12        A.   Yes.
       13        Q.   Do you know, was this the PPM
       14    that was the final PPM agreed to by you and
       15    others?
       16        A.   I don't know that for sure.
       17        (Plaintiff's Exhibit 12 was marked for
       18        identification.)
       19            MR. JOYCE:  We're moving to the
12:42  20    business plan, which is GSC126.  I don't
       21    know, it might take you a few moments to get
       22    familiar with this, so I did want to ask
       23    before we dive into this, does anybody need a
       24    break or anything like that?
       25            MR. RUDELL:  I'm okay.
```

120

```
        1            THE WITNESS:  I'm good.
        2            MR. NARDELLA:  I'm good, if you
        3    guys are.
        4            MR. JOYCE:  All right.  Let's
        5    keep moving forward then.
        6        Q.   So, Mr. Rohrkemper, can you
        7    describe what this document appears to be?
        8        A.   This is, basically, just a
        9    business plan for the EB-5 transaction that
12:43  10    we've been talking about, which, you know,
       11    gets into pretty much all aspects of how this
       12    investment should perform, you know, the
       13    marketing aspects, the financial aspects and
       14    who does what.
       15        Q.   And is this a document that you
       16    reviewed and commented on as it was being
       17    created?
       18        A.   Yes.
       19        Q.   Is this a document that Terry
12:43  20    Chan reviewed and commented on?
       21        A.   Yes.
       22        Q.   Is this a document that
       23    Jacquelyn Chan, to your knowledge, reviewed
       24    and commented on?
       25        A.   Yes.
```

Electronically signed by Julie Patrick (501-060-398-1480)                                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

121

1 Q. If I can direct you, and I'll
2 find the page when I find the page -- if I
3 can direct you to page 35. It's Bates number
4 GSC160 and it has a diagram with
5 organizational structure and personnel. To
6 your understanding, is this a sort of summary
7 version of the flow chart you've been
8 referring to today?
9 A. It's probably a higher level,
12:44 10 but it's comparable.
11 Q. Is this, to your understanding,
12 a fair description of how -- the organization
13 structure for this entity was or was supposed
14 to be?
15 A. I think it's deficient in that
16 it does not show the various management
17 agreements and -- but I think from a high
18 level it's a reasonable picture of the
19 entity.
12:44 20 Q. And if you look under it says
21 the GSC Opp Management, it says EMM and then
22 EB-5 investors and the next side says 6MM; do
23 you see that?
24 A. I do see that.
25 Q. Is that referring to the old

122

1 partnership structure?
2 A. Yes.
3 Q. With the nine million total?
4 A. Yes.
5 Q. Do you know, was a business plan
6 ever created that had a different
7 contribution amount?
8 A. I'm sure that it was modified.
9 This might have been the first document
12:45 10 prepared in the whole series of events.
11 Q. Was this a document that would
12 have been created after the Memorandum of
13 Understanding?
14 A. I would think before.
15 Q. And who primarily created this
16 document? Was it --
17 A. You know, we probably spent as
18 much time on this document as any of the
19 others. The Chans prepared the document. We
12:46 20 did a lot of editing to the document.
21 Q. Did you provide any information
22 to the Chans about maybe Gold Star's
23 structure or things like that that they might
24 not have had?
25 A. Sure.

123

1 Q. But then there was information
2 that they did possess and that they could
3 include in here if they wanted to?
4 A. Yeah, there was a lot of boiler
5 plate in here that they provided.
6 Q. On the next page it mentions the
7 management team of this entity and it
8 mentions that there is an EB-5 management
9 team. So, to your understanding, does this
12:46 10 sort of comply with that general structure
11 where it looks like there's one EB-5 aspect
12 of the project and there's sort of an
13 operational aspect of the project?
14 A. I think this really, in my
15 opinion, makes reference to just the whole
16 project.
17 Q. The overall --
18 A. The overall project.
19 Q. And so Terry Chan is listed
12:46 20 first and foremost on that management team,
21 correct?
22 A. Well, yes. I mean, president of
23 Midwest -- of MERC.
24 Q. Is that a job title that he had,
25 to your knowledge?

124

1 A. Yeah.
2 Q. And it says he's responsible for
3 guiding the team in selection and structuring
4 of projects, selection of investment partners
5 and overall operation. Does that align with
6 what your understanding of his role was with
7 GSC Opportunities?
8 A. No.
9 Q. What was his role?
12:47 10 A. Primarily in the EB-5 aspects of
11 the transaction, the capital raising, the
12 approval from the government, but I guess,
13 under the management agreement, operating
14 responsibilities also.
15 Q. And would those responsibilities
16 have included communicating with actual or
17 potential investors?
18 A. Yes.
19 Q. And then the next two
12:48 20 individuals on this list are Martin Lawler,
21 Allen Chi, and Allen's on the next page; do
22 you see that?
23 A. I do.
24 Q. How much involvement did they
25 have in the creation of these materials?

Michael Rohrkemper, 10/14/2019

(Pages 125 to 128)                    32

---

125

1      A.   You know, not much direct
2  involvement with us. I'd suspect a fair
3  amount of involvement with Terry and Gary.
4      Q.   And if you look at moving to GSC
5  162, that next page, it transitions into the
6  operational management team and it looks like
7  yourself, Mike Mason and Charlie Howard are
8  listed; is that correct?
9      A.   Correct.
12:48 10      Q.   And so do you know why you're
11  listed in this capacity in the business plan?
12      A.   Well, you know, back to your
13  original question of, you know, what does the
14  EB-5 team mean, the EB-5 investment aspects
15  were certainly in the court of these
16  individuals on -- that we looked at first.
17  As far as the operational development of the
18  restaurants and the branding and all of that,
19  I think that certainly fell under our domain.
12:49 20  I don't know if that answered your question
21  or not.
22      Q.   I think it did, fortunately.
23  And I guess why -- was it important for
24  investors to know that you, Mr. Mason and Mr.
25  Howard were involved with this project?

---

126

1      A.   I think so.
2      Q.   What information do you think
3  that would have provided to investors?
4      A.   That the basic investment was
5  substantial and that there was sufficient
6  expertise on running restaurants and
7  developing restaurants and marketing.
8      Q.   These individuals who had
9  operated these very restaurants, these Gold
12:50 10  Star restaurants, for awhile were part of
11  this team?
12      A.   Right.
13      Q.   Were there any other
14  individuals, aside from these three at Gold
15  Star, that would have been involved with
16  these entities?
17      A.   You know, Kim Olden.
18      Q.   Was she involved in the direct
19  restaurant operations at all?
12:50 20      A.   She was a controller, yeah, so
21  she -- you know, financial reporting.
22      Q.   And then on the next page
23  Jacquelyn Chan is listed; do you see that?
24      A.   Yeah.
25      Q.   Do you know why she was listed

---

127

1  on this document?
2      A.   I think, again, they had kind of
3  earmarked her for being the one -- when
4  restaurants were in place and the
5  capitalization was in place, would be the
6  manager of the restaurants. Which, again,
7  under a franchise agreement, we would have
8  had a lot of control over that role.
9      Q.   And are you aware of -- was
12:51 10  there a draw process in place for
11  disbursement of funds?
12      A.   There was a draw process, yeah,
13  identified in the documents as to how that --
14  the priorities and that.
15      Q.   Was that a process that Gold
16  Star followed for their own contribution?
17      A.   No, it was unique to this
18  transaction.
19      Q.   So it was -- would it have been
12:51 20  a process in place if limited partner funds
21  were ever used in the project?
22      A.   No.
23      Q.   Would it just be an overall
24  process for the project itself or --
25      A.   Well, I mean, I think this is

---

128

1  basically giving the limited partners
2  assurance that they had a priority, as far as
3  recovering their investment. So it was a
4  marketing technique for the limited partners.
5  We debated that one a lot.
6      Q.   Oh, the process itself?
7      MR. RUDELL:  You have to say
8  yes.
9      A.   Yes.
12:52 10      Q.   And why was that process so
11  debated?
12      A.   Well, I mean, it's -- typically
13  distributions are made -- you know, prorated
14  to your ownership percentage. This one was
15  more heavily weighted to benefit the limited
16  partners until they recovered their
17  investments and then there was a true-up
18  feature.
19      Q.   Was that designed to sort of
12:52 20  encourage individuals to invest?
21      A.   Yes.
22      Q.   I'll next move on to what will
23  be marked as Exhibit 13.
24      MR. JOYCE:  And, Michael, this
25  is GSC212.

---

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 129 to 132)

33

129

1    (Plaintiff's Exhibit 13 was marked for
2    identification.)
3        Q.  So, Mr. Rohrkemper, you've just
4    been handed what's been marked as Exhibit 13.
5    Have you ever seen this before?
6        A.  I do not recall seeing this
7    document ever.
8        Q.  And if I can direct you to page
9    GSC216.  It's a pie chart on the left side of
12:53 10  it.  Do you see that page?
11       A.  I do.
12       Q.  And now this mentions a
13   $10,000,000 capitalization from EB-5
14   investors and a 5,000,000 from Gold Star?
15       A.  I've never seen this.
16       Q.  To your understanding, was that
17   ever a part of this deal?
18       A.  No, never.
19       Q.  And do you have any knowledge as
12:54 20  to whether this would have been shown to any
21   investors?
22       A.  I have no knowledge of that.
23       MR. JOYCE:  All right.  I guess
24   on that note, we can go off the record for a
25   brief moment.

130

1        (Off the record.)
2        MR. JOYCE:  Back on the record.
3        Q.  So do you know when the
4    partnership agreement and other materials for
5    GSC Opportunities was executed?
6        A.  I don't.
7        Q.  Would May or the summer of 2013
8    be --
9        A.  Yes, I would say I would have
01:02 10  said mid '13.
11       Q.  And so, after all of these
12   agreements are finalized, is that when, to
13   your knowledge, the Chans started contacting
14   potential investors?
15       A.  Yes.
16       Q.  Did they -- and I think we
17   mentioned two investors before.  Do you know
18   when those two invested in the partnership?
19       A.  I don't.
01:02 20  Q.  So the middle of 2013,
21   thereabouts, these materials are finalized.
22   What happened next?
23       A.  Well, again, you know, based on
24   the business plan, there was a lot of work
25   that needed to be done to make the business

131

1    plan happen, right?  So there were a lot
2    of -- one of the requirements of the filing
3    was you had to identify locations that you
4    were going to open stores.  Again, we
5    identified a location and, you know, unless
6    we wrote the check to secure it those
7    locations don't stick around.  Somebody else
8    picks them up.
9        So that was pretty frustrating
01:03 10  on our part, you know, we were trying to
11   identify six good stores, and that's why we
12   finally just went ahead and acted on two of
13   them ourselves.  So our expectations were
14   significantly different than the results that
15   we were seeing from a timing standpoint on
16   approvals and investors and that kind of
17   thing.
18       Q.  So I guess to use an example,
19   you know, do you recall a specific location
01:04 20  that you had identified but that just wasn't
21   acted upon?
22       A.  Yeah, I mean, they're in the
23   business plan.
24       Q.  So a location in the business
25   plan, how would that -- acting on that work?

132

1    Would you notify Terry Chan and say, hey,
2    there's this location available, let's look
3    into this, or how would that process work?
4        A.  Well, they were well aware of
5    the locations that we had identified because
6    they were the ones that had basically put
7    together the narratives on them and the
8    demographics in the business plan so -- and,
9    again, another thing is, I've got to get
01:05 10  board approval for opening new stores.
11       Q.  So would they -- was the
12   expectation that Terry Chan and Gary Chan
13   would contact these various places to see if
14   they could lease it or own it?
15       A.  No, we would do that.  We would
16   say, here's the location.  You know, do what
17   you need to do to put it in the documents for
18   the investors and USCIS to see.  But, you
19   know, if USCIS approves the application
01:05 20  that's got those locations in it, then we've
21   got to modify it for new locations.
22       Q.  Let's say, one of the locations
23   identified in the business plan is leased out
24   or bought up by another entity, would that
25   require modification of USCIS materials, to

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 133 to 136)

34

### 133

1   your knowledge?
2       A.   Yes.
3       Q.   And so it is a circumstance
4   where time might be of the essence?
5       A.   Yes.
6       Q.   And so you identified these
7   materials and it sounds like was the next
8   step to prepare material to send to -- sorry,
9   strike that.  You identified locations and
01:06 10 was the next step to create materials to send
11  to USCIS and investors?
12      A.   Well, the next step, the
13  direction that we were given by the experts,
14  which were the Chans, was, don't worry about
15  it, when it's approved, then we can file an
16  amendment to redo the locations.
17      Q.   So their position was or what
18  they were telling you is that, you know, we
19  just need USCIS approval and then we can sort
01:06 20 of identify new stores or different stores?
21      A.   Filing an amendment or whatever,
22  yes.
23      Q.   Did they ever -- did they tell
24  you how long USCIS approval was supposed to
25  take?

### 134

1       A.   Well, initially, I don't
2   remember the actual timing, but it was just a
3   matter of months.
4       Q.   And then once those matter of
5   months expired, did you contact them and ask
6   what was going on?
7       A.   Yes.
8       Q.   Did you talk to Terry Chan about
9   that?
01:07 10     A.   Yes.
11      Q.   What was his response?
12      A.   You know, it's beyond our
13  control.  It's the government.  You know, we
14  never got any negative feedback on our
15  applications.  I mean, there weren't issues
16  with the applications that we could
17  determine.
18      Q.   So, to your knowledge, was
19  everything submitted appropriately?
01:07 20     A.   To the best of my knowledge.
21      Q.   That's not something that would
22  have been within your area of control?
23      A.   Right.
24      Q.   And so once that -- I think
25  we're late 2014, early -- or late 2013, early

### 135

1   2014, is that when concerns are starting to
2   develop of this USCIS process?
3       A.   Yes.
4       Q.   When it's dragging into the
5   middle of 2014, you know, what were your
6   thoughts on that situation?
7       A.   Kind of damage control a bit.
8       Q.   Did Terry Chan tell you anything
9   else about what was going on with these
01:08 10 locations or with USCIS approval?
11      A.   I can't think of any specifics.
12  I mean, we were pushing him pretty hard.  You
13  know, I've got to report back to the board.
14  They ask me, you know, what's going on.  So,
15  you know, there were no specific reasons,
16  like, you don't have enough locations or --
17  it was just, you know, government works as
18  government works.
19      Q.   Did Terry Chan ever talk to Gold
01:08 20 Star Chili's board at all about these
21  restaurants?
22      A.   You know, we may have introduced
23  him at a board meeting.  I can't remember
24  that for sure.  But he did not give any kind
25  of a presentation or -- that was basically my

### 136

1   responsibility.
2       Q.   When did -- and so as this --
3   these entities -- or as GSC Opportunities is
4   waiting for USCIS approval, were those Gold
5   Star Chili restaurants that had been
6   previously created, were those still
7   operating?
8       A.   Yes.
9       Q.   Do you have any knowledge as to
01:09 10 say how successful or unsuccessful those
11  locations were?
12      A.   I think they were marginal
13  stores.
14      Q.   Do you know how many jobs they
15  would have created?
16      A.   Oh, they would have created --
17  you know, we were looking for 10 per
18  investor, 10 per store.  They would have
19  easily created the proper number of jobs.
01:09 20     Q.   When did you or Gold Star Chili
21  as a whole start thinking about withdrawing
22  from the partnership?
23      A.   I would say it was probably in
24  2015, you know, when Roger and I started
25  talking more and, you know, I think he became

Michael Rohrkemper, 10/14/2019

(Pages 137 to 140)                                        35

---

137

1    disillusioned with it before he actually came
2    on board and, you know, I understood, so --
3         Q.   And is that Roger David?
4         A.   Yeah.
5         Q.   Just to make a quick step back.
6    Are you familiar at all with Buffalo --
7         A.   Wings & Rings?
8         Q.   -- Wings & Rings?
9         A.   I am.
01:10  10    Q.   Did Roger David, was he the CEO
11   of that entity before moving into Gold Star?
12        A.   There was a gap between the two,
13   but he was for a period of time, yeah.
14        Q.   To your knowledge, did this
15   Buffalo entity, did they also have an EB-5
16   relationship with the Chans?
17        A.   I think they did.
18        Q.   And was that something that was
19   along a similar time frame as Gold Star's
01:11  20   relationship or different?
21        A.   I think it was kind of a mirror
22   image of ours and it was -- I'm not sure of
23   the time frame, honestly. I know I got a
24   call from their CEO after Roger and talked to
25   him about it and, you know, he was concerned,

---

138

1    too.
2         Q.   Do you know when Roger left the
3    Buffalo entity and came onto Gold Star?
4         A.   Well, he started Gold Star on
5    May 1st of 2015. He was CEO. Named CEO
6    then. I think he left Buffalo Wings & Rings
7    a year and a half before that maybe.
8         Q.   Do you think that Buffalo --
9    that Buffalo entity and that Gold Star sort
01:12  10   of -- it seemed like they exchanged
11   information about the Chans. Did they?
12        A.   Well, yeah. Yeah. I mean,
13   again, you know, Roger knew both companies,
14   right? So he knew a lot about our deal and I
15   think he took something to them, which is
16   fine. So -- I know that their transaction, I
17   saw it. It was very similar to ours.
18        Q.   If somebody told a GSC limited
19   partner that, you know, in 2016 there was an
01:12  20   opportunity with a Buffalo Wings & Rings was
21   on the table, would that have surprised you
22   given the information exchanged?
23        A.   I'm sorry, ask me that again.
24        Q.   If someone had told one of the
25   GSC limited partners that an opportunity was

---

139

1    on the table to invest in a Buffalo Wings &
2    Rings entity, would that have surprised you
3    given the information exchange between those
4    two company?
5         A.   Huh-uh.
6         MR. RUDELL: No?
7         A.   No.
8         Q.   No, it would not have?
9         A.   No.
01:13  10    Q.   Why not?
11        A.   Well, it just -- I don't know
12   why not. It just wouldn't have surprised me.
13        Q.   Just two different entities and
14   the leadership had changed?
15        A.   Yeah. And they're in different
16   markets. I mean, I think they were looking
17   at a Pittsburgh market or something.
18        Q.   And to move back to Gold Star.
19   You said it was about, and I apologize if I
01:13  20   get the month wrong, but late spring, early
21   summer of '15 is when Gold Star started to
22   think about withdrawing?
23        A.   I would say it was maybe a
24   little bit earlier than that.
25        Q.   And so who -- were you the first

---

140

1    one who thought of, you know, maybe we should
2    get out of this entity or did someone bring
3    that up to you?
4         A.   Well, I was trying to make it
5    work, you know, and I think, you know, the
6    board in general was becoming a little less
7    supportive of it. And, you know, it was
8    becoming a bit of a distraction and I think
9    we were losing -- I know you'll ask me why,
01:14  10   but I think we were just kind of losing faith
11   in the Chans' ability to make their side
12   work.
13        Q.   Why were you losing faith in the
14   Chans' ability?
15        A.   I mean, we weren't getting good
16   answers as to why the investors weren't
17   there, why the approval process wasn't
18   working. I mean, we just were not getting
19   the answers, any answers. I had no reason to
01:14  20   believe there was any kind of fraud going on
21   or anything like that, but just performance.
22   It was performance issues.
23        MR. JOYCE: If we can just go
24   off on the record for a quick second.
25        (Off the record.)

---

Electronically signed by Julie Patrick (501-060-398-1480)                a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 141 to 144)

36

141

1    MR. JOYCE: Back on the record.
2    Please mark this as Exhibit 14.
3    (Plaintiff's Exhibit 14 was marked for
4    identification.)
5    Q.   Mr. Rohrkemper, you're being
6    handed an exhibit marked GSC270 to GSC272.
7    A.   Okay.
8    Q.   And this is, just so you're
9    aware, an e-mail that has what looks to be
01:17 10   some sort of letter or another document
11   attached, and those are the last two pages of
12   that material. It looks like -- the first
13   page, that's an e-mail, correct, to the best
14   of your knowledge?
15   A.   Yes.
16   Q.   And that's an e-mail from Roger
17   David to Gary Chan and Terry, correct?
18   A.   Yes.
19   Q.   And cc'd are individuals named
01:17 20   Tom Fisher and Mike Rohrkemper, correct?
21   A.   Correct.
22   Q.   Have you ever seen this e-mail
23   before?
24   A.   I think -- was this in your
25   discovery documents that -- I received some

142

1    documents attached to e-mails about the
2    deposition and that and I think I have seen
3    this, but I think when I saw it was recently.
4    Q.   Do you recall receiving this in
5    July of 2015?
6    A.   I don't recall.
7    Q.   In the e-mail body itself it's
8    essentially just an e-mail saying, Terry, per
9    our phone conversation as a safety measure.
01:18 10   Roger. Are you aware of any conversation
11   that Roger David might have had with Terry
12   Chan in July of 2015?
13   A.   Yes.
14   Q.   What was that conversation
15   about?
16   A.   Well, I -- termination.
17   Q.   And do you know when that
18   conversation took place?
19   A.   I don't.
01:18 20   Q.   And you mentioned termination.
21   Was that termination of the limited
22   partnership, of GSC Opportunities?
23   A.   Yes.
24   Q.   What was the -- what sort of
25   prompted it to get to the point of

143

1    termination of the partnership?
2    A.   Well, in July of 2013 Roger was
3    the CEO and I was consulting with him and you
4    know, with Mike -- well, Mike Mason wasn't
5    there at that time. You know, I think it was
6    just collectively decided that this deal
7    wouldn't go forward and that we had rights,
8    based on the operating agreement, to
9    terminate the transaction as general partner.
01:19 10   Q.   Do you recall, and without
11   getting into conversations you had with
12   counsel, do you understand what the basis for
13   those rights of termination would have been?
14   A.   I think timing. And my
15   understanding was that the general partner
16   probably had pretty much carte blanche right
17   to terminate the transaction at will.
18   Q.   But as to this question, is this
19   something that you would have sought the
01:20 20   advice of counsel for, the right to
21   terminate?
22   A.   Yes. Yeah.
23   Q.   And if we go to the next page,
24   it looks like the first page of a letter or
25   an attachment or some document, and it notes

144

1    it to be a certified mail and e-mail, and it
2    lists a number of individuals. And those
3    look to be five individuals. Have you ever
4    seen the name of Chen Baoyang, Liu Jihong or
5    the other names listed?
6    A.   I've seen the first name. I
7    don't recall the other names.
8    Q.   Do you know, were those
9    individuals who were investors in GSC?
01:21 10   A.   I wasn't aware at the time that
11   there were five investors.
12   Q.   To the best of your knowledge,
13   there was only -- or to your knowledge, your
14   recollection, is that there were only two
15   investors, maybe three?
16   A.   Well, again, that's -- during
17   the period that I was a CEO. I don't know if
18   something may have happened subsequent to
19   that.
01:21 20   Q.   So the last page of this
21   document mentions, the individuals listed
22   above have under the sole guidance and
23   direction of Mason Hill, submitted $500,000
24   to an escrow account and submitted EB-5
25   applications. Would you have any reason to

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

Michael Rohrkemper, 10/14/2019

(Pages 145 to 148)

37

145

1  disagree with that description of events?
2      A.  I'm surprised, but I -- yeah, I
3  would not have a reason to disagree.
4      Q.  And so this -- do you -- was the
5  lack of limited partner funds or lack of
6  access to those funds a hindrance to Gold
7  Star in getting these restaurants opened and
8  operated?
9      A.  Yes.
01:22 10     Q.  To your knowledge, had Gold Star
11  spent the 1.25 million or any of their
12  capital contribution or --
13     A.  No.
14     Q.  No, to your knowledge?
15     A.  (Negative head shake.)
16     Q.  But still it likely could not --
17  to your knowledge, could Gold Star Chili open
18  six restaurants off of 1.25 million dollars?
19     A.  No.
01:22 20     Q.  Do you recall any conversations
21  that happened after this letter was sent?
22     A.  I do not.
23     Q.  Were you involved in that
24  conversation between Roger David and Terry
25  Chan that's referenced in the e-mail?

146

1      A.  No.
2      Q.  To your recollection, what
3  happened after this notice was sent?
4      A.  I'm not certain.  I mean, I
5  wasn't there on a day-to-day basis.
6      Q.  Were you ever consulted about
7  GSC in that capacity in your one-year interim
8  term?
9      A.  We had conversations about pros
01:23 10  and cons of terminating.
11     Q.  After this -- that notice was
12  sent, do you recall any other conversations
13  about GSC?
14     A.  I do not.
15     Q.  And so you were with Gold Star
16  until about -- until the spring -- April -- I
17  believe April 1st, 2016, or was it May 1st?
18     A.  April 30th of 2015.
19     Q.  And then you had that one year
01:24 20  after that?
21     A.  Correct.
22     Q.  We mentioned the July notice.
23  Before you left or stopped that role in your
24  one-year capacity, do you remember anything
25  about this Gold Star entity, any

147

1  conversations, any e-mails, anything like
2  that?
3      A.  You're talking -- so in my
4  consultive period?
5      Q.  Correct.
6      A.  I think, again, we had some
7  discussions about termination, including Tom
8  Fisher, and I think the decision was -- and I
9  don't remember -- I think Roger brought the
01:25 10  board into it, that that was that direction
11  that we recommended.  And I really had very
12  little interaction after that.
13     Q.  Do you know when -- do you know
14  if Gold Star, GSC Opportunities, was ever
15  terminated?  And I can rephrase that
16  question.
17     A.  I don't know.
18     Q.  Would it have surprised you that
19  the entity wasn't terminated in August of
01:25 20  2016?  And, just for the record, that was a
21  shoulder shrug, correct?
22     A.  Yeah.  I wouldn't be surprised
23  either way, I'll put it that way.  I mean, I
24  think the mindset was, we were operating
25  these restaurants and they were going to be

148

1  operated whether it was an EB-5 or not.
2      Q.  Do you know how Gold Star was
3  going to take control of those two
4  restaurants again upon termination of the
5  partnership?
6      A.  Just collapse the entity and
7  distribute the restaurants back to Gold Star,
8  Inc.
9      Q.  And collapsed the entity that's
01:26 10  the GSC Opportunities, the partnership
11  collapsing?
12     A.  Yeah, and, you know, assuming
13  that the two LLCs that held the restaurants
14  were in place.
15        MR. JOYCE:  I think I'm going to
16  take a few moments to sort of collect some
17  thoughts and then I might be wrapped up.
18  And, I guess, we can go off the record.
19        (Off the record.)
01:31 20        MR. JOYCE:  So I would like to
21  note that I'm done with my questioning for
22  the day.  We are going to leave open this
23  deposition for the limited purposes of
24  potentially asking questions again related to
25  the materials that were recently produced by

Michael Rohrkemper, 10/14/2019

(Pages 149 to 151)                                    38

149

1    Terry and Jacquelyn Chan, but in light of
2    that, I have no further questions.  And I
3    turn it over to you, Mr. Nardella.
4           MR. NARDELLA:  Thank you.
5           CROSS-EXAMINATION
6    BY MR. NARDELLA:
7       Q.  Again, Mr. Rohrkemper, my name
8    is Michael Nardella.  I represent the Chans.
9    I just have one follow-up question from your
01:33 10    testimony.  It's with respect to the Private
11    Placement Memorandum, which was Bates number
12    LIND32.  I don't know the exhibit number.
13           MR. RUDELL:  We have it.  It's
14    number 11.
15           MR. JOYCE:  He has it in front
16    of him.
17           MR. NARDELLA:  Great.  Thank
18    you.
19       Q.  I believe you testified earlier
01:33 20    that Terry Chan was involved in the editing
21    of that document.  Can you explain how you
22    know that it was Terry and not Gary?
23       A.  Well, Terry was definitely the
24    lead in our relationship and I don't know
25    that there was much of anything that was done

150

1    that Terry wasn't at least in the loop on.
2    Like I said, Gary Chan, in my opinion, was
3    kind of the technical guy and so Gary
4    certainly could have been involved in most of
5    the editing on this, but our primary
6    communication link was typically with Terry
7    Chan.
8       Q.  So you're talking about from a
9    general perspective, not with respect to this
01:34 10    particular document?
11       A.  Correct.
12       Q.  Great.
13           MR. NARDELLA:  No further
14    questions.
15           MR. JOYCE:  Off the record.
16
17
           _____
18           MICHAEL ROHRKEMPER
19
20
21
           * * *
22
           (DEPOSITION CONCLUDED AT 1:35 P.M.)
23
           * * *
24
25

151

1           C E R T I F I C A T E
2
     STATE OF OHIO
3                : SS
     COUNTY OF HAMILTON
4
           I, Julie Patrick, the
5    undersigned, a duly qualified notary public
     within and for the State of Ohio, do hereby
6    certify that MICHAEL ROHRKEMPER was by me
     first duly sworn to depose the truth and
7    nothing but the truth; foregoing is the
     deposition given at said time and place by
8    said witness; deposition was taken pursuant
     to stipulations hereinbefore set forth;
9    deposition was taken by me in stenotype and
     transcribed by me by means of computer; that
10    availability of the deposition to the witness
     for examination and signature is expressly
11    waived. I am neither a relative of any of the
     parties or any of their counsel; I am not,
12    nor is the court reporting firm with which I
     am affiliated, under a contract as defined in
13    Civil Rule 28(D) and have no financial
     interest in the result of this action.
14       IN WITNESS WHEREOF, I have hereunto set my
     hand and official seal of office at
15    Cincinnati, Ohio this 31st day of October,
     2019.
16
17
18
19    My commission expires:     Julie Patrick
     March 13, 2024     Notary Public - State of Ohio
20
21
22
23
24
25

Electronically signed by Julie Patrick (501-060-398-1480)                    a0c368d7-63ab-4f3e-a428-69af055ac151

## Thomas Martin

**From:** Thomas Martin
**Sent:** Thursday, March 21, 2013 3:13 PM
**To:** 'Tom Fisher'
**Subject:** FW: Answers to GSC questions

Tom, I hope this addresses some of the issues we discussed earlier today. Let me know if you or Mike need anything further on these subjects. Thanks.

-----Original Message-----
**From:** Gary Chan [mailto:gary.chan@midwesteb5.com]
**Sent:** Thursday, March 21, 2013 3:06 PM
**To:** Thomas Martin
**Cc:** Terry Chan
**Subject:** Answers to GSC questions

Tom, these are responses to questions posed by Tom Fisher today:

1. USCIS' website says the average time for an I-526 approval is about 1 year, is there a way to shorten that timeframe?
　　-The average approval timeframe of 1 year relates to Regional Center projects, which use economic studies and models to calculate indirect and induced jobs on top of direct employment. Direct EB-5 projects like the GSC offering will not utilize indirect or induced jobs and therefore don't require an economic study. This greatly reduces the time for approvals. Our immigration attorneys have seen approvals in as little as 12 days up to 3-4 months for direct projects. Simple projects like restaurants are averaging probably 2 months, but USCIS won't publish this on their website because the vast majority of projects out there need to utilize a Regional Center in order to make the job numbers work.

2. Is it more difficult to get locations approved for direct deals?
　　-Locations (Targeted Employment Areas) are designated by an authority at the state level. We have been in discussions with Ohio, Kentucky and Indiana regarding TEA designations and have prepared data for over 20 locations. We are ready to move forward and the process has been very quick historically, but we've gotten pushback from the state because we haven't been able to tell them for certain the final locations, and they don't want to just designate multiple TEAs if it is not necessary. Once we finalize locations, the states are happy to work with us to get the designation.

3. How long will it take for locations to get approved?
　　-From our experience, once we have a finalized location and the data (which we have already prepared), we have gotten responses within a couple of weeks. USCIS defers to the state authority on TEA designations, but TEA designations are not synonymous with I-526 approvals.

Thanks,
Gary

--
**Gary K. Chan | Midwest EB-5 Regional Center**
1021 Delta Avenue | Cincinnati, Ohio 45208
**Office:** 513.258.2216 | **Fax:** 513.258.0871
**Email:** gary.chan@midwesteb5.com
**Web:** http://www.midwesteb5.com

Δ π EXHIBIT ___1___
Deponent _Rohrkemper_
Date _10/14_ Rptr _SP_
WWW.DEPOBOOK.COM

/21/2013

Page 1 of 2

## Thomas Martin

| | |
|---|---|
| **From:** | Tom Fisher [wtf@bpbslaw.com] |
| **Sent:** | Monday, April 08, 2013 4:54 PM |
| **To:** | Thomas Martin |
| **Cc:** | 'terry.chan@midwesteb5.com'; 'gary.chan@midwesteb5.com'; Michael E. Rohrkemper (miker@goldstarstarchili.com) |

**Subject:** RE: MOU

Tom – thanks for the draft. Will review more closely and with Mike tomorrow. A couple of quick questions – you struck out the 10 jobs per investor in paragraph 5 and changed it to 12 but left it in paragraph 10. Is that intentional or just did not revise? There is no response to my questions/ issues related to the EB-5 investor buy out/transfer to Mason Hill. Are we going to address that? When will you provide documentation regarding the expenses on exhibit D that have been occurred to date? I will get responses to you tomorrow after I speak with Mike.

Tom

**From:** Thomas Martin [mailto:TMartin@lindhorstlaw.com]
**Sent:** Monday, April 08, 2013 4:36 PM
**To:** Tom Fisher
**Cc:** 'terry.chan@midwesteb5.com'; 'gary.chan@midwesteb5.com'
**Subject:** MOU

Tom:

Attached are revised marked and clean copies of the Memorandum of Understanding. It is my understanding that these changes are based upon conversations between my clients and Mike Rohrkemper. Also attached is the Certificate from the Ohio Secretary of State for GSC Opp Management, LLC. Although I filed the Articles of Organization for this LLC, no further action has been taken and we have not obtained a tax identification number or opened an account or done anything in the name of the LLC. Please let me know if you want me to sign anything to transfer or assign this entity or to change the statutory agent.

Finally, attached is a draft of the Limited Partnership Certificate that I prepared but have not filed.

Please let me know if you have any additional comments or changes to the Memorandum of Understanding. By copy of this e-mail, I will remind our clients to provide you with documentation for the expenses that you have requested. Thank you.

Thomas E. Martin, Esq.
LINDHORST & DREIDAME
312 Walnut Street, Suite 3100
Cincinnati, OH 45202-4048
(513) 421-6630
(513) 421-0212 (fax)
tmartin@lindhorstlaw.com



Δ π EXHIBIT 2
Deponent Rohrkemper
Date 10/14 Rptr 902
WWW.DEPOBOOK.COM

4/8/2013

## Mason Hill

### GSC Opportunities Executive Summary of Costs

Mason Hill is a joint-venture between Midwest EB-5 Regional Center and Mason Investments. Mason Hill has taken a previous deal, including cost and personnel required, to compare side-by-side with the current GSC offering. There are some key differences between the two projects, but one common thread is the size of the project. Here is a comparison of each element of the project:

**EB-5 business plan:** Typically, full EB-5 business plans from a professional EB-5 business plan writer will cost anywhere between $16-24K. This includes everything from the ground up: coming to the project site for site visits, creating all materials, revisions and final product. In the case of the Gold Star deal, we brought experienced writers on board in our office and had them sit with us as the deal was being structured, visit sites and create the business plan. The multiple sites required more work as opposed to a large, single-site development like we've done in the past. The business plan has now gone through over 5 significant draft revisions and over 10 total draft updates.

**TEA:** This was the biggest difference between the current deal and our past deals. Since this project includes multiple sites, locations have been in flux and have had multiple iterations, the cost for TEA designation was significantly higher due to volume of sites evaluated (24) and the complexity of multiple TEAs as opposed to one large TEA. This also came during a time when market rates for these kinds of studies increased due to high demand and changing USCIS policies. Currently, we have TEA studies complete for all Ohio locations and Kentucky locations are pending a trip down to Frankfort for final review. A quote from our economist and TEA maps are included in **appendix 1**.

**Drafting Offering Documents and Review:** In previous deals, we've used Thompson Hine as our securities and business counsel. This deal was no exception for drafting the documents, although we had to make a switch once the initial drafts had been completed. Tom Martin was brought on board part-way through and was mostly responsible for review, revisions and updates. Changing deal terms and new case law becoming available for EB-5 necessitated more work from Tom. The current status is that the PPM, Limited Partnership Agreement, Subscription Agreement and Escrow Agreement have gone through multiple drafts with both immigration and securities counsel and are ready to go pending the final MOU. The operating agreement of GSC Opp Management is the remaining item needing to be drafted. A summary of costs from previous deals have been outlined in invoices from Thompson Hine show in **appendix 2**. The total shown is about $60K, which is not representative of all invoiced time for the project. The total invoices in 2012 equaled roughly $100k. Even discounting half of the invoiced time for the items redacted, which is very significant, the total for business and securities counsel in drafting these documents falls between $30k and $60k.

Δ π EXHIBIT 3

Deponent

Date 10/14

WWW.DEPOBOOK.COM

## Mason Hill

**Immigration Counsel:** Immigration counsel in previous deals have been a high cost, but necessary to make sure the project and investors are in compliance with USCIS. The current project provides a different challenge because of multiple locations and equity participation from investors as opposed to simpler debt deals that MERC has done before. Each major iteration of deal terms has necessitated a review from immigration counsel. Final drafts will need immigration counsel review for compliance, but this cost has been reduced significantly from prior deals. Examples of invoices for project work is shown in **appendix 3.**

**Translation and China Costs:** There is a lot of work done on the China side, including guidance around investor and market needs, agent recruitment, training, marketing, promotion, printed materials and translation. This list is by no means exhaustive, and China is notoriously bad with invoicing and receipts. Examples provided in **appendix 4** show transfers we made to a Hong Kong account during a previous project for China expenses. To date, there has been some money expended, but there will be more once the project has a proper launch.

|  | Previous Deal | GSC Deal |
|---|---|---|
| **EB-5 Business Plan** | $20,000 | $10,175 so far |
| **TEA** | $2,500 (1 location) | $66,500 for research $31,500 for mapping, submission (24 locations) |
| **Drafting Offering Documents** | $30-50K | $50K |
| **Review and update Offering Documents** | $20-30k | $16K |
| **Immigration Counsel** | $60K | $40K ($20K+ so far) |
| **Translation** | $10K | $6,800 so far |
| **China Costs (Go to Market, training, marketing, promotion, print materials, etc.)** | $200K | $32K so far |

*Note: The chart above is not a comprehensive list of costs. It is only used as an example to illustrate the current project as compared to a previous project.

## Mason Hill

**Tasks and Contributors:**

**EB-5 Business Plan:**
Benita Rubio
Nathan Hammond
Suzanne Lazicki
Gary Chan
Terry Chan
Lili Wang
Christina Cahalane
Quinn McDowell

**TEA:**
Nathan Hammond
Dr. Paul Sommers, Ph.D
Dr. Mike Evans Ph.D
Gary Chan
Terry Chan
Estelle McKee

**Legal Agreements:**
Thompson Hine
Tom Martin
Estelle McKee
Fredrick Voigtmann
Gary Chan
Terry Chan
Mason Investments Securities Counsel
Allen Chi
Lili Wang

**Translation and China Activities:**
Allen Chi
Lili Wang
Nathan Hammond
Gary Chan

LIND000227

## Mason Hill

**Terry Chan**
**President of Midwest EB-5 Regional Center**
Deal structuring and negotiations

**Gary Chan**
**Managing Director of Midwest EB-5 Regional Center**
Back-end deal structuring

**Nathan Hammond**
**Analyst for Midwest EB-5 Regional Center**
Conduct due diligence analysis, coordinate business plan and offering document
creation, calculate Target Employment Areas, conduct location and market analysis

**Benita Rubio**
**Contract Writer for Midwest EB-5 Regional Center**
Business plan copy writing and research

**Suzanne Lazicki**
**Contract Writer**
Business plan review and revisions

**Christina Cahalane**
**Contract Graphic Designer for Midwest EB-5 Regional Center**
Creation of graphic and marketing content, image optimization for business plan
and other documents.

**Quinn McDowell**
**Contract Copy Writer and Editor for Midwest EB-5 Regional Center**
Generate and edit miscellaneous document content

**Mike Rohrkemper**
**CEO of Gold Star Chili**
Business strategy, determine locations, Gold Star Chili branding and franchising, and
restaurant operations .

**Mike Mason**
**President of Operations and Organizational Development of Gold Star Chili**
Business strategy, determine locations, Gold Star Chili branding and franchising, and
restaurant operations .

**Allen Chi**
**President of Mason Investments, licensed broker dealer**
EB-5 investment management, overseas marketing, deal structuring, investor
relations

LIND000228

## Mason Hill

**Lili Wang**
**Partner of Mason Investments**
EB-5 investment management, overseas marketing, deal structuring, investor relations

**Martin Lawler**
**Immigration Attorney at Lawler and Lawler**
Immigration counsel specializing in EB-5 for MERC. Legal consultant for all EB-5 related matters

**Estelle McKee**
**Immigration Attorney at Lawler and Lawler**
Immigration counsel specializing in EB-5 for MERC. Legal consultant for all EB-5 related matters

**Fredrick Voigtmann**
**Immigration Attorney**
Immigration attorney for Mason Investments specializing in EB-5 related matters

**Thompson Hine**
**General and Securities Counsel**
Initial drafting of offering documents including PPM, LPA, Operating agreements etc.

**Tom Martin**
**Securities Attorney**
Legal review and updating of offering documents

**Paul Sommers**
**Economist**
Prepare TEA studies (as needed)

**Mike Evans**
**Economist**
Prepare TEA studies (as needed)

A full list of contributors to-date to the GSC project can be found in appendix 5, along with brief descriptions and backgrounds on each.

LIND000229

Execution Copy

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding is effective as of the _____ day of _____, 2013 between **GOLD STAR CHILI, INC.,** an Ohio corporation ("Gold Star") and **Mason Hill, LLC,** an Ohio limited liability company ("Mason Hill").

### RECITALS:

A.  Mason Hill and Gold Star have developed a Business Plan for the opening and development of up to 12 new Gold Star franchise restaurants (the "Project") within the Dayton-Cincinnati-Lexington region of Southwest Ohio and Kentucky region that are not included in any current territory of any current Gold Star franchisee. The Project will be owned by GSC Opportunities L.P., an Ohio limited partnership ("Project Owner") to be formed by Gold Star and Mason Hill. The Project Owner will be capitalized with an anticipated amount of $9,000,000 ("Project Capitalization") to be provided to the Project by Gold Star, or a wholly owned subsidiary, in the total amount of $3,000,000 ("Gold Star Capitalization"), and by Mason Hill, through 12 EB-5 immigrant limited partner investors ("EB-5 Investors") in the amount of $6,000,000 ("Mason Hill Capitalization"). It is the parties intentions that the Project Capitalization will be submitted on a 2:1 ratio between Mason Hill (through the EB-5 Investors) and Gold Star, the specific timing and form of the Gold Star Capitalization and the Mason Hill Capitalization, subject to the 2:1 ratio, are set forth in Exhibit A to this Agreement and incorporated herein.. It is the intention of the parties that the ownership the Project Owner will be split between the EB-5 Investors and Gold Star on a 2:1 ratio represented by the EB-5 Investors owning 66.7% of the Project Owner and Gold Star owning the remaining 33.3% of the Project Owner.

B.  Gold Star, or its wholly owned subsidiary, and Mason Hill will form a limited liability company to be the General Partner of the Project Owner. Gold Star will be the Managing Member of the General Partner and own 97% of the membership interests issued pursuant to a capital contribution of the Gold Star Capitalization. Mason Hill will own 3% of the membership

1

Δ π EXHIBIT __4__

Deponent_____
Date 10/1/4 Rptr_____
WWW.DEPOBOOK.COM

GSC000349

Execution Copy

interests issued pursuant to a capital contribution by Mason Hill to GSC Opp Management, LLC equal to $90,000 of the initial Project Costs on Exhibit D.

C. The Project Owner will enter into an agreement with Mason Hill for Mason Hill to provide certain services related to the qualification of the EB-5 Investors and qualifying the Project for the EB-5 Investment Program, including but not limited to compliance with all rules and regulations set forth in applicable Federal law and all rules and regulations promulgated by the United States Customs and Immigration Services ("USCIS Requirements") which will provide for the Project Owner to pay Mason Hill for its services thereunder ("EB-5 Management Agreement").

D. The Project Owner will create a separate, wholly owned disregarded subsidiary limited liability company to own each of the 12 franchised restaurants in the Project (each an "Owner Subsidiary") and will cause each such Owner Subsidiary to execute Gold Star's current franchise agreement with 5% royalty and 4% marketing fees, and comply with all franchise requirements and for the Project Owner to guaranty such franchise agreement.

E. The parties wish to enter into this Non-Binding Memorandum of Understanding to outline the proposed terms and conditions for each party to form the Project Owner and execute documents necessary to commence the Project, perform due diligence related thereto and to further define the terms and conditions, duties and responsibilities of each in connection with the Project.

Subject to the foregoing recitals, and in consideration of each party's mutual good faith, agreement to share certain information regarding the Project and other good and sufficient consideration, the parties agree as follows:

1. The Recitals are incorporated into this Agreement as if fully set forth herein.

2. The parties shall work cooperatively to finalize the Business Plan attached hereto as Exhibit B to conform to Gold Star operation standards and as necessary for

2

GSC000350

Execution Copy

Mason Hill to have the Business Plan comply with all USCIS Requirements, including but not limited to the EB-5 Investors' I-526 petitions. The Business Plan shall be mutually agreeable to both parties and will be completed within the Project Schedule attached as Exhibit C and incorporated herein. To the best of their knowledge, Mason Hill, Gary Chan and Terry Chan (the "Indemnifiers"), individually and collectively represent and warrant to Gold Star that they have extensive experience in EB-5 Program investments and that the Project as structured will qualify under all applicable USCIS Requirements for a direct investment EB-5 Program; and, they are not aware of any regulations or provisions which would be a potential basis for the USCIS to not approve the I-526 Petitions of the EB-5 Investors because of the structure, type of jobs being created or financial structure of the Project. The Indemnifiers acknowledge that Gold Star is relying upon their knowledge and expertise in structuring the Project and that this representation from all of the Indemnifiers is a material inducement for Gold Star to enter into this Agreement. Each of the Indemnifiers agrees that it is receiving a specific and personal benefit as a result of this Agreement and that such funds are sufficient consideration for the Indemnifiers joining this section of the Agreement. Indemnifiers Initials: _____ and _____.

3.      As managing member of the General Partner, Gold Star will receive $15,000 per franchise restaurant location per year (with an annual increase tied to the Consumer Price Index) to pay for various administrative, accounting and compliance costs related to the operation of the Project (the "Management Fee").

4.      Mason Hill shall receive the Project Consultant and Management Fees paid from the partners' capital contribution for each restaurant location up to a maximum of 12 restaurants, as set forth in the Business Plan (Exhibit B) payable , within five business days of the date upon which both an EB-5 Investor and the Project Owner receive notification of the I-526 approval (ii) and receipt by the Project Owner of the approved EB-5 Investors funds from escrow. The Indemnifiers represent and warrant to Gold Star that the majority of the Project Consultant and Management Fees are utilized to pay third party fees necessary to secure the EB-5 Investors' capital contribution and that the EB-5 Investors are not being requested to pay additional fees which may or

3

GSC000351

Execution Copy

could be used to pay the Project Consultant and Management Fees or any cost or component making up such fees.

- In addition, Mason Hill will be compensated by the Project Owner for its services under the EB-5 Management Agreement equal to 3% of gross sales of the Project ("EB-5 Management Fee"). The EB-5 Management Fee shall be payable annually after the Company's gross sales for the year have been determined. As security for Mason Hill performing the duties listed below, the EB-5 Management Fee shall be subject retainage equal to 33.3% of the annual EB-5 Management Fee which shall be held by the Project Owner until the delivery of I-829 approvals for each EB-5 Investor. The duties and responsibilities of Mason Hill to be performed pursuant to the EB-5 Management Agreement shall include the following:

- Take all actions commercially reasonable to promote the Project with potential EB-5 investors as necessary to raise the Mason Hill Capitalization from qualified EB-5 Investors in accordance with all USCIS Regulations.

- Require the Project Owner, investment documentation (including the Business Plan) and the Mason Hill Capitalization contributions comply with all applicable state and Federal securities laws.

- Provide all required assistance and actions necessary to comply with the USCIS Regulations necessary to ensure the Project delivers the necessary immigration documents to the EB-5 Investors and to qualify the Project under any applicable Regional Center under the USCIS Regulations, including but not limited to assistance in preparing all certifications of the Project Owner regarding creation of qualifying jobs.

- Prepare for Gold Star's review and approval the following documents: (i) Business Plan, Private Placement Memorandum, Limited Partnership Agreement for the Project Owner, Subscription Agreement, form subsidiary operating agreement, feasibility studies, and other documents necessary to take the Project to potential EB-5 Investors (collectively the "Offering Documents") which shall be delivered to Gold Star within 30

4

571221v1

Execution Copy

days of the date of this Agreement for final approval within 15 days of such delivery ("Delivery of Completed Offering Documents").

- Mason Hill will represent and warrant that it has the knowledge and capacity to comply with all USCIS Regulations and that, to the best of its knowledge and belief, the Project will qualify as a direct investment EB-5 project.

5.      Gold Star's duties and responsibilities in connection with the project shall include the following:

- Contribute the Gold Star Capitalization.
- Manage and operate the Project Owner and provide staff training for each of the franchise locations in the Project in accordance with the Franchise Agreement.
- Cause the Project Owner to create and employ a minimum of 10 with a target of 12 direct full-time jobs, for each EB-5 Investor, or a total of 144 jobs for 12 Investors, as recommended and structured by Mason Hill under the definitions of the USCIS Regulations, \ and to execute all certifications or other documents necessary to qualify under the EB-5 program and USCIS Regulations..
- Facilitate and cooperate in the transition of management for the Project after Mason Hill exercises its option set forth in Paragraph 9 below; provided training of a member of Mason Hill commences upon the submission of an I-526. .
- Provide information regarding the Gold Star system and franchise or other information consistent with Gold Star's Franchise Offering Circular as support to Mason Hill's investment offering to EB-5 investors.
- Cooperate with Mason Hill for all EB-5 reporting requirements.
- Contribute $30,000 of the Gold Star Capitalization in cash upon the execution of this Agreement for use as initial working capital and to cover startup costs, with the remainder of the Gold Star Capitalization being contributed as $20,000 upon the delivery of the Offering Documents, $50,000 when 12 EB-5 Investors have subscribed to become

-5-

GSC000353

Execution Copy

limited partners, and $50,000 upon Project Commencement (defined below). The remainder shall be contributed ratably with the Mason Hill Capitalization. The $150,000 paid by Gold Star outlined in the previous paragraph ("Initial Gold Star Capitalization") will be paid to GSC Opp Management, LLC as a capital contribution which will contribute it to the Project Owner who will issue payment to Mason Hill for payment of the Project Costs, as defined below, as noted in Exhibit D. Other than the Initial Gold Star Capitalization, Mason Hill and Gold Star will bear their own respective costs in promoting or developing the Project until all of the Mason Hill Capitalization and Gold Star Capitalization is contributed and the I-526 is accepted by the USCIS to permit the start of the Project ("Project Commencement"). Except as set forth in this Paragraph and Exhibit D, any costs incurred by either side that are reimbursable to either Gold Star or Mason Hill as costs of the Project ("Project Costs") shall be reimbursed at the Project Commencement. The initial Project Costs budget is attached as Exhibit D and incorporated herein.

6.     The Project Owner's annual Income shall be used as follows: (i) to pay all necessary and ordinary business expenses, (ii) to pay Gold Star's Management Fee; (iii) to pay Mason Hill's EB-5 Management Fee; (iv) to establish any reasonable reserves for the Project's operation at the sole discretion of the General Partner; (v) distributed to the Partners as income tax payments to cover each partner of the Project Owner's share of its Federal tax payments due as a result of being a partner of the Project Owner; (vi) the sum of $180,000 distributed as 66.7% to the EB-5 Investors and 33.3% to Gold Star ("Preferred Distributions"); and (vii) to the partners of the Project Owner as 80% to the EB-5 Investors and 20% to Gold Star; provided that Mason Hill and Gold Star contemplate and intend that any cash distributable to the EB-5 Investors shall be held and accumulated in a separate fund or account to be utilized for the purchase of the EB-5 Investors' limited partnership interest after the approval of the last EB-5 Investor's I-829 Petition. The parties agree that under no circumstances shall the General Partner make cash payments from this account to the EB-5 Investors before the date that is the later of the EB-5 Investor's final resolution of his/her I-829 Petition or

6

GSC000354

Execution Copy

three (3) years from the date the EB-5 Investor was admitted to the Project Owner. Such funds shall be available for use by the Project Owner for the construction and development of additional franchise store locations.

7. The Project Owner will cause each subsidiary to enter into a Franchise Agreement with Gold Star which requires royalties of 5% of the franchised location's annual gross sales.

8. Subject to the terms set forth in Paragraph 6 above, profits and losses and cash distributions will be allocated 80% to the EB-5 Investors and 20% to GSC Management until the EB-5 Investors receive an amount equal to their Preferred Distribution and the Mason Hill Capitalization ("EB-5 Investor Distributions"). Once the I-829 Petitions of the EB-5 Investors are approved, at the option of the General Partner, each EB-5 Investor's limited partnership interest may be purchased by the Project Owner for fair market value plus any unpaid Preferred Distribution. The "fair market value" will be reflected in a fair value agreement in which the Project Owner will represent to the EB-5 Investors that the fair market value is $500,000 plus any accrued and unpaid Preferred Distribution. At such time, the Project Owner shall be owned 33 1/3% by Gold Star and 66 2/3% by Mason Hill, subject to adjustment as provided in Section 11 hereof, provided Mason Hill doesn't assume the capital account of the EB-5 Investor.

9. Provided Mason Hill has performed all of its obligations under the EB-5 Management Agreement it will have the option to purchase Gold Star's partnership interest in the Project Owner at any time after all applicable requirements of USCIS Regulations has expired and the EB-5 Investors are no longer partners of the Project Owner. The purchase price shall be equal to the fair market value as defined by an objective third-party approved by both Mason Hill and Gold Star and Mason Hill shall have to assume all obligations of the Project Owner under the Franchise Agreements and any leases for the restaurant locations.

10. It is anticipated that 4 of the franchise restaurant locations in the Project will be on real property leased from third parties and 8 of the franchise restaurant locations will be on real estate to be acquired as part of the Project, however, the Project Owner will spend at least $6,000,000 million of the Project Owner's capital to

7

GSC000355

Execution Copy

acquire real estate and all real estate related expenses (including, but not limited to, architectural fees, soft costs, ie., licensing, permitting, design, construction management fees, real estate related legal fees and broker fees) construct leasehold improvements and renovations and purchase equipment (on both owned and leased property) and Gold Star shall be permitted to reduce the number of franchise restaurant locations to be on real estate acquired by the Project Owner if costs exceed this threshold. The Project Owner and its subsidiary owning a franchise restaurant location shall enter into a lease agreement for each of the locations. All leases for franchise restaurants shall conform to the term and other requirements of Gold Star's then current Franchise Agreement and all rent (basic and triple net payments) paid under such leases cannot exceed 7% of the projected gross sales of such restaurant. Not later than two (2) years after a franchise location commences operation, the Lease Agreement for such location shall become a "Fixed Rent" lease payment and not a "Percentage Rent" lease payment (the "Stablization Period"). Each location will create a minimum of ten (10) jobs, but target creating 12 jobs, per EB-5 Investor for purposes of USCIS EB-5 regulations. If any of the locations are closed, the Project Owner will open additional location(s) to satisfy the minimum job creation requirement. Each location, whether rented or purchased shall be approved by both Gold Star and Mason Hill and owned by separate limited liability companies wholly owned by the Project Owner.

     11.    If the Project Owner's aggregate of distributions of income to the EB-5 Investors at the later of three (3) years after the final EB-5 Investor I-526 Petition approval or the final EB-5 Investor's I-829 approval is less than the EB-5 Distributions amount set forth above then the EB-5 Investors, at the election of Mason Hill, may, at its option on a best-efforts basis, enter into sale and lease back transactions (provided all leases for the restaurants remain in effect and are assumed by the purchaser) and use the net proceeds from such transaction, after costs, as set forth below. If the Project Owner's aggregate of distributions of income to the EB-5 Investors at the end of the fifth anniversary of when the final EB-5 Investors I-526 Petition is approved by USCIS is less than the EB-5 Distributions amount set forth above, then, with the consent of the majority of the EB-5 Investors, the Project Owners shall liquidate the Project's real property assets at market values to third parties (provided all leases for the restaurants

8

GSC000356

Execution Copy

remain in effect and are assumed by the purchaser), and use the net proceeds from such transaction, after costs, as set forth below. Subject to the right of the General Partner to have the Project Owner purchase the EB-5 Investors' limited partnership interests, all net proceeds from a transaction described in this paragraph shall be distributed to the partners of the Project Owner as 80% to the EB-5 Investors and 20% to Gold Star. Immediately following the return of the EB-5 Investors EB-5 Distributions, the Project Owner shall be deemed to have redeemed a certain amount of the EB-5 Investors' limited partnership interests based on the following formula: Total EB-5 Distributions in excess of 66.7% of all distributions to the partners of the Project divided by $90,000 will equal the total percentage of interests redeemed.

12. The Project Owner shall be responsible for all agreed upon Project Costs related to the Project.

13. Each party to this agreement shall remain independent of the other party and nothing contained herein shall be construed to create a partnership, joint venture, employment or agency relationship.

14. This Memorandum of Understanding shall be effective the date hereof and shall terminate by written agreement of the parties or written notice from Mason Hill that the offering of Limited Partnership interests to EB-5 investors has been completed and/or terminated. Except for each party's good faith, this Memorandum of Understanding is not intended to be binding on either party and nothing set forth herein shall be deemed to survive the termination of this Agreement and the purpose of this Agreement is to permit the parties to move forward with negotiation and finalization of documents necessary to effect the Project, including but not limited to the Project Owner's Operating Agreement, EB-5 Management Agreement, Business Plan and similar documents.

15. This Agreement shall be governed and construed in accordance with the laws of the State of Ohio.

16. This Agreement constitutes the entire agreement between the parties with respect to the implementation of the Project and supersedes and replaces all prior and contemporaneous oral and written agreements, understandings, negotiations and

9

GSC000357

Execution Copy

discussions with respect to the subject matter hereof. This agreement may be amended only by additional agreement in writing signed by each party.


GOLD STAR CHILI, INC.

By: _Michael E Whitempe_
Title: _C EO_
Date: April _16_, 2013


MASON HILL, LLC

By: _____
Title: _____
Date: April ___, 2013


As Indemnifiers Only:


_____
Terry Chan
Date: April ___, 2013


_____
Gary Chan
Date: April ___, 2013


10

571221v1

GSC000358

Execution Copy

## EXHIBIT A

### Capital Contributions

GSC Capitalization shall consist of up to $3,000,000 payable as $2,500,000 in cash and $500,000 in waived initial franchise fees for each franchised location, waiver of monthly franchise fee for 90 days for each franchise and other agreed upon items. $150,000 of the $2,500,000 shall be paid in as set forth in the Memorandum of Understanding and the remaining portions to be contributed ratably at 2:1 with the Mason Hill Capitalization after crediting the $150,000.

Mason Hill Capitalization shall consist of up to $6,000,000 payable as set forth in the Project Schedule.

## EXHIBIT B

### Business Plan

See attached

## EXHIBIT C

### Project Schedule

See attached

11

GSC000359

--Execution Copy

# EXHIBIT D

## Project Costs

### Capital Budget

| Item | Total Cost | Incurred to Date | Cost Remaining |
|---|---|---|---|
| EB-5 project preparation work | $124,000.00 | $112,000.00 | $12,000.00 |
| TEA Analysis and Submission | $34,000.00 | $27,000.00 | $7,000.00 |
| PPM | $20,000.00 | $15,000.00 | $5,000.00 |
| Operating Agreements | $10,000.00 | $3,000.00 | $7,000.00 |
| Limited Partnership Agreements | $15,000.00 | $12,000.00 | $3,000.00 |
| Subscription Agreement | $3,000.00 | $3,000.00 | $0.00 |
| Legal Document Review & Updates | $10,000.00 | $7,000.00 | $3,000.00 |
| Legal Counsel | $40,000.00 | $20,000.00 | $20,000.00 |
| Feasibility Study | $22,000.00 | $0.00 | $22,000.00 |
| Go To Market Cost | $82,000.00 | $14,000.00 | $68,000.00 |
| Seminar Venues | $40,000.00 | $8,000.00 | $32,000.00 |
| Translation | $10,000.00 | $4,000.00 | $6,000.00 |
| Printed Materials | $10,000.00 | $5,000.00 | $5,000.00 |
| Project Promotion | $15,000.00 | $5,000.00 | $10,000.00 |
| Remainder of GSC Opp Management, LLC Contribution | $2,850,000.00 | $0.00 | $2,850,000.00 |
| **Totals** | **$3,285,000.00** | **$235,000.00** | **$3,050,000.00** |

*Of the $235,000 of costs incurred to date, $150,000 of such costs, including fees and reimbursements to Mason Hill are to be paid as $30,000 on the signing of the MOU, $20,000 on approval of the investment documents by Gold Star, $50,000 on obtaining all 12 fully signed and subscribed subscription agreements from the EB-5 investors, and $50,000 on the approval of the I-526 forms and release of funds from the EB-5 Investors. All additional costs in excess of $235,000 will be a cost of Mason Hill and neither Gold Star, nor the Project Owner will be responsible for or obligated to pay such costs.

### Capitalization Schedule

| Milestone | GSC | Mason Hill/EB-5 | Total |
|---|---|---|---|
| April 1, 2013 | $0.00 | $235,000.00 | |
| MOU Signing | $30,000.00 | -$30,000.00 | $125,000 |
| Delivery of Completed Offering Documents | $20,000.00 | -$20,000.00 | $30,000 |
| EB-5 Investor Subscriptions | $100,000.00 | -$100,000.00 | $20,000 |
| | | | $175,000 |

Execution Copy

| | | | |
|---|---|---|---|
| Transfer of EB-5 Investors Funds to Escrow* | $2,850,000.00 | $6,000,000.00 | $8,850,000 |
| Total | $3,000,000.00 | $6,085,000.00 | $9,200,000.00 |

* The parties acknowledge that Gold Star may cause a subsidiary of the Project Owner to acquire franchise locations prior to the approval of the I-526 and that its costs in acquiring assets, leasehold interests and improvements and other costs of setting up such franchised location may be contributed to the Project in lieu of cash.

13

571221v1

GSC000361

Execution Copy

discussions with respect to the subject matter hereof. This agreement may be amended only by additional agreement in writing signed by each party.

GOLD STAR CHILI, INC.

By: _Michael E Rholempe_
Title: _CEO_
Date: April _15_, 2013

MASON HILL, LLC

By: _____
Title: _President_
Date: April _15_, 2013

As Indemnifiers Only:

_____
Terry Chan
Date: April ___, 2013

_____
Gary Chan
Date: April ___, 2013

10

571221v1

GSC000362

**Thomas Martin**

| | |
|---|---|
| From: | Tom Fisher [wtf@bpbslaw.com] |
| Sent: | Thursday, April 18, 2013 11:03 AM |
| To: | 'Terry Chan'; Michael E. Rohrkemper |
| Cc: | Thomas Martin |
| Subject: | RE: The letter |

Terry - thank you for the letter. The letter does not ease Gold Star's concerns. Gold Star's concern is that there are possible securities law ramifications from releasing information regarding the offering prior to the release of the Private Placement Memorandum. For example, we have not seen the Private Placement Memorandum nor been privy to any conversations with potential investors and making a certification to unknown parties about the deal terms is premature. It also should be noted that the MOU is not binding but the proposed letter requires a certification and representation (again to unknown parties) that the items stated in it are deal terms. While I am confident the deal is going to move forward, I just fail to see a compelling reason to make such certifications to unknown third parties on a document that is not binding. I would prefer to have the Private Placement Memorandum speak for itself. I suggest you send the latest version of the business plan to Mike Mason and Mike Rohrkemper so that Gold Star may start on its revisions and approval. It would be helpful if you can send the latest version of all of the offering documents so that I can get those signed as well. I think with diligent work we could have all of the deal documents completed in a relatively short period of time and move forward with the deal. I will begin putting together an Operating Agreement for GSC Opp Management, LLC for Tom Martin's review.

On a separate note, Gold Star is in communication with Huntington Bank to create the necessary accounts. We received the Certificate of Limited Partnership from Tom Martin today and that was required to set up the account. Depending on how quickly Huntington will allow the funds to move from account to account we may be able to have a check from the Limited Partnership to Mason Hill today. We will let you know as soon as it is ready.

Tom
-----Original Message-----
From: Terry Chan [mailto:terry.chan@midwesteb5.com]
Sent: Wednesday, April 17, 2013 7:51 AM
To: Michael E. Rohrkemper
Cc: Tom Fisher; Thomas Martin
Subject: Fwd: The letter

>
Mike,

Here is the letter from Allen.

Thanks,

1

Δ π EXHIBIT 5

Deponent _____

Date 10/14 Rptr ____

WWW.DEPOBOOK.COM

LIND000218

**Thomas Martin**

| | |
|---|---|
| **From:** | Terry Chan [terry.chan@midwesteb5.com] |
| **Sent:** | Wednesday, April 17, 2013 7:51 AM |
| **To:** | Michael E. Rohrkemper |
| **Cc:** | wtf@bpbslaw.com Fisher; Thomas Martin |
| **Subject:** | Fwd: The letter |



Mason Letter to
GSC to get dec...
>

Mike,

Here is the letter from Allen.

Thanks,

1

LIND000219



Mason|Investments

To Whom it may concern:

The declarations memo will be used to further the business objectives GSC Opportunities, LP.  It is anticipated that the declaration will be shown to agents of interested investors and other parties who will receive or is believed to have received other offering documents.

Signed,

Allen Chi

LIND000220

# OPERATIONS MANAGEMENT AGREEMENT

This OPERATIONS MANAGEMENT AGREEMENT, made and entered into this 7th day of May, 2013, by and between **GSC OPP MANAGEMENT, LLC**, an Ohio limited liability company and the general partner of GSC Opportunities, L.P., an Ohio limited partnership ("GSC") and **GOLD STAR CHILI, INC.** an Ohio corporation ("Manager").

## R E C I T A L S:

A.     GSC is engaged in the business of developing Gold Star Chili franchise restaurant locations and is offering subscriptions to 5 EB-5 Investors as Limited Partners ("Limited Partners") for the development of Gold Star Chili franchise restaurants located in Ohio, Kentucky and Indiana through two investment entities -- GSC Opportunities LP and GSC Opportunities II LP, each in accordance with the Business Plan and the Private Placement Memorandum attached as Exhibit A (collectively the "Business Plan"). GSC serves as the General Partner for each of the limited partnerships and is contracting with Gold Star Chili, Inc. as set forth herein. GSC will rely exclusively on the expertise and knowledge of Manager in connection with the management and operations of all matters involving the administrative, accounting and compliance and operations of the restaurants owned by GSC. Manager has agreed to enter into this Agreement and to assist GSC with the management and administration of these matters as herein described.

**NOW, THEREFORE**, GSC and Manager agree as follows:

1.     GSC engages and employs Manager to provide services related to the management and operations of certain matters involving the administrative, accounting and compliance and operations of the restaurants owned by GSC. Manager shall provide assistance and actions to permit GSC to own and operate the franchised restaurants set forth in the Business Plan in accordance with all franchise agreements and the Business Plan. ("Operations Services"). Manager may select any third party providers to assist in the provision of the Operations Services, subject to the prior approval of GSC, which shall not be unreasonably withheld.  Manager shall be responsible to pay its costs associated with providing its services hereunder.. GSC and Manager agree that all other costs and the day to day operations and management of the franchised restaurants set forth in the Business Plan or as payable pursuant to a Franchise Agreement, including but not limited to operating costs, payment of restaurant employees, payment of restaurant operating expenses and other normal operating costs of GSC and each of its wholly owned subsidiaries shall remain a cost of GSC. Manager's duties, responsibilities and authority hereunder shall include the following:



Δ π EXHIBIT ___6___

Deponent_____

Date_____ Rptr_____

WWW.DEPOBOOK.COM

LIND000046

    a. Provide executive level and strategic oversight for GSC as a whole and and provide staff training for each of the franchise locations in the Business Plan in accordance with the Franchise Agreements.

    b. Assist GSC in creating and employing a minimum of 10 with a target of 12 direct full-time jobs, for each EB-5 Investor, or a total of 144 jobs for 12 Investors, as recommended and structured by Mason Hill under the definitions of the USCIS Regulations, and to execute all certifications or other documents necessary to qualify under the EB-5 program and USCIS Regulations.

    c. Facilitate and cooperate in the transition of management for the Project after Mason Hill exercises its option to purchase GSC EB-5 Investor LLC's ownership interest in GSC pursuant to its Operating Agreement.

    d. Provide information regarding the Gold Star system and franchise or other information consistent with Gold Star's Franchise Offering Circular as support to Mason Hill's investment offering to EB-5 investors.

    e. Cooperate with Mason Hill for all EB-5 reporting requirements.

2.    For the services provided hereunder, GSC shall pay Manager management fee equal to $15,000.00 for each franchise restaurant location per year (with an annual increase tied to the Consumer Price Index). The management fee shall be payable quarterly within 5 days of the quarter-end reporting. GSC shall be entitled to reimbursement of all expenses reasonably incurred with providing service.

3.    The term of this Agreement shall be for a period of five (5) years commencing on the date hereof and terminating on May 7, 2018. Thereafter, the term of this Agreement shall renew automatically on a year-to-year basis, but shall terminate upon the purchase of GSC EB-5 Investor LLC's ownership interest in GSC by Mason Hill LLC or thirty (30) days after notice by either party of a material breach that has not been cured within said thirty (30) day period.

4.    Manager shall defend, indemnify and hold GSC and its partners, agents, employees and assigns, harmless from and against any and all claims, demands, suits, judgments, losses or expenses of any nature whatsoever (including attorneys' fees) arising directly or indirectly, in whole or in part, from or out of:

(a)    any act, error or omission of Manager, Manager's subcontractors and affiliates or their respective officers, managers, agents, subcontractors, invitees or employees;

(b)    any failure of Manager to perform Manager's services hereunder in accordance with generally accepted standards, and/or any breach by Manager of this Agreement.

5.    GSC shall defend, indemnify and hold Manager and its officers, managers, members, agents, employees, and assigns harmless from and against any and all claims, demands, suits, judgments, losses or expenses of any nature

2

LIND000047

whatsoever, (including attorneys' fees) arising directly or indirectly, in whole or in part, from or out of:

       (a)    any act, error or omission of GSC, its subcontractors and affiliates or their respective officers, directors, agents, subcontractors, invitees or employees;

       (b)    any failure of GSC to perform GSC's services hereunder in accordance with generally accepted standards, and/or any breach by GSC of this Agreement.

       6.    Manager's relationship to GSC is that of independent contractor and nothing contained in this Agreement shall be construed to create a partnership, joint venture, or any relationship other than that of independent contractor.

       9.    This Agreement shall be governed and construed in accordance with the laws of the State of Ohio. Any action or proceeding arising out of this Agreement shall be filed and heard solely in Hamilton County, Ohio, and jurisdiction shall be vested exclusively in the Common Pleas Court of Hamilton County, Ohio, or, if appropriate, in the Federal District Court for the Southern District of Ohio. The parties also waive trial by jury with respect to any such action or proceeding. The prevailing party in any action or proceeding in the Common Pleas Court of Hamilton County, Ohio, or, if appropriate, in the Federal District Court for the Southern District of Ohio shall be entitled to recover its reasonable attorney fees and costs of such litigation.

       10.    Manager may not assign or transfer any of its duties under this Agreement without the prior written consent of GSC, which such consent shall not be unreasonably withheld if such assignment is to a Company with at least 50% common ownership with the Manager, or the Manager's wholly owned subsidiary.

       11.    Any notice or other communication required or permitted to be given hereunder shall be given in writing and delivered in person, mailed or delivered by a long-standing, nationally recognized courier service, properly addressed and stamped with the required postage to the intended recipient at its address specified below and shall be deemed effective upon receipt. Either party may from time to time change its address by giving the other party notice of the change in accordance with this section.

       If to GSC:      GSC OPPORTUNITIES, L.P.
                        650 Lunken Park Drive
                        Cincinnati, OH 45226

                        With a copy to:
                        MASON HILL, LLC
                        1021 Delta Avenue
                        Cincinnati, OH 45208

3

LIND000048

If to Manager:     Gold Star Chili, Inc.
                              650 Lunken Park Drive
                              Cincinnati, OH 45226

12.    This Agreement constitutes the entire understanding and agreement between GSC and Manager with respect to the transactions contemplated herein and supersedes any and all prior or contemporaneous oral or written communications with respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement by their duly authorized representative as of the day and year first above written.

**GSC:**                                      **MANAGER:**

**GSC OPP MANAGEMENT, LLC**           **GOLD STAR CHILI, INC.**

**General Partner of GSC Opportunities,**    By: _Michael E Rohrkemper_
**L.P. an Ohio limited partnership**

                                         Its: Michael E. Rohrkemper, CEO

By: GSC EB-5 Investor, LLC, Manager

By: _Michael E Rohrkemper_
        Michael E. Rohrkemper

Its:    Authorized Officer

575545v1

4

LIND000049

Page 1 of 2

## Thomas Martin

| | |
|---|---|
| **From:** | Tom Fisher [wtf@bpbslaw.com] |
| **Sent:** | Tuesday, June 18, 2013 5:55 PM |
| **To:** | Thomas Martin |
| **Cc:** | Michael E. Rohrkemper (miker@goldstarstarchili.com); 'Gary Chan'; terry.chan@midwesteb5.com |

**Subject:** GSC Comments

Attached are the redlined versions of the documents that Tom Martin sent on Thursday. Please note that Mike Rohrkemper has not had a chance to review some of the language in the LPA (particularly with regard to the true up) that I added and we reserve the right to make additional revisions.

In addition to these comments we note the following items that need to be addressed:

1. Update of the Private Placement Memorandum. Tom Martin and I discussed and it has some significant revisions that need to occur. I will forward the revisions I have to it, but both of us wanted to wait to finalize the LPA to revise that document. For example the PPM refers to Mason Investments but nowhere does it refer to Mason Hill. We want the same level of transparency as is in the revised LPA attached.

2. I would prefer not to use "Gold Star Chili" in the name of one of the limited partnerships. In addition to creating an expectation for investors, it will require an additional license agreement for the name since Gold Star Chili is a registered trademark and we prohibit franchisees from using the mark in the business entity's name so that we do not have issues if the franchise agreement is terminated or if the franchisee doesn't change its name. This isn't a huge issue during the time Gold Star is in control of the GP, but after it is an issue and I would prefer not to make exceptions to our franchise process. Would prefer to call it GSC Opp II. Alternately, we would prefer to keep this in one entity. Why can't we take on the two investors and admit them now with the others coming later? If they don't then we revise the project down based on the number of investors? Gold Star does not want an offering to occur until all the other documents in this transaction are finalized, including the operating agreement for the GP, the GSC management agreement (which I should have some time after tomorrow's meeting), finalized PPM and investor documents, finalized business plans and all other documents.

3. We need to confirm that both the UK location (open and operating) as well as Palomar (not open yet) can be included in this project and will qualify for the project. Gold Star has spent about $475,000 on these two and would prefer to put cash capital into the entity and then buy the assets for the amount it has so it is clean from an audit standpoint.

4. We are still waiting for a copy of the agreement between Mason Hill and Mason Investment that purports to have Investment do some of the EB-5 portion of the work on this deal. The PPM indicates the partnership has an agreement with them. Gold Star has not seen or approved that agreement and would like to review it.

5. We are still waiting for a copy of the agreement each investor has to make with Mason Investments per the PPM.

6. Mike and Mike are still reviewing the business plan and other documents so additional comments may be forth coming.

Regards,
Tom
W. Thomas Fisher, Esq.
Direct Dial: 513.533.2019
Direct Fax: 888.202.1694 (toll free)



6/19/2013

LIND000210

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## GSC OPPORTUNITIES, L.P.

836419,7



Δ π EXHIBIT 8
Deponent_____
Date_____Rptr_____
WWW.DEPOBOOK.COM

LIND000102

**Table of Contents**

|  |  | Page |
|---|---|---|
| **ARTICLE I - THE PARTNERSHIP** | | **1** |
| Section 1.1 | Formation. | 1 |
| Section 1.2 | Name. | 1 |
| Section 1.3 | Purpose. | 1 |
| Section 1.4 | Principal Place of Business. | 1 |
| Section 1.5 | Term. | 2 |
| Section 1.6 | Definitions. | 2 |
| **ARTICLE II - PARTNERS; CAPITAL CONTRIBUTIONS; PURCHASE OF LIMITED PARTNER'S INTEREST** | | **7** |
| Section 2.1 | Capital Contributions. | 7 |
| Section 2.2 | Admission of Additional Limited Partners. | 7 |
| Section 2.3 | Schedule of Partners. | 7 |
| Section 2.4 | Purchase of Limited Partner's Interest. | 8 |
| Section 2.5 | Other Matters. | 8 |
| Section 2.6 | Adjustment of the Partners' Partnership Interests | 9 |
| **ARTICLE III – DISTRIBUTIONS AND ALLOCATIONS** | | **9** |
| Section 3.1 | Distributions. | 9 |
| Section 3.2 | Tax Withholding. | 9 |
| Section 3.3 | Allocations. | 10 |
| Section 3.4 | Special Allocations. | 10 |
| Section 3.5 | Curative Allocations. | 11 |
| **ARTICLE IV - MANAGEMENT** | | **11** |
| Section 4.1 | Authority of the General Partner. | 11 |
| Section 4.2 | Right to Rely on General Partner. | 13 |
| Section 4.3 | Duties and Obligations of General Partner. | 14 |
| Section 4.4 | Indemnification of General Partner. | 14 |
| Section 4.5 | Compensation; Expenses of General Partner. | 15 |
| Section 4.6 | Operating Restrictions. | 15 |
| Section 4.7 | Removal and Appointment of General Partner. | 16 |
| **ARTICLE V - ROLE OF LIMITED PARTNERS** | | **16** |
| Section 5.1 | Rights or Powers. | 16 |
| Section 5.2 | Voting Rights. | 16 |
| Section 5.3 | Procedure for Consent. | 16 |
| **ARTICLE VI - BOOKS AND RECORDS** | | **17** |
| Section 6.1 | Books and Records. | 17 |
| Section 6.2 | Tax Information. | 17 |
| **ARTICLE VII - AMENDMENTS; ACTIONS OF THE PARTNERS** | | **17** |

LIND000103

Section 7.1    Amendments. ............................................................................................ 17
Section 7.2    Actions of the Partners. ............................................................................ 17

**ARTICLE VIII – TRANSFERS OF INTERESTS** ................................................................ **17**

Section 8.1    Restriction on Transfers. .......................................................................... 17
Section 8.2    Permitted Transfers. ................................................................................. 18
Section 8.3    Prohibited Transfers. ................................................................................ 18
Section 8.4    Rights of Unadmitted Assignees. ............................................................. 19
Section 8.5    Admission of Assignees as Partners. ...................................................... 19
Section 8.6    Covenants and Representations Regarding Transfers. ........................... 19
Section 8.7    Distributions and Allocations with Respect to Transferred Interests. ............ 20

**ARTICLE IX - GENERAL PARTNER** ................................................................................ **20**

Section 9.1    Covenant Not to Withdraw, Transfer or Dissolve. ................................. 20
Section 9.2    Permitted Transfers. ................................................................................. 20
Section 9.3    Prohibited Transfers. ................................................................................ 21

**ARTICLE X - POWER OF ATTORNEY** .............................................................................. **21**

Section 10.1    General Partner as AttorneyInFact. ...................................................... 21
Section 10.2    Nature as Special Power. ........................................................................ 22

**ARTICLE XI - DISSOLUTION AND WINDING UP** ........................................................ **22**

Section 11.1    Liquidating Events. .................................................................................. 22
Section 11.2    Winding Up. ............................................................................................. 22
Section 11.3    Notice of Dissolution. .............................................................................. 23

**ARTICLE XII - MISCELLANEOUS** ..................................................................................... **23**

Section 12.1    Anti-Money Laundering Provisions. ....................................................... 23
Section 12.2    Notices. ..................................................................................................... 24
Section 12.3    Binding Effect. ......................................................................................... 24
Section 12.4    Construction. ............................................................................................ 24
Section 12.5    Headings. .................................................................................................. 24
Section 12.6    Severability. ............................................................................................. 24
Section 12.7    Incorporation by Reference. .................................................................... 24
Section 12.8    Further Action. ......................................................................................... 25
Section 12.9    Governing Law. ........................................................................................ 25
Section 12.10    Waiver of Action for Partition; No Bill for Partnership Accounting. ......... 25
Section 12.11    Counterpart Execution. .......................................................................... 25
Section 12.12    Sole and Absolute Discretion. ............................................................... 25
Section 12.13    Specific Performance. ............................................................................ 25
Section 12.14    Confidentiality, Trade Secret Protection ............................................... 25
**Signature pages** ............................................................................................................... **26**
**Schedule of Partners** ...................................................................................................... **27**
**Counterpart Signature Pages** ....................................................................................... **28**

LIND000104

## AGREEMENT OF LIMITED PARTNERSHIP
### OF
### GSC OPPORTUNITIES, L.P.

This Agreement of Limited Partnership (this "**Agreement**") of GSC OPPORTUNITIES, L.P., an Ohio limited partnership (the "**Partnership**"), is made and entered into as of the [＿] day of May 2013 by and among GSC Opp Management, **LLC**, an Ohio limited liability company, as the general partner (the "**General Partner**"), GSC Opp Management, LLC, an Ohio limited liability company, as the Initial Limited Partner, and the Persons executing separate counterpart signature pages to this Agreement as Limited Partners (collectively, the "**Limited Partners**" and together with the General Partner, the "**Partners**").

### RECITALS:

WHEREAS, the Partnership is raising funds in order to finance the expansion and operations of Gold Star Chili restaurant franchises in the Dayton-Cincinnati-Lexington region of Southwest Ohio, Kentucky and Southeast Indiana USA as set forth in the Business Plan (the "**Project**").

WHEREAS, the Partners desire to enter into this Agreement in order to set forth fully their respective rights, powers, duties and obligations with respect to the Partnership and each other as Partners

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to by bound hereby, agree as follows:

### I.- THE PARTNERSHIP

1.1 Formation. The Partnership was formed as an Ohio limited partnership by the filing, on April 17, 2013, of a Certificate of Limited Partnership (the "**Certificate**") with the Ohio Secretary of State pursuant to the Ohio Revised Uniform Partnership Act, as amended from time to time (the "**Act**").

1.2 Name. The name of the Partnership shall be GSC OPPORTUNITIES, L.P., and all business of the Partnership shall be conducted in such name. The General Partner may change the name of the Partnership upon ten (10) Business Days' notice to the Limited Partners.

1.3 Purpose. The purpose and business of the Partnership shall be to invest in and/or loan money to various entities in Targeted Employment Areas that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owed subsidiaries to: (i) open and operate Gold Star Chili restaurant franchises in the Dayton-Cincinnati-Lexington region of Southwest Ohio, Kentucky, and Southeast Indiana and (ii) own and lease real estate to such franchises, determined by the General Partner on a case-by-case basis in its sole discretion, as set forth and described in the Business Plan attached as Exhibit A_ to this Agreement ("Business Plan").

1.4 Principal Place of Business. The principal place of business of the Partnership shall be located at 650 Lunken Park Drive, Cincinnati, Ohio 45226. The Partnership may have such other place or

additional places of business as the General Partner may determine from time to time and as indicated by written notice to the limited partners.

1.5 Term. The term of the Partnership commenced on the date the Certificate was filed in the office of the Ohio Secretary of State in accordance with the Act and shall continue until the winding up and liquidation of the Partnership and its business is completed following a Liquidating Event, as provided in ARTICLE XI hereof.

1.6 Definitions. Capitalized words and phrases used in this Agreement have the following meanings:

"Act" has the meaning set forth in Section 1.1 hereof.

"Adjusted Capital Account" means, with respect to any Partner, such Partner's Capital Account, after giving effect to the following adjustments:

      i.      Increase such Capital Account by any amounts that such Partner is obligated to restore (pursuant to any provision of this Agreement or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.7042(g)(1) and 1.7042(i)(5); and

      ii.     Decrease such Capital Account by the items described in Regulations Sections 1.7041(b)(2)(ii)(d)(4), 1.7041(b)(2)(ii)(d)(5) and 1.7041(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Regulations Section 1.7041(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Adjusted Capital Account as of the end of the relevant Allocation Year.

"Affiliate" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any officer, director or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, whether direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" or "Partnership Agreement" means this Agreement of Limited Partnership, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"Allocation Year" means (i) the period commencing on the Effective Date and ending on December 31, 2013, (ii) any subsequent period commencing on January 1 and ending on the following

575372v1                 2

LIND000106

December 31, or (iii) any portion of the period described in clause (ii) for which the Partnership is required to allocate Profits, Losses and other items of Partnership income, gain, loss or deduction pursuant to ARTICLE III hereof.

"**Business Day**" means a day of the year on which banks are not required or authorized to close in New York, New York.

"**Capital Account**" means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

      i.    Each Partner's Capital Account shall be increased by such Partner's Capital Contributions, such Partner's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 3.4 or Section 3.5 hereof, and the amount of any Partnership liabilities assumed by such Partner or that are secured by any Partnership property distributed to such Partner.

      ii.    Each Partner's Capital Account shall be decreased by the amount of cash distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of expenses or any items in the nature of expenses or losses that are specially allocated pursuant to Section 3.4 or Section 3.5 hereof, and the amount of any liabilities of such Partner assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership

      iii.    If all or a portion of an interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

      iv.    In determining the amount of any liability for purposes of subparagraphs (i) and (ii), there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.7041(b) and shall be interpreted and applied in a manner consistent with such Regulations. If the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or the Partners), are computed in order to comply with such Regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to ARTICLE XI hereof upon the dissolution of the Partnership. The General Partner shall also (i) make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes in accordance with Regulations Section 1.7041(b)(2)(iv)(q) and (ii) make any appropriate modifications If unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.7041(b).

LIND000107

"**Capital Contributions**" means, with respect to any Partner, the amount of money and fair market value of other property contributed to the Partnership by such Partner (or its predecessors in interest) reduced by any sums other than the Preferred Returns and Tax Distributions distributed to any Partner.

"**Certificate**" has the meaning set forth in Section 1.1 hereof.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Depreciation**" means, for each Allocation Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Allocation Year.

"**Distributable Cash**" means, for each Allocation Year, the gross cash receipts of the Partnership as a result of the conduct of its business operations and sale of assets, less the sum of the following to the extent paid or set aside by the General Partner on behalf of the Partnership; (i) all principal and interest payments and all other sums paid on or with respect to any indebtedness of the Partnership; (ii) all cash expenditures incurred incident to the operation of the Partnership's business, including without limitation, expenditures for capital improvements; and (iii) such cash reserves as the General Partner deems reasonably necessary to the proper operation of the Partnership's business, including but not limited to, for working capital, capital improvements, repairs, taxes, insurance and funding other cash requirements and contingencies.

"**Effective Date**" means the date first written above.

"**Fiscal Year**" means (i) the period commencing on the Effective Date and ending on December 31, 2013 and (ii) any subsequent period commencing on January 1 and ending on the earlier to occur of (A) the following December 31, or (B) the date on which all Partnership property is distributed pursuant to Section 11.2 hereof and the Certificate has been canceled pursuant to the Act.

"**General Partner**" means GSC Opp Management, LLC, an Ohio limited liability company, and any other Person admitted to the Partnership as a general partner pursuant to the terms of this Agreement, and their respective successors and assigns.

"**Initial Limited Partner**" means GSC Opp Management, LLC, an Ohio limited liability company. The Initial Limited Partner will resign upon the admission of a Limited Partner to the Partnership.

"**Interest**" means, with respect to any Partner, the interest of such Partner in the Partnership pursuant to the terms of this Agreement and the mandatory provisions of any applicable law, including, without limitation, such Partner's right, if any, to participate in the management of the Partnership's business and affairs and such Partner's right to allocations of Profits and Losses and to distributions, liquidating or otherwise, as provided herein.

LIND000108

"**Limited Partner**" means each Person executing a separate counterpart signature page to this Agreement as a Limited Partner, and any other Person admitted to the Partnership as a Limited Partner pursuant to the terms of this Agreement, and their respective successors and assigns.

"**Liquidating Event**" has the meaning set forth in Section 11.1 hereof.

"**Management Fee**" has the meaning set forth in Section 4.5 hereof.

"**Majority in Interest**" means, with respect to any matter requiring the vote or consent of the Limited Partners, those Limited Partners holding more than fifty percent (50%) of the Percentage Interests.

"**Partners**" means the General Partner and the Limited Partners, where no distinction is required by the context in which the term is used herein. "**Partner**" means any one of the Partners.

"**Partner's Preferred Return**" shall mean a cumulative 2% annual return on a Partner's Capital Contribution.

"**Partnership**" means the partnership formed pursuant to this Agreement and the partnership continuing the business of this partnership pursuant to Section 12.1 hereof in the event of dissolution as herein provided.

"**Percentage Interest**" means, with respect to any Partner, as of any date, the interest of a Partner in the Partnership, as set forth on the Schedule of Partners attached hereto.

"**Permitted Transfer**" has the meaning set forth in Section 8.2 hereof.

"**Person**" means any individual, partnership (whether general or limited and whether domestic or foreign), limited liability company, corporation, trust, estate, association, custodian, nominee or other entity.

"**Profits**" and "**Losses**" means, for each Allocation Year, an amount equal to the Partnership's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

    i.    Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

    ii.    Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.7041(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

LIND000109

    iii.    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year or other period, computed in accordance with the definition of "Depreciation;"

    iv.    To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) is required pursuant to Regulations Section 1.7041(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's interest in the Partnership, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

    v.    Notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated pursuant to Section 3.4 or Section 3.5 hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss or deduction available to be specially allocated pursuant to Section 3.4 or Section 3.5 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (v) above.

"**Project**" has the meaning set forth in the Recitals hereof.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" has the meaning set forth in Section 3.5 hereof.

"**Schedule of Partners**" means that certain schedule attached to this Agreement, as amended from time to time in accordance with this Agreement, setting forth the names and addresses of the Partners, the Capital Contributions made by each Partner and each Partner's Percentage Interest.

"**Targeted Employment Area**" means an area that has been designated by parties acceptable to the USCIS, including the Ohio Development Services Agency, the applicable agency for the Commonwealth of Kentucky or the applicable agency for the State of Indiana, as applicable, that has experienced unemployment of at least 150% of the national average rate at the time a Limited Partner made his or her Capital Contribution.

"**Tax Matters Partner**" shall have the meaning set forth in Section 4.1(k) hereof.

"**Purchase of Limited Partner's Interest**" has the meaning set forth in Section 2.4 hereof.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell or otherwise dispose of.

LIND000110

"**Wholly Owned Affiliate**" of any Person means an Affiliate of such Person (i) one hundred percent (100%) of the voting stock or beneficial ownership of which is owned directly by such Person, or by any Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, (ii) an Affiliate of such Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, and (iii) any Wholly Owned Affiliate of any Affiliate described in clause (i) or clause (ii).

## II.- PARTNERS; CAPITAL CONTRIBUTIONS; PURCHASE OF

### LIMITED PARTNER'S INTEREST

2.1 Capital Contributions. The General Partner and each Limited Partner shall make a Capital Contribution to the Partnership in the amount set forth opposite the name of such Partner on the attached Schedule of Partners. Except as otherwise required under applicable law, in no event shall any Limited Partner be required to make a Capital Contribution in excess of such Limited Partner's Capital Contribution as shown on the attached Schedule of Partners.

2.2 Admission of Additional Limited Partners. After the date of this Agreement the General Partner may issue additional Interests in the Partnership to one or more Persons and admit each such Person(s) to the Partnership as a Limited Partner; *provided, however,* that the General Partner shall not issue such Interests unless (i) the Partnership has received an instrument of joinder, in form acceptable to the General Partner, executed by that Person pursuant to which such Person has agreed to be bound by the terms of this Agreement; (ii) that Person has made the Capital Contribution, if any, required by the General Partner; and (iii) that Person has provided such other information or agreements, if any, as the General Partner may require. Upon the admission of a Limited Partner to the Partnership, the Initial Limited Partner shall resign.

Except as otherwise provided in this Section 2.2 or ARTICLE VIII hereof (relating to Transfers of Interests), additional Limited Partners may only be admitted to the Partnership with the approval of the General Partner, with such approval not to be unreasonably withheld, and the approval by the USCIS of a Limited Partner's I-526 petition. If a Limited Partner's I-526 petition is denied by the USCIS, the General Partner shall return his Capital Contribution within 90 days of the receipt of such denial.

2.3 Schedule of Partners. Upon the admission of a Person as a Partner, such Person shall be indicated on the Schedule of Partners as a General Partner or a Limited Partner, as the case may be, together with such Partner's address, Capital Contributions, and Percentage Interest. The Schedule of Partners shall be amended from time to time to reflect the admission of additional Partners, additional Capital Contributions by new or existing Partners, the Transfer of Interests, the withdrawal of a Partner, the Redemption of a Partner, the Purchase of a Limited Partner's Interest, and other pertinent information contained in the Schedule of Partners.

Each Person indicated on the Schedule of Partners as a holder of record of an Interest shall continue to be the holder of record of such Interest until the deemed withdrawal of such Person as a Limited Partner or the notification and acceptance of the Transfer of any such Interest, or portion thereof, is given in accordance with the terms of this Agreement. A holder of record shall be entitled to all distributions and all allocations of Profits and Losses with respect to the Interest registered in his name and to all other rights of a Partner until his rights in such Interest, or portion thereof, have

LIND000111

terminated upon his deemed withdrawal or have been Transferred and the General Partner notified as required herein. The Partnership shall not be affected by any notice or knowledge of Transfer of an Interest, except as expressly provided in <u>ARTICLE VIII</u> or <u>ARTICLE IX</u> hereof, as applicable. The payment to the holder of record of any distribution with respect to an Interest shall discharge the Partnership's obligations in respect thereto.

     2.4    <u>Purchase of a Limited Partner's Interest</u>. At any time on or after the later of (i) three (3) years following the date of the approval of the Limited Partner's I-526 Petition or (ii) approval of the Limited Partner's I-829 Petition, the Partnership, at the sole discretion of the General Partner, shall have the right, which shall not expire, but not the obligation, to and may, in its discretion, purchase the Limited Partnership Interest of each Limited Partner at fair value, which shall be exercised on a first in, first out basis. Each Limited Partner agrees to and shall sell all of his or her Limited Partnership Interest in the Partnership should this right be exercised, at the price determined by agreement of the Partnership and the Limited Partner.

     2.5    <u>Other Matters</u>. Except in accordance with <u>Sections 2.4</u> hereof or as otherwise provided in this Agreement, no Limited Partner shall demand or receive a return of his Capital Contributions or withdraw from the Partnership without the consent of the General Partner. Under circumstances requiring a return of any Capital Contributions, no Limited Partner shall have the right to receive property other than cash, except as may be specifically provided herein.

          No General Partner shall have any personal liability for the repayment of any Capital Contributions of any Partner.

     2.6    <u>Adjustment of the Partners' Partnership Interests</u>. In the event the Partnership purchases all of the Limited Partners' Interests pursuant to Section 2.4 hereof, the Interests of the Limited Partners shall be reduced as if a portion of the Limited Partner's Interest was redeemed as determined in accordance with the following formula:

     (a)    For each Allocation Year, the General Partner shall maintain (i) a pro forma allocation of all Profits and Losses based upon the Partners' Partnership Interests set forth in the Schedule of Partners ("Form Allocation") and (ii) the actual allocations of Profits and Losses based upon the terms of this Partnership Agreement ("Actual Allocation"). Each year the General Partner will compare and reconcile the Form Allocation Amount from the Actual Allocation amount (each year's value is an "Annual Allocation Difference"). Upon the earlier to occur of (i) the purchase of all of the Limited Partners' Interests pursuant to Section 2.4 or (ii) six (6) years after the approval of all of the Limited Partners' I-526 Petitions the General Partner will determine the value of the Partnership by multiplying the Partnership's earnings before interest expense, depreciation and amortization expense ("EBITDA") for the preceding trailing twelve (12) months prior to the date triggering the adjustment set forth in this Section by a factor of 3.5 and dividing such total by 100 to determine the value of a 1% Limited Partnership Interest. The total of the Annual Allocation Differences divided by the value of a 1% limited partnership interest will be the deemed to be redeemed from the Limited Partners during the period as of such date.

     (b)    In no event will the amount of the Limited Partner's Interest reduction be greater than the percentage amount that the formula set forth in Section 2.6(a) would generate if the EBITDA of the Partnership used is replaced with the average EBITDA of all Gold Star Chili,

LIND000112

Inc. franchisees, as of the date of this Agreement, which is an agreed value of $60,000 per store or a total value of $360,000 for six stores.

## III. – DISTRIBUTIONS AND ALLOCATIONS

3.1 Distributions. The Partnership may, but is not required to, make distributions of Distributable Cash to the Partners from time to time upon the approval and at the sole discretion of the General Partner. Notwithstanding the Percentage Interest set forth on the Schedule of Partners, all distributions shall be made:

(a) To the Limited Partners and the General Partner in proportion to the Partnership Interests as set forth on the Schedule of Partners until the Partners receive total distributions equal to the Partners' Preferred Return; and

(b) If the Partnership reports (or anticipates reporting) taxable income, net of the Partners' Preferred Return (for federal income tax purposes) for an Allocation Year, then prior to the payment of any distribution under this Section, a distribution may be made (the "Tax Distribution") to the Partners with respect to such year in an aggregate amount equal to the result obtained when such taxable income is multiplied by the maximum federal individual income tax rate for such year. The Tax Distribution shall be calculated periodically on a good faith estimated basis by the decision of the General Partner in order for Partnership to make Tax Distributions as determined by the General Partner.

(c) Thereafter, and subject to (c) below, distributions shall be made to the General Partner and the Limited Partners in the same manner as the allocation of profits in Section 3.3(b) hereof.

(d) The General Partner intends to accumulate any distributions otherwise payable to the Limited Partners pursuant to (c) above in an account or accounts for the possible purchase of the Limited Partners' Interests as provided in 2.4 hereof. Upon the later of (i) the approval date of each Limited Partner's I-829 petition or (ii) the three-year anniversary of each limited partner's I-526 approval, the Partnership intends to use all funds from this account to purchase each Limited Partner's interest or to reinvest in additional Gold Star Chili franchises or other business purposes consistent with the Business Plan. However, there is no guaranty that the Partnership will actually use these funds in this manner or that there will be any funds available to do so.

3.2 Tax Withholding. All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Partners, and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Partner or any Person owning an interest, directly or indirectly, in such Partner, shall be treated as amounts distributed to the Partner with respect to which such amount was withheld pursuant to this ARTICLE III for all purposes under this Agreement. The

LIND000113

General Partner is authorized to withhold from distributions, or with respect to allocations, to the Partners and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Partners with respect to which such amounts were withheld.

3.3 Allocations. Except as otherwise provided pursuant to Section 3.4 hereof, the Partnership's Profits and Losses shall be allocated in accordance with this Section 3.3. In the event the Partners' Percentage Interests change during any year, such allocations shall be made in accordance with Section 706(d) of the Code by taking into account the Partners' varying interests.

(a)    Losses. After giving effect to the Regulatory Allocations, Losses for any Allocation Year shall be allocated 66-2/3% to the Limited Partners and 33-1/3% to the General Partner.

(b)    Profits. After giving effect to the Regulatory Allocations, Profits for any Allocation Year shall be allocated 66-2/3% to the Limited Partners and 33-1/3% to the General Partner up to the amount of previously allocated Losses, if any, and up to the amount of the Partners' Preferred Return. Thereafter, profits shall be allocated 80% to the Limited Partners and 20% to the General Partner until total distributions to the Limited Partners (other than distributions for the payment of income taxes) equal the Limited Partners' Preferred Return plus the Limited Partners' Capital Contributions. Thereafter, profits for any Allocation Year shall be allocated to the Limited Partners and to the General Partner in proportion to their Partnership Interests, as set forth in the Schedule of Partners, as modified from time to time in accordance with Section 2.6.

(c)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Regulations thereunder.

The Partners are aware of the income tax consequences of the allocations made by this ARTICLE III and hereby agree to be bound by the provisions of this ARTICLE III in reporting their shares of Partnership income and loss for income tax purposes.

3.4 Special Allocations. The following special allocations shall be made in the following order:

a.    Qualified Income Offset. If any Partner who is not a General Partner unexpectedly receives any adjustments, allocations or distributions described in Regulations Sections 1.7041(b)(2)(ii)(d)(4), 1.7041(b)(2)(ii)(d)(5) or 1.7041(b)(2)(ii)(d)(6), items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible, provided that an allocation pursuant to this Section 3.4(a) shall be made if and only to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 3.4(a) were not in the Agreement.

b.    Gross Income Allocation. If any Partner who is not a General Partner has an Adjusted Capital Account Deficit at the end of any Allocation Year, each shall be specially

LIND000114

allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 3.4(b) hereof shall be made if and only to the extent that such Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this ARTICLE III have been tentatively made as if Section 3.4(a) hereof and this Section 3.4(b) were not in the Agreement.

      c.    Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Regulations Section 1.7041(b)(2)(iv)(m)(2) or Section 1.7041(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Partner in complete liquidation of his Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to Partners in accordance with their Interests in the event that Regulations Section 1.7041(b)(2)(iv)(m)(2) applies, or to the Partners to whom such distribution was made in the event that Regulations Section 1.7041(b)(2)(iv)(m)(4) applies.

3.5 Curative Allocations. The allocations set forth in Section 3.4(a), Section 3.4(b) and Section 3.4(c) hereof (the **"Regulatory Allocations"**) are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss or deduction pursuant to this Section 3.5. Therefore, notwithstanding any other provision of this ARTICLE III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of the Agreement and all Partnership items were allocated pursuant to Section 3.3 hereof.

## IV. - MANAGEMENT

4.1 Authority of the General Partner. Subject to the limitations and restrictions set forth in this Agreement (including, without limitation, those set forth in this ARTICLE IV), the General Partner shall have the sole and exclusive right and responsibility to manage the business of the Partnership and shall have all of the rights and powers that may be possessed by general partners under the Act including, without limitation, the right and power to:

      a.    Acquire by purchase, lease or otherwise any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

      b.    Operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage and lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

      c.    Hire any Person, including the General Partner or an affiliate of the General Partner, to provide management, maintenance and operational services to the Project, and to execute any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with such management, maintenance and operation of the Project;

LIND000115

     d.     Execute any and all agreements, contracts, documents, certifications and instruments necessary or convenient in connection with managing the affairs of the Partnership, including executing amendments to the Agreement and the Certificate, in accordance with the terms of the Agreement, both as General Partner and, if required, as attorney-in-fact for the Limited Partners pursuant to any power of attorney granted by the Limited Partners to the General Partner;

     e.     Execute, in furtherance of any or all of the purposes of the Partnership, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract or other instrument purporting to convey or encumber any or all of the Partnership's property;

     f.     Prepay in whole or in part, refinance, recast, increase, modify or extend any liabilities affecting the Partnership's property and, in connection therewith, execute any extensions or renewals of encumbrances on any or all of the Partnership's property;

     g.     Care for and distribute funds to the Partners by way of cash, income, return of capital or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Partnership or this Agreement;

     h.     Contract on behalf of the Partnership for the employment and services of employees and/or independent contractors, such as lawyers and accountants and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Partnership;

     i.     Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Partnership's property and General Partner liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Partnership, as may be lawfully carried on or performed by a partnership under the laws of each state in which the Partnership is then formed or qualified;

     j.     Make any and all elections for federal, state and local tax purposes including, without limitation, any election, if permitted by applicable law: (i) to make the election provided for in Code Section 6231(a)(1)(B)(ii); (ii) to adjust the basis of Partnership property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state or local law, in connection with transfers of Interests and Partnership distributions; (iii) to extend the statute of limitations for assessment of tax deficiencies against the Partners with respect to adjustments to the Partnership's federal, state or local tax returns; and (iv) to the extent provided in Code Sections 6221 through 6231, to represent the Partnership and the Partners before taxing authorities or courts of competent jurisdiction in tax matters affecting the Partnership and the Partners, in their capacity as Partners, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Partners with respect to such tax matters or otherwise affect the rights of the Partnership and the Partners. The General Partner is specifically authorized to act as the "Tax Matters Partner" under the Code and in any similar capacity under state or local law;

     k.     Take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the

LIND000116

Partnership, including but not limited to exercising the right to purchase the Interests of the Limited Partners set forth in Section 2.4 above,;

l.      Institute, prosecute, defend, settle, compromise and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with or incidental to this Agreement, and to engage counsel or others in connection therewith;

m.      Enter into a EB-5 Management Agreement with Mason Hill, LLC, a member of the General Partner, as necessary to delegate to Mason Hill, LLC all of the management and administration of all EB-5 matters involving the Partnership, including the preparation and delivery of documents as necessary for investor procurement and to permit the Partnership to have the Limited Partners qualify for the EB-5 Investment Program or as otherwise required by the Partnership to complete the Project as defined in the Business Plans; and as necessary to authorize Mason Hill LLC to act on behalf of the General Partner or the Partnership to complete such actions; to pay to Mason Hill LLC certain portions of the General Partner's Management Fees for such services as well as the Project Consultant Fees and Management Fees each as set forth in Section 4.5 hereof (Mason Hill LLC may contract with its affiliates which have ownership in Mason Hill, LLC, including but not limited to Midwest EB-5 Regional Center, Mason Investments LLC, or unrelated third parties for the provision of some of these services).

n.      Enter into a Operations Management Agreement with Gold Star Chili, Inc., which is an equity owner of one of the members of the General Partner, for the management and supervision of all restaurant operations owned by the Partnership; and as necessary to permit the General Partner to pay to Gold Star Chili, Inc. certain portions of the General Partner's Management Fees for such services as set forth in Section 4.5 hereof; and

o.      To organize subsidiary entities, including limited liability companies in any jurisdiction, and to fund and operate such subsidiary entities and to cause the Partnership and such entities to enter into lease agreements, franchise agreements, management agreements and all other agreements and transactions as the General Partner deems necessary for the operation of the Partnership's business.

### 4.2 Right to Rely on General Partner.

a.      The signature of the General Partner shall be both necessary and sufficient to convey title to any real property owned by the Partnership or to execute any promissory notes, trust deeds, mortgages or other instruments of hypothecation, and all of the Partners agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of the General Partner shall be sufficient to execute any "statement of partnership" or other documents necessary to effectuate this or any other provision of this Agreement. All of the Partners do hereby appoint the General Partner as their attorney-in-fact for the execution of any or all of the documents described in this Section 4.2.

LIND000117

4.3 Duties and Obligations of General Partner.

The General Partner shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and its Affiliates, including, without limitation, (i) segregating Partnership assets and not allowing funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of the General Partner or any of its Affiliates, (ii) maintaining books and financial records of the Partnership separate from the books and financial records of the General Partner and its Affiliates, and observing all Partnership procedures and formalities, including, without limitation, maintaining minutes of Partnership meetings and acting on behalf of the Partnership only pursuant to due authorization of the Partners, (iii) causing the Partnership to pay its liabilities from assets of the Partnership, (iv) causing the Partnership to conduct its dealings with third parties in its own name and as a separate and independent entity and (v) providing any documentation reasonably necessary to support the immigration petitions of a Limited Partner, including documentation showing the receipt and use of EB-5 capital and employment documentation.

The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Ohio and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance with the provisions of this Agreement and applicable laws and regulations.

The General Partner intends to operate the Partnership in accordance with the Business Plan attached hereto as Exhibit A, including the expenditure of approximately Two Million Five Hundred Thousand Dollars ($2,500,000.00) of the Capital Contributions to acquire interests in real estate and pay all real estate related expenses (including, but not limited to, architectural fees, soft costs, i.e., licensing, permitting, design, construction management fees, real estate related legal fees and broker fees), construct leasehold improvements and renovations and purchase equipment necessary to accomplish the goals of the Business Plan.

4.4 Indemnification of General Partner.

(a) Except as otherwise provided in Section 4.4(c) and Section 4.4(d) hereof, the Partnership, its receiver or its trustee (in the case of its receiver or trustee, to the extent of the Partnership's property) shall indemnify, save harmless and pay all judgments and claims against the General Partner, or any member, manager or employee of the General Partner, relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the General Partner, or such member, manager or employee, in connection with the business of the Partnership, including attorneys' fees incurred by the General Partner, or such member, manager or employee, in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, including all such liabilities under federal and state securities laws (including the Securities Act of 1933, as amended) as permitted

LIND000118

by law. Except as otherwise provided in Section 4.4(c) and Section 4.4(d) hereof, upon such conditions as it deems appropriate, the Partnership may pay the expenses incurred by the General Partner in defending any civil, criminal, administrative or investigative claim, demand, action, suit or proceeding in advance of the final disposition of the same, but only upon the prior receipt of a written undertaking by or on behalf of the General Partner to repay all of such advances if it is ultimately determined that it was not entitled to such indemnification

(b) Except as otherwise provided in Section 4.4(c) and Section 4.4(d) hereof, in the event of any action by a Partner against the General Partner (or a member, manager or employee of the General Partner), including a Partnership derivative suit, the Partnership shall indemnify, save harmless and pay all expenses of the General Partner (or such member, manager or employee), including attorneys' fees, incurred in the defense of such action, if such General Partner (or such member, manager or employee) is successful in such action.

(c) Notwithstanding the provisions of Section 4.4(a) and Section 4.4(b) hereof, neither the General Partner nor any member, manager or employee of the General Partner shall be indemnified from any liability for fraud, bad faith, willful misconduct or gross negligence.

(d) Notwithstanding anything to the contrary in any of Section 4.4(a) and Section 4.4(b) hereof, in the event that any provision in any of such Sections is determined to be invalid in whole or in part, such Section shall be enforced to the maximum extent permitted by law.

4.5 Compensation; Expenses of General Partner.

(a)   Compensation and Reimbursement.  Except as otherwise provided in this Agreement, no Partner shall receive any salary, fee or draw for services rendered to or on behalf of the Partnership, nor shall any Partner be reimbursed for any expenses incurred by such Partner on behalf of the Partnership.

(b)   General Partner Management Fee.  The General Partner shall receive a management fee equal to $15,000.00 for each franchise restaurant location per year (with an annual increase tied to the Consumer Price Index (this portion of the fee will be used to pay Gold Star Chili, Inc. for its services under the Operations Management Agreement set forth above), plus 3% of the Partnership's gross revenues (this portion of the fee will be used to pay Mason Hill LLC for its services under the EB-5 Management Agreement set forth above). In addition, the General Partner shall receive and pay Project Consultant Fees and Management Fees as defined in the Business Plan's budget (see section 8.3 of the Business Plan), which will be used by Mason Hill LLC and/or affiliates to pay for costs and management and consulting services which include but are not limited to project structuring, site evaluation, financial analysis, demographic research, case processing, marketing, operational management and responsibilities of franchisees ongoing as described in the Franchise Disclosure Document provided by Gold Star Chili, Inc.

(c)   Expenses.  The General Partner may charge the Partnership for any direct expenses reasonably incurred by it in connection with the Partnership business.

4.6 Operating Restrictions.

(a)   No loans or guarantees of loans shall be made by the Partnership to the General Partner or any Affiliate of the General Partner.

LIND000119

(b)     All property in the form of cash not otherwise invested shall either be (i) deposited for the benefit of the Partnership in one or more accounts of the Partnership or any of its Affiliates, such accounts to be maintained in such financial institutions as the General Partner shall determine, (ii) invested in short-term liquid securities or other cash-equivalent assets, or (iii) left in escrow, and withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partner may determine from time to time.

4.7 Removal and Appointment of General Partner. The General Partner shall be removed only upon its resignation as General Partner or upon the entry of a final, non-appealable order by a court of competent jurisdiction declaring that the General Partner has engaged in fraud or criminal misconduct with respect to the Partnership or the performance of its duties as General Partner. Upon the removal of the General Partner in accordance with the previous sentence, a Majority in Interest of the Limited Partners shall appoint another Person to serve as General Partner under the terms and conditions of this Agreement. The removal of the General Partner and the appointment of the replacement General Partner shall be effective at such time as the replacement General Partner agrees in writing to be bound by the terms of this Agreement and the Certificate is amended in accordance with the Act to reflect the replacement of the General Partner.

## V. - ROLE OF LIMITED PARTNERS

5.1 Rights or Powers. The Limited Partners shall not have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way. A Limited Partner shall have all the rights, powers, privileges and duties granted to a limited partner under the Ohio Revised Uniform Partnership Act, subject to limitations on such rights set forth in this Agreement as permitted under the Act. A Majority-In-Interest of the Limited Partners shall have the right to call a meeting of the Partners upon fifteen (15) days written notice, which notice shall set forth the time and place of the meeting and the purpose for which it is called.

5.2 Voting Rights. The Limited Partners shall have the right to vote on only the following matters, which shall require an affirmative vote of a Majority-In-Interest: (a) the dissolution, winding up and liquidation of the Partnership; (b) a change in the nature of the Partnership's business; (c), the merger or consolidation of the Partnership; and (d) the sale or other disposition of all or substantially all of the Partnership's real property assets.

5.3 Procedure for Consent. In any circumstances requiring the approval or consent of the Limited Partners as specified in this Agreement, such approval or consent shall, except as expressly provided to the contrary in this Agreement, be given or withheld in the sole and absolute discretion of the Limited Partners and conveyed in writing to the General Partner not later than thirty (30) days after such approval or consent was requested by the General Partner. The General Partner may require a response within a shorter time but in no event less than ten (10) Business Days. Failure to respond within any such time period shall be deemed to constitute a vote that is consistent with the General Partner's recommendation with respect to the proposal. If the General Partner receives the necessary approval or consent of the Limited Partners to such action, the General Partner shall be authorized and empowered to implement such action without any further authorization by the Limited Partners.

LIND000120

## VI. - BOOKS AND RECORDS

6.1 Books and Records. The Partnership shall maintain at its principal place of business separate books of account for the Partnership that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the conduct of the Partnership and the operation of its business in accordance with generally accepted accounting principles consistently applied and, to the extent inconsistent therewith, in accordance with this Agreement. Any Partner or his designated representative shall have the right, at any reasonable time, to have access to and inspect and copy the contents of such books or records.

6.2 Tax Information. Necessary tax information shall be delivered to each Partner after the end of each Fiscal Year of the Partnership. Unless otherwise required by the Code, the Partnership shall use the cash method of accounting for income tax purposes.

## VII. - AMENDMENTS; ACTIONS OF THE PARTNERS

7.1 Amendments. (a) Subject to Section 7.1(c) hereof, this Agreement may be amended by the General Partner, in its discretion and without action by the Limited Partners to: (A) add to the representations, duties or obligations of the General Partner, or surrender any right or power granted to the General Partner herein, for the benefit of the Limited Partners, as applicable; (B) cure any ambiguity, to correct or supplement any provision hereof that may be inconsistent with any other provisions hereof, or to make any other provision with respect to matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; and (C) change any provision of this Agreement required to be so changed by the staff of the Securities and Exchange Commission or other federal agency, or by a state "Blue Sky" commissioner or similar official, which change is deemed by such commissioner, agency or official to be for the benefit or protection of the Limited Partners.

    b.    Subject to Section 7.1(c) hereof, this Agreement may be amended by the General Partner with the approval of a Majority in Interest of the Limited Partners.

    c.    Notwithstanding anything to the contrary in this Agreement, no amendment that would materially and adversely affect the rights of any Limited Partner disproportionately to the rights of the Limited Partners generally shall be made without the consent of each Limited Partner so materially, adversely and disproportionately affected.

7.2 Actions of the Partners. The Partners hereby agree and acknowledge that any vote, consent, approval or other action to be taken by or on behalf of the Limited Partners hereunder and not otherwise referred to in this Agreement shall be valid and effective for all purposes hereunder upon the taking of such action at a meeting or as evidenced in writing by or on behalf of the Limited Partners representing at least the Majority in Interest of the Limited Partners; *provided, however,* that with respect to any action by the Partners, any Limited Partner who is the subject of such action or against whom such action is to be enforced separate or apart from the other Limited Partners on behalf of the Partnership as a whole, shall be excluded from participating in any such action.

## VIII. - TRANSFERS OF INTERESTS

8.1 Restriction on Transfers. Except as otherwise permitted by this Agreement, no Partner may Transfer all or any portion of its Interest. In the event that any Partner pledges or otherwise encumbers any of its Interest as security for the payment of a debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this ARTICLE VIII.

LIND000121

8.2 Permitted Transfers. Subject to the following conditions, a Limited Partner may at any time Transfer all or any portion of its Interest (any Transfer of such Interest satisfying such conditions precedent is referred to herein as a **"Permitted Transfer"**). A Transfer shall not be treated as a Permitted Transfer unless and until the following conditions are satisfied:

a. Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Partnership such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Partnership to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this ARTICLE VIII. In the case of a Transfer of an Interest at death or involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Partnership of legal evidence of such Transfer in form and substance satisfactory to counsel to the Partnership. In all cases, the Partnership shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

b. Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, unless such requirement is waived by the General Partner the transferor shall furnish to the Partnership an opinion of counsel, which counsel and opinion shall be satisfactory to the Partnership, that the Transfer will not cause the Partnership to terminate for federal income tax purposes.

c. The transferor and transferee shall furnish the Partnership with the transferee's taxpayer identification number and sufficient information to determine the transferee's initial tax basis in the Interest transferred, and any other information reasonably necessary to permit the Partnership to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Partnership shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Interest until it has received such information.

d. Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, and unless such requirement is waived by the General Partner, the transferor shall provide an opinion of counsel, which opinion and counsel shall be satisfactory to the Partnership, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

e. Except in the case of a Transfer of an Interest at death or involuntarily by operation of law, the transferor shall provide, at the election of the General Partner, an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the other Partners, to the effect that such Transfer will not cause the Partnership to be deemed to be an "investment company" under the Investment Company Act of 1940, as amended.

8.3 Prohibited Transfers. Any purported Transfer of an Interest that is not a Permitted Transfer shall be null and void and of no force or effect whatsoever, provided that, if the Partnership is required to recognize a Transfer that is not a Permitted Transfer (or if the Partnership, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the Interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Partnership) to satisfy the debts, obligations or liabilities for damages that the transferor or transferee of such Interest may have to the Partnership. In the case of a Transfer or attempted Transfer of an Interest that is not a Permitted Transfer, the parties engaging or attempting to

LIND000122

engage in such Transfer shall be liable to indemnify and hold harmless the Partnership and the Partners from all cost, liability and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

8.4 Rights of Unadmitted Assignees. A Person who acquires an Interest but who is not admitted as a substituted Limited Partner pursuant to Section 8.5 hereof shall be entitled only to allocations and distributions with respect to such Interest in accordance with this Agreement, and shall (i) have no right to any information or accounting of the affairs of the Partnership, (ii) not be entitled to inspect the books or records of the Partnership, and (iii) not have any of the rights of the General Partner or a Limited Partner under the Act or this Agreement.

8.5 Admission of Assignees as Partners. Subject to the other provisions of this ARTICLE VIII, a transferee of an Interest may be admitted to the Partnership as a substituted Limited Partner only upon satisfaction of the conditions set forth below in this Section 8.5:

a. The General Partner consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the General Partner;

b. The Interest with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer;

c. The transferee becomes a party to this Agreement as a Limited Partner and executes such documents and instruments as the General Partner may reasonably request (including, without limitation, amendments to the Certificate) to confirm such transferee as a Limited Partner in the Partnership and such transferee's agreement to be bound by the terms and conditions hereof;

d. The transferee pays or reimburses the Partnership for all reasonable legal, filing, and publication costs that the Partnership incurs in connection with the admission of the transferee as a Limited Partner with respect to the transferred Interest;

e. The transferee provides the Partnership with evidence satisfactory to counsel for the Partnership that (i) such transferee is acquiring its Interest based upon its own investigation, (ii) such transferee's acquisition of its Interest is being made for its own account for investment and not with a view to the sale or distribution thereof, and (iii) such transferee is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with acquiring investments that are similar to the acquisition of its Interest; and

f. If the transferee is not an individual of legal majority, the transferee provides the Partnership with evidence satisfactory to counsel for the Partnership of the authority of the transferee to become a Partner and to be bound by the terms and conditions of this Agreement.

8.6 Covenants and Representations Regarding Transfers.

Each Partner hereby covenants, represents and agrees with the Partnership, for the benefit of the Partnership and all Partners, that (i) he is not currently making a market in the Interests, (ii) he will not Transfer any Interest on an established securities market or a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any Regulations, proposed regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or the

575372v1                                    19

LIND000123

Treasury Department that may be promulgated or published thereunder), and (iii) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements that facilitate the selling of partnership interests and that are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, he will not Transfer any Interest through a matching service that is not approved in advance by the Partnership. Each Partner further agrees that he will not Transfer any Interest to any Person unless such Person agrees to be bound by this Section 8.6 and to Transfer such Interest only to Persons who agree to be similarly bound. The Partnership shall, from time to time and at the request of a Partner, consider whether to approve a matching service and shall notify all Partners of any matching service that is so approved.

8.7 Distributions and Allocations with Respect to Transferred Interests. If any Interest is sold, assigned or Transferred during any Allocation Year in compliance with the provisions of this ARTICLE VIII, Profits, Losses, each item thereof, and all other items attributable to such Interest for such Allocation Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such Allocation Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Partnership shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Partnership is given notice of a Transfer at least ten (10) Business Days prior to the Transfer, the Partnership shall recognize such Transfer as of the date of such Transfer, and provided further that, if the Partnership does not receive a notice stating the date such Interest was transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Allocation Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Partnership, was the owner of the Interest on the last day of the Allocation Year during which the Transfer occurs. Neither the Partnership nor any General Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 8.7, whether or not the General Partner or the Partnership has knowledge of any Transfer of ownership of any Interest.

## IX. - GENERAL PARTNER

9.1 Covenant Not to Withdraw, Transfer or Dissolve. Except as otherwise permitted by this Agreement, the General Partner hereby covenants and agrees that unless it has consent of a Majority In Interest of the Limited Partners not to (i) take any action to file a certificate of dissolution or its equivalent with respect to itself, (ii) take any action that would cause a Voluntary Bankruptcy of the General Partner, (iii) withdraw or attempt to withdraw from the Partnership, (iv) exercise any power under the Act to dissolve the Partnership, except as permitted in Section 11.1, (v) Transfer all or any portion of its Interest as a General Partner other than in accordance with Section 9.2 hereof, or (vi) petition for judicial dissolution of the Partnership. Further, the General Partner hereby covenants and agrees to continue to carry out the duties of the General Partner hereunder until the Partnership is dissolved and liquidated pursuant to ARTICLE XI hereof.

9.2 Permitted Transfers.

The General Partner may Transfer all or any part of its Interest as a General Partner (i) at any time to another General Partner, if any, (ii) at death to its estate, heirs or legatees by will or intestacy, (iii) at any time to any Person who is the General Partner's Wholly Owned Affiliate on both the day the General Partner became a General Partner and the day of such Transfer, or (iv) at any time involuntarily by operation of law, provided that no such

LIND000124

Transfer shall be permitted unless and until all of the conditions set forth in Section 8.2 hereof are satisfied as if the Interest being Transferred was an Interest of a Limited Partner.

A transferee of an Interest from a General Partner hereunder shall be admitted as a General Partner with respect to such Interest if, but only if, (i) at the time of such Transfer, such transferee is otherwise a General Partner or (ii) the transferee is a Wholly Owned Affiliate of the transferring General Partner and all of the other General Partners, if any, consent to such admission.

A transferee who acquires an Interest from a General Partner hereunder by means of a Transfer that is permitted under this Section 9.2, but who is not admitted as a General Partner, shall have no authority to act for or bind the Partnership, to inspect the Partnership's books or otherwise to be treated as a General Partner, but such transferee shall be treated as a Partner who acquired an Interest in a Permitted Transfer under ARTICLE VIII hereof.

9.3 Prohibited Transfers. Any purported Transfer of any Interest held by a General Partner that is not permitted by Section 9.2 hereof shall be null and void and of no force or effect whatsoever, provided that, if the Partnership is required to recognize a Transfer that is not so permitted (or if the Partnership, in its sole discretion, elects to recognize a Transfer that is not so permitted), the Interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Partnership) to satisfy the debts, obligations or liabilities for damages that the transferor or transferee of such Interest may have to the Partnership. In the case of a Transfer or attempted Transfer of an Interest that is not permitted by Section 9.2 hereof, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Partnership and the other Partners from all cost, liability and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

## X. - POWER OF ATTORNEY

10.1 General Partner as Attorney-In-Fact. Each Limited Partner hereby makes, constitutes and appoints the General Partner and each successor General Partner, with full power of substitution and re-substitution, his true and lawful attorney-in-fact for him and in his name, place and stead and for his use and benefit, to sign, execute, certify, acknowledge, swear to, file and record (i) all certificates of limited partnership, amended name or similar certificates, and other certificates and instruments (including counterparts of this Agreement) that the General Partner may deem necessary or appropriate to be filed by the Partnership under the laws of the State of Ohio or any other state or jurisdiction in which the Partnership is doing or intends to do business; (ii) any and all amendments or changes to this Agreement and the instruments described in (i), as now or hereafter amended, that the General Partner may deem necessary or appropriate to effect a change or modification of the Partnership in accordance with the terms of this Agreement, including, without limitation, amendments or changes to reflect (A) the exercise by any General Partner of any power granted to it under this Agreement, (B) any amendments adopted by the Partners in accordance with the terms of this Agreement, (C) the admission of any substituted Partner, and (D) the disposition by any Partner of its Interest; (iii) all certificates of cancellation and other instruments which the General Partner may deem necessary or appropriate to effect the dissolution and termination of the Partnership pursuant to the terms of this Agreement; and (iv) any other instrument that is now or may hereafter be required by law to be filed on behalf of the Partnership or is deemed necessary

LIND000125

or appropriate by the General Partner to carry out fully the provisions of this Agreement in accordance with its terms. Each Limited Partner authorizes each such attorney-in-fact to take any further action that such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with the foregoing as fully as such Limited Partner might or could do personally, and hereby ratifying and confirming all that any such attorney-in-fact shall lawfully do or cause to be done by virtue thereof or hereof.

10.2 Nature as Special Power. The power of attorney granted pursuant to this ARTICLE XI:

      a.      Is a special power of attorney coupled with an interest and is irrevocable;

      b.      May be exercised by any such attorney-in-fact by listing the Limited Partners executing any agreement, certificate, instrument or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Limited Partners; and

      c.      Shall survive the death, disability, legal incapacity, bankruptcy, insolvency, dissolution or cessation of existence of a Limited Partner and shall survive the delivery of an assignment by a Limited Partner of the whole or a portion of his Interest, except that where the assignment is of such Limited Partner's entire Interest and the assignee, with the consent of the General Partner, is admitted as a Substituted Limited Partner, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution.

## XI. - DISSOLUTION AND WINDING UP

11.1 Liquidating Events. Partnership shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("**Liquidating Event**"):

      a.      The sale of all or substantially all of the Partnership's property;

      b.      The determination of the General Partner to dissolve, wind up and liquidate the Partnership after the approval of all of the Limited Partners' I-829 petitions;

      c.      The happening of any other event that makes it unlawful, impossible or impractical to carry on the business of the Partnership; or

          The withdrawal of a sole General Partner or any other event that causes a sole remaining General Partner to cease to be a general partner under the Act, provided that any such withdrawal or other event shall not constitute a Liquidating Event and the business of the Partnership shall continue if, within 180 days of such withdrawal or other event, a Majority in Interest of the Limited Partners appoint a successor General Partner, effective as of the date the former sole General Partner ceased to serve as General Partner.

The Partners hereby agree that, notwithstanding any provision of the Act, the Partnership shall not dissolve prior to the occurrence of a Liquidating Event.

11.2 Winding Up. Upon the occurrence of a Liquidating Event, the Partnership shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying

LIND000126

the claims of its creditors and Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Partnership's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Partnership's property has been distributed pursuant to this Section 11.2 and the Certificate has been cancelled in accordance with the Act. The General Partner (or, if there is no remaining General Partner, any person elected by a Majority in Interest of the Limited Partners) shall be responsible for overseeing the winding up and dissolution of the Partnership, shall take full account of the Partnership's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

       a.     First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors, including Partners;

       b.     The balance, if any, to the Partners in accordance with Section 3.1.

Notwithstanding the foregoing provisions of this Section 11.2, in connection with the final distribution, the General Partner may withhold up to ten percent (10%) of such liquidating distributions for the purpose of paying or satisfying accumulated Administration Fees and other expenses of the General Partner pursuant to Section 4.5 hereof.

11.3 Notice of Dissolution. If a Liquidating Event occurs or an event occurs that would, but for provisions of Section 11.1 hereof, result in a dissolution of the Partnership, the General Partner shall (i) within thirty (30) days thereafter, provide written notice thereof to each of the Partners and (ii) to the extent required under the Act or other law applicable to the Partnership, provide notice of the Liquidating Event to all other parties with whom the Partnership regularly conducts business (as determined in the discretion of the General Partner) and publish notice thereof in a newspaper of general circulation in each place in which the Partnership regularly conducts business (as determined in the discretion of the General Partner).

## XII - MISCELLANEOUS

### 12.1 Anti-Money Laundering Provisions.

Each Limited Partner hereby acknowledges that the Partnership seeks to comply with all applicable laws concerning money laundering and related activities. In furtherance of those efforts, each Limited Partner hereby represents, warrants and agrees that, to the best of such Limited Partner's knowledge based upon appropriate diligence and investigation:

none of the cash or property that such Limited Partner has paid, will pay or will contribute to the Partnership has been or shall be derived from, or related to, an activity that is deemed criminal under United States law; and

no contribution or payment by such Limited Partner to the Partnership shall cause the Partnership or the General Partner to be in violation of the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986 or the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001.

LIND000127

Each Limited Partner agrees to promptly notify the General Partner if any of these representations and warranties cease to be true and accurate regarding such Limited Partner. Each Limited Partner agrees to provide to the General Partner any additional information regarding such Limited Partner that the General Partner deems necessary or appropriate to ensure compliance with all applicable laws concerning money laundering and similar activities.

Each Limited Partner agrees that if at any time the General Partner determines that any of the foregoing representations and warranties are incorrect with respect to such Limited Partner, or if otherwise required by applicable law or regulation related to money laundering and similar activities, the General Partner may undertake whatever actions it considers appropriate to ensure compliance with applicable law or regulation, consistent with the written advice of its external counsel delivered to such Limited Partner, including causing the withdrawal of such Limited Partner from the Partnership in accordance with such terms as the General Partner shall determine are required to comply with applicable laws and regulations.

Each Limited Partner further agrees that the Partnership or General Partner may release confidential information about such Limited Partner and, if applicable, any owners of it, legal or beneficial, to proper authorities if the General Partner, in its sole discretion, determines that it is in the best interests of Partnership in light of relevant rules and regulations under the laws described in this Section 12.1.

12.2 Notices. Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement shall be in writing and sent by electronic mail with confirmation of receipt back, regular mail with postage prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimiled communication sent by regular mail with postage prepaid, and addressed as set forth on the Schedule of Partners, or to such other address as such Person may from time to time specify by notice to the Partners. Any such notice shall be deemed to be delivered, given, and received for all purposes as of the date so sent.

12.3 Binding Effect. Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon, and inure to the benefit of, the Partners and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

12.4 Construction. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Partner. The terms of this Agreement are intended to embody the economic relationship among the Partners and shall not be subject to modification by, or be conformed with, any actions by the Internal Revenue Service except as this Agreement may be explicitly so amended and except as may relate specifically to the filing of tax returns.

12.5 Headings. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

12.6 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

12.7 Incorporation by Reference. Every exhibit, schedule and other appendix attached to this Agreement and referred to herein is not incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

LIND000128

12.8 Further Action. Each Partner, upon the request of any General Partner, agrees to perform all further acts and execute, acknowledge and deliver any documents that may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

12.9 Governing Law. The laws of the State of Ohio shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Partners.

12.10 Waiver of Action for Partition; No Bill for Partnership Accounting. Each of the Partners irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Partnership Property. To the fullest extent permitted by law, each Partner covenants that it will not (except with the consent of the General Partner) file a bill for Partnership accounting.

12.11 Counterpart Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the Partners had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

12.12 Sole and Absolute Discretion. Except as otherwise provided in this Agreement, all actions that the General Partner may take and all determinations that the General Partner may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of the General Partner.

12.13 Specific Performance. Each Partner agrees with the other Partners that the other Partners would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the non-breaching Partners may be entitled, at law or in equity, the non-breaching Partners shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

12.14 Confidentiality, Trade Secret Protection. The Partners acknowledge that the Partnership and its wholly owned subsidiaries will be required to enter into Franchise Agreements with Gold Star Chili, Inc. which have specific provisions governing the Confidentiality and Trade Secrets of the franchised Gold Star Chili system (a copy of such provisions can be found in Sections 11 and 12 of the Franchise Agreement and are attached as Exhibit A to this Agreement and incorporated herein by reference) (collectively the "Restrictive Covenants"). Each Limited Partner, individually by its execution of a counterpart to this Agreement and as additional consideration for being admitted as a Limited Partner agrees that it is bound by the Restrictive Covenants as if it were the "Retailer" set forth in said Restrictive Covenants and will take no action to violate such Restrictive Covenants in any country or territory.

[signature page follows]

LIND000129

IN WITNESS WHEREOF, the undersigned Partners have executed this Agreement of Limited Partnership as of the date first above set forth.

**GENERAL PARTNER:**

GSC Opp Management, LLC,
an Ohio limited liability company

**by and through its Members:**

**GSC EB-5 Investor LLC**

By: _Michael E Rohrkemper_
    Name: Michael E. Rohrkemper
    Title: President

**Mason Hill LLC**

By: _____
    Name: GARY CHAN
    Title: AUTHORIZED MEMBER

**INITIAL LIMITED PARTNER:**

**GSC Opp Management, LLC, an Ohio limited liability company**

**by and through its Members:**

**GSC EB-5 Investor LLC**

By: _Michael E Rohrkemper_
    Name: Michael E. Rohrkemper
    Title: President

**Mason Hill LLC**

By: _____
    Name: GARY CHAN
    Title: AUTHORIZED MEMBER

575372v1

26

LIND000130

**Schedule of Partners**

| Name and Address | Capital Contribution | Percentage Interest |
|---|---|---|
| GENERAL PARTNER | | |
| GSC Opp Management, LLC<br>650 Lunken Park Drive<br>Cincinnati, Ohio 45226 | $1,250,000* | 33 1/3% |
| | | |
| | | |
| | | |
| LIMITED PARTNERS | $2,500,000 | |
| | | 13-1/3% |
| | | 13-1/3% |
| | | 13-1/3% |
| | | 13-1/3% |
| | | 13-1/3% |
| Total | $3,750,000 | 100.00% |

\* The General Partners' Capital Contribution shall consist of approximately $1,038,000.00 in cash or property and $212,000.00 in like kind contributions which include various soft costs and fees of both members of the General Partner the payment of other expenses by the Members of the General Partner for which no reimbursement by the Partnership will be made.

LIND000131

## COUNTERPART SIGNATURE PAGE AND ATTESTATION

By signing below, the undersigned is hereby made a party to the Agreement of Limited Partnership of GSC OPPORTUNITIES, L.P. (the "**Partnership**"), as such Agreement of Limited Partnership is in effect on the date hereof and as it is from time to time amended and/or restated hereafter (the "**Partnership Agreement**"), as a "Limited Partner" thereunder (subject to Redemption under Section 2.4 thereof), and the undersigned hereby agrees to be bound by and to comply with the terms of the Partnership Agreement. Certain terms used and not otherwise defined herein shall have the meanings given to such terms in the Partnership Agreement.

The undersigned hereby acquires a $500,000 Interest, in the form of a Capital Contribution, with voting rights as set forth in the Partnership Agreement.

The undersigned hereby represents and warrants to the Partnership:

1.    The undersigned understands that: (i) the limited partnership interests ("**Interests**") constitute a speculative investment involving a high degree of risk of loss by the undersigned of the undersigned's investment therein, and (ii) there are substantial restrictions on the transferability of the Interests. Accordingly, it may not be possible for the undersigned to liquidate the undersigned's investment in the Partnership in case of emergency.

2.    The undersigned is able: (i) to bear the complete loss of this investment, and (ii) to hold the Interests for an indefinite period of time. The undersigned represents that the undersigned has adequate means of providing for the undersigned's current needs and possible personal contingencies and that the undersigned has no need for liquidity in this particular investment.

3.    The undersigned has such knowledge and experience in financial and business matters that the undersigned is able to evaluate the risks in any investment in the Partnership. The undersigned acknowledges that the undersigned has been advised to discuss this investment with the undersigned's legal or other professional advisors, or with other investment representatives who have knowledge of business and financial matters. If the undersigned has not done so it is because, in the undersigned's opinion, the undersigned is personally capable of evaluating this investment and the Partnership and does not need the advice of other persons. The undersigned and, to the extent deemed necessary by the undersigned, any of the persons mentioned above have been afforded the opportunity to ask questions concerning this investment of officers of the Partnership and its general partner and have been furnished with such information with respect to the Partnership and its proposed operations as the undersigned has requested to the undersigned's satisfaction.

4.    The Interests are being acquired for the undersigned's own personal account for investment and not with a view toward dividing the undersigned's interests therein with others or reselling or otherwise disposing of all or any part of the same, or toward the distribution thereof within the meaning of the Securities Act of 1933, as amended (the "**Act**"), the Securities

LIND000132

Exchange Act of 1934, as amended (the "**Exchange Act**"), or applicable securities laws of any other jurisdiction (which, together with the Act and the Exchange Act, and all rules and regulations promulgated thereunder, are hereinafter referred to as the "**Securities Laws**").

5.    The undersigned is an "accredited investor" as such term is defined in the Securities Laws.

The foregoing representations, warranties, and undertakings are made by the undersigned with the intent that they be relied upon by the Partnership in determining the undersigned's suitability as an investor in the Partnership. The undersigned hereby agrees that such representations and warranties shall survive the undersigned becoming an interest holder in the Partnership. The undersigned further agrees to indemnify and hold harmless the Partnership, its partners, officers, attorneys, agents, and each other interest holder from any damages, claims, expenses, losses, or actions resulting from the untruth of any of the warranties and representations contained in this attestation.

**LIMITED PARTNER:**

PRINT NAME:_____
Signature:_____
Name:
Title:
Email Address:

**AGREED TO AND ACCEPTED BY:**

**GSC OPPORTUNITIES, L.P.**
by   GSC Opp Management, LLC

**by and through its Members:**

**GSC EB-5 Investor LLC**

By:      _____
         Name:  Michael E. Rohrkemper
         Title:   President
**Date:** _____, 2013

**Mason Hill LLC**

By:      _____
         Name:  _____
         Title:   _____
Date: _____, 2013

575372v1                              29

LIND000133

## EXHIBIT A

## RESTRICTIVE COVENANTS

1. **COVENANT REGARDING OTHER BUSINESS INTERESTS.**

    1.1    RETAILER, and all present and future successors and assigns, agents and affiliated parties and entities of RETAILER (collectively "Related Parties"), shall be bound by the following provisions. All defined terms set forth herein have the same meaning as they do in the Gold Star Chili, Inc. Franchise Agreement.

    1.2    Acknowledging that the Products and the System are unique and distinctive and have been developed by Gold Star Chili, Inc. (the "COMPANY") at great effort, time and expense, and that RETAILER has regular and continuing access to valuable and confidential information, training and trade secrets regarding the Proprietary Products, the System and the Business, RETAILER agrees that:

        1.2.1    During the term of this Agreement and for eighteen (18) months thereafter neither RETAILER nor any of the Related Parties shall, in any capacity whatsoever, either directly or indirectly, for itself, himself or herself, or through, on behalf of or in conjunction with any other person, partnership, corporation or organization, own, operate, maintain, engage in, participate in (as director, officer, manager, employee, consultant, representative, agent or otherwise) or have any interest whatsoever in any "Similar Business". As used herein, "Similar Business" means the production, preparation or sale of any food items similar to the Products or any other business similar to the Restaurants, the Business or the System or that offers or grants franchises or licenses to others to operate such a business.

        1.2.2    Upon expiration or termination of this Agreement for any reason, or if RETAILER assigns or transfers his Partnership Units in any manner, then for a period of eighteen (18) months thereafter, neither RETAILER nor any Related Party shall, in any capacity whatsoever, either directly or indirectly, for itself, himself or herself, or through, on behalf of or in conjunction with any other person, partnership, corporation or organization, own, operate, maintain, engage in, participate in (as director, officer, manager, employee, consultant, representative, agent or otherwise) or have any interest whatsoever in any Similar Business at a location within a radius of ten (10) miles of the Retail Location or any other Restaurant site then existing or approved for development.

    1.3    Upon any termination of any Related Party of its relationship to RETAILER, then for a period of eighteen (18) months thereafter, such Related Party shall not, in any capacity whatsoever, either directly or indirectly, for itself, himself or herself, or through, on behalf of or in conjunction with any other person, partnership, corporation or organization, own, operate, maintain, engage in, participate in (as director, officer, manager, employee, consultant, representative, agent or otherwise) or have any interest whatsoever in, any Similar Business at a location within a radius of ten (10) miles of the Retail Location or any other Restaurant site then existing or approved for development.

575372v1

30

LIND000134

1.4     If RETAILER or any Related Party fails to abide by the foregoing covenants and the COMPANY obtains enforcement thereof in a judicial, mediation or arbitration proceeding, RETAILER agrees that the foregoing covenant shall continue to be binding for a period of time expiring eighteen (18) months after the later of the conclusion of such proceedings or the date of a legally binding order enforcing the foregoing covenants. If any court having jurisdiction to determine the enforceability or validity of any of this Agreement determines that any provision hereof would be unenforceable or invalid as written, the definition of "Similar Business" and the geographical, time and other restrictions shall be deemed modified only to the extent necessary to make such restrictions valid and enforceable.

1.5     No claim which RETAILER or any Related Party may have against the COMPANY, whether or not arising from this Agreement, shall constitute a defense to the enforcement by the COMPANY of the foregoing covenants.

1.6     This Section shall not apply to the ownership by RETAILER, any of the Related Parties or any group of related persons, of five percent (5%) or less of the issued and outstanding shares in any publicly-held corporation, unless the same shall constitute a controlling interest therein, or to the operation of another Store in compliance with another Franchise Agreement with the COMPANY.

## 2.    TRADE SECRETS.

2.1     Information contained in the Manual, and other information about the Proprietary Products, the System and the Business (the "Confidential Material") are proprietary highly confidential trade secrets and RETAILER shall not use any such confidential material except as necessary in the operation of the Business in accordance with this Agreement. RETAILER further acknowledges and agrees that the COMPANY is the owner of all rights in and to the System, and the Confidential Material, and that the System and the Confidential Material constitute trade secrets of the COMPANY which are revealed to RETAILER in confidence, and that no right is given to or acquired by RETAILER to, and RETAILER shall not, disclose, duplicate, license, sell or reveal any of such Confidential Material to any person, other than disclosure to an employee of RETAILER to the extent required by his/her work in accordance with this Agreement to be familiar with relevant Confidential Material. RETAILER agrees to keep confidential such Confidential Material, to obtain from each of the Related Parties an agreement to keep and respect such confidences and the noncompete covenants, and to be responsible for compliance by such Related Parties with such agreements. RETAILER will advise the COMPANY promptly in writing if RETAILER learns of any claims made relating to or unauthorized use of any Confidential Material whether by a Related Party or a third party. The COMPANY is not obligated to take any action but may take any action it deems appropriate. RETAILER also agrees not to contest or aid in contesting, directly or indirectly, the COMPANY's right, title, ownership or interest in or to, or the validity or enforceability of, any copyrights, Confidential Material or the System, or contest the COMPANY's sole right to register, use or franchise or license others to use any such copyrights, the System or the Confidential Material, during or after the term of this Agreement or any extension or renewal thereof.

LIND000135

2.2     If RETAILER discloses any Confidential Material to any person, firm or entity or otherwise breaches its obligations under this Section 2.2, or if one of the Related Parties or any other person subject to RETAILER's control makes such a disclosure or otherwise breaches its obligations under this Section 2.2 as a result of the failure of RETAILER to use its best efforts to take the necessary precautions to prevent such disclosure, then RETAILER acknowledges that the COMPANY shall be entitled to seek injunctive or other relief, including but not limited to any damages it incurs.

LIND000136

**OPERATING AGREEMENT**

**OF**

**GSC OPP MANAGEMENT, LLC,**

**AN OHIO LIMITED LIABILITY COMPANY**

**EFFECTIVE AS OF MAY 7, 2013**



Δ π **EXHIBIT** 9

Deponent_____

Date 10/14 Rpt_____

WWW.DEPOBOOK.COM

LIND000072

# OPERATING AGREEMENT
## OF
## GSC OPP MANAGEMENT, LLC,

This Operating Agreement is effective as of this 7th day of May, 2013, by and between the Members whose signatures appear on the signature page hereof.

RECITALS:

WHEREAS, Articles of Organization for GSC OPP MANAGEMENT, LLC (the "**Company**") were filed with the Secretary of State of the State of Ohio on February 28, 2013; and

WHEREAS, Mason Hill, LLC, a Member of the Company, ("**Mason Hill**") and Gold Star Chili, Inc. ("**Gold Star**") have developed a Business Plan for the opening and development of up to 6 new Gold Star franchise restaurants (the "**Project**") within the Dayton-Cincinnati-Lexington region of Southwest Ohio, Kentucky and Indiana region that are not included in any current territory of any current Gold Star franchisee; and

WHEREAS, Mason Hill caused GSC Opportunities L.P., an Ohio limited partnership ("**Project Owner**") to be formed and the Company is the sole General Partner of the Project Owner; and

WHEREAS, the Project Owner will be capitalized with an anticipated amount of $3,750,000 ("**Project Capitalization**") to be provided to the Project Owner by the Company (by and through its Members as set forth in Exhibit A to this Agreement) in the total value amount of $1,250,000 ("**GP Capitalization**") in return for a General Partnership Interest equal to 33.3% of the Project Owner and by 5 individuals investing as EB-5 limited partner investors ("**EB-5 Investors**") in the individual amount of $500,000 each and a total amount of $2,500,000 ("**EB-5 Capitalization**") in return for a Limited Partnership Interest equal to 66.7% of the Project Owner; and

WHEREAS, the Company's purpose is to serve as the General Partner of the Project Owner and to accomplish all aspects of the Project, including but not limited to raising the EB5 Capitalization, securing restaurant locations and operating the locations and will receive a management fee from the Project Owner as set forth on **Exhibit D** ("Management Fee"); and

WHEREAS, the Company will enter into a management agreement with Mason Hill, LLC or affiliate ("EB-5 Administrator") for the EB-5 Administrator to provide certain services related to the qualification of the EB-5 Investors and qualifying the Project for the EB-5 Investment Program, including but not limited to compliance with all rules and regulations set forth in applicable Federal law and all rules and regulations promulgated by the United States Citizenship and Immigration Services ("**USCIS Requirements**") and compliance with all applicable Federal and state securities laws ("**EB-5 Management Agreement**") which will provide for the Company to pay the EB-5 Administrator for its services thereunder as set forth in **Exhibit D**; and

WHEREAS, the Company will enter into a management agreement with Gold Star for Gold Star to provide certain services related to the operation and management of the restaurants within the Project, including but not limited to the final selection of sites, day to day operations of each restaurant, and

1

LIND000073

compliance with franchise agreements for each location ("**Gold Star Management Agreement**") which will provide for the Company to pay Gold Star for its services thereunder as set forth in **Exhibit D**; and

WHEREAS, in addition to the Management Fee, the Company may receive certain distributions from the Project Owner and the Members wish to have all funds received by the Company to be allocated and distributed as set forth in this Agreement.

WHEREAS, the Project Owner will create a separate, wholly owned disregarded subsidiary limited liability company to own each of the 6 franchised restaurants in the Project and may elect to do so for any real estate owned as part of the Project (each an "**Owner Subsidiary**"); and

NOW, THEREFORE, the Members agree as follows:

## ARTICLE I

### DEFINITIONS

The recitals and the associated definitions set forth therein are incorporated herein by reference. The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein);

(a)     The "Act" shall mean the Ohio Limited Liability Company Act.

(b)     "Capital Account" as of any given date shall mean the account mentioned for each pursuant to Section 8.4.

(c)     "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

(d)     "Capital Interest" shall mean the percentage interest of each Member set forth on **Exhibit A**.

(e)     "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

(f)     "Deficit Capital Account" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(i)   credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-l(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the

2

minimum gain attributable to any partner nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

(ii)    debit to such Capital Account the items described in Sections 1.704-l(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.7041(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(g)    "Distributable Cash" means all cash, revenues and funds received by the Company, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business, including but not limited to fees due and owing under the EB5 Management Agreement and the Gold Star Management Agreement; and (iii) such reasonable reserves as the Manager deems necessary in its sole and absolute discretion to the proper operation of the Company's business.

(h)    "Economic Interest" shall mean a Member's or other Person's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

(i)    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

(j)    "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

(k)    "Majority Interest" shall mean one or more Membership Interests which taken together exceed fifty percent (50%) of the Membership Interests.

(l)    "Manager" shall mean one or more managers. Initially, there shall be one (1) Manager, namely; GSC EB5 Investor LLC. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

(m)    "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become a Member.

(n)    "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the Capital Interest, and such other rights and privileges that the Member may enjoy by being a Member.

(o)    "Net Profits" and "Net Losses" shall mean for each taxable year of the Company an amount equal to the Company's net taxable income or loss for such year as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company and in accordance with Section 703 of the Code with the following adjustments:

3

LIND000075

(i) Any items of income, gain, loss and deduction allocated to Members pursuant to **Exhibit B** shall not be taken into account in computing Net Profits or Net Losses of this Operating Agreement;

(ii) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits and Net Losses (pursuant to this definition) shall be added to such taxable income or loss;

(iii) Any expenditure of the Company described in Section 705(a)(2)(B) of the Code and not otherwise taken into account in computing Net Profits and Net Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

(iv) In the event the value of any Company asset is adjusted pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits and Net Losses;

(v) Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the value of the asset on the Company's books, notwithstanding that the adjusted tax basis of such asset differs from such value;

(vi) In the event that Company property is reflected on the Company's books at a value that differs from its tax basis, then Company income, gain, loss and deduction shall (in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g)) include Company income, gain, loss and deduction determined by reference to the value of such property on the Company's books, but shall exclude income, gain, loss and deduction determined by reference to the value of such property as determined for income tax purposes; and

(vii) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Membership Interest or Economic Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses.

(p)     "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

(q)     "Person" shall mean an individual, a general partnership, a limited liability partnership, a limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation, or any other legal entity.

4

LIND000076

(r)    "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

## ARTICLE II

### FORMATION OF COMPANY

2.1    Formation.  On February 28, 2013, Mason Hill, LLC organized an Ohio Limited Liability Company by executing and delivering Articles of Organization to the Secretary of State of the State of Ohio in accordance with and pursuant to the Act.

2.2    Name.  The name of the Company is **GSC OPP MANAGEMENT, LLC**.

2.3    Principal Place of Business.  The principal place of business of the Company shall be 650 Lunken Park Drive, Cincinnati, Ohio 45226.  The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.4    Registered Office and Registered Agent.  The Company's registered office shall be at the office of its registered agent at 650 Lunken Park Drive, Cincinnati, Ohio 45226, and the name of its registered agent at such address shall be Michael E. Rohrkemper.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Ohio pursuant to the Act.

2.5    Term.  The term of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Act.

## ARTICLE III

### BUSINESS OF COMPANY

3.1    Permitted Businesses.  The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

(a)    To acquire, hold, sell, assign, transfer, pledge and otherwise deal with and own an interest in the Project Owner, and to serve as the Project Owner's sole general partner and to perform all tasks of the general partner of the Project Owner pursuant to a certain Limited Partnership Agreement dated May 7, 2013 ("Limited Partnership Agreement"), including but not limited to performing some of those duties by entering into the EB5 Management Agreement and the Gold Star Management Agreement.

5

LIND000077

(b) To exercise all powers enumerated in the Act necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

## ARTICLE IV

## NAMES OF MEMBERS

The names and addresses of the Members are set forth in **Exhibit A**.

## ARTICLE V

## MANAGEMENT OF COMPANY

5.1     Management.

(a)     The business and affairs of the Company shall be managed by the Manager or Managers, appointed from time to time by the Members. The Company shall initially have one (1) Manager. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of Members holding a Majority Interest of the Membership Interests. A Manager shall hold office until the next annual meeting of Members or until his successor shall have been elected and qualified or until his earlier death, resignation or removal. Managers need not be residents of the State of Ohio or Members of the Company. In the event there is more than one Manager, such Managers shall act only by unanimous vote of all Managers. The Company shall have a President, a Vice President and such other officers as may be deemed necessary, each or any of whom may be appointed by the Manager. The same individual may simultaneously hold more than one office in the Company. Unless otherwise provided in the resolution of election or appointment, each officer shall hold office until such officer resigns or is removed by the Manager. Each officer of the Company has the authority and shall perform the duties prescribed by the Manager. The Manager may remove any officer at any time with or without cause. The initial officers are listed on **Exhibit C**. The Manager shall have full authority to manage the affairs of the Company in accordance with the Act and this Operating Agreement.

(b)     The business and affairs of the Company shall be managed by its Manager. The Manager shall direct, manage and control the business of the Company to the best of its ability. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. Unless otherwise provided, the unanimous consent of all Managers is required to authorize and/or approve any action.

5.2     Indemnification.

6

LIND000078

(a) Each person who was or is a Member, Manager, or agent of the Company, or is or was serving at the request of the Company as a director, officer, partner, trustee, manager, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified by the Company to the full extent permitted by the law of the State of Ohio against any liability or loss (including attorneys' fees) reasonably incurred by such person in such capacity or arising out of acting in such capacity.

(b) Expenses (including attorneys' fees) incurred by a Member or Manager in defending any civil, criminal, administrative, or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written agreement by or on behalf of such Member or Manager to repay such amount if it shall ultimately be determined that he, she or it is not entitled to be indemnified by the Company as authorized in this Section 5.2. Such expenses (including attorneys' fees) incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Manager deem appropriate.

5.3    Certain Powers of Manager.

(a)  Without limiting the generality of Section 5.1, the Manager shall have power and authority, on behalf of the Company to do any and all of the following, and in doing so, may delegate such powers and authorities to any such officers of the Company as the Manager deems prudent:

(i) To acquire property from any Person as the Manager may determine. The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(ii) To borrow money for the Company from banks, other lending institutions, the Manager, Members, or affiliates of the Manager or Members on such terms as the Manager deems appropriate, and in connection therewith, provided, however, the Manager must obtain the prior written consent of all Members to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager;

(iii) To purchase liability and other insurance to protect the Company's property and business;

(iv) To hold and own any Company real and/or personal properties in the name of the Company;

(v) To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

7

(vi) To sell or otherwise dispose of all or substantially all of the assets of the Company, except for the general partnership interest in the Project Owner, as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(vii) To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; deeds; options; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company;

(viii) To execute on behalf of the Company and to take all actions on behalf of the Company as the general partner of the Project Owner, including but not limited to all actions authorized under the Limited Partnership Agreement, execution of the EB5 Management Agreement, the Gold Star Management Agreement, all documents necessary to form Subsidiary Owners, and to execute franchise agreements with Gold Star with 5% royalty and 4% marketing fees, and comply with all franchise requirements and for the Project Owner to guaranty such franchise agreement.

(ix) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(x) To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager may approve; and

(xi) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized or permitted to do so by this Operating Agreement, or by the Manager, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member or officer shall have any power or authority to bind the Company unless the Member or officer has been authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

5.4    Restrictions on Authority of the Manager(s).

(a) The Manager shall not have the authority to, and covenants and agrees that it shall not, do any of the following acts without the unanimous consent of the Members:

(i) Cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 3.1 hereof;

8

LIND000080

(ii) Knowingly do any act in contravention of this Operating Agreement;

(iii) Knowingly do any act which would make it impossible to carry on the ordinary business of the Company or the Project Owner, except as otherwise provided in this Operating Agreement; and

(iv) Cause or permit the Project Owner to invest or expend any funds for additional Gold Star Chili franchises in excess of the 6 set forth in the Business Plan if such funds or a portion thereof include amounts held by the Project Owner for Limited Partner distributions, provided such consent will not be unreasonably withheld.

(v) Cause the Project Owner to exercise its rights to purchase the Limited Partners' Units pursuant to Section 2.4 of the Limited Partnership Agreement.

5.5    Standard of Care. A Manager shall perform his duties as Manager in good faith, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, willful misconduct, knowingly breaching this Agreement or a wrongful taking by the Manager. In performing his or her duties, a Manager shall be entitled to rely upon such information, opinions, reports, or statements, including financial statements or other financial data, presented or prepared by (a) any of the Company's other Managers, officers, Members or employees who such Manager reasonably believes are reliable and competent in the matters prepared or presented, or (b) any other Person, including without limitation lawyers or accountants, as to matters which such Manager reasonably believes are within such Person's professional or expert competence.

5.6    Limitation of Liability. A Manager shall not be personally liable to the Company in monetary damages for breach of a duty to the Company unless it is proved by clear and convincing evidence in a court of competent jurisdiction that his or her action or failure to act (a) was not in good faith, (b) was undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company, (c) resulted in an improper personal benefit to such Manager or any of his or her Affiliates at the expense of the Company, (d) constituted fraud or deceit, or (e) was a knowing violation of law.

5.7    Managers and Members Have No Exclusive Duty to Company. The Manager shall not be required to manage the Company as its sole and exclusive function and it (and any Manager and/or Member) may have other business interests and may engage in other activities in addition to those relating to the Company. It is acknowledged that the Manager is a wholly owned subsidiary of Gold Star Chili, Inc. and as a result, both the Manager and Gold Star Chili, Inc. are permitted to continue with their normal business operations of being the franchisor for the Gold Star Chili restaurants and being an owner and operator of Gold Star Chili restaurants. The Member, Mason Hill, LLC and its principal owners and affiliates each will enter into a specific non-competition agreement satisfactory to the Manager that prohibits such parties from competing with the Limited Partnership or Gold Star Chili, Inc. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or

9

participate in such other investments or activities of the Manager and/or Member or to the income or proceeds derived therefrom. Neither the Managers nor any Member shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture except as set forth in Sections 5.5 and 5.6 or in violation of any separate non-compete agreements.

5.8     Bank Accounts. The Manager may from time to time open bank accounts in the name of the Company. The Manager may authorize Mason Hill to open additional accounts and when it does, the Manager and Mason Hill shall mutually agree on a simple and efficient method of obtaining from each other prompt approval and/or pre-approval for all authority to take action with regard to such accounts so that Company expenses will be paid in a timely and expedited fashion.

5.9     Resignation. A Manager of the Company may resign at any time by giving written notice to the Members of the Company at which time the Members shall select a successor Manager. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.10     Removal.  In the event GSC EB-5 Investor, LLC is serving as the Manager of the Company, and permits a default by Gold Star Chili, Inc. under the Gold Star Management Agreement to continue beyond the applicable cure period, if any, Mason Hill, LLC shall have the right to remove GSC EB-5 Investor, LLC as the Manager and appoint the Manager of its sole choice. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.11     Vacancies. Any vacancy occurring for any reason in the number of Managers shall be filled by the affirmative vote of the Members holding a Majority Interest of the Membership Interests. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of the Members holding a Majority Interest.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until his successor shall be elected and shall qualify, or until his earlier death, resignation or removal.

5.12     Right to Rely on the Managers.

(a) Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(i)  The identity of any Manager, officer or any Member;

(ii) The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by any Manager or officer or which are in any other manner germane to the affairs of the Company;

10

LIND000082

(iii) The Persons and/or officers who are authorized to execute and deliver any instrument or document of the Company including any such deeds, mortgages and related documents; or

(iv) Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member or officer.

## ARTICLE VI

### RIGHTS AND OBLIGATIONS OF MEMBERS

6.1     Limitation of Liability.  Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.  In furtherance of the foregoing, none of the Members, Managers, officers or advisory board members of the Company shall be personally liable to satisfy any debt, obligation or liability of any kind of the Company solely by reason of being a Member, Manager, officer or advisory board member.

6.2     Company Books.  The Company shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents. Upon reasonable request, each Member and Economic Interest Owner shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's and Economic Interest Owner's expense.

6.3     Priority and Return of Capital.  Except as may be expressly provided in Article VIII, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

6.4     Voting.  Notwithstanding anything contained herein to the contrary, when acting on matters subject to the vote of the Members, notwithstanding that the Company is not then insolvent, the Members and the Manager shall take into account the interest of the Company's creditors, as well as those of the Members.

6.5     Preemptive Rights.  Each Member have pre-emptive rights to subscribe for or to purchase any Membership Interest of Company of any class, whether such Membership Interest or such class be now or hereafter authorized.

6.6     Loans to Company.  All funds provided to the Company by a Member other than as a contribution of capital made in accordance with Article VIII, advances previously made by GSC EB5 Investor LLC for the Palomar and UK locations, and any loans from a member made in accordance with Section 5.3(a)(ii), shall be approved by the unanimous approval of the Members and treated as a loan which shall not enlarge the Member's Membership Interest in the Company but shall be a debt due from the Company to such Member.  Any loans made by Member shall bear interest at the Applicable Federal Rate in effect at the time of the loan, provided that if such funds are borrowed from a third party institution by the Member, the rate shall be equal to the rate charged to the loaning Member by such third party institution..

11

LIND000083

Such loan shall constitute a liability of the Company and shall be repaid from Company funds subsequent to any payments of any operating expense but prior to any distributions under Article VIII.

6.7    Confidentiality and Other Restrictions. Mason Hill agrees that upon the execution of a Franchise Agreement for any restaurant location by the Project Owner or any of its subsidiaries, that Mason Hill and each of its members shall be obligated to execute an agreement containing the non-competition, confidentiality provisions contained in Sections 11 and 12 of Gold Star Chili, Inc.'s standard franchise agreement. Mason Hill agrees that this is a material inducement to GSC EB5 Investments LLC entering this Operating Agreement and Gold Star Chili, Inc. entering into any franchise agreement.

## ARTICLE VII

### MEETINGS OF MEMBERS

7.1    Special Meetings. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Member.

7.2    Place of Meetings. The Members may designate any place, either within or outside the State of Ohio, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Manager in the State of Ohio.

7.3    Notice of Meetings. Except as provided in Section 7.4, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten nor more than fifty days before the date of the meeting, either personally or by mail, by or at the direction of the person calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the Company, with postage thereon prepaid.

7.4    Meeting of all Members. If all of the Members shall meet at any time and place, either within or outside of the State of Ohio, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

7.5    Quorum. Members holding 100% of the Membership Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members.

7.6    Manner of Acting. If a quorum is present, the affirmative vote of Members holding a Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, the Articles of Organization, or this Operating Agreement.

7.7    Waiver of Notice. When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

7.8    Action Without A Meeting. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more consents describing the action taken, signed by such Members as would be required for approval at a meeting of Members if all Members were present and voting.

12

ARTICLE VIII

CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.1     Members' Capital Contributions.  Each Member's initial Capital Contribution is set forth in **Exhibit A**.

8.2     Additional Contributions.  To the extent unanimously approved by the Members, from time to time, the Members shall make additional Capital Contributions which shall be pro rata to all Members in accordance with the Capital Interests of the Members as set forth on **Exhibit A**.

8.3     No Withdrawal.  Except as provided in Article XI, no Member shall withdraw any part of his Capital Account without the consent of Members holding 100% of the Membership Interests.

8.4     Capital Accounts.

(a)  A separate Capital Account will be maintained for each Member.  Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of Net Profits; (4) any items in the nature of income and gain which are specially allocated to the Member pursuant to Paragraphs (a), (b), (c), (d), (e), (f), (g), and/or (h) of **Exhibit B**; and (5) allocations to such Member of income described in Section 705(a)(1)(B) of the Code.  Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of expenditures described in Section 705(a)(2)(B) of the Code; (4) any items in the nature of deduction and loss that are specially allocated to the Member pursuant to Paragraphs (a), (b), (c), (d), (e), (f), (g), and/or (h) of **Exhibit B**; and (5) allocations to the account of such Member of Net Losses.

(b)  The manner in which Capital Accounts are to be maintained pursuant to this Section 8.4 is intended to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.  If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.4 should be modified in order to comply with Section 704(b) of the Code and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.4, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(c)  Except as otherwise required in the Act (and subject to Section 8.2), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

13

LIND000085

ARTICLE IX

ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.1     Allocations of Profits and Losses from Operations. Except as provided in **Exhibit B**, the Net Profits and Net Losses of the Company for each fiscal year will be allocated in accordance with the Capital Interests set forth on **Exhibit A**.

9.2     Distributions. All distributions of Distributable Cash shall be made to the Members in the same manner as Net Profits and Net Losses are allocated pursuant to Section 9.1. In the event of a refinancing of any debt of the Company or a sale or other disposition of Company property which does not result in a termination of the Company, any Net Cash From Refinancing (as defined herein) or net proceeds from such disposition that the Manager determines is available for distribution shall be distributed to the Members, not later than ninety (90) days after the refinancing or disposition, in the same manner as Net Profits and Net Losses are allocated pursuant to Section 9.1,. Any proceeds from the sale of Company property which results in a termination of the Company shall be distributed in accordance with Article XV.

9.3     Accounting Principles. The profits and losses of the Company shall be determined in accordance with accounting principles applied on a consistent basis using the method of accounting selected by the Manager. It is intended that the Company will elect those accounting methods which provide the Company with the greatest tax benefits.

9.4     Interest On and Return of Capital Contributions. No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein.

9.5     Accounting Period. The Company's accounting period shall be the calendar year.

9.6     Election Under Section 754. The Company may elect, pursuant to Section 754 of the Code, to adjust the basis of Company property when a Member sells his Membership Interest. To the extent that any adjustments to the tax basis of any Company asset is made pursuant to Sections 734(b) or 743(b) of the Code as a result of such an election, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulation § 1.704-(b)(2)(iv)(m).

ARTICLE X

DEATH; WITHDRAWAL

10.1     Withdrawal. A Member shall be permitted to withdraw from the Company without the unanimous approval of the remaining Members by providing at least sixty (60) days prior written notice of the effective date of its withdrawal.

10.2     Continuation of the Company. Upon the death, expulsion, bankruptcy, or withdrawal of a Member (a **"Withdrawal Event"**), remaining Members shall have the right to continue the Company's business under its present name following the Withdrawal Event, provided they unanimously elect to

14

LIND000086

purchase the interest of such Member and continue the business of the Company. The dissolution of a Member shall not be a Withdrawal Event and any person receiving a dissolved Member's interest in the Company shall be Economic Interest Holders unless the remaining Members consent in writing to such parties becoming Members. The election to purchase the interest of such Member shall be exercised by written notice ("**Purchase Notice**") delivered within ninety (90) days after the effective date of the Withdrawal Event or if such Member is deceased or adjudicated incompetent, the appointment of the personal representative of a deceased or incompetent Member. Such Purchase Notice may be delivered in person or may be mailed by registered or certified mail, postage prepaid, to the last known address of the withdrawing Member or to the personal representative of the deceased or incompetent Member.

10.3     Method of Purchase. The remaining Members may upon their unanimous consent, cause the Company to purchase the interest of such Member within one year of the Withdrawal Event at in an amount equal to the Capital Account of such Member as of the date of the Withdrawal Event.

ARTICLE XI
INTENTIONALLY OMITTED

ARTICLE XII

TERMS OF PAYMENT UPON A WITHDRAWAL EVENT

12.1     Payments to a Withdrawing Member. When the Membership Interest of the Member causing the Withdrawal Event is purchased, payment for the value of his Membership Interest in the Company, as determined under Article XI, shall be paid, at the option of the Company over a period of not more than one (1) year beginning no later than four (4) months after the election to purchase the Membership Interest.

12.2     Interest on Payments. No interest shall be paid on the payments provided in this Article if the payments are made within (6) months after the Withdrawal Event. Any amount not paid within six (6) months after the Withdrawal Event shall thereafter bear interest on the unpaid balance thereof at a rate equal to the applicable federal rate under Section 1274(d)(2) of the Code, or any similar successor provision of law.

12.3     Income Tax Incidents of Payments. It is the intention of the parties that all payments described in Article X or Article XI to a Member causing a Withdrawal Event, to the personal representative or beneficiary of a deceased Member, or to an incompetent Member shall constitute payment for his Membership Interest in Company property to the extent of such Member's Capital Account as adjusted pursuant to Section 11.3, and to that extent shall be considered a distribution by the Company under Section 736(b) of the Code.

ARTICLE XIII

ADMISSION OF NEW MEMBERS;
TRANSFERABILITY OF A MEMBERSHIP INTEREST

15

LIND000087

13.1    Admission of New Members Other Than Upon Sale of a Membership Interest. Subject to the provisions of Section 13.2, new Members may be admitted to the Company at the beginning of each Company year by a unanimous vote of the Members. In such case, a supplemental agreement shall be executed by all the Members and by the new Member setting forth (a) the amount of Company capital and the allocation thereof among the Members, (b) the allocation among all of the Members of items of income, gain, loss, deduction, or credit as specified in Section 9.1, and (c) a statement that all Members shall be bound by this Operating Agreement as amended by the supplemental agreement. Each new Member shall pay in cash an amount determined by multiplying his share of the capital of the Company, as set forth in the supplemental agreement, by the total value of the Members' Membership Interests as determined in Article XII as of the date of admission of the new Member to and among the existing Members allocated according to the ratio of their Capital Accounts prior to the admission of the new Member. If the new Member shall so request in writing within ten (10) days of his admission as a Member, the Members shall join with the new Members in causing the Company to file an election under Section 754 of the Code to adjust the basis of the Company property.

13.2    Sale of Membership Interest. No Member shall sell, assign, transfer, or otherwise dispose of all or part of his Membership Interest except in compliance with the following provisions:

(a)    If a Member desires to sell, convey, assign, transfer, pledge or otherwise dispose of any or all of his Membership Interest and shall solicit or receive a bona fide offer from a third party (who may be another Member) to acquire such Membership Interest that such Member desires to accept (an "Offer"), then such Member shall promptly, but in any event not more than ten (10) business days after receipt of the Offer, give the Company and the other Members written notice of the Offer (the "Notice"). The Notice shall specify: (i) the size of the Membership Interest that is the subject of the Offer (such Membership Interest being hereinafter referred to as the "Offered Interest"); (ii) the identity, residence address and resume of the proposed acquirer of the Offered Interest and of each person that will have a beneficial interest in the Offered Interest pursuant to the Offer; (iii) the price for the Offered Interest contained in the Offer, including a detailed description of the terms of payment and of any non-cash consideration to be received by such Member pursuant to the Offer (the "Offer Price"); and (iv) the proposed time and date of closing of the Offer purchase transaction. During the period commencing on the date the Company receives the Notice and ending thirty (30) days thereafter (the "Company Option Period"), the Company shall have the exclusive right (but not the obligation) to acquire the Offered Interest for the Offer Price. The Company may exercise its option by delivering, within the Company Option Period, to the Member who has given Notice and to the other Member a writing stating that the Company has elected to acquire the Offered Interest pursuant to this Section 13.2(a) (the "Notice of Company Option Exercise"). The Notice of Company Option Exercise shall stipulate a closing date for the Company's acquisition of the Offered Interest that shall not be later than ninety (90) days after the date on which the Company received the Notice.

(b)    If the Company Option Period shall have expired without the election by the Company to acquire the Offered Interest, then, for a period of thirty (30) days commencing thirty-one (31) days after the date on which the Company received the Notice (the "Member's Option Period"), the Members other than the Member who has given the Notice shall have the exclusive right (but not the obligation) to acquire the Offered Interest for the Offer Price. Said Members may exercise this option by delivering, within the Member's Option Period, to the Member who has given the Notice and to the Company a writing stating that such Members have elected to acquire the Offered Interest pursuant to this

16

LIND000088

Section 13.2(b) (the **"Notice of Member's Option Exercise"**). The Notice of Member's Option Exercise shall stipulate a closing date for the acquisition of the Offered Interest that shall not be later than one hundred twenty (120) days after the date on which the Company received the Notice. To the extent that, hereafter, the number of Members total more than two, the option contained in this clause (b) shall be a pro rata option of each Member other than the Member desiring to sell any or all of his Membership Interest.

(c)     If, but only if, the Company Option Period and the Member's Option Period shall have expired without the election by the Company or the Members other than the Member who has given the Notice, respectively, to acquire the Offered Interest, then, upon receipt by the Company of a written instrument in form and substance satisfactory to the Company pursuant to which the party (or parties) to whom the Offer Interest are to be transferred pursuant to the Offered agree to be bound as a Member under this Operating Agreement, the Member shall be free to transfer the Offered Interest to said party (or parties) on the exact terms and conditions set forth in the Offer. Any variation of or amendment, modification or supplement to such terms and conditions in the Offer shall be deemed to create a new offer subject to the provisions of Sections 13.2(a) and 13.2(b).

(d)     The Member who shall have given the Notice shall not, and representatives of such Member serving as Manager or on the Company's advisory board, if any, shall not, participate in any deliberations with respect to the exercise of the Company's option to acquire the Offered Interest. If the Offer Price shall include non-cash consideration, either of the Company or the Member other than the Member giving the Notice, as the case may be, shall have the right (but not the obligation) to substitute cash in an amount equal to the approximate value of the non-cash consideration.

13.3     Investment Intent. Each Member, by signing this Operating Agreement, acknowledges that the Membership Interest of such Member will be acquired for investment for its own account, not as a nominee or agent, and not with a view to the resale or distribution thereof. Each Member acknowledges that no Membership Interest has been registered under the Securities Act of 1933, as amended (the "Act"), and, therefore, if the Membership Interests are deemed to be securities, in addition to the restrictions contained in Section 13.2 hereof, no Membership Interest may be resold unless subsequently registered under such Act or unless an exemption from such registration is available. Each Member, other than the two initial Members, represents and warrants that he is either an "accredited investor," as that term is defined in Regulation D promulgated under the Act or has such knowledge, experience and sophistication in the areas in which the Company intends to do business so as to be in a position to understand the risks associated with investment in the Company and bear the loss of such investment. Each Member acknowledges that he/it has been provided the opportunity to ask questions of and receive answers concerning Company. Each Member has conducted his/its own investigation of Company and is prepared to bear the financial risks of an investment therein for an indefinite period of time.

ARTICLE XIV

OPTION TO PURCHASE
GSC EB5 INVESTOR LLC MEMBERSHIP INTEREST.

17

14.1 Provided Mason Hill has not been in default of this Agreement or the EB5 Management Agreement Mason Hill shall have the option, which shall not expire, to purchase all but not less than all of GSC EB5 Investor LLC's Membership Interest in the Company ("Mason Option"), at any time after the Project Owner's limited partners have received their respective permanent residency statuses, all applicable USCIS Regulations related to the Project have been satisfied and the EB5 Investors' interests in the Project Owner have been purchased by the Project Owner pursuant to Section 2.4 of the Limited Partnership Agreement ("Option Commencement Date"). Mason Hill shall exercise it's rights under this Section by delivering written notice to the GSC EB5 Investor LLC at least thirty (30) days prior to the date specified by Mason Hill in such notice as the closing date for such purchase ("Buyout Date").

18

LIND000090

14.2    The purchase price for the GSC EB5 Investor LLC's Membership Interest ("Buyout Price") shall be the amount determined as if the Project Owner is sold at fair market value (as hereinafter determined) and the proceeds distributed to the partners of the Project Owner and such amount received by the Company multiplied by the GSC EB5 Investor LLC's percentage of total membership interests owned.

14.3    The fair market value of the Project Owner shall be determined by agreement between the Members. Such fair market value shall either be agreed upon between the parties or, if they are unable to agree, then determined by a single appraiser acceptable to both parties. If, within thirty (30) days following the Manager's notice of exercise of the option, the parties have not reached agreement on fair market value or on a single appraiser to determine fair market value, then either party may demand arbitration to be conducted by three appraisers, one appointed by each party and the third appointed by the first two. If the third appraisal is less than either of the first two, then the fair market value shall be the average of the two lowest appraisals. If the third appraisal is greater than the first two, then the fair market value shall be the average of the two highest appraisals. If the third appraisal falls between the previous two appraisals, the fair market value shall be the value established by the third appraisal Each appraiser shall be experienced in the valuation of operating businesses in the retail and restaurant industry. If either party shall demand arbitration, such demand shall be in writing and shall name the appraiser designated by such party. If the other party shall fail to name its appraiser within ten (10) days following such demand for arbitration, and if such failure shall continue for five (5) days after the other party shall have received notice demanding such appointment, then the first appraiser may appoint the third, and the two of them will appoint the second. The proceedings of such appraisers shall conform to the rules of the American Arbitration Association, as far as appropriate, and its decision shall be final and binding. The expense of the appraisals shall be paid by the Company.

14.4    The Buyout Price shall be paid in cash to GSC EB5 Investor LLC on the Buyout Date. GSC EB-5 Investor, LLC and Mason Hill shall execute and deliver all documents and instruments of assignment deemed necessary or appropriate for the consummation of such sale of Membership Interests. All agreements and obligations of the Project Owner, including any franchise agreements with Gold Star shall remain in full force and effect after the sale of interests pursuant to this section.

14.5 In the event Mason Hill has failed to exercise its Mason Option on or before a date which is five (5) years after the Option Commencement Date then GSC EB5 Investor LLC shall have the option, which shall not expire, to purchase all but not less than all of Mason Hill's Membership Interest in the Company on the same terms and conditions set forth for the Mason Option above and all but not less than all of Mason Hill's limited partnership interests in the Project Owner for fair market value determined in accordance with this paragraph 14 (but such determination of value shall be separate from the value of the Membership Interest in the Company).

## ARTICLE XV

### DISSOLUTION AND TERMINATION

15.1    Dissolution.

(a)    Except as otherwise provided herein, the Company shall be dissolved upon the occurrence of any of the following events:

19

(i) the written agreement of all the Members; or

(ii) the occurrence of a Withdrawal Event, unless, subject to Article XI, the business of the Company is continued by the consent of a unanimous vote of the remaining Members within 90 days after the Withdrawal Event and there is at least one remaining Member. Notwithstanding anything contained herein to the contrary, the Company shall continue and not dissolve whether as a consequence of the bankruptcy or insolvency of one or more of the Members, or otherwise, but the Company shall continue as long as there remains a solvent Member.

(b) Except as expressly permitted in this Operating Agreement, a Member shall not voluntarily resign or take any other voluntary action which directly causes a Withdrawal Event.

15.2 Effect of Filing of Certificate of Dissolution. Upon the filing by the Secretary of State of a certificate of dissolution, the Company shall continue its existence until the winding up of its affairs is completed.

15.3 Winding Up, Liquidation and Distribution of Assets.

(a) Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(i) Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members unanimously elect to receive distributions of any assets in kind),

(ii) Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are also creditors, and

(iii) Distribute the remaining assets in the following order:

(1) If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members holding 100% of the Membership Interests. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to Article XII to reflect such deemed sale.

(2) The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-l(b)(2)(ii)(b)(2) of the Treasury Regulations.

20

(c)  Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Treasury Regulations, if any Member or Economic Interest Holder has a negative balance in his Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member or Economic Interest Holder shall have no obligation to make any Capital Contribution, and the negative balance of such Capital Account shall not be considered a debt owed by such Member or Economic Interest Holder to the Company or to any other person for any purpose whatsoever.

## ARTICLE XVI

### MISCELLANEOUS PROVISIONS

16.1  Notices.  Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement.  Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

16.2  Application of Ohio Law.  This Operating Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Ohio, and specifically the Act.

16.3  Waiver of Action for Partition.  Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

16.4  Amendments.  This Operating Agreement may not be amended except by the written agreement of Members holding 100% of the Membership Interests.

16.5  Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

16.6  Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

16.7  Counterparts.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

16.8  Tax Matters Partner.  GSC EB5 Investor LLC shall serve as the tax matters partner as defined in Section 6231(a) of the Code, until such time that it resigns or is removed by vote of the Members

21

LIND000093

holding a Majority Interest. Upon such resignation or removal, a new tax matters partner shall be selected by unanimous vote of the Members holding a Majority Interest.

16.9    Arbitration. All claims, demands, disputes, controversies and differences that may arise between or among any of Members, Managers and/or Company concerning any issue relating to the interpretation or enforcement of this Operating Agreement or relating to the rights or liabilities of any of Members, Managers and/or Company under this Operating Agreement, any management agreement, or cross indemnification agreement, shall be exclusively determined and settled by arbitration ("**Arbitration**") on the following terms:

(a)    Any party to such claim, demand, dispute, controversy or difference may, by written notice to all other parties to such claim, demand, dispute, controversy or difference, appoint an arbitrator who shall be a person experienced in serving as an arbitrator under the rules of the American Arbitration Association ("**AAA**"). Each other party to such claim, demand, dispute, controversy or difference shall, by written notice, within 10 days after receipt of such notice by the first party, appoint another arbitrator who shall have the same qualifications and, in default of any such appointment by any of such other parties, the first arbitrator appointed shall be the sole arbitrator.

(b)    If more than one arbitrator has been appointed in accordance with Section 16.9(a), but such number of arbitrators is an even number, such arbitrators shall, if possible, agree upon one more arbitrator with the same qualifications and shall appoint him/her by written notice signed by each of the initial arbitrators with a copy mailed to each party to the claim, demand, dispute, controversy or difference within 10 days after the appointment of the last of the initial arbitrators to be appointed. If such 10 day period has elapsed without notice of appointment of the additional odd-numbered arbitrator, then any one or more parties to the claim, demand, dispute, controversy or difference may, in writing, request any Hamilton County, Ohio, Circuit Court Judge to appoint a third arbitrator.

(c)    In lieu of the foregoing, the parties to such claim, demand, dispute, controversy or difference may agree upon a single arbitrator who shall serve as the sole arbitrator for all purposes of this Section 16.9.

(d)    Within 30 days after the multiple arbitrators or single arbitrator are appointed as provided for above, such arbitrators or arbitrator shall hold an arbitration hearing in Cincinnati, Ohio. At the arbitration hearing, the laws of evidence of the State of Ohio shall apply, and the arbitrators or arbitrator shall allow each party to present that party's case, evidence and witnesses, if any, in the presence of the other party or parties, and shall render an award, including a provision for payment of costs and expenses of arbitration to be paid by one or more parties to the claim, demand, dispute, controversy or difference, as the arbitrator or arbitrators deem just.

(e)    The award of the majority of the multiple arbitrators, or the award of the sole arbitrator, shall be binding on the parties to this Agreement, with no right to appeal with respect to any questions of law or any other issue to any court, and judgment may be entered on such award in any court having jurisdiction.

(f)    The parties request that the arbitrators or arbitrator include in the award explicit provision for the payment of all arbitration costs and expenses, including, without limitation, reasonable attorneys' fees and other costs and expenses incurred by the parties, on terms and conditions that the

22

arbitrators or arbitrator deem just. If the award does not include a complete determination with respect to such costs for any reason, then except to the extent otherwise provided by the award (i) the costs and expenses of the arbitration with respect to any arbitrator shall be borne by the party appointing that arbitrator, (ii) the costs and expenses of the arbitration with respect to any odd-numbered arbitrator appointed by the arbitrators or the sole arbitrator appointed by the parties if there shall be only one arbitrator, as the case may be, shall be evenly divided among all parties to such claim, demand, dispute, controversy or difference, and (iii) each party to such claim, demand, dispute, controversy or difference shall otherwise bear such party's own costs and expenses, including, without limitation, attorneys' fees.

(g) Except where in conflict with the terms of this Section 16.9, the rules and procedures of AAA shall govern the arbitration proceedings.

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement constitutes the Operating Agreement of Company adopted by the Members of the Company as of the date first written above.

**MEMBERS:**

**GSC EB5 INVESTOR LLC**

By: *Michael E Rohrkemper*
Title: Michael E. Rohrkemper, Manager

**Mason Hill, LLC**

By: _____
Title: Gary Chan, Authorized Member

23

575459v1

24

LIND000096

## EXHIBIT A

| Initial Members | Initial Capital Contribution | Allocation of Profits and Losses | Capital Interest |
|---|---|---|---|
| GSC EB5 Investor LLC<br>650 Lunken Park Drive<br>Cincinnati, Ohio 45226 | $1,212,500* | 97.00% | 97.00% |
| Mason Hill, LLC<br>1021 Delta Avenue<br>Cincinnati, OH 45208 | $37,500* | 3.00% | 3.00% |

\*    contributions will be made on a schedule as the capital is required per the following schedule

| GSC Opp Management Equity Contribution Plan | Date | GSC EB5 Investor LLC 97% Member | Mason Hill LLC 3% Member | | | | | |
|---|---|---|---|---|---|---|---|---|
| development to date | 4/15/13 | $30,000 | $37,500 (in kind donation for costs of EB5 offering) | | | | | |
| Completion of offering documents | 6/1/13 | $20,000 | | | | | | |
| EB5 Investor subscription to the Project Owner | 7/1/2013 | $20,000 | | | | | | |
| Admission of EB5 Investors to Project Owner and release of EB5 Investor funds to Project Owner | 8/1/2013 | $1,142,500# | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Total Capital | | $1,212,5000 | $37,500 | | | | | |

# GSC EB5 Investor LLC shall make the $1,142,500 capital contribution to the Company ratably with contributions made by the EB5 Investors to the Project Owner and may include sums expended in advance to secure locations for the Project, other project expenses including franchise fees and royalty fees.

25

LIND000097

## EXHIBIT B

### Special Allocations to Capital Accounts
### and Certain Other Income Tax Allocations

Notwithstanding Section 9.1 hereof:

(a)     If there is a net decrease in "Company minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(d)) for a fiscal year, then, subject to the last paragraph of this **Exhibit B**, there shall be allocated to each Member items of income and gain for that year equal to that Member's share of the net decrease in minimum gain (within the meaning of Treasury Regulations Section 1.704-2(g)(2)). The foregoing is intended to be a "minimum gain chargeback" provision as described in Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in all respects in accordance with that Treasury Regulations Section.

If during a fiscal year there is a net decrease in partner (Member) nonrecourse debt minimum gain (as determined in accordance with Treasury Regulations Section 1.704-2(i)(3)), then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, any Member with a share of that nonrecourse debt minimum gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the fiscal year shall, subject to the last paragraph of this **Exhibit B**, be allocated items of income and gain for that year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in such nonrecourse minimum gain. The foregoing is intended to be the "chargeback of partner (Member) nonrecourse debt minimum gain" required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with that Treasury Regulations Section.

The allocations set forth in the two preceding paragraphs of this **Exhibit B** shall be subject to (1) the exceptions set forth in Treasury Regulations Section 1.704-2(f)(2) and (f)(3), and (2) any exceptions provided by the Commissioner of the Internal Revenue Service ("**Commissioner**") pursuant to Treasury Regulations Section 1.704-2(f)(5) (except that if the Company shall have any discretion as to an exception set forth pursuant to Treasury Regulations Section 1.704-2(f)(5), the Manager may exercise such discretion on behalf of the Company), and (3) any exceptions set pursuant to Treasury Regulations Section 1.704-2(i)(4) including exceptions that such Treasury Regulations Section incorporates by reference to those provided pursuant to Treasury Regulations Sections 1.704-2(f)(2) and (f)(3) and including exceptions provided by the Commissioner pursuant to the Commissioner's authority provided by analogy to Treasury Regulations Section 1.704-2(f)(5) (and subject to the Manager's exercise of any Company discretion as to these exceptions). The Manager shall, if the application of the minimum gain chargeback requirements would cause a distortion in the economic arrangement among the Members, ask the Commissioner to waive the minimum gain chargeback requirements pursuant to Treasury Regulations Sections 1.704-2(f)(4) and 1.704-2(i)(4).

(b)     If during any Fiscal Year of the Company a Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), which causes or increases a deficit balance in the Deficit Capital Account, there shall be allocated to the Member items of income and gain (consisting of a pro rata portion of each item of Company income,

26

including gross income, and gain for such year) in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. The foregoing is intended to be a "qualified income offset" provision as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d), and shall be interpreted and applied in all respects in accordance with such Regulation.

(c)     If the allocation of any item of loss or deduction for any Fiscal Year pursuant to Section 9.1 would cause or increase a deficit balance in the Deficit Capital Account of any Member as of the end of such Fiscal Year, then, to the extent the allocation of such item of loss or deduction would have such effect, it shall instead be allocated (i) first, among those Members having positive balances in their Deficit Capital Accounts as of the end of such Fiscal Year in proportion to the positive balances in their respective Deficit Capital Accounts, and (ii) thereafter, as provided in Section 9.1.

(d)     Notwithstanding anything to the contrary in this **Exhibit B**, any item of deduction, loss, or Section 705(a)(2)(B) of the Code expenditure that is attributable to "partner (Member) nonrecourse debt" shall be allocated in accordance with the manner in which the Members bear the economic risk of loss for such debt (determined in accordance with Treasury Regulations Section 1.704-2(i)).

(e)     Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in the same manner as Net Profit or Net Loss is allocated for such period.

(f)     All recapture of income tax deductions resulting from sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(g)     Any credit or charge to the Capital Accounts of the Members pursuant to Sections (a), (b), (c), (d), and/or (e) of this **Exhibit B** hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.1 and 9.2 (a), (b), (c), (d), and/or (e) and shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of Article IX if the special allocations required by Sections (a), (b), (c), (d), and/or (e) of this **Exhibit B** had not occurred.

27

LIND000099

## **EXHIBIT C**

Officers

Michael E. Rohrkemper   - President

Michael Mason            - Vice President

28

LIND000100

**Exhibit D**

**Management Fees**

29

LIND000101

U.S. Bank, National Association
Escrow Agent
Corporate Trust Services
425 Walnut Street
Cincinnati, OH 45202


The undersigned, GSC Opp Management, LLC, an Ohio limited liability company, is the general partner of GSC Opportunities, L.P., an Ohio limited partnership. The purpose of this letter is to advise that Gary Chan is authorized to sign documents, deposit funds and provide written direction and authorization on behalf of GSC Opportunities, L.P., as the "Issuer Representative" for all purposes concerning the Master Escrow Agreement. Please contact the undersigned if you need anything further concerning this matter.

Sincerely,

GSC OPPORTUNITIES, L.P.
By: GSC OPP MANAGEMENT, LLC,
    General Partner
By: GSC EB-5 INVESTOR, LLC,
    Manager

By: _____
    Mike Rohrkemper,
    Its Authorized Officer

573074v1

Δ π EXHIBIT 10
Deponent_____
Date_____ Rptr_____
WWW.DEPOBOOK.COM

Private Placement
Memorandum

# GSC Opportunities, L.P.,
### an Ohio Limited Partnership
**1021 Delta Avenue**
**Cincinnati, OH 45208**

Maximum Offering Amount: $2,500,000
$500,000 per Unit

———————————

GSC OPPORTUNITIES, L.P., an Ohio limited partnership (the "Fund"), is a newly-organized Ohio limited partnership which intends to raise capital to open and operate Gold Star Chili franchise restaurants in Cincinnati, Ohio, USA, as described in the business plan (Exhibit [C]) distributed together with this Private Placement Memorandum. The Fund proposes to sell to eligible investors up to 5 units of limited partnership interests (the "Units") for $500,000 per Unit. Each Unit represents a 13-1/3% limited partnership interest of the Fund. The Fund's general partner is GSC Opp Management, LLC, an Ohio limited liability company ("GP").

The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion.

The primary investors targeted by this offering are immigrants seeking to enter the United States under
the fifth employment based visa preference category ("EB-5"). The EB-5 category is available to immigrants investing in a new commercial enterprise that will benefit the U.S. economy and create at least 10 full-time jobs.

———————————

**An investment in Units involves risks. See "Risk Factors."**

Neither the Securities and Exchange Commission nor the securities commission of any other jurisdiction has approved or disapproved of these securities or passed upon the adequacy or accuracy of this memorandum. Any representation to the contrary is a criminal offense.

Prospective investors should not construe the contents of this memorandum as legal or tax advice. Each prospective investor should consult his or her own legal and tax advisers.

**ALL INVESTORS ARE REQUIRED TO SECURE AND RETAIN INDEPENDENT IMMIGRATION COUNSEL.**

———————————

The date of this Private Placement Memorandum is May 7, 2013.

1


Δ π EXHIBIT __11__
Deponent_____
Date_____
WWW.DEPOBOOK.COM

This memorandum is for review by the recipient only. The recipient, by accepting delivery of this memorandum, agrees to return this memorandum, all enclosed or attached documents, and all other documents, if any, provided in connection with the offering to the GP if the recipient does not undertake to purchase any of the securities offered hereby. This memorandum is furnished for the sole use of the recipient, and for the sole purpose of providing information regarding the offer and sale of Units. Neither the GP nor the Fund has authorized any other use of this information. Any distribution of this memorandum to a person other than representatives of the recipient is unauthorized, and any reproduction of this memorandum or the divulgence of any of its contents, without the prior written consent of the Fund or the GP is prohibited. The delivery of this memorandum or other information does not imply that the memorandum or other information is correct as of any time subsequent to the date appearing on the cover of this memorandum.

The delivery of this memorandum does not constitute an offer in any jurisdiction to any person to whom such offer would be unlawful in such jurisdiction. The recipient should rely only on the information contained in this memorandum. The information contained in this memorandum supersedes any other information provided to potential investors. Neither the GP nor the Fund has authorized any person to provide any information or to make any representations except to the extent contained in this memorandum. If any such representations are given or made, such information and representations must not be relied upon as having been authorized by the Fund or the GP. This memorandum is not an offer to sell, nor is it seeking an offer to buy, securities in any jurisdiction where the offer or sale is not permitted. The information in this memorandum is accurate as of the date on the front cover, but the information may have changed since that date.

The price of the Units as described in this memorandum has been arbitrarily determined by the Fund and the GP, and each prospective investor should make an independent evaluation of the fairness of such price under all the circumstances as described in this memorandum.

No representations or warranties of any kind are intended nor should any be inferred with respect to the economic viability of this investment or with respect to any benefits which may accrue to an investment in the Units. Neither the GP nor the Fund in any way represents, guarantees or warrants an economic gain or profit with regard to this investment or that favorable income tax consequences will flow therefrom. Neither the GP nor the Fund in any way represents or warrants the advisability of buying Units. Any projections or other forward-looking statements or opinions contained in this memorandum constitute estimates based upon sources deemed to be reliable, but the accuracy of this information is not guaranteed nor all-inclusive.

No person is authorized to give any information or make any representation in connection with this memorandum, except such information as is contained or referenced in this memorandum. Only information or representations contained or referenced herein may be relied upon as having been made by the Fund and the GP. Prospective investors who have questions concerning the terms and conditions of this memorandum or who desire additional information or documentation to verify the information contained herein should contact the GP. Projections or forecasts contained in this memorandum, or other materials, must be viewed only as estimates. Although any projections contained in this memorandum are based upon assumptions, which the Fund and the GP believes to be reasonable, the actual performance of the Fund may depend upon factors beyond its control. No assurance can be given that the Fund's actual performance will match its intended results.

2

LIND000033

## FORWARD-LOOKING STATEMENTS

All statements other than statements of historical facts included in this memorandum or in any exhibits hereto, including without limitation, statements regarding financial position, business strategy, growth strategy and other plans and objectives for future operations, are forward-looking statements as such term is defined in the Private Securities Litigation Reform Act of 1995. The words "anticipate," "believe," "estimate," "expect," "intend," "plan," and similar expressions that may tend to suggest a future event or outcome are not guarantees of performance, which cannot be predicted or anticipated. These forward-looking statements are based largely on expectations and are subject to a number of risks and uncertainties, many of which are beyond the control of the Fund or the GP. Actual results could differ materially from these forward-looking statements for a number of reasons, including, but not limited to, the matters discussed under "Risk Factors" and elsewhere in this memorandum. As a result, potential investors should not unduly rely on forward-looking statements. Additionally, no party related to this offering undertakes any obligations to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this memorandum.

## INVESTOR SUITABILITY STANDARDS

THE PURCHASE OF UNITS INVOLVES AN INVESTMENT RISK AND IS NOT A SUITABLE INVESTMENT FOR ALL POTENTIAL INVESTORS.

Each prospective purchaser of Units will be required to make certain representations and supply certain information to the GP in order that it may determine the suitability of persons who have subscribed for Units. The suitability standards referred to herein, however, represent minimum suitability requirements for a prospective purchaser, and the satisfaction of such standards by a prospective purchaser does not necessarily mean that the Units are a suitable investment for the purchaser. Accordingly, each prospective purchaser must rely on his or her own judgment and advisors in making a decision to contribute capital to the Fund. Each prospective purchaser should consider whether the purchase of a Unit is suitable in light of each prospective purchaser's individual investment objectives and present and expected future financial and tax position and needs.

A purchase of Units involves a high degree of risk. For the reasons set forth in this memorandum, the purchase of Units offered hereby is suitable only for certain persons who (i) can afford to hold their Units for an indefinite period and do not expect that they will be required to sell their Units in the foreseeable future, and (ii) have a sufficient net worth to sustain a loss of their entire investment in the Fund in the event such loss should occur.

## ELIGIBLE INVESTORS

### Who May Invest

The Units have not been registered under the Securities Act of 1933, as amended (the "Act"), or the securities laws of any other jurisdiction and are being offered for sale in reliance upon exemptions from registration in Section 4(2) of the Act and/or Rule 506 of Regulation D promulgated thereunder. Units will be sold only to persons who qualify as *"accredited investors"* (as defined in Rule 501 of Regulation D).

An "accredited investor" is a person who has a net worth, or joint net worth with the person's spouse, of over $1 million (excluding the value of the person's primary residence) or who had individual income in excess of $200,000, or joint income with the person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects the same income level in the current year.

3

LIND000034

**Subscriptions**

An investor may subscribe for a Unit by completing, signing and delivering to the GP the following:

- Subscription Agreement (see Exhibit A attached hereto); and
- For each Unit purchased, wire transfer or checks payable to "GSC OPPORTUNITIES, L.P." in the amount of $500,000; and

- Confirmation that the administrative fee, if any, as described in a Program Management Agreement that is among the Investor, Mason Investments, LLC ("Mason"), and/or third parties has been paid("Administrative Fee").

The GP has the right to accept or reject subscriptions on behalf of the Fund, in whole or in part, for any reason or to request additional information to determine investor eligibility. The investor can become a limited partner only after the approval of his I-526 petition by the United States Citizenship and Immigration Services ("USCIS"). Acceptance by the Fund is not conclusive of whether an investment in Units is suitable for the investor. Suitability can be determined only by the investor and then only after discussion with the investor's tax, legal and investment advisers. Any investment in Units should be made only after a careful review of the provisions of this memorandum and attached documents.

**THE OFFERING**

The Fund is offering up to 5 Units to eligible investors at a purchase price of $500,000 per Unit. All Units will be sold on a best-efforts basis for a total maximum offering of $2,500,000 (exclusive of Administrative Fees).

All funds received by the General Partner from investors will initially be deposited into an escrow account. Funds will be released from the escrow account as the investor's I-526 petition is approved. Upon approval of the first two investors' I-526 petitions, all funds then held in escrow, and from any subsequent subscriptions, will be released to the Limited Partnership upon notification that the investor's I-526 petition has been filed with the USCIS; provided that 10% of each investor's funds will remain in escrow until his I-526 petition is approved. If an investor's I-526 petition is denied, the GP will return such investor's subscription amount within 90 days of receipt of written notification of such denial.

The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion. The GP may, in its sole discretion, accept subscriptions, admit investors as partners, commence Fund operations, and offer and continue to offer Units for sale. The GP reserves the right to purchase, or cause affiliates to purchase, Units for its own account, for cash or contributions of property. The GP may accept subscriptions for fractions of a Unit in its discretion. If the GP terminates the offering, all funds will be returned to investors. There will be no minimum offering size.

**Administrative Fees**

Mason, an affiliate of Mason Hill, LLC, a member of the GP, will be responsible for the exclusive program management in China. Mason will collect an administration fee as described in the Program Management Agreement at the time the investor submits his subscription agreement. If an I-526

4

petition is denied by the USCIS and the Fund rejects the subscriber's subscription agreement, any refund of the non-expended portion of the subscriber's Administrative Fee will be subject to the terms of the Program Management Agreement. EB-5 investors should proceed under the understanding that little to none of his or her Administrative Fee will be refunded should the Fund reject the investor's subscription agreement based on denial of the investor's I-526 Petition.

## SUMMARY

| | |
|---|---|
| The Fund | GSC OPPORTUNITIES, L.P., a newly organized Ohio limited partnership. The Fund will continue in existence until terminated as provided in the partnership agreement. |
| General Partner or GP | GSC Opp Management, LLC, an Ohio limited liability company owned by Mason Hill, LLC and GSC EB-5 Investor, LLC, the Managing Member of the GP and a subsidiary of Gold Star Chili, Inc. The GP will be responsible for the management of the Fund. See "General Partner." |
| Limited Partners | Persons subscribing to purchase Units who are accepted as partners in the Fund (the "Partners"). |
| Fund Objectives | The Fund's objectives are to provide its Partners and the GP with cash distributions through returns on investments in Gold Star Chili franchises. To the extent funds are available, the Fund intends, but is not required to, make a 2% annual cumulative preferred return for each Limited Partner's and General Partner's respective capital contribution ("Preferred Return"). There is no guarantee that the Fund will be able to make any distributions to the Partners or the General Partner. |
| | It is the intent of the GP to accumulate 80% of theDistributable Cash in excess of the Preferred Return and any distribution for the payment of income taxes for distribution to the Partners upon approval of their I-829 petition. The Fund is not required to and there is no guaranty that the Fund will be able to accumulate any such funds or to make any distributions to a Partner. |
| Offering Size | Up to $2,500,000 through the sale of up to 5 Units at a price per Unit of $500,000. There will be no minimum offering size. |
| Minimum Commitment | One Unit ($500,000). An investor applying for approval of an I-526 Petition through the EB-5 Program by the USCIS must subscribe for at least one full Unit. |
| Closing | The offering will remain open until fully subscribed or until terminated by the GP in its sole discretion. |

5

LIND000036

Allocations and Distributions

Losses will be allocated to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement. Income, up to the extent of previously allocated losses, and also up to the amount of the Preferred Return, will be allocated to the Partners in the same manner.

Thereafter, income will be allocated 80% to the Partners and 20% to the GP.

Distributions of cash will be made at the sole discretion of the GP as follows:

1) First, an amount equal to the Preferred Return;

2) Second, an amount determined by the GP to reimburse the GP and the Partners for the income tax consequences attributable to the income allocated to the GP and the Partners in excess of the Preferred Return; and

3) Thereafter, any distributions shall be made 80% to the Partners and 20% to the GP; provided that the GP intends to accumulate any such distributions to the Partners in an account or accounts for the possible purchase of their Units as provided in Section 2.4 of the Partnership Agreement.

Upon the later of the approval date of each Partner's I-829 Petition or the 3 year anniversary of each Partner's I-526 Approval, the Partnership has the right, but not the obligation to use all funds from this account to purchase each Partner's Unit or to reinvest in additional Gold Star Chili franchises. There is no guaranty that the Partnership will actually use these funds in this manner or that there will be any funds available to do so.

Investment Strategy

The Fund anticipates investing the capital raised in this offering in one or more wholly-owned limited liability companies ("InvestCo").

Each InvestCo will be organized to own one or more Gold Star Chili franchise restaurant establishments (collectively the "Project") in Ohio, Kentucky and Indiana, USA. In addition, one or more InvestCos may

6

LIND000037

be organized to own and lease real estate ("RealCo") to certain InvestCos as determined on a case-by-case basis.

Upon the approval of the Partners' I-829 petitions, the GP has the right, but not the obligation to purchase the Partners' Units and to liquidate the assets of RealCo to provide funds for such action, in addition to the Partners' Distributable Cash retained by the Fund. Any such purchase of the Units by the GP would be on a first in first out basis. In no event is the GP obligated to liquidate the assets of RealCo or use the proceeds therefrom to acquire the Partners' Units.

Payments to the GP and Affiliates

The GP shall receive a management fee equal to $15,000 for each franchise restaurant location per year (with an annual increase tied to the consumer price index (this portion of the fee will be used to pay Gold Star Chili, Inc. for its services under the operations management agreement) plus 3% of the Partnership's gross revenues (this portion of the fee will be used to pay Mason Hill, LLC for its services under an EB-5 Management Agreement)). In addition, the GP will receive and pay Project Consultant Fees and Management Fees as defined in the Business Plan's budget (see Section 8.3 of the Business Plan) which will be used by Mason Hill, LLC and/or affiliates to pay for costs and management and consulting services which include but are not limited to project structuring, site evaluation, financial analysis, demographic research, case processing, marketing, operational management and responsibilities of franchises on an on-going basis.

Term

The Fund shall have a perpetual term, provided that the GP may elect to terminate and liquidate the Fund at any time in its sole discretion after the approval of the Partners' I-829 petitions.

Risk Factors

See "Risk Factors Relating to the Offering" and "Risk Factors Relating to the EB-5 Program."

7

LIND000038

## THE EB-5 PROGRAM

**ALL INVESTORS ARE REQUIRED TO SECURE AND RETAIN INDEPENDENT IMMIGRATION COUNSEL.**

### The EB-5 Immigrant Investor Program

The EB-5 Immigrant Investor Program (the "EB-5 Investor Program") grants lawful permanent resident status in the United States to foreign investors who make a qualifying investment ("Qualifying Investment") under the provisions of 8 U.S.C. §1153(b)(5)(A)(i)-(iii), (C) (the "Act"). To take advantage of the EB-5 Program, qualified investors must make a Qualifying Investment and complete the required immigration procedures.

An investor must invest at least $500,000 if the project is located in a targeted employment area ("TEA"), which is defined by the USCIS as a *"rural"* or *"high unemployment area."* Otherwise, an investment must be at least $1,000,000.

The Project is located in an approved
TEA.

### General Investor Eligibility

The capital investment requirement for any EB-5 investor is $1,000,000. The capital investment requirement for an EB-5 investor in a TEA is $500,000.

### EB-5 Approval under the EB-5 Program

To seek status as an immigrant investor, applicants must file USCIS Form I-526, Immigrant Petition by Alien Entrepreneur. The I-526 Petition must be filed with supporting documentation that clearly demonstrates that the individual's investment meets all EB-5 requirements, such as:

- investing the requisite capital amount;
- proving the investment comes from a lawful source of funds;
- demonstrating that the investment will be at risk of loss for the purpose of generating a return on the investment;
- creating the requisite number of jobs; and, where applicable,
- demonstrating investment within a targeted employment area.

Once the USCIS approves the I-526 Petition, an immigrant investor may obtain status as a conditional resident by filing Form I-485, Application to Register Permanent Residence or Adjust Status, if already residing within the United States in a lawful non-immigrant status. If the investor is outside the United States, he or she will obtain a conditional immigrant visa through a U.S. embassy or consulate.

To become a lawful permanent resident, eligible investors must file a Form I-829, Petition by Entrepreneur to Remove Conditions. The I-829 Petition must be filed within 90 days before the second anniversary of an alien investor's admission to the United States as a conditional resident.

### Important Terms

*High Unemployment Area:* A high unemployment area is a geographic area or political subdivision

8

located within a metropolitan statistical area or within a city or town with a population in excess of 20,000 with an unemployment level at least 150% of the national unemployment rate. High unemployment areas within a state are identified and designated by a state agency appointed by the governor (for a high unemployment area within the District of Columbia, designation is made by the Mayor). Typically, a Regional Center seeks to encompass one or more high unemployment areas. One example of a high unemployment area is a Regional Center that encompasses a large city which contains clearly delineated census tracts that have been designated as a high unemployment area by the State based on the measured unemployment rates for the population residing within those locations.

*Rural Area:* A rural area is a geographical area that is outside a metropolitan statistical area, or part of the outer boundary of any city or town having a population of 20,000 or less as shown by population indicators. In certain areas, an approved statewide Regional Center may encompass both high unemployment areas and rural areas.

*Required Amount of Investment:* Depending on the location of the project, the required amount of the investment may be either $1,000,000 or $500,000. If the project is located within a TEA, the requisite minimum threshold for investment is $500,000. Otherwise, an alien must invest a minimum of $1,000,000 to qualify.

*Required Commercial Enterprise:* To qualify under the EB-5 Program, an investment of the requisite amount ($500,000 or $1,000,000) must be made in a new commercial enterprise located within an approved Regional Center.

*Risk:* The regulations and precedent decisions require an investor to place their investment at risk for the purpose of generating a return on his or her capital investment. As such, the USCIS does not permit the capital contribution to be subject to guarantees, buy back arrangements, unsecured promissory notes or other agreements that mitigate the at risk requirement.

*Engagement of the Alien Investor in the Enterprise:* The regulations require that the alien investor is or will be *"engaged"* in the management of the new commercial enterprise, either through day-to-day managerial control or through participation in policy-making decisions for the commercial enterprise. As a limited partner of the Fund, an investor is deemed to satisfy this requirement.

## THE PROJECT

**General**

The Fund's objectives are to provide investors with cash distributions through returns on investments.

The Fund anticipates investing the capital raised in this offering in one or more InvestCos. A separate InvestCo will be formed to own and operate each Gold Star Chili franchise restaurant and RealCo may be formed to own and lease real estate to operating InvestCos in certain situations determined on a case-by-case basis. The GP anticipates liquidating the assets of RealCo at some point during or over the course of 3-5 years, although the GP is not required to do so. If the GP does liquidate such assets then it may, but is not obligated to, use the proceeds thereof to purchase the Partners' Units but only after the approval of their I-829 petitions. In no event is the GP obligated to liquidate the assets of RealCo or return the proceeds to the Partners. There is no guarantee that the Fund will be able to make any distributions to the Partners.

## GENERAL PARTNER

GSC Opp Management, LLC, an Ohio limited liability company, will serve as the GP of the Fund. The GP is owned by Mason Hill, LLC and GSC EB-5 Investor, LLC, a subsidiary of Gold Star Chili, Inc. GSC EB-5 Investor, LLC will be the managing member of the GP. The GP will have control and be responsible for the management of the Fund, overseeing day-to-day operations of the Fund and

9

LIND000040

investments made by the Fund. The GP will have sole and absolute authority to invest, hold, sell or exchange Fund assets and properties, provided that the GP shall use its best efforts to cause the Fund to operate in accordance with the then applicable EB-5 Program requirements. The Partners will have no control over the operations of the Fund. The GP will enter into an EB-5 Management Agreement with Mason Hill, LLC for the supervision and administration of EB-5 program related matters. The GP will enter into an Operations Management Agreement with Gold Star Chili, Inc. for the supervision and administration of the franchise restaurants' operations.

The GP will be paid management fees from the Fund. See "Payments to the GP and Affiliates", page 7 hereof.    In addition, Mason may receive an Administrative Fee in accordance with the Program Management Agreement.

## CONFLICTS OF
## INTEREST

The GP will be subject to various conflicts of interest in managing the Fund. Those conflicts include:

1.        **Other Activities of the GP.** The GP was formed to operate the Fund or other similar funds and its affiliates have acquired, financed, operated and sold businesses and expect to continue to do so in the future. Such businesses may be managed by the GP. The GP is not required to, and will not, devote its full time efforts to the Fund but will devote only so much of its time to the business of the Fund as in its judgment is reasonably required. In this regard, certain owners of the GP are also owners and/or operators of other businesses and/or real estate assets.

2.        **Other Financing Options.** The GP and its affiliates may finance an acquired business or the purchase of real estate without borrowing or otherwise receiving capital from the Fund.

3.        **Receipt of Fees and Other Benefits by the GP.** The operation and management of businesses acquired by the GP and financed by the Fund may result in fees and compensation to the GP and its affiliates.

4.        **No Independent Counsel.** The Fund and the GP are represented by the same legal counsel. No independent counsel has been selected to represent the interests of any of the investors. The foregoing disclosure does not limit the right of any investor to select independent legal counsel to represent its interests in connection with its subscription for Units.

### RISK FACTORS RELATING TO THE OFFERING

The purchase of the Units offered hereby involves various risks. In addition to the factors set forth elsewhere in this memorandum, investors should consider the following:

1.        The business of identifying, acquiring, operating and selling Gold Star Chili franchises is highly competitive and subject to numerous inherent risks, including changes in general or local economic conditions. The Project may not succeed, and one or all of the InvestCos or RealCo may not succeed. The GP may not succeed in identifying suitable opportunities, and the franchises identified for investment by the GP may fail. The restaurant industry is highly competitive and subject to multiple risks beyond the control of the GP, including but not limited to food costs, energy costs, employment costs and other factors. The RealCo is subject to additional risks beyond the control of the GP, including but not limited to changes in values based on market conditions or other conditions.

2.        The GP will have complete discretion in identifying, acquiring and selling franchises and assets of RealCo. Partners in the Fund will not have the opportunity to evaluate the merits of any investment in any franchise nor will they be able to influence the decision to make an investment in any particular franchise.

10

LIND000041

3.      The proceeds used from investments made by the Fund to InvestCo will be used for working capital, development, sales initiatives and other expenses that may not result in the generation of significant revenue to the Project. A f r a n c h i s e may also need additional capital in the future. It is possible that the franchise may be unable to raise additional capital on terms that are attractive to or that protect the Fund. There can be no assurance that the GP will be able to raise additional funds for the Project.

4.      The Fund may experience a deficiency in cash flow. Revenues may be insufficient to pay expenses. The GP is not obligated to fund shortfalls in cash flows.

5.      Units should only be purchased as a long-term investment and by investors who have a substantial net worth and no need for liquidity.

6.      There is no assurance that the Fund will be profitable or successful. Units should be purchased only by persons who can afford the entire loss of their investment.

7.      There is no assurance there will be any cash distributions to the Partners. Except as otherwise provided by law, the GP will not be liable for the return of any contribution by an investor.

8.      All decisions with respect to the management of the Fund will be made exclusively by the GP. The Partners have no right or power to take part in the management or control of the business of the Fund. Accordingly, no person should purchase any of the Units offered unless he or she is willing to entrust all aspects of the Fund to the GP.

9.      The Units have not been registered under the Act or the securities laws of any other jurisdiction, and may not be sold or transferred unless the sale is registered or qualified under the Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or applicable securities laws of any other jurisdiction (which, together with the Act and the Exchange Act, and all rules and regulations promulgated thereunder, are hereinafter referred to as the "Securities Laws"), or unless an opinion of counsel, satisfactory to the GP and its counsel, is obtained that registration is not required. While a partner may assign his or her economic interest in the Fund, the transferee may not become a substitute partner without the approval of the GP. There is no public market for the Units, and it is not expected that a public market will develop. Adverse tax effects also may result from a transfer of Units.

10.     The Fund may generate taxable income for the Partners without generating the necessary cash flow to allow for distributions by the Fund to the Partners to pay the tax liability.

### RICK FACTORS RELATING TO THE EB-5 PROGRAM

In addition to the factors set forth elsewhere in this memorandum, investors should consider the following:

1.      Congress and/or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an investor or the Fund.

2.      It is impossible to predict visa-processing times. Investors should not physically move to the United States until their visa has been issued.

3.      Investors who obtain conditional or permanent residence status must intend to make the United States their primary residence. Conditional or permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status.

11

LIND000042

4.     USCIS requires proof of direct employment creation as part of the removal of conditions process. There is no assurance that the actual number of qualified direct employees will be the same as the number predicted in the Business Plan. Depending upon the disparity, there may be insufficient employment to remove conditional resident status.

5.     The process of obtaining conditional and permanent resident status involves several factors and circumstances which are not within the control of the Fund. These include the investor's past history and quotas established by the United States government limiting the number of immigrant visas available to qualified individuals seeking permanent resident status under the EB-5 Program. Although the Fund has been structured so that each Unit holder may maximize eligibility for conditional and permanent residency under the EB-5 Program, no assurance can be given that each investor will obtain approval of his or her particular immigrant petition. Purchase of a Unit does not guarantee conditional or permanent residency in the United States. Furthermore, no advice can be given that conditions to permanent residency will be removed. Each prospective investor should consult competent immigration counsel to review the likelihood that the investor's immigrant petition will be granted.

6.     The investment must be at risk to qualify for the EB-5 Program. As part of the green card application, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk.

7.     Each investor who purchases a Unit with the intention of obtaining permanent or conditional residence from the USCIS is encouraged, along with his or her advisors, to make his or her own independent review of the EB-5 Program and the various risk factors relating to the process in obtaining permanent or conditional residence in the United States to determine if an investment in the Unit is a suitable approach for such investor.

8.     As part of the I-526 Petition, an investor must present to the USCIS clear documentary evidence of the source of funds invested and that the funds belong to the investor. Generally, the investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For investors who do not have such records, there may be other records that can be provided to the USCIS by an investor to demonstrate that the investment funds came from legal sources. All such matters regarding the investor's I-526 Petition should be discussed with his or her immigration counsel.

9.     The EB-5 Program requires an investor to hold a policymaking or management position within the Fund. The Fund believes that each Partner, as a limited partnership partner, is provided with the powers and duties under a p p l i c a b l e   l a w   a n d   t h e   P a r t n e r s h i p   A g r e e m e n t which satisfy the EB-5 requirements.

10.    USCIS rules and regulations relating to the EB-5 Program require that to maintain the validity of its approval and designation, an approved Regional Center must continue to meet the statutory requirements of the EB-5 Program by serving the purpose of promoting economic growth, improved regional productivity, job creation and increased domestic capital investment. The USCIS thus requires Regional Centers to monitor all investment activities under its sponsorship and to maintain records, data and information on a quarterly basis to report to the USCIS, upon request, year-to-date information for each federal fiscal year. Such records, data and information include, but are not limited to, the Regional Center's administration, oversight and management plan, biographical and other relevant investor data, total regional center investment and job creation totals.

12

LIND000043

## SUMMARY OF PARTNERSHIP AGREEMENT

The following is a summary of certain provisions of the partnership agreement of the Fund. This summary is qualified in its entirety by reference to the full text of the Partnership Agreement.

**Capital Contributions**

Each Partner will make a capital contribution of $500,000 for each full Unit purchased. The GP will make a capital contribution to the Fund of One Million Two Hundred Fifty Thousand Dollars ($1,250,000). Contributions from the GP will be in the form of cash, property, real property and the waiver of certain franchise fees.

Partners have no right to a return of any capital contribution.

**Allocation of Profits and Losses**

Losses will be allocated to the Limited Partners and the GP in proportion to their respective ownership interests as set forth on the Schedule of Partners attached to the Partnership Agreement. Income, up to the extent of previously allocated losses, and also up to the amount of the Preferred Return, will be allocated to the Partners in the same manner.

Thereafter, income will be allocated 80% to the Limited Partners and 20% to the GP.

**Purchase of Partner's Units in the Fund**

At any time on or after the later of (i) 3 years following the date of the approval of the Partner's I-526 petition or (ii) approval of the Partner's I-829 petition, the Partnership, at the sole discretion of the GP shall have the right, which shall not expire, but not the obligation, to and may in its discretion, purchase the Units of each Partner at fair value, exercised on a first in, first out basis. Each Partner agrees to and shall sell all of his or her Unit, should this right be exercised, at a price determined by agreement of the Partnership and the Partner.

**Management of the Fund**

The management of the Fund and all decisions concerning the business affairs of the Fund will be made by the GP. The GP is owned by Mason Hill, LLC and by GSC EB-5 Investor, LLC, a subsidiary of Gold Star Chili, Inc. GSC EB-5 Investor, LLC will be the managing member of the GP. Mason Hill, LLC will be responsible for providing all EB-5 and securities and USCIS regulatory compliance services to the GP. No Partner other than the GP shall take part in the management of the Fund's business and affairs or have any right or authority to act for or to bind the Fund.

The GP and its affiliates will receive certain management fees from the Fund. See "Payments to the GP and Affiliates", page 7 hereof. In addition, Mason will receive an Administration Fee in accordance with the Program Management Agreement.

**Voting Rights, Amendments and Meetings**

The vote of the Partners owning a majority in interest of the Units in the Fund is required to amend the Partnership Agreement.

Meetings of the Partners may be called by the GP at its discretion or upon written request of Partners owning a majority in interest of the Units in the Fund.

13

**Restrictions on Assignment of Partner Interests**

The ownership interest of a Partner in the Fund may be assigned only as permitted by the Partnership . The assignment, transfer or pledge of an interest in the Fund by a Partner is prohibited unless (i) the Fund causes the interest to be registered under the Securities Laws, which the Fund has no obligation or intention to do, or (ii) counsel satisfactory to the Fund has rendered an opinion that an exemption from registration is available and that the transfer will not otherwise violate the Securities Laws.

The GP may defer the effectiveness of any transfer or assignment of an interest in the Fund if necessary to avoid a termination of the Fund for federal income tax purposes.

**Substitute partner**

An assignee of a Partner's interest in the Fund will be admitted as a substitute partner only upon the written consent of the GP, delivery of an executed instrument of assignment, the assignee's agreement to be bound by the terms of the partnership agreement, the execution of such other instruments as the GP deems necessary or desirable to effect the admission, the assignee's agreement to pay all expenses in connection with the admission, and compliance with the Securities Laws.

**Non-compete, Confidentiality and Trade Secrets**

Each Partner will agree to certain non-competition, confidentiality and trade secret provisions for the benefit of Gold Star Chili, Inc. See Section 12.14 and Exhibit A to the Limited Partnership Agreement.

**Term**

The Fund shall have a perpetual term, provided that the GP may elect to terminate and liquidate the Fund at any time in its sole discretion after the approval of the Limited Partners' I-829 petitions.

## SUMMARY OF SALES MATERIAL

In addition to this memorandum, the Fund, the GP or any of its affiliates may utilize a supplemental brochure, an executive summary, business plan or fund outline in connection with the offering of Units. The GP may also respond to specific questions from prospective investors and their representatives. The offering of Units is made only by means of this memorandum. Except as described herein, the Fund has not authorized the use of other supplemental literature in connection with this offering. The information in such literature does not purport to be complete, may conflict with information in this memorandum, and shall not be considered a part of this memorandum, or as incorporated in this memorandum by reference, or as forming the basis of the offering or sale of Units.

List of Exhibits:

Exhibit A: Subscription Agreement
Exhibit B: Limited Partnership Agreement
Exhibit C: Business Plan
Exhibit D: Investor Questionnaire
Exhibit E: Escrow Agreement

14

# GSC Opportunities, L.P:
# A Direct EB-5 Investment Project
## Comprehensive Business Plan



Δ π EXHIBIT 12

Deponent_____

Date_____ Rptr#____

WWW.DEPOBOOK.COM

## TABLE OF CONTENTS

1.0 DESCRIPTION OF BUSINESS AND OBJECTIVES ...................................................................4
   1.1 EXECUTIVE SUMMARY .......................................................................................................4
   1.2 CONCEPT DESCRIPTION AND OBJECTIVES ...........................................................................5
   1.3 CAPITALIZATION ..............................................................................................................7
   1.4 DEVELOPMENT TIMELINES ................................................................................................8
      1.4.1 Phasing Timeline..................................................................................................8
      1.4.2 Immigration and Project Job Creation Timeline....................................................9
      1.4.3 Single Restaurant Development Timeline..............................................................10

2.0 PERMITS, LICENSES & CONTRACTS.....................................................................................11
   2.1 REAL ESTATE PERMITS AND CONTRACTS ..........................................................................11
   2.2 OPERATIONAL PERMITS AND CONTRACTS .........................................................................11

3.0 MARKET ANALYSIS AND COMPETITION ...........................................................................12
   3.1 TARGET MARKET SUMMARY ...........................................................................................12
      3.1.1 Cincinnati Metropolitan Statistical Area ............................................................12
      3.1.2 Lexington, Fayette County, Kentucky..................................................................13
      3.1.3 Dayton, Ohio Metropolitan Statistical Area........................................................13
   3.2 TARGET LOCATIONS ........................................................................................................13
      3.2.1 Germantown, Ohio..............................................................................................14
      3.2.2 UC Area / Clifton, Ohio 1....................................................................................14
      3.2.3 UC Area / Clifton , Ohio 2...................................................................................14
      3.2.4 Downtown Cincinnati, Ohio 1..............................................................................15
      3.2.5 Downtown Cincinnati, Ohio 2..............................................................................15
      3.2.6 Loveland, Ohio....................................................................................................16
      3.2.7 Over the Rhine, Ohio...........................................................................................17
      3.2.8 Florence, Kentucky..............................................................................................17
      3.2.9 Palomar / Lexington, Kentucky............................................................................18
      3.2.10 Lexington, Kentucky..........................................................................................18
      3.2.11 Greendale, Indiana ...........................................................................................18
   3.3 COMPETITION PROFILE....................................................................................................18
   3.4 COMPETITORS BY LOCATION ...........................................................................................20
      3.4.1 Germantown, Ohio..............................................................................................20
      3.4.2 UC Area / Clifton, Ohio 1....................................................................................21
      3.4.3 UC Area / Clifton, Ohio  2...................................................................................22
      3.4.4 Downtown Cincinnati, Ohio 1..............................................................................23
      3.4.5 Downtown Cincinnati, Ohio 2..............................................................................24
      3.4.6 Loveland, Ohio....................................................................................................25
      3.4.7 Over the Rhine, Cincinnati, Ohio.........................................................................26
      3.4.8 Florence, Kentucky .............................................................................................27
      3.4.9 Palomar, Lexington, Kentucky.............................................................................28
      3.4.10 Lexington, Kentucky..........................................................................................29
      3.4.11 Greendale, Indiana ..........................................................................................30

4.0 COMPETITIVE AND OPERATIONS STRATEGY..................................................................31
   4.1 COMPETITIVE STRATEGY.................................................................................................31
   4.2 OPERATIONS STRATEGY ..................................................................................................32

5.0 ORGANIZATIONAL STRUCTURE AND PERSONNEL .........................................................35
   5.1 ORGANIZATIONAL STRUCTURE.........................................................................................35

GSC000127

5.2 MANAGEMENT TEAM, CONSULTANTS AND KEY COLLABORATORS .................................................. 36
5.2.1 EB-5 MANAGEMENT TEAM ............................................................................................. 36
5.2.2 GSC OPPORTUNITIES OPERATIONAL MANAGEMENT TEAM ......................................... 37

6.0 STAFFING AND JOB CREATION ................................................................................................ 38
6.1 SINGLE RESTAURANT STAFFING PROJECTION ........................................................................ 38
6.2.1 Job Descriptions ........................................................................................................... 39
6.3 JOB CREATION PHASING AND HIRING TIMELINES ................................................................... 40

7.0 EXIT STRATEGY ........................................................................................................................ 42
7.1 EXPANSION PLANS ...................................................................................................................... 42
7.2 INVESTOR EXIT OPTIONS ........................................................................................................... 42

8.0 FINANCIALS ............................................................................................................................... 43
8.1 INDUSTRY TRENDS ...................................................................................................................... 44
8.2 PROFIT AND LOSS PROJECTIONS ............................................................................................... 45
8.2.1 Single Restaurant Sample Year-1 Summary P&L Projections ................................. 45
8.2.2 Single Restaurant Sample 5-year P&L Projection ..................................................... 46
8.2.3 GSC Opportunities, L.P. Comprehensive 5-year Operating Projection ................... 47
8.3 CAPITAL BUDGETS ...................................................................................................................... 48
8.3.1 Comprehensive Project Capital Budget .................................................................... 48
8.3.2 Single Restaurant Sample Capital Budget ................................................................ 50
8.4 ROI AND EQUITY ANALYSIS ...................................................................................................... 51
8.5 FUNDS DISBURSEMENT AND CONTROLS ................................................................................... 52

APPENDICES .................................................................................................................................... 53
APPENDIX 1: TARGETED EMPLOYMENT AREAS ............................................................................ 53
APPENDIX 2: SAMPLE MENU ........................................................................................................ 54
APPENDIX 3: LOCATION MAPS ..................................................................................................... 55
APPENDIX 4: REAL ESTATE DETAILS ............................................................................................ 56
APPENDIX 5: KEY COMPETITOR METRICS AND INDUSTRY DATA ................................................ 77
McDonald's ......................................................................................................................... 77
Kentucky Fried Chicken (KFC) .......................................................................................... 78
Pizza Hut ............................................................................................................................. 79
APPENDIX 6: DRAW PROCESS ...................................................................................................... 80

3

## 1.0 Description of Business and Objectives

### 1.1 Executive Summary

GSC Opportunities, L.P. ("the Partnership") will accept a $6 million direct investment of EB-5 capital from 12 investors to fund and operate twelve Gold Star Chili restaurants. GSC Opp Management, LLC will serve as the General Partner of GSC Opportunities, L.P. Gold Star Chili, Inc. will be the managing member of GSC Opp Management, LLC. EB-5 investors will serve as limited partners in the Partnership. (see sec. 5.1)

GSC Opportunities, L.P. will not employ indirect job creation or any other advantages exclusive to EB-5 Regional Centers. GSC Opportunities and all of its wholly owned subsidiaries constitute the EB-5 new commercial enterprise for this direct, non-regional center EB-5 investment. Each of the twelve restaurant locations will be located within a 200-mile radius of Gold Star Chili's corporate headquarters and commissary in Cincinnati, Ohio.



Gold Star Chili was founded in 1965 in Cincinnati. A privately held company, Gold Star now operates and franchises about 100 quick-serve, Cincinnati-style chili restaurants in Ohio, Kentucky, and Indiana. Gold Star has identified twelve locations ideal for new franchise restaurants within the Dayton-Cincinnati-Lexington region of southwest Ohio and Kentucky, all within a 200-mile radius of Cincinnati (see Appendix 3). Each location is targeted for its proximity to business and residential demographics that favor low-cost, quick-serve restaurants. These areas also recognize and value the Gold Star brand.



Gold Star Chili is a regional brand that competes successfully with many national fast-food brands such as McDonalds, Burger King, Kentucky Fried Chicken, and Pizza Hut. Headquarters for Yum! Brands, which owns Kentucky Fried Chicken and Pizza Hut, is located just 100 miles away in Louisville, Kentucky. The GSC Opportunities, L.P. management team (see sec. 5.2) brings over 100 years of combined executive experience. Gold Star Chili's executives working on the GSC Opportunities team bring 30 years combined experience to the table as Gold Star executives, during which time they have successfully diversified Gold Star's corporate and franchise portfolios. In addition to managing the Partnership, as managing member of GSC Opp Management,LLC, Gold Star Chili, Inc. will manage and oversee the start up and stabilization of each restaurant location in the GSC Opportunities, L.P. portfolio.

Twelve EB-5 immigrant investors will invest $6 million in GSC Opportunities, L.P., and become limited partners in this new commercial enterprise. GSC Opportunities, L.P. will pool the EB-5 capital and channel the capital to a total of twelve wholly-owned subsidiary Gold Star Chili restaurant locations (see sec. 5.1). Gold Star Chili,

4

GSC000129

Inc. will contribute $3 million total equity contribution in these twelve new locations. Gold Star's contribution represents 33% of the total capital invested. Capital will be used for both real estate and operational purposes. Real property will be owned in a real estate holding company, (RealCo), that is a wholly-owned subsidiary of GSC Opportunities, L.P. RealCo will then lease the real estate to the individual restaurants as applicable (see Sec. 5.1). Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure and the cost breakdown (see Sec. 8.1.2). GSC Opp Management, LLC will oversee funding of the project on behalf of the investors, and will disburse funds per monthly draw schedule submitted to the management team by the restaurant operators.

Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contributions from Gold Star Chili, Inc. The proposed sources of funds are as follows:

| Source of Funds | Amount |
|---|---|
| EB-5 Funds | $6,000,0000 |
| Gold Star Chili Equity Contribution | $3,000,000 |
| Total | $9,000,000 |

GSC Opportunities, L.P. will seek to return capital to the investor Limited Partners after 3 years or once their I-829 applications have been approved by USCIS per the requirements of the EB-5 program. However, return of EB-5 capital to the Limited Partners is not guaranteed.

### 1.2 Concept Description and Objectives

GSC Opportunities, L.P on behalf of twelve EB-5 immigrant investors, seeks to fund and operate twelve Gold Star Chili restaurant locations, each located within a 200-mile radius of Cincinnati, Ohio (see Appendix 3). Detailed descriptions of the restaurant locations are covered in Sec. 3.2, Target Locations. In general, the locations will operate seven days a week, serving continuously from 10:00 a.m. to 11:00 p.m., focusing on the lunch and dinner meal periods.

|  | Hours |
|---|---|
| Monday | 10:00am-11:00pm |
| Tuesday | 10:00am-11:00pm |
| Wednesday | 10:00am-11:00pm |
| Thursday | 10:00am-11:00pm |
| Friday | 10:00am-11:00pm |
| Saturday | 10:00am-11:00pm |
| Sunday | 10:00am-11:00pm |

GSC000130

Frank Daoud and three of his brothers, all immigrants to the United States, founded Gold Star Chili in 1965, and since that time Gold Star has dubbed itself "the Flavor of Cincinnati." A privately held company, Gold Star now operates and franchises about 100 quick-serve, Cincinnati-style chili restaurants in Ohio, Kentucky, and Indiana. Gold Star is currently seeking to establish both new franchise and new corporate locations within a 200-mile radius of its Cincinnati-based commissary facility. Gold Star has developed a restaurant model with streamlined operations, a simple, focused menu, and a one-of-a-kind brand identity, designed to deliver return on investment to owner-operators. The corporate package includes direct support from Gold Star high-level management for site selection, construction, purchasing and information technology, training, operations, marketing, and the hiring of operators and general managers for the locations.

Cincinnati-style chili has a national reputation, and the Gold Star chili recipe has been a closely guarded secret for 45 years. The commissary prepares chili from scratch daily to exacting quality standards to ensure the restaurants have a consistent product. The commissary delivers chili fresh to its restaurants, and operators reheat the chili on-site. Gold Star Chili restaurants offer a "brand" dining experience. The chili-parlor style incorporates an open steam table with counter seating as the heart of the restaurant. This gives the crew the opportunity to interact with customers and create the personal connections that are the foundation of brand loyalty.

Cincinnati-style chili is significantly different from the familiar, Southwestern-style chili that originated in Texas. Thinner and soupier than its Texas cousin, Cincinnati-style chili is a smooth, meat sauce made with finely ground beef and tomatoes, garlic and onion, and a blend of spices that may include cinnamon, allspice, cloves, and chocolate. This traditional, Mediterranean sauce first became popular in the early 1920's at a Cincinnati restaurant operated by Macedonian



immigrants. Although the sauce was Mediterranean, the style of service became unique to the region: Cincinnatians like their chili served over spaghetti or hotdogs on a bun, and piled high with finely grated, cheddar cheese. Variations include the addition of chopped onions, yellow mustard, red



kidney beans, hot-pepper sauce, and oyster crackers. Since the 1920's, other Mediterranean immigrants, including the Daoud brothers, have continued this local tradition, raising Cincinnati-style chili and the Gold Star brand to the status it enjoys today: a regional specialty with cult-like popularity.

Traditional chili dishes make up 70% of sales: coney dogs, chili cheese fries, and the "3-way," spaghetti topped with chili and finely shredded cheddar cheese. Gold Star also adds chili to nachos and burritos for a creative twist, and offers other menu items that complement chili such as double-decker sandwiches, salads, hamburgers,

6

and milkshakes (see Sample Menu, Appendix 2).  Carryout is a significant portion of business.  Gold Star products are available online and through retail grocers.

Gold Star Chili has established corporate partnerships with many other significant local Greater Cincinnati and Northern Kentucky area businesses. Gold Star is the official chili of the Cincinnati's National Football League team, the Bengals, Cincinnati Northern Kentucky International Airport, University of Kentucky's Rupp Arena, Cincinnati Children's Hospital Medical Center and Minor League Baseball team the Lexington Legends.

    

## 1.3 Capitalization

Twelve EB-5 immigrant investors will invest $6 million in GSC Opportunities, L.P., a Limited Partnership that will channel it into twelve, wholly-owned subsidiaries. Each of these subsidiaries will own and operate a Gold Star Chili restaurant.  Gold Star Chili, Inc. will invest $3 million total equity contribution in these twelve new locations.  All EB-5 investment capital will be held in escrow until two investors have received their I-526 approvals.  After this point, all funds held in escrow as well as any funds from subsequent EB-5 investors subscribing to the L.P. will be released directly to GSC Opportunities, L.P.

Gold Star Chili, Inc.'s contribution of non-EB-5 capital represents 33% equity contribution in each of the restaurants.  Capital will be used for both real estate and operational purposes.  Land/building for each of these twelve restaurants will be purchased and held in a real estate holding company, RealCo, that is a wholly owned subsidiary of GSC Opportunities, L.P. The holding company will lease the real estate to each of the twelve respective restaurant LLCs (job creating entities). Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure (see Sec. 5.1) and the cost breakdown (see Sec. 8.1.2).  GSC Opp Management, LLC will oversee funding of the project on behalf of the investors, and will disburse funds per monthly draw schedule submitted to the management team by the restaurant operators.

Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contribution from Gold Star Chili, Inc. The proposed sources of funds for each of the ten locations are as follows:

| Source of Funds | Amount |
|---|---|
| EB-5 Funds | $6,000,0000 |
| Gold Star Chili Equity Contribution | $3,000,000 |
| Total | $9,000,000 |

7

GSC000132

## 1.4 Development Timelines

### 1.4.1 Phasing Timeline



8

GSC000133

## 1.4.2 Immigration and Project Job Creation Timeline



| Date | Event |
|------|-------|
| 4/1/13 | Internal review of I-526 package begins investor funds transferred to escrow |
| 5/1/13 | I-526 petition submitted to USCIS by immigration attorney on behalf of the investor |
| 11/1/13 | I-526 approved by USCIS, investor funds released from escrow to project / Investor and immigration attorney schedule Consulate Interview |
| 3/1/14 | 1st phase Gold Star Chili restaurant locations open / Total of three restaurants now operational and a total of 48 full time positions created |
| 5/1/14 | Successful consulate interview results in investor receiving visa to enter the U.S. within 180 days |
| 7/1/14 | 2nd phase Gold Star Chili restaurant locations open Total of six restaurants now operational and and a total of 96 full time positions created |
| 11/1/14 | 3rd phase Gold Star Chili restaurant locations open / Total of nine restaurants now operational and and a total of 144 full time positions created / **All EB-5 investor job creation requirements now fulfilled** |
| 3/1/15 | 4th and final phase Gold Star Chili restaurant locations open / Total of eleven restaurants now operational and and a total of 192 full time positions created |
| 3/1/16 | Project reports job creation numbers and immigration attorney files I-829 petition with USCIS on behalf of investor |
| 9/1/16 | **I-829 petition approved by USCIS and investor's Green Card becomes permanent** |

9

GSC000134

### 1.4.3 Single Restaurant Development Timeline



| Tasks | Duration (working days) |
|---|---|
| Architectural, Permits and Fees | 10 |
| Interior & Exterior Demolition | 6 |
| Framing and Reconfiguration | 10 |
| Exterior Restoration Finishes | 9 |
| Roofing and Exterior Rough | 8 |
| Insulation, Drywall, and Plaster | 9 |
| Commercial Kitchen Work | 10 |
| Rough Electrical | 11 |
| Rough HVAC | 11 |
| Rough Plumbing | 11 |
| Interior Trim & Millwork | 7 |
| Interior Painting and Finishes | 6 |
| Cabinetry and Casework | 5 |
| Flooring & Hard Surfaces | 5 |

| | |
|---|---|
| Misc. Accessories, Hardware, and Shelving | 7 |
| Electrical Finishes | 5 |
| HVAC Finishes | 5 |
| Plumbing Finishes | 5 |
| Interior and Exterior Punchlist | 7 |
| Set Up Kitchen Equipment, Fixtures, and Furniture | 7 |
| FF&E | 6 |
| IT/Systems | 7 |
| Point of Sale | 4 |
| Set Up Benefits and Payroll | 10 |
| Hire Management | 10 |
| Hire Skilled Workers | 10 |
| Hire Unskilled Workers | 10 |

| | |
|---|---|
| Organizational Development | 45 |
| Licenses | 24 |
| Bar | 6 |
| Kitchen | 6 |
| Smallwares | 6 |
| Other Supplies | 6 |
| Pay Supplies Inventory Deposit | (milestone) |
| Bar | 6 |
| Pay Bar Inventory Deposit | (milestone) |
| Food | 6 |
| Pay Food Inventory Deposit | (milestone) |
| Preopening Punch List | 11 |
| Grand Opening | |

10

GSC000135

## 2.0 Permits, Licenses & Contracts

### 2.1 Real Estate Permits and Contracts

**Pre-Construction**
- Demolition Permit
- Confirmation of Zoning Status
- Environmental Reports

**Construction**
- Building Permits
  - Separate permits for each contractor
    - Handled by each appropriate contractor or by GC
- Health Department Regulations
  - Planning
- Fire Code Regulations
  - Planning
- Proof of fully licensed and bonded contractors
- Occupancy Permit

**Contracts**
- Architects
- Construction
  - GC, subs, developer, etc.
- Suppliers
  - Food stuffs
  - FOH wares
  - BOH wares
  - Appliances

### 2.2 Operational Permits and Contracts

**Operational**
- Fire code inspection
- Health department inspection

11

GSC000136

## 3.0 Market Analysis and Competition

### 3.1 Target Market Summary

According to market research organization IBISWorld, in 2010 in the United States there were approximately 215,000 full-service restaurants and 300,000 fast food restaurants. Full service establishments generated $178 billion in revenue and fast food restaurants generated $184 billion for a combined total of $362 billion.

The National Restaurant Association reported that in 2010 there were 21,302 "eating and drinking places" in Ohio. The Association projects that in 2012, these Ohio establishments will register $16.6 billion in sales. A total of 6,696 eating and drinking places in Kentucky as of 2010 were expected to generate $6 billion in revenue in 2012.

USDA Economic Research Service figures show that Americans spend approximately 5% of disposable personal income on food outside the home and approximately 73% of this expenditure occurs at eating and drinking places, meaning that Americans spend approximately 3.65% of disposable income at eating and drinking places. According to the U.S. Bureau of Economic Analysis, Ohio per-capita disposable income in 2011 was approximately $34,000, and Kentucky per-capita disposable income was approximately $31,000. The national per capita average was $37,000.

### 3.1.1 Cincinnati Metropolitan Statistical Area

According to the U.S. Census, there are a total of 1.63 million Ohioans who reside in Hamilton, Butler, Warren and Clermont and Brown counties. These five counties constitute the Ohio portion of the Greater Cincinnati MSA. According to the same data there were 430,000 people residing in the seven Kentucky counties of the Cincinnati MSA and 79,000 within the three Indiana counties. Based on the above data, these 2.14 million people in the Cincinnati MSA spent a grand total of $2.6 billion at eating and drinking places in 2011.

The U.S. Census Bureau counted 3,862 eating and drinking places in the greater Cincinnati, Ohio-Kentucky-Indiana Metropolitan Statistical Area in 2010. Based on this and the calculations of disposable income spent at these establishments, each establishment in the above outlined geographic region averaged approximately $674,000 in revenue that year.

The City of Cincinnati (note: not the Cincinnati MSA) was listed in February 2011 by the Daily Beast as the #8 fast-food capital in the continental United States. This assessment was based on the existence of 313 fast-food restaurants, or 94 restaurants per 100,000 residents. There are a total of 93 Gold Star Chili restaurants throughout Ohio, Kentucky and Indiana. Gold Star's biggest competitor, Skyline Chili (see sec. 3.3), has just over 130 restaurants in the same three states. Of

GSC000137

the twelve locations identified for expansion of Gold Star Chili (see sec. 3.2) eight are located in the Cincinnati, Ohio-Kentucky-Indiana Metropolitan Statistical Area.

### 3.1.2 Lexington, Fayette County, Kentucky

In 2010, the U.S. Census Bureau counted over 301,000 residents in Fayette County Kentucky. The territory, population and government of this county are coextensive with the city of Lexington. Lexington accounts for almost two thirds of the population of the regional MSA that it anchors. In 2002, the most recent data available, the U.S. Census Bureau counted 752 eating and drinking places, and based on the disposable income figures above, these residents expended a total of $624,083,000 on food and drink in the Lexington MSA, averaging $829,897 per establishment.  Two Gold Star Chili expansion location is being targeted in Lexington.

### 3.1.3 Dayton, Ohio Metropolitan Statistical Area

In 2010, the U.S. Census Bureau counted 841,502 residents in Greene, Montgomery, Miami, and Preble Counties in Ohio, comprising the Dayton MSA.  In 2002, the most recent data available, the U.S. Census Bureau counted 1,471 eating and drinking places, and based on the disposable income figures above, these residents expended a total of $1,053,483,000 on food and drink in the Dayton MSA, averaging $716,167 per establishment. Of the twelve locations identified for Gold Star Chili expansion, one is located in the Dayton MSA.

### 3.2 Target Locations

The following table lists the twenty locations proposed for the new restaurants, followed by detailed descriptions of each.

| Location | |
|---|---|
| Germantown, OH | Over The Rhine, OH |
| UC Area / Clifton, OH 1 | Florence, KY |
| UC Area / Clifton, OH 2 | Palomar / Lexington, KY |
| Downtown Cincinnati, OH 1 | Lexington Kentucky |
| Downtown Cincinnati, OH 2 | Greendale, IN |
| Loveland, OH | |

GSC000138

### 3.2.1 Germantown, Ohio

Germantown, Ohio is a city of 5,547 residents (2010) 15 miles southwest of Dayton. In 2000 the median per capita income was $23, 287 and the median household income was $47,179. Established in 1804, Germantown boasts the Gunckel Town Plat, a district listed on the National Register of Historic places because of its many original 19th and early 20th century buildings. Germantown is nestled in the scenic Twin Creek Valley and the city maintains two city parks. Once the home of larger industries such as distilleries and cigar manufacturers, today Germantown's businesses are mostly smaller and locally owned. Germantown has no chili restaurants, but there are many locations of Gold Star Chili and Skyline in nearby small cities and in Greater Dayton. The new Gold Star Chili restaurant location will be located in the new Hickory Pointe Centre development being constructed by Associate Construction. The address for the new location will be 2394 Beechwood Ave.

### 3.2.2 UC Area / Clifton, Ohio 1

Clifton/UC is a large, densely populated urban area, located five minutes north of downtown Cincinnati, surrounding the University of Cincinnati and six regional hospitals. Clifton has excellent transportation and accessibility, conveniently located between Interstates 71 and 75. The University of Cincinnati is the region's largest employer. University and hospital employees, as well as students, are all natural patrons of quick-serve and carryout restaurants. Significant economic development is underway in the Clifton Heights area, where this plan proposes a Gold Star location: U Square @ the Loop, currently under construction, will be a multi-use, mid-rise development covering two city blocks between McMillan and Calhoun streets, across from the University of Cincinnati's main campus. U Square will offer 161 upscale market-rate apartments; 80,000 square feet of retail space; 40,000 square feet of University of Cincinnati office space; 700 parking spaces in two parking garages; and green space for social, musical, cultural, and neighborhood events. This location is ideal for a Gold Star location; the nearest Skyline Chili competitor is one mile away. The address for the new location will be 2707 Vine Street.

### 3.2.3 UC Area / Clifton , Ohio 2

Clifton/UC is a large, densely populated urban area, located five minutes north of downtown Cincinnati, surrounding the University of Cincinnati and six regional hospitals. Clifton has excellent transportation and accessibility, conveniently located between Interstates 71 and 75. The University of Cincinnati is the region's largest employer. University and hospital employees, as well as students, are natural patrons of quick-serve and carryout restaurants. The address at 200 West McMillan is located in heart of the shopping and entertainment district directly across the street from the University of Cincinnati's main campus.

GSC000139

### 3.2.4 Downtown Cincinnati, Ohio 1

Downtown Cincinnati's central business district comprises 12 million square feet of office space for use by 63,000 workers, and is headquarters to six Fortune 500 companies—including Procter & Gamble, Fifth Third Bank, The Kroger Company, Macy's, Inc., American Financial Group, and the Great American Insurance Company—as well as operations centers for many other Fortune 500 companies.

A mix of historical and modern buildings, the central business district is also the site of several cultural venues including the Aronoff Center for the Arts, the Lois and Richard Rosenthal Center for Contemporary Art, and the Taft Museum of Art. Downtown is a major, regional shopping district with stores such as Macy's, Saks Fifth Avenue, and Tiffany's, as well as specialty shops located in historic storefronts, mixed in with hotel chains. A variety of restaurants serve the lunch crowd, as well as upscale bars and restaurants that cater to nightlife.

Several development projects are underway. Some are new construction; others are restoration of historic buildings for condominiums, hotels, and retail space. Built in 1871, historic Fountain Square is at the heart of the central business district, and underwent renovation in 2005 to accommodate more underground parking as well as space for community events, such as Cincinnati's annual Oktoberfest, the largest German-heritage festival outside of Germany, reflecting the city's cultural heritage. Fountain Square is walking distance to the Ohio Riverfront, the National Underground Railroad and Freedom Center, and stadiums for professional sports teams Cincinnati Reds baseball and Cincinnati Bengals football. Located between these stadiums is downtown's newest improvement, The Banks, an 18-acre development of upscale housing, retail, parking, and bars and restaurants. The Banks will create 2,400 jobs and generate $275 million annually in economic activity. The city's new 45-acre Riverfront Park, under construction, will connect the central business district to the waterfront. Over the past decade, local and federal governments have invested over $2 billion in the overall redevelopment of Cincinnati's central riverfront.

In the northeast corner of downtown, and still within walking distance from Fountain Square, the $400 million Horseshoe Casino development sits on 20 acres of formerly distressed urban real estate. Opening in March 2013, the casino will create 1,700 jobs, and draw 6 million visitors annually.

Gold Star Chili Downtown Cincinnati I's location will be 8 E. 4th Street.

### 3.2.5 Downtown Cincinnati, Ohio 2

Downtown Cincinnati's central business district comprises 12 million square feet of office space for use by 63,000 workers, and is headquarters to six Fortune 500

GSC000140

companies—including Procter & Gamble, Fifth Third Bank, The Kroger Company, Macy's, Inc., American Financial Group, and the Great American Insurance Company—as well as operations centers for many other Fortune 500 companies.

A mix of historical and modern buildings, the central business district is also the site of several cultural venues including the Aronoff Center for the Arts, the Lois and Richard Rosenthal Center for Contemporary Art, and the Taft Museum of Art. Downtown is a major, regional shopping district with stores such as Macy's, Saks Fifth Avenue, and Tiffany's, as well as specialty shops located in historic storefronts, mixed in with hotel chains. A variety of restaurants serve the lunch crowd, as well as upscale bars and restaurants that cater to nightlife.

Several development projects are underway. Some are new construction; others are restoration of historic buildings for condominiums, hotels, and retail space. Built in 1871, historic Fountain Square is at the heart of the central business district, and underwent renovation in 2005 to accommodate more underground parking as well as space for community events, such as Cincinnati's annual Oktoberfest, the largest German-heritage festival outside of Germany, reflecting the city's cultural heritage. Fountain Square is walking distance to the Ohio Riverfront, the National Underground Railroad and Freedom Center, and stadiums for professional sports teams Cincinnati Reds baseball and Cincinnati Bengals football. Located between these stadiums is downtown's newest improvement, The Banks, an 18-acre development of upscale housing, retail, parking, and bars and restaurants. The Banks will create 2,400 jobs and generate $275 million annually in economic activity. The city's new 45-acre Riverfront Park, under construction, will connect the central business district to the waterfront. Over the past decade, local and federal governments have invested over $2 billion in the overall redevelopment of Cincinnati's central riverfront.

In the northeast corner of downtown, and still within walking distance from Fountain Square, the $400 million Horseshoe Casino development sits on 20 acres of formerly distressed urban real estate. Opening in March 2013, the casino will create 1,700 jobs, and draw 6 million visitors annually.

Gold Star Chili Downtown Cincinnati II's location will be 814 Plum Street.

### 3.2.6 Loveland, Ohio

Loveland, population 12,000, is a bedroom suburb of Cincinnati, 20 miles north of downtown on Interstate 275. Primarily residential, Loveland is close to upscale communities Madeira, Symmes Township, and Mason, and is growing with new residential development. The address at 700 Loveland-Madeira Road is located on the main thoroughfare and near two strip malls.

16

### 3.2.7 Over the Rhine, Ohio

Over-the-Rhine (OTR) is Cincinnati's oldest and most historic neighborhood, home to the country's largest collection of 19th-century Italianate architecture, earning the entire 360-acre OTR neighborhood distinction as an historic district listed in the National Register of Historic Places. The neighborhood's name comes from German immigrants who built and settled there.

By the beginning of the 21st century, OTR had become one of the most economically distressed areas in the country, despite its pivotal location directly between the city's two largest employment centers, the downtown business district and the uptown medical and university district. In 2003, the City of Cincinnati and the city's corporate leaders made a joint commitment to jumpstart economic development in Cincinnati's urban core, creating the Cincinnati Center City Development Corp. (3CDC), which would focus on a 110 square block area of OTR.

3CDC has invested over $255 million in OTR. Historic buildings have now been renovated into single-family homes, condominiums, apartments, commercial spaces, and parking. The arts community, which includes the Ensemble Theatre, Know Theatre, Cincinnati Art Academy, Music Hall, and the public, K-12 School for Creative & Performing Arts are all located in OTR. A vibrant bar and restaurant scene draws patrons from all over the city. Washington Park is a two-block area of renovated green space, fountains, and playgrounds that draw families and others for recreation and local events.

Although there is an increase in residential development as well as a diverse demographic visiting the area, there is a shortage of quick-serve, low-cost restaurants. Most restaurants in the area are bars. This area would support a Gold Star restaurant; both the Gold Star brand and the neighborhood are respected as part of the city's history and identity.

### 3.2.8 Florence, Kentucky

Florence is a suburb of Cincinnati, located 10 miles south of downtown Cincinnati and the Ohio River. Florence, population 30,000 is rapidly growing, and presents a residential mix of lower to higher-income households of homeowners and renters, as well as significant businesses and manufacturing, Turfway Race Track, a major regional shopping area, and the Greater Cincinnati International Airport nearby. The location under consideration is next to Stafford Jewelers on Mall Road, part of the Florence Mall entertainment and shopping complex. This is a very high-traffic area day and night that draws patrons from all over the region. Mall Road has recently undergone expansion and upgrading with the use of federal stimulus funds to relieve congestion and accommodate public transportation, pedestrians, and bicycles. The Gold Star brand is regionally recognized here; the mix of shoppers, families, and workers would support a low-cost, quick-serve chili restaurant. The

GSC000142

new restaurant will be located at 7649 Mall Rd. across from the Florence Mall shopping center.

### 3.2.9 Palomar / Lexington, Kentucky

Palomar is a large, upscale subdivision of 663 homes situated on 200 acres in suburban Lexington, Kentucky, located five miles from downtown Lexington and the University of Kentucky. The median household income in the Palomar subdivision is $91,000. The Keeneland Race Course and beautiful horse farms are nearby. Lexington, one-and-a-half hours south of Cincinnati, recognizes and values the Gold Star Chili brand and tradition of Cincinnati-style chili. As 73 percent of households in Palomar include children, a Gold Star restaurant would fill the need for a popular, quick-serve, family restaurant. The new Gold Star Chili restaurant will be located at 3734 Palomar Centre Drive, Suite 100.

### 3.2.10 Lexington, Kentucky

Located 80 miles south of Cincinnati on Interstate Highway 75, Lexington is the second largest city in Kentucky, with a metropolitan area of 472,100 people. Home to the University of Kentucky, a research institution with an enrollment of 29,000, Lexington is also known as the "horse capital of the world," for the Thoroughbred horse farms and racetracks in the area. The address at 350 Foreman Avenue is adjacent to the campus of the University of Kentucky, the city's largest employer, and although there are several quick-serve restaurants close to this address, the nearest chili parlor is five miles away. Lexington recognizes and values Cincinnati-style chili, and would welcome a local Gold Star location.

### 3.2.11 Greendale, Indiana

Greendale, Indiana is a city of just over 4,500 inhabitants in Dearborn County, Indiana in the Southeast part of the state. Greendale is 25 miles from downtown Cincinnati, Ohio. Greendale has easy access to Interstates 74, and 275 and is located just 12 miles away from Cincinnati Northern Kentucky International Airport. Greendale offers a wide range of economic development economic assistance programs for businesses planning to locate or expand existing operations. Certain areas of the community have been established for controlled industrial growth. Greendale is served by a Skyline Chili location one mile away in Lawrenceburg, Indiana, but the nearest Gold Star Chili location, also in Lawrenceburg is 4.5 miles away. The new Greendale Indiana location of Gold Star Chili will be located at 881 East Eads Parkway.

### 3.3 Competition Profile

Competition falls into four categories: Skyline Chili, locally owned chili chains, locally-owned other restaurant chains, and national fast-food chains.

18

GSC000143

Cincinnati-based Skyline Chili is the biggest competitor to Gold Star. Established in 1949 by the Lambrinides brothers, and offering franchises since 1965, Skyline Chili operates and franchises 140 restaurants, offers a near-identical product and dining experience, national brand recognition and merchandising, and an equally fierce loyalty and following as Gold Star Chili. Whereas Gold Star is the official chili of the Cincinnati Bengals professional football team, Skyline is the official chili of the Cincinnati Reds professional baseball team. Cincinnati-style chili is engrained in the region's collective identity; neighborhoods are loyal to one or to the other. The price point is similar.

As Gold Star and Skyline take the lion's share of chili-parlor business, there exist lesser, locally-owned chains Dixie Chili and Empress Chili, as well as stand-alone, family-owned chili parlors competing for business neighborhood by neighborhood. The price point is similar.

Local restaurant chains Frisch's Big Boy and LaRosa's are in a third category of competitors to Gold Star. Frisch's opened Cincinnati's first year-round, drive-in restaurant in 1939, and introduced the famous double-decker Big Boy sandwich in 1946. The chain now operates and franchises 120 restaurants in the region, serving breakfast, lunch, and dinner. The price point is similar to Gold Star. LaRosa's operates and franchises 60 pizza restaurants, first opened by local celebrity Buddy LaRosa in 1954. The price point for LaRosa's is slightly higher with the sale of alcohol.

Other national fast-food chains such as McDonald's and Burger King compete for business with Gold Star Chili.

19

GSC000144

### 3.4 Competitors by Location

Note: Twelve of the following twenty listed locations will be chosen as GSC portfolio locations.

### 3.4.1 Germantown, Ohio

The following chart displays restaurants within approximately a one-mile range of 2394 Beechwood Ave. in **Germantown**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| McDonalds | Fast Food | B/L/D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |
| Papa John's | Pizza | L,D | No |
| Super Wok | Chinese Cuisine | L,D | No |
| Hot Heads Burritos | Burritos | L,D | Yes |

20

GSC000145

### 3.4.2 UC Area / Clifton, Ohio 1

The following chart displays restaurants within approximately a one-mile range of 2707 Vine Street in the area of the **University of Cincinnati / Clifton, Ohio**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Martino's On Vine | Italian | L,D | No |
| LaRosa's | Pizza | L,D | No |
| Cincy Steak and Lemonade | Sandwiches | L,D | Yes |
| Skyline Chili | Fast Food | L,D | Yes |
| Island Frydays | Jamaican | L,D | No |
| Domino's | Pizza | L,D | Yes |
| Chipotle | Burritos | L,D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |
| McDonalds | Fast Food | B/L/D | Yes |
| Dunkin Donuts | Fast Food | B/L | No |

GSC000146

### 3.4.3 UC Area / Clifton, Ohio  2

The following chart displays restaurants within approximately a one-mile range of
200 W. McMillan St. in the area of the **University of Cincinnati / Clifton, Ohio**. It
includes a sampling of all restaurants perceived to be nearby area competition for
the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Martino's On Vine | Italian | L,D | No |
| LaRosa's | Pizza | L,D | No |
| Cincy Steak and Lemonade | Sandwiches | L,D | Yes |
| Skyline Chili | Fast Food | L,D | Yes |
| Island Frydays | Jamaican | L,D | No |
| Domino's | Pizza | L,D | Yes |
| Chipotle | Burritos | L,D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |
| McDonalds | Fast Food | B/L/D | Yes |
| Dunkin Donuts | Fast Food | B/L | No |

22

GSC000147

### 3.4.4 Downtown Cincinnati, Ohio 1

The following chart displays restaurants within approximately a one-mile range of 8 E. Fourth Street in **Downtown Cincinnati**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Quizno's | Subs/ Sandwiches | L,D | Yes |
| Bruegger's | Bagels/Sandwiches | L,D | Yes |
| Local 127 | American | L,D | No |
| Paula's Café | American | L | No |
| J Gumbo | Cajun | L,D | Yes |
| Café De-vine | Diner | L,D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |

23

GSC000148

### 3.4.5 Downtown Cincinnati, Ohio 2

The following chart displays restaurants within approximately a one-mile range of 814 Plum Street in **Downtown Cincinnati**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Sung Korean Bistro | Korean | L,D | No |
| Izzy's | Fast Food | L,D | Yes |
| Diner on Elm | Diner | L,D | Yes |
| Plaza Cafe | Café | L,D | Yes |
| Yum Yum Chinese | Casual Full Service | L,D | No |
| Papa John's | Pizza | L,D | No |
| Marrakech | Mediterranean | L | Yes |

24

GSC000149

### 3.4.6 Loveland, Ohio

The following chart displays restaurants within approximately a one-mile range of **Loveland, Ohio.** It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst;Lunch;Dinn | Direct Competition |
| El Picante | Mexican | L,D | Maybe |
| McDonald's | Fast Food | B,L,D | Yes |
| The Veg Head | Vegetarian | L,D | No |
| LaRosa's | Pizza | L,D | Yes |
| Angilo's | Pizza | L,D | No |
| Marco's | Pizza | L,D | No |
| Little Shanghai | Asian | L,D | No |
| Hitch's Il Deli | Deli, grill | L,D | Maybe |

25

GSC000150

### 3.4.7 Over the Rhine, Cincinnati, Ohio

The following chart displays restaurants within approximately a one-mile range of
**Over the Rhine.** It includes a sampling of all restaurants perceived to be nearby
area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Senate | Pub | L,D | No |
| Lavomatic Café | Café | L,D | No |
| Venice on Vine | Pizza | L,D | No |
| Skyline Chili | Fast Food | L,D | Yes |
| Taste of Belgium | Casual Full Service | L,D | No |
| Bakersfield | Mexican / Southwest | L,D | No |
| Tuckers | Breakfast, Brunch | B,L | No |

GSC000151

### 3.4.8 Florence, Kentucky

The following chart displays restaurants within approximately a one-mile range of 7649 Mall Road in **Florence**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| City Barbeque | Barbeque | L,D | Yes |
| Chipotle | Burritos | L,D | Yes |
| Asian Buffet | Asian | L,D | No |
| Subway | Subs / Sandwiches | B,L,D | Yes |
| Chuck E. Cheese's | Pizza | L,D | No |
| Qdoba | Sandwiches | L,D | No |
| Taco Bell | Fast Food | L,D | Yes |
| Sarku | Japanese | L,D | No |

27

GSC000152

### 3.4.9 Palomar, Lexington, Kentucky

The following chart displays restaurants within approximately a quarter mile range of 3734 Palomar Centre Drive in **Lexington**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Malones | American | L,D | No |
| Panera Bread | Sandwiches | L,D | Yes |
| Asian Wind | Asian | L,D | No |
| Little Caesars | Pizza | L,D | Yes |
| Papa John's | Pizza | L,D | Yes |
| Arby's | Fast Food | L,D | Yes |
| Jimmy John's | Sandwiches | L,D | Yes |
| McDonald's | Fast Food | B,L,D | Yes |
| Fazoli's | Italian | L,D | No |
| Qdoba | Sandwiches | L,D | Yes |

GSC000153

### 3.4.10 Lexington, Kentucky

The following chart displays restaurants within approximately a quarter mile range 350 Foreman Ave. in **Lexington**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst;Lunch;Dinn | Direct Competition |
| Arby's | Fast Food | L,D | Yes |
| Tolly-Ho | Greasy Spoon | B,L,D | Yes |
| Pazzo's Pizza Pub | Bar | L,D | Maybe |
| Waffle House | 24-hour breakfast | B,L,D | Maybe |
| Casanova | Italian restaurant | L,D | No |
| Joe Bologna's | Pizza | L,D | Yes |
| Thai Orchid | Asian | L,D | No |
| Sierra Fria | Mexican | L,D | Maybe |

GSC000154

### 3.4.11 Greendale, Indiana

The following chart displays restaurants within approximately a one-mile range of 881 East Eads Parkway in **Greendale**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Final Cut | Upscale American | L,D | No |
| Acapulco | Mexican | L,D | No |
| McDonald's | Fast Food | B,L,D | Yes |
| Burger King | Fast Food | B,L,D | Yes |

30

GSC000155

## 4.0 Competitive and Operations Strategy

### 4.1 Competitive Strategy

Gold Star is a locally owned and managed chain of local-specialty chili restaurants. The chili is prepared in a central commissary, which reduces the equipment needs and labor cost at individual restaurants, and promotes product consistency, which protects the brand. Gold Star operates in a highly competitive market against other multi-location chili restaurants and national chili fast-food chains. Among these top competitors are McDonalds, Burger King, Pizza Hut and Kentucky Fried Chicken. Pizza Hut and Kentucky Fried Chicken are owned and operated by Yum! Brands which has its corporate head quarters just 100 miles away from Cincinnati in Louisville, Kentucky. Similar to its competitors, Gold Star offers attractive coupons and seasonal promotions. Additionally, however, Gold Star emphasizes a family-friendly price point and dining experience, and augments this with kid's club coupons and neighborhood fundraiser promotions for local schools and other organizations.

Direct customers who use Gold Star products and services include restaurant customers, franchisees, franchise applicants, retail-product customers, retail-product wholesalers, and mail-order/internet customers. Indirect customers include product and service suppliers, product co-packers, brokers/consultants, shareholders, and regulatory agencies.

Franchisees are attracted by the relatively low investment required and the opportunity to profit from the brand equity. In return, franchisees expect consistency in the chili product as well as support from corporate with advice, market feedback, and promotions. Additionally, Gold Star provides geo-demographic analysis of potential locations to ensure that a new location will not take more than 10% of business from an existing location.

Gold Star takes product orders from its locations on a daily or weekly basis, which creates good dialog between the individual restaurants and the corporate office. The Franchise Advisory Council consists of owners who meet to review business decisions that affect the chain. These council members work in committee groups to meet with corporate department heads to review marketing, purchasing, menu pricing, operations costs, and gross profit analysis. Gold Star also conducts quarterly meetings with restaurant owners, key managers, and outside suppliers to discuss operations issues affecting the chain.

31

## 4.2 Operations Strategy

**Overview:**
Management will establish sound operating guidelines by which to conduct the day-to-day operations for Gold Star Chili. Policies, systems, and procedures will be adopted and documented using the combined resources of RestaurantOwner.com and the previous experiences of the management team. Gold Star membership at RestaurantOwner.com provides the management team with valuable, up-to-date resources to assist in the startup and operation of Gold Star Chili. The site contains hundreds of articles, downloadable tools and other resources packed with practical insights on marketing, customer service, restaurant startup, business management, menu promotion, staffing, and more. Management will have at their disposal the expertise of thousands of other operators through a member forum.

**Training:**
A thorough training program will be adopted for every position in the restaurant. Highly qualified people filling those positions will be provided training materials and personal instruction. They will learn the Gold Star Chili method of how to operate a successful restaurant, including instruction in customer service, safety, and health laws, in addition to the job functions of their respective positions. Customer service will be given special emphasis throughout the operation: Research shows that only 1 in 20 restaurant customers report a problem to management. Gold Star will provide a product and a dining experience in a manner that exemplifies highly responsive and proactive customer service. Staff will receive specific training in the areas of service attitudes, customer perception, and how to deal with guest complaints. Management will conduct periodic staff meetings to review policy, increase guest satisfaction, and to maintain an open dialog between management and staff. Staff will empathetically acknowledge guest complaints and immediately refer the complaints to management. Programs will be in place to systematically deal with various types of guest complaints; more serious complaints will be documented and kept on file. Customer feedback will be accomplished by

**Management Controls:**
Management will practice sound management procedures to control costs, insure quality of product, and provide friendly customer service. Management will use the following systems:

**POS System:**
Careful evaluation will be used in the selection of a POS (point of sale) system that best meets the needs of the location. The POS system will be configured with requisition printing, a process which forces food and beverage items to be registered in the system before the items can be prepared. Requisition printing has proven to reduce costs by as much as 3-5%. The POS system will also be the control center to regulate the flow of service and item preparation. Built-in cash controls will help in tracking sales and receipts.

32

GSC000157

**Order Guide, Daily Inventory, and Weekly Inventory:**
The restaurant will use an item-specific order guide to track order history and maintain designated levels of product in inventory. Daily inventory will be taken on specific items; movement will be compared to sales data to ensure products are properly accounted for. Weekly inventory will determine valuation for use in preparation of weekly profit and loss reports.

**Cash Audits:**
Management will conduct periodic cash audits for all cashier stations. Surprise shift audits are an effective tool to determine cashier under ringing.

**Video Surveillance:** Video surveillance will be in place to monitor activities and deter crime.

**Mystery Shopper.** The restaurant will engage the service of a secret shopper service from time to time. The mystery (secret) shopper is an effective tool to get a customer's perspective of the average guest experience. Feedback will help management to constantly improve customer service.

**Time, Attendance, and Scheduling Systems:**
The restaurant will use an automated time and attendance system. Management will evaluate systems that are integrated into the POS system as well as stand alone time clock systems; hourly labor cost control and the ability to transfer information to Gold Star payroll processing will be key factors in system selection. Management will adopt a scheduling system that expedites the preparation of schedules, reflects anticipated labor budgets, and helps to regulate labor cost.

**Operations Checklists:**
The restaurant will be managed with consistent use of various checklists that maintain quality control and ensure that established procedures are followed. Checklists will be used for customer service, purchasing, receiving, and storage, preparation, cleaning, shift changes, openings, and closings.

**Safety and Liability Reviews:**
Periodic safety and liability assessments ensure that employees and customers are not exposed to dangerous or harmful conditions, or actions by others. Alcohol awareness, employee relations, and guest treatment will be reviewed.

**Daily Cash Control:**
Sales and receipts recorded by the POS system will be compared to actual cash and credit card deposits on a daily basis. Acceptable over/short amounts will be limited to $5.00 per day. Discrepancies greater than $5.00 will prompt management to conduct an immediate audit to account for the difference. Monthly totals will be compared to actual P&L statements for accuracy.

33

Cash, debit card and credit card receipts will be deposited in a deposit account that is kept separate from the general operating account. Transfers to the general operating account will be made as necessary. Separation of the two accounts is intended to aid in account reconciliation and cash flow management.

**Weekly Prime Cost Report:**
The bookkeeper will prepare a weekly report that shows the gross profit margin after cost of goods sold and labor cost has been deducted from the sales revenue. The prime cost for this type of restaurant is expected to range from 64% to 68%. Proper control of the prime cost is the single most effective measure of management's ability to operate the restaurant. Weekly monitoring allows for quick reaction to adverse cost ratios.

**Purchasing Records/Payables:**
The bookkeeper will process and record invoices and credits daily. Reports detailing cash expenditures, payments by check, and accounts payable transactions will be readily available. Check disbursements will be prepared by bookkeeper. Check signing authority for the general operating account will be given to General Manager.

**Accounting System/Service:**
Management will be responsible for the timely preparation of monthly financial statements, including monthly Profit & Loss and Balance sheet. To accomplish this task Gold Star Chili will contract with a Certified Public Accountant.

**Payroll Processing:**
Payroll checks will be issued bi-weekly. The designated manager will run reports from the time and attendance system, make necessary adjustments, and prepare for transfer to the payroll system. Payroll will be processed by payroll processing service.

34

GSC000159

GSC000160

# 5.0 Organizational Structure and Personnel

## 5.1 Organizational Structure



35

## 5.2 Management Team, Consultants and Key Collaborators

### 5.2.1 EB-5 Management Team

**Terry Chan**
*President, Midwest EB-5 Regional Center (MERC)*
Terry Chan is president and one of the founders of MERC. Chan is responsible for guiding the team in selection and structuring of projects, selection of investment partners, and overall operations.

While ramping up operations at MERC, Chan was also one of the core team members at CincyTech USA, a public-private partnership whose mission is to provide services for high-growth startup technology companies in Southwest Ohio. CincyTech does this through management assistance, seed-capital investments and connections to partners who share a common mission. In his capacity at CincyTech, Chan was part of a team that has driven over $10 million in 30 companies and syndicated over $100 million. Those 30 companies have created over 200 direct jobs and over 500 indirect and induced jobs from the $10 million invested. Terry Chan brings his job-creation expertise to the project, where he is responsible for tenant selection and managing job creation.

Prior to arriving in Cincinnati, Chan was a manager in the commercial finance and information technology divisions at General Electric. In that role, he was responsible for working with the commercial teams to maximize margins across a diverse product portfolio. Chan received his master's and bachelor's degrees in finance and information systems management from Carnegie Mellon University, and attended high school at the Hong Kong International School.

**Martin Lawler**
*Lead Immigration Counsel*
Martin J. Lawler is a California immigration lawyer with over thirty years experience. He is the author of *Professionals: A Matter of Degree*, a treatise on business visas and permanent residence. The Wall Street Journal published two of Martin's opinion-page articles in 2007. Lawler was a guest speaker on National Public Radio's Science Friday program about visas for scientists, and has spoken at universities including Harvard, Stanford, San Jose State, and San Francisco State. He is a regular speaker at AILA conferences, including the EB-5 Investor Visa conference. Lawler also lectured at the American Law Institute, the San Francisco Bar Association, and Innovation Norway, among other venues. Lawler chaired the AILA's H-1B visa committee and is a member of AILA's EB-5 Investor Committee 2008–2010. Lawler is the recipient of the AILA Jack Wasserman Memorial Award for excellence in immigration litigation. He is Martindale-Hubbell A rated and listed in Best Lawyers in America, the Bar Register of Preeminent Lawyers, and San Francisco Magazine's Super Lawyers. With over 75 approval cases and a 100% success rate, Lawler is a nationally recognized expert in the area of EB-5 immigration law.

36

GSC000161

**Allen Chi**
*Chief Executive Officer, Mason Investment Group*
Allen oversees the operations of Mason and is also responsible for regional center relationships. Allen was formerly a Partner at Celerity Partners, a private equity firm, where he oversaw an investment portfolio valued at $1 billion, developing a personal investment track record with a 65% annual rate of return. Prior to Celerity, Allen helped lead the turnaround of Merisel, a $6 Billion technology company, where the stock price returned 800% during his tenure. Allen started his career at Bain & Company and is a graduate of Stanford University.

### 5.2.2 GSC Opportunities Operational Management Team

**Mike Rohrkemper**
*Chief Executive Officer, Gold Star Chili*
Mike Rohrkemper, CPA, was appointed Chief Executive Officer of Gold Star Chili, Inc. in 2008. Rohrkemper joined Gold Star from Kemper and Brown Business Consultants, where he provided management counsel for a variety of clients, including Gold Star Chili. Rohrkemper brings more than 30 years of senior-level experience to Gold Star Chili. His background in finance and management includes CFO and directorship positions from 1993 to 2005 at Pomeroy IT Solutions Inc., and a partnership in the Cincinnati accounting firm of Rohrkemper Ossege & Combs Ltd. from 1991 through 2001.

With the appointment of Rohrkemper, Gold Star, with an objective to invest in building brand awareness, also hired a marketing director to help expand deeper into the greater Cincinnati market, while also improving per-store performance. Additionally, Rohrkemper facilitated the diversification of the Gold Star portfolio, including real estate. Gold Star now owns a number of its franchised locations, and invests in strip centers anchored by Gold Star restaurants, and includes other spaces that it leases to other businesses.

**Mike Mason**
*Vice President, Operations and Franchise Development, Gold Star Chili*
Mike Mason has served as the Vice President of Operations and Franchise Development since 1991, and oversees franchisee consulting and training, company store financials, quality assurance, and new product testing. Prior experience includes brand supervisor for GZK, the Dayton, Ohio, franchisee for Lee's Famous Recipe Chicken and Arby's Restaurants; district supervisor for Hardee's Food Systems Inc.; and co-founder of Video Ventures.

**Charlie Howard**
*Vice President, Marketing and Brand Development, Gold Star Chili*
Charlie Howard has been Vice President of Marketing and Brand Development since 2008. He is responsible for the planning, development, and implementation of all of Gold Star's marketing strategies, marketing communications, and public relations. He directs the efforts of outside advertising and public relations agencies, and

GSC000162

coordinates the strategic and tactical planning and execution of promotional programs with the company's franchise community.  Prior to Gold Star, Mr. Howard was the Senior Director of Marketing and Communications, Cincinnati Museum Center.  Mr. Howard has 25 years of consumer, business-to-business, and non-profit branding, marketing communication, and marketing management experience with J. Malsh & Company, Didday & Branch, and Clopay Corporation.

**Jacquelyn Chan**
*Director, Allure Restaurant Group- Subsidiary of Midwest EB-5 Regional Center*
A native of Pittsburgh, Pennsylvania, Jacquelyn Chan holds a Bachelor's degree in Business and Marketing from the University of Cincinnati.  Chan brings extensive restaurant experience, relationships with local business and community leaders, and work in community development.  Since 2011, Chan has served as director of retail for Midwest EB-5 Regional Center.  From 2008 to 2011, Chan served as development director at the Vine Street Urban Redevelopment Corporation (VCURC), a corporation funded by the University of Cincinnati to revitalize the university's neighboring Corryville community.  During that time she also served as a member in the University Village Business Association, where she applied for and received $150,000 from the City of Cincinnati to aid the redevelopment of Corryville. From 2001-2011, Chan managed Martino's on Vine restaurant in Cincinnati.

## 6.0 Staffing and Job Creation

### 6.1 Single Restaurant Staffing Projection

Gold Star Chili is expected to hire for 13 full time positions at each restaurant location. A full time position is defined as a minimum of 35 hours per working week with benefits. Some full time positions will be subject to job sharing arrangements. Each employee will sign a document noting their understanding of the job sharing arrangement and will be eligible for benefits. Management has adopted an effective interview process designed to staff the restaurant with highly qualified people for each position.  Each applicant will be rated and evaluated according to a pre-defined set of standards adopted for each position.  Management will run criminal background checks on all applicants to ensure the hiring of the highest quality employees.

Recruiting efforts will include placing ads in the local paper, online job forums, and similar outlets; signage will be placed at the jobsites.  Priority will be given to applicants referred or actively recruited by management—applicants previously employed by management and personally known to them.  Management may use recruiting agencies to fill managers' and other salaried positions, or in the case of long-term unfilled crewmember positions.

GSC000163

Expected staffing levels for both full- and part-time positions are shown in the following table:

| Position | # Full Time Positions | # Part Time Positions | Pay Rate |
|---|---|---|---|
| General Manager | 1 | 0 | $45,000/year |
| Crew Leaders | 1 | 0 | $12.50 / hour |
| Steam Table Operator | 2 | 0 | $12.50/hour |
| Prep Cooks / Bussers | 2 | 1 | $8.00/hour |
| Dishwashers | 0 | 2 | $7.85 / hour |
| Servers | 6 | 0 | $3.93/hour |
| Cashiers | 1 | 1 | $8.50/hour |
| **Total** | **13** | **4** | |

### 6.2.1 Job Descriptions

**General Manager:** Oversees all operations of the restaurant location, based on reports from the corporate office, and from the assistant manager. All supplies, HR concerns, financial tracking/budgeting, general building maintenance, and operations related to food preparation are in the purview of the general manager.

**Crew Leader:** Coordinates restaurant employees and operations related to food preparation and customer service.

**Steam Table Operator:** Serves as the kitchen crew leader. Cooks and assembles orders for servers. Maintains an orderly and sanitary work environment in the food production area.

**Prep Cook / Busser:** Prepares food for the steam table operators. Manages food inventory. Busses tables, sets tables, cleans dining area, and supports servers. Maintains an orderly and sanitary work environment in the food production area.

**Dishwasher:** Washes dishes, pots, and pans. Cleans the kitchen and dining areas. Stocks dry goods and non-food supplies.

**Server:** Takes orders and serves customers tableside.

**Cashier:** Fills carryout orders; handles payment for carryout and dine-in customers.

GSC000164

GSC000165

## 6.3 Job Creation Phasing and Hiring Timelines

| Timeframe | Positions Hired |
|---|---|
| 2 months before opening | management / salaried employees |
| 2-4 weeks before opening | servers, prep cooks |
| 1-2 weeks before opening | dishwashers, and cashiers |

40

GSC000166

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restaurant 1 | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant 2 | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant 3 | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant 4 | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - |
| Restaurant 5 | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - |
| Restaurant 6 | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - |
| Restaurant 7 | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - |
| Restaurant 8 | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - |
| Restaurant 9 | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - |
| Restaurant 10 | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 |
| Restaurant 11 | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 |
| Restaurant 12 | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 |
| Month Total | 0 | 12 | 27 | 12 | 0 | 12 | 27 | 12 | 0 | 12 | 27 | 12 | 0 | 12 | 27 | 12 |
| Aggregate Total | 0 | 12 | 39 | 51 | 51 | 63 | 90 | 102 | 102 | 114 | 141 | 153 | 153 | 165 | 192 | 204 |
| # Full Time Positions | 0 | 12 | 36 | 39 | 39 | 51 | 75 | 78 | 78 | 90 | 114 | 117 | 117 | 129 | 153 | 156 |

## 7.0 Exit Strategy

### 7.1 Expansion Plans

 Gold Star Chili's appealing menu, comfortable atmosphere and reasonable prices will position the concept for broad customer appeal in a wide range of markets.

The operating partner(s) will focus first and foremost on developing this concept to achieve a successful return on investment without the need for expansion.  Because of its broad appeal, however, the concept does lend itself to expansion opportunities.  The comprehensive approach taken in the creation of the business philosophy, systems, and controls will enhance the ability to expand the concept: Gold Star Chili Inc., may seek in the future to create additional Limited Partnerships and/or add-on phases to GSC Opportunities, L.P., to facilitate expansion of the number of Gold Star locations.

### 7.2 Investor Exit Options

GSC Opportunities, L.P. (see Sec. 5.1) will seek to return capital to the investor Limited Partners after the later of 3 years or once their I-829 applications have been approved by USCIS. At that point, GSC Opp Management as the general partner of GSC Opportunities, LLC will take commercially reasonable steps towards valuing and selling Real Co. After 18 months the limited partners of GSC Opportunities can compel the general partner to liquidate RealCo. The limited partners get 1005 of liquidated RealCo proceeds up to their initial investmen less any amount that has been repaid through distributions etc. Capital returned to investors will be sourced from GSC Opportunities, L.P.'s share of distributable cash flow (see sec. 8.4) and also from equity value of real property held in RealCo. GSC Opportunities, L.P. does not however guarantee the return of any investor's capital in part or in full. GSC Opp Management, LLC as the General Partner of the GSC Opportunities will retain ownership and management interest respectively at rates and in capacities governed by the Operating Agreements until they so choose to act upon their right to exit, pursuant to the same agreements.

42

GSC000167

## 8.0 Financials

Financial projections for GSC Opportunities, L.P. have been created as a result of collaboration between the members of GSC Opp Management, LLC based on their experience and on national industry averages, trends and other statistics. Capital contributions required for the restaurant will come from EB-5 immigrant investors as well as Gold Star Chili, Inc. The amount required from each of these investment roles, as shown in Capitalization (Section 1.3), is dependent upon the successful acquisition of funds from each of the listed sources. The funds will be used to fulfill the projected capital budget requirements as explained in the Single Restaurant Financial Projections (Sec. 8.2). Adjustments to the amount of funds needed by each source may be necessary in the event of unforeseen circumstances. Allowances for that possibility have been addressed in the operating agreements between the two entities.

43

GSC000168

## 8.1 Industry Trends

National Numeric Industry Standards: The following table shows industry-standard benchmarks against which we have measured the projected financial requirements and performance of the Gold Star Chili restaurants. Metrics and other industry information for key competitors can be found in Appendix 5.

| Metric | Benchmark | Range (+/-) | Gold Star Chili Financial Projections |
|---|---|---|---|
| **Space/Capacity** | | | |
| FOH / Seat (Sq. Ft.) | 15 | 5 | 13.5 |
| Seat Turnover / Day | 2 | 0.5 | 2.11 |
| Kitchen Sq. Ft. (%) | 30 | - | 30% |
| Total Sq. Ft. | 3,000 | 1,500 | 2,250 |
| **Employment (FTE)** | | | |
| FTE/ 100 Seats | 18 | 2 | 16.4 |
| FTE / 100 Daily Covers | 9 | 1 | 7.8 |
| **Sales ($)** | | | |
| Year Sales/ Sq. Ft. | 350 | 100 | 422 |
| Year Sales/ Seat | 10,000 | 2,000 | 8,193 |
| Avg. Year Sales / Employee | 46,000 | - | 50,000 |
| Median Year Sales / FTE | 63,000 | | 50,000 |
| Avg. Rev / Year | 600,000 | - | 950,000 |
| % Carryout | 50 | 20 | 46 |
| **Cost (%)** | | | |
| Prime Cost (Payroll + COGS) | 60 | 5 | 65.7 |
| Payroll Cost | 30 | 5 | 37.7 |
| COGS | 30 | 5 | 28 |
| Rent | 8 | 2 | 9.3 |
| Marketing | 2 | 1 | 4 |

Sources:

National Restaurant Association 2009/2010 Restaurant Industry Operations Report

"IBISWorld Industry Report 72221 Fast Food Restaurants in the US," (April 2010).

RestaurantOwner.Com Industry Surveys- How Much Does it Cost to Open a Restaurant?, (Accessed 11/27/12)

44

GSC000169

## 8.2 Profit and Loss Projections

### 8.2.1 Single Restaurant Sample Year-1 Summary P&L Projections

# Gold Star Chili
## Annual Operating Projection - Summary
### First Full Year of Operations

| | MONTHLY AVE | | ANNUAL | |
|---|---|---|---|---|
| **Sales:** | | | | |
| Food/Bev | $ 62,299 | 100.0% | $ 747,584 | 100.0% |
| TOTAL SALES | 62,299 | 100.0% | 747,584 | 100.0% |
| **Cost of Sales:** | | | | |
| Food/Bev | 17,444 | 28.0% | 209,324 | 28.0% |
| TOTAL COST OF SALES | 17,444 | 28.0% | 209,324 | 28.0% |
| **Gross Profit** | 44,855 | 72.0% | 538,261 | 72.0% |
| **Payroll:** | | | | |
| Salaries & Wages | 18,616 | 29.9% | 223,394 | 29.9% |
| Payroll Taxes | 1,820 | 2.9% | 21,841 | 2.9% |
| TOTAL PAYROLL | 20,436 | 32.8% | 245,235 | 32.8% |
| **PRIME COST** | 37,880 | 60.8% | 454,558 | 60.8% |
| **Controllable Costs** | | | | |
| Direct Operating Expenses | 2,754 | 4.4% | 33,050 | 4.4% |
| Marketing | 2,500 | 4.0% | 30,000 | 4.0% |
| Utilities | 1,850 | 3.0% | 22,200 | 3.0% |
| General & Administrative Expenses | 556 | 0.9% | 6,675 | 0.9% |
| Repairs & Maintenance | 250 | 0.4% | 3,000 | 0.4% |
| TOTAL CONTROLLABLE COSTS | 7,910 | 12.7% | 94,925 | 12.7% |
| **Non-Controllable Costs** | | | | |
| Occupancy Costs | 4,125 | 6.6% | 49,500 | 6.6% |
| Royalties | 3,115 | 5.0% | 37,379 | 5.0% |
| TOTAL NON-CONTROLLABLE COSTS | 7,240 | 11.6% | 86,879 | 11.6% |
| **NET INCOME (EBITDA)** | 9,268 | 14.9% | 111,221 | 14.9% |
| Preferred Distribution | 1,363.64 | 2.2% | 16,363.64 | 2.2% |
| Depreciation and Amortization | 1,398.27 | 2.2% | 16,779.20 | 2.2% |
| **NET INCOME BEFORE INCOME TAXES** | 6,507 | 10.4% | 78,078 | 10.4% |
| ADD BACK: | | | | |
| Occupancy Costs | 0 | 0.0% | 0 | 0.0% |
| ADD BACK: | | | | |
| Depreciation and Amortization | 1,398 | 2.2% | 16,779 | 2.2% |
| **CASH FLOW BEFORE INCOME TAXES** | 7,905 | 12.7% | 94,858 | 12.7% |
| Distributions- | | | | |
| Limited Partners | 5,059 | 8.1% | 60,709 | 8.1% |
| General Partner | 1,265 | 2.0% | 15,177 | 2.0% |
| TOTAL DISTRIBUTIONS | 6,324 | 10.2% | 75,886 | 10.2% |
| Taxes | 553 | 0.9% | 6,640 | 0.9% |
| **RETAINED EARNINGS** | 1,028 | 1.6% | 12,331 | 1.6% |

| KEY RATIOS: | |
|---|---|
| **Sales Per Square Foot** | $332 |
| **Sales Per Seat** | $6,445 |
| **Sales to Investment** | 1.0 |

GSC000170

GSC000171

## 8.2.2 Single Restaurant Sample 5-year P&L Projection

### Gold Star Chili
#### 5 Year Operating Projections

| | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| **Sales:** | | | | | | | | | | |
| Food/Bev | $ 747,564 | 100.0% | $ 762,536 | 100.0% | $ 777,787 | 100.0% | $ 793,342 | 100.0% | $ 809,209 | 100.0% |
| TOTAL SALES | 747,564 | 100.0% | 762,536 | 100.0% | 777,787 | 100.0% | 793,342 | 100.0% | 809,209 | 100.0% |
| **Cost of Sales:** | | | | | | | | | | |
| Food/Bev | $ 209,324 | 28.0% | 213,510 | 28.0% | 217,780 | 28.0% | 222,136 | 28.0% | 226,579 | 28.0% |
| TOTAL COST OF SALES | 209,324 | 28.0% | 213,510 | 28.0% | 217,780 | 28.0% | 222,136 | 28.0% | 226,579 | 28.0% |
| **Gross Profit** | 538,261 | 72.0% | 549,026 | 72.0% | 560,006 | 72.0% | 571,207 | 72.0% | 582,631 | 72.0% |
| **Payroll:** | | | | | | | | | | |
| Salaries & Wages | $ 223,384 | 29.9% | 227,861 | 29.9% | 232,419 | 29.9% | 237,067 | 29.9% | 241,808 | 29.9% |
| Payroll Taxes | $ 21,841 | 2.9% | 22,278 | 2.9% | 22,724 | 2.9% | 23,178 | 2.9% | 23,642 | 2.9% |
| TOTAL PAYROLL | 245,225 | 32.8% | 250,138 | 32.8% | 255,142 | 32.8% | 260,245 | 32.8% | 265,450 | 32.8% |
| **PRIME COST** | 454,558 | 60.8% | 463,649 | 60.8% | 472,922 | 60.8% | 482,381 | 60.8% | 492,028 | 60.8% |
| **Controllable Costs** | | | | | | | | | | |
| Direct Operating Expenses | 33,050 | 4.4% | 33,546 | 4.4% | 34,049 | 4.4% | 34,560 | 4.4% | 35,079 | 4.3% |
| Marketing | 30,000 | 4.0% | 30,450 | 4.0% | 30,907 | 4.0% | 31,370 | 4.0% | 31,841 | 3.9% |
| Utilities | 22,200 | 3.0% | 22,533 | 3.0% | 22,871 | 2.9% | 23,214 | 2.9% | 23,562 | 2.9% |
| General & Administrative Expenses | 6,675 | 0.9% | 6,775 | 0.9% | 6,877 | 0.9% | 6,980 | 0.9% | 7,085 | 0.9% |
| Repairs & Maintenance | 3,000 | 0.4% | 3,045 | 0.4% | 3,091 | 0.4% | 3,137 | 0.4% | 3,184 | 0.4% |
| TOTAL CONTROLLABLE COSTS | $ 94,925 | 12.7% | 96,349 | 12.6% | 97,795 | 12.6% | 99,261 | 12.5% | 100,750 | 12.5% |
| **Non-Controllable Costs** | | | | | | | | | | |
| Occupancy Costs | $ 49,500 | 6.6% | 50,243 | 6.6% | 50,996 | 6.6% | 51,761 | 6.5% | 52,537 | 6.5% |
| Royalties | $ 37,379 | 5.0% | 38,127 | 5.0% | 38,889 | 5.0% | 39,667 | 5.0% | 40,460 | 5.0% |
| TOTAL NON-CONTROLLABLE COSTS | $ 86,879 | 11.6% | 88,369 | 11.6% | 89,885 | 11.6% | 91,428 | 11.5% | 92,998 | 11.5% |
| **NET INCOME (EBITDA)** | 111,221 | 14.9% | 114,148 | 15.0% | 117,164 | 15.1% | 120,272 | 15.2% | 123,432 | 15.3% |
| Preferred Distribution | 16,384 | 2.2% | 16,384 | 2.1% | 16,384 | 2.1% | 16,384 | 2.1% | 16,384 | 2.0% |
| Depreciation and Amortization | 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.1% | 16,779 | 2.1% |
| **NET INCOME BEFORE INCOME TAXES** | $ 78,078 | 10.4% | $ 81,025 | 10.6% | $ 84,041 | 10.8% | $ 87,129 | 11.0% | $ 90,290 | 11.2% |
| **ADD BACK:** | | | | | | | | | | |
| Occupancy Costs | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% |
| **ADD BACK:** | | | | | | | | | | |
| Depreciation and Amortization | 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.1% | 16,779 | 2.1% |
| **CASH FLOW BEFORE INCOME TAXES** | $ 94,858 | 12.7% | $ 97,804 | 12.8% | $ 100,821 | 13.0% | $ 103,908 | 13.1% | $ 107,069 | 13.2% |
| **Distributions** | | | | | | | | | | |
| Limited Partners | 60,709 | 8.1% | 62,595 | 8.2% | 64,525 | 8.3% | 66,501 | 8.4% | 68,524 | 8.5% |
| General Partner | 15,177 | 2.0% | 15,649 | 2.1% | 16,131 | 2.1% | 16,625 | 2.1% | 17,131 | 2.1% |
| TOTAL DISTRIBUTIONS | 75,885 | 10.2% | 78,243 | 10.3% | 80,656 | 10.4% | 83,127 | 10.5% | 85,655 | 10.6% |
| Taxes | 6,640 | 0.9% | 6,846 | 0.0% | 7,057 | 0.0% | 7,274 | 0.0% | 7,495 | 0.0% |
| **RETAINED EARNINGS** | 12,331.50 | 1.6% | 12,714.55 | 1.7% | 13,106.67 | 1.7% | 13,508.06 | 1.7% | 13,919 | 1.7% |

46

GSC000172

## 8.2.3 GSC Opportunities, L.P. Comprehensive 5-year Operating Projection

**GSC Opportunities, L.P.**
5-Year Comprehensive Operating Projections

| | Year 1 | % | Year 2 | % | Year 3 | % | Year 4 | % | Year 5 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Sales:** | | | | | | | | | | |
| Food/Bev | $ 2,242,752 | 100.0% | $ 8,223,424 | 100.0% | $ 9,105,573 | 100.0% | $ 9,287,685 | 100.0% | $ 9,473,438 | 100.0% |
| TOTAL SALES | 2,242,752 | 100.0% | 8,223,424 | 100.0% | 9,105,573 | 100.0% | 9,287,685 | 100.0% | 9,473,438 | 100.0% |
| **Cost of Sales:** | | | | | | | | | | |
| Food/Bev | $ 627,972 | 28.0% | $ 2,302,563 | 28.0% | $ 2,549,562 | 28.0% | $ 2,600,552 | 28.0% | $ 2,652,563 | 28.0% |
| TOTAL COST OF SALES | 627,972 | 28.0% | 2,302,563 | 28.0% | 2,549,562 | 28.0% | 2,600,552 | 28.0% | 2,652,563 | 28.0% |
| **Gross Profit** | 1,614,780 | 72.0% | 5,920,861 | 72.0% | 6,556,011 | 72.0% | 6,687,133 | 72.0% | 6,820,876 | 72.0% |
| **Payroll:** | | | | | | | | | | |
| Salaries & Wages | $ 670,192 | 29.9% | $ 2,457,234 | 29.9% | $ 2,720,639 | 29.9% | $ 2,775,356 | 29.9% | $ 2,830,655 | 29.9% |
| Payroll Taxes | $ 65,523 | 2.9% | $ 240,261 | 2.9% | $ 266,023 | 2.9% | $ 271,344 | 2.9% | $ 276,777 | 2.9% |
| TOTAL PAYROLL | 736,705 | 32.8% | 2,697,565 | 32.8% | 2,986,662 | 32.8% | 3,046,702 | 32.8% | 3,107,636 | 32.8% |
| **PRIME COST** | 1,363,677 | 60.8% | 5,000,148 | 60.8% | 5,536,554 | 60.8% | 5,647,253 | 60.8% | 5,760,198 | 60.8% |
| **Controllable Costs** | | | | | | | | | | |
| Direct Operating Expenses | $ 99,150 | 4.4% | $ 363,550 | 4.4% | $ 401,092 | 4.4% | $ 407,078 | 4.4% | $ 413,184 | 4.4% |
| Marketing | $ 90,550 | 4.0% | $ 330,000 | 4.0% | $ 364,050 | 4.0% | $ 369,511 | 4.0% | $ 378,553 | 4.0% |
| Utilities | $ 66,600 | 3.0% | $ 244,200 | 3.0% | $ 269,397 | 3.0% | $ 273,438 | 2.9% | $ 277,940 | 2.9% |
| General & Administrative Expenses | $ 20,025 | 0.9% | $ 73,425 | 0.9% | $ 81,001 | 0.9% | $ 82,216 | 0.9% | $ 83,449 | 0.9% |
| Repairs & Maintenance | $ 9,900 | 0.4% | $ 33,000 | 0.4% | $ 36,405 | 0.4% | $ 36,951 | 0.4% | $ 37,505 | 0.4% |
| TOTAL CONTROLLABLE COSTS | $ 284,775 | 12.7% | $ 1,044,175 | 12.7% | $ 1,151,915 | 12.7% | $ 1,169,194 | 12.6% | $ 1,186,732 | 12.5% |
| **Non-Controllable Costs** | | | | | | | | | | |
| Occupancy Costs | $ 146,500 | 6.6% | $ 544,500 | 6.5% | $ 600,683 | 6.6% | $ 609,683 | 6.6% | $ 618,838 | 6.5% |
| Royalties | $ 112,137 | 5.0% | $ 411,149 | 5.0% | $ 455,278 | 5.0% | $ 464,384 | 5.0% | $ 473,672 | 5.0% |
| TOTAL NON-CONTROLLABLE COSTS | $ 258,637 | 11.6% | $ 955,689 | 11.6% | $ 1,055,961 | 11.6% | $ 1,074,077 | 11.6% | $ 1,092,510 | 11.5% |
| **NET INCOME (EBITDA)** | $ 333,661 | 14.9% | $ 1,223,432 | 14.9% | $ 1,361,173 | 14.9% | $ 1,397,161 | 15.0% | $ 1,433,398 | 15.1% |
| Preferred Distribution | $ 49,092 | 2.2% | $ 180,004 | 2.2% | $ 196,368 | 2.2% | $ 196,368 | 2.1% | $ 196,368 | 2.1% |
| Depreciation and Amortization | $ 56,982 | 2.5% | $ 208,934 | 2.5% | $ 227,928 | 2.5% | $ 227,928 | 2.5% | $ 227,928 | 2.4% |
| **NET INCOME BEFORE INCOME TAXES** | $ 227,599 | 10.1% | $ 834,494 | 10.1% | $ 936,877 | 10.3% | $ 972,865 | 10.5% | $ 1,009,702 | 10.7% |
| **ADD BACK:** | | | | | | | | | | |
| Occupancy Costs | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% |
| **ADD BACK:** | | | | | | | | | | |
| Depreciation and Amortization | $ 56,982 | 2.5% | $ 208,934 | 2.5% | $ 227,928 | 2.5% | $ 227,928 | 2.5% | $ 208,934 | 2.2% |
| **CASH FLOW BEFORE INCOME TAXES** | $ 284,571 | 12.7% | $ 1,043,428 | 12.7% | $ 1,164,805 | 12.8% | $ 1,200,793 | 12.9% | $ 1,218,636 | 12.9% |
| Distributions: | | | | | | | | | | |
| Limited Partners | $ 182,125 | 8.1% | $ 667,793 | 8.1% | $ 749,479 | 8.2% | $ 768,507 | 8.3% | $ 779,927 | 8.2% |
| General Partner | $ 45,531 | 2.0% | $ 166,948 | 2.0% | $ 186,369 | 2.0% | $ 192,127 | 2.1% | $ 194,982 | 2.1% |
| TOTAL DISTRIBUTIONS | $ 227,657 | 10.2% | $ 834,742 | 10.2% | $ 931,844 | 10.2% | $ 960,634 | 10.3% | $ 974,909 | 10.3% |
| Taxes | 10,920 | 0.0% | 73,010 | 0.0% | 81,536 | 0.0% | 84,055 | 0.0% | 85,305 | 0.0% |
| **RETAINED EARNINGS** | 36,994.23 | 1.6% | 135,646.45 | 1.6% | 151,424.71 | 1.7% | 156,103.06 | 1.7% | $ 156,423 | 1.7% |

GSC000173

## 8.3 Capital Budgets

### 8.3.1 Comprehensive Project Capital Budget

| | Non- EB-5 | EB-5 | Total |
|---|---|---|---|
| Real Estate & Construction | 1,410,000 | 4,000,000 | 5,410,000 |
| FF&E | 816,000 | 695,000 | 1,511,000 |
| Professional Services | 600,000 | 144,000 | 744,000 |
| Organizational & Development | 84,000 | 684,000 | 768,000 |
| Pre-Opening Expenses | 90,000 | 162,000 | 252,000 |
| Working Capital & Contingency | 0 | 315,000 | 315,000 |
| Total | 3,000,000 | 6,000,000 | 9,000,000 |

EB-5 funds will be held in escrow pending the investors' I-526 approvals as described in the offering memorandum. Non-EB-5 funds will be used for the initial phases prior to the release of EB-5 funds from escrow. Uses include land and building, professional services and other soft costs. Actual amounts will vary depending on USCIS adjudication timelines.

GSC000174

## 8.3.2 Single Restaurant Sample Capital Budget

**Gold Star Chili**
Capital Budget



| | TOTAL COST | Detail | Building | Leasehold | Equipment | Start Up | Expense | Non-Ded. |
|---|---|---|---|---|---|---|---|---|
| **REAL ESTATE & CONSTRUCTION** | 450,833 | | | | | | | |
| Land & Building | | 262,500 | | | | | | 262,500 |
| Construction Contract | | 168,333 | 168,333 | | | | | |
| **FURNITURE, FIXTURES & EQUIPMENT (FF&E)** | 125,917 | | | | | | | |
| Interior Finishes & Equipment * | 106,417 | | | 125,917 | | | | |
| Kitchen Equipment | | 7,417 | | | | | | |
| Dining Room Furniture | | 60,000 | | | | | | |
| Kitchen Smallwares | | 3,000 | | | | | | |
| Security System | | 1,500 | | 1,500 | | 3,000 | | |
| Music/Sound/Audio-Visual Systems | | 3,000 | | 3,000 | | | | |
| Cash Register / Point of Sale | | 15,000 | | 15,000 | | | | |
| Phone System | | 500 | | 500 | | | | |
| Office Equipment / Computer | | 2,000 | | 2,000 | | | | |
| Office Supplies | | 2,500 | | | | 1,500 | | |
| Interior Signs | | 2,500 | | 2,000 | | | | |
| Exterior Finishes & Equipment * | 19,500 | | | 19,500 | | | | |
| Landscaping | | 500 | | 0 | | | | |
| Exterior Signs & Decorations | | 16,000 | | | | | | |
| Parking Lot | | 3,000 | | | | | | |
| **PROFESSIONAL SERVICES** | 62,000 | | | 62,000 | | | | |
| Architect & Engineering | | 6,000 | | | | | | |
| Legal (lease & incorporation) | | 3,000 | | | | | | |
| Project Consultant * | | 50,000 | | | | | | |
| Accounting & Tax | | 3,000 | | | | | | |
| **ORGANIZATIONAL DEVELOPMENT** | 64,000 | | | | | | | |
| Management Fee | | 50,000 | | | | 50,000 | | |
| Deposits (Utilities, sales tax, etc.) | | 3,000 | | | | 3,000 | | |
| Insurance Binder (property, casualty, liability) | | 1,500 | | | | | 1,500 | |
| Building Permits | | 4,500 | | 2,500 | | | | 2,500 |
| Other Licenses & Permits | | 1,000 | | 1,000 | | | | 2,500 |
| Utility Deposits (gas, electric, water) | | 2,500 | | | | | | |
| Change, Operating Servcs & Petty Cash | | 500 | | | | | | |
| Menus / Menu Boards | | 1,000 | | | | 1,000 | | |
| **PRE-OPENING EXPENSES** | 21,000 | | | | | | | |
| Construction Period Utilities | | 4,000 | | | | 21,000 | | |
| Uniforms | | 2,000 | | | | | | |
| **Operating Inventories *** | | | | | | | | |
| Food | | 3,000 | | | | | | |
| Paper & Other Supplies | | 1,000 | | | | | | |
| **Marketing *** | | | | | | | | |
| Advertising | | 4,000 | | | | | | |
| Opening Parties | | 1,000 | | | | | | |
| **Personnel *** | | | | | | | | |
| Training | | 7,500 | | | | | | |
| **CONTINGENCY** | 26,250 | 26,250 | | 26,250 | | | | |
| **TOTAL PROJECT COST** | $ 750,000 | | $ 168,333 | $ 237,167 | $ 24,000 | $ 26,500 | $ 1,500 | $ 340,500 |

| | |
|---|---|
| Project Cost Per Square Foot | $331 |
| Project Cost Per Seat | $6,466 |

## 8.4 ROI and Equity Analysis

| Investor | Amount of Contribution | Expected ROI on Original Investment |
|---|---|---|
| Until Investor Capital is Returned* | | |
| GSC Opportunities, L.P. | $6 Million | 80% of cash distributions |
| Gold Star Chili, Inc. | $3 Million | 20% of cash distributions |
| After Investor Capital is Returned* | | |
| GSC Opportunities, L.P. | $6 Million | 20% of cash distributions |
| Gold Star Chili, Inc. | $3 Million | 80% of cash distributions |

These tables suggest the anticipated ROI. They are intended to be a summary only. Please refer to the Offering Documents for clarification of equity and cash distributions.

*While GSC Opportunities, L.P. intends and will seek to return the capital of its limited partners, no return of capital or other return on investment is guaranteed.

51

GSC000175

### 8.5 Funds Disbursement and Controls

All funds will be invested in the New Commercial Enterprise (NCE), which is GSC Opportunities, L.P. for disbursement to its wholly owned subsidiary Job Creating Entities (JCEs). As the General Partner of GSC Opportunities, L.P. GSC Opp Management, LLC with Gold Star Chili, Inc. as its managing member will oversee and control the disbursement of funds from the NCE to the JCEs on a monthly basis once invested funds have been released from escrow. A draw process has been established and all relevant checklists and forms will be provided to the JCEs to facilitate the implementation of the draw process and timely disbursement of funds.

Each draw request shall include a master budget, updated investment plan, and hiring summary. In addition each draw submitted by a JCE must be accompanied by documentation that verifies expenditures proposed in the draw. For example if construction or renovation monies are included in the draw, relevant contracts, bids, and permits will be furnished by the JCE. If monies are marked for operational or working capital expenditures, these intended expenditures will be required to be similarly documented as applicable. Upon submission of the subsequent draw request, receipts, invoices, bank statements, and a summary of all activity related to the prior draw request will be required.

Draw requests will be submitted to GSC Opp Management. The management team consisting of representatives of various project stakeholders will have the authority to approve draw requests and thus approve the disbursement of funds from the L.P. to the JCEs. A copy of the draw process checklist is available in Appendix 6.

GSC000176

## Appendices

### Appendix 1: Targeted Employment Areas

(pending approval)

GSC000177

GSC000178

**Appendix 2: Sample Menu**



54

## Appendix 3: Location Maps

The following map shows 88 existing Gold Star Chili locations and the twelve new Gold Star Chili restaurants that are proposed in this business plan. Existing locations are shown with blue markers and proposed new locations are shown with red markers. This map was created using Google Maps data and a Google Maps application.



55

GSC000179

## Appendix 4: Real Estate Details

### Germantown, Ohio



56

GSC000180



**UC Area/ Clifton, Ohio 1**



57

GSC000181



**UC Area/ Clifton, Ohio 2**



GSC000182



LoopNet - 200 West McMillan, Retail (Other), 200 West McMillan, Cincinnati, OH                    2/28/13 2:26 PM

Retail Property · Off Market

## 200 West McMillan
200 West McMillan, Cincinnati, OH 45211

| | |
|---|---|
| Price: | **$900,000** |
| Building Size: | 6,000 SF |
| Price/SF: | $150 |
| Property Type: | Retail |
| Property Sub-type: | Retail (Other) |
| Property Use Type: | Net Lease Investment with 1 years left on lease |
| Commission Split: | 6% |
| Cap Rate: | 5% |
| Tenancy: | Multiple |

Last Updated  232 days ago
Listing ID  17742134

59

GSC000183

## **Downtown Cincinnati, Ohio 1**



## 8 E. Fourth Street / Cincinnati, OH 45202

- Located near prime downtown corner of 4th and Vine Street in the heart of CBD

- Pedestrian Traffic >2,500 people per day

- Opportunity for signage for tenants

- Loading dock in alley way allows for flexibility for street-level tenants

- Retail space set up for restaurant use

- 5,200 SF of front Retail Space

- 6,100 SF of 2nd floor Office Space

- 3,000 SF of 3rd floor Office Space

- Office has elevator and separate entrance



For more information, contact:

Andrew Sellet
513-763-3053
andrew.sellet@cassidyturley.com

www.cassidyturley.com

221 E. Fourth St., 26th Floor
Cincinnati, OH 45202

cassidyturley.com



The information contained herein was obtained from sources we consider reliable. We cannot be responsible, however, for errors, omissions, prior sales, withdrawal from the market or change in price. Seller and broker make no representation as to the environmental condition of the property and recommend purchasers independent investigation.

60

## AERIAL

8 E. Fourth Street / Cincinnati, OH 45202



## PROPERTY PHOTOS






61

GSC000185

8 E. Fourth Street / Cincinnati, OH 45202

## DEMOGRAPHICS



**Summary Profile**
2000 - 2010 Census, 2011 Estimates with 2016 Projections
*Calculated using Proportional Block Groups*

Lat/Lon: 39.10003/-84.51238

| 8 E 4th Street Cincinnati, OH | | 1 Mile | 3 Miles | 5 Miles |
|---|---|---|---|---|
| **POPULATION** | 2011 Estimated Population | 18,079 | 133,330 | 291,966 |
| | 2016 Estimated Population | 15,949 | 132,938 | 282,618 |
| | 2010 Census Population | 15,966 | 133,238 | 293,171 |
| | 2000 Census Population | 16,035 | 145,359 | 324,112 |
| | Historical Annual Growth 2000 to 2011 | - | -0.8% | -0.9% |
| | Projected Annual Growth 2011 to 2016 | -0.2% | -0.1% | -0.6% |
| | 2011 Median Age | 38.88 | 37.81 | 36.94 |
| **HOUSEHOLDS** | 2011 Estimated Households | 7,964 | 58,099 | 125,369 |
| | 2016 Projected Households | 8,164 | 58,250 | 124,136 |
| | 2010 Census Households | 7,856 | 58,080 | 125,344 |
| | 2000 Census Households | 7,961 | 63,748 | 138,436 |
| | Historical Annual Growth 2000 to 2011 | 0.1% | -0.8% | -0.9% |
| | Projected Annual Growth 2011 to 2016 | 0.5% | 0.1% | -0.2% |
| **POPULATION BY RACE** | 2011 Estimated White | 49.9% | 66.4% | 65.4% |
| | 2011 Estimated Black or African American | 44.9% | 27.3% | 28.9% |
| | 2011 Estimated Asian & Pacific Islander | 2.3% | 2.4% | 2.0% |
| | 2011 Estimated American Indian & Native Alaskan | - | 0.1% | 0.1% |
| | 2011 Estimated Other Races | 0.7% | 1.0% | 1.0% |
| | 2011 Estimated Hispanic | 3.2% | 3.4% | 3.2% |
| **INCOME** | 2011 Estimated Average Household Income | $56,898 | $49,864 | $58,255 |
| | 2011 Estimated Median Household Income | 34,366.74 | 35,740.77 | 41,245.79 |
| | 2011 Estimated Per Capita Income | $32,976 | $23,753 | $25,475 |
| **EDUCATION (AGE 25+)** | 2011 Elementary | 4.0% | 6.6% | 5.5% |
| | 2011 Some High School | 14.3% | 15.3% | 14.8% |
| | 2011 High School Graduate | 33.1% | 33.3% | 34.0% |
| | 2011 Some College | 19.1% | 19.3% | 20.9% |
| | 2011 Associates Degree Only | 5.7% | 6.7% | 7.5% |
| | 2011 Bachelors Degree Only | 24.1% | 21.7% | 22.1% |
| | 2011 Graduate Degree | 18.5% | 15.3% | 14.4% |
| **BUSINESS** | Number of Businesses | 3,446 | 9,789 | 14,209 |
| | Total Number of Employees | 84,944 | 202,468 | 260,136 |
| | Employee Population per Business | 24.7 | 20.7 | 18.3 |
| | Residential Population per Business | 4.7 | 13.6 | 20.5 |

©2012, Sites USA, Chandler, Arizona, 480-491-1112     page 1 of 1     Demographic Source: Applied Geographic Solutions 8/2011, TIGER Geography

**Cassidy Turley**/ Commercial Real Estate Services

62

GSC000186

8 E. Fourth Street / Cincinnati, OH 45202

## DEMOGRAPHIC MAP



*For additional information contact:*

Andrew Sellet
513-763-3053
andrew.sellet@cassidyturley.com

221 E. Fourth St., 26th Floor
Cincinnati, OH 45202



Cassidy
Turley / Commercial
Real Estate Services

63

GSC000187

## Downtown Cincinnati, Ohio 2

FOR SALE

### 814 Plum Street
Cincinnati, Ohio 45202

*Price Reduction!*
**$290,000 Sale Price**
9,450 sq. ft. building



- 3,150 sq. ft. per floor
- Renovated in 1999
- Newly painted throughout
- Soaring 10' ceilings
- Convenient and affordable parking options across the street
- Immediate access to I-75, easy access to I-71 and I-471



For more information, contact:

**Joe Janszen**
joe.janszen@cassidyturley.com
513.549.3011

221 E Fourth St
26th Floor
Cincinnati, OH 45202

cassidyturley.com

**Cassidy Turley** | Commercial Real Estate Services

The information contained herein has been obtained from sources deemed reliable. While every effort has been made to assure its accuracy, we cannot guarantee. No warranty or representation, express or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any special listing conditions imposed by the owner(s). As applicable, we make no representation as to the condition of the property (or properties) in question.

GSC000188

# First Floor Plan

PLUM STREET





GSC000189

## Second Floor Plan





GSC000190

## Third Floor Plan





**Loveland, Ohio**



GSC000192

Prepared for

2/27/2013

Presented by Terry Chan
(513) 400-8533
terry.chan@midwesteb5.com

## Properties for Sale

| 1 | 700 Loveland Maderia Road, Loveland, OH 45140 |

**Property Details**

| | |
|---|---|
| Price | $395,000 |
| Building Size | 3,171 SF |
| Lot Size | 0.75 AC |
| Price/SF | $124.57 /SF |
| Property Type | Retail |
| Property Sub-type | Restaurant |
| Property Use Type | Vacant/Owner-User |
| Status | Active |

Property Notes

**Property Description**

Former Wings & Rings Restaurant orginally built in 1978 as a Hardee's Restaurant. The current owner converted it in 1995 to a BUffalo Wings & Rings Restaurant. The facility has been closed for a approximately 1 year. the building is in need or extensive repairs as well as the parking lot. The asking price includes all FF&E.

**Location Description**

Located in the heart of Loveland. Excellend location on a corner directly next to a brand new, double drive through McDonalds. The other side is a Kroger store.

69

GSC000193

**Over the Rhine, Cincinnati, Ohio**



70

GSC000194

**Florence, Kentucky**



71

GSC000195

**Palomar, Lexington, Kentucky**



GSC000196



GSC000197

**Lexington, Kentucky**



74

GSC000198

## Greendale, Indiana

Hilsinger Management Co. LTD          **Craig Hilsinger** — (513) 598-1990

Land For Sale

# Tanners Creek Retail Complex
881 Eads Parkway, Lawrenceburg, IN 47025

| | |
|---|---|
| Price: | **$495,000** |
| Lot Size: | **1.20 AC** |
| Property Type: | **Land** |
| Property Sub-type: | **Retail (land)** |
| Zoning Description: | **Retail** |

Last Updated  13 days ago
Listing ID  14521204

### 1 Lot Available

| Lot 1 | | |
|---|---|---|
| | Price: | **$495,000** |
| | Lot Size: | **1.20 AC** |
| | Price/AC: | **$412,499.98** |
| | Lot Type: | **Retail (land)** |

### Highlights

- Great Exposure
- Across the Street from Lowe's
- Perfect for Resturant or Motel
- Near new Honda Plant

### Description

240 Feet of frontage on 50,000 plus cars per day Eads Parkway (Route 50) in Lawrenceburg, IN. This site is next door to a Brand New Arby's. Rapidly growing, Lawrenceburg is home to the Hollywood Casino, the busiest Riverboat Casino in the world. Usable area of the 2.4 acre site is 240 feet wide and 200 feet deep with connector road access to the singalized intersection of Route 50 and Tanners Creek Drive the Retail Center of the County and the primary shopping destination for four and a half counties. The intersection is the access point for Kroger, Lowe's, US Post Office, McDonalds, Steak & Shake, United Dairy Farmers, Blockbuster and others. Can divide for slight price adjustment.

Located at the intersection of Route 50 and Tanners Creek Drive in Lawrenceburg, IN. Accross the street from Kroger, Lowe's and at the same intersection as McDonalds, Steak & Shake, United Dairy Farmers and next door to a

75

GSC000199

LoopNet – Tanners Creek Retail Complex, Retail (land), 881 Eads Parkway, Lawrenceburg, IN                1/31/13 1:53 PM

New Arby's.

## Map of 881 Eads Parkway, Lawrenceburg, IN 47025 (Dearborn County)



## Additional Photos



Aerial Photo

Created 3/1/2006

http://www.loopnet.com/xNet/MainSite/Listing/Profile/PrintProfile.aspx?LID=14521204&ShowAudit=false          Page 2 of 2

GSC000200

## Appendix 5: Key Competitor Metrics and Industry Data

### McDonald's

**Income Statement for "Average" U.S. McDonald's Franchisee**
**(Per Traditional Store)**

|  | Dollar Amount | % of Net Sales |
|---|---|---|
| Net Sales | $2,700,000 | 100.0% |
| Food Costs | $810,000 | 30.0% |
| Paper Costs | $108,000 | 4.0% |
| Total Cost of Sales | $918,000 | 34.0% |
| Gross Profits | $1,782,000 | 66.0% |
| Crew Payroll | $540,000 | 20.0% |
| Manager Payroll | $108,000 | 4.0% |
| Payroll Taxes | $54,000 | 2.0% |
| Advertising | $108,000 | 4.0% |
| Promotions | $13,500 | 0.5% |
| Outside Services | $27,000 | 1.0% |
| Linen | $5,400 | 0.2% |
| Operating Supplies | $27,000 | 1.0% |
| Maintenance & Repair | $40,500 | 1.5% |
| Utilities | $81,000 | 3.0% |
| Cash Over/Short | $2,700 | 0.1% |
| Miscellaneous | $13,500 | 0.5% |
| Controllable Expenses | $1,020,600 | 37.8% |
| Profit After Controllables | $761,400 | 28.2% |
| Rent & Fees | $391,500 | 14.5% |
| Legal & Accounting | $8,100 | 0.3% |
| Insurance | $54,000 | 2.0% |
| Taxes & Licenses | $27,000 | 1.0% |
| Miscellaneous Income/Expenses | $2,700 | 0.1% |
| Depreciation/Amortization | $94,500 | 3.5% |
| Interest Expense | $27,000 | 1.0% |
| Net Non-Product | $2,700 | 0.1% |
| Total Non-Controllable Expenses | $607,500 | 22.5% |
| Store-Level Operating Income | $153,900 | 5.7% |

Source: Janney Capital Markets

- In 2009 McDonalds registered over $31b in sales in the U.S.
- In 2009 there were a total of 13,980 McDonalds Locations in the U.S.
- Each McDonald's location averages $2.2mm in annual revenues
- Worldwide, McDonald's serves 46mm customers every day
- There are a total of 32,478 McDonald's restaurants worldwide
- On average each McDonald's restaurant serves 1,416 customers per day
- The average check at McDonald's is approximately $4.25

77

GSC000201

## Kentucky Fried Chicken (KFC)

- In 2009 KFC registered over 4.9b in sales in the U.S.
- In 2011 there were a total of 5,200 KFC locations in the U.S.
- Each KFC location averages $940k in annual revenues
- Worldwide, KFC serves 12mm customers per day.
- There are a total of 17,401 KFC restaurants world wide as of 2011.
- On average each KFC restaurant serves 690 customers per day
- The average check at KFC is approximately $3.75

GSC000202

### Pizza Hut

- In 2009 Pizza Hut registered over $5b in sales in the U.S.
- In 2011 there were a total of 7,566 Pizza Hut locations in the U.S.
- Each Pizza Hut location averages $660k in annual revenues
- Worldwide, Pizza Hut serves 4mm customers per day.
- There are a total of 13,147 Pizza Hut restaurants world wide as of 2011.
- On average each Pizza Hut restaurant serves 304 customers per day
- The average check at Pizza Hut is approximately $6.00

GSC000203

**Appendix 6: Draw Process**

Disbursement of Funds into project from LP

1. Borrower submits loan draw forms G702/703 and related material
   a. Invoices
   b. Job creation reporting form
   c. Lien Waivers
   d. Use of funds from previous draw
2. Investment committee reviews materials (1 week) to check for completeness and compliance
   a. Economist
   b. Immigration counsel
   c. Loan administrator
3. Draws will be disbursed in order of complete packages received (partial requests not processed)
4. Funds disbursed at the end of the week from LP to borrowing entity

Documents Required

G702/703
Invoices
Receipts
Lien Waivers
Job creation reporting form
Use of funds from previous draw
Bank statements
Check register
I-9 copies
E-verify reports

80

GSC000204



# *Gold Star Chili, Inc.*

*Corporate Restaurant Expansion Opportunity Through EB-5 Investment*







GSC000212

GSC000285





## Gold Star Chili, Inc.



# The Flavor of Cincinnati®

Cincinnati-style chili has put Cincinnati on the nation's culinary map. It's a taste that has a reputation across the country. Gold Star Chili has been a staple of Cincinnati dining since its foundation in 1965 by Jordanian immigrant Frank Daoud and his three brothers. To this day, the spice blend that gives Gold Star Chili its unique flavor is a closely guarded secret that remains within the family. The brothers created a product to exacting specifications and perfected its preparation, and in doing so, created one of Cincinnati's most iconic brands.

Gold Star prepares chili from scratch daily to exacting quality standards, to ensure its restaurants have a consistently great-tasting product. Gold Star delivers chili fresh to the restaurants with its own distribution system so that the restaurants simply reheat the chili on site, knowing they are bringing their customers the best possible product.

Gold Star Chili, Inc. is committed to building profitable businesses for its restaurant partners, and has developed a restaurant model with streamlined operations, a simple and focused menu, and a one-of-a-kind brand identity, designed to deliver return on investment. Gold Star's success depends on your success, so you can rely on Gold Star's support from site selection, construction, purchasing and information technology, training, operations, and marketing. With over 90 locations in the region, Gold Star, Inc. is currently seeking new investment partners to open locations within a 300-kilometer radius of the Cincinnati-based commissary.

Gold Star is the official chili of:



GSC000246

## Cincinnati

"The Flavor of Cincinnati" refers to more than the savory taste of chili—it encompasses the culture and identity of one of America's great cities. Located in the Midwestern United States, 475 kilometers southeast of Chicago, Cincinnati operates as a hub of economic activity and educational progress. Within the metropolitan area of 2.1 million people, 370 Fortune 500 companies have operations in Cincinnati, nine of these call Cincinnati home. Macy's, Procter & Gamble, Kroger Co., Fifth Third Bank, AK Steel, and General Electric Aviation have headquarters in Cincinnati, in addition to the North American base of Toyota Motor Engineering and Manufacturing, located in nearby Erlanger, Kentucky. Major universities in the region include the University of Cincinnati, Xavier University, Miami University, and Northern Kentucky University, as well as two nationally acclaimed research hospitals, University of Cincinnati Medical Center and Cincinnati Children's Hospital Medical Center.

Along with a favorable economic climate and outstanding educational system, Cincinnati provides a high quality of life. Forbes magazine recently ranked Cincinnati the ninth best place in the nation to raise a family. The seasonal rhythms of local weather, combined with the many outdoor parks and recreation areas, make the city a pleasant place to live and work. The migration of 19th-century German immigrants colors the region's cultural heritage, commemorated by the largest annual Oktoberfest celebration outside of Germany. Cincinnati is also home to nationally acclaimed cultural institutions including the Cincinnati Symphony Orchestra, Cincinnati Ballet, and the Cincinnati Art Museum, among others. Cincinnati is a unique city whose diversity of residents and history give it a "flavor" all its own.



## Midwest EB-5 Regional Center Management



### Martin Lawler  Lead Immigration Counsel

Martin J. Lawler is a California immigration lawyer with over thirty years experience. He is the author of "Professionals: A Matter of Degree," a treatise on business visas and permanent residence. In 2007, the Wall Street Journal publishes two of Lawler's opinion-page articles. Lawler was a guest on National Public Radio's Science Friday program, speaking about visas for scientists. Lawler has spoken at universities including Harvard, Stanford, San José State, and San Francisco State. He is a regular speaker at the American Immigration Lawyers Association (AILA) conferences, including the EB-5 Investor Visa conference. He has also lectured at the American Law Institute, the San Francisco Bar Association, and Innovation Norway. Lawler chaired AILA's H-1B visa committee, and was a member of AILA's EB-5 Investor Committee, 2008–2010. Lawler received the AILA Jack Wasserman Memorial Award for excellence in immigration litigation, and is also Martindale-Hubbell "A-rated," and listed in "Best Lawyers in America," the "Bar Register of Preeminent Lawyers," and San Francisco Magazine's "Super Lawyers." With over 75 approval cases and a 100% success rate, Lawler is a nationally recognized expert in EB-5 immigration law. Lawler ensures that all Midwest EB-5 Regional Center (MERC) projects and applications comply with USCIS regulations, and guides the process to successful completion.



### Terry Chan  President, Midwest EB-5 Regional Center

Terry Chan is one of the founders and the president of the Midwest EB5 Regional Center. Terry is responsible for guiding the team in the selection and structuring of projects, selection of investment partners, and overall operations. While ramping up operations at the Midwest EB-5 Regional Center, Terry was also one of the core team members at CincyTech USA, a public-private partnership whose mission is to provide services for high-growth startup technology companies in Southwest Ohio. CincyTech does this through management assistance, seed capital investments and connections to partners who share a common mission. In his capacity at CincyTech, Terry was part of a team that has driven over $10 million in 30 companies and syndicated over $100 million. Those 30 companies have created over 200 direct jobs and over 500 indirect and induced job from the $10 million invested. Terry Chan brings his job creation expertise to the project, where he is responsible for tenant selection and managing and ensuring job creation. Prior to arriving in Cincinnati, Terry was a manager in the commercial finance and information technology divisions at General Electric. In that role, he was responsible for working with the commercial teams to maximize margins across a diverse product portfolio. Terry received his masters and bachelors degrees in finance and information technology from Carnegie Mellon University and attended high school at the Hong Kong International School. Terry currently sits on the board of several Ohio based companies including Zzocone, Wearcast, Source Labs and Batteri.

GSC000245

# GSC Opportunities Operational Management Team

**Mike Rohrkemper** *Chief Executive Officer*

Mike Rohrkemper, CPA, was appointed Chief Executive Officer of Gold Star Chili, Inc. in 2006. Rohrkemper joined Gold Star from Kemper and Brown Business Consultants, where he provided management counsel for a variety of clients, including Gold Star Chili. Rohrkemper brings more than 30 years of senior-level experience to Gold Star Chili. His background in finance and management includes CFO and directorship positions from 1993 to 2006 at Pomeroy IT Solutions Inc., and a partnership in the Cincinnati accounting firm of Rohrkemper Cosage & Combs Ltd. from 1991 through 2001. With the appointment of Rohrkemper, Gold Star, with an objective to invest in building brand awareness, also hired a marketing director to help expand deeper into the greater Cincinnati market, while also improving per-store performance. Additionally, Rohrkemper facilitated the diversification of the Gold Star portfolio, including real estate. Gold Star now owns a number of its franchised locations, invests in strip centers anchored by Gold Star restaurants, and includes other spaces that it leases to other businesses.

**Mike Mason** *Vice President, Operations and Franchise Development*

Mike Mason, serving as the Vice President of Operations and Franchise Development since 1991, oversees franchisee consulting and training, company store financials, quality assurance, and new product testing. Prior experience includes brand supervisor for GZK, the Dayton, Ohio, franchisee for Lee's Famous Recipe Chicken and Arby's Restaurants; district supervisor for Hardee's Food Systems Inc.; and co-founder of Video Ventures.

**Charlie Howard** *Vice President, Marketing and Brand Development*

Charlie Howard has been Vice President of Marketing and Brand Development since 2008. He is responsible for the planning, development, and implementation of all of Gold Star's marketing strategies, marketing communications, and public relations. He directs the efforts of outside advertising and public relations agencies, and coordinates the strategic and tactical planning and execution of promotional programs with the company's franchise community. Prior to Gold Star, Mr. Howard was the Senior Director of Marketing and Communications, Cincinnati Museum Center. Mr. Howard has 25 years of consumer, business-to-business, and non-profit branding, marketing communication, and marketing management experience with J. Makir & Company, Dickley & Branch, and Clopay Corporation.

# Gold Star Locations

GSC000203

## Capitalization and Exit Strategy

**EB-5 Investors**

**$10,000,000**

**Gold Star, Inc.**

**$5,000,000**



- Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contribution from Gold Star Chili, Inc. 20 EB-5 immigrant investors will invest **$10 million** in GSC Opportunities, L.P. which will make equity investments in 20 Gold Star Chili locations. Gold Star Chili, Inc. will invest **$5 million** total equity contribution on these 20 new locations. Gold Star's contribution of non-EB-5 capital represents 33% equity contribution in each of the restaurants. Capital will be used for both real estate and operational purposes. Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure and the cost breakdown. Midwest EB-5 Regional Center (MERC) will oversee funding of the project on behalf of the investors, and will disburse funds per monthly draw schedule submitted to MERC by the restaurant operators.

- GSC Opportunities, L.P. will seek to return capital to the investor Limited Partners after three years, or once the investors' I-829 applications have been approved by USCIS. If the market does not allow for the return of capital at the end of three years, GSC Opportunities, L.P. will have an additional two years to return capital. If capital cannot be returned within five years, Limited Partners will have the option to liquidate assets of GSC Opportunities, L.P. to recover their investment. GSC Opportunities, L.P. cannot guarantee any return of all or any portion of investment. MERC as the General Partner of the GSC Opportunities, L.P. will retain ownership and management interest respectively at rates and in capacities governed by the Operating Agreements until they so choose to act upon their right to exit, pursuant to the same agreements.

## Job Creation

Based upon accepted industry standards, analysis by MERC projects that each Gold Star Chili location will create 19 full-time positions. USCIS defines a full-time position as a minimum of 35 hours per working week with benefits. Some full-time positions will be subject to job sharing arrangements. Each employee will sign a document noting their understanding of the job sharing arrangement and will be eligible for benefits. Only 10 full-time positions are needed to satisfy the USCIS requirement for a $500,000 EB-5 investment, and for the investor to obtain lawful permanent residency. GSC Opportunities, L.P. expects to create approximately 19 full-time positions per $500,000 of EB-5 investment, totaling approximately 380 full-time positions. The 20 immigrant investors in this investment opportunity would only need to create a minimum of 200 full-time positions. The chart below shows the minimum number of full-time positions created by one Gold Star Chili location.

| Position | # Full-Time Positions | Pay Rate |
|---|---|---|
| General Manager | 1 | $40,000/yr |
| Assistant Manager | 2 | $28,000/yr |
| Steam Table Operator | 1 | $30,000/yr |
| Prep Cooks | 3 | $9.00/hr |
| Dishwashers | 2 | $7.80/hr |
| Servers | 5 | $3.90/hr + tips |
| Bussers | 2 | $4.30/hr + tips |
| Cashiers | 3 | $7.80/hr |
| **Total** | **19** | |

GSC000202



*Floorplans and Photos*



**Gold Star Chili**

# The Flavor of Cincinnati.



GSC000218

**From:** Roger David
**Sent:** Fri Jul 31 15:36:25 2015
**To:** Gary Chan; Terry
**Cc:** Tom Fisher; Mike Rohrkemper
**Subject:** Notice
**Importance:** High
**Attachments:** Notice of Termination of Partnership EB5.pdf

Terry,

Per our phone conversation as a safety measure.

Roger



Δ π EXHIBIT __14__

Deponent_____

Date_____

WWW.DEPOBOOK.COM

GSC000270

# GSC EB5 Investor LLC
650 Lunken Park Drive
Cincinnati, Ohio 45226

July 31, 2015

VIA CERTIFIED MAIL AND EMAIL :

Mason Hill, LLC
Attn: Gary Chan
11285 Grooms Road
Cincinnati, Ohio 45242
Gary.chan@jardinhill.com
Terry.chan@jardinhill.com

Chen Baoyang
C/O Mason Hill, LLC

Liu Jihong
C/O Mason Hill, LLC

Yin Lijun
C/O Mason Hill, LLC

Yu Jing
C/o Mason Hill, LLC

Zhao Junru
C/O Mason Hill LLC

RE: DISSOLUTION OF GSC OPPORTUNITIES, L.P.

Mr. Chan,

GSC EB5 Investor LLC ("Manager") is the Manager of GSC Opp Management LLC, an Ohio limited liability company ("General Partner") whose members are the Manager and Mason Hill, LLC ("Mason Hill") pursuant to an operating agreement effective May 7, 2013 ("Operating Agreement"). GSC Management is the general partner and currently the only admitted limited partner of GSC Opportunities, L.P., an Ohio limited partnership ("GSC Opportunities") pursuant to an Agreement of Limited Partnership effective May 7, 2013 ("LP Agreement"). Except as otherwise set forth in this letter, all capitalized but undefined terms shall have the same meaning as set forth in the LP Agreement.

GSC Opportunities was formed more than two years ago for the purpose of investing in Gold Star Chili restaurant franchises in Targeted Employment Areas in the Dayton-Cincinnati-Lexington region of Southwest Ohio, Kentucky and Southeast Indiana pursuant to the Business

GSC000271

Plan attached to the LP Agreement. The individuals listed above, Chen Baoyang, Liu Jihong, Yin Lijun, Yu Jing and Zhao Junru (collectively the "Proposed Investors") have under the sole guidance and direction of Mason Hill, submitted $500,000 to an escrow account and submitted EB-5 applications for admission to the United States under USCIS EB-5 guidelines. Pursuant to the LP Agreement, the Proposed Investors are not Limited Partners until the approval of the initial EB-5 applications by the USCIS. Unfortunately, as of the date of this letter, the USCIS has not made a determination regarding the EB-5 application for the Business Plan or any of the Proposed Investors.

The Manager, by its sole member, Gold Star Chili, Inc., has continued to seek new locations and open and operate locations pursuant to the Business Plan, however, with no foreseeable decision from USCIS to approve the EB-5 application for the Business Plan or any of the Proposed Investors, the Manager has made a determination that it cannot continue to proceed with the Business Plan without the additional $2,500,000 USD to be provided by the Proposed Investors' admission as Limited Partners. The delay has made it practically impossible for the Manager to secure adequate locations for the additional Gold Star Chili franchise locations as it cannot sign leases and expend funds with no guaranty that the additional $2,500,000 USD to be provided by the Proposed Investors will be available for the Business Plan. As a result of the USCIS's failure to approve the EB-5 application for the Business Plan or any of the Proposed Investors, the Manager on behalf of the General Partner (which is also currently the sole limited partner of GSC Opportunities) hereby terminates GSC Opportunities. Further, upon the final dissolution of GSC Opportunities, the Manager will withdrawal from the General Partner pursuant to Section 10.1 of the Operating Agreement.

While we understand this is not the result the parties hoped would occur when this project was started over two years ago, the Manager believes it has no other option due to the delays in funding caused by the USCIS inaction. The Manager is providing this notice to you and the Proposed Investors so that you may work to find other investments for in which they may participate. We will work with you to smoothly transition such activities and will forward a plan of dissolution for the General Partner and GSC Opportunities shortly.

Sincerely,

GSC EB5 Investor LLC


_____
Roger David, Manager

GSC000272