Michael Mason, 8/23/2019

(Pages 1 to 4)

1

---

**Page 1**

```
 1          UNITED STATES BANKRUPTCY COURT
             MIDDLE DISTRICT OF FLORIDA
 2               ORLANDO DIVISION
 3   IN RE:        :
                   :
 4   TERRY HONG-YIN CHAN : Chapter 7
     and JACQUELYN     :
 5   ANGIULLI CHAN,    : Case No.
              : 6:18-BK-03297
 6      Debtor     :
                   :
 7   _____ :
                   :
     BAOYANG CHEN,    :
 8                   :
       Plaintiff,   :
 9                   : Adv. Pro. No.
     vs.             : 6:18-ap-00098-KSJ
10                   :
     TERRY HONG-YIN CHAN :
11   and JACQUELYN     :
     ANGIULLI CHAN,    :
12                   :
       Defendants.  :
13
14     Deposition of MICHAEL MASON, a witness
15   herein, taken by the plaintiff as upon
16   cross-examination, pursuant to the Federal
17   Rules of Civil Procedure and pursuant to
18   notice of counsel as to the time and place
19   and stipulations hereinafter set forth, at
20   the offices of Mr. Joyce, Porter Wright
21   Morris & Arthur, 250 East Fifth Street, Suite
22   2200, Cincinnati, Ohio, at 10:00 a.m.,
23   Friday, August 23, 2019, before Deanne
24   Cartwright, a Notary Public within and for
25   the State of Ohio.
```

---

**Page 2**

```
 1   APPEARANCES
 2
 3   FOR THE     JUSTIN J. JOYCE, ESQ.
     PLAINTIFF:  Porter Wright Morris & Arthur
 4               250 East Fifth Street
                 Suite 2200
 5               Cincinnati, Ohio 45202
 6   FOR THE     CHRISTOPHER D. CATHEY, ESQ.
     PLAINTIFF:  Porter Wright Morris & Arthur
 7               9132 Strada Place
                 3rd Floor
 8               Naples, Florida 34103
 9   FOR THE     MICHAEL A. NARDELLA, ESQ.
     DEFENDANTS:   (Via telephone)
10               Nardella & Nardella
                 135 W. Central Blvd.
11               Suite 300
                 Orlando, FL 32801
12
     FOR THE     TED C. COPETAS, ESQ.
13   WITNESS:    Eberly McMahon Copetas
                 2321 Kemper Lane
14               Suite 100
                 Cincinnati, OH 45206
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1          S T I P U L A T I O N S
 2      It is stipulated by counsel for the
 3   respective parties that the deposition of
 4   MICHAEL MASON, a witness herein, may be taken
 5   at this time by the plaintiff as upon
 6   cross-examination and pursuant to the Federal
 7   Rules of Civil Procedure and notice to take
 8   deposition, under notice all other legal
 9   formalities being waived by agreement; that
10   the deposition may be taken in stenotype by
11   the Notary Public Reporter and transcribed by
12   her out of the presence of the witness; that
13   availability of the deposition to the witness
14   for examination and signature is expressly
15   waived.
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1               INDEX
 2   WITNESS   DIRECT CROSS RE-   RE-
                         DIRECT CROSS
 3
     MICHAEL MASON
 4   BY MR. JOYCE:   5
 5   EXHIBIT IDENTIFIED      PAGE
 6   Exhibit 1            34
     Exhibit 2            59
 7   Exhibit 3            74
     Exhibit 4            75
 8   Exhibit 5            78
     Exhibit 6            114
 9   Exhibit 7            122
     Exhibit 8            132
10   Exhibit 9            140
     Exhibit 10           146
11   Exhibit 11           163
     Exhibit 12           178
12   Exhibit 13           180
     Exhibit 14           188
13   Exhibit 15           204
14   OBJECTIONS        PAGE LINE
15   MR. NARDELLA:       25   11
     MR. NARDELLA:       34   11
16   MR. NARDELLA:       47   13
     MR. NARDELLA:       55   24
17   MR. NARDELLA:       79   15
     MR. NARDELLA:      101   20
18   MR. NARDELLA:      102   3
     MR. NARDELLA:      138   3
19   MR. NARDELLA:      138   8
     MR. NARDELLA:      138   14
20   MR. NARDELL:       165   25
     MR. NARDELLA:      198   4
21   MR. NARDELLA:      200   24
     MR. NARDELLA:      201   3
22   MR. NARDELLA:      201   7
     MR. NARDELL:       208   17
23   MR. NARDELLA:      209   24
     MR. NARDELLA:      210   6
24   MR. NARDELLA:      210   12
25
```

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 5 to 8)

2

| 5 | 6 |
|---|---|

5

```
 1              MICHAEL MASON,
 2        a witness herein, of lawful age, having
 3        been first duly sworn as hereinafter
 4        certified, was examined and testified as
 5        follows:
 6              THE WITNESS:  I do.
 7              CROSS-EXAMINATION
 8   BY MR. JOYCE:
 9        Q.   Hi.  My name is Justin Joyce and
10:01 10  I represent the Plaintiff Baoyang Chen in
11        this action.  Before we get too far into this
12        deposition, I just wanted to note some things
13        for the record.  The first is that we have
14        opposing counsel Michael Nardella on the
15        phone here today.
16              MR. JOYCE:  Michael, if for
17        whatever reason the call drops off or you're
18        not -- there's a tech issue or something like
19        that, I can give you my cellphone number or
10:01 20  you can e-mail me and we'll freeze the
21        deposition for you to get back online.
22              And the same thing goes for the
23        documents that I e-mailed you this morning.
24        Those documents are the same documents we all
25        have on this deposition table here with us.
```

6

```
 1        If -- if for whatever reason there's a
 2        misprint with what you're working with or if
 3        you lose track of where we are, you know,
 4        feel free to just stop me and then we'll --
 5        we'll get it all sorted out before going
 6        forward.
 7              And the last thing I just want
 8        to note is that there have been -- the
 9        depositions of Terry Chan and Jacquelyn Chan,
10:02 10  the debtors in this action and defendants in
11        this adversary proceeding, were noticed for
12        Tuesday and Wednesday of next week which is
13        the 27th and 28th, and it's -- Michael, just
14        to confirm, will your clients be unavailable
15        for those depositions those days?
16              MR. NARDELLA:  Correct.  My
17        clients are unavailable for depositions those
18        days and we are working with you guys to
19        propose and find new dates.
10:02 20        MR. JOYCE:  And just so that you
21        know, Chris Cathy, also appearing on this
22        case, also just walked into the conference
23        room so he's here with us now.
24   BY MR. JOYCE:
25        Q.   So Michael or Mike?  Do you --
```

| 7 | 8 |
|---|---|

7

```
 1        A.   Mike.
 2        Q.   -- have any preference?
 3        A.   Mike is fine.
 4        Q.   So you've been sworn in.  And it
 5        looks like you've brought documents today, so
 6        before we go to too far in I'm being handed
 7        an envelope that contains a number of
 8        documents.
 9              MR. COPETAS:  And a thumb drive.
10:03 10  And the thumb drive is a copy that, you know,
11        you can have.  The rest are for inspection
12        and copying.
13              MR. JOYCE:  Just taking a quick
14        look through the materials that were just
15        handed.  Mike, as we discussed earlier, we'll
16        get you copies of these materials as soon as
17        we can after the deposition.
18              MR. COPETAS:  And I'll just
19        note, as Mr. Mason's counsel, the documents
10:03 20  and Mr. Mason's appearance today are pursuant
21        to a subpoena with which he was served
22        personally.
23   BY MR. JOYCE:
24        Q.   And so before we sort of just go
25        through the documents, Mr. Mason, can you
```

8

```
 1        just state your name and spell it for the
 2        record, please?
 3        A.   Michael Mason, M-I-C-H-A-E-L
 4        M-A-S-O-N.
 5        Q.   Thank you.  And the documents
 6        that were handed to me, were those documents
 7        that you searched for and obtained?
 8        A.   Yes.
 9        Q.   How did you go about searching
10:04 10  for those documents?
11        A.   On any flash drives, my hard
12        drive, an older laptop that I used in the
13        initial stages of employment, and anything I
14        could find with anything pertinent on it.
15        Q.   And were these flash drives that
16        you had already possessed or that you created
17        in response?
18        A.   They were backup -- no.  They
19        were backup from the past flash drives that I
10:04 20  didn't know exactly what was on them.  I knew
21        I had some so there's a total of about 3,000
22        files all together, a lot of minutia, but
23        yes.
24        Q.   Thank you.  And you mentioned a
25        laptop.  Was that a laptop that you used
```

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 9 to 12)    3

| | 9 |
|---|---|
| 1 | during your employment with Clearwater |
| 2 | Hospitality Group? |
| 3 | A. Just for the first month or so. |
| 4 | They furnished me a laptop soon thereafter |
| 5 | until my termination. |
| 6 | Q. And after the termination from |
| 7 | Clearwater it looks like Gary Chan possessed |
| 8 | a laptop and might have removed some |
| 9 | documents. Is this the laptop that he took a |
| 10:05 10 | look at? |
| 11 | A. I had two. One was a small used |
| 12 | Macintosh or whatever brand -- it was Apple |
| 13 | and used that for a period of time and that |
| 14 | was in -- on my one-year anniversary I was |
| 15 | given a new laptop Air Mac. |
| 16 | Q. Thank you. And so were these |
| 17 | documents obtained from the -- the newer, the |
| 18 | Air Mac laptop, or the previous one? |
| 19 | A. Which documents? |
| 10:05 20 | Q. The document -- I apologize. |
| 21 | The documents that you provided here today. |
| 22 | A. I have not -- I do not have |
| 23 | possession of those so these were from my |
| 24 | personal home computer, my older laptop, and |
| 25 | a flash drive. |

| | 10 |
|---|---|
| 1 | Q. Thank you. I got it now. Thank |
| 2 | you. So we've -- we've done a little bit of |
| 3 | questioning but just to clarify a little bit |
| 4 | going forward, just -- it looks like you're |
| 5 | experienced. Have you ever been deposed |
| 6 | before? |
| 7 | A. No. |
| 8 | Q. Oh. Have you ever testified at |
| 9 | a trial before? |
| 10:06 10 | A. No. |
| 11 | Q. All right. Well, then it will |
| 12 | be helpful to go over -- |
| 13 | A. Not that I recall. |
| 14 | Q. -- go over some ground rules |
| 15 | just to make sure that the deposition moves |
| 16 | effectively. |
| 17 | The first is that the court |
| 18 | reporter is going to record everything that |
| 19 | we say and in order for her to do her job I |
| 10:06 20 | only ask that we don't speak over one |
| 21 | another. So if I ask a question, please wait |
| 22 | until I'll done asking the question to |
| 23 | answer, and I'll do the same when you're |
| 24 | providing an answer. Does that sound fair? |
| 25 | A. Yes. |

| | 11 |
|---|---|
| 1 | Q. The second rule sort of with |
| 2 | that is that the recorder -- the reporter, I |
| 3 | apologize, can't track verbal gestures: Head |
| 4 | shakes, nods, anything like that. |
| 5 | A. Yes. |
| 6 | Q. So to respond to any questions, |
| 7 | could you please state an affirmative yes or |
| 8 | no or anything like that? |
| 9 | A. Yes. |
| 10:07 10 | Q. And the same goes for uh-huhs or |
| 11 | uh-uhs. Those are sort of -- |
| 12 | A. Yes. |
| 13 | Q. -- similar so just yeses or noes |
| 14 | if that's possible. I'll also assume that |
| 15 | you understood the question after I've asked |
| 16 | it and you respond, so if for whatever reason |
| 17 | you don't understand the question I'm asking, |
| 18 | please tell me to rephrase, clarify a point. |
| 19 | There are a number of companies |
| 10:07 20 | that are involved all with similar initial |
| 21 | names and so I want to make sure that you |
| 22 | know that what I'm asking is talking about |
| 23 | the right company or talking about the right |
| 24 | situation. Does that make sense? |
| 25 | A. Yes. |

| | 12 |
|---|---|
| 1 | Q. And then if you remember |
| 2 | anything later during this deposition that |
| 3 | might change an answer or supplement an |
| 4 | answer, please let me know, you know, |
| 5 | whenever it's convenient whether that's |
| 6 | coming back from a break or responding to |
| 7 | whatever question. If that makes sense. |
| 8 | A. Yes. |
| 9 | Q. And speaking of breaks, this |
| 10:08 10 | isn't an endurance contest. We're not trying |
| 11 | to keep you in a room for six to eight hours |
| 12 | straight. If you need any breaks, please |
| 13 | just say so. I'm happy to give you a break |
| 14 | and, you know, obviously everybody needs one. |
| 15 | The only thing I ask is that if there's |
| 16 | question pending that you answer that |
| 17 | question before we go on break. Does that |
| 18 | sound fair? |
| 19 | A. Yes. |
| 10:08 20 | Q. So going from the start, where |
| 21 | did you go to high school? |
| 22 | A. Milford High School. |
| 23 | Q. And what year did you graduate? |
| 24 | A. 1973. |
| 25 | Q. 1973. Did you receive any |

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 13 to 16)                                          4

---

**13**

1    secondary education after high school?
2         A.   UC graduate.  1977 graduation.
3         Q.   And what did you graduate with?
4         A.   Management degree.  Bachelor.
5         Q.   Was that business management or
6    just --
7         A.   Business.  Which is now called
8    the Lindner School of Business.  It wasn't
9    then.
10:09 10       Q.   Did you receive any further
11   education after 1977?
12        A.   Not formal.
13        Q.   Did you get any certifications
14   or work through any programs after that?
15        A.   Sure.  Yes.
16        Q.   What certification?
17        A.   ServSafe, a lot of restaurant
18   qualifications, management -- MDP one and
19   two.  Their initials are management
10:09 20   development programs.  Chamber programs that
21   were held in Cincinnati:  Strategic Eight --
22   there's multiple ones.  I -- I would have to
23   sit and list them but all pretty much
24   centered around management mostly and
25   restaurants.

---

**14**

1         Q.   And so after graduating from UC
2    in 1977 did you find employment somewhere?
3         A.   I found employment in 1972 at
4    high school still and worked my way through
5    college.
6         Q.   Where were you employed in 1972?
7         A.   Burger Chef Systems, Inc. --
8         Q.   And how --
9         A.   -- which most of you won't
10:10 10   remember.
11        Q.   And how long were you employed
12   there?
13        A.   I was employed there a total of
14   17 years but Hardee's Food Systems purchased
15   Burger Chef from General Foods in 1982 so --
16   but my employment did not cease.  So a total
17   of 17 years.
18        Q.   Okay.  And I know this might be
19   a little tricky to remember but do you
10:10 20   remember your various roles --
21        A.   Sure.
22        Q.   -- with those companies?
23        A.   Sure.  I was -- I was an
24   hourly -- hourly supervisor most of my
25   college life -- high school and college life,

---

**15**

1    went into management when I graduated in '77,
2    became a district manager and that's
3    pretty -- yeah.  That's where I stayed with
4    at Hardee's.
5         Q.   And then when you left Hardee's
6    in 1989, did you go to any other company?
7         A.   For a brief spell went to Lee's
8    or GZK is a franchisor -- franchisee of --
9    I'm sorry -- Lee's Famous Recipe out of
10:11 10   Dayton.
11        Q.   And how long were you with the
12   Lee's franchise?
13        A.   Little less than a year.
14        Q.   And where did you go after that?
15        A.   The gentleman that was my
16   supervisor at Hardee's had taken over the CEO
17   position at Gold Star Chili.  He brought me
18   on there to work for him.
19        Q.   And was that in 1989 or 1990
10:11 20   or --
21        A.   1990 it just -- well, I -- I
22   stayed until January of 1990 with Hardee's.
23   I remember being January.  And then it was
24   six months later I believe it was -- nine
25   months later.  Yeah, nine months later I went

---

**16**

1    with them.
2         Q.   And who was the individual that
3    became Gold Star's CEO around that time
4    frame?
5         A.   John Sullivan.
6         Q.   John Sullivan.  When you joined
7    Gold Star, what position did you join in?
8         A.   Director of operations.
9         Q.   And how long were you in that
10:12 10   role?
11        A.   Twelve years probably until I --
12   yeah.  12 years.
13        Q.   So that would be -- if you
14   joined in 1990, that presumes that you were
15   director of operations until about 2002.
16   Does that sound fair?
17        A.   About that.  Yeah.
18        Q.   And did you take a new role
19   after you were no longer director of
10:12 20   operations?
21        A.   Vice president of operations and
22   franchise development.
23        Q.   And how long were you in that
24   role?
25        A.   Until I left in 2014.  November

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 17 to 20)                                          5

---

17

1   of 2014 or -- I'm sorry -- October of 2014.
2       Q.   And as the VP of operations what
3   were your job responsibilities?
4       A.   I was in charge of all
5   operational issues with the franchise and
6   corporate stores, responsible for training,
7   development of training, and following up on
8   the training -- trainers.
9            I was responsible for
10:13 10  construction both from a site selection and
11  construction of the building, working with --
12  we had a construction manager -- working with
13  him to make sure that it worked from an
14  operational standpoint all the equipment and
15  everything, soliciting new franchisees.
16           Pretty much anything that had to
17  do with operations, franchises, franchise
18  development, training and POS also. Any
19  electronical thing I was responsible for.
10:13 20    Q.   So just the -- just to review.
21  So in that role you would be responsible for
22  selecting and building out potential Gold
23  Star --
24      A.   Yes.
25      Q.   -- restaurants?

---

18

1       A.   Yes.
2       Q.   And would you be involved in the
3   day-to-day operation of those restaurants?
4       A.   Yes.
5       Q.   Would you be involved in any
6   sort of financing for those restaurants
7   whether that be lending for the restaurants
8   or their day-to-day revenues?
9       A.   In certain capacities. Not --
10:14 10  not direct lending but in helping them
11  prepare what they needed to get lending.
12      Q.   Were the Gold Star restaurants
13  generally franchises or were they owned by
14  Gold Star?
15      A.   Ninety percent of them are
16  franchised. Now, that 90's rough number.
17  That flows in and out depending. It's a
18  little -- it's a little less than that today.
19  I've been --
10:14 20     THE REPORTER: I've been what?
21      A.   I've been -- I haven't been
22  there since 2014 and I know they took on a
23  number of more company stores after my exit.
24  Sorry.
25      Q.   No worries. Thank you. For the

---

19

1   company stores, are those stores wholly run
2   by Gold Star or its employees?
3       A.   Yes.
4       Q.   And Gold Star for those types of
5   stores would be essentially in charge of
6   everything from the moment a site is selected
7   to development, to build out, all the way
8   through the day-to-day operations once it's
9   opened?
10:15 10    A.   Yes.
11      Q.   Is that the same situation for
12  its franchised restaurants?
13      A.   You have less direct
14  responsibility for franchise restaurants.
15  Typically we -- you would say a franchise
16  brings the people and the money, the
17  corporate brings the systems and the
18  processes and -- and logo, with a company
19  store you have to bring all four.
10:15 20    Q.   Would Gold Star look at how
21  money is being spent in franchised
22  restaurants? Would they track expenditures
23  and make sure that expenses are legitimate?
24      A.   Yes.
25      Q.   How often would they look to the

---

20

1   operational expenses of its franchise stores:
2   Is that a monthly, quarterly, annual or
3   another period?
4       A.   We -- with franchises it's not
5   as cut and dried as it is with the company
6   stores. We tried to get annual statements
7   from them that we could. We put some heavy
8   pressure on them to do that. Yes.
9       Q.   If Gold Star Chili doesn't
10:16 10  receive any of those annual statements, is
11  there any sort of punishment that is enacted
12  against a franchisee? Is there any mechanism
13  that Gold Start uses to compel them to
14  provide that information?
15      A.   We didn't at the time, no.
16      Q.   And you said didn't at that
17  time. What time period are you referring to?
18      A.   Prior to the electronic
19  infiltration of business. You know, after a
10:16 20  while we would receive daily, weekly, monthly
21  sales and you could -- you could pretty much
22  put together a P&L statement just from the
23  data that you get from the electronic but,
24  you know, going back before that time, it was
25  difficult.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 21 to 24)

6

| 21 | | 22 | |
|---|---|---|---|
| 1 | Q. Do you recall -- and I know this | 1 | of any case where that could have happened. |
| 2 | might be a tricky question. Do you know when | 2 | Q. And as part of your role as VP |
| 3 | you started getting those electronic feedback | 3 | of operations and franchise development, did |
| 4 | reports? | 4 | you explore potential EB-5 opportunities for |
| 5 | A. Probably 2012 we started but it | 5 | restaurants? |
| 6 | was -- it wasn't a compete day -- one day | 6 | A. I was introduced to EB-5 while I |
| 7 | you're in and then your total. It was over a | 7 | was in that role. |
| 8 | three-year, four-year period of time. | 8 | Q. When were you introduced to the |
| 9 | Q. Certainly. And when the | 9 | EB-5 concept? |
| 10:17 10 | restaurants are being developed and built | 10:18 10 | A. Probably 20 -- early 2013. |
| 11 | out, is Gold Star tracking their expenses for | 11 | Q. And who introduced you to that |
| 12 | construction cost or anything like that? | 12 | concept? |
| 13 | A. Yes. We put the full | 13 | A. Mike Rohrkemper was our CEO at |
| 14 | construction budget together and that's more | 14 | the time, my boss. He had heard about it and |
| 15 | of a construction manager's responsibility to | 15 | we visited Terry Chan at his office in Hyde |
| 16 | hold to those costs. Yes. | 16 | Park. |
| 17 | Q. And what would happen if Gold | 17 | Q. So might step back. I believe |
| 18 | Star noticed that these expenses were, you | 18 | you mentioned a Mr. Sullivan as the Gold Star |
| 19 | know, either going out of control or might | 19 | CEO when you joined. When did Mike |
| 10:18 20 | have been going to places that those expenses | 10:19 20 | Rohrkemper become the CEO of Gold Star? |
| 21 | shouldn't have been going to? | 21 | A. I worked for Mike for seven |
| 22 | A. It was -- the banks really | 22 | years so if you take -- would be 2007 I |
| 23 | worked directly with the contractor for the | 23 | guess. |
| 24 | most part in what the bid was and what their | 24 | Q. We need a calculator for this |
| 25 | expectation was to get paid. So I don't know | 25 | deposition apparently. |

| 23 | | 24 | |
|---|---|---|---|
| 1 | A. Yeah. I need to start -- 2007 | 1 | spring? |
| 2 | is pretty good. Since John had worked there | 2 | A. I don't know. |
| 3 | a year prior to me and he worked there | 3 | Q. At the time of this meeting with |
| 4 | 17 years, so I was there 25 years all | 4 | Terry Chan, to your knowledge was Gold Star |
| 5 | together. So 2007 sounds about right. | 5 | working with Terry to develop any sort of |
| 6 | Q. Okay. And you mentioned an | 6 | concepts or was this sort of a first |
| 7 | individual named Terry Chan. Had Mike | 7 | introductory meeting? |
| 8 | Rohrkemper talked with you about previous | 8 | A. First -- first introductory |
| 9 | conversations he had with Terry or I guess | 9 | meeting. |
| 10:19 10 | what prompted that -- that meeting to your | 10:20 10 | Q. Okay. |
| 11 | knowledge? | 11 | A. Another gentleman, our marketing |
| 12 | A. I'm not sure where Mike had | 12 | manager, was in that meeting as well. |
| 13 | first heard about EB-5. Mike used to own a | 13 | Charlie Howard. |
| 14 | business here in Cincinnati Rohrkemper Osage. | 14 | Q. And then -- sorry. What was his |
| 15 | It was a CPA firm. He heard a lot -- you | 15 | title again? |
| 16 | know, he hears a lot and had come upon | 16 | A. Director of marketing. |
| 17 | this EB-5 program, wanted to explore more as | 17 | Q. Had Charlie heard of Terry Chan |
| 18 | a way to expand our restaurants. | 18 | before? |
| 19 | Q. Prior to this meeting, have you | 19 | A. No. Not to my knowledge. |
| 10:20 20 | ever heard of the name Terry Chan before? | 10:21 20 | Q. Okay. And was this meeting |
| 21 | A. No. | 21 | prompted by Terry reaching out to you or Mike |
| 22 | Q. Do you remember when exactly | 22 | sort of telling you, hey, we've got this |
| 23 | this meeting might have been whether it's a | 23 | opportunity, let's go meet with Terry Chan? |
| 24 | month or -- you said early 2013. Would that | 24 | A. I've always thought it was Mike |
| 25 | be January, February or sort of later in the | 25 | reaching out. |

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 25 to 28)

7

25

1    Q.   And during this meeting what was
2  discussed?
3    A.   The EB-5 program: How it works,
4  the origins of it, the requirements of it,
5  the fulfillment of it, how it would benefit
6  everybody.
7    Q.   And during this process did
8  Terry Chan hold himself out as someone who
9  knew a great deal about the EB-5 program or
10:21  10  was an expert in it?
11    MR. NARDELLA:  Object to form.
12    Q.   You can go ahead and answer.
13    A.   Okay.  I -- I don't -- he didn't
14  say that out directly but from any time
15  listening to him he appeared to know
16  everything about it.
17    Q.   Seemed to have knowledge of the
18  EB-5 program?
19    A.   Of a program I knew nothing
10:22  20  about so, you know...
21    Q.   Was there anybody else with
22  Terry Chan at this meeting?
23    A.   Trying to remember.  There were
24  two or three people in the office.  I'm not
25  sure if Gary, his brother, walked in at the

26

1  time or not.  I don't recall him doing that
2  but it's possible.  He was in another office
3  and we were introduced to him and another guy
4  named Nathan I think we might have been
5  introduced to, but they were not part of the
6  I don't believe.
7    Q.   Do you know Nathan's last name
8  by chance?
9    A.   No.
10:22  10    Q.   Was Jacquelyn Chan ever part of
11  that meeting?
12    A.   No.
13    Q.   How long did this meeting last?
14    A.   About 45 minutes.
15    Q.   Was anything resolved after that
16  meeting?  Did everyone agree to work together
17  on this EB-5 program or I guess what was the
18  next step after the meeting?
19    A.   The next step was that we would
10:23  20  go back, take a look at what we had said and
21  what Terry had said and see if there was good
22  fit.
23    Q.   And by taking a look, is that
24  Gold Star taking a look at the program and
25  seeing if it would fit into its concept?

27

1    A.   Yes.  And, you know, we had four
2  owners that Mike would -- the board.  Mike
3  would take everything to the board for
4  approval before we took action on anything
5  large.
6    Q.   And is the EB-5 process
7  something that would have required board
8  approval to sort of initiate and get involved
9  with?
10:23  10    A.   In the initial stages, no, but
11  once -- I mean, just to kind of do
12  exploration and -- and whatnot of the concept
13  and we would do the homework and then once it
14  got to a point where we were talking about
15  making a change, whether it be financial,
16  physical, whatever, adding stores, doing
17  whatever, that would have to be a board decision.
18    Q.   Okay.  So after this -- this
19  meeting Gold Star sort of reviewed the
10:24  20  process, do you remember what Gold Star did
21  in reviewing the EB-5 process?
22    A.   Studied more about it:  The
23  feasibility of, you know, putting ten
24  full-time employees at 35 hours a piece to
25  work over a period of time seemed like it

28

1  would work in our situation.  Did more
2  research on it.  That's pretty much -- a due
3  diligence to see if we had the infrastructure
4  that could make it work and we felt like --
5  and, you know, we had stores that were coming
6  up that we would see if it would fit the EB-5
7  program.
8    Because of the requirements from
9  an employment standpoint had to be at a
10:24  10  certain point before you qualified for the --
11  the EB -- I don't need to educate you, I'm
12  sure, but the million dollar contribution and
13  a half million dollar contribution to the
14  EB-5 program are two different things.  The
15  half million being you locate in an area
16  where unemployment was higher.  Okay.
17    So we just did all that research
18  to see what fits, you know, how could we --
19  how could we do this.
10:25  20    Q.   As part of that research, did
21  you look into Terry Chan's background?
22    A.   Yes.  As -- I think Mike did.  I
23  think some of the board members did.  One of
24  the board members in particular.
25    Q.   And what board member was that?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 29 to 32)                                8

29

```
 1        A.   Roger David.
 2        Q.   Do you have any idea what they
 3   did to look into his background?
 4        A.   Just researched newspaper
 5   articles of whatever, you know, had gone on
 6   prior.
 7        Q.   Did they run any sort of
 8   background check on him?
 9        A.   I'm not familiar with any
10:25 10  company that I remember.  You know, it may
11   have happened.  I just don't know.
12        Q.   Do you know if they looked into
13   his credit history or looked into his
14   finances at all?
15        A.   I don't know.
16        Q.   And I know there's -- there
17   might be a few entities that were involved in
18   this process.  Was Terry at that time working
19   with Midwest EB-5 or a different company?
10:26 20  A.   I do recall the name.  I believe
21   he may have been.
22        Q.   Did he ever tell you he was
23   working with -- during this meeting, did he
24   ever tell you that he worked with Jardin
25   Hill?
```

30

```
 1        A.   Yes.
 2        Q.   Did he tell you that he worked
 3   with Mason Hill?
 4        A.   I've heard all the names.  Never
 5   could quite delineate what was what and how
 6   they fit but, yes, I -- I knew of Mason Hill.
 7        Q.   Did Terry ever tell you what his
 8   role with Jardin Hill was?
 9        A.   President I believe.
10:26 10  Q.   So there's the introductory
11   meeting in early 2013, Gold Star looks into
12   its own processes.  When was the next time
13   that you or anyone else communicated with
14   Terry Chan to your knowledge?
15        A.   It went on for some period of
16   time.  Probably four months, five months.  We
17   kind of, -- you know in the restaurant
18   business things don't stop so you just kind
19   of go on about life, but I believe it was
10:27 20  Mike that brought it back up and said we need
21   to follow up back with them and see if
22   there's still an interest.
23        Q.   And how long, to your knowledge,
24   was Gold Star looking into the background of
25   Terry Chan?  You mentioned -- was that what
```

31

```
 1   was going on during those few months you were
 2   talking about or --
 3        A.   I don't think there was an
 4   extensive process there but I don't really
 5   know.
 6        Q.   And so by bringing it back, what
 7   did Mike do to sort of reinitiate contact
 8   with Terry Chan?
 9        A.   We set up another meeting.
10:27 10  Q.   Do you know when that meeting
11   was?
12        A.   I don't.
13        Q.   Would it have been early to
14   middle of 2013 to the best of your knowledge?
15        A.   Perhaps.  I really don't know.
16        Q.   What was discussed during the
17   second meeting?
18        A.   About moving forward and seeing
19   if we could make this work.
10:28 20  Q.   Do you remember who was at that
21   meeting?
22        A.   Terry and Gary.  Jacquelyn may
23   have been.  I'm not sure.  There was probably
24   15 meetings that went on between then and the
25   next four, five months.
```

32

```
 1        Q.   Did Terry, Gary, Jacquie did
 2   they have any materials prepared for you, any
 3   offering materials, business plan, anything
 4   like that?
 5        A.   We also had a lawyer I failed to
 6   mention, Tom Fisher, that began attending
 7   these meetings and discussing all the
 8   documents that needed to be produced which
 9   Terry, Tom, and Mike Rohrkemper are the ones
10:28 10  that did initiate those documents and
11   whatnot.
12        I don't know if Terry brought
13   prepared documents.  I don't recall that.
14   But the MoU and all the other documents that
15   needed to be prepared, Tom Fisher was going
16   to do the preparing and that's -- Mike was a
17   CPA.  So, you know, Mike and Terry and Tom
18   that did the -- almost all the work on those.
19        Q.   Okay.  And you mentioned an MoU.
10:29 20  Would that have been a Memorandum of
21   Understanding?
22        A.   Yes.
23        Q.   Would those documents have
24   included a Private Placement Memorandum?
25        A.   I remember that.
```

Michael Mason, 8/23/2019

(Pages 33 to 36)                                                    9

33

```
 1        Q.   A Business Plan?
 2        A.   A Business Plan, yes.
 3        Q.   A Limited Partnership Agreement
 4   for what would eventually become GSC
 5   Opportunities, LP?
 6        A.   Yes.
 7        Q.   And you mentioned that there
 8   were many, many meetings during this time
 9   period.  Were you meeting weekly or was it
10:29 10   just sort of on an ad hoc basis?
11        A.   It was on an ad hoc basis.
12        Q.   And during these meetings was --
13   was Terry usually present?
14        A.   Yes.
15        Q.   Was he always present?
16        A.   I don't know always and
17   sometimes I wasn't present.  I will not
18   correct but kind of add, the one plan that
19   you did talk about that was produced I did do
10:30 20   work on, that was the business plan.  I said
21   they did all the plan, but the Business Plan,
22   because it was an operational type plan, I
23   did work on that.
24        Q.   So the Business Plan seems to
25   fit in your wheelhouse --
```

34

```
 1        A.   Yeah.
 2        Q.   -- a little bit better.  Okay
 3   did you ever take a look at the Private
 4   Placement Memorandum or the Limited
 5   Partnership Agreement?
 6        A.   I'm sure I did, yes.
 7        Q.   And those contained some
 8   business operational discussions to your
 9   knowledge, right?
10:30 10        A.   Yes.
11             MR. NARDELLA:  Object to form.
12        Q.   I'm pausing for a brief moment.
13   I just want to make sure I don't need to show
14   you documents that we don't need to talk
15   about.  We're going to go off the record for
16   a second.
17        (Off the record discussion.)
18        (Exhibit 1 identified.)
19   BY MR. JOYCE:
10:33 20        Q.   So before we took our break you
21   had mentioned a Memorandum of Understanding.
22   I'm going to hand you a document Exhibit 1.
23             MR. JOYCE:  And, Michael, just
24   so you know, we're flipping to -- it's a few
25   pages -- a few documents in, it's bates
```

35

```
 1   labeled GSC00349 on the bottom left-hand
 2   corner.
 3             MR. NARDELLA:  Okay.
 4             MR. JOYCE:  I've handed a copy
 5   to Mr. Mason's counsel and Mr. Mason is
 6   taking a look.  Mike, please take a few
 7   minutes or take a look at this just --
 8             THE WITNESS:  When you say Mike,
 9   I don't know if you're talking to him or me
10:34 10   so I don't -- I don't care if you call me
11   Mason the rest of the day.
12             MR. JOYCE:  All right.
13             THE WITNESS:  You don't have to
14   call me Mister but -- I mean, just because
15   I've been confused a couple times if I'm who
16   you're talking to.
17             MR. JOYCE:  You made the joke
18   that there are so many Mikes before the
19   deposition.
10:34 20             THE WITNESS:  I didn't even know
21   his name was Mike at the time.
22             MR. JOYCE:  So I guess I'll call
23   you Mason just so that you know.
24             THE WITNESS:  I won't be
25   offended.  I use that name more.
```

36

```
 1             MR. JOYCE:  And just to get a
 2   little clarification, Mike, just so you know,
 3   this is a document GSC349 all the way to 362.
 4             MR. NARDELLA:  Thank you.  Okay.
 5   BY MR. JOYCE:
 6        Q.   And, Mason, please let me know
 7   when you feel that you're adequately familiar
 8   with the document.
 9        A.   Not having written it but kind
10:35 10   of having read it four or five years ago, it
11   appears to be the same, yes.
12        Q.   And just to sort of take a quick
13   step back.  So to your knowledge this is --
14   this looks like the Memorandum of
15   Understanding that you were discussing
16   earlier today?
17        A.   To my knowledge.
18        Q.   And it mentions execution copy
19   on the top left corner and it's got a number
10:36 20   of signatures on the very last page; is that
21   correct, the copy that you have?
22        A.   Yes.  Also has a signature on a
23   previous page.
24        Q.   And you mentioned that you had
25   looked at this document before, correct?
```

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Michael Mason, 8/23/2019

(Pages 37 to 40)

10

37

1    A.   Uh-huh.
2    Q.   When did you look at this
3  document first or a version of this document
4  first?
5    A.   Probably during the construction
6  of it or right after the construction of it
7  but it wasn't anything I was required to even
8  read.  It just -- a lot of documents were
9  passed by through me just to look at.
10:36 10    Q.   And was this document, to your
11  knowledge, a product of negotiations with
12  Mr. Rohrkemper and with Terry Chan?
13    A.   That's my understanding.
14    Q.   Did Terry Chan review and edit
15  this document?
16    A.   I would have no idea.
17    Q.   Did Terry Chan have a lawyer
18  involved in these negotiations?
19    A.   I don't have an answer.  I mean,
10:37 20  I know we did, we had Tom, but he -- I -- I
21  don't know.
22    Q.   Does the name Tom Martin ring a
23  bell?
24    A.   Yes.
25    Q.   And Lindhorst and Dreidame?

38

1    A.   Yeah.  I mean, I didn't know for
2  this document if they were part of that but,
3  yeah, those were lawyers of his.
4    Q.   And so that Tom Martin was --
5  was Terry's lawyer?
6    A.   I believe so.
7    Q.   And was Tom Martin involved in
8  negotiating this project and sort of
9  preparing documents for this project?
10:37 10    A.   He could have been.  I was not
11  at our -- at our place when this was going
12  on.  Tom was there almost all the time for
13  the meetings and Mike and Terry were but I
14  may have seen Tom -- is it Tom Martin?  I was
15  talking about Tom Fisher before.  Mr. Martin
16  I don't know how many times, if any, that he
17  had been to our offices.  Now, this doesn't
18  mean that he wasn't part of it.  I just don't
19  know.
10:38 20    Q.   So this Memorandum of
21  Understanding, to your knowledge what does
22  this document do?
23    A.   As any -- as -- it does what any
24  MoU normally would do in my opinion is it
25  gives you a -- it doesn't commit to anything

39

1  but it gives you a working document to go off
2  of as to how you move forward and there's a
3  clear understanding of the terms and
4  conditions on both parties.
5    Q.   So this document would reflect
6  what the parties understood this EB-5 program
7  to be at the time it was signed?
8    A.   It should.
9    Q.   In looking at this Memorandum of
10:38 10  Understanding, this is an agreement between
11  Gold Star Chili, Inc. and Mason Hill, LLC,
12  correct?
13    A.   Yes.
14    Q.   And Mason Hill, LLC do you know
15  what that entity is?
16    A.   I really don't know.
17    Q.   Do you know if Terry and Gary
18  Chan were principals of Mason Hill, LLC?
19    A.   I really don't.
10:39 20    Q.   And this Memorandum of
21  Understanding sort of details -- and to go --
22  to direct you specifically to it, the recital
23  section, paragraph A, it explains that Gold
24  Star and Mason Hill were going to work to
25  develop 12 Gold Star restaurants.  Is that

40

1  what your understanding was?
2    A.   Yes.
3    Q.   How did that number of 12
4  restaurants get arrived at?
5    A.   I don't recall.  I mean, I know
6  we wanted -- it was about the limit that we
7  could do over a three-year period of time
8  effectively, but beyond that I don't know why
9  that specific number was arrived at.
10:39 10    Q.   Was Gold Star and Mason Hill
11  anticipating to have 12 investors into this
12  project?
13    A.   I don't recall.
14    Q.   This document also mentioned
15  that this 12 restaurant project will be
16  financed with $9 million.  Does that sound
17  correct?
18    A.   I believe so.
19    Q.   Do you know how that $9 million
10:40 20  will be contributed?
21    A.   That would be construction and
22  opening and all the expenses incurred.
23    Q.   Was that $9 million solely
24  supposed to come from investors or was Gold
25  Star going to put any money into the project?

Michael Mason, 8/23/2019

(Pages 41 to 44)

11

41

1      A.   I believe Gold Star -- does that
2   say? Gold Star Chili had a -- stake in it.
3   I'm -- I'm -- 6,000 maybe? I'm not sure.
4      Q.   Would about one-third of three
5   million sound appropriate or a two-to-one
6   ratio?
7      Okay. Yeah. I'm getting two
8   things mixed up. Yeah. But I -- it's hard
9   for me to remember how that went.
10:40 10      Q.   Just to direct you to the middle
11   of the paragraph, it says: The project owner
12   will be capitalized with an anticipated
13   amount of nine million. The project
14   capitalization to be provided to the project
15   by Gold Star, or a wholly owned subsidiary,
16   in the total amount of three million and by
17   Mason Hill through 12 EB-5 investors or 12
18   EB-5 immigrant limited partner investors.
19      A.   Okay.
10:41 20      Q.   Is that your understanding of
21   it?
22      A.   Yeah.
23      Q.   Okay. And was the three million
24   to be contributed by Gold Star was that going
25   to be contributed through a $3 million check

42

1   to your knowledge or was that going to be
2   contributed in another way?
3      A.   Into building the -- my
4   understanding was that it was going to be
5   spent in building the restaurants. I don't
6   know that there was a arrangement as to how
7   the two moneys would go together.
8      Q.   And this -- this section
9   mentions Gold Star, a wholly owned
10:41 10   subsidiary. Does the name GSC EB-5 investors
11   sound familiar to you?
12      A.   I think I've heard it.
13      Q.   Okay. To your knowledge, did
14   Gold Star create an entity to manage what
15   would ultimately become GSC Opportunities,
16   LP?
17      A.   There was a organization
18   developed to manage it, yes. And there's a
19   diagram on one of the -- in the plan, I
10:42 20   believe, that kind of shows what that entity
21   is.
22      Q.   Okay. And would that entity --
23   does GSC Opp Management, LLC ring a bell?
24      A.   Yes.
25      Q.   And we'll get to that, the

43

1   Business Plan. I think we'll all kind of
2   table those discussions until then. If you
3   flip to the third page, it says bates number
4   GSC351 on the bottom. About the fifth
5   sentence from the top, starting at the fourth
6   sentence, it says: To the best of their
7   knowledge, Mason Hill, Gary Chan, and Terry
8   Chan, individually and collectively represent
9   and warrant that they have extensive
10:43 10   experience in the EB-5 program.
11      Was that in line with your --
12   with your experience with Gary and Terry:
13   Did they seem to have expertise in the EB-5
14   program?
15      A.   Page three you said?
16      Q.   I'm sorry. Yeah. Page number
17   three and it has the bates label of --
18      A.   Okay. I gotcha. That -- that
19   was our understanding, yes.
10:43 20      Q.   So Gold Star anticipated that
21   Terry Chan and Gary Chan would sort of manage
22   the EB-5 project?
23      A.   Yes.
24      Q.   And Gold Star was willing to let
25   them do that because they had this expertise

44

1   in the program?
2      A.   Yes.
3      Q.   To your understanding, what --
4   what were Gary Chan and Terry Chan doing in
5   connection with this EB-5 process?
6      A.   They were finding investors to
7   invest in the project.
8      Q.   By finding investors, were they
9   going to China to meet with investors or were
10:44 10   they contacting them by phone, e-mail? Do
11   you have any idea of what kind of contact
12   they had?
13      A.   I can answer that I wasn't as
14   involved in -- I have limited knowledge of
15   how they got Gold Star investors. The
16   Rodizio investors I am knowledgeable on but
17   the Gold Star investors I think they had
18   already been working on our -- you know, a
19   lot without our knowledge.
10:44 20      But to -- to answer your
21   question, to get the Rodizio investors, yes,
22   they went to China and they worked through
23   another company there to set up meetings and
24   whatnot.
25      Q.   Okay. And you mentioned they

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                        2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 45 to 48)                                                12

---

45

1  were getting Gold Star investors without your
2  knowledge. Does that mean they had investors
3  already lined up or --
4        A.   I can't answer that. I don't
5  know.
6        Q.   Did -- were they contacting
7  investors without Gold Star's permission?
8        A.   If they were contacting
9  investors, unless Mike Rohrkemper knew, I
10:45 10 didn't.
11       Q.   And you mentioned you're more
12 familiar with the -- with the Rodizio Grill
13 investors. Can you describe what you knew
14 about those activities with those investors?
15       A.   Sure. You want to transition
16 from Gold Star to that or --
17       Q.   Just for this limited --
18       A.   Okay. Go to China, set up a --
19 meetings in various cities with groups of
10:45 20 investors that wanted to become -- to go into
21 the EB-5 program. I was there doing that
22 with them, translator, and they would
23 either -- you know, recruit investors that
24 way.
25       Q.   And by they do you mean Terry

---

46

1  Chan and Gary Chan?
2        A.   There's also kind of a brokerage
3  group called NCA. I'm not sure exactly what
4  it stands for but that did the -- did the
5  meetings and had them set up for when we got
6  there.
7        Q.   And was Terry Chan going to
8  these meetings in China?
9        A.   No. Gary.
10:46 10      Q.   Gary Chan would go to the
11 meetings in China?
12       A.   Yes. Myself.
13       Q.   Did Terry Chan ever talk with
14 you about what should be said during those
15 meetings in China?
16       A.   There was a script. Terry -- I
17 don't know if Terry did or Gary did but there
18 was a script, there was a Power Point
19 presentation. There was a translator but I
10:46 20 don't know what she was saying but there was
21 a script for me to talk about.
22       Q.   Do you know who prepared that
23 script?
24       A.   I believe Gary did. Probably a
25 combination of Gary and Terry.

---

47

1        Q.   Was Terry involved in these
2  pitch meetings? Would he be updated, send
3  you e-mails related to it or anything like
4  that?
5        A.   Not necessarily me. I think
6  Gary and Terry talked every night.
7        Q.   And do you have any idea about
8  what these discussions would cover?
9        A.   No.
10:47 10      Q.   Just maybe recap of the day and
11 what happened?
12       A.   I would -- I don't know.
13            MR. NARDELLA: Object to form.
14       Q.   Would Terry Chan be notified
15 when new investors agreed to sign on to
16 whatever project it was?
17       A.   I would assume so but I -- I
18 never -- I would have no knowledge of when
19 they signed on so I don't know.
10:47 20      Q.   And you mentioned there was a
21 script and then there was a Power Point
22 presentation. Was there --
23       A.   The Power Point was the script.
24       Q.   Oh, gotcha. Were there any
25 materials that were given to potential

---

48

1  investors during those meetings?
2        A.   Possibly but we didn't produce
3  them. We didn't take anything that I can
4  recall.
5        Q.   Would -- would a Business Plan
6  be given to them to your knowledge?
7        A.   I don't know.
8        Q.   And just to sort of backtrack a
9  minute. So it was -- to your knowledge, it
10:47 10 was Gary Chan in connection with Rodizio
11 Grill investors was the one who would go and
12 meet with these individuals, right?
13       A.   Gary and myself.
14       Q.   Okay. Gary and you. Were there
15 any other agency or agents that were retained
16 by Gary to help with these programs?
17       A.   NCA.
18       Q.   NCA. Were there any other
19 entities that were involved in this -- this
10:48 20 recruiting or this pitch process or was it
21 just Gary and NCA?
22       A.   Those are the only ones I know.
23       Q.   Okay. And that's -- that's all
24 based on your knowledge of the Rodizio Grill
25 program and you don't have as much knowledge

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 49 to 52)

13

49

```
 1     about the Gold Star program, correct?
 2        A.  As far as the recruitment piece
 3     and all that, yeah.
 4        Q.  Okay.  And after those pitches
 5     occurred, did you have any other
 6     communications with the investors or were you
 7     just sort of left out?
 8        A.  I couldn't speak Chinese, no.
 9        Q.  Okay.  But did any investor ever
10:48 10   contact you after those pitch meetings?
11        A.  No.
12        Q.  If an investor had tried to
13     contact you, would you have just directed
14     them to Gary or Terry Chan?
15        A.  Never happened.  I don't think
16     any of the investors could speak English, so
17     I mean, I can't answer that question.
18        Q.  Do you know the translator's
19     name that you were using?
10:49 20      A.  No, I don't.  It was a young
21     lady.
22        Q.  So going back to -- to Gold Star
23     fortunately, so we're going back to the --
24     the Memorandum of Understanding as our basis.
25     So we talked about how there was a Business
```

50

```
 1     Plan, a Private Placement Memorandum, and a
 2     Limited Partnership Agreement created.  To
 3     your knowledge, was a subscription agreement
 4     ever created in connection with GSC?
 5        A.  It could have been.
 6        Q.  And just to clarify, when I
 7     mention GSC, it's a shorthand for GSC
 8     Opportunities, LP, the limited partnership.
 9        A.  Okay.  Okay.
10:49 10      Q.  Was there a subsidiary operating
11     agreement or anything created?
12        A.  Not to my knowledge.
13        Q.  To your knowledge, would Gold
14     Star have to review and approve the Limited
15     Partnership Agreement and the Business Plan
16     before it were given to anybody?
17        A.  My assumption would be
18     absolutely but I know of none.
19        Q.  That's why you were involved in
10:50 20   the -- in the negotiations and creations of
21     some of these materials.
22        A.  (Witness nods.)
23        Q.  And so to sort of get the
24     breakdown a little bit more of what was going
25     on with GSC Opportunities, we mentioned how
```

51

```
 1     Terry and Gary Chan were sort of more
 2     responsible for the EB-5 component.  What was
 3     Gold Star responsible for in connection with
 4     GSC?
 5        A.  In -- E-Verify all the employees
 6     that would go into a store that would be a
 7     potential EB-5 restaurant we had designated
 8     that would have made that -- qualify for that
 9     designation, making sure that they got their
10:51 10   hours, and that they were -- you know,
11     followed anything that the EB-5 program
12     required of them.
13        Q.  Did Gold Star ever have to
14     construct any restaurants for GSC?
15        A.  We did.  Yeah.  I don't know if
16     it was already under construction or it
17     was -- I believe it was already under
18     construction.
19        Q.  And was there a restaurant --
10:51 20   and just to make sure we're on the same page,
21     does the Palomar Shopping Centre ring a bell?
22        A.  Yeah.
23        Q.  Is that the restaurant that --
24        A.  That's what I was thinking of
25     and there was also one at UK that they were
```

52

```
 1     trying to get into that program, weren't sure
 2     if they could.
 3        Q.  And were both of those
 4     restaurants under construction in 2013?
 5        A.  I believe UK was -- it was a
 6     franchise who ended up dropping out and it
 7     was -- the corporate took it over so it was
 8     not under construction for the EB-5 program,
 9     but there was some -- according to Terry
10:52 10   there was some ways we could possibly get it
11     into the EB-5 program.  I don't know what
12     those ways are but...
13        Q.  So Terry said that he thought
14     the Palomar restaurant could --
15        A.  Not Palomar.  I'm talking about
16     UK.
17        Q.  Oh, okay.
18        A.  That was the franchise
19     restaurant.  Now, Palomar was being
10:52 20   constructed I think from the beginning and
21     that program was used from the beginning.
22        Q.  So for the UK restaurant Terry
23     told you that that might be appropriate for
24     the EB-5 program?  And then --
25        A.  (Witness nods.)
```

Michael Mason, 8/23/2019

(Pages 53 to 56)                                    14

53

```
          1          THE REPORTER: I'm sorry. He
          2    just nodded.
          3          THE WITNESS: Yes.
          4          MR. JOYCE: Thank you.
          5    BY MR. JOYCE:
          6     Q.   And the -- the Palomar
          7    restaurant, that was one that was developed
          8    through the EB-5 process from the start,
          9    right?
10:52    10     A.   That's my understanding.
         11     Q.   Was Terry Chan involved in
         12    evaluating whether or not that Palomar
         13    restaurant could fit into the EB-5 process?
         14     A.   Yes.
         15     Q.   And to your understanding, what
         16    was Terry doing when he evaluated whether
         17    those restaurants could fit into the EB-5
         18    process? Was he doing anything or did he
         19    just -- did he describe his process to you?
10:53    20     A.   Gary did more than Terry but
         21    they both somewhat talked about it.
         22    There's -- it's very difficult not to qualify
         23    for an EB-5 program. There's software out
         24    there that you can get to show incomes that
         25    are lower that would qualify and employment
```

54

```
          1    areas -- I mean, incomes are lower -- that
          2    would qualify to work in these restaurants.
          3          In other words, take Adams
          4    County and Brown County that can work in
          5    Hamilton County. You can use that -- they
          6    had to be contiguous counties. Not in Ohio
          7    they don't. In Kentucky they have to be
          8    contiguous counties or areas. Counties I
          9    think it is.
10:53    10          So there's -- there's software
         11    that helps you do that you don't have to go
         12    out and search. That -- that -- that was
         13    what was explained to me.
         14     Q.   As Gold Star and Terry and Gary
         15    Chan were sort of working out the details of
         16    this arrangement, was Terry actively involved
         17    in those negotiations?
         18     A.   Negotiations for?
         19     Q.   As they're trying to figure out
10:54    20    how this GSC would be granted construction.
         21     A.   Yes.
         22     Q.   He was. How -- how involved was
         23    he to your knowledge?
         24     A.   He was in all the meetings with,
         25    like I said, Tom Fisher and Mike Rohrkemper
```

55

```
          1    so -- I don't know if I'm answering your
          2    question correctly but -- or what you're
          3    asking me but...
          4     Q.   Did Terry Chan ever talk with
          5    you while you're figuring out what this
          6    entity would look like? Did he ever talk to
          7    you and say, hey, we need -- you know, would
          8    this business fit into the EB-5 program or --
          9     A.   I don't recall a conversation
10:54    10    like that.
         11     Q.   But to your knowledge he was
         12    involved in all the meetings with Tom Fisher
         13    and --
         14     A.   Yes.
         15     Q.   -- with Mike Rohrkemper as well,
         16    right?
         17     A.   Right.
         18          MR. COPETAS: Remember yes or
         19    no.
10:55    20     A.   Yes.
         21     Q.   How long did those negotiations
         22    take place related to GSC between Terry, Gary
         23    Chan and Gold Star?
         24          MR. NARDELLA: Object to form.
         25     A.   Perhaps three months.
```

56

```
          1     Q.   And do you have any idea when
          2    those negotiations concluded?
          3     A.   No.
          4     Q.   Do you know when the structure
          5    of GSC Opportunities was finalized in that,
          6    you know, no more changes were being made to
          7    it?
          8     A.   No.
          9     Q.   Have you ever heard of a
10:55    10    document called a Declarations Memo?
         11     A.   Possibly.
         12     Q.   Would the -- has the Memorandum
         13    of Understanding ever been referred to as a
         14    Declarations Memo?
         15     A.   Not to my knowledge.
         16     Q.   Did Gold Star ever express any
         17    concerns that some materials might have been
         18    showed to investors too early?
         19     A.   I didn't know if that was --
10:56    20     Q.   Did Mr. Rohrkemper or anyone
         21    else talk to you about when the Subscription
         22    Agreement, PPM, Business Plan, or any other
         23    business materials could be shown to
         24    investors?
         25     A.   No. Not to my knowledge. Not
```

Michael Mason, 8/23/2019

(Pages 57 to 60)                                                    15

---

57

1    to my recollection.
2         Q.   Did you ever hear any concerns
3    from Mr. Rohrkemper or others that materials
4    were being shown to investors too early?
5         A.   No.  Not to my recollection.
6         Q.   So you mentioned that you were
7    involved in the creation of a Business Plan
8    for GSC opportunities.  What type of
9    involvement was that?  What were you doing?
10:57  10         A.   I put together a template of a
11   range of things that any restaurant that
12   would be built would -- would look at, you
13   know, marketing opportunities, employment,
14   scheduling, everything.
15              It was basically a template from
16   RestaurantOwner.com that I used and kind of
17   populated it with all the data that a Gold
18   Star would use to really show someone what a
19   Gold Star's all about, what it looks like
10:57  20   and, you know, had some financials.  Nothing
21   heavy.  Scheduling and whatnot.  Gary took
22   the template and actually expounded on it
23   quite a lot.
24        Q.   Were you going back and forth
25   with Gary Chan about the business plan?  Were

---

58

1    you exchanging edits or anything like that or
2    did he --
3         A.   Not a whole lot.  I mean, I -- I
4    kind of finished it and passed it on.  That
5    was pretty much my recollection of how that
6    transaction worked.
7         Q.   Did Terry Chan ever talk with
8    you about the Business Plan?
9         A.   The creation of it --
10:58  10         Q.   Yes.
11        A.   -- or the plan at all?  No.  Not
12   that I recall.
13        Q.   The creation of -- did he ever
14   talk with you about any of the details that
15   would be contained in the Business Plan?
16        A.   Well, once the Business Plan was
17   expounded upon, we would review some of the
18   numbers and so to a degree I'd say yes.
19        Q.   And when you -- when you
10:58  20   mentioned it was -- as being upgraded, did
21   Gold Star take a look after Gary Chan had
22   made those -- those changes?
23        A.   By this time I don't believe I
24   was any longer with Gold Star so I don't
25   know.

---

59

1         Q.   And how long were you with Gold
2    Star Chili?
3         A.   Until when?
4         Q.   Yeah.  Until when?
5         A.   October I believe it was the
6    7th -- I'm not positive -- of 2014.  Would
7    have been '14.  I'm not sure.
8         Q.   So I'm going to hand you --
9    we're going to go ahead and mark a document.
10:59  10         MR. JOYCE:  Please mark this as
11   Exhibit 2.  Mike, I'm working through.  I'm
12   going to the Business Plan that's included --
13        MR. NARDELLA:  Okay.
14   (Exhibit 2 identified.)
15   BY MR. JOYCE:
16        Q.   I've just -- Well, Mason, you've
17   just been handed a document.  Can you please
18   describe the document that you've just been
19   handed?
10:59  20         A.   GSC Opportunities, LP Business
21   Plan.
22        Q.   And I know -- I'm not gonna ask
23   you to review every word of every page but if
24   you could take a quick second to look through
25   this, does this look like the finalized

---

60

1    version of the Business Plan?
2         A.   Yes.
3         Q.   And you mentioned you were
4    involved in the -- in the creation of this
5    Business Plan.
6         A.   I was involved in it, yes.  A
7    lot of this material is not mine but I was
8    involved in it, yes.
9         Q.   This is a 80-page document.
11:00  10   How -- how much of this material do you think
11   you contributed to?
12        A.   When it got to the specific
13   locations, maps, and all of that, that was
14   not something I had done.  You know, I put
15   together the templates for the annual
16   operating projections and P&Ls and operating
17   budgets and don't know if the numbers are the
18   same --
19        Q.   Okay.
11:01  20         A.   -- without having the original,
21   but all the categories -- all of this was
22   pretty much mine.  Positions.
23        Q.   And I guess what we'll just do
24   is we'll isolate on various sections and
25   we'll discuss them and see --

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 61 to 64)                                    16

61

1    A. Okay.
2    Q. -- if you were contributing.
3  I'll direct you first to the -- on page four
4  it's a description of business objectives is
5  the top of that page. Taking a look at this,
6  is this section -- that 1.0 and that includes
7  the 1.1 executive summary all the way through
8  page seven -- is that something that you
9  created?
11:02 10    A. Okay. No. Not -- I created the
11  template but nothing I created was for EB-5.
12  In other words, didn't mention EB-5. It was
13  for Gold Star so Gary and Terry could get an
14  idea of what a Gold Star was all about but
15  not in a -- not in a respective what a EB-5
16  Gold Star would be.
17    Q. Okay. So the pages four through
18  seven, those -- those weren't prepared by
19  you?
11:02 20    A. No. I mean, some of this could
21  be, you know, like this middle paragraph and
22  some of this, but when it came to the EB-5 I
23  don't recall having written those items.
24    Q. So to go with the start, the
25  executive summary, the very first paragraph

62

1  it mentions that GSC Opportunities, LP, the
2  partnership. I know I've mentioned GSC
3  before. Was that the -- the entity that was
4  ultimately created to facilitate this EB-5
5  process?
6    A. (Witness nods.)
7    THE REPORTER: I'm sorry. He
8  just nodded.
9    A. Yes. Yes.
11:03 10    Q. Okay. And it mentioned that GSC
11  were -- will accept a $6 million direct
12  investment from 12 investors; is that
13  correct?
14    A. That's what it says. I did not
15  write that.
16    Q. And then the last sentence
17  mentions that Gold Star Chili, Inc. will be
18  the managing member of GSC Opp Management,
19  LLC. I believe we've discussed GSC Opp
11:03 20  Management, LLC. Do you know what the entity
21  is?
22    A. It's what managed all the real
23  estate I believe.
24    Q. And is this correct that it's
25  your understanding that Gold Star Chili was

63

1  the managing member of that entity?
2    A. That's my understanding.
3    Q. Did Gold Star control that
4  entity and what it did?
5    A. It was my understanding.
6    Q. And later on in this section --
7  you don't have to review it -- there's a
8  discussion of GSC, LP -- GSC Opportunities,
9  LP Management Team. Was Gold Star involved
11:04 10  in the -- in the management of restaurants
11  created under this GSC partnership?
12    A. Yes.
13    Q. Who at Gold Star was involved in
14  managing these entities?
15    A. The time that I was there, I
16  would have been one. Can't think of his last
17  name. Saad, S-A-A-D. He was -- it was
18  through our corporate store and he was in
19  charge of all corporate stores. Alsauda,
11:04 20  A-L-S-A-U-D-A, I believe it is.
21    Kim Olden was the HR and
22  financial person both and would ensure
23  that all the E-Verifies got done and whatnot
24  so she was heavily involved. Marketing,
25  Charlie Howard to a degree. Mike Rohrkemper,

64

1  myself. Any of the support staff that needed
2  to do training which all reported to me would
3  be part of that team.
4    Q. And just to clarify, I think you
5  mentioned a Kim Holden or --
6    A. Olden, O-L-D-E-N.
7    Q. Olden. Okay. That's what I
8  wanted to clarify. And you mentioned that --
9  a corporate store. What does a corporate
11:05 10  store mean?
11    A. Corporate store is wholly owned
12  and operated by the corporation not a
13  franchise. In theory they're a franchise or
14  a corporate store.
15    Q. And so Gold Star considered
16  restaurants created under GSC to be corporate
17  stores?
18    A. They treated them as corporate
19  stores, yes.
11:05 20    Q. And going back to our discussion
21  previously, what does, again, a Gold Star do
22  with a corporate store? How much oversight
23  does it exercise over that store?
24    A. A tremendous amount. I mean,
25  it's a -- it's a day-to-day thing. It's a --

Michael Mason, 8/23/2019

(Pages 65 to 68)                                                                17

65

1    as I said, the franchise brings the money and
2    the people, we bring everything else. And
3    the money and the people are things that is a
4    daily, weekly, monthly obligation. It's a
5    heavily managed entity.
6         Q.   And as part of that, did Gold
7    Star oversee the -- the startup, whether
8    that's the construction or purchasing land,
9    and the operations of those restaurants, were
11:06 10  they from start to finish?
11        A.   Yes. We did that pretty much
12   even with franchise -- a piece of that even
13   with franchise stores. Yes for company
14   stores.
15        Q.   And to your knowledge, did Gold
16   Star oversee how funds were distributed to
17   construct restaurants for GSC? Did they
18   approve contractor payments for example?
19        A.   Gold Star? Yes.
11:07 20       Q.   Would they have approved, you
21   know, if a component, if a fryer or something
22   broke, would they approve and have been
23   involved with purchasing new equipment?
24        A.   Yes.
25        Q.   How would Gold Star approve

66

1    those types of expenses?
2         A.   As I said, it was operated as a
3    company store, so as a company store would go
4    down, it -- it got ordered and, you know,
5    purchased through Gold Star's purchasing.
6         But the accounting part of it,
7    was held separate from a corporate store
8    though. Kim Olden is the one that tracked
9    the differences.
11:07 10       Q.   And so would Gold Star be doing
11   the accounting?
12        A.   Yes.
13        Q.   So I know we discussed the chart
14   earlier. Can I direct you to page 35 of this
15   Business Plan? So this is a page of the
16   document that says Organizational Structure
17   and Personnel. Have you ever seen this chart
18   before?
19        A.   Yes.
11:08 20       Q.   Did you create this chart?
21        A.   No.
22        Q.   Who created this chart?
23        A.   Mike and Terry. Mike
24   Rohrkemper, Terry Chan. Because I remember
25   it was -- it took a number of forms before it

67

1    ever got to this and I -- I really can't
2    speak to whether this is the actual one they
3    did. It was always on paper. I've seen it
4    printed out but I don't remember if every
5    circle is exactly the same as four years ago.
6         Q.   Taking a look at this chart,
7    does this sort of confirm your understanding
8    of how GSC was -- was organized?
9         A.   Yes.
11:09 10       Q.   And so it mentions that, you
11   know, Gold Star Chili on the left side and
12   puts an arrow directly to GSC. To your --
13   what would that represent? Is that sort of
14   their management of the -- of the restaurants
15   or --
16        A.   It would -- that's what it would
17   appear to me.
18        Q.   And then under GSC Opp
19   Management, LLC it mentions Gold Star Chili,
11:09 20  Inc. managing member. That reflects your
21   understanding as well?
22        A.   There was -- that reflects my
23   understanding of the real estate part of it.
24        Q.   And you mentioned real estate
25   part of it. Was GSC expected to -- to

68

1    purchase any properties?
2         A.   That was always going to be an
3    option.
4         Q.   Was it going to lease any
5    properties?
6         A.   That would have been the option
7    from my understanding. I mean, again, any
8    major purchase obviously Mike would take it
9    to the board to get approval and whatnot on
11:10 10  land or whatever.
11        Q.   On the very next page there's a
12   discussion of management team, consultants
13   and key collaborators. It mentions GSC
14   management team. Terry Chan is the first
15   person listed on that, right?
16        A.   Uh-huh.
17        Q.   And then there's an individual
18   named Martin Lawler. Have you ever heard
19   that name before?
11:10 20       A.   Yes.
21        Q.   How did you hear that name
22   first?
23        A.   From this document. I mean, the
24   reason I say that, we never saw him and
25   never -- we asked each other, well, who is

Michael Mason, 8/23/2019

(Pages 69 to 72)

18

69

1 this gentleman?
2 Q. Did anyone ever talk to Martin
3 Lawler?
4 A. Not to my knowledge.
5 Q. What was he involved with in
6 connection with GSC?
7 A. Only what I read is all I know
8 about it.
9 Q. Did Terry Chan ever mention that
11:11 10 they had talked to Martin Lawler before?
11 A. Yes.
12 Q. And do you have any idea how
13 frequent those conversations were?
14 A. Have no idea.
15 Q. Would he say that he discussed
16 something with Martin based on any sort of
17 questions you had about the EB-5 process or I
18 guess to more correctly state it: When would
19 he tell you that he talked with Martin
11:11 20 Lawler?
21 A. I may have only heard the
22 gentleman's name two times in my whole stay.
23 I just knew nothing about him. Terry did not
24 speak with him -- about him frequently that I
25 can recall.

70

1 Q. Was Martin involved in any of
2 the discussions related to GSC to your
3 knowledge?
4 A. None to my knowledge. Unless it
5 was done by phone with Terry or somebody. I
6 don't know that Mike Rohrkemper ever --
7 Q. Have you ever heard of an
8 individual named Allen Chi before, C-H-I?
9 A. No.
11:12 10 Q. Have you ever heard of Mason
11 Investment Group?
12 A. I may have heard of the name.
13 Never was clear on what a lot of the entities
14 were.
15 Q. And then there's an operational
16 management team and that mentions -- it lists
17 Rohrkemper, Mason and Howard, right?
18 A. Correct.
19 Q. And then on the back -- on the
11:12 20 next page it lists Jacquelyn Chan.
21 A. Yes.
22 Q. Why was she listed on this
23 document?
24 A. She was the operations team for
25 the EB-5 restaurant because she had

71

1 restaurant experience. Previous question you
2 asked me: We managed them. We did. She
3 would go in, however, do visits, make
4 comments if things weren't right. And
5 actually forgot that until just now. Because
6 there was some influence that she had in that
7 group as part of the operating group.
8 As far as giving orders, doing
9 any purchasing, any bill paying, never
11:13 10 anything like it. Was more -- I knew they
11 do -- did a couple visits to the restaurants
12 on weekends and made comment on things.
13 Q. And was that the Gold Star Chili
14 restaurants?
15 A. Yes. The two that we talked
16 about: Palomar and UK.
17 Q. How often was she visiting those
18 restaurants?
19 A. To my knowledge, maybe four or
11:13 20 five times total. If there was a UK game or
21 whatnot, I think they would, you know, go
22 down do that as well.
23 Q. Did she ever talk with you about
24 any of these restaurants?
25 A. Yes.

72

1 Q. What kind of things would she
2 talk to you about?
3 A. She had some issues, operational
4 issues, one time she was down there and
5 mentioned it to me. I took it to Saad, who
6 was in charge of the restaurants, and -- to
7 get it corrected.
8 Q. What operational issue was that?
9 A. Just they were so busy they
11:14 10 weren't able to handle it, place wasn't
11 clean, that type of thing. Was a UK day. I
12 remember one, you know, one conversation
13 about that.
14 Q. Did Jacquelyn Chan at all talk
15 with you, review, or edit this Business Plan
16 that you worked on?
17 A. I have no knowledge.
18 Q. I know we've been going for
19 another hour. Did you need a break or
11:15 20 anything like that?
21 A. Not this second.
22 Q. Okay.
23 A. Use a little bit more something
24 to drink.
25 MR. JOYCE: Mike, he's just

Michael Mason, 8/23/2019

(Pages 73 to 76)                                          19

73

```
        1    going to refill his glass of water.
        2           MR. NARDELLA: Okay.
        3    (Off the record discussion.)
        4    BY MR. JOYCE:
        5        Q.   Just a quick point of
        6    clarification. When we were going through
        7    the EB-5 and operational management list and
        8    Jacquie and you and others were discussed,
        9    did you create that or did someone else
11:26  10    create that?
       11        A.   We each created our own profile,
       12    so who -- probably a clerical person put it
       13    together.
       14        Q.   Did Terry Chan create his own
       15    description on the Business Plan?
       16        A.   That was my understanding. I
       17    didn't see him do it.
       18        Q.   Now, the Business Plan lists a
       19    12 restaurant arrangement. Was that the
11:26  20    ultimate arrangement that was arrived at for
       21    Gold Star? Did it ever get revised down?
       22        A.   Not that I know of.
       23        Q.   Okay. So to your knowledge it
       24    remained a 12-store entity?
       25        A.   To my knowledge, yes.
```

74

```
        1        Q.   Was there ever a plan to
        2    construct those restaurants in phases?
        3        A.   Yes. Because you can't
        4    construct them all at one time.
        5        Q.   Was it ever a plan to tell
        6    investors that you were going to do phase
        7    constructions?
        8        A.   Gold Star's communication with
        9    investors was zero.
11:27  10        Q.   Who communicated with the
       11    investors to your knowledge?
       12        A.   I never witnessed any so I --
       13    I -- I can only guess. I don't want to guess
       14    but...
       15        Q.   Did Gary Chan ever tell you that
       16    he had talked to investors?
       17        A.   Yes.
       18        Q.   Did Terry Chan ever tell you
       19    that as well?
11:27  20        A.   I don't recall really. I mean,
       21    seriously I -- I don't.
       22    (Exhibit 3 identified.)
       23           MR. JOYCE: Michael, we're going
       24    to the Goldlink booklet.
       25           MR. NARDELLA: Okay. Is there a
```

75

```
        1    bates number or --
        2           MR. JOYCE: No. No bates number
        3    on this one.
        4           MR. NARDELLA: Oh, I see what it
        5    is. Okay. Got it. The Flavor of
        6    Cincinnati. Is that what the title is?
        7           MR. JOYCE: Yes.
        8           MR. NARDELLA: Gotcha.
        9    BY MR. JOYCE:
11:29  10        Q.   You've just been handed what's
       11    been marked as Exhibit 3. Can you describe
       12    what that document is?
       13        A.   No.
       14        Q.   Have you ever seen this document
       15    before?
       16        A.   No.
       17        Q.   Okay.
       18        A.   Not that I -- I've kind of just
       19    been looking at it actually but, no, I don't.
11:29  20    (Exhibit 4 identified.)
       21           MR. JOYCE: Mike, we're moving
       22    to the next one. It's the Gold Star -- the
       23    next Gold Star document.
       24           THE WITNESS: I will -- this
       25    does resemble UK.
```

76

```
        1    BY MR. JOYCE:
        2        Q.   Okay. So the photo on the front
        3    of that promotional booklet does represent
        4    the UK restaurant?
        5        A.   University of Kentucky place.
        6        Q.   Okay. Mason, you've just been
        7    handed what's been marked as Exhibit 4. Can
        8    you please describe what this document is?
        9        A.   What it appears to be or -- to
11:30  10    my knowledge, I -- I'm not familiar with it.
       11        Q.   And I might -- there is a
       12    colored version but luckily --
       13        A.   I don't --
       14        Q.   -- for our purposes it doesn't
       15    matter.
       16        A.   I mean, I see my name in here
       17    but...
       18        Q.   Have you ever seen this document
       19    before?
11:30  20        A.   Not to my knowledge.
       21        Q.   Did you have any hand in
       22    creating this document?
       23        A.   A lot of these are excerpts from
       24    things that we have in our -- when I was with
       25    Gold Star -- publications, so possibly. I
```

Michael Mason, 8/23/2019

(Pages 77 to 80)                                    20

---

77

1    mean, excerpts from it such as my name and
2    other things. I mean, this Cincinnati piece,
3    this Flavor of Cincinnati, that was our
4    slogan at the time. That was -- I part of it
5    but, no, not the document itself.
6         Q.   To your knowledge, was there
7    ever a plan to have 20 EB-5 immigrant
8    investors in GSC?
9         A.   I -- I don't know.
11:31 10       Q.   And then there's this -- the
11   Midwest EB-5 Regional Center, its logo is
12   noted on the bottom of the --
13        A.   Yeah.
14        Q.   You mentioned -- do you recall
15   what that entity is?
16        A.   I do not. Is that -- my only
17   recollection I have of it is it was a former
18   entity that Gary and Terry were in that no
19   longer existed at some point but I don't know
11:32 20   when.
21        Q.   Did it -- did that entity exist
22   at the time you were having discussions with
23   Terry Chan about GSC?
24        A.   The initial discussions it may
25   have. Can't say for sure.

---

78

1         Q.   Does the abbreviation of MERC or
2    M-E-R-C ring any bells?
3         A.   No. No.
4    (Exhibit 5 identified.)
5         MR. JOYCE: We're moving to the
6    next one, Mike. It's the Operating Agreement
7    of GSC Opp Management. It's LIND000072 is
8    the front page.
9         MR. NARDELLA: Okay. Got it.
11:33 10   Thank you.
11   BY MR. JOYCE:
12        Q.   You've just been handed
13   Exhibit 5. Could you please just take a few
14   moments to familiarize yourself with the
15   document and then let me know if you've seen
16   this document before.
17        A.   It appears to be one that was
18   created -- Tom Fisher had a lot to do with
19   this.
11:33 20       Q.   Did you have any involvement in
21   creating this document?
22        A.   I mean, I would be -- attend
23   meetings where we would discuss certain
24   subjects but not -- not this document. I
25   mean, these subjects may be in this document

---

79

1    that we discussed or questions answered but
2    not in creating this document itself.
3         Q.   Did you ever type parts of this?
4         A.   Not that I can ever recall. I
5    don't -- I could almost say no.
6         Q.   Do you ever recall an agreement
7    to have only six investors invest in GSC?
8         A.   No.
9         Q.   Who was responsible for ensuring
11:34 10   that these materials and others complied with
11   securities laws to your knowledge?
12        A.   I don't know.
13        Q.   Would you think that would have
14   been Terry Chan to your knowledge?
15        MR. NARDELLA: Object to form.
16        A.   That would have been my
17   assumption back then but don't know.
18        Q.   Were you aware that you're a
19   vice president of GSC Opp Management, LLC?
11:35 20       A.   Am? Was?
21        Q.   I guess a more accurate question
22   is: Are you a vice president of GSC Opp
23   Management, LLC?
24        A.   No.
25        Q.   Have you ever been a vice

---

80

1    president of that entity?
2         A.   It -- I didn't know I was but, I
3    mean, there's -- in forming this thing a lot
4    of words and titles were passed around that
5    Mike Rohrkemper may have put that on there.
6    I don't know.
7         Q.   So Rohrkemper could have listed
8    you as a vice president of that entity?
9         A.   I would think so.
11:35 10       Q.   Why --
11        A.   I don't recall signing anything
12   saying I was.
13        Q.   Why would Rohrkemper have listed
14   you as a VP to your knowledge?
15        A.   I don't know that he would. I
16   don't event want to go there because from my
17   knowledge he didn't.
18        Q.   If I could direct you to page 28
19   of the document, it's LIND100 and it lists
11:36 20   Michael Rohrkemper as president and Michael
21   Mason as vice president, and so that's -- to
22   your knowledge, did Michael Rohrkemper ever
23   talk to you about being the vice president
24   of --
25        A.   The president.

---

Michael Mason, 8/23/2019

(Pages 81 to 84)

21

81

1    Q.   The vice president.
2    A.   Oh, me.
3    Q.   Yes, you.
4    A.   Not that I recall.
5    Q.   Did Michael Rohrkemper ever talk
6    to you ever about being the president of this
7    entity?
8    A.   Not that I recall.
9    Q.   Did he ever talk to you about
11:36 10   this entity?
11   A.   This is the real estate entity.
12   I mean, I'm thinking that's what this is. I
13   know we discussed the real estate entity but
14   this doesn't -- Opps Management. I don't
15   know.
16   Q.   Did he ever talk to you about
17   being a managing partner of GSC?
18   A.   No.
19   Q.   Do you know what a managing
11:37 20   partner of a partnership is?
21   A.   Yes.
22   Q.   What is it to your knowledge?
23   A.   You -- you would have more than
24   51 percent of a -- of a share to manage the
25   partnership.

82

1    Q.   And to manage the partnership
2    would that be to ensure that the
3    partnership's goals are obtained?
4    A.   Yeah.
5    Q.   Just sort of comply with the
6    partnership agreement if you could?
7    A.   Yes.
8    Q.   Did you ever have any meetings
9    related to GSC Opp Management, LLC with
11:37 10   Mr. Rohrkemper?
11   A.   We were in a lot of meetings. I
12   don't recall any specific ones on this, no.
13   Q.   Any formal, you know, officer
14   meeting or shareholder meeting for this
15   entity?
16   A.   No.
17   Q.   And so the -- eventually GSC
18   the -- you know, both sides sort of agree on
19   what's gonna happen and -- and to go back to
11:38 20   it, do you have any recollection of when --
21   of when Gold Star and Terry and Gary Chan
22   agreed on what GSC would look like?  Do you
23   know what date that was?
24   A.   When you say GSC would look
25   like, meaning GSC Opportunities?

83

1    Q.   That's correct.  Yes.  The
2    limited partnership.
3    A.   Sometime in 2013 but I don't --
4    Q.   Would June of 2013 sound
5    familiar?
6    A.   Could be.
7    Q.   Did Mike Rohrkemper ever tell
8    you, hey, I'm gonna sign a bunch of materials
9    for GSC in June of 2013?
11:38 10   A.   Not to me.  He would have told
11   Tom Fisher.
12   Q.   Okay.  And so that would be a
13   discussion that he had with Tom Fisher?
14   A.   (Witness nods.)
15       THE REPORTER:  Is that a yes?
16   A.   Yes.
17   Q.   And during these negotiations
18   was the -- the UK restaurant -- that was the
19   one being built, correct?
11:39 20   A.   No.
21   Q.   Okay.
22   A.   Palomar.
23   Q.   That was the one that was
24   already --
25   A.   Yes.

84

1    Q.   UC was already operational.
2    Palomar was the one being built.  Do you have
3    any idea when the Palomar restaurant became
4    operational?
5    A.   No, not off the top.
6    Q.   Was it operational before or
7    after you left?
8    A.   Before.
9    Q.   Before.  Were there any other
11:39 10   restaurants that were going to be developed
11   for GSC to your knowledge?
12   A.   There was discussions on some
13   but none had been developed that I know of.
14   Q.   What other restaurants had been
15   discussed?
16   A.   I believe Xavier.
17   Q.   Anywhere else?
18   A.   None that I remember.
19   Q.   So the 2013 occurs, the
11:39 20   discussions have happened, we've got Palomar
21   and UK are sort of progressing along, and
22   were -- did you have any discussions with
23   Terry Chan, to your knowledge, once those
24   restaurants were operational and running
25   related to GSC?

Michael Mason, 8/23/2019

(Pages 85 to 88)                               22

---

85

1          A.   In the times that they had
2    visited the restaurants, yes.
3          Q.   Would he visit with Jacquelyn
4    Chan --
5          A.   Yes.
6          Q.   -- or by himself?
7          A.   Usually with her.
8          Q.   Did you have any other
9    communications with him outside of those
11:40 10  restaurant visits?
11         A.   We -- we would have meetings
12   to -- to give them P&Ls and whatnot. Yes.
13   Mike Rohrkemper held the meetings but I would
14   be -- I would attend those meetings.
15         Q.   And what does P&L mean?
16         A.   Profit and loss statement.
17         Q.   And what -- what are those types
18   of meetings?
19         A.   They're -- I think we did it on
11:40 20  a quarterly basis. Could have been more
21   frequent at some times but just to review the
22   various cost, revenue costs, profits, losses.
23         Q.   Were those restaurants
24   generating revenue in 2013 and 2014?
25         A.   They were generating revenue.

---

86

1    Profits, not that I recall.
2          Q.   Do you know if they were
3    generating losses?
4          A.   Yes.
5          Q.   Do you know how big those --
6          A.   No.
7          Q.   Did those numbers improve in
8    2014?
9          A.   I -- I don't recall what it
11:41 10  looked like.
11         Q.   To your knowledge, were
12   investors ever told about these restaurants?
13         A.   I have no idea.
14         Q.   To your knowledge, did the
15   investors know that these restaurants were
16   operational and generating revenues?
17         A.   I do not know.
18         Q.   What was supposed to happen to
19   these investor funds while the restaurants
11:41 20  were being constructed to your knowledge?
21         A.   I know there were fees collected
22   or attempted to be collected but that's the
23   extent of any funds that Gold Star ever
24   received.
25         Q.   Have you ever heard of escrow

---

87

1    accounts at U.S. Bank related to GSC?
2          A.   Not -- well, I mean, when I
3    became part of Clearwater retro I learned
4    about them and retro I learned about the GSC
5    escrow accounts as well. Yes.
6          Q.   At the time you were at Gold
7    Star, did you know --
8          A.   I doubt that I ever heard that
9    term.
11:42 10        Q.   Who was contributing the funds
11   to develop the UK and Palomar restaurants and
12   have them operational? Was that Gold Star?
13         A.   Gold Star.
14         Q.   Did anyone at Gold Star ever
15   express to you frustration with investor
16   funds not being released from escrow
17   accounts?
18         A.   Don't recall.
19         Q.   And you mentioned I believe --
11:43 20  when did you join Clearwater Hospitality
21   Group?
22         A.   November 2nd of 2014 I believe
23   was the date. Like I said, it may have been
24   the 14th. Not sure.
25         Q.   So how did that -- I guess to go

---

88

1    from the start, how did you first entertain
2    the idea of leaving Gold Star for Clearwater?
3          A.   I have 25 years with Gold Star
4    and Mike Rohrkemper being my supervisor was
5    grooming me or whatever to take over. He --
6    he was only gonna be there five years to
7    start with. He ended up being there seven
8    years. But to take over the position of
9    president and -- at least that's what -- what
11:44 10  he communicated to me and that's the way I
11   felt. It was my life goal as far as that
12   time in my life.
13         So anyway, we moved towards that
14   period, one of the shareholders of the
15   business decided he would like to be in that
16   position. You know, he owns part of the
17   company. I can't blame him. That would be
18   Roger David.
19         And some of the other
11:44 20  shareholders approached me and said, well,
21   we'll interview both of you and their -- then
22   it became pretty evident that I wasn't even
23   gonna be interviewed or even if I was
24   interviewed it was just kind of a mock
25   interview and I didn't want that.

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                          2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 89 to 92)                                    23

89

1         And during these periods of
2    time, you know, Jacquie and Terry and Gary
3    would be coming in and I see this opportunity
4    that appears to be something right down my
5    wheelhouse that I could help somebody do. I
6    mean, I just spent 40 years in the restaurant
7    business, I know what I'm doing and it got to
8    the point where I could -- you know, the
9    construction piece, the construction manager
11:45 10  reported to me, so I knew site selection,
11   construction, whatnot.
12        So I said maybe there's
13   something I could do to join your group. I
14   don't know -- I mean, even if I stayed on
15   here, usually the guy that's gonna get the
16   job gets the boot and -- and I don't know if
17   that would have happened or not but it kind
18   of -- my dreams weren't gonna be fulfilled so
19   I --
11:45 20      We had a number of discussions
21   on my employment there over a number of
22   months and they -- they agreed rather quickly
23   but as far as getting to the point of
24   actually starting in November, was longer
25   than what I had thought.

90

1         Q.   When did you first have
2    discussions with Jacquie, Terry or Gary about
3    potentially joining Clearwater?
4         A.   When I first found out that
5    Roger wanted to come back and take over as
6    CEO.
7         Q.   Do you know when that was
8    approximately?
9         A.   Early 2014.
11:46 10       Q.   And do you recall how you first
11   approached that subject with Gary, Terry or
12   Jacquie?
13        A.   We were in one of the standard
14   meetings that we would have and no one else
15   was there, you know, the Gold Star people. I
16   said -- you know, I said, well, how are you
17   gonna lay this out? Do you have somebody in
18   mind that's gonna -- and Jacquie is going to
19   be the president or whatever. I said, you
11:46 20   know, I'm thinking about looking at other
21   opportunities. You know, I'm available if
22   you think I could be of assistance but I
23   don't know how much longer my tenure is here.
24        Q.   And that first discussion was it
25   with all three of them or just --

91

1         A.   Terry and Jacquie.
2         Q.   You mentioned Jacquie was going
3    to be president. President of what?
4         A.   Of the corporation. I don't
5    know if they had named it Clearwater yet but
6    the corporation that they were forming to run
7    all of those.
8         Q.   So Jacquie was gonna be the
9    president of Clearwater Hospitality Group?
11:47 10       A.   Yeah. I'm not sure that that
11   name came out that day but that's what that
12   eventually became, but Jacquie was going to
13   be running the whole thing.
14        Q.   And this entity, which
15   eventually becomes Clearwater, what -- what
16   does that entity do for Gold Star or GSC
17   Opportunities? I apologize.
18        A.   It -- it would manage all of the
19   various opportunity -- everything became an
11:47 20   opportunity -- was named an opportunity like
21   RG Opportunity one and everything had its own
22   little entity. All of them pretty much
23   called an opportunity: GSC Opportunity one,
24   two, three, whatever; RG Opportunity one,
25   two, three, whatever. So that -- Clearwater

92

1    was kind of the umbrella of that of those
2    opportunities.
3         Q.   And so would it as the umbrella
4    would oversee these --
5         A.   Oversee, hire, train, manage,
6    you know, administer, you know, HR. All
7    that. Yeah.
8         Q.   And was that just the -- the
9    each individual restaurants that were being
11:48 10   operated or -- or I guess who were they
11   training and supervising?
12        A.   As we opened restaurants --
13        Q.   Okay.
14        A.   -- and managing them, the
15   accounting, HR, like I said, insurance, that
16   type of thing. All of them would be -- we
17   didn't have too many at the time but that was
18   the goal is how -- how to do that. Yes.
19        Q.   And what -- what entity sort of
11:48 20   fell under this umbrella? I think you
21   mentioned Gold Star, Rodizio. Were there
22   other restaurants?
23        A.   Gold Star was treated a little
24   bit differently with an agreement they had
25   that Gold Star would manage that end of it,

Michael Mason, 8/23/2019

(Pages 93 to 96)                                          24

93

1  so it didn't hold quite true for the Gold
2  Star restaurants and that was an agreement
3  Mike Rohrkemper had agreed to prior.
4       But with the Rodizio it was
5  going to be done that way as a -- the way the
6  corporate Rodizio looked at it was
7  franchises.
8       Q.  Were there any Boardwalk Fresh
9  Burger and Fries restaurants as part of that
11:49 10  umbrella?
11       A.  That -- there was a number of
12  different entities that were thrown into that
13  mix and Buffalo Wings and Rings was one of
14  them as was Boardwalk.  We even -- there was
15  one Twin Peaks -- I don't know if you're
16  familiar with that.  Look at him.
17       Q.  No.  What -- what is Twin Peaks?
18       A.  Oh, I'm sorry.  There's one over
19  there in -- it's like a Hooters.  They're
11:49 20  moving one into West Chester over there.  I
21  thought maybe you knew.
22       But anyway, we went down and
23  flew down to Texas to talk to the Twin Peaks
24  guy.  He's acting all innocent.  And there --
25  there are two mountains is what they -- what

94

1  their logo is anyway --
2       And talked to them but that was
3  a -- probably the short -- the longest trip
4  of the shortest meeting that ever happened.
5  We got up and walked out.
6       But I'm saying there was a
7  number of places we looked at.  King's
8  Supermarkets.  But the ones that were serious
9  and that started putting on business cards
11:50 10  and whatnot were Boardwalk Fresh Burgers and
11  Fries, Gold Star, Rodizio, and Buffalo Wings
12  and Rings.
13       Q.  And who was involved in all
14  those discussions with these entities?  Were
15  you involved in those discussions?
16       A.  Not the initial discussions at
17  all but as we went down the road, yeah, I
18  became involved.  Yes.
19       Q.  Who was involved in the initial
11:50 20  discussion?
21       A.  Gary and Terry is my assumption.
22  Jacquie probably was there as well.  I wasn't
23  there so I really can't tell you, but those
24  concepts were brought to me as potentials.
25       Q.  Was the Rodizio Grill concept

95

1  already formed by the time you joined in
2  2014?
3       A.  When you say the concept, they
4  -- Salt Lake City is the headquarters for
5  Rodizio Grill.  They had a number of Rodizio
6  Grills out there and had been operating for
7  quite a while.  So it was almost like a
8  franchise to Rodizio Grill.
9       Q.  Was RG Opportunities created
11:51 10  when --
11       A.  No.
12       Q.  -- before you joined?
13       A.  Not before I joined, no.
14       Q.  That would have been after you
15  joined?
16       A.  That was after I joined.
17       Q.  Would Boardwalk Fries
18  Opportunities or that -- that limited
19  partnership have been created?
11:51 20       A.  Probably.  I mean, we never
21  opened any so I -- I don't -- I didn't even
22  realize there was a limited partnership
23  developed.  I guess there could have been,
24  would have been.  I don't know.  I -- I know
25  I went to train in San Jose at a Boardwalk

96

1  Fresh Burgers and Fries to see how, you know,
2  how they operated.
3       But, I mean, I didn't know there
4  was anything going on.  You know, the
5  paperwork and everything I don't think I've
6  ever seen any of that.
7       Q.  Who would know the most about
8  what Clearwater was doing with those
9  entities?
11:52 10       A.  The principals.
11       Q.  And who are the principals of
12  Clearwater?
13       A.  Well, Jacquie's the only
14  principal of Clearwater but Terry and Gary
15  would know everything about it as well.
16       Q.  And -- and how would they -- how
17  would they know what's going on?  Do they
18  communicate frequently?
19       A.  Terry, Jacquie and Gary?
11:52 20       Q.  Yes.
21       A.  Yes.
22       Q.  Did they have meetings with each
23  other to your knowledge?
24       A.  Yes.
25       Q.  How involved was Terry Chan in

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 97 to 100)                    25

---

97

1    Clearwater Hospitality Group to your
2    knowledge?
3        A.   Very.
4        Q.   What kind of things was he
5    doing?
6        A.   Well, being Jacquie's husband
7    and Gary's brother, I mean, from -- from an
8    outsider, he pretty much controlled
9    everything of all the entities.
11:53 10     Q.   And what was he doing -- when
11   you say controlled, what do you mean by that?
12       A.   Decisions weren't made without
13   his approval from what I could see.
14       Q.   Would he know the finances of
15   those companies?
16       A.   Oh, yeah.
17       Q.   Would he know of transfers of
18   funds involving those companies?
19       A.   I have no knowledge of that but
11:53 20  I -- I -- I'm sure he -- I mean, he talked
21   about transfers.  He would say when a new
22   investor had come on board.  I mean, we -- he
23   would kind of announce it to the group, you
24   know, that a new investor came on and
25   whatnot.  Yeah.

---

98

1        Q.   Terry would do the announcing?
2        A.   Pretty sure, yeah.
3        Q.   What other things was -- was he
4    doing in connection of Clearwater?  Was he
5    involved with developing these restaurant
6    concepts?
7        A.   He had a hand in it, yes,
8    approving the plans, the operations
9    everything.  I mean, he was in -- Jacquie as
11:54 10  well but, I mean, he was in the restaurant,
11   one in Liberty Township, much of the time
12   developing marketing programs with Jacquie
13   and whatnot.
14       Q.   Was he involved in negotiating
15   lease agreements?
16       A.   Yes.
17       Q.   Would he have been involved in
18   negotiating franchise agreements?
19       A.   With like Rodizio Grill parent
11:54 20  company?
21       Q.   Yeah.  In the Rodizio Grill
22   context would he have been involved in those
23   negotiations with Rodizio?
24       A.   He was involved with the
25   agreement with Rodizio Grill.  I don't know

---

99

1    if it was franchise contract.  I don't know
2    how it was written but he was involved in
3    that, yes.
4        Q.   But overall it seems that, you
5    know, Gary, Terry, and Jacquie they were just
6    all involved in what was going on at
7    Clearwater.
8        A.   Yes.
9        Q.   And that goes for -- you know,
11:54 10  obviously Jacquelyn was mentioned.  Was she
11   involved in any lease negotiations?
12       A.   Not so much.
13       Q.   What was Jacquie doing sort of
14   more so with Clearwater?  What was her
15   primary responsibility?
16       A.   To -- well, marketing is the
17   role she took but she was the president so
18   she would speak with whomever:  Deb, who was
19   our accounting and HR person; Tamer, who was
11:55 20  Deb's assistant; whoever she needed to speak
21   to and talk to; and me and, you know,
22   whatever she would --
23       Q.   Would you ever talk to her about
24   the construction of restaurants for any of
25   the Clearwater restaurants?

---

100

1        A.   When I joined, she was pregnant
2    and there was -- there was a period of time
3    where she was disconnected from the business,
4    rightfully so, so a lot of that discussion
5    was not done with her.  After that point,
6    more of it did happen.
7        Q.   Okay.  So did you ever -- for
8    the -- for the Liberty Rodizio Grill, did you
9    talk with her about the construction budget
11:56 10  for that project?
11       A.   That was primarily discussed
12   with the contractor and Terry.
13       Q.   And who was the contractor for
14   that project?
15       A.   ML Barnard.
16       Q.   ML Barnard.  And you also said
17   Terry Chan as well.
18       A.   Terry was not the contractor.
19       Q.   Oh, sorry.  But you also
11:56 20  discussed the Liberty construction with Terry
21   Chan?
22       A.   Terry and the -- ML Barnard
23   would discuss the budget and everything, yes.
24   And I -- I mean, if I was there, yes, I would
25   discuss it with them as well.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 101 to 104)                                    26

101

1    Q.  But it would -- to your
2  appearance it looked like Terry would
3  directly talk with ML --
4    A.  Oh, yeah.
5    Q.  -- Barnard about budget?
6    A.  Yeah.
7    Q.  Would Terry be involved with
8  transfers of funds to ML Barnard to pay them
9  for the work they did?
11:56 10   A.  Yes.  Well, Gary would actually
11  do the transaction.
12    Q.  Would Terry --
13    A.  From my understanding.  It
14  didn't go through me so I didn't really see
15  the checks but I got the opinion that that's
16  how the process worked.
17    Q.  But would Terry know that the
18  funds were being transferred and checks were
19  being paid?
11:57 20      MR. NARDELLA: Object to form.
21    Q.  Would Terry know that funds were
22  being transferred?
23    A.  I have no knowledge of that but
24  I would have to think yes.
25    Q.  Would Terry have knowledge as to

102

1  the source of the funds that were being paid
2  to ML Barnard?
3      MR. NARDELLA: Object to form.
4    A.  I have no idea.
5    Q.  So just to sort of get all the
6  entities straightened away, you mentioned --
7  so it looks like -- was Gold Star Chili the
8  first restaurant concept that was developed
9  under this Clearwater umbrella or were
11:57 10  there -- I guess to sort of strike that and
11  re-clarify.
12      At the time you joined
13  Clearwater, was Gold Star the only entity
14  that had restaurants operational?
15    A.  Yes.
16    Q.  When did the Rodizio restaurant
17  at Liberty Center become open to your
18  knowledge?
19    A.  November of 2015.
11:58 20   Q.  Were any Boardwalk restaurants
21  ever opened?
22    A.  Never.
23    Q.  Did construction begin on any
24  Boardwalk restaurants?
25    A.  None to my knowledge.

103

1    Q.  Before you left Clearwater, had
2  any restaurants been developed for Boardwalk?
3    A.  None to my knowledge.  And I did
4  receive a call accidentally from somebody
5  from Boardwalk because my number was still in
6  his phone.  He wanted to know who it was and
7  I just said, well, I haven't been with them
8  for a couple years.  He says -- he told me,
9  oh, those guys never did anything with us.
11:58 10   Q.  When did you receive that call?
11    A.  Six months ago maybe.
12    Q.  So would --
13    A.  It was -- it was Fran -- it
14  happened to be Fran, the guy that I spent
15  some time out in San Jose.  He was their
16  development -- I mean, he wasn't angry or
17  anything.  He just was saying who he was and
18  I -- I told him, well, I no longer work there
19  and that was it and he just said, well, they
11:59 20  never developed any.  I said, okay.
21    Q.  You mentioned Fran.  Who is
22  Fran?
23    A.  That was his name.  He was their
24  construction development manager.
25    Q.  Okay.  Do you know his last name

104

1  by chance?
2    A.  He and his brother owned the
3  concept so I don't know.  If I thought about
4  it long enough, I might remember.
5    Q.  Well, then maybe -- maybe it
6  will be refreshed later on.  So you joined
7  Clearwater in 2014.  At that time period, to
8  your knowledge, were things between
9  Clearwater and Gold Star Chili doing well?
11:59 10  Any -- any problems that you saw?
11    A.  No.  When Roger came on board,
12  there was a period of time that Roger and
13  Mike would be -- both be on board for three
14  months and Roger and -- Roger David in an
15  advisory type role.  Mike would be going out.
16      And there were a couple of
17  meetings with just Mike and me and Terry and
18  probably Jacquie, and then we had a couple
19  meetings with Roger and Mike, but at this
12:00 20  time I was on the Clearwater side so...
21      And your question -- I'm trying
22  to answer your question exactly but what was
23  the question again?
24    Q.  Luckily that gave -- that gave
25  some good insight.  So after you left -- you

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 105 to 108)                                    27

105

1    left Gold Star to go to Clearwater.  Did you
2    have any meetings with anybody at Gold Star
3    Chili?
4        A.    Yes.
5        Q.    Who did you meet with?
6        A.    Mike Rohrkemper.
7        Q.    Okay.
8        A.    And later Mike Rohrkemper and
9    Roger David.
12:00 10     Q.    And how long did you just meet
11   with Mike Rohrkemper to the best of your
12   knowledge?
13       A.    How many meetings?
14       Q.    How long of a time period was it
15   just Mike?
16       A.    I -- I only recall one meeting.
17   So it probably was over a three-month period
18   of time.
19       Q.    Do you know when that meeting
12:01 20  took place?
21       A.    Probably January or February of
22   2015.
23       Q.    Do you know who was at that
24   meeting?
25       A.    Terry, myself, Gary and Mike

106

1    Rohrkemper I believe.  Possibly Dave Mayerik
2    was there as well.  He took my place.
3        Q.    As the vice president of --
4        A.    Operations.
5        Q.    Do you remember what was
6    discussed during that meeting?
7        A.    Review of financials.  Not much
8    more.
9        Q.    Whose financials were being
12:01 10  reviewed?
11       A.    The two restaurants and any
12   progress or any operational things going on.
13       Q.    Were the GSC investors ever
14   talked about during this meeting?
15       A.    No.
16       Q.    Did Rohrkemper ever ask about
17   when limited partner funds might be
18   available?
19       A.    I don't recall that.
12:02 20     Q.    And so after this -- this
21   meeting you mentioned that there was some
22   meetings with Roger David and Rohrkemper.
23       A.    And Terry, Gary, and myself.
24       Q.    Okay.  So when was the next
25   meeting that you remember having with Gold

107

1    Star after this January, February 2015
2    meeting?
3        A.    I don't know the month but it
4    was probably at least another month, month
5    and a half later.
6        Q.    And that had Roger David, Mike
7    Rohrkemper, you, Terry and Gary Chan?
8        A.    If I recall, that -- maybe one
9    of those with Dave Mayerik as well.
12:02 10     Q.    Was Jacquelyn Chan at that
11   meeting?
12       A.    I believe so.
13       Q.    Do you recall what was discussed
14   during this meeting?
15       A.    I remember Roger saying he feels
16   better about it the fact that I'm now with
17   them.  He's a little sceptical of having
18   someone -- some other entity running Gold
19   Stars but he felt better about it that I was
12:03 20  with them but he wasn't convinced that it was
21   going to work.  What that means, -- I mean,
22   it was -- he wasn't -- you could tell he
23   wasn't a hundred percent on board as it had
24   been before Roger came.
25       Q.    Did he have reservations about

108

1    the EB-5 program?
2        A.    I don't -- he actually brought
3    the EB-5 program into Buffalo Wings and
4    Rings.
5        Q.    Roger David?
6        A.    Yeah.  He was the CEO for them
7    prior to taking or coming on.
8        Q.    So he was familiar with the EB-5
9    program at that time?
12:03 10     A.    Yeah.
11       Q.    And did he voice his sort of
12   hesitation or -- or concerns with GSC during
13   that meeting?
14       A.    Yes.
15       Q.    What were those hesitations or
16   concerns?
17       A.    That it wasn't -- I can't -- I
18   can't recall what his specific points were.
19       Q.    Okay.  Was anything done after
12:04 20  this meeting that you can recall?
21       A.    No.
22       Q.    When was the next meeting that
23   you had with anybody involving Gold Star?
24       A.    I think we -- about that period
25   there were no more meetings.

Michael Mason, 8/23/2019

(Pages 109 to 112)                                        28

109

1       Q.  Was that the final meeting that
2   you remember having with Gold Star?
3       A.  Either one or two.  I can't
4   remember if we had two but no more than two.
5       Q.  Okay.  And did you ever hear of
6   Gold Star wanting to pull out of GSC
7   Opportunities?
8       A.  Yes.
9       Q.  When did you first hear about
12:04 10  that?
11      A.  A couple of months maybe after
12  that last meeting.
13      Q.  Do you remember what was said to
14  you?
15      A.  That Roger wants to pull out.
16      Q.  Did he explain why?
17      A.  I don't recall.
18      Q.  Who told you that Roger wanted
19  to pull out?
12:05 20  A.  Terry.
21      Q.  Terry.  That Terry Chan?
22      A.  Chan.
23      Q.  Do you recall anything else he
24  said during that conversation?
25      A.  No.

110

1       Q.  And did Terry seem to think that
2   Gold Star had a, you know, a real reason to
3   pull from GSC or --
4       A.  No.
5       Q.  He didn't -- he just didn't
6   explain why Gold Star wanted out?
7       A.  I mean, as I said before, he was
8   questioning whether it was going to work for
9   Gold Star, EB-5, whatever, in the previous
12:05 10  meeting so my assumption might have been
11  that, you know, that's why he pulled out.
12      Q.  Did anyone ever talk to you
13  about frustrations occurring with limited
14  partner funds not being released from escrow?
15      A.  No.  On the Gold Star side?
16      Q.  On the Gold Star side.
17      A.  No, wasn't communicated to me
18  from Gold Star about anything like that.
19      Q.  Did anyone at Gold Star complain
12:06 20  about not having enough money to open and
21  operate additional restaurants?
22      A.  No.
23      Q.  When did Gold Star announce --
24  formally announce they wanted to withdraw
25  from GSC to the best of your knowledge?

111

1       A.  I really don't know.  I -- I
2   found out about it after the fact.
3       Q.  How did you find out about it?
4       A.  Terry mentioned it one day in a
5   meeting.
6       Q.  Did he say anything in
7   particular about why they --
8       A.  No.  About Roger just not
9   wanting to do it and I recall asking, you
12:06 10  know, what happens now?  And he thinks we can
11  get that into another concept.
12      Q.  And what do you mean he thinks
13  that we can get done and do another concept?
14  Is that the restaurants or the limited
15  investor fund?
16      A.  Limited investor funds was my
17  understanding.
18      Q.  Okay.  When did he have that
19  conversation with you?
12:07 20  A.  Whenever I found out about them
21  pulling out.  Would -- maybe a couple months
22  after they did.
23      Q.  Would the fall of 2015 been
24  maybe around this time period that you recall
25  this happening?

112

1       A.  It could be.  The fall of 2015.
2   I was so heavily involved in opening Rodizio,
3   Liberty Township had to open by Thanksgiving,
4   the whole center did, and every day was a
5   pressure keg.  I mean, the amount of meetings
6   and the amount of time I spent towards any of
7   the subjects that we're talking about weren't
8   even -- I mean, weren't even top of mind.
9           I mean, I had to get the
12:07 10  restaurant opened and -- and a restaurant of
11  4,000 square feet is quite large and a lot of
12  things didn't hit right and it just -- it was
13  not a time when -- I let everybody else worry
14  about what was going on back at the office.
15  I rarely even was at the office.
16      Q.  And you mentioned there were --
17  there were problems going on with the Rodizio
18  Grill.  What -- what sort of specific
19  problems?
12:08 20  A.  Typical restaurant problems:
21  Wrong equipment being shipped to come in, you
22  know, contractors not hitting their dates
23  that they need to get certain things done,
24  contractors not working weekends while other
25  contractors were, and the pressure from

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 113 to 116)

29

---

113

1  Liberty to be open in time and materials like
2  glazers.
3      I mean, there was glass all
4  through the whole Liberty Center. Every
5  glazer in town was being used by somebody
6  else and you had to beg, you know, everybody
7  to do you a favor and it was -- it was
8  just -- every trade just about, plumber,
9  everybody, you had to beg to get to do the
12:09 10  job just to try to get done.
11      Q.   At the time this Rodizio Grill
12  restaurant was being developed, was a
13  Boardwalk Fries restaurant being developed?
14      A.   No.
15      Q.   Had you ever been told that
16  there were plans to construct a Boardwalk
17  restaurant around that time period?
18      A.   I visited a number of sites in
19  Florida for Boardwalk and some other places
12:09 20  but no.
21      Q.   No. No firm commitment to
22  construct anything?
23      A.   No.
24      Q.   In your role, would you have
25  expected to be informed of that type of

---

114

1  information?
2      A.   If something was going down?
3  Yeah.
4      Q.   Particularly --
5      A.   I would think so.
6      Q.   Particularly restaurant
7  construction?
8      A.   Yeah. Or even purchase a or
9  lease a property or anything.
12:09 10      Q.   And actually think I neglected
11  to ask this but what was your role at
12  Clearwater?
13      A.   Chief operating officer.
14      Q.   What did you do in that role?
15      A.   Similar to what I did only more
16  of it just because there was less support
17  staff. It was just a role. It was just a
18  title, you know, did operations.
19      (Exhibit 6 identified.)
12:10 20      MR. JOYCE:  One moment. All
21  right. For everyone's record, he's been
22  handed what's been marked as Exhibit 6. One
23  second, Mike. I'm gonna get it for you.
24  It's bate numbered. The first page is
25  GSC00270. It's a -- the first page is an

---

115

1  e-mail and the document ends at GSC272.
2      MR. NARDELLA:  Is this before
3  the Goldlink in the package or --
4      MR. JOYCE:  It'll be after.
5  It'll be a few documents after.
6      MR. NARDELLA:  Okay. All right.
7      MR. JOYCE:  After all that: The
8  business plan, management plan, all that
9  stuff.
12:11 10      MR. NARDELLA:  I haven't found
11  it yet but you can go ahead.
12  BY MR. JOYCE:
13      Q.   Okay. Mr. Mason, can you
14  describe the document that's been handed to
15  you marked Exhibit 6?
16      A.   It -- it's a memo from Roger to
17  Gary and Terry regarding the termination of
18  partnership with EB-5.
19      Q.   Have you ever seen this e-mail
12:12 20  or the document that's attached to this
21  e-mail before?
22      A.   No. Not that I recall.
23      Q.   In this -- in this memo from
24  Mr. David he mentions that there's a delay
25  that was caused by limited partner funds not

---

116

1  being released from escrow. Had you heard of
2  that being a cause of delay for GSC?
3      A.   No.
4      Q.   Have you ever heard anyone
5  mention that the delayed release of funds
6  from escrow would prevent additional
7  restaurants being constructed for GSC?
8      A.   No.
9      Q.   Were there any plans at this
12:13 10  time period in July of 2015 to construct
11  additional Gold Star restaurants?
12      A.   No. We -- to be honest with
13  you, as I started in November of '14, never
14  really dealt with Gold Star beyond -- after
15  that. I mean, a couple meetings and then
16  that was pretty much it.
17      Q.   Any -- were you involved with
18  the restaurant operations for the Gold Star
19  restaurants?
12:13 20      A.   No.
21      Q.   That was all Gold Star's
22  responsibility --
23      A.   Yes.
24      Q.   -- I believe you mentioned. And
25  now to go back an entity that I don't think

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 117 to 120)

30

### 117

1  we've talked about yet but have you ever
2  heard of KRC Funds or KRC Fund 1 before?
3      A.  No.
4      Q.  Have you ever heard Terry or
5  Jacquelyn Chan mention KRC before?
6      A.  It -- no.  But, I mean, there
7  were a number of things mentioned before and,
8  you know, they would be on the board writing
9  a lot a lot of times.  I mean, it's possible
12:14 10  but I have no recollection whatsoever.
11     Q.  Have you heard of Short Vine?
12     A.  Oh, yeah.
13     Q.  What is Short Vine?
14     A.  Where Bogart's is.
15     Q.  And what was Terry and Jacquie's
16  involvement with Short Vine?
17     A.  From reading the papers, I mean,
18  they were -- there was an EB-5 program there
19  to develop that area.
12:14 20     Q.  What happened to the EB-5
21  program?
22     A.  I'm not totally sure.  I know
23  there was some problems with Jacquie's dad
24  and Terry and some family issues that
25  occurred, some lawsuits that went down.  I

### 118

1  know Jacquie's dad actually visited China in
2  this process but I don't know the specifics
3  of it whatsoever.
4      Q.  Did Terry Chan ever talk to you
5  about that project?
6      A.  At a very high level or -- yeah,
7  just surface level.  Because of the
8  relationship, it was -- it was a strained
9  relationship of -- between the parents and
12:15 10  Jacquie and -- and it was kind of
11  unfortunate.  You know, they never had seen
12  the new baby and everything and at that
13  level.  Not to the level of what you're
14  asking on the EB-5 thing.
15     Q.  Do you know why there was a
16  strained relationship between Jacquie and her
17  parents?
18     A.  Well, he -- according to Terry,
19  he had sued them and I don't know the result
12:15 20  of it exactly.  I mean, I remember it was
21  ugly and from hearing about it from various
22  people, you know, but I don't know from an
23  EB-5 standpoint exactly.
24         Yeah.  Terry made it sound like
25  it was mainly him.  It wasn't an EB-5 issue.

### 119

1  I don't know.  I mean, it was more of a
2  conversation not a legal thing.
3      Q.  Have you ever -- had you ever
4  heard of that Short Vine project, we'll say,
5  prior to joining Clearwater?
6      A.  Yeah.
7      Q.  When did you first hear about
8  it?
9      A.  Well, Mike Rohrkemper had known
12:16 10  about it.  Actually, we went down and ate at
11  Martino's to kind of see what was going on
12  down there and, you know, was there progress
13  being made and whatnot.  Heard about it from
14  the paper and everybody, had people talk
15  about it and whatnot.  Yeah.
16     Q.  What do you mean like heard
17  about it from the paper?  What do you mean?
18     A.  The paper wrote an article on
19  how these Chinese investors were gonna invest
12:16 20  money to upgrade that whole area, Short Vine,
21  and I knew Martino's was involved in some
22  way.
23         Mike Rohrkemper's actually the
24  one that brought it to my attention and
25  that's when we decided to go down and take a

### 120

1  look at it.  I think at that time we may have
2  already met Terry the one time.
3      Q.  And do you recall when this
4  meeting might have occurred?  Would that have
5  been in 2013?
6      A.  Probably.
7      Q.  Did Mike Rohrkemper do anything
8  else to investigate this Short Vine project?
9      A.  Not that I know of.
12:17 10     Q.  Did he talk with Terry Chan
11  about it?
12     A.  Not to my knowledge.
13     Q.  When Terry talked to you about
14  that Short Vine project, what did he say his
15  responsibilities were in connection with it?
16     A.  He didn't.
17     Q.  Did he talk about what Jacquie's
18  responsibilities were?
19     A.  No.
12:17 20     Q.  Did Gold Star when making its
21  determination related to GSC opportunities
22  look at the financials of the Short Vine
23  project to your knowledge?
24     A.  I did not.
25     Q.  Did it look to see if any

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 121 to 124)                                    31

121

1    lawsuits had been filed related to this Short
2    Vine project?
3        A.   I believe Roger had -- being a
4    board member, Roger -- I remember Roger going
5    to Mike Rohrkemper about it.
6        Q.   When did he go to Mike
7    Rohrkemper?
8        A.   I don't know.  It was just a
9    conversation they had.  I couldn't tell you a
12:18 10   date.
11       Q.   Would it have been when --
12   before GSC Opportunities was formed or after?
13       A.   I'm thinking before.
14       Q.   Okay.  Do you have any idea what
15   that conversation was about?
16       A.   No.  Other than there was a
17   lawsuit and, you know, what he had known --
18   what he knew about what was going on.
19       Q.   So going back to 2015, were you
12:18 20   ever aware of situations in which Jacquelyn
21   Chan or Terry Chan have applied for loans?
22       A.   I believe for a house.
23       Q.   Do you know of any situation
24   which they applied for a loan for the Rodizio
25   Grill in Liberty Center?

122

1        A.   I don't know.  I don't know.
2        Q.   And then they had loans for RG
3    Liberty Way?
4        A.   That's the same entity.
5        Q.   Just wanted to confirm --
6        A.   Oh.
7        Q.   -- that was the same entity.
8        A.   Oh.  Not that I know of.  It's
9    possible -- I mean, I -- none to my direct
12:19 10   knowledge.
11       (Exhibit 7 identified.)
12       MR. JOYCE:  Mason's being handed
13   what's been marked as Exhibit 7.  I'm handing
14   it to his counsel.  Mike, just so you know,
15   it's the document bates numbered BWS022147.
16       MR. NARDELLA:  Okay.  All right.
17   Go ahead.
18   BY MR. JOYCE:
19       Q.   Okay.  Mr. Mason, can you please
12:20 20   describe what's been handed to you?
21       A.   It is a -- an e-mail that --
22   from -- to them that a loan approval had been
23   made to Bancorp Bank.
24       Q.   And do you know who Connie Rolon
25   is?

123

1        A.   No.
2        Q.   Do you know who Claudio Montoya
3    is?
4        A.   No.
5        Q.   Do you know what this
6    Jacquelyn.Chan@ClearwaterHG.com is?  Whose
7    e-mail address is that?
8        A.   Jacquelyn.Chan@Clearwater --
9    yeah, that's Jacquie's.
12:21 10       Q.   And would
11   Terry.H.Chan@Gmail.com, is that Terry's?
12       A.   I believe so, yes.
13       Q.   And Mike.mason@ClearwaterHG.com
14   was that your e-mail address?
15       A.   Yeah.
16       Q.   And having looked at this
17   document, do you recall a SBA loan for RG
18   Liberty Way, LLC?
19       A.   When I looked at it, it did look
12:21 20   familiar, yes, I got to say.  I forgot all
21   about it but yeah.
22       Q.   Do you remember this loan at
23   all?  Do you remember the circumstances
24   behind it?
25       A.   I don't remember the

124

1    circumstances.  I recall them needing a
2    short-term loan to fill some gaps but I don't
3    know the circumstances behind it.
4        Q.   Do you recall why they needed
5    the short-term loan?
6        A.   No.
7        Q.   And you mentioned fill some
8    gaps.  What were those gaps?
9        A.   Well, I know they were trying to
12:22 10   move into Indian Hill.  I don't know if it
11   was -- there was a lot of trips being taken.
12   So I don't know if it was to pay for some of
13   Liberty Way, that investment hadn't come in.
14   I didn't know.
15       Q.   So you don't know if this would
16   be for personal or for business --
17       A.   I don't know.
18       Q.   -- reasons?  Did Jacquelyn Chan
19   or Terry Chan ever discuss this loan with
12:22 20   you?
21       A.   Not to any detail.
22       Q.   Did you know that this loan was
23   being applied for?
24       A.   Not that I recall.
25       Q.   Were there any discussions in

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 125 to 128)                                    32

---

125

1    September of 2015 about an equity injection?
2         A.   Not that I recall.
3         Q.   Were there any sort of financial
4    problems with RG Liberty Way in the fall of
5    2015?
6         A.   It opened November of 2015, so
7    we hadn't operated -- you say the fall. I'm
8    not sure if you're --
9         Q.   Okay. In -- in August or
12:23 10   September of 2015, were there any sort of
11   financial problems with RG Liberty Way?
12        A.   We hadn't opened yet so I can't
13   imagine any -- any financial problems if it
14   was funded. And I'm looking at the date.
15   Again, there's probably a hundred e-mails
16   that I never looked at during this last
17   period of time and if I did look at them it
18   was -- you know, I didn't think -- put any --
19   any thought to them because I was rarely at
12:23 20   the office. I was trying to get the
21   restaurant open. But anyway to answer your
22   question, no.
23        Q.   Did any contractors approach you
24   about not being paid?
25        A.   The only -- most of the

---

126

1    contractors were subs of ML Barnard and I
2    believe he was paid.
3         Q.   And did ML Barnard ever talk to
4    you about needing funds or not being paid
5    funds?
6         A.   Not to any serious degree.
7         Q.   Did any vendors talk to you
8    about not being paid?
9         A.   There were a couple that I
12:24 10   received phone calls from.
11        Q.   Do you recall which ones those
12   were?
13        A.   The guy that sells the chafer
14   dishes, I remember getting a direct call from
15   him. You talking about while I was still
16   employed?
17        Q.   That's correct.
18        A.   That's about all I remember.
19        Q.   When you got the phone call from
12:24 20   that individual, what did you do -- what did
21   you do next?
22        A.   You know, I may have already --
23   I may have not been there very long. I'm
24   pretty sure I wasn't after I thought about it
25   because I think I referred him to the person

---

127

1    that was -- Steve -- Steve Schott who had
2    taken my spot there.
3         Q.   Who was handling the --
4         MR. JOYCE: Sorry. Mike, are
5    you okay?
6         MR. NARDELLA: Yeah, I'm good.
7    BY MR. JOYCE:
8         Q.   Who was handling the payment of
9    these funds to the contractors and suppliers
12:25 10   or anything else?
11        A.   Debora Myree.
12        Q.   And who is Debora Myree?
13        A.   She was accountant, slash, HR
14   person for the corporation.
15        Q.   Was she handling those payments
16   in September of 2015?
17        A.   Yes.
18        Q.   Do you know was she receiving
19   directions from anybody?
12:25 20        A.   I'm sorry. I'm trying to think
21   of the dates. Jacquie, Terry, Gary maybe.
22        Q.   So would -- I guess do you know
23   who invoices were addressed to related to RG
24   Liberty Way?
25        A.   Probably just to Clearwater

---

128

1    Hospitality Group.
2         Q.   And Jacquie --
3         A.   They didn't come through my
4    desk.
5         Q.   Jacquelyn was the president of
6    Clearwater?
7         A.   Yes.
8         Q.   Was she back from her maternity
9    leave at this time?
12:26 10        A.   Yeah. She was back before the
11   restaurant opened.
12        Q.   When do you recall her getting
13   back?
14        A.   April, May of '15.
15        Q.   How involved was she with this
16   restaurant construction?
17        A.   Construction piece not so much.
18        Q.   Was she involved in other
19   pieces?
12:26 20        A.   Well, operationally a little bit
21   more and marketing.
22        Q.   And by operational what do you
23   mean?
24        A.   This -- she was there two, three
25   times a week just talking to the crew, doing

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 129 to 132) 33

129

```
1    different marketing ideas, arrangements,
2    tables, whatever.
3        Q.   Was Terry Chan involved with the
4    restaurant during that time period? Was
5    he --
6        A.   Yes.
7        Q.   -- part of the construction?
8    What was he doing?
9        A.   Construction not as much. He
12:27 10  would do checks on it. I mean, he would be
11   there and he would talk to the -- the
12   supervisor and the project manager from ML
13   Barnard.
14       Q.   Was he doing anything else with
15   the project?
16       A.   Like, I mean, walking around
17   looking at things, asking questions.
18       Q.   Was he talking to suppliers?
19       A.   I don't recall any. I did most
12:27 20  of that.
21       Q.   And you mentioned that he was
22   talking with ML Barnard.
23       A.   Barnard.
24       Q.   Is it Barnard or Bernard?
25       A.   Barnard.
```

130

```
1        Q.   Okay.
2        A.   Accent's on the second syllable.
3        Q.   Okay. And so he was the -- he
4    was the general contractor for that project?
5        A.   Yes.
6        Q.   Was he the general contractor
7    for any other projects?
8        A.   That -- that we did with them?
9        Q.   Correct.
12:27 10  A.   Might have been Palomar.
11       Q.   Okay.
12       A.   I think he was Palomar.
13       Q.   And what about UK?
14       A.   That was -- no.
15       Q.   Was he involved with the Carmel,
16   Indiana?
17       A.   He bid it but didn't --
18       Q.   And then was he involved with
19   the one in Cleveland I believe?
12:28 20  A.   No.
21       Q.   Just the Liberty Way concept?
22       A.   Yes.
23       Q.   Was he involved in any Boardwalk
24   Fries restaurants?
25       A.   No.
```

131

```
1        Q.   Did he bid any Boardwalk Fries
2    restaurants?
3        A.   I don't believe so.
4        Q.   Did he construct any
5    Boardwalk --
6        A.   No.
7        Q.   -- Fries restaurants? Do you
8    have any knowledge on how bills were being
9    paid for the Liberty Way restaurant
12:28 10  construction?
11       A.   No. Just where the money was
12   coming from?
13       Q.   Correct.
14       A.   No.
15       Q.   Did you know if it was limited
16   partner money or --
17       A.   No.
18       Q.   -- Clearwater funds? Had anyone
19   told you that RG Opportunities investors'
12:29 20  money had been released from escrow?
21       A.   I believe so.
22       Q.   Do you know when they were
23   released from escrow?
24       A.   It appeared like it happened
25   periodically but I don't have dates.
```

132

```
1        Q.   Do you know when first somebody
2    told you about their money being released
3    from escrow?
4        A.   No.
5        Q.   Would -- would anyone have
6    mentioned that funds were released from
7    escrow in October of 2015?
8        A.   I don't know.
9        (Exhibit 8 identified.)
12:29 10      MR. JOYCE: We're marking
11   another exhibit, Exhibit 8, and it has no
12   bates number. It's the General Electric
13   Credit Union document.
14       MR. NARDELLA: Like an invoice
15   or something?
16       MR. JOYCE: Yeah. Or a printout
17   of an account.
18       MR. NARDELL: Got it. Yeah.
19       MR. JOYCE: And there are two
12:30 20  checks on the back of it.
21       MR. NARDELLA: Got it. Thank
22   you.
23   BY MR. JOYCE:
24       Q.   So, Mr. Mason, you've just been
25   handed Exhibit 8. Can you describe that
```

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 133 to 136) 34

---

133

1  document for me? I guess the first page of
2  that document for me.
3      A.   I'm not sure.
4      Q.   Have you ever heard of General
5  Electric Credit Union before?
6      A.   Yes.  But not through this
7  entity.
8      Q.   Just generally through marketing
9  or --
12:31 10     A.   Yeah.
11     Q.   -- being around the city?
12     A.   GE Credit Union.
13     Q.   Did you know that Boardwalk
14  Fries Opportunities had an account --
15     A.   No.
16     Q.   -- in General Electric Credit
17  Union? Did you know that Gary Chan had an
18  account with General Electric Credit Union?
19     A.   No.
12:31 20     Q.   Had anyone talked to you about
21  opening an account at General Electric Credit
22  Union?
23     A.   No.
24     Q.   And just to go through you'll
25  notice that there's a member number listed on

---

134

1  the -- it's the second bubble on the top
2  right corner.
3      A.   Uh-huh.
4      Q.   Can you read that member number
5  for me?
6      A.   0003690910.
7      Q.   Okay.  And this statement
8  appears to be from October 7th of 2015 to
9  December 31st of 2015.  Does that sound about
12:31 10  correct?
11     A.   Yeah.
12     Q.   Okay.  And this statement
13  appears -- it has a number of deposits listed
14  and this is on the statement itself.  Does
15  that look correct?
16     A.   Yeah.
17     Q.   Looks like one, two, three,
18  four, five, seven deposits.  Those are the
19  450,000.
12:32 20     A.   Uh-huh.
21     Q.   And was that a yes?
22     A.   Oh, I'm sorry.  Yes.
23     Q.   Okay.  And then it looks like
24  there are two withdrawals following that.
25  It's a 900,000 and a transfer of 1.5 million?

---

135

1      A.   Yes.
2      Q.   So you had no knowledge of this
3  bank account, correct?
4      A.   Uh-huh.
5      Q.   And if we flip to the other --
6  the second document here, it's a copy of a
7  check and it says Boardwalk Fires
8  Opportunities, LP on the top left of that
9  check.  Does that look right?
12:33 10     A.   Yes.
11     Q.   Okay.  Jardin Hill, LLC.  Do you
12  know what entity that is?
13     A.   Part of Jardin Hill but I don't
14  know what it's made up of or anything.
15     Q.   Do you know why it would be
16  getting a check from Boardwalk Fries?
17     A.   I don't know.
18     Q.   Do you know why it would be
19  getting a check for management fees from
12:33 20  Boardwalk Fries?
21     A.   No.
22     Q.   And there's a signature on the
23  second -- on sort of the reverse side of this
24  check copy.
25     A.   Uh-huh.

---

136

1      Q.   Do you see that signature?
2      A.   Uh-huh.
3      Q.   Whose signature is that?
4      A.   I don't know.
5      Q.   Okay.  Then if we go to the next
6  one, it appears to be another check marked
7  from Boardwalk Fries, does it not?
8      A.   Yes.
9      Q.   Do you see who -- who is this
12:33 10  check addressed to?
11     A.   ML Barnard.
12     Q.   And how much is the amount of
13  that check?
14     A.   500,000.
15     Q.   All right.  And what's that --
16  what does it appear like the check is for
17  based on the --
18     A.   Deposit for construction.
19     Q.   Do you know of any reason why
12:34 20  Boardwalk Fries would be paying ML Barnard
21  $500,000?
22     A.   No.
23     Q.   Was ML Barnard doing any work
24  for Boardwalk Fries Opportunities in October
25  2015 to your knowledge?

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 137 to 140)                                    35

137

1      A.   No. I wasn't with them at that
2   time. Oh, no. No. I'm sorry. No. Not
3   for -- no.
4      Q.   And you mentioned Terry Chan was
5   an individual who spoke with ML Barnard
6   frequently.
7      A.   Uh-huh.
8      Q.   Was he the one who spoke to them
9   the most?
12:34 10      A.   Gary and Terry.
11      Q.   In your role at Clearwater, one
12   of the things under your umbrella was
13   construction --
14      A.   Uh-huh.
15      Q.   -- of these restaurants. Would
16   you have expected to know whether ML Barnard
17   was being paid for Boardwalk Fries work?
18      A.   Yeah.
19      Q.   Would you have expected to know
12:35 20   that half a million dollars was going to ML
21   Barnard for Boardwalk Fries work?
22      A.   For building a Boardwalk?
23      Q.   Correct.
24      A.   Yes.
25      Q.   Can you think of any reason why

138

1   a check would be written for $500,000 from
2   Boardwalk Fries at that time period?
3      MR. NARDELLA:   Object to form.
4      A.   I can guess but I don't want to
5   say.
6      Q.   If you had to guess, what would
7   you say?
8      MR. NARDELLA:   Object to form.
9      A.   I -- I'd rather not guess. I
12:35 10   mean, just because I -- you know.
11      Q.   Do you think these funds were
12   used to pay fees used for Rodizio Grill
13   construction?
14      MR. NARDELLA:   Object to form.
15      A.   Do I think that?
16      Q.   Do you think that? Yes.
17      THE WITNESS:   Can I have a
18   minute of your time? Just because I -- I
19   don't want to --
12:35 20      MR. COPETAS:   You know -- yeah.
21   Sure.
22      MR. JOYCE:   We're gonna take a
23   quick break off the record.
24   (Off the record discussion.)
25   BY MR. JOYCE:

139

1      Q.   All right. So we last talked
2   about that -- that check and you mentioned
3   that you might have -- it might have gone to
4   the Rodizio Grill restaurant; is that right?
5      A.   You asked me to guess.
6      Q.   If you had to -- if you had to
7   guess.
8      A.   Yes.
9      Q.   But you don't know where this
12:45 10   check went?
11      A.   It went to ML Barnard.
12      Q.   You don't know what it was being
13   paid for or why it was being spent?
14      A.   I mean, I have a good reason to,
15   yes, think --
16      Q.   And what -- and what's that
17   reason based off of?
18      A.   Not too long ago -- Albert
19   Fedders was with ML Barnard at the time.
12:46 20   Friend of mine. We were having lunch and ML
21   Barnard had gotten an e-mail about a
22   Boardwalk check written to them and Albert
23   said Terry gave it to me and said it didn't
24   matter because it was all the same company
25   and we were owed that much money and -- and

140

1   we cashed it.
2      Q.   Did he tell you when Terry gave
3   him that check?
4      A.   I didn't ask him. We were just
5   at a Mexican restaurant and I -- I just said,
6   well, I don't want to know anything else.
7   No. I just -- you know, that's between you
8   and Mike Barnard and you got to figure out
9   that but it -- but it was Rodizio according
12:46 10   to Albert.
11      Q.   And as we'll sort of explore
12   further and talk about in further detail,
13   there were cash management concerns that you
14   had with Terry and Jacquie Chan, right?
15      A.   Uh-huh.
16      Q.   And that -- just can you please
17   state a yes or no?
18      A.   Yes.
19      Q.   Okay. Thank you.
12:47 20   (Exhibit 9 identified.)
21      MR. JOYCE:   All right. We're
22   marking the next exhibit, Exhibit 9. Mike,
23   this is BWS016287. It's an ML Barnard
24   Document.
25      MR. NARDELL:   Got it. Thank

Michael Mason, 8/23/2019

(Pages 141 to 144) 36

141

1    you.
2    BY MR. JOYCE:
3         Q.   And this is -- Mr. Mason, can
4    you describe what the document is before you,
5    the first page of the document?
6         A.   The first page is a document
7    from ML Barnard to me regarding design build
8    fees.
9         Q.   And then what -- what design
12:48 10  build fees is this regarding?  Is it for a
11   specific restaurant?
12        A.   Rodizio Grill at Liberty.
13        Q.   Okay.  How much is this invoice
14   for?
15        A.   141,201.70.
16        Q.   Okay.  And what is the date of
17   this invoice?
18        A.   10/28/15.
19        Q.   Do you recall receiving this
12:48 20  invoice?
21        A.   Probably.
22        Q.   Would this invoice have been
23   reasonable and consistent with the services
24   that ML Barnard was providing at that time?
25        A.   Sure.

142

1         Q.   And that was related to the
2    Rodizio Grill?
3         A.   Absolutely.
4         Q.   And then on the next page can
5    you describe what that document is?
6         A.   It's a temporary CO, Certificate
7    of Occupancy.
8         Q.   Now, you know more about this
9    than I do.  What -- what type of document is
12:48 10  this?  Is this --
11        A.   You have to have a temporary CO
12   to get open.
13        Q.   Okay.
14        A.   It's -- you got to have more
15   than 90 percent approval by the commission or
16   whatever, building department.
17        Q.   And then you mentioned the
18   applicant is Albert Feeder?
19        A.   Fedders.  Spelled wrong.
12:49 20        Q.   Okay.  And that should be Albert
21   Fedders though?
22        A.   Uh-huh.
23        Q.   And he was the individual that
24   you mentioned that you talked to?
25        A.   (Witness nods.)

143

1              THE REPORTER:  I'm sorry.  He
2    just nodded.
3         A.   Yes.
4         Q.   Do you know when this
5    Certificate of Occupation was issued?
6         A.   About -- it doesn't have a date,
7    right?  Because my -- oh, 11/20.  I was gonna
8    say it was about two days after Thanksgiving
9    of the year because we opened three days
12:49 10  later than Liberty wanted us to get open.
11        Q.   And just to -- just to clarify,
12   there are actually -- there are two dates on
13   this certificate.  The very bottom date,
14   bottom left corner, it says today's date.  Do
15   you see?
16        A.   Oh, okay.
17        Q.   Do you see what --
18        A.   10/20?  Yeah.
19        Q.   Okay.  Then there's one that
12:50 20  says the Certificate of Occupancy expires as
21   of November 20th of 2015.
22        A.   Okay.
23        Q.   Okay.  I just wanted to -- to
24   clarify.
25        A.   Yeah.  I'm sorry.  Yeah.

144

1         Q.   And then you mentioned the
2    Liberty restaurant, that didn't open until
3    after Thanksgiving?
4         A.   Two days I believe.
5         Q.   Oh, okay.
6         A.   I'm not sure what date.  It's
7    the third Thursday but -- isn't it?  Fourth
8    Thursday?
9         Q.   I actually -- I honestly don't
12:50 10  know.
11        A.   Third Thursday of every
12   November, right?  Fourth Thursday?
13        Q.   So was there any -- does the
14   date of November 2nd stand out to you?
15   November 2nd, 2015.
16        A.   No.
17        Q.   Is there -- do you recall that
18   rent might start being charged for Liberty on
19   November 2nd?
12:51 20        A.   Could have been.
21        Q.   And by could have been, what
22   makes you think that it might have been?
23        A.   There was a number of
24   discussions about rent with all the tenants
25   in that area and the need to get the store

Michael Mason, 8/23/2019

(Pages 145 to 148) 37

145

1  open and get everybody's stores open so we
2  could generate revenue to pay rent. I mean,
3  so that makes sense. I mean, I don't recall
4  anyone telling me rent starts November 2nd.
5  Q.  And was that a general
6  conversation with who?
7  A.  I -- I don't -- Terry and Gary
8  maybe.
9  Q.  Was it with the overall owner --
10  A.  Other -- other tenants there.
11  They were -- they didn't use that date but
12  they were anxious to get open in order to be
13  able -- because rent was starting and
14  depended on their contracts too but...
15  Q.  And does the name of Steiner --
16  A.  They owned it, Liberty Center.
17  Q.  And what -- what's Steiner's
18  name, the -- I guess the full legal name?
19  A.  I don't -- he opens malls
20  everywhere but I don't know.
21  Q.  But Steiner is sort of what
22  you --
23  A.  Steiner Corporation, yeah.
24  Q.  Okay. Do you know would Steiner
25  have sent an invoice in -- in October of 2015

146

1  to --
2  A.  All the invoices went directly
3  to Deb.
4  Q.  Okay. And then Deb would
5  process them?
6  A.  (Witness nods.)
7  THE REPORTER:  You just nodded
8  again.
9  THE WITNESS:  Yes. You got to
10  quit nodding and I won't.
11  MR. JOYCE:  Just encourages it.
12  So I'm gonna hand you -- this is Exhibit 10?
13  THE REPORTER:  Ten.
14  (Exhibit 10 identified.)
15  MR. JOYCE:  This next one, Mike,
16  just being handed to him -- and let me know
17  if you can't hear me well. I'm getting some
18  feedback from you on the phone.
19  MR. NARDELL:  Okay. Sorry. My
20  earpiece died so I switched to speaker.
21  MR. JOYCE:  Okay. The next
22  document we're going to doesn't have a bates
23  number and the first page is General Electric
24  Credit Union outgoing wire transfer request.
25  MR. NARDELLA:  Got it. Thank

147

1  you.
2  MR. JOYCE:  Okay.
3  BY MR. JOYCE:
4  Q.  Mr. Mason, you've just been
5  handed what's been marked as Exhibit 10.
6  Have you ever seen the first page of this
7  exhibit before?
8  A.  No.
9  Q.  Can you describe what it is to
10  the best of your ability?
11  A.  Looks like a GE Credit Union
12  outgoing transfer request.
13  Q.  And what's the date of that
14  transfer request?
15  A.  11/2/15.
16  Q.  And that's -- that 11/2/15 is
17  that November 2nd, 2015 date we discussed?
18  A.  That is correct.
19  Q.  Okay. And do you see the amount
20  of this wire transfer request?
21  A.  $300,000.
22  Q.  Okay. And then do you -- do you
23  see a -- the receiving financial institution?
24  It's the third --
25  A.  Jardin Hill? Is that -- the

148

1  beneficiary?
2  Q.  I'm sorry. The third line.
3  A.  Oh. First Financial Bank.
4  Perfect.
5  Q.  And then the beneficiary name?
6  A.  Jardin Hill, LLC.
7  Q.  Okay. And then going down to
8  the member information where it says by the
9  order of, do you see anyone's name printed on
10  that by the order or by order of line?
11  A.  Terry Chan.
12  Q.  Okay. And then there's a member
13  account to be charged that's above that by
14  order of line. Can you read that number for
15  me, please?
16  A.  3690910-130.
17  Q.  And I know this might be causing
18  you to flip back a little bit but if you flip
19  back to that GE Credit Union front page,
20  which was Exhibit 8, the first page, can you
21  compare the member number that's on the top
22  right second bubble from the top and the
23  member number on the Exhibit 10?
24  A.  Yes.
25  Q.  Do those numbers align or is

12:51 (line 10)
12:52 (line 20)
12:52 (line 10)
12:52 (line 20)
12:53 (line 10)
12:53 (line 20)
12:54 (line 10)
12:54 (line 20)

Michael Mason, 8/23/2019

(Pages 149 to 152)

38

149

1  there any difference with those numbers?
2      A.  Technically there's three extra
3  zeros on one and then on the other there's a
4  dash 130.
5      Q.  Okay.  But they both include
6  this 3690910?
7      A.  Correct.
8      Q.  Now, going back to Exhibit 10,
9  that's a $300,000 transfer on November 2nd.
12:55 10  Now if you could flip to the second page, can
11  you -- is this another -- another transfer in
12  November?
13      A.  Appears to be.
14      Q.  What's the date of this
15  transfer?
16      A.  11/2/15.
17      Q.  And what's the amount of this
18  transfer?
19      A.  $150,000.
12:55 20      Q.  And then there's an additional
21  information line here.  Can you read what
22  that additional information is for?
23      A.  Travel, research, concept
24  development.
25      Q.  And then the beneficiary name of

150

1  this transfer again is Jardin Hill, LLC?
2      A.  Correct.
3      Q.  Do you have any idea why Jardin
4  Hill, LLC might be getting Boardwalk Fries
5  investor money?
6      A.  No.
7      Q.  And then if we go back down to
8  the by order of, can you please read the name
9  of -- the printed name on that line?
12:56 10      A.  Terry Chan.
11      Q.  If we flip to the next one, I'm
12  gonna just -- sort of zip through this so we
13  speed through it.  This appears to be a
14  11/2/15 transfer request in the amount of
15  $250,000 dollars, correct?
16      A.  Yes.
17      Q.  That's a Jardin Hill, LLC?
18      A.  Yes.
19      Q.  The additional information is
12:56 20  for management fee?
21      A.  Yes.
22      Q.  And then if we flip to the next
23  one, we have 11/2/15 again for the amount of
24  $300,000; is that correct?
25      A.  Yes.

151

1      Q.  Beneficiary name is Jardin Hill,
2  LLC?
3      A.  Yes.
4      Q.  And then the additional
5  information is lease deposit, correct?
6      A.  Yes.
7      Q.  And to the next one, last page,
8  that again is another transfer of 11 -- on
9  11/2/15, correct?
12:57 10      A.  Yes.
11      Q.  Of $300,000?
12      A.  Yes.
13      Q.  There is nothing listed on
14  additional information tab?
15      A.  Correct.
16      Q.  And then if we go to the by
17  order of, is there a printed name in that
18  signature line?
19      A.  Terry Chan.
12:57 20      Q.  Do you have any reason to know
21  about why these fund transfers occurred on
22  November 2nd, 2015?
23      A.  No.
24      Q.  Do you know why Terry Chan was
25  involved with transferring over a million

152

1  dollars out of a bank account on
2  November 2nd, 2015?
3      A.  No.
4      Q.  Would these transfers have been
5  related to the construction of any Boardwalk
6  restaurants?
7      A.  No.
8      Q.  Were the Rodizio Grill
9  restaurants or specifically the one in
12:58 10  Liberty Township the only restaurant being
11  constructed under Clearwater at that time?
12      A.  Yes.
13      Q.  And going back to the loan that
14  we had discussed earlier, does the name of
15  Bancorp, B-A-N-C-O-R-P, ring a bell to you at
16  all?
17      A.  I mean, I've heard of it.
18      Q.  Did you -- did anyone notify you
19  that in December of 2015 Bancorp had approved
12:58 20  a loan to RG Liberty Way?
21      A.  Not that I recall.
22      Q.  To your knowledge, did Bancorp
23  approve a loan to RG Liberty Way?
24      A.  No idea.
25      Q.  Returning back and moving to

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 153 to 156)

39

153

1  January of 2016, would there have been any
2  reason for you to believe that Boardwalk
3  Fries investor money -- funds, excuse me,
4  should have been transferred in January of
5  2016?
6      A.  Not that I know of.  I could
7  make it a little easier.  I didn't know there
8  was Boardwalk funds in escrow.
9      Q.  Okay.  What had you been told
12:59 10  about the Boardwalk Fries investors?
11      A.  I -- I don't recall anything
12  being mentioned about that.  I mean, it's
13  possible that it had been mentioned but we
14  never discussed Boardwalk funds, investment
15  funds, escrow account, anything with
16  Boardwalk Fries.
17      Q.  And nobody told you that the
18  Boardwalk Fries investors had signed a
19  limited partnership agreement?
01:00 20      A.  Not that I can recall.
21      Q.  And what sort of conversations
22  had occurred at or before January 2016 that
23  you were involved with related to Boardwalk?
24      A.  I looked at a number of spots.
25  I mean, just because I don't recall it

154

1  doesn't mean it didn't happen, but I looked
2  at a number of spots in Bradenton, Tampa,
3  Orlando.  Like I said, I went out to San
4  Jose.  That was only for training for
5  Boardwalk, I mean.
6      So that was my involvement:
7  Looking for spots, talking to people, looking
8  at places to build Boardwalk Fries, getting
9  to know the group.  I took a group of them
01:00 10  around Cincinnati, went to Kenwood, looked at
11  Blue Ash, looked at Montgomery Road and that
12  was November 19th of that year.
13      Q.  Of 2015?
14      A.  Yeah.
15      Q.  Okay.  Did you have
16  conversations with Dave DiFerdinando?
17      A.  Yes.  That's Fran's last name.
18      Q.  Okay.  So Fran DiFerdinando is
19  the other one?
01:01 20      A.  Yeah.
21      Q.  Okay.  Do you recall any of
22  the -- any of the conversations you had with
23  them in 2015?
24      A.  Yes.  They're Baltimore fans.  I
25  know that.  Big time.  We just walked -- we

155

1  did a lot of sightseeing and whatnot.  He
2  wanted to know about me and, you know, what
3  my background was and, you know, he -- we got
4  along good and his son as well was part of
5  this group.  Fran, Dave, and Dave's son were
6  part of the group that kind of did the -- the
7  only people that I saw, you know, that we did
8  any of that stuff with.
9      Q.  And did they travel to
01:01 10  Cincinnati to meet you?
11      A.  They did.
12      Q.  How long were they in Cincinnati
13  for?
14      A.  Two days maybe.  Three.
15      Q.  Did they return to Cincinnati
16  or --
17      A.  I believe once, yes.
18      Q.  So potentially two trips?
19      A.  Probably, yes.
01:02 20      Q.  Do you know when that second
21  trip might have been?
22      A.  The second trip was
23  November 19th.
24      Q.  Do you know the first trip?
25      A.  I remember them being here but I

156

1  don't remember the trip itself.
2      Q.  Did any of those individuals
3  meet with Terry Chan during that second trip?
4      A.  Oh, sure.
5      Q.  Jacquie Chan during that second
6  trip?
7      A.  I didn't visually see them but I
8  know they were with Terry.
9      Q.  Okay.  How did you know they
01:02 10  were with Terry?
11      A.  I saw them because, for one, we
12  went out to some sights together and Jacquie
13  was there as well on that first trip but the
14  second trip I took them pretty much myself.
15      Q.  How involved were you with
16  discussions with -- with the Boardwalk
17  individuals you met with?
18      A.  Just about operations:
19  Building, getting -- you know, how are they
01:02 20  doing, what kind of, you know, sales it is.
21  I had visited one in Hoboken, New Jersey,
22  talked to them a little bit about that and
23  just -- it was all operations.  Nothing
24  financial.  Didn't talk finances at all.
25      Q.  They talk any EB-5 with you?

Michael Mason, 8/23/2019

(Pages 157 to 160)                              40

---

157

1    A.   No.  Not that I recall.
2    Q.   Did you know that they were
3  interested in the EB-5 concept?
4    A.   Well, that's the whole -- yeah.
5  I knew that's why they were here to do this.
6  Yes.
7    Q.   And who was -- was there an
8  individual with Clearwater who took point or
9  took the lead with the EB-5 concept for them?
01:03 10    A.   Terry Chan.
11    Q.   Terry Chan.  Did Terry Chan have
12  conversations with David DiFerdinando and
13  maybe the others related to the EB-5 concept
14  for Boardwalk?
15    A.   I'm sure -- not in front of me
16  but yeah.
17    Q.   Did you have any conversations
18  with Mr. -- and David DiFerdinando after he
19  visited Cincinnati that second time?
01:03 20    A.   On the phone possibly.  E-mails
21  possibly.  I don't --
22    Q.   Were they ever interested in
23  building restaurants?
24    A.   They were, yeah.
25    Q.   Do you know when that interest

---

158

1  started?
2    A.   Well, when they were here and,
3  you know, when we were talking about it but
4  it kind of got put on the back burner and,
5  you know, they never called and said, hey --
6  actually, they didn't call me at all but I
7  know they were pushing Terry to do that.  I
8  remember they put some pressure on Terry to
9  do that.
01:04 10    Q.   And do you know roughly when
11  they were putting the pressure on Terry?
12    A.   Had to be after our visits so --
13    Q.   2015 or 2016?
14    A.   '15.  Pretty sure.
15    Q.   Would it have been around the
16  time the Liberty Way restaurant was being
17  constructed or after?
18    A.   After.
19    Q.   Okay.
01:04 20    A.   He did come up one time and saw
21  that as well, so that would have been a third
22  visit.
23    Q.   Okay.  And was that Dave
24  DiFerdinando?
25    A.   Yeah.

---

159

1    Q.   And he saw the Rodizio Grill
2  restaurant?
3    A.   Yes.
4    Q.   Did he talk with you during that
5  visit?
6    A.   Sure we talked but nothing in
7  detail.  I was busy.
8    Q.   Restaurant just opened, right?
9    A.   Yeah.
01:05 10    Q.   Was he there with Terry and
11  Jacquelyn Chan?
12    A.   Terry.
13    Q.   And Jacquelyn Chan?
14    A.   Jacquelyn I believe was there.
15    Q.   Okay.  Did you see Terry Chan
16  talking to him?
17    A.   Yes.
18    Q.   Did you see Jacquelyn Chan
19  talking to him?
01:05 20    A.   Yes.
21    Q.   Do you know what they talked
22  about?
23    A.   No.  I -- I know they did leave
24  and go look at a site while they were there.
25    Q.   Do you know where that site was

---

160

1  located?
2    A.   It was across the street where
3  the Cabela's is.
4    Q.   Where the Cabela's now is?
5    A.   It was there.  They were
6  building onto it and there was some options
7  on that.
8    Q.   Okay.  Do you know Kerry Sales
9  and Service, Inc?
01:05 10    A.   Doesn't ring a bell.
11    Q.   Okay.  Who was your restaurant
12  supplier for Rodizio in Liberty Way?
13    A.   Alack Restaurant Supply or
14  otherwise own as Redi, R-E-D-I.
15    Q.   Okay.
16    A.   But Alack had bought Redi.  At
17  one point in time they were still going by
18  both names so.  They're down there on
19  Reading.
01:06 20    Q.   Do you know an Architects Plus?
21    A.   Yes.
22    Q.   Who are they?
23    A.   They're an architectural group
24  in Blue Ash.  I mean, Matt Erdman is the
25  principle along with some other lady.

---

Michael Mason, 8/23/2019

(Pages 161 to 164)

41

161

1      Q.   And they're based in Blue Ash,
2   Ohio?
3      A.   They were when I knew them.
4      Q.   Are they -- is that any
5   different now?
6      A.   I have no idea.
7      Q.   Did they provide services in
8   connection with the Rodizio Grill in Liberty?
9      A.   They did.
01:06 10      Q.   Do you know did they provide any
11   services related to Boardwalk Fries to your
12   knowledge?
13      A.   Yes.
14      Q.   Would that have been
15   architectural design?
16      A.   Yes.
17      Q.   So were you ever informed at --
18   I think you might have touched on this so
19   excuse me.  Were you ever informed that there
01:07 20   were escrow accounts containing Boardwalk
21   Fries investor money?
22      A.   I don't recall a conversation
23   like that.  That's not to say it didn't
24   happen but I don't recall the conversation.
25      Q.   So returning back to Gold Star a

162

1   bit.  I believe it was in October of 2015
2   when Gold Star had decided that they didn't
3   really want to move forward with GSC.  Is
4   that your understanding?
5      A.   That's what the paper said.
6      Q.   Okay.  Do you know did the --
7   did GSC terminate at that time period?
8      A.   When you say terminate --
9      Q.   Did Gold Star withdraw from GSC
01:08 10   in October of 2015?
11      A.   That's what the paper said.  I
12   wasn't aware of it at the time.  I mean, I
13   knew Roger had kind of expressed some of
14   these feelings in the meeting that we had had
15   but I found out about it, yeah, through
16   Terry.
17      Q.   And was that you found out
18   through Terry in October of 2015?
19      A.   Uh-huh.  I guess it was -- I
01:08 20   don't know exactly when he told me.  I don't
21   know the date but, I mean, I remember him
22   saying that, yes.
23      Q.   Would it surprise you that in
24   April of 2016 Gold Star still had not removed
25   themselves from GSC?

163

1      A.   When you say they had -- Gold
2   Star from GSC, in what capacity had they not
3   removed themselves?
4      Q.   That Gold Star was still
5   involved with the general partner and with
6   GSC.
7      A.   I -- I really couldn't -- I have
8   no clue what you mean by that or even
9   anything about it.
01:09 10      Q.   So were you aware in April of
11   2016 that Tom Martin sent a letter to Gold
12   Star limited partners or investors regarding
13   Gold Star's withdrawal from GSC?
14      A.   No.
15      (Exhibit 11 identified.)
16      MR. JOYCE:  All right.  We're
17   moving to Lindhorst LIND272 document.
18      MR. NARDELLA:  Can you say that
19   bates number again?
01:10 20      MR. JOYCE:  LIND272.  It's going
21   to be after the -- the other Boardwalk
22   checks.
23      MR. NARDELL:  LIND373 or 272?
24      MR. JOYCE:  272.  It's a letter
25   from -- on Lindhorst and Dreidame --

164

1      MR. NARDELL:  Gotcha.  Found it.
2   Thank you.
3      MR. JOYCE:  Okay.
4   BY MR. JOYCE:
5      Q.   Mr. Mason, can you describe what
6   this document appears to be?
7      A.   They want an update from Gold
8   Star.
9      Q.   I guess to more boil down, is
01:10 10   this a letter dated April 13th of 2016?
11      A.   Correct.
12      Q.   And then who's this letter
13   addressed to?
14      A.   Mr. Voigtmann.
15      Q.   Do you know who Fred Voigtmann
16   is?
17      A.   No clue.  No.
18      Q.   In this -- this letter mentioned
19   that -- to sort of go to the third paragraph.
01:11 20   Do you mind reading the first three sentences
21   of that paragraph, please?
22      A.   Gold Star Chili, Inc. was to
23   provide the partnership with locations for
24   development of Gold Star Chili franchises and
25   capital for development.  It decided,

Michael Mason, 8/23/2019

(Pages 165 to 168)                                    42

---

165

1    subsequent to the receipt of your client's
2    subscriptions, that it would not provide any
3    sites for development or follow up on any
4    commitment it made in the partnership
5    agreement. The decision to withdraw from the
6    partnership has left the general partner,
7    with Mason Hill, LLC, as the only active
8    member with limited choices. At this
9    point --
01:11 10    Q.  You can go ahead and stop.
11    A.  Okay.
12    Q.  So that description it mentions
13    that Gold Star did not provide any sites for
14    development or followup; is that correct?
15    A.  That's what it says, yes.
16    Q.  Do you believe that to be
17    accurate?
18    A.  I'm -- I'm not sure in what
19    context he's talking about. Any additional
01:12 20    ones beyond the ones that we -- they were
21    working on or -- I don't know.
22    Q.  Do you -- do you state the three
23    that it could just be that they -- that Gold
24    Star provided no restaurants for development?
25    MR. NARDELL: Object to form.

---

166

1    A.  Yeah.
2    Q.  And this letter sort of gives
3    the investor the option of what to do with
4    their investment but relevant here it
5    mentions a Buffalo Wings and Rings Pittsburgh
6    Opportunities, LP. Do you know what that
7    entity is?
8    A.  Not at all.
9    Q.  Do you -- do you have any
01:12 10    knowledge about a Buffalo Wings restaurants
11    or --
12    A.  I knew they were involved.
13    Roger, as I said before, was the CEO at the
14    time and brought that into the realm. I know
15    they were looking -- I mean, I know Terry,
16    Jacquie wanted something in Pittsburgh. I
17    never visited. I don't know it very well, so
18    I don't know how far down the road they got
19    with Buffalo Wings. I don't know.
01:13 20    Q.  Did Terry talk to you about
21    Buffalo Wings and Rings?
22    A.  In a cursory fashion we talked
23    about all those concepts mentioned earlier,
24    yeah.
25    Q.  And did Jacquie talk with you in

---

167

1    any respect regarding Buffalo --
2    A.  Well, every time we would visit
3    a place, such as in upstate New York we
4    visited five or six malls that would want to
5    put us in, we would bring up all concepts and
6    Buffalo Wings and Rings was one that was
7    desirable because of the clientele and how it
8    would hit and how it would sit in the mall
9    and what would happen.
01:13 10    So we've had a number of
11    discussions of that being a choice as was
12    Buffalo -- I mean as was the Boardwalk Fresh
13    Burgers and Fries, but we -- since nothing
14    ever really occurred with that, you know, to
15    me it was just -- you know, we weren't gonna
16    do it. We never built any, so was a moot
17    point.
18    So we had a number of
19    discussions on Buffalo Wings and Rings with
01:14 20    various mall development people and whatnot
21    but not the Pittsburgh one in particular, no.
22    I've never really discussed Pittsburgh with
23    anybody.
24    Q.  Okay. In April of 2016, would
25    you have thought that's a viable concept for

---

168

1    Clearwater?
2    A.  Yeah. I think it is, yeah.
3    Q.  And then the -- final page
4    is a section that lists legal proceedings and
5    it just goes --
6    MR. NARDELL: Hey, before you --
7    before you jump into -- I think I've seen
8    this document before and I think it had a
9    whole lot more attached to it like a PTM and
01:14 10    other documents?
11    MR. JOYCE: Yeah.
12    MR. NARDELL: Is it complete?
13    MR. JOYCE: Yeah, there are some
14    versions of it that have that addition. I
15    just --
16    MR. NARDELL: Okay.
17    MR. JOYCE: Yeah. Yeah. I
18    didn't attach it for space reasons.
19    MR. NARDELL: That makes sense.
01:15 20    I just want to make it clear for the record
21    that there's more to it. It's really not
22    really the final page in another -- in its
23    complete version I guess.
24    MR. JOYCE: No. I appreciate
25    that. And to clarify for the record, the

---

Michael Mason, 8/23/2019

(Pages 169 to 172)

43

169

1  page that we're discussing is LIND, L-I-N-D,
2  000274.
3  BY MR. JOYCE:
4      Q.   And just to -- just to confirm
5  some knowledge with you, is it your
6  understanding that -- that Jacquie Chan is
7  the sole owner of Clearwater Hospitality
8  Group?
9      A.   I was always told that, yes.
01:15 10    Q.   Do you know Lumen Point Capital
11  Fund?
12     A.   I've heard the name.
13     Q.   How did you hear about that
14  name?
15     A.   It would be discussed along with
16  all the other entities that were around but I
17  never had any involvement in it or knowledge
18  of what -- what it did, had, or performed or
19  whatever.
01:16 20    Q.   Have you ever heard of RG MGMT,
21  LLC?
22     A.   I would assume that would be
23  Rodizio Grill management.  No, not really.
24     Q.   No -- no like discussions about
25  it that you can recall?

170

1      A.   Not that I recall.
2      Q.   And this -- this document
3  relates or discusses -- this page discusses
4  the KRC Fund 1, LP.  Did you hear about a
5  lawsuit filed on November 15th, 2015 related
6  to KRC Fund 1?
7      A.   No.
8      Q.   Did Terry Chan ever talk to you
9  about that?
01:16 10    A.   There was one day when -- trying
11  to remember what month it was.  Rodizio was
12  open.  I was at the restaurant.  They were
13  there.  I knew something bad had happened
14  that day or something disturbing -- Jacquie
15  was disturbed.
16         They mentioned that, you know,
17  somebody had done that but Lindhorst had told
18  them there was nothing to worry about, told
19  me there's nothing to worry about, Jacquie's
01:17 20  just upset, so I didn't have time to
21  worry about it so I didn't.
22     Q.   And that was Terry that was
23  talking to you?
24     A.   (Witness nods.)
25         THE REPORTER:  I'm sorry.  He

171

1  just nodded.
2      A.   I'm sorry.  Yes.
3      Q.   Did Terry or did Jacquie ever
4  talk with you about KRC Fund?
5      A.   No.
6      Q.   Did anyone ever mention that --
7  that Terry Chan had been accused of breach of
8  contract, gross negligence, conversion and
9  fraud?
01:17 10    A.   No.  Not -- I mean, I'm not -- I
11  know there was a -- a rental situation where
12  the owner was going to sue Terry for rent or
13  something because he didn't fulfill.  I'm not
14  sure if that's what that is at all, the
15  Indian Hill house, but -- so I don't want to
16  say I've never heard of -- I just don't
17  recall.  I never got involved in any of that
18  stuff.
19     Q.   So you never heard of those
01:18 20  types of allegations related to KRC Funds?
21     A.   Not that I recall ever, no.
22  We -- never was discussed with us.
23     Q.   Okay.  Did you ever try to
24  approach that subject with them, talk to them
25  about KRC Fund?

172

1      A.   I don't even recall the word KRC
2  Fund as we speak so I wouldn't have.
3      Q.   Ever try to talk them about
4  Midwest EB-5 Regional Center?
5      A.   We talked about it in the early
6  days and how that had gone away and been
7  replaced by this, by Clearwater.  To me it
8  was a non-subject matter.  I didn't know
9  there was any issues with it.
01:18 10    Q.   Do you know an individual named
11  Richard Lickfield?
12     A.   No.  I mean, if you tell me a
13  little more about him I might.
14     Q.   Okay.
15     A.   Okay.
16     Q.   Would he -- do you know is that
17  name associated with Rodizio Grill at all?
18     A.   Not that I know of.
19     Q.   Were there any
01:19 20  discussions in the summer of 2016 about
21  trying to build additional Rodizio Grill
22  restaurants?
23     A.   The summer of 2016?
24     Q.   Uh-huh.
25     A.   I think Carmel was under

Michael Mason, 8/23/2019

(Pages 173 to 176)                                    44

173

1    discussion.  Something in Cleveland.
2         Q.   Any discussions of trying to
3    build Boardwalk Fries location?
4         A.   I mean, we were always talking
5    about it.  Yeah.  I mean, I'm sure there was
6    discussions because I -- in the summer I even
7    went out to Orlando and looked at some
8    sights.
9         Q.   Do you know Poughkeepsie,
01:19 10   Middletown, Holyoke?  Those names ring a
11   bell?
12        A.   Yeah.  Those were up in New
13   York.  That was that north -- northern New
14   York trip we took with all the mall
15   developers.
16        Q.   And do you know what -- you went
17   up to New York.  Were you looking for any
18   specific restaurant sites or was it just a
19   general --
01:20 20        A.   All the restaurants in that -- I
21   forget the name of the management group that
22   did it, but they were all in the process of
23   just totally revamping their malls, putting
24   entertainment centers in, you know, various,
25   you know, race car sites and they wanted all

174

1    new fresh ideas.
2         They had -- you know, Sears had
3    gone out, other places had gone out so, yeah,
4    we looked at every mall -- four or five of
5    them while we were up there and we talked
6    about all three concepts.
7         Not Gold Star ever but BWR --
8    Buffalo Wings and Rings, Boardwalk Fries, and
9    Rodizio.  Poughkeepsie is one of their better
01:20 10   malls.
11        Q.   In July of 2016 do you recall
12   any conversations about the nonpayment of
13   rent in the Liberty Center restaurant?
14        A.   Well, if you recall, that's when
15   we wrote a letter so yeah.
16        Q.   We'll get to that -- that letter
17   but I guess before we get too far into that,
18   what was Clearwater's, you know, financial
19   status in July of 2016?
01:21 20        A.   We weren't really privy to --
21   Deb had all -- control of all the finances
22   so, I mean, specifics I can't necessarily
23   tell you but I -- I know there were a number
24   of bills not getting paid.  The employees one
25   week did not get paid.  It just wasn't --

175

1    things weren't -- I mean, there were symptoms
2    coming -- coming up to that point but at this
3    point it was like enough's enough.
4         Q.   And by symptoms what do you mean
5    by that?
6         A.   Deb would complain about having
7    to juggle things, 401-K program not getting
8    funded on time.  They were moving to Orlando
9    which didn't -- so they just bought a brand
01:22 10   new -- just bought a brand new house -- not
11   brand new.  They had just bought a house in
12   Indian Hill, very nice house.  So it was just
13   hard to understand, you know, why the bills
14   weren't getting paid.
15        Q.   And by they, was that Terry and
16   Jacquelyn Chan buying a house in --
17        A.   Yes.
18        Q.   -- Indian Hill?  And was it them
19   wanting to move down to Florida?
01:22 20        A.   Well, they did move by July.
21        Q.   When did they start saying that
22   they wanted to move to Orlando?
23        A.   It just kind of came out the
24   woodwork somewhere.  I don't know.  Just all
25   of a sudden we found out they were moving in

176

1    a couple few weeks.
2         Q.   Did they want to move all of
3    Clearwater's operations down there?
4         A.   That was our worry, you know,
5    our suspicion, but I don't -- they never said
6    that.
7         Q.   Did they ever tell you why they
8    wanted to move down to Florida?
9         A.   No.
01:23 10        Q.   And you said they gave you only
11   a few weeks notice?
12        A.   I mean, Gary was gonna stay
13   there.  Nothing was gonna happen to the
14   office but I think the turnaround was
15   relatively short from them living in
16   Cincinnati and then living in Orlando.
17        Q.   When did you first hear any
18   complaints about bills not getting paid?
19        A.   Deb would come to me, you know,
01:23 20   occasionally.  I would get posted on certain
21   things because I would kind of handle the
22   401-K, the initial meetings with those people
23   in the Trinity Fund which was the third-party
24   representative, and I would get notices that
25   this has to be funded by July or December

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 177 to 180)                                45

177

```
 1    31st otherwise -- you know.
 2         So I -- and they were in the
 3    Bahamas at the time and I was trying to make
 4    this happen.  You know, I don't even pay the
 5    bills.  I didn't have any way to pay bills.
 6    I guess they got it cleared up but just
 7    various little things along the way just not
 8    getting done.
 9         Q.   And you mentioned -- did you
01:24 10   have any control over the bank accounts?
11         A.   Not at all.
12         Q.   And you mentioned -- did Debora?
13         A.   Deb -- Deb had -- in most -- a
14    lot of my knowledge came from her as well.
15         Q.   Was she complaining ever about
16    being told that she has to transfer funds?
17         A.   I don't recall.
18         Q.   And, you know, were those
19    conversations frequent about not being able
01:24 20   to pay bills or --
21         A.   They became more frequent, yes.
22         Q.   And about what time period did
23    they become more frequent?
24         A.   Summer of -- early summer of --
25    late spring of 2016.
```

178

```
 1    (Exhibit 12 identified.)
 2         MR. JOYCE:  So we're moving to
 3    Exhibit 12.  It's going to be bates number
 4    BWS14583.
 5         MR. NARDELLA:  Got it.  Thank
 6    you.
 7         THE WITNESS:  I remember it now.
 8    That's why it kind of hit me but not.
 9         MR. JOYCE:  Just got to figure
01:26 10   out where I put my copy.
11    BY MR. JOYCE:
12         Q.   Can you please describe what the
13    document you've just been handed is?
14         A.   When he's referring to Mike, I
15    believe he's referring to Mike Brown,
16    correct?
17         Q.   I guess what's your
18    understanding of it?
19         A.   Yes.  Because these were none of
01:26 20   my -- at first I'm looking -- I don't -- and
21    then I looked up and saw that, you know, Mike
22    Brown was on it.  And Mike Brown was their
23    attorney.  Rich was saying that there had
24    been some change in terms.
25         Q.   And going to Steve Schott, I
```

179

```
 1    believe you mentioned that name before.  Who
 2    is Steve Schott?
 3         A.   Steve initially I hired to
 4    manage the Rodizio.  He was removed and put
 5    at the office and was kind of -- he -- he
 6    went to New York with us, he went some other
 7    places with us.  He ended up taking on my
 8    responsibilities when I left.
 9         Q.   Do you know why he was removed
01:27 10   from his previous position?
11         A.   They didn't feel he was running
12    the restaurant well enough.
13         Q.   Who was that?
14         A.   Jacquie and Terry.  Jacquie
15    mainly but Terry.
16         Q.   So Jacquie removed Steve and
17    sort of put him into the home office or
18    Clearwater --
19         A.   Initially they told me to fire
01:27 20   him and then something changed and they just
21    said just bring him back to the office and
22    work him there.
23         Q.   So was Jacquie able to make
24    those types of hiring and firing decisions
25    for Clearwater?
```

180

```
 1         A.   She was the president.
 2         Q.   All things ran through her?
 3         A.   Yeah.
 4         Q.   And just to sort of clarify,
 5    that was a yes?
 6         A.   Yes.
 7    (Exhibit 13 identified.)
 8         MR. JOYCE:  Just been handed
 9    Exhibit 13 and, Mike, for your record
01:28 10   Exhibit 13 is going to be BWS14212 and it's a
11    Steiner letter and this document extends all
12    the way to 14214.
13         MR. NARDELL:  Gotcha.
14         MR. JOYCE:  Okay.
15    BY MR. JOYCE:
16         Q.   Mr. Mason, have you ever seen
17    this letter before?
18         A.   Not to my knowledge.
19         Q.   This letter mentions that, looks
01:28 20   like, RG Liberty Way, LLC, d/b/a Rodizio
21    Grill, currently owed $84,325 as of
22    July 12th, 2016.  Does that appear to be
23    correct from the document?
24         A.   Yes.
25         Q.   Based on your understanding of
```

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 181 to 184)

46

---

181

1    the financial status of RG Liberty Way at
2    that time, would that be expected or was that
3    entity not paying their rent at that time?
4        A.   Correct.
5        Q.   How --
6        A.   I didn't pay rent but Deb had
7    mentioned that so I did not have no direct
8    knowledge of it.
9        Q.   Do you know how long they hadn't
01:29  10   been paying rent?
11        A.   Well, it was about 30,000 a
12    month so you can kind of contripulate (sic)
13    three months or so.
14        Q.   And it was Deb had talked to you
15    about the payment of rent before?
16        A.   Payment of a lot of issues, yes.
17        Q.   And -- and I apologize.  Did you
18    receive a copy of this letter?
19        A.   I don't -- I don't recall ever
01:30  20   seeing it.
21        Q.   Do you recall any discussions in
22    July 2016 about past due rent?
23        A.   I knew we were past due.  I
24    mean, that was the week we left, but I
25    mean -- or the week after so, I mean, I'm

---

182

1    sure there was some discussions on it.  There
2    was a point where they quit talking to me
3    almost altogether.  You know, they were in
4    Orlando too but, I mean, just kind of quit
5    talking to me so I kind of knew, you know,
6    the inevitable was going to happen anyway.
7        Q.   And do you recall when Terry and
8    Jacquelyn stopped talking to you?
9        A.   I shouldn't say stopped talking
01:30  10   to me.  There were always upset over sales
11    and -- and everything.  They didn't quit
12    talking to me.  Just it was very difficult
13    communicate -- communicating to them the
14    summer of 2016.
15        Q.   And you mentioned they were
16    concerned about sales.  Sales of what?
17        A.   He was -- of the restaurant.  It
18    wasn't doing what it should be, what it was
19    projected to be doing.
01:31  20       Q.   And Terry was -- did Terry talk
21    to you about being concerned about restaurant
22    sales?
23        A.   Yeah.
24        Q.   Did Jacquie as well?
25        A.   Yeah.

---

183

1        Q.   How often were those
2    conversations?
3        A.   Almost daily after a while.  We
4    were trying all kind of things: Taking
5    dinners and lunches out to ball fields and
6    doing all kinds of things to try to generate
7    revenue.
8        Q.   During this time period, did you
9    ever have any discussions about them related
01:31  10   to the Gold Star Chili restaurants?
11        A.   Never -- not that I ever
12    remember, no.
13        Q.   Did you ever talk with them
14    about there being an imminent opportunity to
15    build a Gold Star restaurant --
16        A.   No.
17        Q.   -- during that time period?  Did
18    they ever talk to you about needing to
19    generate more revenue out of the Liberty Way
01:31  20   restaurant?
21        A.   Yes.
22        Q.   Do you have any understanding
23    with sort of how dire of that -- that revenue
24    need was?  Were they just upset about the
25    funds or were they sort of thinking that this

---

184

1    might be the end of their business?
2        A.   I don't know how they thought.
3        Q.   How -- you know, how urgent were
4    those conversations that you had regarding
5    sales?
6        A.   When you ask me a question like
7    that, how urgent, I mean, things were
8    happening every day to try to increase sales
9    so, I mean, that -- that's -- that's -- you
01:32  10   could be more specific what the volume of --
11    of voice was maybe.  I don't know.  But it
12    was -- it was pretty urgent.
13        Q.   Did they ever sound desperate to
14    increase their sales?
15        A.   What's desperate?  I mean --
16        Q.   In your opinion.
17        A.   If I owed this kind of money, I
18    would be desperate so I would assume they
19    were desperate.
01:32  20       Q.   Okay.  Do you know did Terry
21    Chan ever sign any personal indemnity
22    provisions related to Rodizio Grill?
23        A.   None that I know of.
24        Q.   Do you know did Jacquie?
25        A.   None that I know of.

---

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 185 to 188)                    47

185

1     Q.   Was Gary having any
2   conversations with you about Liberty Way
3   sales?
4     A.   Not too many.
5     Q.   It was mostly Terry and Jacquie?
6     A.   (Witness nods.)
7          THE REPORTER:  Is that a yes?
8     A.   Yes.  Terry and Jacquie.
9     Q.   And you mentioned that you had
01:33 10   spoken with another employee, with Deb.  Is
11   that Debora Myree?
12    A.   Yes.
13    Q.   Who is she?
14    A.   She was the -- in charge of
15   accounting and human resources.
16    Q.   In July 2016, was she expressing
17   any concerns about Clearwater and their
18   financial status?
19    A.   Yes.
01:33 20   Q.   What type of concerns was she
21   expressing?
22    A.   We don't -- I don't know how I'm
23   gonna pay any of the bills or several of
24   these bills.
25    Q.   Did she ever say that to Terry

186

1   Chan to your knowledge?
2     A.   I couldn't answer that.
3     Q.   Were you ever in the room where
4   she discussed that with Terry or Jacquelyn?
5     A.   Was never in the room.
6     Q.   Did she ever look into why
7   Liberty Way was not able to pay these
8   expenses?
9     A.   You would have to ask her.
01:34 10   Q.   Did you ever look into why RG
11   Liberty Way --
12    A.   I didn't have access to the
13   bills, the accounting, the banking or
14   anything so...
15    Q.   Did you know -- you didn't have
16   access to any of the bank accounts --
17    A.   No.
18    Q.   -- for Clearwater?
19    A.   Right.
01:34 20   Q.   Did you know that there were
21   bank accounts at First Financial Bank?
22    A.   I -- I didn't know how all the
23   banking fit together.  I mean, it's not the
24   first time I've heard the name but I didn't
25   know that they were loans or whatever you're

187

1   saying that money was coming from there to do
2   any of this.
3     Q.   Did -- when presented with this
4   letter related to RG Liberty Way, did Terry
5   and Jacquelyn Chan try to do anything to get
6   their rent debated or reduce their rent?
7     A.   I believe he had several
8   conversations with -- the gentleman's name
9   that works for Steiner -- to try to get
01:35 10   that -- make that happen.
11    Q.   Beau, B-E-A-U, Arnason.  That
12   sound familiar?
13    A.   That wasn't the one.
14    Q.   Okay.  Were you ever privy to
15   any discussions related to rent abatement for
16   RG Liberty Way?
17    A.   No.
18    Q.   But you know -- did you know
19   that RG Liberty was in default of its lease?
01:35 20   A.   I mean, I could have concluded
21   that.  I don't -- no one ever told me that.
22    Q.   And so in -- in late July of
23   2016 did you and Debora call a meeting with
24   Terry, Jacquelyn and Gary Chan to discuss --
25    A.   We wrote a letter.

188

1     Q.   Okay.  What prompted you to
2   write that letter?
3     A.   The items addressed in the
4   letter is what prompted us to write the
5   letter.
6          MR. JOYCE:  We're going to move
7   to the -- Mike, just so you know, we're gonna
8   introduce the document bates numbered
9   BWS023633.
01:36 10   (Exhibit 14 identified.)
11         MR. NARDELLA:  Got it.  Thank
12   you.
13         MR. JOYCE:  And this has -- it's
14   bates numbered 633 all the way to 635.
15   BY MR. JOYCE:
16    Q.   And so to start just with the --
17   with the e-mail that's on -- so July 25th,
18   2016, did you prepare the letter which is
19   attached as BWS023633?
01:37 20   A.   Deb prepared it.
21    Q.   How did -- how did she prepare
22   it?  Did she talk with you?
23    A.   Yes.
24    Q.   How long did she talk with you
25   before sending this letter?  Is it days or

Michael Mason, 8/23/2019

(Pages 189 to 192)                                    48

189

1    hours?
2          A.   A day.  We decided the day
3    before.
4          Q.   So July 24th you decided to
5    prepare a letter?
6          A.   I mean, could have been -- we
7    may have led up to it in prior discussion but
8    that was the day we said, yes, we will.
9          Q.   Did you have a number of
01:37 10   discussions related to the circumstances of
11   Clearwater before sending this letter?
12         A.   Yes.
13         Q.   When did those discussions
14   really start in sort of really discussing the
15   financial status of Clearwater?
16         A.   She became worried probably
17   three months prior and would come to me
18   because of my position and -- and we would
19   discuss it and, you know, we both were
01:38 20   concerned on how things were gonna go, you
21   know, what were going to happen to our jobs
22   and anything else if -- if things continued.
23         Q.   So three months and it might
24   be --
25         A.   It could have been two months.

190

1    I don't know.
2          Q.   So May -- April, May?
3          A.   May.
4          Q.   So in May of 2016.  Did you ever
5    talk with Terry Chan about concerns that Deb
6    had raised that you?
7          A.   No.
8          Q.   Did you ever talk to Jacquelyn
9    Chan?
01:38 10         A.   No.
11         Q.   Why didn't you talk with either
12   of them about it?
13         A.   Not sure.  I mean, we wanted to.
14   We wanted to make sure we had everything in
15   order before -- you know, I didn't -- like I
16   said, I didn't have the data to begin with so
17   talking to them on something I didn't have
18   hard data on, that was the purpose for this
19   was to have that discussion.
01:39 20         Q.   And so there was a need to sort
21   of assemble information to be able to have
22   this discussion?
23         A.   Yeah.
24         Q.   And was it -- since it took two
25   months, was it difficult for Deb to find this

191

1    type of information?
2          A.   I don't know.  You'd have to ask
3    Deb.
4          Q.   Was it -- and I think you
5    mentioned, were you involved with 401-Ks?
6          A.   Yes.
7          Q.   Did you notice that 401
8    contributions weren't being made on time?
9          A.   I only was told that if Trinity
01:39 10   would call me and let me know.  That happened
11   once, maybe twice.
12         Q.   Is there anyone else who
13   contacted you about funds not being paid?
14         A.   Insurance.  Insurance did once.
15         Q.   Was that around this May, June,
16   July time period?
17         A.   Probably, yeah.
18         Q.   Did Deb ever talk with you about
19   individuals who had contacted her about
01:40 20   nonpayment of funds?
21         A.   I'm sure she did.  Again, you'd
22   need to get specifics from her.
23         Q.   Were you able to look at ADP
24   direct deposit?
25         A.   No.

192

1          Q.   Was that was something Deb could
2    look at?
3          A.   Yes.
4          Q.   And so in this July 2015 letter
5    it's noted that you and Debora have a belief
6    the principals need to become transparent
7    regarding the state of the business.  Is that
8    a concern that you had --
9          A.   Yes.
01:40 10         Q.   -- at that time?  Why -- why was
11   the business not transparent at that time?
12         A.   Because we didn't know why bills
13   weren't getting paid and expenses were going
14   other places but not to what needed to do to
15   run the engine.
16         Q.   You mentioned expenses going to
17   other places.  What types of places?
18         A.   Like I said, you know, they
19   bought a house in Indian hill, bought a house
01:41 20   in Orlando -- I don't know if they sold the
21   one in Indian Hill.  I think they might
22   have -- trips to Bahamas and different things
23   like that.
24         Q.   Were they financing these
25   different --

Michael Mason, 8/23/2019

(Pages 193 to 196)                49

193

1     A.  I have no idea.
2     Q.  Okay.  You don't know how those
3  things --
4     A.  No.
5     Q.  -- were being financed?  Was
6  there any suspicion that they were taking
7  money from the companies to finance those
8  things?
9     A.  We wanted it to be transparent
01:41 10  that's why we initiated the meeting.  We
11  wanted to know what's going on and how are we
12  going to continue to operate based on all of
13  this.
14     Q.  And so you're the chief
15  operations officer and Myree is listed as the
16  director of finance on this letter, right?
17     A.  Yeah.
18     Q.  In those roles you didn't have
19  transparency related to the state of the
01:41 20  business.  Is that concerning to you?  I
21  guess more accurately, is that unusual to
22  you?
23     A.  It was the way it was set up and
24  it was -- it appeared that there were silos
25  meant to be done like that.

194

1     Q.  Meant to prevent
2  communication --
3     A.  Yeah.
4     Q.  -- from being shared?  Was the
5  silos set up by Terry and Jacquelyn?
6     A.  The organization seemed to set
7  it up that way, yes.
8     Q.  The organization as a whole or
9  certain individuals?
01:42 10     A.  Probably, you know, Terry and
11  Jacquie.
12     Q.  And they didn't want one hand
13  communicating with the other hand in some
14  situations?
15     A.  Yes.
16     Q.  Did they ever explain any reason
17  for those silos being set up?
18     A.  No.  And they might say there
19  weren't even silos but it was obvious.
01:42 20     Q.  Just wasn't a lot of cross
21  communications amongst the different
22  employees?
23     A.  There were a number of times
24  that they didn't like the fact that Deb and I
25  talked and, I mean, it was apparent.  They --

195

1  they thought we were -- we didn't like each
2  other so they weren't worried about it.
3     Q.  They thought you Deb didn't like
4  each other?
5     A.  Right.
6     Q.  Why did they think that?
7     A.  We would discuss things loudly
8  sometimes.
9     Q.  And so they -- but once it
01:43 10  appeared that you were discussing they
11  appeared to be unhappy with that?
12     A.  Appeared to be.
13     Q.  Did they ever say anything to
14  you about that?
15     A.  They mentioned as the letter
16  came out, you know, I thought you and Deb
17  hated each other.  No.  I mean, there were a
18  number of references to, well, you and Deb
19  never even talked to each other or I thought
01:43 20  you guys hate each other, how did you get
21  together on this or whatever.
22     Q.  They seemed to be surprised that
23  you had talked about this?
24     A.  Yes.
25     Q.  Did they talk with you about

196

1  anything else related to this letter?
2     A.  After this letter, conversations
3  were pretty much over except for one
4  conversation I had with Gary.
5     Q.  Did they ever try to explain --
6     A.  No.
7     Q.  -- the financial condition?
8  They ever try to get you more transparency?
9     A.  No.  The only other conversation
01:44 10  I had with Terry after my exit was he called
11  to see, because of the severance package we
12  had already agreed upon, if he could reduce
13  it because, you know, you try to -- appeared
14  to empathize that:  You know, Mike, the
15  restaurant's not doing well.  Can we reduce
16  that?  I said, look, I don't have a job.  And
17  so he just dropped it and that was the only
18  conversation I had with Terry.
19     Q.  So Terry talked to you about
01:44 20  reducing the severance?
21     A.  Yes.
22     Q.  And that was related to the
23  severance agreement?
24     A.  Yes.
25     Q.  Would you consider that to be a

Michael Mason, 8/23/2019

(Pages 197 to 200)                              50

197

1    legal agreement, the severance agreement?
2         A.  Yeah.
3         Q.  Would you consider a discussion
4    related to your severance payment to be a
5    financial discussion?
6         A.  I'm not following you.
7         Q.  If Terry told you that he wasn't
8    involved in the legal or financial aspects of
9    Clearwater or other entities, would that
01:45 10   surprise you?  Would you disagree with that
11   statement?
12        A.  Yes.
13        Q.  Why would you disagree with that
14   statement?
15        A.  Because he was.
16        Q.  How involved was he in these
17   areas?
18        A.  Totally.
19        Q.  Knew everything that was going
01:45 20   on or knew a good deal?
21        A.  I would say everything.  I mean,
22   that was -- that's what I always thought, I
23   mean, and still think today.  Yeah.
24        Q.  And so if -- if he were to again
25   say under oath that he -- he didn't know the

198

1    finances of this organization, that would
2    still surprise you?
3         A.  Would surprise me.
4              MR. NARDELLA:  Object to form.
5         Q.  Okay.  And so we go through
6    this -- the Clearwater letter and it looks
7    like you've got a number of concerns, and
8    just to highlight it -- and I guess if you
9    don't mind just kind of walking me through
10   this letter and explaining, to the best of
11   your recollection, what each of those
12   concerns were just -- obviously I don't
13   understand some of them based on me not being
14   part of the organization.
15        A.  Hourlys didn't get paid one time
16   and -- and their tips didn't.  Managers pay
17   didn't get paid.  Defaulted on the ADP direct
18   deposits for non-sufficient funds.  The risk
19   was that we would be suspended by ADP.  They
01:46 20   actually funded one week of payroll, ADP did,
21   if I remember correctly.  Deb told me this.
22   I didn't deal with ADP directly.
23             No tax deposits being made for
24   FICA or FUTA, state, local; none of that was
25   being deposited resulting in -- would --

199

1    could -- this is a risk now.  She's telling
2    the risks of all of this.
3              Cannot track employees for the
4    ACA Compliance.  We did that religiously and
5    that became more -- without ADP it became
6    impossible.  ADP Workforce Now implemented,
7    upgrade would be suspended which was part of
8    the software that we used.
9              American Funds contributions
01:47 10   weren't being made.  There was insufficient
11   funds going into that.  That was our 401-K
12   company.  The two risks there are lost
13   earnings to employees and must pay excise tax
14   to the IRS at 15 percent earnings.
15             Humana, that was the insurance I
16   told you about past bill due.  Other risks:
17   Expense reimbursements to checks due to
18   non-sufficient funds, vendor payments,
19   creditworthiness, reputation management.
01:47 20        Q.  So just expenses were being
21   returned.  Credit card.  Was the credit card
22   ever getting declined for corporate credit
23   cards?
24        A.  I don't recall that.
25        Q.  And do you know --

200

1         A.  I don't think we had corporate
2    credit cards.
3         Q.  Okay.
4         A.  No.  We just had expense
5    reports.
6         Q.  And did you see sort of the
7    day-to-day expenses or would that have been
8    Deb's area?
9         A.  Deb's.  I mean, you know, I
01:48 10   would get expenses from my guys and I would
11   try to sign -- review them, sign them, turn
12   them over to her.  There were expense
13   accounts.
14        Q.  Did Jacquelyn Chan ever submit
15   expenses to you?
16        A.  To me, no.
17        Q.  Did Terry ever submit expenses
18   to you?
19        A.  No.
01:48 20        Q.  Okay.  And so after you sent
21   this letter to them and again there was no
22   response from Terry and Jacquie, did they
23   ever try to engage you about this letter?
24             MR. NARDELLA:  Object to form.
25        A.  No.

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Michael Mason, 8/23/2019

(Pages 201 to 204)                                        51

201

1      Q.   They never tried to talk to you
2  about what this letter said?
3           MR. NARDELLA:  Object to form.
4      A.   No.
5      Q.   Did they ever try to discuss the
6  issues that were raised in this letter?
7           MR. NARDELLA:  Object to form.
8      A.   No.
9      Q.   What did they do in response to
01:48 10  this letter?
11     A.   Gary called Deb into the office
12 in the morning and I -- you know, she came
13 out and said she was gone.  And I had a lunch
14 engagement, went out to it and I got called
15 by Gary while I was out and had to miss the
16 lunch engagement, came back into the office
17 and I was let go.
18     Q.   What did Gary say during that
19 conversation?
01:49 20     A.   That I was no longer needed.
21 You know, he had -- he didn't really say it
22 was my pay but, you know, I guess you got to
23 assume that, but he didn't address the letter
24 as being the reason and he didn't really give
25 me a good reason.

202

1      Q.   He just said it was pay and --
2      A.   He didn't even say it was pay.
3  He just said, you know, we've got other
4  expenses.  I've got -- you know, I've got to
5  take care of my mother.  I've got -- Terry
6  and Jacquie's got two children and, you know,
7  their -- I've got -- we've got apartments,
8  they've got houses, you know, just I can't
9  afford you anymore pretty much.
01:50 10     Q.   Okay.  And did he mention that
11 he had talked with Terry or Jacquelyn before
12 this?
13     A.   Yes.
14     Q.   Did he say it was a consensus
15 agreement for you to be let go?
16     A.   He didn't use that word.
17     Q.   You were let go?
18     A.   Yeah.
19     Q.   And again, Jacquie was the
01:50 20  president of Clearwater?
21     A.   Yes.  Most -- the rough things
22 would come from Gary.
23     Q.   Okay.  So the rough things like
24 severance, bad news would come from Gary?
25     A.   Yeah.

203

1      Q.   What was his --
2      A.   But they were in Orlando at this
3  time too.
4      Q.   What was Gary's role in
5  Clearwater at this time period?
6      A.   I don't know what his title was.
7  He dealt mainly with the funds, you know, and
8  the Chinese part of it.  He -- I went to
9  China with him so...
01:50 10         MR. JOYCE:  Well, we've been
11 going for a little while.  If you give me
12 about five minutes, I'm gonna just review
13 what you sent me and we'll do kind of a
14 wrap-up and I'm hoping to get everyone out by
15 2:30 if that's okay with everybody.
16         MR. COPETAS:  Sounds great.
17         MR. NARDELL:  That works.
18         MR. JOYCE:  We'll just get back
19 here around 2:00 if that works for everybody
01:51 20  and we'll wrap it up.
21         MR. NARDELL:  All right.
22         (Break taken.)
23 BY MR. JOYCE:
24     Q.   Going back to that BWS23633,
25 that was -- it looks like an e-mail from Gary

204

1  Chan CCing Terry Chan to Kristen Myers.  Do
2  you -- can you read the date on that e-mail
3  in the top left?  Mr. Mason, can you please
4  read it?
5      A.   I thought you were talking to
6  him.  July 27th of '14 -- I'm sorry -- '16.
7      Q.   Had you already been terminated
8  by that date?
9      A.   Yes.
02:02 10     Q.   Okay.  And did you ever have any
11 communications with Terry and Jacquie Chan
12 after meeting with Gary on the 26th?
13     A.   That one phone conversation with
14 Terry that I -- lasted for about two minutes.
15     Q.   Did you ever sign any e-mails to
16 them?
17     A.   Beyond that, no.
18     Q.   So this July 27th e-mail was
19 sent regarding that letter that you had sent
02:03 20  regarding the state of the business.  I'm
21 gonna hand you one more, another document,
22 and this is bates numbered LIND372, and it's
23 being marked as Exhibit 15, and this exhibit
24 goes all the way to LIND000374.
25         (Exhibit 15 identified.)

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Michael Mason, 8/23/2019

(Pages 205 to 208)

52

205

```
 1        Q.   And if you flip to the second
 2   page, this -- what does that document appear
 3   to be to you and that specifically is
 4   Lindhorst 373 and 374?
 5        A.   You're address --
 6        Q.   Yeah.
 7        A.   I'm not really sure.  Just a
 8   second.  Basically informing this gentleman
 9   that the Gold Star and the Buffalo Wings and
10   Rings funds are no longer there, so there's
11   not enough money to provide the resources to
12   complete the locations.
13        Q.   So it's a -- it's a letter
14   from -- and this is a, as we discussed,
15   Thomas Martin.  Did you know was he a lawyer
16   that worked for Terry and Jacquie Chan?
17        A.   I believe so.  I don't know that
18   I ever met him.
19        Q.   And this letter mentions on the
20   third paragraph down, the first sentence
21   says, as indicated in my earlier
22   correspondence, Gold Star Chili, Inc. will
23   not continue as a member of the general
24   partner and will not provide any economic
25   contributions.  And so would it surprise you
```
02:05 (line 10)
02:05 (line 20)

206

```
 1   to know that the Gold Star Chili, Inc. had
 2   not yet withdrawn from GSC by July of 2016?
 3        A.   I wasn't with Gold Star but I
 4   hadn't heard their name for so long I
 5   would -- it would surprise me.
 6        Q.   Did you hear anything about Gold
 7   Star from Terry and Jacquelyn Chan?
 8        A.   Not for months.
 9        Q.   And it mentions a Buffalo Wings
10   and Rings restaurant.  Were you aware of any
11   Buffalo Wings and Rings restaurants that were
12   going to be constructed in the next month by
13   Clearwater?
14        A.   Of this date?
15        Q.   Yeah.  By July or --
16        A.   No.
17        Q.   -- August of 2016.
18        A.   No.
19        Q.   Did you know of any
20   opportunities to start the construction of
21   restaurants --
22        A.   No.
23        Q.   -- at that time period?  And
24   this letter mentions -- excuse me.  Sorry.
25   Strike that.  This letter is dated July 27th
```
02:06 (line 10)
02:06 (line 20)

207

```
 1   of 2016, correct?
 2        A.   Correct.
 3        Q.   The very date that that e-mail
 4   is forwarded with Debora Myree and your
 5   letter to a Kristen Myers from the previous
 6   exhibit.  And returning back to the last page
 7   of this letter, and it's LIND374, this letter
 8   presents investors with an option to rescind
 9   their investment in GSC.  Were you aware that
10   investors had that option?
11        A.   I was aware that there was a
12   possibility that they could transfer to
13   another project.  I don't recall a discussion
14   that they could rescind one.
15        Q.   And were you aware of any
16   discussions about transferring funds to
17   another project in 2016?
18        A.   I don't -- I don't recall any.
19        Q.   Do you know how many investors
20   were still in GSC at that time period?
21        A.   No.
22        Q.   If I told you that there were
23   three investors in GSC at that time period
24   and those are limited partner investors,
25   would that surprise you?
```
02:07 (line 10)
02:07 (line 20)

208

```
 1        A.   It wouldn't surprise me there
 2   was three investors.  That they were still
 3   there at this date, yes.
 4        Q.   And how much to your knowledge
 5   does a limited partner have to invest for the
 6   EB-5 program?
 7        A.   500,000.
 8        Q.   500,000.  So there were three
 9   limited partners.  How much money would they
10   have presumably invested?
11        A.   Looks like 1.5 million.
12        Q.   And this -- this letter gives
13   Mr. Voigtmann sort of a deadline of August
14   10th, 2016 to decide whether or not these
15   funds are gonna be rescinded, right?
16        A.   Yes.  What appears to be.
17             MR. NARDELL:  Object to form.
18        Q.   Do you know that Fred Voigtmann
19   was an immigration attorney?
20        A.   No.
21        Q.   Did Terry or Jacquelyn Chan ever
22   discuss with you communicating directly to
23   GSC limited partners?
24        A.   Not that I know of.
25        Q.   Do you know of an individual
```
02:08 (line 10)
02:08 (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          2f7aae6c-a1f1-4c16-8477-100edbe43d17

Michael Mason, 8/23/2019

(Pages 209 to 212)                                    53

209

1    named Baoyang Chen?
2        A.   No.
3        Q.   Did you know he was an investor
4    in GSC?
5        A.   Just from the documents that
6    I've seen since this.
7        Q.   And are you familiar with the
8    allegations contained in the adversary
9    proceeding Complaint where Terry and
02:09 10   Jacquelyn Chan stole our client's funds,
11   that's Baoyang Chen's funds, in August of
12   2016?
13       A.   I read the Complaint.
14       Q.   So from your understanding
15   Clearwater was having financial problems in
16   July of 2016?
17       A.   Yes.
18       Q.   You wrote a letter to Terry and
19   Jacquelyn and Gary Chan about those financial
02:09 20   problems.
21       A.   Yes.
22       Q.   Their response to that letter
23   was to immediately terminate you.
24            MR. NARDELLA:  Object to form.
25       A.   That was the action that took

210

1    place after that.
2        Q.   Did they -- did they fire you
3    from your position the day after that letter
4    was sent?
5        A.   Yes.
6            MR. NARDELLA:  Object to form.
7        Q.   And immediately after that
8    letter is sent this July 27th, 2016 letter is
9    sent to Mr. Fred Voigtmann or the day after?
02:10 10   I apologize.
11       A.   Uh-huh.
12            MR. NARDELLA:  Object to form.
13       Q.   To your knowledge, did
14   Clearwater resolve its financial difficulties
15   in July of 2016?
16       A.   No, not to my knowledge.
17       Q.   Do you know when the Rodizio
18   Grill in Liberty Way closed?
19       A.   I just heard rumors.  I mean,
02:10 20   people in the neighborhood and stuff, the
21   people who know I was associated with it, but
22   I never heard -- I drove by it one time and
23   it was closed so that's how.
24       Q.   Do you know roughly when that
25   would have been?

211

1        A.   It was before Christmas.
2        Q.   Of 2016?
3        A.   That's my understanding, yeah.
4        Q.   Was Clearwater operating any
5    other restaurants that would have generated
6    revenue in 2016?
7        A.   Not while I was with them.  I --
8    I had heard that they were opening others.
9    In fact, I read it on the Rodizio website
02:11 10   that they had one in Indianapolis.
11       Q.   In August of 2016 there were no
12   Boardwalk Fries restaurants opened to your
13   knowledge?
14       A.   Correct.
15       Q.   Were there any GSC restaurants
16   that are still owned by GSC Opportunities
17   opened?
18       A.   I don't know when that
19   transfer -- that transaction actually
02:11 20   happened that was addressed in the letter
21   from Roger because I have no insight to Gold
22   Star Chili.
23       Q.   To your knowledge, was
24   Clearwater generating any revenue from the
25   operation of Gold Star restaurants?

212

1        A.   I have no knowledge of it.
2        Q.   Would Deb have knowledge of
3    that?
4        A.   She would know.
5        Q.   Okay.  Did Deb ever mention that
6    she was told to transfer funds on the request
7    of Terry Chan?
8        A.   I don't know.
9        Q.   What about Jacquelyn Chan?
02:12 10       A.   Is it possible?  I just don't
11   know.  I mean, she may have told me that.  I
12   don't recall.
13       Q.   After you left Clearwater, did
14   you have any conversations with any
15   Clearwater employees?
16       A.   Every once in a while one would
17   call me.
18       Q.   Do you recall any of those
19   conversations?
02:12 20       A.   I wouldn't have a conversation.
21   I just had to say, you know, I'm busy or how
22   about them Reds or something, you know.  I
23   just really tried to not, you know, talk to
24   anybody.
25       Q.   Did anyone talk to you about any

Michael Mason, 8/23/2019

(Pages 213 to 216)                                              54

---

213

1    financial problems that Clearwater was
2    experiencing?
3        A.   One of -- when one of the
4    managers got fired, he kind of said something
5    and I said sorry so hear it. That's pretty
6    much it.
7        Q.   Was it a Rodizio Grill manager?
8        A.   Yeah.
9        Q.   And was that from the Liberty
02:13 10   Way store?
11        A.   Yes. But I didn't invite any --
12    I didn't even respond to any of the -- it
13    wasn't -- it was maybe two total, you know.
14        Q.   When you left Clearwater, did
15    you take all of your cellphones, laptops,
16    everything with you?
17        A.   Well, I never took a cellphone.
18    I wanted to continue using my cellphone so I
19    didn't have a cellphone. The laptop they
02:13 20   said they would -- because they had given it
21    to me kind of for my anniversary, birthday
22    type thing and I said -- because I didn't
23    have a laptop at the time. A good one,
24    working one. I said, am I allowed to keep my
25    laptop you gave me? And he said -- they

---

214

1    thought about it and they decided yes but
2    they wanted to get all the information out of
3    it, so I -- I met Gary about a week later at
4    a Starbucks. He said a couple words to me.
5    I don't think I said anything to him and he
6    handed me the laptop.
7        Q.   Do you have any idea what Gary
8    Chan did with your laptop?
9        A.   He made it -- he reset it to
02:14 10   system. Yeah. Because I only opened it up
11    but, yeah, he reset it to operating system,
12    whatever, start, restart.
13        Q.   So just -- sorry. Just making
14    sure I got nothing else for you before we go.
15    I think -- I think I'll open the door.
16        MR. JOYCE: Mike, do you have
17    any questions?
18        MR. NARDELLA: No questions.
19
20
21
22
23
24
25

---

215

1        MR. JOYCE: All right. Well, on
2    that note I'll say, you know, obviously thank
3    you for showing up and we can go off the
4    record. I think we're wrapped up.
5
6
7        (Signature waived.)
         _____
         MICHAEL MASON
8
9
10
11        * * *
12    (DEPOSITION CONCLUDED AT 2:15 p.m.)
13        * * *
14
15
16
17
18
19
20
21
22
23
24
25

---

216

1        C E R T I F I C A T E
2
     STATE OF OHIO
3                   : SS
     COUNTY OF CLERMONT
4
5        I, Deanne Cartwright, the undersigned,
     a duly qualified notary public within and for
6    the State of Ohio, do hereby certify that
     MICHAEL MASON was by me first duly sworn to
7    depose the truth and nothing but the truth;
     foregoing is the deposition given at said
8    time and place by said witness; deposition
     was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
     by me in stenotype and transcribed by me by
10   means of computer; that availability of the
     deposition to the witness for examination and
11   signature is expressly waived. I am neither a
     relative of any of the parties or any of
12   their counsel; I am not, nor is the court
     reporting firm with which I am affiliated,
13   under a contract as defined in Civil Rule
     28(D) and have no financial interest in the
14   result of this action.
15       IN WITNESS WHEREOF, I have hereunto set
     my hand and official seal of office at
16   Cincinnati, Ohio this 6th day of September,
     2019.
17
18
                    Deanne Cartwright
19   My commission expires: Deanne Cartwright
     August 5, 2023    Notary Public - State of Ohio
20
21
22
23
24
25

---

Michael Mason, 8/23/2019

1

| A | | | | |
|---|---|---|---|---|
| A-L-S-A-U-D-A 63:20 | actively 54:16 | 39:10 50:2,3 | 49:17 104:22 | applicant |
| a.m 1:22 | activities 45:14 | 50:11,15 56:22 | 125:21 186:2 | 142:18 |
| abatement | actual 67:2 | 78:6 79:6 82:6 | answered 79:1 | applied 121:21 |
| 187:15 | ad 33:10,11 | 92:24 93:2 | answering 55:1 | 121:24 124:23 |
| abbreviation | Adams 54:3 | 98:25 153:19 | anticipated | appreciate |
| 78:1 | add 33:18 | 165:5 196:23 | 41:12 43:20 | 168:24 |
| ability 147:10 | adding 27:16 | 197:1,1 202:15 | anticipating | approach |
| able 72:10 | addition 168:14 | agreements | 40:11 | 125:23 171:24 |
| 145:13 177:19 | additional | 98:15,18 | anxious 145:12 | approached |
| 179:23 186:7 | 110:21 116:6 | ahead 25:12 | anybody 25:21 | 88:20 90:11 |
| 190:21 191:23 | 116:11 149:20 | 59:9 115:11 | 50:16 105:2 | appropriate |
| absolutely 50:18 | 149:22 150:19 | 122:17 165:10 | 108:23 127:19 | 41:5 52:23 |
| 142:3 | 151:4,14 | Air 9:15,18 | 167:23 212:24 | approval 27:4,8 |
| ACA 199:4 | 165:19 172:21 | Alack 160:13,16 | anymore 202:9 | 68:9 97:13 |
| Accent's 130:2 | address 123:7 | Albert 139:18 | anyone's 148:9 | 122:22 142:15 |
| accept 62:11 | 123:14 201:23 | 139:22 140:10 | anyway 88:13 | approve 50:14 |
| access 186:12,16 | 205:5 | 142:18,20 | 93:22 94:1 | 65:18,22,25 |
| accidentally | addressed | align 148:25 | 125:21 182:6 | 152:23 |
| 103:4 | 127:23 136:10 | allegations | apartments | approved 65:20 |
| account 132:17 | 164:13 188:3 | 171:20 209:8 | 202:7 | 152:19 |
| 133:14,18,21 | 211:20 | Allen 70:8 | apologize 9:20 | approving 98:8 |
| 135:3 148:13 | adequately 36:7 | allowed 213:24 | 11:3 91:17 | approximately |
| 152:1 153:15 | administer 92:6 | Alsauda 63:19 | 181:17 210:10 | 90:8 |
| accountant | ADP 191:23 | altogether 182:3 | apparent 194:25 | April 128:14 |
| 127:13 | 198:17,19,20 | American 199:9 | apparently | 162:24 163:10 |
| accounting 66:6 | 198:22 199:5,6 | amount 41:13 | 22:25 | 164:10 167:24 |
| 66:11 92:15 | Adv 1:9 | 41:16 64:24 | appear 67:17 | 190:2 |
| 99:19 185:15 | adversary 6:11 | 112:5,6 136:12 | 136:16 180:22 | Architects |
| 186:13 | 209:8 | 147:19 149:17 | 205:2 | 160:20 |
| accounts 87:1,5 | advisory 104:15 | 150:14,23 | appearance 7:20 | architectural |
| 87:17 161:20 | affiliated 216:12 | ANGIULLI 1:5 | 101:2 | 160:23 161:15 |
| 177:10 186:16 | affirmative 11:7 | 1:11 | APPEARANC... | area 28:15 |
| 186:21 200:13 | afford 202:9 | angry 103:16 | 2:1 | 117:19 119:20 |
| accurate 79:21 | age 5:2 | anniversary | appeared 25:15 | 144:25 200:8 |
| 165:17 | agency 48:15 | 9:14 213:21 | 131:24 193:24 | areas 54:1,8 |
| accurately | agents 48:15 | announce 97:23 | 195:10,11,12 | 197:17 |
| 193:21 | ago 36:10 67:5 | 110:23,24 | 196:13 | Arnason 187:11 |
| accused 171:7 | 103:11 139:18 | announcing | appearing 6:21 | arrangement |
| acting 93:24 | agree 26:16 | 98:1 | appears 36:11 | 42:6 54:16 |
| action 5:11 6:10 | 82:18 | annual 20:2,6,10 | 76:9 78:17 | 73:19,20 |
| 27:4 209:25 | agreed 47:15 | 60:15 | 89:4 134:8,13 | arrangements |
| 216:14 | 82:22 89:22 | answer 10:23,24 | 136:6 149:13 | 129:1 |
| active 165:7 | 93:3 196:12 | 12:3,4,16 | 150:13 164:6 | arrived 40:4,9 |
| | agreement 3:9 | 25:12 37:19 | 208:16 | 73:20 |
| | 33:3 34:5 | 44:13,20 45:4 | Apple 9:12 | arrow 67:12 |

Michael Mason, 8/23/2019

2

| | | | | |
|---|---|---|---|---|
| **Arthur** 1:21 2:3 2:6 | 121:20 162:12 163:10 206:10 207:9,11,15 | **banking** 186:13 186:23 | 46:24 51:17 52:5 58:23 | 50:24 72:23 92:24 128:20 |
| **article** 119:18 | | **BANKRUPT...** 1:1 | 59:5 62:19,23 63:20 84:16 | 148:18 156:22 162:1 |
| **articles** 29:5 | **B** | **banks** 21:22 | 87:19,22 106:1 | **blame** 88:17 |
| **Ash** 154:11 160:24 161:1 | **B-A-N-C-O-R-P** 152:15 | **Baoyang** 1:7 5:10 209:1,11 | 107:12 116:24 121:3,22 | **Blue** 154:11 160:24 161:1 |
| **asked** 11:15 68:25 71:2 139:5 | **B-E-A-U** 187:11 **baby** 118:12 **Bachelor** 13:4 | **Barnard** 100:15 100:16,22 101:5,8 102:2 | 123:12 126:2 130:19 131:3 131:21 144:4 | **Blvd** 2:10 **board** 27:2,3,7 27:17 28:23,24 |
| **asking** 10:22 11:17,22 55:3 111:9 118:14 129:17 | **back** 5:21 12:6 20:24 22:17 26:20 30:20,21 31:6 36:13 | 126:1,3 129:13 129:22,23,24 129:25 136:11 136:20,23 | 153:2 155:17 159:14 162:1 165:16 178:15 179:1 187:7 | 28:25 68:9 97:22 104:11 104:13 107:23 117:8 121:4 |
| **aspects** 197:8 | 49:22,23 57:24 | 137:5,16,21 | 205:17 | **Boardwalk** 93:8 |
| **assemble** 190:21 | 64:20 70:19 | 139:11,19,21 | **bell** 37:23 42:23 | 93:14 94:10 |
| **assistance** 90:22 | 79:17 82:19 | 140:8,23 141:7 | 51:21 152:15 | 95:17,25 |
| **assistant** 99:20 | 90:5 112:14 | 141:24 | 160:10 173:11 | 102:20,24 |
| **associated** 172:17 210:21 | 116:25 121:19 128:8,10,13 | **based** 48:24 69:16 136:17 | **bells** 78:2 **beneficiary** | 103:2,5 113:13 113:16,19 |
| **assume** 11:14 47:17 169:22 184:18 201:23 | 132:20 148:18 148:19 149:8 150:7 152:13 | 139:17 161:1 180:25 193:12 198:13 | 148:1,5 149:25 151:1 **benefit** 25:5 | 130:23 131:1,5 133:13 135:7 135:16,20 |
| **assumption** 50:17 79:17 94:21 110:10 | 152:25 158:4 161:25 179:21 201:16 203:18 | **basically** 57:15 205:8 **basis** 33:10,11 | **Bernard** 129:24 **best** 31:14 43:6 105:11 110:25 | 136:7,20,24 137:17,21,22 138:2 139:22 150:4 152:5 |
| **ate** 119:10 | 203:24 207:6 | 49:24 85:20 | 147:10 198:10 | 153:2,8,10,14 |
| **attach** 168:18 | **background** | **bate** 114:24 | **better** 34:2 | 153:16,18,23 |
| **attached** 115:20 168:9 188:19 | 28:21 29:3,8 30:24 155:3 | **bates** 34:25 43:3 43:17 75:1,2 | 107:16,19 174:9 | 154:5,8 156:16 157:14 161:11 |
| **attempted** 86:22 | **backtrack** 48:8 | 122:15 132:12 | **beyond** 40:8 | 161:20 163:21 |
| **attend** 78:22 85:14 | **backup** 8:18,19 **bad** 170:13 | 146:22 163:19 178:3 188:8,14 | 116:14 165:20 204:17 | 167:12 173:3 174:8 211:12 |
| **attending** 32:6 | 202:24 | 204:22 | **bid** 21:24 130:17 | **Bogart's** 117:14 |
| **attention** 119:24 | **Bahamas** 177:3 | **Beau** 187:11 | 131:1 | **boil** 164:9 |
| **attorney** 178:23 208:19 | 192:22 **ball** 183:5 | **beg** 113:6,9 **began** 32:6 | **big** 86:5 154:25 **bill** 71:9 199:16 | **booklet** 74:24 76:3 |
| **August** 1:23 125:9 206:17 | **Baltimore** 154:24 | **beginning** 52:20 52:21 | **bills** 131:8 174:24 175:13 | **boot** 89:16 **boss** 22:14 |
| 208:13 209:11 211:11 216:19 | **Bancorp** 122:23 152:15,19,22 | **belief** 192:5 **believe** 15:24 | 176:18 177:5,5 177:20 185:23 | **bottom** 35:1 43:4 77:12 |
| **availability** 3:13 216:10 | **bank** 87:1 122:23 135:3 | 22:17 26:6 29:20 30:9,19 | 185:24 186:13 192:12 | 143:13,14 **bought** 160:16 |
| **available** 90:21 106:18 | 148:3 152:1 177:10 186:16 | 38:6 40:18 41:1 42:20 | **birthday** 213:21 **bit** 10:2,3 34:2 | 175:9,10,11 |
| **aware** 79:18 | 186:21,21 | | | |

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Michael Mason, 8/23/2019

3

192:19,19
**Bradenton**
154:2
**brand** 9:12
175:9,10,11
**breach** 171:7
**break** 12:6,13,17
34:20 72:19
138:23 203:22
**breakdown**
50:24
**breaks** 12:9,12
**brief** 15:7 34:12
**bring** 19:19 65:2
167:5 179:21
**bringing** 31:6
**brings** 19:16,17
65:1
**broke** 65:22
**brokerage** 46:2
**brother** 25:25
97:7 104:2
**brought** 7:5
15:17 30:20
32:12 94:24
108:2 119:24
166:14
**Brown** 54:4
178:15,22,22
**bubble** 134:1
148:22
**budget** 21:14
100:9,23 101:5
**budgets** 60:17
**Buffalo** 93:13
94:11 108:3
166:5,10,19,21
167:1,6,12,19
174:8 205:9
206:9,11
**build** 19:7 141:7
141:10 154:8
172:21 173:3
183:15
**building** 17:11

17:22 42:3,5
137:22 142:16
156:19 157:23
160:6
**built** 21:10
57:12 83:19
84:2 167:16
**bunch** 83:8
**Burger** 14:7,15
93:9
**Burgers** 94:10
96:1 167:13
**burner** 158:4
**business** 13:5,7
13:8 20:19
23:14 30:18
32:3 33:1,2,20
33:21,24 34:8
43:1 48:5
49:25 50:15
55:8 56:22,23
57:7,25 58:8
58:15,16 59:12
59:20 60:1,5
61:4 66:15
72:15 73:15,18
88:15 89:7
94:9 100:3
115:8 124:16
184:1 192:7,11
193:20 204:20
**busy** 72:9 159:7
212:21
**buying** 175:16
**BWR** 174:7
**BWS016287**
140:23
**BWS022147**
122:15
**BWS023633**
188:9
**BWS023635**
188:19
**BWS14212**
180:10

BWS14583
178:4
**BWS23633**
203:24

_____
**C**
_____
**C** 2:12 216:1,1
**C-H-I** 70:8
**Cabela's** 160:3,4
**calculator** 22:24
**call** 5:17 35:10
35:14,22 103:4
103:10 126:14
126:19 158:6
187:23 191:10
212:17
**called** 13:7 46:3
56:10 91:23
158:5 196:10
201:11,14
**calls** 126:10
**capacities** 18:9
**capacity** 163:2
**capital** 164:25
169:10
**capitalization**
41:14
**capitalized**
41:12
**car** 173:25
**card** 199:21,21
**cards** 94:9
199:23 200:2
**care** 35:10 202:5
**Carmel** 130:15
172:25
**Cartwright** 1:24
216:5,19
**case** 1:5 6:22
22:1
**cash** 140:13
**cashed** 140:1
**categories** 60:21
**CATHEY** 2:6
**Cathy** 6:21
**cause** 116:2

**caused** 115:25
**causing** 148:17
**CCing** 204:1
**cease** 14:16
**cellphone** 5:19
213:17,18,19
**cellphones**
213:15
**center** 77:11
102:17 112:4
113:4 121:25
145:16 172:4
174:13
**centered** 13:24
**centers** 173:24
**Central** 2:10
**Centre** 51:21
**CEO** 15:16 16:3
22:13,19,20
90:6 108:6
166:13
**certain** 18:9
28:10 78:23
112:23 176:20
194:9
**Certainly** 21:9
**certificate** 142:6
143:5,13,20
**certification**
13:16
**certifications**
13:13
**certified** 5:4
**certify** 216:6
**chafer** 126:13
**Chamber** 13:20
**Chan** 1:4,5,10
1:11 6:9,9 9:7
22:15 23:7,20
24:4,17,23
25:8,22 26:10
30:14,25 31:8
37:12,14,17
39:18 43:7,8
43:21,21 44:4

44:4 46:1,1,7
46:10,13 47:14
48:10 49:14
51:1 53:11
54:15 55:4,23
57:25 58:7,21
66:24 68:14
69:9 70:20
72:14 73:14
74:15,18 77:23
79:14 82:21
84:23 85:4
96:25 100:17
100:21 107:7
107:10 109:21
109:22 117:5
118:4 120:10
121:21,21
124:18,19
129:3 133:17
137:4 140:14
148:11 150:10
151:19,24
156:3,5 157:10
157:11,11
159:11,13,15
159:18 169:6
170:8 171:7
175:16 184:21
186:1 187:5,24
190:5,9 200:14
204:1,1,11
205:16 206:7
208:21 209:10
209:19 212:7,9
214:8
**Chan's** 28:21
**chance** 26:8
104:1
**change** 12:3
27:15 178:24
**changed** 179:20
**changes** 56:6
58:22
**Chapter** 1:4

Michael Mason, 8/23/2019

4

charge 17:4 19:5 63:19 72:6 185:14
charged 144:18 148:13
Charlie 24:13,17 63:25
chart 66:13,17 66:20,22 67:6
check 29:8 41:25 135:7,9,16,19 135:24 136:6 136:10,13,16 138:1 139:2,10 139:22 140:3
checks 101:15 101:18 129:10 132:20 163:22 199:17
Chef 14:7,15
Chen 1:7 5:10 209:1
Chen's 209:11
Chester 93:20
Chi 70:8
chief 114:13 193:14
children 202:6
Chili 15:17 20:9 39:11 41:2 59:2 62:17,25 67:11,19 71:13 102:7 104:9 105:3 164:22 164:24 183:10 205:22 206:1 211:22
China 44:9,22 45:18 46:8,11 46:15 118:1 203:9
Chinese 49:8 119:19 203:8
choice 167:11
choices 165:8

Chris 6:21
Christmas 211:1
CHRISTOPH... 2:6
Cincinnati 1:22 2:5,14 13:21 23:14 75:6 77:2,3 154:10 155:10,12,15 157:19 176:16 216:16
circle 67:5
circumstances 123:23 124:1,3 189:10
cities 45:19
city 95:4 133:11
Civil 1:17 3:7 216:13
clarification 36:2 73:6
clarify 10:3 11:18 50:6 64:4,8 143:11 143:24 168:25 180:4
Claudio 123:2
clean 72:11
clear 39:3 70:13 168:20
cleared 177:6
Clearwater 9:1 9:7 87:3,20 88:2 90:3 91:5 91:9,15,25 96:8,12,14 97:1 98:4 99:7 99:14,25 102:9 102:13 103:1 104:7,9,20 105:1 114:12 119:5 127:25 128:6 131:18 137:11 152:11 157:8 168:1

169:7 172:7 179:18,25 185:17 186:18 189:11,15 197:9 198:6 202:20 203:5 206:13 209:15 210:14 211:4 211:24 212:13 212:15 213:1 213:14
Clearwater's 174:18 176:3
clerical 73:12
CLERMONT 216:3
Cleveland 130:19 173:1
client's 165:1 209:10
clientele 167:7
clients 6:14,17
closed 210:18,23
clue 163:8 164:17
collaborators 68:13
collected 86:21 86:22
collectively 43:8
college 14:5,25 14:25
colored 76:12
combination 46:25
come 23:16 40:24 90:5 97:22 112:21 124:13 128:3 158:20 176:19 189:17 202:22 202:24
coming 12:6 28:5 89:3 108:7 131:12

175:2,2 187:1
comment 71:12
comments 71:4
commission 142:15 216:19
commit 38:25
commitment 113:21 165:4
communicate 96:18 182:13
communicated 30:13 74:10 88:10 110:17
communicating 182:13 194:13 208:22
communication 74:8 194:2
communicatio... 49:6 85:9 194:21 204:11
companies 11:19 14:22 97:15,18 193:7
company 11:23 15:6 18:23 19:1,18 20:5 29:10,19 44:23 65:13 66:3,3 88:17 98:20 139:24 199:12
compare 148:21
compel 20:13
compete 21:6
complain 110:19 175:6
complaining 177:15
Complaint 209:9,13
complaints 176:18
complete 168:12 168:23 205:12
Compliance

199:4
complied 79:10
comply 82:5
component 51:2 65:21
computer 9:24 216:10
concept 22:9,12 26:25 27:12 94:25 95:3 102:8 104:3 111:11,13 130:21 149:23 157:3,9,13 167:25
concepts 24:6 94:24 98:6 166:23 167:5 174:6
concern 192:8
concerned 182:16,21 189:20
concerning 193:20
concerns 56:17 57:2 108:12,16 140:13 185:17 185:20 190:5 198:7,12
concluded 56:2 187:20 215:12
condition 196:7
conditions 39:4
conference 6:22
confirm 6:14 67:7 122:5 169:4
confused 35:15
connection 44:5 48:10 50:4 51:3 69:6 98:4 120:15 161:8
Connie 122:24
consensus

202:14
consider 196:25
 197:3
considered
 64:15
consistent
 141:23
construct 51:14
 65:17 74:2,4
 113:16,22
 116:10 131:4
constructed
 52:20 86:20
 116:7 152:11
 158:17 206:12
construction
 17:10,11,12
 21:12,14,15
 37:5,6 40:21
 51:16,18 52:4
 52:8 54:20
 65:8 89:9,9,11
 99:24 100:9,20
 102:23 103:24
 114:7 128:16
 128:17 129:7,9
 131:10 136:18
 137:13 138:13
 152:5 206:20
constructions
 74:7
consultants
 68:12
contact 31:7
 44:11 49:10,13
contacted
 191:13,19
contacting 44:10
 45:6,8
contained 34:7
 58:15 209:8
containing
 161:20
contains 7:7
contest 12:10

context 98:22
 165:19
contiguous 54:6
 54:8
continue 193:12
 205:23 213:18
continued
 189:22
contract 99:1
 171:8 216:13
contractor 21:23
 65:18 100:12
 100:13,18
 130:4,6
contractors
 112:22,24,25
 125:23 126:1
 127:9
contracts 145:14
contributed
 40:20 41:24,25
 42:2 60:11
contributing
 61:2 87:10
contribution
 28:12,13
contributions
 191:8 199:9
 205:25
contripulate
 181:12
control 21:19
 63:3 174:21
 177:10
controlled 97:8
 97:11
convenient 12:5
conversation
 55:9 72:12
 109:24 111:19
 119:2 121:9,15
 145:6 161:22
 161:24 196:4,9
 196:18 201:19
 204:13 212:20

conversations
 23:9 69:13
 153:21 154:16
 154:22 157:12
 157:17 174:12
 177:19 183:2
 184:4 185:2
 187:8 196:2
 212:14,19
conversion
 171:8
convinced
 107:20
Copetas 2:12,13
 7:9,18 55:18
 138:20 203:16
copies 7:16
copy 7:10 35:4
 36:18,21 135:6
 135:24 178:10
 181:18
copying 7:12
corner 35:2
 36:19 134:2
 143:14
corporate 17:6
 19:17 52:7
 63:18,19 64:9
 64:9,11,14,16
 64:18,22 66:7
 93:6 199:22
 200:1
corporation
 64:12 91:4,6
 127:14 145:23
correct 6:16
 33:18 36:21,25
 39:12 40:17
 49:1 62:13,24
 70:18 83:1,19
 126:17 130:9
 131:13 134:10
 134:15 135:3
 137:23 147:18
 149:7 150:2,15

150:24 151:5,9
 151:15 164:11
 165:14 178:16
 180:23 181:4
 207:1,2 211:14
corrected 72:7
correctly 55:2
 69:18 198:21
correspondence
 205:22
cost 21:12 85:22
costs 21:16
 85:22
counsel 1:18 3:2
 5:14 7:19 35:5
 122:14 216:12
counties 54:6,8,8
County 54:4,4,5
 216:3
couple 35:15
 71:11 103:8
 104:16,18
 109:11 111:21
 116:15 126:9
 176:1 214:4
court 1:1 10:17
 216:12
cover 47:8
CPA 23:15
 32:17
create 42:14
 66:20 73:9,10
 73:14
created 8:16
 50:2,4,11 61:9
 61:10,11 62:4
 63:11 64:16
 66:22 73:11
 78:18 95:9,19
creating 76:22
 78:21 79:2
creation 57:7
 58:9,13 60:4
creations 50:20
credit 29:13

132:13 133:5
 133:12,16,18
 133:21 146:24
 147:11 148:19
 199:21,21,22
 200:2
creditworthin...
 199:19
crew 128:25
cross 4:2,2
 194:20
cross-examina...
 1:16 3:6 5:7
currently 180:21
cursory 166:22
cut 20:5

——————
D
——————
D 2:6
d/b/a 180:20
dad 117:23
 118:1
daily 20:20 65:4
 183:3
dash 149:4
data 20:23 57:17
 190:16,18
date 82:23 87:23
 121:10 125:14
 141:16 143:6
 143:13,14
 144:6,14
 145:11 147:13
 147:17 149:14
 162:21 204:2,8
 206:14 207:3
 208:3
dated 164:10
 206:25
dates 6:19
 112:22 127:21
 131:25 143:12
Dave 106:1
 107:9 154:16
 155:5 158:23
Dave's 155:5

Michael Mason, 8/23/2019

6

88:18 104:14
105:9 106:22
107:6 108:5
115:24 157:12
157:18
**day** 21:6,6 35:11
47:10 72:11
91:11 111:4
112:4 170:10
170:14 184:8
189:2,2,8
210:3,9 216:16
**day-to-day** 18:3
18:8 19:8
64:25 200:7
**days** 6:15,18
143:8,9 144:4
155:14 172:6
188:25
**Dayton** 15:10
**deadline** 208:13
**deal** 25:9 197:20
198:22
**dealt** 116:14
203:7
**Deanne** 1:23
216:5,19
**Deb** 99:18 146:3
146:4 174:21
175:6 176:19
177:13,13
181:6,14
185:10 188:20
190:5,25 191:3
191:18 192:1
194:24 195:3
195:16,18
198:21 201:11
212:2,5
**Deb's** 99:20
200:8,9
**debated** 187:6
**Debora** 127:11
127:12 177:12
185:11 187:23

192:5 207:4
**Debtor** 1:6
**debtors** 6:10
**December** 134:9
152:19 176:25
**decide** 208:14
**decided** 88:15
119:25 162:2
164:25 189:2,4
214:1
**decision** 27:17
165:5
**decisions** 97:12
179:24
**Declarations**
56:10,14
**declined** 199:22
**default** 187:19
**Defaulted**
198:17
**defendants** 1:12
2:9 6:10
**defined** 216:13
**degree** 13:4
58:18 63:25
126:6
**delay** 115:24
116:2
**delayed** 116:5
**delineate** 30:5
**department**
142:16
**depended**
145:14
**depending** 18:17
**depose** 216:7
**deposed** 10:5
**deposit** 136:18
151:5 191:24
**deposited**
198:25
**deposition** 1:14
3:3,8,10,13
5:12,21,25
7:17 10:15

12:2 22:25
35:19 215:12
216:7,8,9,10
**depositions** 6:9
6:15,17
**deposits** 134:13
134:18 198:18
198:23
**describe** 45:13
53:19 59:18
75:11 76:8
115:14 122:20
132:25 141:4
142:5 147:9
164:5 178:12
**description** 61:4
73:15 165:12
**design** 141:7,9
161:15
**designated** 51:7
**designation** 51:9
**desirable** 167:7
**desk** 128:4
**desperate**
184:13,15,18
184:19
**detail** 124:21
140:12 159:7
**details** 39:21
54:15 58:14
**determination**
120:21
**develop** 24:5
39:25 87:11
117:19
**developed** 21:10
42:18 53:7
84:10,13 95:23
102:8 103:2,20
113:12,13
**developers**
173:15
**developing** 98:5
98:12
**development**

13:20 16:22
17:7,18 19:7
22:3 103:16,24
149:24 164:24
164:25 165:3
165:14,24
167:20
**diagram** 42:19
**died** 146:20
**DiFerdinando**
154:16,18
157:12,18
158:24
**difference** 149:1
**differences** 66:9
**different** 28:14
29:19 93:12
129:1 161:5
192:22,25
194:21
**differently**
92:24
**difficult** 20:25
53:22 182:12
190:25
**difficulties**
210:14
**diligence** 28:3
**dinners** 183:5
**dire** 183:23
**direct** 4:2,2
18:10 19:13
39:22 41:10
61:3 62:11
66:14 80:18
122:9 126:14
181:7 191:24
198:17
**directed** 49:13
**directions**
127:19
**directly** 21:23
25:14 67:12
101:3 146:2
198:22 208:22

**director** 16:8,15
16:19 24:16
193:16
**disagree** 197:10
197:13
**disconnected**
100:3
**discuss** 60:25
78:23 100:23
100:25 124:19
187:24 189:19
195:7 201:5
208:22
**discussed** 7:15
25:2 31:16
62:19 66:13
69:15 73:8
79:1 81:13
84:15 100:11
100:20 106:6
107:13 147:17
152:14 153:14
167:22 169:15
171:22 186:4
205:14
**discusses** 170:3
170:3
**discussing** 32:7
36:15 169:1
189:14 195:10
**discussion** 34:17
63:8 64:20
68:12 73:3
83:13 90:24
94:20 100:4
138:24 173:1
189:7 190:19
190:22 197:3,5
207:13
**discussions** 34:8
43:2 47:8 70:2
77:22,24 84:12
84:20,22 89:20
90:2 94:14,15
94:16 124:25

Michael Mason, 8/23/2019

7

| | | | | |
|---|---|---|---|---|
| 144:24 156:16 | 9:21 32:8,10 | 139:21 188:17 | 157:13 172:4 | **endurance** 12:10 |
| 167:11,19 | 32:13,14,23 | 203:25 204:2 | 208:6 | **engage** 200:23 |
| 169:24 172:20 | 34:14,25 37:8 | 204:18 207:3 | **Eberly** 2:13 | **engagement** |
| 173:2,6 181:21 | 38:9 115:5 | **e-mailed** 5:23 | **economic** 205:24 | 201:14,16 |
| 182:1 183:9 | 168:10 209:5 | **e-mails** 47:3 | **edit** 37:14 72:15 | **engine** 192:15 |
| 187:15 189:10 | **doing** 26:1 27:16 | 125:15 157:20 | **edits** 58:1 | **English** 49:16 |
| 189:13 207:16 | 44:4 45:21 | 204:15 | **educate** 28:11 | **enough's** 175:3 |
| **dishes** 126:14 | 53:16,18 57:9 | **E-Verifies** 63:23 | **education** 13:1 | **ensure** 63:22 |
| **distributed** | 66:10 71:8 | **E-Verify** 51:5 | 13:11 | 82:2 |
| 65:16 | 89:7 96:8 97:5 | **earlier** 7:15 | **effectively** 10:16 | **ensuring** 79:9 |
| **district** 1:1 15:2 | 97:10 98:4 | 36:16 66:14 | 40:8 | **entertain** 88:1 |
| **disturbed** | 99:13 104:9 | 152:14 166:23 | **eight** 12:11 | **entertainment** |
| 170:15 | 128:25 129:8 | 205:21 | 13:21 | 173:24 |
| **disturbing** | 129:14 136:23 | **early** 22:10 | **either** 21:19 | **entities** 29:17 |
| 170:14 | 156:20 182:18 | 23:24 30:11 | 45:23 109:3 | 48:19 63:14 |
| **DIVISION** 1:2 | 182:19 183:6 | 31:13 56:18 | 190:11 | 70:13 93:12 |
| **document** 9:20 | 196:15 | 57:4 90:9 | **Electric** 132:12 | 94:14 96:9 |
| 34:22 36:3,8 | **dollar** 28:12,13 | 172:5 177:24 | 133:5,16,18,21 | 97:9 102:6 |
| 36:25 37:3,3 | **dollars** 137:20 | **earnings** 199:13 | 146:23 | 169:16 197:9 |
| 37:10,15 38:2 | 150:15 152:1 | 199:14 | **electronic** 20:18 | **entity** 39:15 |
| 38:22 39:1,5 | **door** 214:15 | **earpiece** 146:20 | 20:23 21:3 | 42:14,20,22 |
| 40:14 56:10 | **doubt** 87:8 | **easier** 153:7 | **electronical** | 55:6 62:3,20 |
| 59:9,17,18 | **dreams** 89:18 | **East** 1:21 2:4 | 17:19 | 63:1,4 65:5 |
| 60:9 66:16 | **Dreidame** 37:25 | **EB** 28:11 | **empathize** | 73:24 77:15,18 |
| 68:23 70:23 | 163:25 | **EB-5** 22:4,6,9 | 196:14 | 77:21 80:1,8 |
| 75:12,14,23 | **dried** 20:5 | 23:13,17 25:3 | **employed** 14:6 | 81:7,10,11,13 |
| 76:8,18,22 | **drink** 72:24 | 25:9,18 26:17 | 14:11,13 | 82:15 91:14,16 |
| 77:5 78:15,16 | **drive** 7:9,10 8:12 | 27:6,21 28:6 | 126:16 | 91:22 92:19 |
| 78:21,24,25 | 9:25 | 28:14 29:19 | **employee** 185:10 | 102:13 107:18 |
| 79:2 80:19 | **drives** 8:11,15 | 39:6 41:17,18 | **employees** 19:2 | 116:25 122:4,7 |
| 115:1,14,20 | 8:19 | 42:10 43:10,13 | 27:24 51:5 | 133:7 135:12 |
| 122:15 123:17 | **dropped** 196:17 | 43:22 44:5 | 174:24 194:22 | 166:7 181:3 |
| 132:13 133:1,2 | **dropping** 52:6 | 45:21 51:2,7 | 199:3,13 | **envelope** 7:7 |
| 135:6 140:24 | **drops** 5:17 | 51:11 52:8,11 | 212:15 | **equipment** |
| 141:4,5,6 | **drove** 210:22 | 52:24 53:8,13 | **employment** | 17:14 65:23 |
| 142:5,9 146:22 | **due** 28:2 181:22 | 53:17,23 55:8 | 8:13 9:1 14:2,3 | 112:21 |
| 163:17 164:6 | 181:23 199:16 | 61:11,12,15,22 | 14:16 28:9 | **equity** 125:1 |
| 168:8 170:2 | 199:17 | 62:4 69:17 | 53:25 57:13 | **Erdman** 160:24 |
| 178:13 180:11 | **duly** 5:3 216:5,6 | 70:25 73:7 | 89:21 | **escrow** 86:25 |
| 180:23 188:8 | | 77:7,11 108:1 | **enacted** 20:11 | 87:5,16 110:14 |
| 204:21 205:2 | ——————— | 108:3,8 110:9 | **encourages** | 116:1,6 131:20 |
| **documents** 5:23 | **E** | 115:18 117:18 | 146:11 | 131:23 132:3,7 |
| 5:24,24 7:5,8 | **E** 216:1,1 | 117:20 118:14 | **ended** 52:6 88:7 | 153:8,15 |
| 7:19,25 8:5,6 | **e-mail** 5:20 | 118:23,25 | 179:7 | 161:20 |
| 8:10 9:9,17,19 | 44:10 115:1,19 | 156:25 157:3,9 | **ends** 115:1 | **ESQ** 2:3,6,9,12 |
| | 115:21 122:21 | | | |
| | 123:7,14 | | | |

Michael Mason, 8/23/2019

8

essentially 19:5
estate 62:23
   67:23,24 81:11
   81:13
evaluated 53:16
evaluating 53:12
event 80:16
eventually 33:4
   82:17 91:12,15
everybody 12:14
   25:6 112:13
   113:6,9 119:14
   203:15,19
everybody's
   145:1
everyone's
   114:21
evident 88:22
exactly 8:20
   23:22 46:3
   67:5 104:22
   118:20,23
   162:20
examination
   3:14 216:10
examined 5:4
example 65:18
excerpts 76:23
   77:1
exchanging 58:1
excise 199:13
excuse 153:3
   161:19 206:24
execution 36:18
executive 61:7
   61:25
exercise 64:23
exhibit 4:5,6,6,7
   4:7,8,8,9,9,10
   4:10,11,11,12
   4:12,13 34:18
   34:22 59:11,14
   74:22 75:11,20
   76:7 78:4,13
   114:19,22

115:15 122:11
122:13 132:9
132:11,11,25
140:20,22,22
146:12,14
147:5,7 148:20
148:23 149:8
163:15 178:1,3
180:7,9,10
188:10 204:23
204:23,25
207:6
exist 77:21
existed 77:19
exit 18:23
   196:10
expand 23:18
expectation
   21:25
expected 67:25
   113:25 137:16
   137:19 181:2
expenditures
   19:22
expense 199:17
   200:4,12
expenses 19:23
   20:1 21:11,18
   21:20 40:22
   66:1 186:8
   192:13,16
   199:20 200:7
   200:10,15,17
   202:4
experience
   43:10,12 71:1
experienced
   10:5
experiencing
   213:2
expert 25:10
expertise 43:13
   43:25
expires 143:20
   216:19

explain 109:16
   110:6 194:16
   196:5
explained 54:13
explaining
   198:10
explains 39:23
exploration
   27:12
explore 22:4
   23:17 140:11
expounded
   57:22 58:17
express 56:16
   87:15
expressed
   162:13
expressing
   185:16,21
expressly 3:14
   216:11
extends 180:11
extensive 31:4
   43:9
extent 86:23
extra 149:2

——————
F
F 216:1
facilitate 62:4
fact 107:16
   111:2 194:24
   211:9
failed 32:5
fair 10:24 12:18
   16:16
fall 111:23 112:1
   125:4,7
familiar 29:9
   36:7 42:11
   45:12 76:10
   83:5 93:16
   108:8 123:20
   187:12 209:7
familiarize
   78:14

family 117:24
Famous 15:9
fans 154:24
far 5:11 7:6 49:2
   71:8 88:11
   89:23 166:18
   174:17
fashion 166:22
favor 113:7
feasibility 27:23
February 23:25
   105:21 107:1
Fedders 139:19
   142:19,21
Federal 1:16 3:6
fee 150:20
feedback 21:3
   146:18
Feeder 142:18
feel 6:4 36:7
   179:11
feelings 162:14
feels 107:15
fees 86:21
   135:19 138:12
   141:8,10
feet 112:11
fell 92:20
felt 28:4 88:11
   107:19
FICA 198:24
fields 183:5
fifth 1:21 2:4
   43:4
figure 54:19
   140:8 178:9
figuring 55:5
filed 121:1 170:5
files 8:22
fill 124:2,7
final 109:1 168:3
   168:22
finalized 56:5
   59:25
finance 193:7,16

financed 40:16
   193:5
finances 29:14
   97:14 156:24
   174:21 198:1
financial 27:15
   63:22 125:3,11
   125:13 147:23
   148:3 156:24
   174:18 181:1
   185:18 186:21
   189:15 196:7
   197:5,8 209:15
   209:19 210:14
   213:1 216:13
financials 57:20
   106:7,9 120:22
financing 18:6
   192:24
find 6:19 8:14
   14:2 111:3
   190:25
finding 44:6,8
fine 7:3
finish 65:10
finished 58:4
fire 179:19
   210:2
fired 213:4
Fires 135:7
firing 179:24
firm 23:15
   113:21 216:12
first 5:3,13 9:3
   10:17 23:13
   24:6,8,8 37:3,4
   61:3,25 68:14
   68:22 88:1
   90:1,4,10,24
   102:8 109:9
   114:24,25
   119:7 132:1
   133:1 141:5,6
   146:23 147:6
   148:3,20

Michael Mason, 8/23/2019

155:24 156:13
164:20 176:17
178:20 186:21
186:24 205:20
216:6
**Fisher** 32:6,15
38:15 54:25
55:12 78:18
83:11,13
**fit** 26:22,25 28:6
30:6 33:25
53:13,17 55:8
186:23
**fits** 28:18
**five** 30:16 31:25
36:10 71:20
88:6 134:18
167:4 174:4
203:12
**FL** 2:11
**flash** 8:11,15,19
9:25
**Flavor** 75:5 77:3
**flew** 93:23
**flip** 43:3 135:5
148:18,18
149:10 150:11
150:22 205:1
**flipping** 34:24
**Floor** 2:7
**Florida** 1:1 2:8
113:19 175:19
176:8
**flows** 18:17
**follow** 30:21
165:3
**followed** 51:11
**following** 17:7
134:24 197:6
**follows** 5:5
**followup** 165:14
**Food** 14:14
**Foods** 14:15
**foregoing** 216:7
**forget** 173:21

**forgot** 71:5
123:20
**form** 25:11
34:11 47:13
55:24 79:15
101:20 102:3
138:3,8,14
165:25 198:4
200:24 201:3,7
208:17 209:24
210:6,12
**formal** 13:12
82:13
**formalities** 3:9
**formally** 110:24
**formed** 95:1
121:12
**former** 77:17
**forming** 80:3
91:6
**forms** 66:25
**forth** 1:19 57:24
216:9
**fortunately**
49:23
**forward** 6:6
10:4 31:18
39:2 162:3
**forwarded**
207:4
**found** 14:3 90:4
111:2,20
115:10 162:15
162:17 164:1
175:25
**four** 19:19 27:1
30:16 31:25
36:10 61:3,17
67:5 71:19
134:18 174:4
**four-year** 21:8
**fourth** 43:5
144:7,12
**frame** 16:4
**Fran** 103:13,14

103:21,22
154:18 155:5
**Fran's** 154:17
**franchise** 15:12
16:22 17:5,17
19:14,15 20:1
22:3 52:6,18
64:13,13 65:1
65:12,13 95:8
98:18 99:1
**franchised**
18:16 19:12,21
**franchisee** 15:8
20:12
**franchisees**
17:15
**franchises** 17:17
18:13 20:4
93:7 164:24
**franchisor** 15:8
**fraud** 171:9
**Fred** 164:15
208:18 210:9
**free** 6:4
**freeze** 5:20
**frequent** 69:13
85:21 177:19
177:21,23
**frequently** 69:24
96:18 137:6
**fresh** 93:8 94:10
96:1 167:12
174:1
**Friday** 1:23
**Friend** 139:20
**Fries** 93:9 94:11
95:17 96:1
113:13 130:24
131:1,7 133:14
135:16,20
136:7,20,24
137:17,21
138:2 150:4
153:3,10,16,18
154:8 161:11

161:21 167:13
173:3 174:8
211:12
**front** 76:2 78:8
148:19 157:15
**frustration**
87:15
**frustrations**
110:13
**fryer** 65:21
**fulfill** 171:13
**fulfilled** 89:18
**fulfillment** 25:5
**full** 21:13 145:18
**full-time** 27:24
**fund** 111:15
117:2 151:21
169:11 170:4,6
171:4,25 172:2
176:23
**funded** 125:14
175:8 176:25
198:20
**funds** 65:16
86:19,23 87:10
87:16 97:18
101:8,18,21
102:1 106:17
110:14 111:16
115:25 116:5
117:2 126:4,5
127:9 131:18
132:6 138:11
153:3,8,14,15
171:20 177:16
183:25 191:13
191:20 198:18
199:9,11,18
203:7 205:10
207:16 208:15
209:10,11
212:6
**furnished** 9:4
**further** 13:10
140:12,12

**FUTA** 198:24

**G**

**game** 71:20
**gaps** 124:2,8,8
**Gary** 9:7 25:25
31:22 32:1
39:17 43:7,12
43:21 44:4
46:1,9,10,17
46:24,25 47:6
48:10,13,14,16
48:21 49:14
51:1 53:20
54:14 55:22
57:21,25 58:21
61:13 74:15
77:18 82:21
89:2 90:2,11
94:21 96:14,19
99:5 101:10
105:25 106:23
107:7 115:17
127:21 133:17
137:10 145:7
176:12 185:1
187:24 196:4
201:11,15,18
202:22,24
203:25 204:12
209:19 214:3,7
**Gary's** 97:7
203:4
**GE** 133:12
147:11 148:19
**general** 14:15
130:4,6 132:12
133:4,16,18,21
145:5 146:23
163:5 165:6
173:19 205:23
**generally** 18:13
133:8
**generate** 145:2
183:6,19
**generated** 211:5

generating
85:24,25 86:3
86:16 211:24
gentleman 15:15
24:11 69:1
205:8
gentleman's
69:22 187:8
gestures 11:3
getting 21:3 41:7
45:1 89:23
126:14 128:12
135:16,19
146:17 150:4
154:8 156:19
174:24 175:7
175:14 176:18
177:8 192:13
199:22
give 5:19 12:13
85:12 201:24
203:11
given 9:15 47:25
48:6 50:16
213:20 216:7
gives 38:25 39:1
166:2 208:12
giving 71:8
glass 73:1 113:3
glazer 113:5
glazers 113:2
go 7:6,24 8:9
10:12,14 12:17
12:21 15:6,14
24:23 25:12
26:20 30:19
34:15 39:1,21
42:7 45:18,20
46:10 48:11
51:6 54:11
59:9 61:24
66:3 71:3,21
80:16 82:19
87:25 101:14
105:1 115:11

116:25 119:25
121:6 122:17
133:24 136:5
150:7 151:16
159:24 164:19
165:10 189:20
198:5 201:17
202:15,17
214:14 215:3
goal 88:11 92:18
goals 82:3
goes 5:22 11:10
99:9 168:5
204:24
going 6:5 10:4
10:18 12:20
20:24 21:19,20
21:21 31:1
32:15 34:15,22
38:11 39:24
40:25 41:24
42:1,4 44:9
46:7 49:22,23
50:24 57:24
59:8,9,12
64:20 68:2,4
72:18 73:1,6
74:6,23 84:10
90:18 91:2,12
93:5 96:4,17
99:6 104:15
106:12 107:21
110:8 112:14
112:17 114:2
119:11 121:4
121:18,19
137:20 146:22
148:7 149:8
152:13 160:17
163:20 171:12
178:3,25
180:10 182:6
188:6 189:21
192:13,16
193:11,12

197:19 199:11
203:11,24
206:12
Gold 15:17 16:3
16:7 17:22
18:12,14 19:2
19:4,20 20:9
20:13 21:11,17
22:18,20 24:4
26:24 27:19,20
30:11,24 39:11
39:23,25 40:10
40:24 41:1,2
41:15,24 42:9
42:14 43:20,24
44:15,17 45:1
45:7,16 49:1
49:22 50:13
51:3,13 54:14
55:23 56:16
57:17,19 58:21
58:24 59:1
61:13,14,16
62:17,25 63:3
63:9,13 64:15
64:21 65:6,15
65:19,25 66:5
66:10 67:11,19
71:13 73:21
74:8 75:22,23
76:25 82:21
86:23 87:6,12
87:13,14 88:2
88:3 90:15
91:16 92:21,23
92:25 93:1
94:11 102:7,13
104:9 105:1,2
106:25 107:18
108:23 109:2,6
110:2,6,9,15
110:16,18,19
110:23 116:11
116:14,18,21
120:20 161:25

162:2,9,24
163:1,4,11,13
164:7,22,24
165:13,23
174:7 183:10
183:15 205:9
205:22 206:1,3
206:6 211:21
211:25
Goldlink 74:24
115:3
gonna 59:22
82:19 83:8
88:6,23 89:15
89:18 90:17,18
91:8 114:23
119:19 138:22
143:7 146:12
150:12 167:15
176:12,13
185:23 188:7
189:20 203:12
204:21 208:15
good 23:2 26:21
104:25 127:6
139:14 155:4
197:20 201:25
213:23
gotcha 43:18
47:24 75:8
164:1 180:13
gotten 139:21
graduate 12:23
13:2,3
graduated 15:1
graduating 14:1
graduation 13:2
granted 54:20
great 25:9
203:16
Grill 45:12
48:11,24 94:25
95:5,8 98:19
98:21,25 100:8
112:18 113:11

121:25 138:12
139:4 141:12
142:2 152:8
159:1 161:8
169:23 172:17
172:21 180:21
184:22 210:18
213:7
Grills 95:6
grooming 88:5
gross 171:8
ground 10:14
group 9:2 46:3
70:11 71:7,7
87:21 89:13
91:9 97:1,23
128:1 154:9,9
155:5,6 160:23
169:8 173:21
groups 45:19
GSC 33:4 42:10
42:15,23 50:4
50:7,7,25 51:4
51:14 54:20
55:22 56:5
57:8 59:20
62:1,2,10,18
62:19 63:8,8
63:11 64:16
65:17 67:8,12
67:18,25 68:13
69:6 70:2 77:8
77:23 78:7
79:7,19,22
81:17 82:9,17
82:22,24,25
83:9 84:11,25
87:1,4 91:16
91:23 106:13
108:12 109:6
110:3,25 116:2
116:7 120:21
121:12 162:3,7
162:9,25 163:2
163:6,13 206:2

207:9,20,23
208:23 209:4
211:15,16
**GSC00270**
114:25
**GSC00349** 35:1
**GSC272** 115:1
**GSC349** 36:3
**GSC351** 43:4
**guess** 22:23 23:9
26:17 35:22
60:23 69:18
74:13,13 79:21
87:25 92:10
95:23 102:10
127:22 133:1
138:4,6,9
139:5,7 145:18
162:19 164:9
168:23 174:17
177:6 178:17
193:21 198:8
201:22
**guy** 26:3 89:15
93:24 103:14
126:13
**guys** 6:18 103:9
195:20 200:10
**GZK** 15:8

**H**
**half** 28:13,15
107:5 137:20
**Hamilton** 54:5
**hand** 34:22 59:8
76:21 98:7
146:12 194:12
194:13 204:21
216:15
**handed** 7:6,15
8:6 35:4 59:17
59:19 75:10
76:7 78:12
114:22 115:14
122:12,20
132:25 146:16

147:5 178:13
180:8 214:6
**handing** 122:13
**handle** 72:10
176:21
**handling** 127:3
127:8,15
**happen** 21:17
82:19 86:18
100:6 154:1
161:24 167:9
176:13 177:4
182:6 187:10
189:21
**happened** 22:1
29:11 47:11
49:15 84:20
89:17 94:4
103:14 117:20
131:24 170:13
191:10 211:20
**happening**
111:25 184:8
**happens** 111:10
**happy** 12:13
**hard** 8:11 41:8
175:13 190:18
**Hardee's** 14:14
15:4,5,16,22
**hate** 195:20
**hated** 195:17
**Head** 11:3
**headquarters**
95:4
**hear** 57:2 68:21
109:5,9 119:7
146:17 169:13
170:4 176:17
206:6 213:5
**heard** 22:14
23:13,15,20
24:17 30:4
42:12 56:9
68:18 69:21
70:7,10,12

86:25 87:8
116:1,4 117:2
117:4,11 119:4
119:13,16
133:4 152:17
169:12,20
171:16,19
186:24 206:4
210:19,22
211:8
**hearing** 118:21
**hears** 23:16
**heavily** 63:24
65:5 112:2
**heavy** 20:7
57:21
**held** 13:21 66:7
85:13
**help** 48:16 89:5
**helpful** 10:12
**helping** 18:10
**helps** 54:11
**hereinafter** 1:19
5:3
**hereinbefore**
216:9
**hereunto** 216:15
**hesitation**
108:12
**hesitations**
108:15
**hey** 24:22 55:7
83:8 158:5
168:6
**Hi** 5:9
**high** 12:21,22
13:1 14:4,25
118:6
**higher** 28:16
**highlight** 198:8
**hill** 29:25 30:3,6
30:8 39:11,14
39:18,24 40:10
41:17 43:7
124:10 135:11

135:13 147:25
148:6 150:1,4
150:17 151:1
165:7 171:15
175:12,18
192:19,21
**hire** 92:5
**hired** 179:3
**hiring** 179:24
**history** 29:13
**hit** 112:12 167:8
178:8
**hitting** 112:22
**Hoboken** 156:21
**hoc** 33:10,11
**hold** 21:16 25:8
93:1
**Holden** 64:5
**Holyoke** 173:10
**home** 9:24
179:17
**homework**
27:13
**honest** 116:12
**honestly** 144:9
**HONG-YIN** 1:4
1:10
**Hooters** 93:19
**hoping** 203:14
**Hospitality** 9:2
87:20 91:9
97:1 128:1
169:7
**hour** 72:19
**hourly** 14:24,24
**Hourlys** 198:15
**hours** 12:11
27:24 51:10
189:1
**house** 121:22
171:15 175:10
175:11,12,16
192:19,19
**houses** 202:8
**Howard** 24:13

63:25 70:17
**HR** 63:21 92:6
92:15 99:19
127:13
**human** 185:15
**Humana** 199:15
**hundred** 107:23
125:15
**husband** 97:6
**Hyde** 22:15

**I**
**idea** 29:2 37:16
44:11 47:7
56:1 61:14
69:12,14 84:3
86:13 88:2
102:4 121:14
150:3 152:24
161:6 193:1
214:7
**ideas** 129:1
174:1
**identified** 4:5
34:18 59:14
74:22 75:20
78:4 114:19
122:11 132:9
140:20 146:14
163:15 178:1
180:7 188:10
204:25
**imagine** 125:13
**immediately**
209:23 210:7
**immigrant**
41:18 77:7
**immigration**
208:19
**imminent**
183:14
**implemented**
199:6
**impossible** 199:6
**improve** 86:7
**include** 149:5

Michael Mason, 8/23/2019

12

included 32:24
59:12
includes 61:6
incomes 53:24
54:1
increase 184:8
184:14
incurred 40:22
indemnity
184:21
INDEX 4:1
Indian 124:10
171:15 175:12
175:18 192:19
192:21
Indiana 130:16
Indianapolis
211:10
indicated 205:21
individual 16:2
23:7 68:17
70:8 92:9
126:20 137:5
142:23 157:8
172:10 208:25
individually
43:8
individuals
48:12 156:2,17
191:19 194:9
inevitable 182:6
infiltration
20:19
influence 71:6
information
20:14 114:1
148:8 149:21
149:22 150:19
151:5,14
190:21 191:1
214:2
informed 113:25
161:17,19
informing 205:8
infrastructure

28:3
initial 8:13
11:20 27:10
77:24 94:16,19
176:22
initially 179:3
179:19
initials 13:19
initiate 27:8
32:10
initiated 193:10
injection 125:1
innocent 93:24
insight 104:25
211:21
inspection 7:11
institution
147:23
insufficient
199:10
insurance 92:15
191:14,14
199:15
interest 30:22
157:25 216:13
interested 157:3
157:22
interview 88:21
88:25
interviewed
88:23,24
introduce 188:8
introduced 22:6
22:8,11 26:3,5
introductory
24:7,8 30:10
invest 44:7 79:7
119:19 208:5
invested 208:10
investigate
120:8
investment
62:12 70:11
124:13 153:14
166:4 207:9

investor 49:9,12
86:19 87:15
97:22,24
111:15,16
150:5 153:3
161:21 166:3
209:3
investors 40:11
40:24 41:17,18
42:10 44:6,8,9
44:15,16,17,21
45:1,2,7,9,13
45:14,20,23
47:15 48:1,11
49:6,16 56:18
56:24 57:4
62:12 74:6,9
74:11,16 77:8
79:7 86:12,15
106:13 119:19
153:10,18
163:12 207:8
207:10,19,23
207:24 208:2
investors'
131:19
invite 213:11
invoice 132:14
141:13,17,20
141:22 145:25
invoices 127:23
146:2
involved 11:20
18:2,5 27:8
29:17 37:18
38:7 44:14
47:1 48:19
50:19 53:11
54:16,22 55:12
57:7 60:4,6,8
63:9,13,24
65:23 69:5
70:1 94:13,15
94:18,19 96:25
98:5,14,17,22

98:24 99:2,6
99:11 101:7
112:2 116:17
119:21 128:15
128:18 129:3
130:15,18,23
151:25 153:23
156:15 163:5
166:12 171:17
191:5 197:8,16
involvement
57:9 78:20
117:16 154:6
169:17
involving 97:18
108:23
IRS 199:14
isolate 60:24
issue 5:18 72:8
118:25
issued 143:5
issues 17:5 72:3
72:4 117:24
172:9 181:16
201:6
It'll 115:4,5
items 61:23
188:3

J

J 2:3
Jacquelyn 1:4
1:11 6:9 26:10
31:22 70:20
72:14 85:3
99:10 107:10
117:5 121:20
124:18 128:5
159:11,13,14
159:18 175:16
182:8 186:4
187:5,24 190:8
194:5 200:14
202:11 206:7
208:21 209:10
209:19 212:9

Jacquelyn.Ch...
123:8
Jacquelyn.Ch...
123:6
Jacquie 32:1
73:8 89:2 90:2
90:12,18 91:1
91:2,8,12
94:22 96:19
98:9,12 99:5
99:13 104:18
118:10,16
127:21 128:2
140:14 156:5
156:12 166:16
166:25 169:6
170:14 171:3
179:14,14,16
179:23 182:24
184:24 185:5,8
194:11 200:22
202:19 204:11
205:16
Jacquie's 96:13
97:6 117:15,23
118:1 120:17
123:9 170:21
202:6
January 15:22
15:23 23:25
105:21 107:1
153:1,4,22
Jardin 29:24
30:8 135:11,13
147:25 148:6
150:1,3,17
151:1
Jersey 156:21
job 10:19 17:3
89:16 113:10
196:16
jobs 189:21
John 16:5,6 23:2
join 16:7 87:20
89:13

Michael Mason, 8/23/2019

13

**joined** 16:6,14
22:19 95:1,12
95:13,15,16
100:1 102:12
104:6
**joining** 90:3
119:5
**joke** 35:17
**Jose** 95:25
103:15 154:4
**Joyce** 1:20 2:3
4:4 5:8,9,16
6:20,24 7:13
7:23 34:19,23
35:4,12,17,22
36:1,5 53:4,5
59:10,15 72:25
73:4 74:23
75:2,7,9,21
76:1 78:5,11
114:20 115:4,7
115:12 122:12
122:18 127:4,7
132:10,16,19
132:23 138:22
138:25 140:21
141:2 146:11
146:15,21
147:2,3 163:16
163:20,24
164:3,4 168:11
168:13,17,24
169:3 178:2,9
178:11 180:8
180:14,15
188:6,13,15
203:10,18,23
214:16 215:1
**juggle** 175:7
**July** 116:10
174:11,19
175:20 176:25
180:22 181:22
185:16 187:22
188:17 189:4

191:16 192:4
204:6,18 206:2
206:15,25
209:16 210:8
210:15
**jump** 168:7
**June** 83:4,9
191:15
**Justin** 2:3 5:9

**K**

**keep** 12:11
213:24
**keg** 112:5
**Kemper** 2:13
**Kentucky** 54:7
76:5
**Kenwood**
154:10
**Kerry** 160:8
**key** 68:13
**Kim** 63:21 64:5
66:8
**kind** 27:11 30:17
30:18 33:18
36:9 42:20
43:1 44:11
46:2 57:16
58:4 72:1
75:18 88:24
89:17 92:1
97:4,23 118:10
119:11 155:6
156:20 158:4
162:13 175:23
176:21 178:8
179:5 181:12
182:4,5 183:4
184:17 198:9
203:13 213:4
213:21
**kinds** 183:6
**King's** 94:7
**knew** 8:20 25:9
25:19 30:6
45:9,13 69:23

71:10 89:10
93:21 119:21
121:18 157:5
161:3 162:13
166:12 170:13
181:23 182:5
197:19,20
**know** 6:3,21
7:10 8:20
11:22 12:4,4
12:14 14:18
18:22 20:19,24
21:1,2,19,25
23:16 24:2
25:15,20 26:7
27:1,23 28:5
28:18 29:5,10
29:11,12,15,16
30:17 31:5,10
31:15 32:12,17
33:16 34:24
35:9,20,23
36:2,6 37:20
37:21 38:1,16
38:19 39:14,16
39:17 40:5,8
40:19 42:6
44:18 45:5,23
46:17,20,22
47:12,19 48:7
48:22 49:18
50:18 51:10,15
52:11 55:1,7
56:4,6,19
57:13,20 58:25
59:22 60:14,17
61:21 62:2,20
65:21 66:4,13
67:11 69:7
70:6 71:21
72:12,18 73:22
77:9,19 78:15
79:12,17 80:2
80:6,15 81:13
81:15,19 82:13

82:18,23 84:13
86:2,5,15,17
86:21 87:7
88:16 89:2,7,8
89:14,16 90:7
90:15,16,20,21
90:23 91:5
92:6,6 93:15
95:24,24 96:1
96:3,4,7,15,17
97:14,17,24
98:25 99:1,5,9
99:21 101:17
101:21 103:6
103:25 104:3
105:19,23
107:3 110:2,11
111:1,10
112:22 113:6
114:18 117:8
117:22 118:1,2
118:11,15,19
118:22,22
119:1,12 120:9
121:8,17,23
122:1,1,8,14
122:24 123:2,5
124:3,9,10,12
124:14,15,17
124:22 125:18
126:22 127:18
127:22 131:15
131:22 132:1,8
133:13,17
135:12,14,15
135:17,18
136:4,19
137:16,19
138:10,20
139:9,12 140:6
140:7 142:8
143:4 144:10
145:20,24
146:16 148:17
151:20,24

153:6,7 154:9
154:25 155:2,2
155:3,7,20,24
156:8,9,19,20
157:2,25 158:3
158:5,7,10
159:21,23,25
160:8,20
161:10 162:6
162:20,21
164:15 165:21
166:6,14,15,17
166:18,19
167:14,15
169:10 170:16
171:11 172:8
172:10,16,18
173:9,16,24,25
174:2,18,23
175:13,24
176:4,19 177:1
177:4,18
178:21 179:9
181:9 182:3,5
184:2,3,11,20
184:23,24,25
185:22 186:15
186:20,22,25
187:18,18
188:7 189:19
189:21 190:1
190:15 191:2
191:10 192:12
192:18,20
193:2,11
194:10 195:16
196:13,14
197:25 199:25
200:9 201:12
201:21,22
202:3,4,6,8
203:6,7 205:15
205:17 206:1
206:19 207:19
208:18,24,25

209:3 210:17
210:21,24
211:18 212:4,8
212:11,21,22
212:23 213:13
215:2
**knowledge**
23:11 24:4,19
25:17 30:14,23
31:14 34:9
36:13,17 37:11
38:21 42:1,13
43:7 44:14,19
45:2 47:18
48:6,9,24,25
50:3,12,13
54:23 55:11
56:15,25 65:15
69:4 70:3,4
71:19 72:17
73:23,25 74:11
76:10,20 77:6
79:11,14 80:14
80:17,22 81:22
84:11,23 86:11
86:14,20 96:23
97:2,19 101:23
101:25 102:18
102:25 103:3
104:8 105:12
110:25 120:12
120:23 122:10
131:8 135:2
136:25 152:22
161:12 166:10
169:5,17
177:14 180:18
181:8 186:1
208:4 210:13
210:16 211:13
211:23 212:1,2
**knowledgeable**
44:16
**known** 119:9
121:17

**KRC** 117:2,2,5
170:4,6 171:4
171:20,25
172:1
**Kristen** 204:1
207:5

**L**

**L** 3:1
**L-I-N-D** 169:1
**label** 43:17
**labeled** 35:1
**lady** 49:21
160:25
**Lake** 95:4
**land** 65:8 68:10
**Lane** 2:13
**laptop** 8:12,25
8:25 9:4,8,9,15
9:18,24 213:19
213:23,25
214:6,8
**laptops** 213:15
**large** 27:5
112:11
**lasted** 204:14
**late** 177:25
187:22
**lawful** 5:2
**Lawler** 68:18
69:3,10,20
**laws** 79:11
**lawsuit** 121:17
170:5
**lawsuits** 117:25
121:1
**lawyer** 32:5
37:17 38:5
205:15
**lawyers** 38:3
**lay** 90:17
**lead** 157:9
**learned** 87:3,4
**lease** 68:4 98:15
99:11 114:9
151:5 187:19

**leave** 128:9
159:23
**leaving** 88:2
**led** 189:7
**Lee's** 15:7,9,12
**left** 15:5 16:25
36:19 49:7
67:11 84:7
103:1 104:25
105:1 135:8
143:14 165:6
179:8 181:24
204:3 212:13
213:14
**left-hand** 35:1
**legal** 3:8 119:2
145:18 168:4
197:1,8
**legitimate** 19:23
**lending** 18:7,10
18:11
**let's** 24:23
**letter** 163:11,24
164:10,12,18
166:2 174:15
174:16 180:11
180:17,19
181:18 187:4
187:25 188:2,4
188:5,18,25
189:5,11 192:4
193:16 195:15
196:1,2 198:6
198:10 200:21
200:23 201:2,6
201:10,23
204:19 205:13
205:19 206:24
206:25 207:5,7
207:7 208:12
209:18,22
210:3,8,8
211:20
**level** 118:6,7,13
118:13

**Liberty** 98:11
100:8,20
102:17 112:3
113:1,4 121:25
122:3 123:18
124:13 125:4
125:11 127:24
130:21 131:9
141:12 143:10
144:2,18
145:16 152:10
152:20,23
158:16 160:12
161:8 174:13
180:20 181:1
183:19 185:2
186:7,11 187:4
187:16,19
210:18 213:9
**Lickfield** 172:11
**life** 14:25,25
30:19 88:11,12
**limit** 40:6
**limited** 33:3
34:4 41:18
44:14 45:17
50:2,8,14 83:2
95:18,22
106:17 110:13
111:14,16
115:25 131:15
153:19 163:12
165:8 207:24
208:5,9,23
**LIND** 169:1
**LIND000072**
78:7
**LIND000374**
204:24
**LIND100** 80:19
**LIND272** 163:17
163:20
**LIND372** 204:22
**LIND373** 163:23
**LIND374** 207:7

**Lindhorst** 37:25
163:17,25
170:17 205:4
**Lindner** 13:8
**line** 4:14 43:11
148:2,10,14
149:21 150:9
151:18
**lined** 45:3
**list** 13:23 73:7
**listed** 68:15
70:22 80:7,13
133:25 134:13
151:13 193:15
**listening** 25:15
**lists** 70:16,20
73:18 80:19
168:4
**little** 10:2,3
14:19 15:13
18:18,18 34:2
36:2 50:24
72:23 91:22
92:23 107:17
128:20 148:18
153:7 156:22
172:13 177:7
203:11
**living** 176:15,16
**LLC** 39:11,14
39:18 42:23
62:19,20 67:19
79:19,23 82:9
123:18 135:11
148:6 150:1,4
150:17 151:2
165:7 169:21
180:20
**loan** 121:24
122:22 123:17
123:22 124:2,5
124:19,22
152:13,20,23
**loans** 121:21
122:2 186:25

Michael Mason, 8/23/2019

15

| | | | | |
|---|---|---|---|---|
| **local** 198:24 | 178:21 | **M-I-C-H-A-E-L** | **marked** 75:11 | 139:24 172:8 |
| **locate** 28:15 | **looking** 30:24 | 8:3 | 76:7 114:22 | **Mayerik** 106:1 |
| **located** 160:1 | 39:9 75:19 | **Mac** 9:15,18 | 115:15 122:13 | 107:9 |
| **location** 173:3 | 90:20 125:14 | **Macintosh** 9:12 | 136:6 147:5 | **McMahon** 2:13 |
| **locations** 60:13 | 129:17 154:7,7 | **major** 68:8 | 204:23 | **MDP** 13:18 |
| 164:23 205:12 | 166:15 173:17 | **making** 27:15 | **marketing** 24:11 | **mean** 27:11 |
| **logo** 19:18 77:11 | 178:20 | 51:9 120:20 | 24:16 57:13 | 35:14 37:19 |
| 94:1 | **looks** 7:5 9:7 | 214:13 | 63:24 98:12 | 38:1,18 40:5 |
| **long** 14:11 15:11 | 10:4 30:11 | **mall** 167:8,20 | 99:16 128:21 | 45:2,25 49:17 |
| 16:9,23 26:13 | 36:14 57:19 | 173:14 174:4 | 129:1 133:8 | 54:1 58:3 |
| 30:23 55:21 | 102:7 134:17 | **malls** 145:19 | **marking** 132:10 | 61:20 64:10,24 |
| 59:1 104:4 | 134:23 147:11 | 167:4 173:23 | 140:22 | 68:7,23 74:20 |
| 105:10,14 | 180:19 198:6 | 174:10 | **Martin** 37:22 | 76:16 77:1,2 |
| 126:23 139:18 | 203:25 208:11 | **manage** 42:14 | 38:4,7,14,15 | 78:22,25 80:3 |
| 155:12 181:9 | **lose** 6:3 | 42:18 43:21 | 68:18 69:2,10 | 81:12 85:15 |
| 188:24 206:4 | **loss** 85:16 | 81:24 82:1 | 69:16,19 70:1 | 87:2 89:6,14 |
| **longer** 16:19 | **losses** 85:22 86:3 | 91:18 92:5,25 | 163:11 205:15 | 95:20 96:3 |
| 58:24 77:19 | **lost** 199:12 | 179:4 | **Martino's** | 97:7,11,20,22 |
| 89:24 90:23 | **lot** 8:22 13:17 | **managed** 62:22 | 119:11,21 | 98:9,10 100:24 |
| 103:18 201:20 | 23:15,16 37:8 | 65:5 71:2 | **Mason** 1:14 3:4 | 103:16 107:21 |
| 205:10 | 44:19 57:23 | **management** | 4:3 5:1 7:25 | 110:7 111:12 |
| **longest** 94:3 | 58:3 60:7 | 13:4,5,18,19 | 8:3 30:3,6 35:5 | 112:5,8,9 |
| **look** 7:14 9:10 | 70:13 76:23 | 13:24 15:1 | 35:11,23 36:6 | 113:3 116:15 |
| 19:20,25 26:20 | 78:18 80:3 | 42:23 62:18,20 | 39:11,14,18,24 | 117:6,9,17 |
| 26:23,24 28:21 | 82:11 100:4 | 63:9,10 67:14 | 40:10 41:17 | 118:20 119:1 |
| 29:3 34:3 35:6 | 112:11 117:9,9 | 67:19 68:12,14 | 43:7 59:16 | 119:16,17 |
| 35:7 37:2,9 | 124:11 155:1 | 70:16 73:7 | 70:10,17 76:6 | 122:9 128:23 |
| 55:6 57:12 | 168:9 177:14 | 78:7 79:19,23 | 80:21 115:13 | 129:10,16 |
| 58:21 59:24,25 | 181:16 194:20 | 81:14 82:9 | 122:19 132:24 | 138:10 139:14 |
| 61:5 67:6 | **loudly** 195:7 | 115:8 135:19 | 141:3 147:4 | 145:2,3 152:17 |
| 82:22,24 93:16 | **lower** 53:25 54:1 | 140:13 150:20 | 164:5 165:7 | 153:12,25 |
| 120:1,22,25 | **LP** 33:5 42:16 | 169:23 173:21 | 180:16 204:3 | 154:1,5 160:24 |
| 123:19 125:17 | 50:8 59:20 | 199:19 | 215:7 216:6 | 162:12,21 |
| 134:15 135:9 | 62:1 63:8,9 | **manager** 15:2 | **Mason's** 7:19,20 | 163:8 166:15 |
| 159:24 186:6 | 135:8 166:6 | 17:12 24:12 | 35:5 122:12 | 167:12 171:10 |
| 186:10 191:23 | 170:4 | 89:9 103:24 | **material** 60:7,10 | 172:12 173:4,5 |
| 192:2 196:16 | **luckily** 76:12 | 129:12 213:7 | **materials** 7:14 | 174:22 175:1,4 |
| **looked** 29:12,13 | 104:24 | **manager's** 21:15 | 7:16 32:2,3 | 176:12 181:24 |
| 36:25 86:10 | **Lumen** 169:10 | **managers** | 47:25 50:21 | 181:25,25 |
| 93:6 94:7 | **lunch** 139:20 | 198:16 213:4 | 56:17,23 57:3 | 182:4 184:7,9 |
| 101:2 123:16 | 201:13,16 | **managing** 62:18 | 79:10 83:8 | 184:15 186:23 |
| 123:19 125:16 | **lunches** 183:5 | 63:1,14 67:20 | 113:1 | 187:20 189:6 |
| 153:24 154:1 | ——————— | 81:17,19 92:14 | **maternity** 128:8 | 190:13 194:25 |
| 154:10,11 | **M** | **maps** 60:13 | **Matt** 160:24 | 195:17 197:21 |
| 173:7 174:4 | **M-A-S-O-N** 8:4 | **mark** 59:9,10 | **matter** 76:15 | 197:23 200:9 |
| | **M-E-R-C** 78:2 | | | |

Michael Mason, 8/23/2019

| | | | | |
|---|---|---|---|---|
| 210:19 212:11 | 62:18 63:1 | 185:9 191:5 | 104:17,19 | 141:24 |
| **meaning** 82:25 | 67:20 121:4 | 192:16 195:15 | 105:6,8,11,15 | **mock** 88:24 |
| **means** 107:21 | 133:25 134:4 | **mentions** 36:18 | 105:25 107:6 | **moment** 19:6 |
| 216:10 | 148:8,12,21,23 | 42:9 62:1,17 | 114:23 119:9 | 34:12 114:20 |
| **meant** 193:25 | 165:8 205:23 | 67:10,19 68:13 | 119:23 120:7 | **moments** 78:14 |
| 194:1 | **members** 28:23 | 70:16 115:24 | 121:5,6 122:14 | **money** 19:16,21 |
| **mechanism** | 28:24 | 165:12 166:5 | 127:4 140:8,22 | 40:25 65:1,3 |
| 20:12 | **memo** 56:10,14 | 180:19 205:19 | 146:15 178:14 | 110:20 119:20 |
| **meet** 24:23 44:9 | 115:16,23 | 206:9,24 | 178:15,21,22 | 131:11,16,20 |
| 48:12 105:5,10 | **Memorandum** | **MERC** 78:1 | 180:9 188:7 | 132:2 139:25 |
| 155:10 156:3 | 32:20,24 34:4 | **met** 120:2 | 196:14 214:16 | 150:5 153:3 |
| **meeting** 23:10 | 34:21 36:14 | 156:17 205:18 | **Mike.mason@...** | 161:21 184:17 |
| 23:19,23 24:3 | 38:20 39:9,20 | 214:3 | 123:13 | 187:1 193:7 |
| 24:7,9,12,20 | 49:24 50:1 | **Mexican** 140:5 | **Mikes** 35:18 | 205:11 208:9 |
| 25:1,22 26:11 | 56:12 | **MGMT** 169:20 | **Milford** 12:22 | **moneys** 42:7 |
| 26:13,16,18 | **mention** 32:6 | **Michael** 1:14 2:9 | **million** 28:12,13 | **Montgomery** |
| 27:19 29:23 | 50:7 61:12 | 3:4 4:3 5:1,14 | 28:15 40:16,19 | 154:11 |
| 30:11 31:9,10 | 69:9 116:5 | 5:16 6:13,25 | 40:23 41:5,13 | **month** 9:3 23:24 |
| 31:17,21 33:9 | 117:5 171:6 | 8:3 34:23 | 41:16,23,25 | 107:3,4,4 |
| 82:14,14 94:4 | 202:10 212:5 | 74:23 80:20,20 | 62:11 134:25 | 170:11 181:12 |
| 105:16,19,24 | **mentioned** 8:24 | 80:22 81:5 | 137:20 151:25 | 206:12 |
| 106:6,14,21,25 | 22:18 23:6 | 215:7 216:6 | 208:11 | **monthly** 20:2,20 |
| 107:2,11,14 | 30:25 32:19 | **middle** 1:1 31:14 | **mind** 90:18 | 65:4 |
| 108:13,20,22 | 33:7 34:21 | 41:10 61:21 | 112:8 164:20 | **months** 15:24,25 |
| 109:1,12 | 36:24 40:14 | **Middletown** | 198:9 | 15:25 30:16,16 |
| 110:10 111:5 | 44:25 45:11 | 173:10 | **mine** 60:7,22 | 31:1,25 55:25 |
| 120:4 162:14 | 47:20 50:25 | **Midwest** 29:19 | 139:20 | 89:22 103:11 |
| 187:23 193:10 | 57:6 58:20 | 77:11 172:4 | **minute** 48:9 | 104:14 109:11 |
| 204:12 | 60:3 62:2,10 | **Mike** 6:25 7:1,3 | 138:18 | 111:21 181:13 |
| **meetings** 31:24 | 64:5,8 67:24 | 7:15 22:13,19 | **minutes** 26:14 | 189:17,23,25 |
| 32:7 33:8,12 | 72:5 77:14 | 22:21 23:7,12 | 35:7 203:12 | 190:25 206:8 |
| 38:13 44:23 | 87:19 91:2 | 23:13 24:21,24 | 204:14 | **Montoya** 123:2 |
| 45:19 46:5,8 | 92:21 99:10 | 27:2,2 28:22 | **minutia** 8:22 | **moot** 167:16 |
| 46:11,15 47:2 | 102:6 103:21 | 30:20 31:7 | **misprint** 6:2 | **morning** 5:23 |
| 48:1 49:10 | 106:21 111:4 | 32:9,16,17 | **Mister** 35:14 | 201:12 |
| 54:24 55:12 | 112:16 116:24 | 35:6,8,21 36:2 | **mix** 93:13 | **Morris** 1:21 2:3 |
| 78:23 82:8,11 | 117:7 124:7 | 38:13 45:9 | **mixed** 41:8 | 2:6 |
| 85:11,13,14,18 | 129:21 132:6 | 54:25 55:15 | **ML** 100:15,16 | **mother** 202:5 |
| 90:14 96:22 | 137:4 139:2 | 59:11 63:25 | 100:22 101:3,8 | **MoU** 32:14,19 |
| 104:17,19 | 142:17,24 | 66:23,23 68:8 | 102:2 126:1,3 | 38:24 |
| 105:2,13 | 144:1 153:12 | 70:6 72:25 | 129:12,22 | **mountains** 93:25 |
| 106:22 108:25 | 153:13 164:18 | 75:21 78:6 | 136:11,20,23 | **move** 39:2 |
| 112:5 116:15 | 166:23 170:16 | 80:5 83:7 | 137:5,16,20 | 124:10 162:3 |
| 176:22 | 177:9,12 179:1 | 85:13 88:4 | 139:11,19,20 | 175:19,20,22 |
| **member** 28:25 | 181:7 182:15 | 93:3 104:13,15 | 140:23 141:7 | 176:2,8 188:6 |

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

moved 88:13
moves 10:15
moving 31:18
  75:21 78:5
  93:20 152:25
  163:17 175:8
  175:25 178:2
multiple 13:22
Myers 204:1
  207:5
Myree 127:11
  127:12 185:11
  193:15 207:4

**N**

N 3:1
name 5:9 8:1
  23:20 26:7
  29:20 35:21,25
  37:22 42:10
  49:19 63:17
  68:19,21 69:22
  70:12 76:16
  77:1 91:11
  103:23,25
  145:15,18,18
  148:5,9 149:25
  150:8,9 151:1
  151:17 152:14
  154:17 169:12
  169:14 172:17
  173:21 179:1
  186:24 187:8
  206:4
named 23:7 26:4
  68:18 70:8
  91:5,20 172:10
  209:1
names 11:21
  30:4 160:18
  173:10
Naples 2:8
NARDELL 4:20
  4:22 132:18
  140:25 146:19
  163:23 164:1

165:25 168:6
168:12,16,19
180:13 203:17
203:21 208:17
Nardella 2:9,10
  2:10 4:15,15
  4:16,16,17,17
  4:18,18,19,19
  4:20,21,21,22
  4:23,23,24
  5:14 6:16
  25:11 34:11
  35:3 36:4
  47:13 55:24
  59:13 73:2
  74:25 75:4,8
  78:9 79:15
  101:20 102:3
  115:2,6,10
  122:16 127:6
  132:14,21
  138:3,8,14
  146:25 163:18
  178:5 188:11
  198:4 200:24
  201:3,7 209:24
  210:6,12
  214:18
Nathan 26:4
Nathan's 26:7
NCA 46:3 48:17
  48:18,21
necessarily 47:5
  174:22
need 12:12
  22:24 23:1
  28:11 30:20
  34:13,14 55:7
  72:19 112:23
  144:25 183:24
  190:20 191:22
  192:6
needed 18:11
  32:8,15 64:1
  99:20 124:4

192:14 201:20
needing 124:1
  126:4 183:18
needs 12:14
neglected 114:10
negligence 171:8
negotiating 38:8
  98:14,18
negotiations
  37:11,18 50:20
  54:17,18 55:21
  56:2 83:17
  98:23 99:11
neighborhood
  210:20
neither 216:11
never 30:4 47:18
  49:15 68:24,25
  70:13 71:9
  74:12 95:20
  102:22 103:9
  103:20 116:13
  118:11 125:16
  153:14 158:5
  166:17 167:16
  167:22 169:17
  171:16,17,19
  171:22 176:5
  183:11 186:5
  195:19 201:1
  210:22 213:17
new 6:19 9:15
  16:18 17:15
  47:15 65:23
  97:21,24
  118:12 156:21
  167:3 173:12
  173:13,17
  174:1 175:10
  175:10,11
  179:6
newer 9:17
news 202:24
newspaper 29:4
nice 175:12

night 47:6
nine 15:24,25
  41:13
Ninety 18:15
nodded 53:2
  62:8 143:2
  146:7 171:1
nodding 146:10
nods 11:4 50:22
  52:25 62:6
  83:14 142:25
  146:6 170:24
  185:6
noes 11:13
non-subject
  172:8
non-sufficient
  198:18 199:18
nonpayment
  174:12 191:20
normally 38:24
north 173:13
northern 173:13
notary 1:24 3:11
  216:5,19
note 5:12 6:8
  7:19 215:2
noted 77:12
  192:5
notice 1:18 3:7,8
  133:25 176:11
  191:7
noticed 6:11
  21:18
notices 176:24
notified 47:14
notify 152:18
November 16:25
  87:22 89:24
  102:19 116:13
  125:6 143:21
  144:12,14,15
  144:19 145:4
  147:17 149:9
  149:12 151:22

152:2 154:12
155:23 170:5
number 5:19 7:7
  11:19 18:16,23
  36:19 40:3,9
  43:3,16 66:25
  75:1,2 89:20
  89:21 93:11
  94:7 95:5
  103:5 113:18
  117:7 132:12
  133:25 134:4
  134:13 144:23
  146:23 148:14
  148:21,23
  153:24 154:2
  163:19 167:10
  167:18 174:23
  178:3 189:9
  194:23 195:18
  198:7
numbered
  114:24 122:15
  188:8,14
  204:22
numbers 58:18
  60:17 86:7
  148:25 149:1

**O**

O 3:1
O-L-D-E-N 64:6
oath 197:25
Object 25:11
  34:11 47:13
  55:24 79:15
  101:20 102:3
  138:3,8,14
  165:25 198:4
  200:24 201:3,7
  208:17 209:24
  210:6,12
OBJECTIONS
  4:14
objectives 61:4
obligation 65:4

Michael Mason, 8/23/2019

18

obtained 8:7
9:17 82:3
obvious 194:19
obviously 12:14
68:8 99:10
198:12 215:2
occasionally
176:20
Occupancy
142:7 143:20
Occupation
143:5
occurred 49:5
117:25 120:4
151:21 153:22
167:14
occurring
110:13
occurs 84:19
October 17:1
59:5 132:7
134:8 136:24
145:25 162:1
162:10,18
offended 35:25
offering 32:3
office 22:15
25:24 26:2
112:14,15
125:20 176:14
179:5,17,21
201:11,16
216:15
officer 82:13
114:13 193:15
offices 1:20
38:17
official 216:15
oh 2:14 10:8
47:24 52:17
75:4 81:2
93:18 97:16
100:19 101:4
103:9 117:12
122:6,8 134:22

137:2 143:7,16
144:5 148:3
156:4
Ohio 1:22,25 2:5
54:6 161:2
216:2,6,16,19
okay 14:18 23:6
24:10,20 25:13
27:18 28:16
32:19 34:2
35:3 36:4 41:7
41:19,23 42:13
42:22 43:18
44:25 45:18
48:14,23 49:4
49:9 50:9,9
52:17 59:13
60:19 61:1,10
61:17 62:10
64:7 72:22
73:2,23 74:25
75:5,17 76:2,6
78:9 83:12,21
92:13 100:7
103:20,25
105:7 106:24
108:19 109:5
111:18 115:6
115:13 121:14
122:16,19
125:9 127:5
130:1,3,11
134:7,12,23
135:11 136:5
140:19 141:13
141:16 142:13
142:20 143:16
143:19,22,23
144:5 145:24
146:4,19,21
147:2,19,22
148:7,12 149:5
153:9 154:15
154:18,21
156:9 158:19

158:23 159:15
160:8,11,15
162:6 164:3
165:11 167:24
168:16 171:23
172:14,15,19
180:14 184:20
187:14 188:1
193:2 198:5
200:3,20
202:10,23
203:15 204:10
212:5
Olden 63:21
64:6,7 66:8
older 8:12 9:24
once 19:8 27:11
27:13 58:16
84:23 155:17
191:11,14
195:9 212:16
one-third 41:4
one-year 9:14
ones 13:22 32:9
48:22 82:12
94:8 126:11
165:20,20
online 5:21
open 102:17
110:20 112:3
113:1 125:21
142:12 143:10
144:2 145:1,1
145:12 170:12
214:15
opened 19:9
92:12 95:21
102:21 112:10
125:6,12
128:11 143:9
159:8 211:12
211:17 214:10
opening 40:22
112:2 133:21
211:8

opens 145:19
operate 110:21
193:12
operated 64:12
66:2 92:10
96:2 125:7
operating 50:10
60:16,16 71:7
78:6 95:6
114:13 211:4
214:11
operation 18:3
211:25
operational 17:5
17:14 20:1
33:22 34:8
70:15 72:3,8
73:7 84:1,4,6
84:24 86:16
87:12 102:14
106:12 128:22
operationally
128:20
operations 16:8
16:15,20,21
17:2,17 19:8
22:3 65:9
70:24 98:8
106:4 114:18
116:18 156:18
156:23 176:3
193:15
opinion 38:24
101:15 184:16
Opp 42:23 62:18
62:19 67:18
78:7 79:19,22
82:9
opportunities
22:4 33:5
42:15 50:8,25
56:5 57:8,13
59:20 62:1
63:8 82:25
90:21 91:17

92:2 95:9,18
109:7 120:21
121:12 131:19
133:14 135:8
136:24 166:6
206:20 211:16
opportunity
24:23 89:3
91:19,20,20,21
91:23,23,24
183:14
opposing 5:14
Opps 81:14
option 68:3,6
166:3 207:8,10
options 160:6
order 10:19
145:12 148:9
148:10,10,14
150:8 151:17
190:15
ordered 66:4
orders 71:8
organization
42:17 194:6,8
198:1,14
Organizational
66:16
organized 67:8
original 60:20
origins 25:4
Orlando 1:2
2:11 154:3
173:7 175:8,22
176:16 182:4
192:20 203:2
Osage 23:14
outgoing 146:24
147:12
outside 85:9
outsider 97:8
overall 99:4
145:9
oversee 65:7,16
92:4,5

Michael Mason, 8/23/2019

19

oversight 64:22
owed 139:25
  180:21 184:17
owned 18:13
  41:15 42:9
  64:11 104:2
  145:16 211:16
owner 41:11
  145:9 169:7
  171:12
owners 27:2
owns 88:16

**P**

**P** 3:1
**P&L** 20:22
  85:15
**P&Ls** 60:16
  85:12
**p.m** 215:12
**package** 115:3
  196:11
**page** 4:5,14
  36:20,23 43:3
  43:15,16 51:20
  59:23 61:3,5,8
  66:14,15 68:11
  70:20 78:8
  80:18 114:24
  114:25 133:1
  141:5,6 142:4
  146:23 147:6
  148:19,20
  149:10 151:7
  168:3,22 169:1
  170:3 205:2
  207:6
**pages** 34:25
  61:17
**paid** 21:25
  101:19 102:1
  125:24 126:2,4
  126:8 131:9
  137:17 139:13
  174:24,25
  175:14 176:18

191:13 192:13
198:15,17
**Palomar** 51:21
  52:14,15,19
  53:6,12 71:16
  83:22 84:2,3
  84:20 87:11
  130:10,12
**paper** 67:3
  119:14,17,18
  162:5,11
**papers** 117:17
**paperwork** 96:5
**paragraph**
  39:23 41:11
  61:21,25
  164:19,21
  205:20
**parent** 98:19
**parents** 118:9,17
**Park** 22:16
**part** 21:24 22:2
  26:5,10 28:20
  38:2,18 64:3
  65:6 66:6
  67:23,25 71:7
  77:4 87:3
  88:16 93:9
  129:7 135:13
  155:4,6 198:14
  199:7 203:8
**particular** 28:24
  111:7 167:21
**Particularly**
  114:4,6
**parties** 3:3 39:4
  39:6 216:11
**partner** 41:18
  81:17,20
  106:17 110:14
  115:25 131:16
  163:5 165:6
  205:24 207:24
  208:5
**partners** 163:12

208:9,23
**partnership**
  33:3 34:5 50:2
  50:8,15 62:2
  63:11 81:20,25
  82:1,6 83:2
  95:19,22
  115:18 153:19
  164:23 165:4,6
**partnership's**
  82:3
**parts** 79:3
**passed** 37:9 58:4
  80:4
**pausing** 34:12
**pay** 101:8
  124:12 138:12
  145:2 177:4,5
  177:20 181:6
  185:23 186:7
  198:16 199:13
  201:22 202:1,2
**paying** 71:9
  136:20 181:3
  181:10
**payment** 127:8
  181:15,16
  197:4
**payments** 65:18
  127:15 199:18
**payroll** 198:20
**Peaks** 93:15,17
  93:23
**pending** 12:16
**people** 19:16
  25:24 65:2,3
  90:15 118:22
  119:14 154:7
  155:7 167:20
  176:22 210:20
  210:21
**percent** 18:15
  81:24 107:23
  142:15 199:14
**Perfect** 148:4

**performed**
  169:18
**period** 9:13 20:3
  20:17 21:8
  27:25 30:15
  33:9 40:7
  88:14 100:2
  104:7,12
  105:14,17
  108:24 111:24
  113:17 116:10
  125:17 129:4
  138:2 162:7
  177:22 183:8
  183:17 191:16
  203:5 206:23
  207:20,23
**periodically**
  131:25
**periods** 89:1
**permission** 45:7
**person** 63:22
  68:15 73:12
  99:19 126:25
  127:14
**personal** 9:24
  124:16 184:21
**personally** 7:22
**Personnel** 66:17
**pertinent** 8:14
**phase** 74:6
**phases** 74:2
**phone** 5:15
  44:10 70:5
  103:6 126:10
  126:19 146:18
  157:20 204:13
**photo** 76:2
**physical** 27:16
**piece** 27:24 49:2
  65:12 77:2
  89:9 128:17
**pieces** 128:19
**pitch** 47:2 48:20
  49:10

**pitches** 49:4
**Pittsburgh**
  166:5,16
  167:21,22
**place** 1:18 2:7
  38:11 55:22
  72:10 76:5
  105:20 106:2
  167:3 210:1
  216:8
**Placement** 32:24
  34:4 50:1
**places** 21:20
  94:7 113:19
  154:8 174:3
  179:7 192:14
  192:17,17
**plaintiff** 1:8,15
  2:3,6 3:5 5:10
**plan** 32:3 33:1,2
  33:18,20,21,21
  33:22,24 42:19
  43:1 48:5 50:1
  50:15 56:22
  57:7,25 58:8
  58:11,15,16
  59:12,21 60:1
  60:5 66:15
  72:15 73:15,18
  74:1,5 77:7
  115:8,8
**plans** 98:8
  113:16 116:9
**please** 8:2 10:21
  11:7,18 12:4
  12:12 35:6
  36:6 59:10,17
  76:8 78:13
  122:19 140:16
  148:15 150:8
  164:21 178:12
  204:3
**plumber** 113:8
**Plus** 160:20
**point** 11:18

Michael Mason, 8/23/2019

20

27:14 28:10 46:18 47:21,23 73:5 77:19 89:8,23 100:5 157:8 160:17 165:9 167:17 169:10 175:2,3 182:2
**points** 108:18
**populated** 57:17
**Porter** 1:20 2:3 2:6
**POS** 17:18
**position** 15:17 16:7 88:8,16 179:10 189:18 210:3
**Positions** 60:22
**positive** 59:6
**possessed** 8:16 9:7
**possession** 9:23
**possibility** 207:12
**possible** 11:14 26:2 117:9 122:9 153:13 212:10
**possibly** 48:2 52:10 56:11 76:25 106:1 157:20,21
**posted** 176:20
**potential** 17:22 22:4 47:25 51:7
**potentially** 90:3 155:18
**potentials** 94:24
**Poughkeepsie** 173:9 174:9
**Power** 46:18 47:21,23
**PPM** 56:22
**preference** 7:2

**pregnant** 100:1
**prepare** 18:11 188:18,21 189:5
**prepared** 32:2 32:13,15 46:22 61:18 188:20
**preparing** 32:16 38:9
**presence** 3:12
**present** 33:13,15 33:17
**presentation** 46:19 47:22
**presented** 187:3
**presents** 207:8
**president** 16:21 30:9 79:19,22 80:1,8,20,21 80:23,25 81:1 81:6 88:9 90:19 91:3,3,9 99:17 106:3 128:5 180:1 202:20
**pressure** 20:8 112:5,25 158:8 158:11
**presumably** 208:10
**presumes** 16:14
**pretty** 13:23 15:3 17:16 20:21 23:2 28:2 58:5 60:22 65:11 88:22 91:22 97:8 98:2 116:16 126:24 156:14 158:14 184:12 196:3 202:9 213:5
**prevent** 116:6 194:1
**previous** 9:18

23:8 36:23 71:1 110:9 179:10 207:5
**previously** 64:21
**primarily** 100:11
**primary** 99:15
**principal** 96:14
**principals** 39:18 96:10,11 192:6
**principle** 160:25
**printed** 67:4 148:9 150:9 151:17
**printout** 132:16
**prior** 20:18 23:3 23:19 29:6 93:3 108:7 119:5 189:7,17
**Private** 32:24 34:3 50:1
**privy** 174:20 187:14
**Pro** 1:9
**probably** 16:11 21:5 22:10 30:16 31:23 37:5 46:24 73:12 94:3,22 95:20 104:18 105:17,21 107:4 120:6 125:15 127:25 141:21 155:19 189:16 191:17 194:10
**problems** 104:10 112:17,19,20 117:23 125:4 125:11,13 209:15,20 213:1
**Procedure** 1:17 3:7
**proceeding** 6:11

209:9
**proceedings** 168:4
**process** 25:7 27:6,20,21 29:18 31:4 44:5 48:20 53:8,13,18,19 62:5 69:17 101:16 118:2 146:5 173:22
**processes** 19:18 30:12
**produce** 48:2
**produced** 32:8 33:19
**product** 37:11
**profile** 73:11
**Profit** 85:16
**profits** 85:22 86:1
**program** 23:17 25:3,9,18,19 26:17,24 28:7 28:14 39:6 43:10,14 44:1 45:21 48:25 49:1 51:11 52:1,8,11,21 52:24 53:23 55:8 108:1,3,9 117:18,21 175:7 208:6
**programs** 13:14 13:20,20 48:16 98:12
**progress** 106:12 119:12
**progressing** 84:21
**project** 38:8,9 40:12,15,25 41:11,13,14 43:22 44:7 47:16 100:10

100:14 118:5 119:4 120:8,14 120:23 121:2 129:12,15 130:4 207:13 207:17
**projected** 182:19
**projections** 60:16
**projects** 130:7
**promotional** 76:3
**prompted** 23:10 24:21 188:1,4
**properties** 68:1 68:5
**property** 114:9
**propose** 6:19
**provide** 20:14 161:7,10 164:23 165:2 165:13 205:11 205:24
**provided** 9:21 41:14 165:24
**providing** 10:24 141:24
**provisions** 184:22
**PTM** 168:9
**public** 1:24 3:11 215:5,19
**publications** 76:25
**pull** 109:6,15,19 110:3
**pulled** 110:11
**pulling** 111:21
**punishment** 20:11
**purchase** 68:1,8 114:8
**purchased** 14:14 66:5

Michael Mason, 8/23/2019

21

purchasing 65:8
65:23 66:5
71:9
purpose 190:18
purposes 76:14
pursuant 1:16
1:17 3:6 7:20
216:8
pushing 158:7
put 20:7,22
21:13 40:25
57:10 60:14
73:12 80:5
125:18 158:4,8
167:5 178:10
179:4,17
puts 67:12
putting 27:23
94:9 158:11
173:23

**Q**

qualifications
13:18
qualified 28:10
216:5
qualify 51:8
53:22,25 54:2
quarterly 20:2
85:20
question 10:21
10:22 11:15,17
12:7,16,17
21:2 44:21
49:17 55:2
71:1 79:21
104:21,22,23
125:22 184:6
questioning 10:3
110:8
questions 11:6
69:17 79:1
129:17 214:17
214:18
quick 7:13 36:12
59:24 73:5

138:23
quickly 89:22
quit 146:10
182:2,4,11
quite 30:5 57:23
93:1 95:7
112:11

**R**

R 216:1
R-E-D-I 160:14
race 173:25
raised 190:6
201:6
ran 180:2
range 57:11
rarely 112:15
125:19
ratio 41:6
RE- 4:2,2
re-clarify 102:11
reaching 24:21
24:25
read 36:10 37:8
69:7 134:4
148:14 149:21
150:8 204:2,4
209:13 211:9
reading 117:17
160:19 164:20
real 62:22 67:23
67:24 81:11,13
110:2
realize 95:22
really 21:22 31:4
31:15 39:16,19
57:18 67:1
74:20 94:23
101:14 111:1
116:14 162:3
163:7 167:14
167:22 168:21
168:22 169:23
174:20 189:14
189:14 201:21
201:24 205:7

212:23
realm 166:14
reason 5:17 6:1
11:16 68:24
110:2 136:19
137:25 139:14
139:17 151:20
153:2 194:16
201:24,25
reasonable
141:23
reasons 124:18
168:18
recall 10:13 21:1
26:1 29:20
32:13 40:5,13
48:4 55:9
58:12 61:23
69:25 74:20
77:14 79:4,6
80:11 81:4,8
82:12 86:1,9
87:18 90:10
105:16 106:19
107:8,13
108:18,20
109:17,23
111:9,24
115:22 120:3
123:17 124:1,4
124:24 125:2
126:11 128:12
129:19 141:19
144:17 145:3
152:21 153:11
153:20,25
154:21 157:1
161:22,24
169:25 170:1
171:17,21
172:1 174:11
174:14 177:17
181:19,21
182:7 199:24
207:13,18

212:12,18
recap 47:10
receipt 165:1
receive 12:25
13:10 20:10,20
103:4,10
181:18
received 86:24
126:10
receiving 127:18
141:19 147:23
Recipe 15:9
recital 39:22
recollection 57:1
57:5 58:5
77:17 82:20
117:10 198:11
record 5:13 8:2
10:18 34:15,17
73:3 114:21
138:23,24
168:20,25
180:9 215:4
recorder 11:2
recruit 45:23
recruiting 48:20
recruitment
49:2
Redi 160:14,16
Reds 212:22
reduce 187:6
196:12,15
reducing 196:20
references
195:18
referred 56:13
126:25
referring 20:17
178:14,15
refill 73:1
reflect 39:5
reflects 67:20,25
refreshed 104:6
regarding
115:17 141:7

141:10 163:12
167:1 184:4
192:7 204:19
204:20
Regional 77:11
172:4
reimbursements
199:17
reinitiate 31:7
related 47:3
55:22 70:2
82:9 84:25
87:1 120:21
121:1 127:23
142:1 152:5
153:23 157:13
161:11 170:5
171:20 183:9
184:22 187:4
187:15 189:10
193:19 196:1
196:22 197:4
relates 170:3
relationship
118:8,9,16
relative 216:11
relatively 176:15
release 116:5
released 87:16
110:14 116:1
131:20,23
132:2,6
relevant 166:4
religiously 199:4
remained 73:24
remember 12:1
14:10,19,20
15:23 23:22
25:23 27:20
29:10 31:20
32:25 41:9
55:18 66:24
67:4 72:12
84:18 104:4
106:5,25

Michael Mason, 8/23/2019

22

| | | | | |
|---|---|---|---|---|
| 107:15 109:2,4 | requirements | 98:5,10 102:8 | 137:15 152:6,9 | Richard 172:11 |
| 109:13 118:20 | 25:4 28:8 | 102:16 112:10 | 157:23 165:24 | right 10:11 |
| 121:4 123:22 | rescind 207:8,14 | 112:10,20 | 166:10 172:22 | 11:23,23 23:5 |
| 123:23,25 | rescinded | 113:12,13,17 | 173:20 183:10 | 34:9 35:12 |
| 126:14,18 | 208:15 | 114:6 116:18 | 206:11,21 | 37:6 48:12 |
| 155:25 156:1 | research 28:2,17 | 125:21 128:11 | 211:5,12,15,25 | 53:9 55:16,17 |
| 158:8 162:21 | 28:20 149:23 | 128:16 129:4 | result 118:19 | 68:15 70:17 |
| 170:11 178:7 | researched 29:4 | 131:9 139:4 | 216:14 | 71:4 89:4 |
| 183:12 198:21 | resemble 75:25 | 140:5 141:11 | resulting 198:25 | 112:12 114:21 |
| removed 9:8 | reservations | 144:2 152:10 | retained 48:15 | 115:6 122:16 |
| 162:24 163:3 | 107:25 | 158:16 159:2,8 | retro 87:3,4 | 134:2 135:9 |
| 179:4,9,16 | reset 214:9,11 | 160:11,13 | return 155:15 | 136:15 139:1,4 |
| rent 144:18,24 | resolve 210:14 | 170:12 173:18 | returned 199:21 | 140:14,21 |
| 145:2,4,13 | resolved 26:15 | 174:13 179:12 | returning | 143:7 144:12 |
| 171:12 174:13 | resources | 182:17,21 | 152:25 161:25 | 148:22 159:8 |
| 181:3,6,10,15 | 185:15 205:11 | 183:15,20 | 207:6 | 163:16 186:19 |
| 181:22 187:6,6 | respect 167:1 | 206:10 | revamping | 193:16 195:5 |
| 187:15 | respective 3:3 | restaurant's | 173:23 | 203:21 208:15 |
| rental 171:11 | 61:15 | 196:15 | revenue 85:22 | 215:1 |
| rephrase 11:18 | respond 11:6,16 | RestaurantO... | 85:24,25 145:2 | rightfully 100:4 |
| replaced 172:7 | 213:12 | 57:16 | 183:7,19,23 | ring 37:22 42:23 |
| reported 64:2 | responding 12:6 | restaurants | 211:6,24 | 51:21 78:2 |
| 89:10 | response 8:17 | 13:25 17:25 | revenues 18:8 | 152:15 160:10 |
| reporter 3:11 | 200:22 201:9 | 18:3,6,7,12 | 86:16 | 173:10 |
| 10:18 11:2 | 209:22 | 19:12,14,22 | reverse 135:23 | Rings 93:13 |
| 18:20 53:1 | responsibilities | 21:10 22:5 | review 17:20 | 94:12 108:4 |
| 62:7 83:15 | 17:3 120:15,18 | 23:18 39:25 | 37:14 50:14 | 166:5,21 167:6 |
| 143:1 146:7,13 | 179:8 | 40:4 42:5 | 58:17 59:23 | 167:19 174:8 |
| 170:25 185:7 | responsibility | 51:14 52:4 | 63:7 72:15 | 205:10 206:10 |
| reporting | 19:14 21:15 | 53:17 54:2 | 85:21 106:7 | 206:11 |
| 216:12 | 99:15 116:22 | 63:10 64:16 | 200:11 203:12 | risk 198:18 |
| reports 21:4 | responsible 17:6 | 65:9,17 67:14 | reviewed 27:19 | 199:1 |
| 200:5 | 17:9,19,21 | 71:11,14,18,24 | 106:10 | risks 199:2,12 |
| represent 5:10 | 51:2,3 79:9 | 72:6 74:2 | reviewing 27:21 | 199:16 |
| 43:8 67:13 | rest 7:11 35:11 | 84:10,14,24 | revised 73:21 | road 94:17 |
| 76:3 | restart 214:12 | 85:2,23 86:12 | RG 91:21,24 | 154:11 166:18 |
| representative | restaurant 13:17 | 86:15,19 87:11 | 95:9 122:2 | Rodizio 44:16 |
| 176:24 | 30:17 40:15 | 92:9,12,22 | 123:17 125:4 | 44:21 45:12 |
| reputation | 51:7,19,23 | 93:2,9 99:24 | 125:11 127:23 | 48:10,24 92:21 |
| 199:19 | 52:14,19,22 | 99:25 102:14 | 131:19 152:20 | 93:4,6 94:11 |
| request 146:24 | 53:7,13 57:11 | 102:20,24 | 152:23 169:20 | 94:25 95:5,5,8 |
| 147:12,14,20 | 70:25 71:1 | 103:2 106:11 | 180:20 181:1 | 98:19,21,23,25 |
| 150:14 212:6 | 73:19 76:4 | 110:21 111:14 | 186:10 187:4 | 100:8 102:16 |
| required 27:7 | 83:18 84:3 | 116:7,11,19 | 187:16,19 | 112:2,17 |
| 37:7 51:12 | 85:10 89:6 | 130:24 131:2,7 | Rich 178:23 | 113:11 121:24 |

138:12 139:4
140:9 141:12
142:2 152:8
159:1 160:12
161:8 169:23
170:11 172:17
172:21 174:9
179:4 180:20
184:22 210:17
211:9 213:7
**Roger** 29:1
88:18 90:5
104:11,12,14
104:14,19
105:9 106:22
107:6,15,24
108:5 109:15
109:18 111:8
115:16 121:3,4
121:4 162:13
166:13 211:21
**Rohrkemper**
22:13,20 23:8
23:14 32:9
37:12 45:9
54:25 55:15
56:20 57:3
63:25 66:24
70:6,17 80:5,7
80:13,20,22
81:5 82:10
83:7 85:13
88:4 93:3
105:6,8,11
106:1,16,22
107:7 119:9
120:7 121:5,7
**Rohrkemper's**
119:23
**role** 16:10,18,24
17:21 22:2,7
30:8 99:17
104:15 113:24
114:11,14,17
137:11 203:4

**roles** 14:20
193:18
**Rolon** 122:24
**room** 6:23 12:11
186:3,5
**rough** 18:16
202:21,23
**roughly** 158:10
210:24
**rule** 11:1 216:13
**rules** 1:17 3:7
10:14
**rumors** 210:19
**run** 19:1 29:7
91:6 192:15
**running** 84:24
91:13 107:18
179:11

---

**S**

**S** 3:1,1
**S-A-A-D** 63:17
**Saad** 63:17 72:5
**sales** 20:21
156:20 160:8
182:10,16,16
182:22 184:5,8
184:14 185:3
**Salt** 95:4
**San** 95:25
103:15 154:3
**saw** 68:24
104:10 155:7
156:11 158:20
159:1 178:21
**saying** 46:20
80:12 94:6
103:17 107:15
162:22 175:21
178:23 187:1
**says** 41:11 43:3
43:6 62:14
66:16 103:8
135:7 143:14
143:20 148:8
165:15 205:21

**SBA** 123:17
**sceptical** 107:17
**scheduling**
57:14,21
**school** 12:21,22
13:1,8 14:4,25
**Schott** 127:1
178:25 179:2
**script** 46:16,18
46:21,23 47:21
47:23
**seal** 216:15
**search** 54:12
**searched** 8:7
**searching** 8:9
**Sears** 174:2
**second** 11:1
31:17 34:16
59:24 72:21
114:23 130:2
134:1 135:6,23
148:22 149:10
155:20,22
156:3,5,14
157:19 205:1,8
**secondary** 13:1
**section** 39:23
42:8 61:6 63:6
168:4
**sections** 60:24
**securities** 79:11
**see** 26:21 28:3,6
28:18 30:21
60:25 73:17
75:4 76:16
89:3 96:1
97:13 101:14
119:11 120:25
136:1,9 143:15
143:17 147:19
147:23 148:9
156:7 159:15
159:18 196:11
200:6
**seeing** 26:25

31:18 181:20
**seen** 38:14 66:17
67:3 75:14
76:18 78:15
96:6 115:19
118:11 147:6
168:7 180:16
209:6
**selected** 19:6
**selecting** 17:22
**selection** 17:10
89:10
**sells** 126:13
**send** 47:2
**sending** 188:25
189:11
**sense** 11:24 12:7
145:3 168:19
**sent** 145:25
163:11 200:20
203:13 204:19
204:19 210:4,8
210:9
**sentence** 43:5,6
62:16 205:20
**sentences** 164:20
**separate** 66:7
**September**
125:1,10
127:16 216:16
**serious** 94:8
126:6
**seriously** 74:21
**served** 7:21
**Service** 160:9
**services** 141:23
161:7,11
**ServSafe** 13:17
**set** 1:19 31:9
44:23 45:18
46:5 193:23
194:5,6,17
216:9,15
**seven** 22:21 61:8
61:18 88:7

134:18
**severance**
196:11,20,23
197:1,4 202:24
**shakes** 11:4
**share** 81:24
**shared** 194:4
**shareholder**
82:14
**shareholders**
88:14,20
**shipped** 112:21
**Shopping** 51:21
**short** 94:3
117:11,13,16
119:4,20 120:8
120:14,22
121:1 176:15
**short-term**
124:2,5
**shortest** 94:4
**shorthand** 50:7
**show** 34:13
53:24 57:18
**showed** 56:18
**showing** 215:3
**shown** 56:23
57:4
**shows** 42:20
**sic** 181:12
**side** 67:11
104:20 110:15
110:16 135:23
**sides** 82:18
**sights** 156:12
173:8
**sightseeing**
155:1
**sign** 47:15 83:8
184:21 200:11
200:11 204:15
**signature** 3:14
36:22 135:22
136:1,3 151:18
215:6 216:11

Michael Mason, 8/23/2019

24

| | | | | |
|---|---|---|---|---|
| signatures 36:20 | 137:2 143:1,25 | speaking 12:9 | 41:15,24 42:9 | 20:13 23:1 |
| signed 39:7 | 146:19 148:2 | specific 40:9 | 42:14 43:20,24 | 53:8 61:24 |
| 47:19 153:18 | 170:25 171:2 | 60:12 82:12 | 44:15,17 45:1 | 65:10 88:1,7 |
| signing 80:11 | 204:6 206:24 | 108:18 112:18 | 45:16 49:1,22 | 144:18 175:21 |
| silos 193:24 | 213:5 214:13 | 141:11 173:18 | 50:14 51:3,13 | 188:16 189:14 |
| 194:5,17,19 | sort 7:24 11:1,11 | 184:10 | 54:14 55:23 | 206:20 214:12 |
| similar 11:13,20 | 18:6 20:11 | specifically | 56:16 57:18 | started 21:3,5 |
| 114:15 | 23:25 24:5,6 | 39:22 152:9 | 58:21,24 59:2 | 94:9 116:13 |
| sit 13:23 167:8 | 24:22 27:8,19 | 205:3 | 61:13,14,16 | 158:1 |
| site 17:10 19:6 | 29:7 31:7 | specifics 118:2 | 62:17,25 63:3 | starting 43:5 |
| 89:10 159:24 | 33:10 36:12 | 174:22 191:22 | 63:9,13 64:15 | 89:24 145:13 |
| 159:25 | 38:8 39:21 | speed 150:13 | 64:21 65:7,16 | starts 145:4 |
| sites 113:18 | 43:21 48:8 | spell 8:1 15:7 | 65:19,25 66:10 | startup 65:7 |
| 165:3,13 | 49:7 50:23 | Spelled 142:19 | 67:11,19 71:13 | state 1:25 8:1 |
| 173:18,25 | 51:1 54:15 | spent 19:21 42:5 | 73:21 75:22,23 | 11:7 69:18 |
| situation 11:24 | 67:7,13 69:16 | 89:6 103:14 | 76:25 82:21 | 140:17 165:22 |
| 19:11 28:1 | 82:5,18 84:21 | 112:6 139:13 | 86:23 87:7,12 | 192:7 193:19 |
| 121:23 171:11 | 92:19 99:13 | spoke 137:5,8 | 87:13,14 88:2 | 198:24 204:20 |
| situations | 102:5,10 | spoken 185:10 | 88:3 90:15 | 216:2,6,19 |
| 121:20 194:14 | 108:11 112:18 | spot 127:2 | 91:16 92:21,23 | statement 20:22 |
| six 12:11 15:24 | 125:3,10 | spots 153:24 | 92:25 93:2 | 85:16 134:7,12 |
| 79:7 103:11 | 135:23 140:11 | 154:2,7 | 94:11 102:7,13 | 134:14 197:11 |
| 167:4 | 145:21 150:12 | spring 24:1 | 104:9 105:1,2 | 197:14 |
| slash 127:13 | 153:21 164:19 | 177:25 | 107:1 108:23 | statements 20:6 |
| slogan 77:4 | 166:2 179:17 | square 112:11 | 109:2,6 110:2 | 20:10 |
| small 9:11 | 180:4 183:23 | SS 216:3 | 110:6,9,15,16 | STATES 1:1 |
| software 53:23 | 183:25 189:14 | staff 64:1 114:17 | 110:18,19,23 | status 174:19 |
| 54:10 199:8 | 190:20 200:6 | stages 8:13 | 116:11,14,18 | 181:1 185:18 |
| sold 192:20 | 208:13 | 27:10 | 120:20 161:25 | 189:15 |
| sole 169:7 | sorted 6:5 | stake 41:2 | 162:2,9,24 | stay 69:22 |
| solely 40:23 | sound 10:24 | stand 144:14 | 163:2,4,12 | 176:12 |
| soliciting 17:15 | 12:18 16:16 | standard 90:13 | 164:8,22,24 | stayed 15:3,22 |
| somebody 70:5 | 40:16 41:5 | standpoint | 165:13,24 | 89:14 |
| 89:5 90:17 | 42:11 83:4 | 17:14 28:9 | 174:7 183:10 | Steiner 145:15 |
| 103:4 113:5 | 118:24 134:9 | 118:23 | 183:15 205:9 | 145:21,23,24 |
| 132:1 170:17 | 184:13 187:12 | stands 46:4 | 205:22 206:1,3 | 180:11 187:9 |
| somewhat 53:21 | sounds 23:5 | Star 15:17 16:7 | 206:7 211:22 | Steiner's 145:17 |
| son 155:4,5 | 203:16 | 17:23 18:12,14 | 211:25 | stenotype 3:10 |
| soon 7:16 9:4 | source 102:1 | 19:2,4,20 20:9 | Star's 16:3 45:7 | 216:9 |
| sorry 15:9 17:1 | space 168:18 | 21:11,18 22:18 | 57:19 66:5 | step 22:17 26:18 |
| 18:24 24:14 | speak 10:20 49:8 | 22:20 24:4 | 74:8 116:21 | 26:19 36:13 |
| 43:16 53:1 | 49:16 67:2 | 26:24 27:19,20 | 163:13 | Steve 127:1,1 |
| 62:7 93:18 | 69:24 99:18,20 | 30:11,24 39:11 | Starbucks 214:4 | 178:25 179:2,3 |
| 100:19 127:4 | 172:2 | 39:24,25 40:10 | Stars 107:19 | 179:16 |
| 127:20 134:22 | speaker 146:20 | 40:25 41:1,2 | start 12:20 | stipulated 3:2 |

Michael Mason, 8/23/2019

25

stipulations 1:19
216:8
stole 209:10
stop 6:4 30:18
165:10
stopped 182:8,9
store 19:19 51:6
63:18 64:9,10
64:11,14,22,23
66:3,3,7
144:25 213:10
stores 17:6
18:23 19:1,1,5
20:1,6 27:16
28:5 63:19
64:17,19 65:13
65:14 145:1
Strada 2:7
straight 12:12
straightened
102:6
strained 118:8
118:16
Strategic 13:21
street 1:21 2:4
160:2
strike 102:10
206:25
structure 56:4
66:16
Studied 27:22
stuff 115:9 155:8
171:18 210:20
subject 90:11
171:24
subjects 78:24
78:25 112:7
submit 200:14
200:17
subpoena 7:21
subs 126:1
subscription
50:3 56:21
subscriptions
165:2

subsequent
165:1
subsidiary 41:15
42:10 50:10
sudden 175:25
sue 171:12
sued 118:19
Suite 1:21 2:4,11
2:14
Sullivan 16:5,6
22:18
summary 61:7
61:25
summer 172:20
172:23 173:6
177:24,24
182:14
Supermarkets
94:8
supervising
92:11
supervisor 14:24
15:16 88:4
129:12
supplement 12:3
supplier 160:12
suppliers 127:9
129:18
Supply 160:13
support 64:1
114:16
supposed 40:24
86:18
sure 10:15 11:21
13:15 14:21,23
17:13 19:23
23:12 25:25
28:12 31:23
34:6,13 41:3
45:15 46:3
51:9,20 52:1
59:7 77:25
87:24 91:10
97:20 98:2
117:22 125:8

126:24 133:3
138:21 141:25
144:6 156:4
157:15 158:14
159:6 165:18
171:14 173:5
182:1 190:13
190:14 191:21
205:7 214:14
surface 118:7
surprise 162:23
197:10 198:2,3
205:25 206:5
207:25 208:1
surprised
195:22
suspended
198:19 199:7
suspicion 176:5
193:6
switched 146:20
sworn 5:3 7:4
216:6
syllable 130:2
symptoms 175:1
175:4
system 214:10
214:11
systems 14:7,14
19:17

———————————
T
———————————
T 3:1,1 216:1,1
tab 151:14
table 5:25 43:2
tables 129:2
take 3:7 16:18
22:22 26:20
27:3 34:3 35:6
35:7 36:12
48:3 54:3
55:22 58:21
59:24 68:8
78:13 88:5,8
90:5 119:25
138:22 202:5

213:15
taken 1:15 3:4
3:10 15:16
124:11 127:2
203:22 216:8,9
talk 33:19 34:14
46:13,21 55:4
55:6 56:21
58:7,14 69:2
71:23 72:2,14
80:23 81:5,9
81:16 93:23
99:21,23 100:9
101:3 110:12
118:4 119:14
120:10,17
126:3,7 129:11
140:12 156:24
156:25 159:4
166:20,25
170:8 171:4,24
172:3 182:20
183:13,18
188:22,24
190:5,8,11
191:18 195:25
201:1 212:23
212:25
talked 23:8 47:6
49:25 53:21
69:10,19 71:15
74:16 94:2
97:20 106:14
117:1 120:13
133:20 139:1
142:24 156:22
159:6,21
166:22 172:5
174:5 181:14
194:25 195:19
195:23 196:19
202:11
talking 11:22,23
27:14 31:2
35:9,16 38:15

52:15 112:7
126:15 128:25
129:18,22
154:7 158:3
159:16,19
165:19 170:23
173:4 182:2,5
182:8,9,12
190:17 204:5
Tamer 99:19
Tampa 154:2
tax 198:23
199:13
team 63:9 64:3
68:12,14 70:16
70:24
tech 5:18
Technically
149:2
TED 2:12
telephone 2:9
tell 11:18 29:22
29:24 30:2,7
69:19 74:5,15
74:18 83:7
94:23 107:22
121:9 140:2
172:12 174:23
176:7
telling 24:22
145:4 199:1
template 57:10
57:15,22 61:11
templates 60:15
temporary
142:6,11
ten 27:23 146:13
tenants 144:24
145:10
tenure 90:23
term 87:9
terminate 162:7
162:8 209:23
terminated
204:7

Michael Mason, 8/23/2019

26

| | | | | |
|---|---|---|---|---|
| **termination** 9:5 | 121:21 124:19 | 112:3 143:8 | 168:8 172:25 | 9:13 16:3 |
| 9:6 115:17 | 127:21 129:3 | 144:3 | 176:14 191:4 | 20:15,17,17,24 |
| **terms** 39:3 | 137:4,10 | **theory** 64:13 | 192:21 195:6 | 21:8 22:14 |
| 178:24 | 139:23 140:2 | **thing** 5:22 6:7 | 197:23 200:1 | 24:3 25:14 |
| **Terry** 1:4,10 6:9 | 140:14 145:7 | 12:15 17:19 | 214:5,15,15 | 26:1 27:25 |
| 22:15 23:7,9 | 148:11 150:10 | 64:25 72:11 | 215:4 | 29:18 30:12,16 |
| 23:20 24:4,5 | 151:19,24 | 80:3 91:13 | **thinking** 51:24 | 33:8 35:21 |
| 24:17,21,23 | 156:3,8,10 | 92:16 118:14 | 81:12 90:20 | 38:12 39:7 |
| 25:8,22 26:21 | 157:10,11,11 | 119:2 213:22 | 121:13 183:25 | 40:7 58:23 |
| 28:21 29:18 | 158:7,8,11 | **things** 5:12 | **thinks** 111:10,12 | 63:15 72:4 |
| 30:7,14,25 | 159:10,12,15 | 28:14 30:18 | **third** 43:3 144:7 | 74:4 77:4,22 |
| 31:8,22 32:1,9 | 162:16,18 | 41:8 57:11 | 144:11 147:24 | 87:6 88:12 |
| 32:12,17 33:13 | 166:15,20 | 65:3 71:4,12 | 148:2 158:21 | 89:2 92:17 |
| 37:12,14,17 | 170:8,22 171:3 | 72:1 76:24 | 164:19 205:20 | 95:1 98:11 |
| 38:13 39:17 | 171:7,12 | 77:2 97:4 98:3 | **third-party** | 100:2 102:12 |
| 43:7,12,21 | 175:15 179:14 | 104:8 106:12 | 176:23 | 103:15 104:7 |
| 44:4 45:25 | 179:15 182:7 | 112:12,23 | **Thomas** 205:15 | 104:12,20 |
| 46:7,13,16,17 | 182:20,20 | 117:7 129:17 | **thought** 24:24 | 105:14,18 |
| 46:25 47:1,6 | 184:20 185:5,8 | 137:12 175:1,7 | 52:13 89:25 | 108:9 111:24 |
| 47:14 49:14 | 185:25 186:4 | 176:21 177:7 | 93:21 104:3 | 112:6,13 113:1 |
| 51:1 52:9,13 | 187:4,24 190:5 | 180:2 183:4,6 | 125:19 126:24 | 113:11,17 |
| 52:22 53:11,16 | 194:5,10 | 184:7 189:20 | 167:25 184:2 | 116:10 120:1,2 |
| 53:20 54:14,16 | 196:10,18,19 | 189:22 192:22 | 195:1,3,16,19 | 125:17 128:9 |
| 55:4,22 58:7 | 197:7 200:17 | 193:3,8 195:7 | 197:22 204:5 | 129:4 137:2 |
| 61:13 66:23,24 | 200:22 202:5 | 202:21,23 | 214:1 | 138:2,18 |
| 68:14 69:9,23 | 202:11 204:1 | **think** 26:4 28:22 | **three** 25:24 41:4 | 139:19 141:24 |
| 70:5 73:14 | 204:11,14 | 28:23 31:3 | 41:16,23 43:15 | 152:11 154:25 |
| 74:17 77:18,23 | 205:16 206:7 | 42:12 43:1 | 43:17 55:25 | 157:19 158:16 |
| 79:14 82:21 | 208:21 209:9 | 44:17 47:5 | 90:25 91:24,25 | 158:20 160:17 |
| 84:23 89:2 | 209:18 212:7 | 49:15 52:20 | 104:13 128:24 | 162:7,12 |
| 90:2,11 91:1 | **Terry's** 38:5 | 54:9 60:10 | 134:17 143:9 | 166:14 167:2 |
| 94:21 96:14,19 | 123:11 | 63:16 64:4 | 149:2 155:14 | 170:20 175:8 |
| 96:25 98:1 | **Terry.H.Chan...** | 71:21 79:13 | 164:20 165:22 | 177:3,22 181:2 |
| 99:5 100:12,17 | 123:11 | 80:9 85:19 | 174:6 181:13 | 181:3 183:8,17 |
| 100:18,20,22 | **testified** 5:4 10:8 | 90:22 92:20 | 189:17,23 | 186:24 191:8 |
| 101:2,7,12,17 | **Texas** 93:23 | 96:5 101:24 | 207:23 208:2,8 | 191:16 192:10 |
| 101:21,25 | **thank** 8:5,24 | 108:24 110:1 | **three-month** | 192:11 198:15 |
| 104:17 105:25 | 9:16 10:1,1 | 114:5,10 | 105:17 | 203:3,5 206:23 |
| 106:23 107:7 | 18:25 36:4 | 116:25 120:1 | **three-year** 21:8 | 207:20,23 |
| 109:20,21,21 | 53:4 78:10 | 125:18 126:25 | 40:7 | 210:22 213:23 |
| 110:1 111:4 | 132:21 140:19 | 127:20 130:12 | **thrown** 93:12 | 216:8 |
| 115:17 117:4 | 140:25 146:25 | 137:25 138:11 | **thumb** 7:9,10 | **times** 35:15 |
| 117:15,24 | 164:2 178:5 | 138:15,16 | **Thursday** 144:7 | 38:16 69:22 |
| 118:4,18,24 | 188:11 215:2 | 139:15 144:22 | 144:8,11,12 | 71:20 85:1,21 |
| 120:2,10,13 | **Thanksgiving** | 161:18 168:2,7 | **time** 1:18 3:5 | 117:9 128:25 |

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Michael Mason, 8/23/2019

194:23
**tips** 198:16
**title** 24:15 75:6
  114:18 203:6
**titles** 80:4
**today** 5:15 7:5
  7:20 9:21
  18:18 36:16
  197:23
**today's** 143:14
**told** 52:23 83:10
  86:12 103:8,18
  109:18 113:15
  131:19 132:2
  153:9,17
  162:20 169:9
  170:17,18
  177:16 179:19
  187:21 191:9
  197:7 198:21
  199:16 207:22
  212:6,11
**Tom** 32:6,9,15
  32:17 37:20,22
  38:4,7,12,14
  38:14,15 54:25
  55:12 78:18
  83:11,13
  163:11
**top** 36:19 43:5
  61:5 84:5
  112:8 134:1
  135:8 148:21
  148:22 204:3
**total** 8:21 14:13
  14:16 21:7
  41:16 71:20
  213:13
**totally** 117:22
  173:23 197:18
**touched** 161:18
**town** 113:5
**Township** 98:11
  112:3 152:10
**track** 6:3 11:3

19:22 199:3
**tracked** 66:8
**tracking** 21:11
**trade** 113:8
**train** 92:5 95:25
**trainers** 17:8
**training** 17:6,7,8
  17:18 64:2
  92:11 154:4
**transaction** 58:6
  101:11 211:19
**transcribed** 3:11
  216:9
**transfer** 134:25
  146:24 147:12
  147:14,20
  149:9,11,15,18
  150:1,14 151:8
  177:16 207:12
  211:19 212:6
**transferred**
  101:18,22
  153:4
**transferring**
  151:25 207:16
**transfers** 97:17
  97:21 101:8
  151:21 152:4
**transition** 45:15
**translator** 45:22
  46:19
**translator's**
  49:18
**transparency**
  193:19 196:8
**transparent**
  192:6,11 193:9
**travel** 149:23
  155:9
**treated** 64:18
  92:23
**tremendous**
  64:24
**trial** 10:9
**tricky** 14:19

21:2
**tried** 20:6 49:12
  201:1 212:23
**Trinity** 176:23
  191:9
**trip** 94:3 155:21
  155:22,24
  156:1,3,6,13
  156:14 173:14
**trips** 124:11
  155:18 192:22
**true** 93:1
**truth** 216:7,7
**try** 113:10
  171:23 172:3
  183:6 184:8
  187:5,9 196:5
  196:8,13
  200:11,23
  201:5
**trying** 12:10
  25:23 52:1
  54:19 104:21
  124:9 125:20
  127:20 170:10
  172:21 173:2
  177:3 183:4
**Tuesday** 6:12
**turn** 200:11
**turnaround**
  176:14
**Twelve** 16:11
**twice** 191:11
**Twin** 93:15,17
  93:23
**two** 9:11 13:19
  25:24 28:14
  41:7 42:7
  69:22 71:15
  91:24,25 93:25
  106:11 109:3,4
  109:4 128:24
  132:19 134:17
  134:24 143:8
  143:12 144:4

155:14,18
  189:25 190:24
  199:12 202:6
  204:14 213:13
**two-to-one** 41:5
**type** 33:22 57:8
  72:11 79:3
  92:16 104:15
  113:25 142:9
  185:20 191:1
  213:22
**types** 19:4 66:1
  85:17 171:20
  179:24 192:17
**Typical** 112:20
**Typically** 19:15

———
**U**
———
**U** 3:1
**U.S** 87:1
**UC** 13:2 14:1
  84:1
**ugly** 118:21
**Uh-huh** 37:1
  68:16 134:3,20
  135:25 136:2
  137:7,14
  140:15 142:22
  162:19 172:24
  210:11
**uh-huhs** 11:10
**Uh-uh** 135:4
**uh-uhs** 11:11
**UK** 51:25 52:5
  52:16,22 71:16
  71:20 72:11
  75:25 76:4
  83:18 84:21
  87:11 130:13
**ultimate** 73:20
**ultimately** 42:15
  62:4
**umbrella** 92:1,3
  92:20 93:10
  102:9 137:12
**unavailable** 6:14

6:17
**undersigned**
  216:5
**understand**
  11:17 175:13
  198:13
**understanding**
  32:21 34:21
  36:15 37:13
  38:21 39:3,10
  39:21 40:1
  41:20 42:4
  43:19 44:3
  49:24 53:10,15
  56:13 62:25
  63:2,5 67:7,21
  67:23 68:7
  73:16 101:13
  111:17 162:4
  169:6 178:18
  180:25 183:22
  209:14 211:3
**understood**
  11:15 39:6
**unemployment**
  28:16
**unfortunate**
  118:11
**unhappy** 195:11
**Union** 132:13
  133:5,12,17,18
  133:22 146:24
  147:11 148:19
**UNITED** 1:1
**University** 76:5
**unusual** 193:21
**update** 164:7
**updated** 47:2
**upgrade** 119:20
  199:7
**upgraded** 58:20
**upset** 170:20
  182:10 183:24
**upstate** 167:3
**urgent** 184:3,7

Michael Mason, 8/23/2019

28

184:12
**use** 35:25 54:5
57:18 72:23
145:11 202:16
**uses** 20:13
**usually** 33:13
85:7 89:15

**V**

**various** 14:20
45:19 60:24
85:22 91:19
118:21 167:20
173:24 177:7
**vendor** 199:18
**vendors** 126:7
**verbal** 11:3
**version** 37:3
60:1 76:12
168:23
**versions** 168:14
**viable** 167:25
**vice** 16:21 79:19
79:22,25 80:8
80:21,23 81:1
106:3
**Vine** 117:11,13
117:16 119:4
119:20 120:8
120:14,22
121:2
**visit** 85:3 158:22
159:5 167:2
**visited** 22:15
85:2 113:18
118:1 156:21
157:19 166:17
167:4
**visiting** 71:17
**visits** 71:3,11
85:10 158:12
**visually** 156:7
**voice** 108:11
184:11
**Voigtmann**
164:14,15

208:13,18
210:9
**volume** 184:10
**VP** 17:2 22:2
80:14
**vs** 1:9

**W**

**W** 2:10
**wait** 10:21
**waived** 3:9,15
215:6 216:11
**walked** 6:22
25:25 94:5
154:25
**walking** 129:16
198:9
**want** 6:7 11:21
34:13 45:15
74:13 80:16
88:25 138:4,19
140:6 162:3
164:7 167:4
168:20 171:15
176:2 194:12
**wanted** 5:12
23:17 40:6
45:20 64:8
90:5 103:6
109:18 110:6
110:24 122:5
143:10,23
155:2 166:16
173:25 175:22
176:8 190:13
190:14 193:9
193:11 213:18
214:2
**wanting** 109:6
111:9 175:19
**wants** 109:15
**warrant** 43:9
**wasn't** 13:8 21:6
33:17 37:7
38:18 44:13
72:10 88:22

94:22 103:16
107:20,22,23
108:17 110:17
118:25 126:24
137:1 162:12
174:25 182:18
187:13 194:20
197:7 206:3
213:13
**water** 73:1
**way** 14:4 19:7
23:18 36:3
42:2 45:24
61:7 88:10
93:5,5 119:22
122:3 123:18
124:13 125:4
125:11 127:24
130:21 131:9
152:20,23
158:16 160:12
177:5,7 180:12
180:20 181:1
183:19 185:2
186:7,11 187:4
187:16 188:14
193:23 194:7
204:24 210:18
213:10
**ways** 52:10,12
**we'll** 5:20 6:4,5
7:15 42:25
43:1 60:23,24
60:25 88:21
119:4 140:11
174:16 203:13
203:18,20
**we're** 12:10
34:15,24 49:23
51:20 59:9
74:23 75:21
78:5 112:7
132:10 138:22
140:21 146:22
163:16 169:1

178:2 188:6,7
215:4
**we've** 10:2,2
24:22 62:19
72:18 84:20
117:1 167:10
202:3,7 203:10
**website** 211:9
**Wednesday** 6:12
**week** 6:12
128:25 174:25
181:24,25
198:20 214:3
**weekends** 71:12
112:24
**weekly** 20:20
33:9 65:4
**weeks** 176:1,11
**went** 15:1,7,25
30:15 31:24
41:9 44:22
93:22 94:17
95:25 117:25
119:10 139:10
139:11 146:2
154:3,10
156:12 173:7
173:16 179:6,6
201:14 203:8
**weren't** 52:1
61:18 71:4
72:10 89:18
97:12 112:7,8
167:15 174:20
175:1,14 191:8
192:13 194:19
195:2 199:10
**West** 93:20
**whatnot** 27:12
32:11 44:24
57:21 63:23
68:9 71:21
85:12 89:11
94:10 97:25
98:13 119:13

119:15 155:1
167:20
**whatsoever**
117:10 118:3
**wheelhouse**
33:25 89:5
**WHEREOF**
216:15
**wholly** 19:1
41:15 42:9
64:11
**willing** 43:24
**Wings** 93:13
94:11 108:3
166:5,10,19,21
167:6,19 174:8
205:9 206:9,11
**wire** 146:24
147:20
**withdraw**
110:24 162:9
165:5
**withdrawal**
163:13
**withdrawals**
134:24
**withdrawn**
206:2
**witness** 1:14
2:13 3:4,12,13
4:2 5:2,6 35:8
35:13,20,24
50:22 52:25
53:3 62:6
75:24 83:14
138:17 142:25
146:6,9 170:24
178:7 185:6
216:8,10,15
**witnessed** 74:12
**woodwork**
175:24
**word** 59:23
172:1 202:16
**words** 54:3

LITIGATION SUPPORT SERVICES
Cincinnati, Ohio (513) 241-5605 / Toll-Free (844) 321-3376

Michael Mason, 8/23/2019

61:12 80:4
214:4
**work** 13:14
15:18 26:16
27:25 28:1,4
31:19 32:18
33:20,23 39:24
54:2,4 101:9
103:18 107:21
110:8 136:23
137:17,21
179:22
**worked** 14:4
17:13 21:23
22:21 23:2,3
29:24 30:2
44:22 58:6
72:16 101:16
205:16
**Workforce**
199:6
**working** 6:2,18
17:11,12 24:5
29:18,23 39:1
44:18 54:15
59:11 112:24
165:21 213:24
**works** 25:3
187:9 203:17
203:19
**worried** 189:16
195:2
**worries** 18:25
**worry** 112:13
170:18,19,21
176:4
**wouldn't** 172:2
208:1 212:20
**wrap** 203:20
**wrap-up** 203:14
**wrapped** 215:4
**Wright** 1:20 2:3
2:6
**write** 62:15
188:2,4

**writing** 117:8
**written** 36:9
61:23 99:2
138:1 139:22
**wrong** 112:21
142:19
**wrote** 119:18
174:15 187:25
209:18

---

**X**

**Xavier** 84:16

---

**Y**

**yeah** 15:3,25
16:12,17 23:1
34:1 38:1,3
41:7,8,22
43:16 49:3
51:15,22 59:4
77:13 82:4
91:10 92:7
94:17 97:16,25
98:2,21 101:4
101:6 108:6,10
114:3,8 117:12
118:6,24 119:6
119:15 123:9
123:15,21
127:6 128:10
132:16,18
133:10 134:11
134:16 137:18
138:20 143:18
143:25,25
145:23 154:14
154:20 157:4
157:16,24
158:25 159:9
162:15 166:1
166:24 168:2,2
168:11,13,17
168:17 173:5
173:12 174:3
174:15 180:3
182:23,25

190:23 191:17
193:17 194:3
197:2,23
202:18,25
205:6 206:15
211:3 213:8
214:10,11
**year** 12:23 15:13
23:3 143:9
154:12
**years** 14:14,17
16:11,12 22:22
23:4,4 36:10
67:5 88:3,6,8
89:6 103:8
**yeses** 11:13
**York** 167:3
173:13,14,17
179:6
**young** 49:20

---

**Z**

**zero** 74:9
**zeros** 149:3
**zip** 150:12

---

**0**

**000274** 169:2
**0003690910**
134:6

---

**1**

**1** 4:6 34:18,22
117:2 170:4,6
**1.0** 61:6
**1.1** 61:7
**1.5** 134:25
208:11
**10** 4:10 146:12
146:14 147:5
148:23 149:8
**10/20** 143:18
**10/28/15** 141:18
**10:00** 1:22
**100** 2:14
**101** 4:17

**102** 4:18
**10th** 208:14
**11** 4:11,15,15
151:8 163:15
**11/2/15** 147:15
147:16 149:16
150:14,23
151:9
**11/20** 143:7
**114** 4:8
**12** 4:11,24 16:12
39:25 40:3,11
40:15 41:17,21
62:12 73:19
178:1,3
**12-store** 73:24
**122** 4:9
**12th** 180:22
**13** 4:12,16 180:7
180:9,10
**130** 149:4
**132** 4:9
**135** 2:10
**138** 4:18,19,19
**13th** 164:10
**14** 4:12,19 59:7
116:13 188:10
204:6
**140** 4:10
**141,201.70**
141:15
**14214** 180:12
**146** 4:10
**14th** 87:24
**15** 4:13,17 31:24
128:14 158:14
199:14 204:23
204:25
**150,000** 149:19
**15th** 170:5
**16** 204:6
**163** 4:11
**165** 4:20
**17** 4:22 14:14,17
23:4

**178** 4:11
**180** 4:12
**188** 4:12
**1972** 14:3,6
**1973** 12:24,25
**1977** 13:2,11
14:2
**198** 4:20
**1982** 14:15
**1989** 15:6,19
**1990** 15:19,21,22
16:14
**19th** 154:12
155:23

---

**2**

**2** 4:6 59:11,14
**2:00** 203:19
**2:15** 215:12
**2:30** 203:15
**20** 4:17 22:10
77:7
**200** 4:21
**2002** 16:15
**2007** 22:22 23:1
23:5
**201** 4:21,22
**2012** 21:5
**2013** 22:10
23:24 30:11
31:14 52:4
83:3,4,9 84:19
85:24 120:5
**2014** 16:25 17:1
17:1 18:22
59:6 85:24
86:8 87:22
90:9 95:2
104:7
**2015** 102:19
105:22 107:1
111:23 112:1
116:10 121:19
125:1,5,6,10
127:16 132:7
134:8,9 136:25

Michael Mason, 8/23/2019

143:21 144:15
145:25 147:17
151:22 152:2
152:19 154:13
154:23 158:13
162:1,10,18
170:5 192:4
**2016** 153:1,5,22
158:13 162:24
163:11 164:10
167:24 172:20
172:23 174:11
174:19 177:25
180:22 181:22
182:14 185:16
187:23 188:18
190:4 206:2,17
207:1,17
208:14 209:12
209:16 210:8
210:15 211:2,6
211:11
**2019** 1:23
216:16
**2023** 216:19
**204** 4:13
**208** 4:22
**209** 4:23
**20th** 143:21
**210** 4:23,24
**2200** 1:22 2:4
**23** 1:23
**2321** 2:13
**24** 4:16,21,23
**24th** 189:4
**25** 4:15,20 23:4
88:3
**250** 1:21 2:4
**250,000** 150:15
**25th** 188:17
**26th** 204:12
**272** 163:23,24
**27th** 6:13 204:6
204:18 206:25
210:8

**28** 80:18
**28(D)** 216:13
**28th** 6:13
**2nd** 87:22
144:14,15,19
145:4 147:17
149:9 151:22
152:2

---

**3**

**3** 4:7,18,18,21
41:25 74:22
75:11
**3,000** 8:21
**30,000** 181:11
**300** 2:11
**300,000** 147:21
149:9 150:24
151:11
**31st** 134:9 177:1
**32801** 2:11
**34** 4:6,15
**34103** 2:8
**35** 27:24 66:14
**362** 36:3
**3690910** 149:6
**3690910-130**
148:16
**373** 205:4
**374** 205:4
**3rd** 2:7

---

**4**

**4** 4:7,20 75:20
76:7
**4,000** 112:11
**40** 89:6
**401** 191:7
**401-K** 175:7
176:22 199:11
**401-Ks** 191:5
**45** 26:14
**450,000** 134:19
**45202** 2:5
**45206** 2:14
**47** 4:16

---

**5**

**5** 4:4,8 78:4,13
216:19
**500,000** 136:14
136:21 138:1
208:7,8
**51** 81:24
**55** 4:16
**59** 4:6

---

**6**

**6** 4:8,23 62:11
114:19,22
115:15
**6,000** 41:3
**6:18-ap-00098...**
1:9
**6:18-BK-03297**
1:5
**633** 188:14
**635** 188:14
**6th** 216:16

---

**7**

**7** 1:4 4:9,22
122:11,13
**74** 4:7
**75** 4:7
**77** 15:1
**78** 4:8
**79** 4:17
**7th** 59:6 134:8

---

**8**

**8** 4:9,19 132:9
132:11,25
148:20
**80-page** 60:9
**84,325** 180:21

---

**9**

**9** 4:10 40:16,19
40:23 140:20
140:22
**90** 142:15
**90's** 18:16

**900,000** 134:25
**9132** 2:7

Execution Copy

### MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding is effective as of the _____ day of _____, 2013 between **GOLD STAR CHILI, INC.**, an Ohio corporation ("Gold Star") and **Mason Hill**, **LLC**, an Ohio limited liability company ("Mason Hill").

### RECITALS:

A.    Mason Hill and Gold Star have developed a Business Plan for the opening and development of up to 12 new Gold Star franchise restaurants (the "Project") within the Dayton-Cincinnati-Lexington region of Southwest Ohio and Kentucky region that are not included in any current territory of any current Gold Star franchisee. The Project will be owned by GSC Opportunities L.P., an Ohio limited partnership ("Project Owner") to be formed by Gold Star and Mason Hill. The Project Owner will be capitalized with an anticipated amount of $9,000,000 ("Project Capitalization") to be provided to the Project by Gold Star, or a wholly owned subsidiary, in the total amount of $3,000,000 ("Gold Star Capitalization"), and by Mason Hill, through 12 EB-5 immigrant limited partner investors ("EB-5 Investors") in the amount of $6,000,000 ("Mason Hill Capitalization"). It is the parties intentions that the Project Capitalization will be submitted on a 2:1 ratio between Mason Hill (through the EB-5 Investors) and Gold Star, the specific timing and form of the Gold Star Capitalization and the Mason Hill Capitalization, subject to the 2:1 ratio, are set forth in Exhibit A to this Agreement and incorporated herein.. It is the intention of the parties that the ownership the Project Owner will be split between the EB-5 Investors and Gold Star on a 2:1 ratio represented by the EB-5 Investors owning 66.7% of the Project Owner and Gold Star owning the remaining 33.3% of the Project Owner.

B.    Gold Star, or its wholly owned subsidiary, and Mason Hill will form a limited liability company to be the General Partner of the Project Owner. Gold Star will be the Managing Member of the General Partner and own 97% of the membership interests issued pursuant to a capital contribution of the Gold Star Capitalization. Mason Hill will own 3% of the membership

1

△ π EXHIBIT ____/____

Deponent _Mason_

Date _8/23_ Rptr _DC_

WWW.DEPOBOOK.COM

GSC000349

Execution Copy

    interests issued pursuant to a capital contribution by Mason Hill to GSC Opp Management, LLC equal to $90,000 of the initial Project Costs on Exhibit D.

C.    The Project Owner will enter into an agreement with Mason Hill for Mason Hill to provide certain services related to the qualification of the EB-5 Investors and qualifying the Project for the EB-5 Investment Program, including but not limited to compliance with all rules and regulations set forth in applicable Federal law and all rules and regulations promulgated by the United States Customs and Immigration Services ("USCIS Requirements") which will provide for the Project Owner to pay Mason Hill for its services thereunder ("EB-5 Management Agreement").

D.    The Project Owner will create a separate, wholly owned disregarded subsidiary limited liability company to own each of the 12 franchised restaurants in the Project (each an "Owner Subsidiary") and will cause each such Owner Subsidiary to execute Gold Star's current franchise agreement with 5% royalty and 4% marketing fees, and comply with all franchise requirements and for the Project Owner to guaranty such franchise agreement.

E.    The parties wish to enter into this Non-Binding Memorandum of Understanding to outline the proposed terms and conditions for each party to form the Project Owner and execute documents necessary to commence the Project, perform due diligence related thereto and to further define the terms and conditions, duties and responsibilities of each in connection with the Project.

Subject to the foregoing recitals, and in consideration of each party's mutual good faith, agreement to share certain information regarding the Project and other good and sufficient consideration, the parties agree as follows:

1.    The Recitals are incorporated into this Agreement as if fully set forth herein.

2.    The parties shall work cooperatively to finalize the Business Plan attached hereto as Exhibit B to conform to Gold Star operation standards and as necessary for

2

571221v1

GSC000350

Execution Copy

Mason Hill to have the Business Plan comply with all USCIS Requirements, including but not limited to the EB-5 Investors' I-526 petitions.  The Business Plan shall be mutually agreeable to both parties and will be completed within the Project Schedule attached as Exhibit C and incorporated herein. To the best of their knowledge, Mason Hill, Gary Chan and Terry Chan (the "Indemnifiers"), individually and collectively represent and warrant to Gold Star that they have extensive experience in EB-5 Program investments and that the Project as structured will qualify under all applicable USCIS Requirements for a direct investment EB-5 Program; and, they are not aware of any regulations or provisions which would be a potential basis for the USCIS to not approve the I-526 Petitions of the EB-5 Investors because of the structure, type of jobs being created or financial structure of the Project.  The Indemnifiers acknowledge that Gold Star is relying upon their knowledge and expertise in structuring the Project and that this representation from all of the Indemnifiers is a material inducement for Gold Star to enter into this Agreement. Each of the Indemnifiers agrees that it is receiving a specific and personal benefit as a result of this Agreement and that such funds are sufficient consideration for the Indemnifiers joining this section of the Agreement. Indemnifiers Initials: _____ and _____.

     3.     As managing member of the General Partner, Gold Star will receive $15,000 per franchise restaurant location per year (with an annual increase tied to the Consumer Price Index) to pay for various administrative, accounting and compliance costs related to the operation of the Project (the "Management Fee").

     4.     Mason Hill shall receive the Project Consultant and Management Fees paid from the partners' capital contribution for each restaurant location up to a maximum of 12 restaurants, as set forth in the Business Plan (Exhibit B) payable , within five business days of the date upon which both an EB-5 Investor and the Project Owner receive notification of the I-526 approval (ii) and receipt by the Project Owner of the approved EB-5 Investors funds from escrow.  The Indemnifiers represent and warrant to Gold Star that the majority of the Project Consultant and Management Fees are utilized to pay third party fees necessary to secure the EB-5 Investors' capital contribution and that the EB-5 Investors are not being requested to pay additional fees which may or

3

GSC000351

Execution Copy

could be used to pay the Project Consultant and Management Fees or any cost or component making up such fees.

- In addition, Mason Hill will be compensated by the Project Owner for its services under the EB-5 Management Agreement equal to 3% of gross sales of the Project ("EB-5 Management Fee"). The EB-5 Management Fee shall be payable annually after the Company's gross sales for the year have been determined. As security for Mason Hill performing the duties listed below, the EB-5 Management Fee shall be subject retainage equal to 33.3% of the annual EB-5 Management Fee which shall be held by the Project Owner until the delivery of I-829 approvals for each EB-5 Investor. The duties and responsibilities of Mason Hill to be performed pursuant to the EB-5 Management Agreement shall include the following:
- Take all actions commercially reasonable to promote the Project with potential EB-5 investors as necessary to raise the Mason Hill Capitalization from qualified EB-5 Investors in accordance with all USCIS Regulations.
- Require the Project Owner, investment documentation (including the Business Plan) and the Mason Hill Capitalization contributions comply with all applicable state and Federal securities laws.
- Provide all required assistance and actions necessary to comply with the USCIS Regulations necessary to ensure the Project delivers the necessary immigration documents to the EB-5 Investors and to qualify the Project under any applicable Regional Center under the USCIS Regulations, including but not limited to assistance in preparing all certifications of the Project Owner regarding creation of qualifying jobs.
- Prepare for Gold Star's review and approval the following documents: (i) Business Plan, Private Placement Memorandum, Limited Partnership Agreement for the Project Owner, Subscription Agreement, form subsidiary operating agreement, feasibility studies, and other documents necessary to take the Project to potential EB-5 Investors (collectively the "Offering Documents") which shall be delivered to Gold Star within 30

4

GSC000352

Execution Copy

days of the date of this Agreement for final approval within 15 days of such delivery ("Delivery of Completed Offering Documents").

- Mason Hill will represent and warrant that it has the knowledge and capacity to comply with all USCIS Regulations and that, to the best of its knowledge and belief, the Project will qualify as a direct investment EB-5 project.

5.    Gold Star's duties and responsibilities in connection with the project shall include the following:

- Contribute the Gold Star Capitalization.
- Manage and operate the Project Owner and provide staff training for each of the franchise locations in the Project in accordance with the Franchise Agreement.
- Cause the Project Owner to create and employ a minimum of 10 with a target of 12 direct full-time jobs, for each EB-5 Investor, or a total of 144 jobs for 12 Investors, as recommended and structured by Mason Hill under the definitions of the USCIS Regulations, \ and to execute all certifications or other documents necessary to qualify under the EB-5 program and USCIS Regulations..
- Facilitate and cooperate in the transition of management for the Project after Mason Hill exercises its option set forth in Paragraph 9 below; provided training of a member of Mason Hill commences upon the submission of an I-526. .
- Provide information regarding the Gold Star system and franchise or other information consistent with Gold Star's Franchise Offering Circular as support to Mason Hill's investment offering to EB-5 investors.
- Cooperate with Mason Hill for all EB-5 reporting requirements.
- Contribute $30,000 of the Gold Star Capitalization in cash upon the execution of this Agreement for use as initial working capital and to cover startup costs, with the remainder of the Gold Star Capitalization being contributed as $20,000 upon the delivery of the Offering Documents, $50,000 when 12 EB-5 Investors have subscribed to become

5

GSC000353

Execution Copy

limited partners, and $50,000 upon Project Commencement (defined below). The remainder shall be contributed ratably with the Mason Hill Capitalization. The $150,000 paid by Gold Star outlined in the previous paragraph ("Initial Gold Star Capitalization") will be paid to GSC Opp Management, LLC as a capital contribution which will contribute it to the Project Owner who will issue payment to Mason Hill for payment of the Project Costs, as defined below, as noted in Exhibit D. Other than the Initial Gold Star Capitalization, Mason Hill and Gold Star will bear their own respective costs in promoting or developing the Project until all of the Mason Hill Capitalization and Gold Star Capitalization is contributed and the I-526 is accepted by the USCIS to permit the start of the Project ("Project Commencement"). Except as set forth in this Paragraph and Exhibit D, any costs incurred by either side that are reimbursable to either Gold Star or Mason Hill as costs of the Project ("Project Costs") shall be reimbursed at the Project Commencement. The initial Project Costs budget is attached as Exhibit D and incorporated herein.

6.     The Project Owner's annual Income shall be used as follows: (i) to pay all necessary and ordinary business expenses, (ii) to pay Gold Star's Management Fee; (iii) to pay Mason Hill's EB-5 Management Fee; (iv) to establish any reasonable reserves for the Project's operation at the sole discretion of the General Partner; (v) distributed to the Partners as income tax payments to cover each partner of the Project Owner's share of its Federal tax payments due as a result of being a partner of the Project Owner; (vi) the sum of $180,000 distributed as 66.7% to the EB-5 Investors and 33.3% to Gold Star ("Preferred Distributions"); and (vii) to the partners of the Project Owner as 80% to the EB-5 Investors and 20% to Gold Star; provided that Mason Hill and Gold Star contemplate and intend that any cash distributable to the EB-5 Investors shall be held and accumulated in a separate fund or account to be utilized for the purchase of the EB-5 Investors' limited partnership interest after the approval of the last EB-5 Investor's I-829 Petition. The parties agree that under no circumstances shall the General Partner make cash payments from this account to the EB-5 Investors before the date that is the later of the EB-5 Investor's final resolution of his/her I-829 Petition or

6

571221v1

GSC000354

Execution Copy

three (3) years from the date the EB-5 Investor was admitted to the Project Owner. Such funds shall be available for use by the Project Owner for the construction and development of additional franchise store locations.

      7.    The Project Owner will cause each subsidiary to enter into a Franchise Agreement with Gold Star which requires royalties of 5% of the franchised location's annual gross sales.

      8.    Subject to the terms set forth in Paragraph 6 above, profits and losses and cash distributions will be allocated 80% to the EB-5 Investors and 20% to GSC Management until the EB-5 Investors receive an amount equal to their Preferred Distribution and the Mason Hill Capitalization ("EB-5 Investor Distributions"). Once the I-829 Petitions of the EB-5 Investors are approved, at the option of the General Partner, each EB-5 Investor's limited partnership interest may be purchased by the Project Owner for fair market value plus any unpaid Preferred Distribution. The "fair market value" will be reflected in a fair value agreement in which the Project Owner will represent to the EB-5 Investors that the fair market value is $500,000 plus any accrued and unpaid Preferred Distribution. At such time, the Project Owner shall be owned 33 1/3% by Gold Star and 66 2/3% by Mason Hill, subject to adjustment as provided in Section 11 hereof, provided Mason Hill doesn't assume the capital account of the EB-5 Investor.

      9.    Provided Mason Hill has performed all of its obligations under the EB-5 Management Agreement it will have the option to purchase Gold Star's partnership interest in the Project Owner at any time after all applicable requirements of USCIS Regulations has expired and the EB-5 Investors are no longer partners of the Project Owner. The purchase price shall be equal to the fair market value as defined by an objective third-party approved by both Mason Hill and Gold Star and Mason Hill shall have to assume all obligations of the Project Owner under the Franchise Agreements and any leases for the restaurant locations.

      10.    It is anticipated that 4 of the franchise restaurant locations in the Project will be on real property leased from third parties and 8 of the franchise restaurant locations will be on real estate to be acquired as part of the Project, however, the Project Owner will spend at least $6,000,000 million of the Project Owner's capital to

7

GSC000355

Execution Copy

acquire real estate and all real estate related expenses (including, but not limited to, architectural fees, soft costs, ie., licensing, permitting, design, construction management fees, real estate related legal fees and broker fees) construct leasehold improvements and renovations and purchase equipment (on both owned and leased property) and Gold Star shall be permitted to reduce the number of franchise restaurant locations to be on real estate acquired by the Project Owner if costs exceed this threshold. The Project Owner and its subsidiary owning a franchise restaurant location shall enter into a lease agreement for each of the locations. All leases for franchise restaurants shall conform to the term and other requirements of Gold Star's then current Franchise Agreement and all rent (basic and triple net payments) paid under such leases cannot exceed 7% of the projected gross sales of such restaurant. Not later than two (2) years after a franchise location commences operation, the Lease Agreement for such location shall become a "Fixed Rent" lease payment and not a "Percentage Rent" lease payment (the "Stablization Period"). Each location will create a minimum of ten (10) jobs, but target creating 12 jobs, per EB-5 Investor for purposes of USCIS EB-5 regulations. If any of the locations are closed, the Project Owner will open additional location(s) to satisfy the minimum job creation requirement. Each location, whether rented or purchased shall be approved by both Gold Star and Mason Hill and owned by separate limited liability companies wholly owned by the Project Owner.

11.    If the Project Owner's aggregate of distributions of Income to the EB-5 Investors at the later of three (3) years after the final EB-5 Investor I-526 Petition approval or the final EB-5 Investor's I-829 approval is less than the EB-5 Distributions amount set forth above then the EB-5 Investors, at the election of Mason Hill, may, at its option on a best-efforts basis, enter into sale and lease back transactions (provided all leases for the restaurants remain in effect and are assumed by the purchaser) and use the net proceeds from such transaction, after costs, as set forth below. If the Project Owner's aggregate of distributions of income to the EB-5 Investors at the end of the fifth anniversary of when the final EB-5 Investors I-526 Petition is approved by USCIS is less than the EB-5 Distributions amount set forth above, then, with the consent of the majority of the EB-5 Investors, the Project Owners shall liquidate the Project's real property assets at market values to third parties (provided all leases for the restaurants

8

GSC000356

Execution Copy

remain in effect and are assumed by the purchaser), and use the net proceeds from such transaction, after costs, as set forth below. Subject to the right of the General Partner to have the Project Owner purchase the EB-5 Investors' limited partnership interests, all net proceeds from a transaction described in this paragraph shall be distributed to the partners of the Project Owner as 80% to the EB-5 Investors and 20% to Gold Star. Immediately following the return of the EB-5 Investors EB-5 Distributions, the Project Owner shall be deemed to have redeemed a certain amount of the EB-5 Investors' limited partnership interests based on the following formula: Total EB-5 Distributions in excess of 66.7% of all distributions to the partners of the Project divided by $90,000 will equal the total percentage of interests redeemed.

12.    The Project Owner shall be responsible for all agreed upon Project Costs related to the Project.

13.    Each party to this agreement shall remain independent of the other party and nothing contained herein shall be construed to create a partnership, joint venture, employment or agency relationship.

14.    This Memorandum of Understanding shall be effective the date hereof and shall terminate by written agreement of the parties or written notice from Mason Hill that the offering of Limited Partnership interests to EB-5 investors has been completed and/or terminated.    Except for each party's good faith, this Memorandum of Understanding is not intended to be binding on either party and nothing set forth herein shall be deemed to survive the termination of this Agreement and the purpose of this Agreement is to permit the parties to move forward with negotiation and finalization of documents necessary to effect the Project, including but not limited to the Project Owner's Operating Agreement, EB-5 Management Agreement, Business Plan and similar documents.

15.    This Agreement shall be governed and construed in accordance with the laws of the State of Ohio.

16.    This Agreement constitutes the entire agreement between the parties with respect to the implementation of the Project and supersedes and replaces all prior and contemporaneous oral and written agreements, understandings, negotiations and

571221v1

GSC000357

Execution Copy

discussions with respect to the subject matter hereof. This agreement may be amended only by additional agreement in writing signed by each party.


GOLD STAR CHILI, INC.

By: _Michael E Blankempe_
Title: _CEO_
Date: April _15_, 2013


MASON HILL, LLC

By: _____
Title: _____
Date: April ___, 2013


As Indemnifiers Only:


_____
Terry Chan
Date: April ___, 2013


_____
Gary Chan
Date: April ___, 2013


10

571221v1

GSC000358

Execution Copy

## EXHIBIT A

### Capital Contributions

**GSC Capitalization shall consist of up to $3,000,000 payable as $2,500,000 in cash and $500,000 in waived initial franchise fees for each franchised location, waiver of monthly franchise fee for 90 days for each franchise and other agreed upon items. $150,000 of the $2,500,000 shall be paid in as set forth in the Memorandum of Understanding and the remaining portions to be contributed ratably at 2:1 with the Mason Hill Capitalization after crediting the $150,000.**

**Mason Hill Capitalization shall consist of up to $6,000,000 payable as set forth in the Project Schedule.**

## EXHIBIT B

### Business Plan

See attached

## EXHIBIT C

### Project Schedule

See attached

11

GSC000359

–Execution Copy

## EXHIBIT D

## Project Costs

| Capital Budget | | | |
|---|---|---|---|
| Item | Total Cost | Incurred to Date | Cost Remaining |
| EB-5 project preparation work | $124,000.00 | $112,000.00 | $12,000.00 |
| TEA Analysis and Submission | $34,000.00 | $27,000.00 | $7,000.00 |
| PPM | $20,000.00 | $15,000.00 | $5,000.00 |
| Operating Agreements | $10,000.00 | $3,000.00 | $7,000.00 |
| Limited Partnership Agreements | $15,000.00 | $12,000.00 | $3,000.00 |
| Subscription Agreement | $3,000.00 | $3,000.00 | $0.00 |
| Legal Document Review & Updates | $10,000.00 | $7,000.00 | $3,000.00 |
| Legal Counsel | $40,000.00 | $20,000.00 | $20,000.00 |
| Feasibility Study | $22,000.00 | $0.00 | $22,000.00 |
| Go To Market Cost | $82,000.00 | $14,000.00 | $68,000.00 |
| Seminar Venues | $40,000.00 | $8,000.00 | $32,000.00 |
| Translation | $10,000.00 | $4,000.00 | $6,000.00 |
| Printed Materials | $10,000.00 | $5,000.00 | $5,000.00 |
| Project Promotion | $15,000.00 | $5,000.00 | $10,000.00 |
| Remainder of GSC Opp Management, LLC Contribution | $2,850,000.00 | $0.00 | $2,850,000.00 |
| **Totals** | **$3,285,000.00** | **$235,000.00** | **$3,050,000.00** |

*Of the $235,000 of costs incurred to date, $150,000 of such costs, including fees and reimbursements to Mason Hill are to be paid as $30,000 on the signing of the MOU, $20,000 on approval of the investment documents by Gold Star, $50,000 on obtaining all 12 fully signed and subscribed subscription agreements from the EB-5 Investors, and $50,000 on the approval of the I-526 forms and release of funds from the EB-5 Investors. All additional costs in excess of $235,000 will be a cost of Mason Hill and neither Gold Star, nor the Project Owner will be responsible for or obligated to pay such costs.

| Capitalization Schedule | | | |
|---|---|---|---|
| Milestone | GSC | Mason Hill/EB-5 | Total |
| April 1, 2013 | $0.00 | $235,000.00 | $125,000 |
| MOU Signing | $30,000.00 | -$30,000.00 | $30,000 |
| Delivery of Completed Offering Documents | $20,000.00 | -$20,000.00 | $20,000 |
| EB-5 Investor Subscriptions | $100,000.00 | -$100,000.00 | $175,000 |

GSC000360

Execution Copy

| | | | |
|---|---|---|---|
| Transfer of EB-5 Investors Funds to Escrow* | $2,850,000.00 | $6,000,000.00 | $8,850,000 |
| Total | $3,000,000.00 | $6,085,000.00 | $9,200,000.00 |

* The parties acknowledge that Gold Star may cause a subsidiary of the Project Owner to acquire franchise locations prior to the approval of the I-526 and that its costs in acquiring assets, leasehold interests and improvements and other costs of setting up such franchised location may be contributed to the Project in lieu of cash.

13

571221v1

GSC000361

Execution Copy

discussions with respect to the subject matter hereof. This agreement may be amended only by additional agreement in writing signed by each party.

GOLD STAR CHILI, INC.

By: _Michael E Lhwhempe_
Title: _CEO_
Date: April _15_, 2013

MASON HILL, LLC

By: _____
Title: _President_
Date: April _15_, 2013

As Indemnifiers Only:

_____
Terry Chan
Date: April __, 2013

_____
Gary Chan
Date: April __, 2013

10

571221v1



**GSC Opportunities, L.P:**

**A Direct EB-5 Investment Project**

**Comprehensive Business Plan**



Δ π EXHIBIT  2

Deponent Mason

Date 8/23 Rptr

WWW.DEPOBOOK.COM

## TABLE OF CONTENTS

1.0 DESCRIPTION OF BUSINESS AND OBJECTIVES .................................................................. 4
   1.1 EXECUTIVE SUMMARY ......................................................................................................... 4
   1.2 CONCEPT DESCRIPTION AND OBJECTIVES ........................................................................ 5
   1.3 CAPITALIZATION ............................................................................................................... 7
   1.4 DEVELOPMENT TIMELINES ............................................................................................... 8
      1.4.1 Phasing Timeline ................................................................................................ 8
      1.4.2 Immigration and Project Job Creation Timeline ........................................... 9
      1.4.3 Single Restaurant Development Timeline ..................................................... 10

2.0 PERMITS, LICENSES & CONTRACTS ..................................................................................... 11
   2.1 REAL ESTATE PERMITS AND CONTRACTS ...................................................................... 11
   2.2 OPERATIONAL PERMITS AND CONTRACTS ...................................................................... 11

3.0 MARKET ANALYSIS AND COMPETITION ........................................................................... 12
   3.1 TARGET MARKET SUMMARY ........................................................................................... 12
      3.1.1 Cincinnati Metropolitan Statistical Area ..................................................... 12
      3.1.2 Lexington, Fayette County, Kentucky ........................................................... 13
      3.1.3 Dayton, Ohio Metropolitan Statistical Area ................................................ 13
   3.2 TARGET LOCATIONS ........................................................................................................ 13
      3.2.1 Germantown, Ohio ........................................................................................... 14
      3.2.2 UC Area / Clifton, Ohio 1 ................................................................................ 14
      3.2.3 UC Area / Clifton , Ohio 2 ............................................................................... 14
      3.2.4 Downtown Cincinnati, Ohio 1 ........................................................................ 15
      3.2.5 Downtown Cincinnati, Ohio 2 ........................................................................ 15
      3.2.6 Loveland, Ohio .................................................................................................. 16
      3.2.7 Over the Rhine, Ohio ....................................................................................... 17
      3.2.8 Florence, Kentucky ........................................................................................... 17
      3.2.9 Palomar / Lexington, Kentucky ..................................................................... 18
      3.2.10 Lexington, Kentucky ...................................................................................... 18
      3.2.11 Greendale, Indiana ........................................................................................ 18
   3.3 COMPETITION PROFILE .................................................................................................... 18
   3.4 COMPETITORS BY LOCATION .......................................................................................... 20
      3.4.1 Germantown, Ohio ........................................................................................... 20
      3.4.2 UC Area / Clifton, Ohio 1 ................................................................................ 21
      3.4.3 UC Area / Clifton, Ohio 2 ................................................................................ 22
      3.4.4 Downtown Cincinnati, Ohio 1 ........................................................................ 23
      3.4.5 Downtown Cincinnati, Ohio 2 ........................................................................ 24
      3.4.6 Loveland, Ohio .................................................................................................. 25
      3.4.7 Over the Rhine, Cincinnati, Ohio .................................................................. 26
      3.4.8 Florence, Kentucky ........................................................................................... 27
      3.4.9 Palomar, Lexington, Kentucky ...................................................................... 28
      3.4.10 Lexington, Kentucky ...................................................................................... 29
      3.4.11 Greendale, Indiana ........................................................................................ 30

4.0 COMPETITIVE AND OPERATIONS STRATEGY ................................................................ 31
   4.1 COMPETITIVE STRATEGY ................................................................................................. 31
   4.2 OPERATIONS STRATEGY .................................................................................................. 32

5.0 ORGANIZATIONAL STRUCTURE AND PERSONNEL ..................................................... 35
   5.1 ORGANIZATIONAL STRUCTURE ....................................................................................... 35

5.2 Management Team, Consultants and Key Collaborators .................................................. 36
5.2.1 EB-5 Management Team ............................................................................................ 36
5.2.2 GSC Opportunities Operational Management Team ................................................ 37

**6.0 STAFFING AND JOB CREATION** .................................................................................. **38**
6.1 Single Restaurant Staffing Projection ............................................................................. 38
*6.2.1 Job Descriptions* ....................................................................................................... *39*
6.3 Job Creation Phasing and Hiring Timelines .................................................................... 40

**7.0 EXIT STRATEGY** ............................................................................................................. **42**
7.1 Expansion Plans ............................................................................................................... 42
7.2 Investor Exit Options ....................................................................................................... 42

**8.0 FINANCIALS** .................................................................................................................... **43**
8.1 Industry Trends ................................................................................................................ 44
8.2 Profit and Loss Projections ............................................................................................. 45
*8.2.1 Single Restaurant Sample Year-1 Summary P&L Projections* ................................ *45*
*8.2.2 Single Restaurant Sample 5-year P&L Projection* ................................................... *46*
*8.2.3 GSC Opportunities, L.P. Comprehensive 5-year Operating Projection* .................. *47*
8.3 Capital Budgets ................................................................................................................ 48
*8.3.1 Comprehensive Project Capital Budget* .................................................................. *48*
*8.3.2 Single Restaurant Sample Capital Budget* ............................................................... *50*
8.4 ROI and Equity Analysis ................................................................................................. 51
8.5 Funds Disbursement and Controls ................................................................................... 52

**APPENDICES** ......................................................................................................................... **53**
Appendix 1: Targeted Employment Areas ............................................................................. 53
Appendix 2: Sample Menu ..................................................................................................... 54
Appendix 3: Location Maps .................................................................................................... 55
Appendix 4: Real Estate Details ............................................................................................. 56
Appendix 5: Key Competitor Metrics and Industry Data ...................................................... 77
*McDonald's* ........................................................................................................................ *77*
*Kentucky Fried Chicken (KFC)* .......................................................................................... *78*
*Pizza Hut* ........................................................................................................................... *79*
Appendix 6: Draw Process ...................................................................................................... 80

## 1.0 Description of Business and Objectives

### 1.1 Executive Summary

GSC Opportunities, L.P. ("the Partnership") will accept a $6 million direct investment of EB-5 capital from 12 investors to fund and operate twelve Gold Star Chili restaurants. GSC Opp Management, LLC will serve as the General Partner of GSC Opportunities, L.P. Gold Star Chili, Inc. will be the managing member of GSC Opp Management, LLC. EB-5 investors will serve as limited partners in the Partnership. (see sec. 5.1)

 GSC Opportunities, L.P. will not employ indirect job creation or any other advantages exclusive to EB-5 Regional Centers. GSC Opportunities and all of its wholly owned subsidiaries constitute the EB-5 new commercial enterprise for this direct, non-regional center EB-5 investment. Each of the twelve restaurant locations will be located within a 200-mile radius of Gold Star Chili's corporate headquarters and commissary in Cincinnati, Ohio.




Gold Star Chili was founded in 1965 in Cincinnati.  A privately held company, Gold Star now operates and franchises about 100 quick-serve, Cincinnati-style chili restaurants in Ohio, Kentucky, and Indiana.  Gold Star has identified twelve locations ideal for new franchise restaurants within the Dayton-Cincinnati-Lexington region of southwest Ohio and Kentucky, all within a 200-mile radius of Cincinnati (see Appendix 3).  Each location is targeted for its proximity to business and residential demographics that favor low-cost, quick-serve restaurants.  These areas also recognize and value the Gold Star brand.

Gold Star Chili is a regional brand that competes successfully with many national fast-food brands such as McDonalds, Burger King, Kentucky Fried Chicken, and Pizza Hut. Headquarters for Yum! Brands, which owns Kentucky Fried Chicken and Pizza Hut, is located just 100 miles away in Louisville, Kentucky.  The GSC Opportunities, L.P. management team (see sec. 5.2) brings over 100 years of combined executive experience.  Gold Star Chili's executives working on the GSC Opportunities team bring 30 years combined experience to the table as Gold Star executives, during which time they have successfully diversified Gold Star's corporate and franchise portfolios.  In addition to managing the Partnership, as managing member of GSC Opp Management,LLC, Gold Star Chili, Inc. will manage and oversee the start up and stabilization of each restaurant location in the GSC Opportunities, L.P. portfolio.

Twelve EB-5 immigrant investors will invest $6 million in GSC Opportunities, L.P., and become limited partners in this new commercial enterprise. GSC Opportunities, L.P. will pool the EB-5 capital and channel the capital to a total of twelve wholly-owned subsidiary Gold Star Chili restaurant locations (see sec. 5.1). Gold Star Chili,

Inc. will contribute $3 million total equity contribution in these twelve new locations. Gold Star's contribution represents 33% of the total capital invested. Capital will be used for both real estate and operational purposes. Real property will be owned in a real estate holding company, (RealCo), that is a wholly-owned subsidiary of GSC Opportunities, L.P. RealCo will then lease the real estate to the individual restaurants as applicable (see Sec. 5.1). Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure and the cost breakdown (see Sec. 8.1.2). GSC Opp Management, LLC will oversee funding of the project on behalf of the investors, and will disburse funds per monthly draw schedule submitted to the management team by the restaurant operators.

Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contributions from Gold Star Chili, Inc. The proposed sources of funds are as follows:

| Source of Funds | Amount |
|---|---|
| EB-5 Funds | $6,000,0000 |
| Gold Star Chili Equity Contribution | $3,000,000 |
| Total | $9,000,000 |

GSC Opportunities, L.P. will seek to return capital to the investor Limited Partners after 3 years or once their I-829 applications have been approved by USCIS per the requirements of the EB-5 program. However, return of EB-5 capital to the Limited Partners is not guaranteed.

### 1.2 Concept Description and Objectives

GSC Opportunities, L.P on behalf of twelve EB-5 immigrant investors, seeks to fund and operate twelve Gold Star Chili restaurant locations, each located within a 200-mile radius of Cincinnati, Ohio (see Appendix 3). Detailed descriptions of the restaurant locations are covered in Sec. 3.2, Target Locations. In general, the locations will operate seven days a week, serving continuously from 10:00 a.m. to 11:00 p.m., focusing on the lunch and dinner meal periods.

| | Hours |
|---|---|
| **Monday** | 10:00am-11:00pm |
| **Tuesday** | 10:00am-11:00pm |
| **Wednesday** | 10:00am-11:00pm |
| **Thursday** | 10:00am-11:00pm |
| **Friday** | 10:00am-11:00pm |
| **Saturday** | 10:00am-11:00pm |
| **Sunday** | 10:00am-11:00pm |

Frank Daoud and three of his brothers, all immigrants to the United States, founded Gold Star Chili in 1965, and since that time Gold Star has dubbed itself "the Flavor of Cincinnati." A privately held company, Gold Star now operates and franchises about 100 quick-serve, Cincinnati-style chili restaurants in Ohio, Kentucky, and Indiana. Gold Star is currently seeking to establish both new franchise and new corporate locations within a 200-mile radius of its Cincinnati-based commissary facility. Gold Star has developed a restaurant model with streamlined operations, a simple, focused menu, and a one-of-a-kind brand identity, designed to deliver return on investment to owner-operators. The corporate package includes direct support from Gold Star high-level management for site selection, construction, purchasing and information technology, training, operations, marketing, and the hiring of operators and general managers for the locations.

Cincinnati-style chili has a national reputation, and the Gold Star chili recipe has been a closely guarded secret for 45 years. The commissary prepares chili from scratch daily to exacting quality standards to ensure the restaurants have a consistent product. The commissary delivers chili fresh to its restaurants, and operators reheat the chili on-site. Gold Star Chili restaurants offer a "brand" dining experience. The chili-parlor style incorporates an open steam table with counter seating as the heart of the restaurant. This gives the crew the opportunity to interact with customers and create the personal connections that are the foundation of brand loyalty.

Cincinnati-style chili is significantly different from the familiar, Southwestern-style chili that originated in Texas. Thinner and soupier than its Texas cousin, Cincinnati-style chili is a smooth, meat sauce made with finely ground beef and tomatoes, garlic and onion, and a blend of spices that may include cinnamon, allspice, cloves, and chocolate. This traditional, Mediterranean sauce first became popular in the early 1920's at a Cincinnati restaurant operated by Macedonian immigrants. Although the sauce was Mediterranean, the style of service became unique to the region: Cincinnatians like their chili served over spaghetti or hotdogs on a bun, and piled high with finely grated, cheddar cheese. Variations include the addition of chopped onions, yellow mustard, red kidney beans, hot-pepper sauce, and oyster crackers. Since the 1920's, other Mediterranean immigrants, including the Daoud brothers, have continued this local tradition, raising Cincinnati-style chili and the Gold Star brand to the status it enjoys today: a regional specialty with cult-like popularity.

Traditional chili dishes make up 70% of sales: coney dogs, chili cheese fries, and the "3-way," spaghetti topped with chili and finely shredded cheddar cheese. Gold Star also adds chili to nachos and burritos for a creative twist, and offers other menu items that complement chili such as double-decker sandwiches, salads, hamburgers,

and milkshakes (see Sample Menu, Appendix 2). Carryout is a significant portion of business. Gold Star products are available online and through retail grocers.

Gold Star Chili has established corporate partnerships with many other significant local Greater Cincinnati and Northern Kentucky area businesses. Gold Star is the official chili of the Cincinnati's National Football League team, the Bengals, Cincinnati Northern Kentucky International Airport, University of Kentucky's Rupp Arena, Cincinnati Children's Hospital Medical Center and Minor League Baseball team the Lexington Legends.

    

### 1.3 Capitalization

Twelve EB-5 immigrant investors will invest $6 million in GSC Opportunities, L.P., a Limited Partnership that will channel it into twelve, wholly-owned subsidiaries. Each of these subsidiaries will own and operate a Gold Star Chili restaurant. Gold Star Chili, Inc. will invest $3 million total equity contribution in these twelve new locations. All EB-5 investment capital will be held in escrow until two investors have received their I-526 approvals. After this point, all funds held in escrow as well as any funds from subsequent EB-5 investors subscribing to the L.P. will be released directly to GSC Opportunities, L.P.

Gold Star Chili, Inc.'s contribution of non-EB-5 capital represents 33% equity contribution in each of the restaurants. Capital will be used for both real estate and operational purposes. Land/building for each of these twelve restaurants will be purchased and held in a real estate holding company, RealCo, that is a wholly owned subsidiary of GSC Opportunities, L.P. The holding company will lease the real estate to each of the twelve respective restaurant LLCs (job creating entities). Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure (see Sec. 5.1) and the cost breakdown (see Sec. 8.1.2). GSC Opp Management, LLC will oversee funding of the project on behalf of the investors, and will disburse funds per monthly draw schedule submitted to the management team by the restaurant operators.

Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contribution from Gold Star Chili, Inc. The proposed sources of funds for each of the ten locations are as follows:

| Source of Funds | Amount |
|---|---|
| EB-5 Funds | $6,000,0000 |
| Gold Star Chili Equity Contribution | $3,000,000 |
| Total | $9,000,000 |

7

## 1.4 Development Timelines

### 1.4.1 Phasing Timeline



Construction time per restaurant = 60 days (2 months)

Operational startup time per restaurant = 90 days (3 months)

### 1.4.2 Immigration and Project Job Creation Timeline



| | |
|---|---|
| 4/1/13 | Internal review of I-526 package begins, investor funds transferred to escrow |
| 5/1/13 | I-526 petition submitted to USCIS by immigration attorney on behalf of the investor |
| | I -526 approved by USCIS, investor funds released from escrow to project |
| 11/1/13 | Investor and immigration attorney schedule Consulate Interview |
| | 1st phase Gold Star Chili restaurant locations open |
| 3/1/14 | Total of three restaurants now operational and and a total of 48 full time positions created |
| 5/1/14 | Successful consulate interview results in investor receiving visa to enter the U.S. within 180 days |
| | 2nd phase Gold Star Chili restaurant locations open. Total of six restaurants now operational and |
| 7/1/14 | and a total of 96 full time positions created. |
| | 3rd phase Gold Star Chili restaurant locations open |
| | Total of nine restaurants now operational and and a total of 144 full time positions created |
| 11/1/14 | **All EB-5 investor job creation requirements now fulfilled** |
| | 4th and final phase Gold Star Chili restaurant locations open |
| 3/1/15 | Total of eleven restaurants now operational and and a total of 192 full time positions created |
| | Project reports job creation numbers and immigration attorney |
| 3/1/16 | files I-829 petition with USCIS on behalf of investor |
| 9/1/16 | **I-829 petition approved by USCIS and investor's Green Card becomes permanent** |

### 1.4.3 Single Restaurant Development Timeline



| Tasks | Duration (working days) |
|---|---|
| Architectural, Permits and Fees | 10 |
| Interior & Exterior Demolition | 6 |
| Framing and Reconfiguration | 10 |
| Exterior Restoration Finishes | 9 |
| Roofing and Exterior Rough | 8 |
| Insulation, Drywall, and Plaster | 9 |
| Commercial Kitchen Work | 10 |
| Rough Electrical | 11 |
| Rough HVAC | 11 |
| Rough Plumbing | 11 |
| Interior Trim & Millwork | 7 |
| Interior Painting and Finishes | 6 |
| Cabinetry and Casework | 5 |
| Flooring & Hard Surfaces | 5 |

| | |
|---|---|
| Misc. Accessories, Hardware, and Shelving | 7 |
| Electrical Finishes | 5 |
| HVAC Finishes | 5 |
| Plumbing Finishes | 5 |
| Interior and Exterior Punchlist | 7 |
| Set Up Kitchen Equipment, Fixtures, and Furniture | 7 |
| FF&E | 6 |
| IT/Systems | 7 |
| Point of Sale | 4 |
| Set Up Benefits and Payroll | 10 |
| Hire Management | 10 |
| Hire Skilled Workers | 10 |
| Hire Unskilled Workers | 10 |

| | |
|---|---|
| Organizational Development | 45 |
| Licenses | 24 |
| Bar | 6 |
| Kitchen | 6 |
| Smallwares | 6 |
| Other Supplies | 6 |
| Pay Supplies Inventory Deposit | (milestone) |
| Bar | 6 |
| Pay Bar Inventory Deposit | (milestone) |
| Food | 6 |
| Pay Food Inventory Deposit | (milestone) |
| Preopening Punch List | 11 |
| Grand Opening | |

10

## 2.0 Permits, Licenses & Contracts

### 2.1 Real Estate Permits and Contracts

**Pre-Construction**
- Demolition Permit
- Confirmation of Zoning Status
- Environmental Reports

**Construction**
- Building Permits
  - Separate permits for each contractor
    - Handled by each appropriate contractor or by GC
- Health Department Regulations
  - Planning
- Fire Code Regulations
  - Planning
- Proof of fully licensed and bonded contractors
- Occupancy Permit

**Contracts**
- Architects
- Construction
  - GC, subs, developer, etc.
- Suppliers
  - Food stuffs
  - FOH wares
  - BOH wares
  - Appliances

### 2.2 Operational Permits and Contracts

**Operational**
- Fire code inspection
- Health department inspection

## 3.0 Market Analysis and Competition

### 3.1 Target Market Summary

According to market research organization IBISWorld, in 2010 in the United States there were approximately 215,000 full-service restaurants and 300,000 fast food restaurants. Full service establishments generated $178 billion in revenue and fast food restaurants generated $184 billion for a combined total of $362 billion.

The National Restaurant Association reported that in 2010 there were 21,302 "eating and drinking places" in Ohio. The Association projects that in 2012, these Ohio establishments will register $16.6 billion in sales. A total of 6,696 eating and drinking places in Kentucky as of 2010 were expected to generate $6 billion in revenue in 2012.

USDA Economic Research Service figures show that Americans spend approximately 5% of disposable personal income on food outside the home and approximately 73% of this expenditure occurs at eating and drinking places, meaning that Americans spend approximately 3.65% of disposable income at eating and drinking places. According to the U.S. Bureau of Economic Analysis, Ohio per-capita disposable income in 2011 was approximately $34,000, and Kentucky per-capita disposable income was approximately $31,000. The national per capita average was $37,000.

### 3.1.1 Cincinnati Metropolitan Statistical Area

According to the U.S. Census, there are a total of 1.63 million Ohioans who reside in Hamilton, Butler, Warren and Clermont and Brown counties. These five counties constitute the Ohio portion of the Greater Cincinnati MSA. According to the same data there were 430,000 people residing in the seven Kentucky counties of the Cincinnati MSA and 79,000 within the three Indiana counties. Based on the above data, these 2.14 million people in the Cincinnati MSA spent a grand total of $2.6 billion at eating and drinking places in 2011.

The U.S. Census Bureau counted 3,862 eating and drinking places in the greater Cincinnati, Ohio-Kentucky-Indiana Metropolitan Statistical Area in 2010. Based on this and the calculations of disposable income spent at these establishments, each establishment in the above outlined geographic region averaged approximately $674,000 in revenue that year.

The City of Cincinnati (note: not the Cincinnati MSA) was listed in February 2011 by the Daily Beast as the #8 fast-food capital in the continental United States. This assessment was based on the existence of 313 fast-food restaurants, or 94 restaurants per 100,000 residents. There are a total of 93 Gold Star Chili restaurants throughout Ohio, Kentucky and Indiana. Gold Star's biggest competitor, Skyline Chili (see sec. 3.3), has just over 130 restaurants in the same three states. Of

12

the twelve locations identified for expansion of Gold Star Chili (see sec. 3.2) eight are located in the Cincinnati, Ohio-Kentucky-Indiana Metropolitan Statistical Area.

### 3.1.2 Lexington, Fayette County, Kentucky

In 2010, the U.S. Census Bureau counted over 301,000 residents in Fayette County Kentucky. The territory, population and government of this county are coextensive with the city of Lexington. Lexington accounts for almost two thirds of the population of the regional MSA that it anchors. In 2002, the most recent data available, the U.S. Census Bureau counted 752 eating and drinking places, and based on the disposable income figures above, these residents expended a total of $624,083,000 on food and drink in the Lexington MSA, averaging $829,897 per establishment.  Two Gold Star Chili expansion location is being targeted in Lexington.

### 3.1.3 Dayton, Ohio Metropolitan Statistical Area

In 2010, the U.S. Census Bureau counted 841,502 residents in Greene, Montgomery, Miami, and Preble Counties in Ohio, comprising the Dayton MSA.  In 2002, the most recent data available, the U.S. Census Bureau counted 1,471 eating and drinking places, and based on the disposable income figures above, these residents expended a total of $1,053,483,000 on food and drink in the Dayton MSA, averaging $716,167 per establishment. Of the twelve locations identified for Gold Star Chili expansion, one is located in the Dayton MSA.

### 3.2 Target Locations

The following table lists the twenty locations proposed for the new restaurants, followed by detailed descriptions of each.

| Location | |
|---|---|
| Germantown, OH | Over The Rhine, OH |
| UC Area / Clifton, OH 1 | Florence, KY |
| UC Area / Clifton, OH 2 | Palomar / Lexington, KY |
| Downtown Cincinnati, OH 1 | Lexington Kentucky |
| Downtown Cincinnati, OH 2 | Greendale, IN |
| Loveland, OH | |

### 3.2.1 Germantown, Ohio

Germantown, Ohio is a city of 5,547 residents (2010) 15 miles southwest of Dayton. In 2000 the median per capita income was $23, 287 and the median household income was $47,179.  Established in 1804, Germantown boasts the Gunckel Town Plat, a district listed on the National Register of Historic places because of its many original 19th and early 20th century buildings.  Germantown is nestled in the scenic Twin Creek Valley and the city maintains two city parks.  Once the home of larger industries such as distilleries and cigar manufacturers, today Germantown's businesses are mostly smaller and locally owned.  Germantown has no chili restaurants, but there are many locations of Gold Star Chili and Skyline in nearby small cities and in Greater Dayton. The new Gold Star Chili restaurant location will be located in the new Hickory Pointe Centre development being constructed by Associate Construction. The address for the new location will be 2394 Beechwood Ave.

### 3.2.2 UC Area / Clifton, Ohio 1

Clifton/UC is a large, densely populated urban area, located five minutes north of downtown Cincinnati, surrounding the University of Cincinnati and six regional hospitals.  Clifton has excellent transportation and accessibility, conveniently located between Interstates 71 and 75.  The University of Cincinnati is the region's largest employer.  University and hospital employees, as well as students, are all natural patrons of quick-serve and carryout restaurants.  Significant economic development is underway in the Clifton Heights area, where this plan proposes a Gold Star location:  U Square @ the Loop, currently under construction, will be a multi-use, mid-rise development covering two city blocks between McMillan and Calhoun streets, across from the University of Cincinnati's main campus.  U Square will offer 161 upscale market-rate apartments; 80,000 square feet of retail space; 40,000 square feet of University of Cincinnati office space; 700 parking spaces in two parking garages; and green space for social, musical, cultural, and neighborhood events.  This location is ideal for a Gold Star location; the nearest Skyline Chili competitor is one mile away. The address for the new location will be 2707 Vine Street.

### 3.2.3 UC Area / Clifton , Ohio 2

Clifton/UC is a large, densely populated urban area, located five minutes north of downtown Cincinnati, surrounding the University of Cincinnati and six regional hospitals.  Clifton has excellent transportation and accessibility, conveniently located between Interstates 71 and 75.  The University of Cincinnati is the region's largest employer.  University and hospital employees, as well as students, are natural patrons of quick-serve and carryout restaurants.  The address at 200 West McMillan is located in heart of the shopping and entertainment district directly across the street from the University of Cincinnati's main campus.

### 3.2.4 Downtown Cincinnati, Ohio 1

Downtown Cincinnati's central business district comprises 12 million square feet of office space for use by 63,000 workers, and is headquarters to six Fortune 500 companies—including Procter & Gamble, Fifth Third Bank, The Kroger Company, Macy's, Inc., American Financial Group, and the Great American Insurance Company—as well as operations centers for many other Fortune 500 companies.

A mix of historical and modern buildings, the central business district is also the site of several cultural venues including the Aronoff Center for the Arts, the Lois and Richard Rosenthal Center for Contemporary Art, and the Taft Museum of Art. Downtown is a major, regional shopping district with stores such as Macy's, Saks Fifth Avenue, and Tiffany's, as well as specialty shops located in historic storefronts, mixed in with hotel chains. A variety of restaurants serve the lunch crowd, as well as upscale bars and restaurants that cater to nightlife.

Several development projects are underway. Some are new construction; others are restoration of historic buildings for condominiums, hotels, and retail space. Built in 1871, historic Fountain Square is at the heart of the central business district, and underwent renovation in 2005 to accommodate more underground parking as well as space for community events, such as Cincinnati's annual Oktoberfest, the largest German-heritage festival outside of Germany, reflecting the city's cultural heritage. Fountain Square is walking distance to the Ohio Riverfront, the National Underground Railroad and Freedom Center, and stadiums for professional sports teams Cincinnati Reds baseball and Cincinnati Bengals football. Located between these stadiums is downtown's newest improvement, The Banks, an 18-acre development of upscale housing, retail, parking, and bars and restaurants. The Banks will create 2,400 jobs and generate $275 million annually in economic activity. The city's new 45-acre Riverfront Park, under construction, will connect the central business district to the waterfront. Over the past decade, local and federal governments have invested over $2 billion in the overall redevelopment of Cincinnati's central riverfront.

In the northeast corner of downtown, and still within walking distance from Fountain Square, the $400 million Horseshoe Casino development sits on 20 acres of formerly distressed urban real estate. Opening in March 2013, the casino will create 1,700 jobs, and draw 6 million visitors annually.

Gold Star Chili Downtown Cincinnati I's location will be 8 E. 4th Street.

### 3.2.5 Downtown Cincinnati, Ohio 2

Downtown Cincinnati's central business district comprises 12 million square feet of office space for use by 63,000 workers, and is headquarters to six Fortune 500

companies—including Procter & Gamble, Fifth Third Bank, The Kroger Company, Macy's, Inc., American Financial Group, and the Great American Insurance Company—as well as operations centers for many other Fortune 500 companies.

A mix of historical and modern buildings, the central business district is also the site of several cultural venues including the Aronoff Center for the Arts, the Lois and Richard Rosenthal Center for Contemporary Art, and the Taft Museum of Art. Downtown is a major, regional shopping district with stores such as Macy's, Saks Fifth Avenue, and Tiffany's, as well as specialty shops located in historic storefronts, mixed in with hotel chains. A variety of restaurants serve the lunch crowd, as well as upscale bars and restaurants that cater to nightlife.

Several development projects are underway. Some are new construction; others are restoration of historic buildings for condominiums, hotels, and retail space. Built in 1871, historic Fountain Square is at the heart of the central business district, and underwent renovation in 2005 to accommodate more underground parking as well as space for community events, such as Cincinnati's annual Oktoberfest, the largest German-heritage festival outside of Germany, reflecting the city's cultural heritage. Fountain Square is walking distance to the Ohio Riverfront, the National Underground Railroad and Freedom Center, and stadiums for professional sports teams Cincinnati Reds baseball and Cincinnati Bengals football. Located between these stadiums is downtown's newest improvement, The Banks, an 18-acre development of upscale housing, retail, parking, and bars and restaurants. The Banks will create 2,400 jobs and generate $275 million annually in economic activity. The city's new 45-acre Riverfront Park, under construction, will connect the central business district to the waterfront. Over the past decade, local and federal governments have invested over $2 billion in the overall redevelopment of Cincinnati's central riverfront.

In the northeast corner of downtown, and still within walking distance from Fountain Square, the $400 million Horseshoe Casino development sits on 20 acres of formerly distressed urban real estate. Opening in March 2013, the casino will create 1,700 jobs, and draw 6 million visitors annually.

Gold Star Chili Downtown Cincinnati II's location will be 814 Plum Street.

### 3.2.6 Loveland, Ohio

Loveland, population 12,000, is a bedroom suburb of Cincinnati, 20 miles north of downtown on Interstate 275. Primarily residential, Loveland is close to upscale communities Madeira, Symmes Township, and Mason, and is growing with new residential development. The address at 700 Loveland-Madeira Road is located on the main thoroughfare and near two strip malls.

16

### 3.2.7 Over the Rhine, Ohio

Over-the-Rhine (OTR) is Cincinnati's oldest and most historic neighborhood, home to the country's largest collection of 19th-century Italianate architecture, earning the entire 360-acre OTR neighborhood distinction as an historic district listed in the National Register of Historic Places.  The neighborhood's name comes from German immigrants who built and settled there.

By the beginning of the 21st century, OTR had become one of the most economically distressed areas in the country, despite its pivotal location directly between the city's two largest employment centers, the downtown business district and the uptown medical and university district.  In 2003, the City of Cincinnati and the city's corporate leaders made a joint commitment to jumpstart economic development in Cincinnati's urban core, creating the Cincinnati Center City Development Corp. (3CDC), which would focus on a 110 square block area of OTR.

3CDC has invested over $255 million in OTR.  Historic buildings have now been renovated into single-family homes, condominiums, apartments, commercial spaces, and parking.  The arts community, which includes the Ensemble Theatre, Know Theatre, Cincinnati Art Academy, Music Hall, and the public, K-12 School for Creative & Performing Arts are all located in OTR.   A vibrant bar and restaurant scene draws patrons from all over the city.  Washington Park is a two-block area of renovated green space, fountains, and playgrounds that draw families and others for recreation and local events.

Although there is an increase in residential development as well as a diverse demographic visiting the area, there is a shortage of quick-serve, low-cost restaurants.  Most restaurants in the area are bars.   This area would support a Gold Star restaurant; both the Gold Star brand and the neighborhood are respected as part of the city's history and identity.

### 3.2.8 Florence, Kentucky

Florence is a suburb of Cincinnati, located 10 miles south of downtown Cincinnati and the Ohio River.  Florence, population 30,000 is rapidly growing, and presents a residential mix of lower to higher-income households of homeowners and renters, as well as significant businesses and manufacturing, Turfway Race Track, a major regional shopping area, and the Greater Cincinnati International Airport nearby. The location under consideration is next to Stafford Jewelers on Mall Road, part of the Florence Mall entertainment and shopping complex.  This is a very high-traffic area day and night that draws patrons from all over the region.  Mall Road has recently undergone expansion and upgrading with the use of federal stimulus funds to relieve congestion and accommodate public transportation, pedestrians, and bicycles.  The Gold Star brand is regionally recognized here; the mix of shoppers, families, and workers would support a low-cost, quick-serve chili restaurant.  The

new restaurant will be located at 7649 Mall Rd. across from the Florence Mall shopping center.

### 3.2.9 Palomar / Lexington, Kentucky

Palomar is a large, upscale subdivision of 663 homes situated on 200 acres in suburban Lexington, Kentucky, located five miles from downtown Lexington and the University of Kentucky. The median household income in the Palomar subdivision is $91,000. The Keeneland Race Course and beautiful horse farms are nearby. Lexington, one-and-a-half hours south of Cincinnati, recognizes and values the Gold Star Chili brand and tradition of Cincinnati-style chili. As 73 percent of households in Palomar include children, a Gold Star restaurant would fill the need for a popular, quick-serve, family restaurant. The new Gold Star Chili restaurant will be located at 3734 Palomar Centre Drive, Suite 100.

### 3.2.10 Lexington, Kentucky

Located 80 miles south of Cincinnati on Interstate Highway 75, Lexington is the second largest city in Kentucky, with a metropolitan area of 472,100 people. Home to the University of Kentucky, a research institution with an enrollment of 29,000, Lexington is also known as the "horse capital of the world," for the Thoroughbred horse farms and racetracks in the area. The address at 350 Foreman Avenue is adjacent to the campus of the University of Kentucky, the city's largest employer, and although there are several quick-serve restaurants close to this address, the nearest chili parlor is five miles away. Lexington recognizes and values Cincinnati-style chili, and would welcome a local Gold Star location.

### 3.2.11 Greendale, Indiana

Greendale, Indiana is a city of just over 4,500 inhabitants in Dearborn County, Indiana in the Southeast part of the state. Greendale is 25 miles from downtown Cincinnati, Ohio. Greendale has easy access to Interstates 74, and 275 and is located just 12 miles away from Cincinnati Northern Kentucky International Airport. Greendale offers a wide range of economic development economic assistance programs for businesses planning to locate or expand existing operations. Certain areas of the community have been established for controlled industrial growth. Greendale is served by a Skyline Chili location one mile away in Lawrenceburg, Indiana, but the nearest Gold Star Chili location, also in Lawrenceburg is 4.5 miles away. The new Greendale Indiana location of Gold Star Chili will be located at 881 East Eads Parkway.

### 3.3 Competition Profile

Competition falls into four categories: Skyline Chili, locally owned chili chains, locally-owned other restaurant chains, and national fast-food chains.

18

Cincinnati-based Skyline Chili is the biggest competitor to Gold Star. Established in 1949 by the Lambrinides brothers, and offering franchises since 1965, Skyline Chili operates and franchises 140 restaurants, offers a near-identical product and dining experience, national brand recognition and merchandising, and an equally fierce loyalty and following as Gold Star Chili. Whereas Gold Star is the official chili of the Cincinnati Bengals professional football team, Skyline is the official chili of the Cincinnati Reds professional baseball team. Cincinnati-style chili is engrained in the region's collective identity; neighborhoods are loyal to one or to the other. The price point is similar.

As Gold Star and Skyline take the lion's share of chili-parlor business, there exist lesser, locally-owned chains Dixie Chili and Empress Chili, as well as stand-alone, family-owned chili parlors competing for business neighborhood by neighborhood. The price point is similar.

Local restaurant chains Frisch's Big Boy and LaRosa's are in a third category of competitors to Gold Star. Frisch's opened Cincinnati's first year-round, drive-in restaurant in 1939, and introduced the famous double-decker Big Boy sandwich in 1946. The chain now operates and franchises 120 restaurants in the region, serving breakfast, lunch, and dinner. The price point is similar to Gold Star. LaRosa's operates and franchises 60 pizza restaurants, first opened by local celebrity Buddy LaRosa in 1954. The price point for LaRosa's is slightly higher with the sale of alcohol.

Other national fast-food chains such as McDonald's and Burger King compete for business with Gold Star Chili.

### 3.4 Competitors by Location

Note: Twelve of the following twenty listed locations will be chosen as GSC portfolio locations.

### 3.4.1 Germantown, Ohio
The following chart displays restaurants within approximately a one-mile range of 2394 Beechwood Ave. in **Germantown**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| McDonalds | Fast Food | B/L/D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |
| Papa John's | Pizza | L,D | No |
| Super Wok | Chinese Cuisine | L,D | No |
| Hot Heads Burritos | Burritos | L,D | Yes |

### 3.4.2 UC Area / Clifton, Ohio 1

The following chart displays restaurants within approximately a one-mile range of 2707 Vine Street in the area of the **University of Cincinnati / Clifton, Ohio.** It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Martino's On Vine | Italian | L,D | No |
| LaRosa's | Pizza | L,D | No |
| Cincy Steak and Lemonade | Sandwiches | L,D | Yes |
| Skyline Chili | Fast Food | L,D | Yes |
| Island Frydays | Jamaican | L,D | No |
| Domino's | Pizza | L,D | Yes |
| Chipotle | Burritos | L,D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |
| McDonalds | Fast Food | B/L/D | Yes |
| Dunkin Donuts | Fast Food | B/L | No |

### 3.4.3 UC Area / Clifton, Ohio  2

The following chart displays restaurants within approximately a one-mile range of 200 W. McMillan St. in the area of the **University of Cincinnati / Clifton, Ohio.** It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Martino's On Vine | Italian | L,D | No |
| LaRosa's | Pizza | L,D | No |
| Cincy Steak and Lemonade | Sandwiches | L,D | Yes |
| Skyline Chili | Fast Food | L,D | Yes |
| Island Frydays | Jamaican | L,D | No |
| Domino's | Pizza | L,D | Yes |
| Chipotle | Burritos | L,D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |
| McDonalds | Fast Food | B/L/D | Yes |
| Dunkin Donuts | Fast Food | B/L | No |

### 3.4.4 Downtown Cincinnati, Ohio 1

The following chart displays restaurants within approximately a one-mile range of 8 E. Fourth Street in **Downtown Cincinnati**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Quizno's | Subs/ Sandwiches | L,D | Yes |
| Bruegger's | Bagels/Sandwiches | L,D | Yes |
| Local 127 | American | L,D | No |
| Paula's Café | American | L | No |
| J Gumbo | Cajun | L,D | Yes |
| Café De-vine | Diner | L,D | Yes |
| Subway | Subs/ Sandwiches | B/L/D | Yes |

### 3.4.5 Downtown Cincinnati, Ohio 2

The following chart displays restaurants within approximately a one-mile range of 814 Plum Street in **Downtown Cincinnati**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Sung Korean Bistro | Korean | L,D | No |
| Izzy's | Fast Food | L,D | Yes |
| Diner on Elm | Diner | L,D | Yes |
| Plaza Cafe | Café | L,D | Yes |
| Yum Yum Chinese | Casual Full Service | L,D | No |
| Papa John's | Pizza | L,D | No |
| Marrakech | Mediterranean | L | Yes |

### 3.4.6 Loveland, Ohio

The following chart displays restaurants within approximately a one-mile range of **Loveland, Ohio.** It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst;Lunch;Dinn | Direct Competition |
| El Picante | Mexican | L,D | Maybe |
| McDonald's | Fast Food | B,L,D | Yes |
| The Veg Head | Vegetarian | L,D | No |
| LaRosa's | Pizza | L,D | Yes |
| Angilo's | Pizza | L,D | No |
| Marco's | Pizza | L,D | No |
| Little Shanghai | Asian | L,D | No |
| Hitch's II Deli | Deli, grill | L,D | Maybe |

### 3.4.7 Over the Rhine, Cincinnati, Ohio

The following chart displays restaurants within approximately a one-mile range of **Over the Rhine.** It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Senate | Pub | L,D | No |
| Lavomatic Café | Café | L,D | No |
| Venice on Vine | Pizza | L,D | No |
| Skyline Chili | Fast Food | L,D | Yes |
| Taste of Belgium | Casual Full Service | L,D | No |
| Bakersfield | Mexican / Southwest | L,D | No |
| Tuckers | Breakfast, Brunch | B,L | No |

### 3.4.8 Florence, Kentucky

The following chart displays restaurants within approximately a one-mile range of 7649 Mall Road in **Florence**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| City Barbeque | Barbeque | L,D | Yes |
| Chipotle | Burritos | L,D | Yes |
| Asian Buffet | Asian | L,D | No |
| Subway | Subs / Sandwiches | B,L,D | Yes |
| Chuck E. Cheese's | Pizza | L,D | No |
| Qdoba | Sandwiches | L,D | No |
| Taco Bell | Fast Food | L,D | Yes |
| Sarku | Japanese | L,D | No |

### 3.4.9 Palomar, Lexington, Kentucky

The following chart displays restaurants within approximately a quarter mile range of 3734 Palomar Centre Drive in **Lexington**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Malones | American | L,D | No |
| Panera Bread | Sandwiches | L,D | Yes |
| Asian Wind | Asian | L,D | No |
| Little Caesars | Pizza | L,D | Yes |
| Papa John's | Pizza | L,D | Yes |
| Arby's | Fast Food | L,D | Yes |
| Jimmy John's | Sandwiches | L,D | Yes |
| McDonald's | Fast Food | B,L,D | Yes |
| Fazoli's | Italian | L,D | No |
| Qdoba | Sandwiches | L,D | Yes |

28

### 3.4.10 Lexington, Kentucky

The following chart displays restaurants within approximately a quarter mile range 350 Foreman Ave. in **Lexington**.  It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst;Lunch;Dinn | Direct Competition |
| Arby's | Fast Food | L,D | Yes |
| Tolly-Ho | Greasy Spoon | B,L,D | Yes |
| Pazzo's Pizza Pub | Bar | L,D | Maybe |
| Waffle House | 24-hour breakfast | B,L,D | Maybe |
| Casanova | Italian restaurant | L,D | No |
| Joe Bologna's | Pizza | L,D | Yes |
| Thai Orchid | Asian | L,D | No |
| Sierra Fria | Mexican | L,D | Maybe |

### 3.4.11 Greendale, Indiana

The following chart displays restaurants within approximately a one-mile range of 881 East Eads Parkway in **Greendale**. It includes a sampling of all restaurants perceived to be nearby area competition for the new Gold Star Chili restaurant location.

| Area Restaurants within a 1 Mile Range | | | |
|---|---|---|---|
| Name | Type | Brkfst; Lunch; Dinner | Direct Competition |
| Final Cut | Upscale American | L,D | No |
| Acapulco | Mexican | L,D | No |
| McDonald's | Fast Food | B,L,D | Yes |
| Burger King | Fast Food | B,L,D | Yes |

## 4.0 Competitive and Operations Strategy

### 4.1 Competitive Strategy

Gold Star is a locally owned and managed chain of local-specialty chili restaurants. The chili is prepared in a central commissary, which reduces the equipment needs and labor cost at individual restaurants, and promotes product consistency, which protects the brand. Gold Star operates in a highly competitive market against other multi-location chili restaurants and national fast-food chains. Among these top competitors are McDonalds, Burger King, Pizza Hut and Kentucky Fried Chicken. Pizza Hut and Kentucky Fried Chicken are owned and operated by Yum! Brands which has its corporate head quarters just 100 miles away from Cincinnati in Louisville, Kentucky. Similar to its competitors, Gold Star offers attractive coupons and seasonal promotions. Additionally, however, Gold Star emphasizes a family-friendly price point and dining experience, and augments this with kid's club coupons and neighborhood fundraiser promotions for local schools and other organizations.

Direct customers who use Gold Star products and services include restaurant customers, franchisees, franchise applicants, retail-product customers, retail-product wholesalers, and mail-order/internet customers. Indirect customers include product and service suppliers, product co-packers, brokers/consultants, shareholders, and regulatory agencies.

Franchisees are attracted by the relatively low investment required and the opportunity to profit from the brand equity. In return, franchisees expect consistency in the chili product as well as support from corporate with advice, market feedback, and promotions. Additionally, Gold Star provides geo-demographic analysis of potential locations to ensure that a new location will not take more than 10% of business from an existing location.

Gold Star takes product orders from its locations on a daily or weekly basis, which creates good dialog between the individual restaurants and the corporate office. The Franchise Advisory Council consists of owners who meet to review business decisions that affect the chain. These council members work in committee groups to meet with corporate department heads to review marketing, purchasing, menu pricing, operations costs, and gross profit analysis. Gold Star also conducts quarterly meetings with restaurant owners, key managers, and outside suppliers to discuss operations issues affecting the chain.

## 4.2 Operations Strategy

**Overview:**
Management will establish sound operating guidelines by which to conduct the day-to-day operations for Gold Star Chili. Policies, systems, and procedures will be adopted and documented using the combined resources of RestaurantOwner.com and the previous experiences of the management team. Gold Star membership at RestaurantOwner.com provides the management team with valuable, up-to-date resources to assist in the startup and operation of Gold Star Chili. The site contains hundreds of articles, downloadable tools and other resources packed with practical insights on marketing, customer service, restaurant startup, business management, menu promotion, staffing, and more. Management will have at their disposal the expertise of thousands of other operators through a member forum.

**Training:**
A thorough training program will be adopted for every position in the restaurant. Highly qualified people filling those positions will be provided training materials and personal instruction. They will learn the Gold Star Chili method of how to operate a successful restaurant, including instruction in customer service, safety, and health laws, in addition to the job functions of their respective positions. Customer service will be given special emphasis throughout the operation: Research shows that only 1 in 20 restaurant customers report a problem to management. Gold Star will provide a product and a dining experience in a manner that exemplifies highly responsive and proactive customer service. Staff will receive specific training in the areas of service attitudes, customer perception, and how to deal with guest complaints. Management will conduct periodic staff meetings to review policy, increase guest satisfaction, and to maintain an open dialog between management and staff. Staff will empathetically acknowledge guest complaints and immediately refer the complaints to management. Programs will be in place to systematically deal with various types of guest complaints; more serious complaints will be documented and kept on file. Customer feedback will be accomplished by

**Management Controls:**
Management will practice sound management procedures to control costs, insure quality of product, and provide friendly customer service. Management will use the following systems:

**POS System:**
Careful evaluation will be used in the selection of a POS (point of sale) system that best meets the needs of the location. The POS system will be configured with requisition printing, a process which forces food and beverage items to be registered in the system before the items can be prepared. Requisition printing has proven to reduce costs by as much as 3-5%. The POS system will also be the control center to regulate the flow of service and item preparation. Built-in cash controls will help in tracking sales and receipts.

32

**Order Guide, Daily Inventory, and Weekly Inventory:**
The restaurant will use an item-specific order guide to track order history and maintain designated levels of product in inventory.  Daily inventory will be taken on specific items; movement will be compared to sales data to ensure products are properly accounted for.  Weekly inventory will determine valuation for use in preparation of weekly profit and loss reports.

**Cash Audits:**
Management will conduct periodic cash audits for all cashier stations.  Surprise shift audits are an effective tool to determine cashier under ringing.

**Video Surveillance**: Video surveillance will be in place to monitor activities and deter crime.

**Mystery Shopper.** The restaurant will engage the service of a secret shopper service from time to time. The mystery (secret) shopper is an effective tool to get a customer's perspective of the average guest experience. Feedback will help management to constantly improve customer service.

**Time, Attendance, and Scheduling Systems:**
The restaurant will use an automated time and attendance system.  Management will evaluate systems that are integrated into the POS system as well as stand alone time clock systems; hourly labor cost control and the ability to transfer information to Gold Star payroll processing will be key factors in system selection.  Management will adopt a scheduling system that expedites the preparation of schedules, reflects anticipated labor budgets, and helps to regulate labor cost.

**Operations Checklists:**
The restaurant will be managed with consistent use of various checklists that maintain quality control and ensure that established procedures are followed.  Checklists will be used for customer service, purchasing, receiving, and storage, preparation, cleaning, shift changes, openings, and closings.

**Safety and Liability Reviews:**
Periodic safety and liability assessments ensure that employees and customers are not exposed to dangerous or harmful conditions, or actions by others.  Alcohol awareness, employee relations, and guest treatment will be reviewed.

**Daily Cash Control:**
 Sales and receipts recorded by the POS system will be compared to actual cash and credit card deposits on a daily basis. Acceptable over/short amounts will be limited to $5.00 per day. Discrepancies greater than $5.00 will prompt management to conduct an immediate audit to account for the difference. Monthly totals will be compared to actual P&L statements for accuracy.

Cash, debit card and credit card receipts will be deposited in a deposit account that is kept separate from the general operating account. Transfers to the general operating account will be made as necessary. Separation of the two accounts is intended to aid in account reconciliation and cash flow management.

**Weekly Prime Cost Report:**
The bookkeeper will prepare a weekly report that shows the gross profit margin after cost of goods sold and labor cost has been deducted from the sales revenue. The prime cost for this type of restaurant is expected to range from 64% to 68%. Proper control of the prime cost is the single most effective measure of management's ability to operate the restaurant. Weekly monitoring allows for quick reaction to adverse cost ratios.

**Purchasing Records/Payables:**
The bookkeeper will process and record invoices and credits daily. Reports detailing cash expenditures, payments by check, and accounts payable transactions will be readily available. Check disbursements will be prepared by bookkeeper. Check signing authority for the general operating account will be given to General Manager.

**Accounting System/Service:**
Management will be responsible for the timely preparation of monthly financial statements, including monthly Profit & Loss and Balance sheet. To accomplish this task Gold Star Chili will contract with a Certified Public Accountant.

**Payroll Processing:**
Payroll checks will be issued bi-weekly. The designated manager will run reports from the time and attendance system, make necessary adjustments, and prepare for transfer to the payroll system. Payroll will be processed by payroll processing service.

34

## 5.0 Organizational Structure and Personnel

### 5.1 Organizational Structure



## 5.2 Management Team, Consultants and Key Collaborators

### 5.2.1 EB-5 Management Team

**Terry Chan**
*President, Midwest EB-5 Regional Center (MERC)*
Terry Chan is president and one of the founders of MERC. Chan is responsible for
guiding the team in selection and structuring of projects, selection of investment
partners, and overall operations.

While ramping up operations at MERC, Chan was also one of the core team members
at CincyTech USA, a public-private partnership whose mission is to provide services
for high-growth startup technology companies in Southwest Ohio. CincyTech does
this through management assistance, seed-capital investments and connections to
partners who share a common mission. In his capacity at CincyTech, Chan was part
of a team that has driven over $10 million in 30 companies and syndicated over
$100 million. Those 30 companies have created over 200 direct jobs and over 500
indirect and induced jobs from the $10 million invested. Terry Chan brings his job-
creation expertise to the project, where he is responsible for tenant selection and
managing job creation.

Prior to arriving in Cincinnati, Chan was a manager in the commercial finance and
information technology divisions at General Electric. In that role, he was responsible
for working with the commercial teams to maximize margins across a diverse
product portfolio. Chan received his master's and bachelor's degrees in finance and
information systems management from Carnegie Mellon University, and attended
high school at the Hong Kong International School.

**Martin Lawler**
*Lead Immigration Counsel*
Martin J. Lawler is a California immigration lawyer with over thirty years
experience. He is the author of *Professionals: A Matter of Degree*, a treatise on
business visas and permanent residence. The Wall Street Journal published two of
Martin's opinion-page articles in 2007. Lawler was a guest speaker on National
Public Radio's Science Friday program about visas for scientists, and has spoken at
universities including Harvard, Stanford, San Jose State, and San Francisco State. He
is a regular speaker at AILA conferences, including the EB-5 Investor Visa
conference. Lawler also lectured at the American Law Institute, the San Francisco
Bar Association, and Innovation Norway, among other venues. Lawler chaired the
AILA's H-1B visa committee and is a member of AILA's EB-5 Investor Committee
2008–2010. Lawler is the recipient of the AILA Jack Wasserman Memorial Award
for excellence in immigration litigation. He is Martindale-Hubbell A rated and listed
in Best Lawyers in America, the Bar Register of Preeminent Lawyers, and San
Francisco Magazine's Super Lawyers. With over 75 approval cases and a 100%
success rate, Lawler is a nationally recognized expert in the area of EB-5
immigration law.

**Allen Chi**
*Chief Executive Officer, Mason Investment Group*
Allen oversees the operations of Mason and is also responsible for regional center relationships. Allen was formerly a Partner at Celerity Partners, a private equity firm, where he oversaw an investment portfolio valued at $1 billion, developing a personal investment track record with a 65% annual rate of return. Prior to Celerity, Allen helped lead the turnaround of Merisel, a $6 Billion technology company, where the stock price returned 800% during his tenure. Allen started his career at Bain & Company and is a graduate of Stanford University.

### 5.2.2 GSC Opportunities Operational Management Team

**Mike Rohrkemper**
*Chief Executive Officer, Gold Star Chili*
Mike Rohrkemper, CPA, was appointed Chief Executive Officer of Gold Star Chili, Inc. in 2008. Rohrkemper joined Gold Star from Kemper and Brown Business Consultants, where he provided management counsel for a variety of clients, including Gold Star Chili. Rohrkemper brings more than 30 years of senior-level experience to Gold Star Chili. His background in finance and management includes CFO and directorship positions from 1993 to 2005 at Pomeroy IT Solutions Inc., and a partnership in the Cincinnati accounting firm of Rohrkemper Ossege & Combs Ltd. from 1991 through 2001.

With the appointment of Rohrkemper, Gold Star, with an objective to invest in building brand awareness, also hired a marketing director to help expand deeper into the greater Cincinnati market, while also improving per-store performance. Additionally, Rohrkemper facilitated the diversification of the Gold Star portfolio, including real estate. Gold Star now owns a number of its franchised locations, and invests in strip centers anchored by Gold Star restaurants, and includes other spaces that it leases to other businesses.

**Mike Mason**
*Vice President, Operations and Franchise Development, Gold Star Chili*
Mike Mason has served as the Vice President of Operations and Franchise Development since 1991, and oversees franchisee consulting and training, company store financials, quality assurance, and new product testing. Prior experience includes brand supervisor for GZK, the Dayton, Ohio, franchisee for Lee's Famous Recipe Chicken and Arby's Restaurants; district supervisor for Hardee's Food Systems Inc.; and co-founder of Video Ventures.

**Charlie Howard**
*Vice President, Marketing and Brand Development, Gold Star Chili*
Charlie Howard has been Vice President of Marketing and Brand Development since 2008. He is responsible for the planning, development, and implementation of all of Gold Star's marketing strategies, marketing communications, and public relations. He directs the efforts of outside advertising and public relations agencies, and

coordinates the strategic and tactical planning and execution of promotional programs with the company's franchise community. Prior to Gold Star, Mr. Howard was the Senior Director of Marketing and Communications, Cincinnati Museum Center. Mr. Howard has 25 years of consumer, business-to-business, and non-profit branding, marketing communication, and marketing management experience with J. Malsh & Company, Didday & Branch, and Clopay Corporation.

**Jacquelyn Chan**
*Director, Allure Restaurant Group- Subsidiary of Midwest EB-5 Regional Center*
A native of Pittsburgh, Pennsylvania, Jacquelyn Chan holds a Bachelor's degree in Business and Marketing from the University of Cincinnati. Chan brings extensive restaurant experience, relationships with local business and community leaders, and work in community development. Since 2011, Chan has served as director of retail for Midwest EB-5 Regional Center. From 2008 to 2011, Chan served as development director at the Vine Street Urban Redevelopment Corporation (VCURC), a corporation funded by the University of Cincinnati to revitalize the university's neighboring Corryville community. During that time she also served as a member in the University Village Business Association, where she applied for and received $150,000 from the City of Cincinnati to aid the redevelopment of Corryville. From 2001-2011, Chan managed Martino's on Vine restaurant in Cincinnati.

## 6.0 Staffing and Job Creation

### 6.1 Single Restaurant Staffing Projection

Gold Star Chili is expected to hire for 13 full time positions at each restaurant location. A full time position is defined as a minimum of 35 hours per working week with benefits. Some full time positions will be subject to job sharing arrangements. Each employee will sign a document noting their understanding of the job sharing arrangement and will be eligible for benefits. Management has adopted an effective interview process designed to staff the restaurant with highly qualified people for each position. Each applicant will be rated and evaluated according to a pre-defined set of standards adopted for each position. Management will run criminal background checks on all applicants to ensure the hiring of the highest quality employees.

Recruiting efforts will include placing ads in the local paper, online job forums, and similar outlets; signage will be placed at the jobsites. Priority will be given to applicants referred or actively recruited by management—applicants previously employed by management and personally known to them. Management may use recruiting agencies to fill managers' and other salaried positions, or in the case of long-term unfilled crewmember positions.

Expected staffing levels for both full- and part-time positions are shown in the following table:

| Position | # Full Time Positions | # Part Time Positions | Pay Rate |
|---|---|---|---|
| General Manager | 1 | 0 | $45,000/year |
| Crew Leaders | 1 | 0 | $12.50 / hour |
| Steam Table Operator | 2 | 0 | $12.50/hour |
| Prep Cooks / Bussers | 2 | 1 | $8.00/hour |
| Dishwashers | 0 | 2 | $7.85 / hour |
| Servers | 6 | 0 | $3.93/hour |
| Cashiers | 1 | 1 | $8.50/hour |
| **Total** | **13** | **4** | |

### 6.2.1 Job Descriptions

**General Manager:** Oversees all operations of the restaurant location, based on reports from the corporate office, and from the assistant manager. All supplies, HR concerns, financial tracking/budgeting, general building maintenance, and operations related to food preparation are in the purview of the general manager.

**Crew Leader:** Coordinates restaurant employees and operations related to food preparation and customer service.

**Steam Table Operator:** Serves as the kitchen crew leader. Cooks and assembles orders for servers. Maintains an orderly and sanitary work environment in the food production area.

**Prep Cook / Busser:** Prepares food for the steam table operators. Manages food inventory. Busses tables, sets tables, cleans dining area, and supports servers. Maintains an orderly and sanitary work environment in the food production area.

**Dishwasher:** Washes dishes, pots, and pans. Cleans the kitchen and dining areas. Stocks dry goods and non-food supplies.

**Server:** Takes orders and serves customers tableside.

**Cashier:** Fills carryout orders; handles payment for carryout and dine-in customers.

## 6.3 Job Creation Phasing and Hiring Timelines

| Timeframe | Positions Hired |
|---|---|
| 2 months before opening | management / salaried employees |
| 2-4 weeks before opening | servers, prep cooks |
| 1-2 weeks before opening | dishwashers, and cashiers |

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restaurant 1 | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant 2 | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant 3 | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant 4 | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - |
| Restaurant 5 | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - |
| Restaurant 6 | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - | - | - | - | - |
| Restaurant 7 | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - |
| Restaurant 8 | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - |
| Restaurant 9 | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 | - | - | - | - |
| Restaurant 10 | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 |
| Restaurant 11 | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 |
| Restaurant 12 | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 4 | 9 | 4 |
| Month Total | 0 | 12 | 27 | 12 | 0 | 12 | 27 | 12 | 0 | 12 | 27 | 12 | 0 | 12 | 27 | 12 |
| Aggregate Total | 0 | 12 | 39 | 51 | 51 | 63 | 90 | 102 | 102 | 114 | 141 | 153 | 153 | 165 | 192 | 204 |
| # Full Time Positions | 0 | 12 | 36 | 39 | 39 | 51 | 75 | 78 | 78 | 90 | 114 | 117 | 117 | 129 | 153 | 156 |

41

## 7.0 Exit Strategy

### 7.1 Expansion Plans

Gold Star Chili's appealing menu, comfortable atmosphere and reasonable prices will position the concept for broad customer appeal in a wide range of markets.

The operating partner(s) will focus first and foremost on developing this concept to achieve a successful return on investment without the need for expansion. Because of its broad appeal, however, the concept does lend itself to expansion opportunities. The comprehensive approach taken in the creation of the business philosophy, systems, and controls will enhance the ability to expand the concept: Gold Star Chili Inc., may seek in the future to create additional Limited Partnerships and/or add-on phases to GSC Opportunities, L.P., to facilitate expansion of the number of Gold Star locations.

### 7.2 Investor Exit Options

GSC Opportunities, L.P. (see Sec. 5.1) will seek to return capital to the investor Limited Partners after the later of 3 years or once their I-829 applications have been approved by USCIS. At that point, GSC Opp Management as the general partner of GSC Opportunities, LLC will take commercially reasonable steps towards valuing and selling Real Co. After 18 months the limited partners of GSC Opportunities can compel the general partner to liquidate RealCo. The limited partners get 1005 of liquidated RealCo proceeds up to their initial investmen less any amount that has been repaid through distributions etc. Capital returned to investors will be sourced from GSC Opportunities, L.P.'s share of distributable cash flow (see sec. 8.4) and also from equity value of real property held in RealCo. GSC Opportunities, L.P. does not however guarantee the return of any investor's capital in part or in full. GSC Opp Management, LLC as the General Partner of the GSC Opportunities will retain ownership and management interest respectively at rates and in capacities governed by the Operating Agreements until they so choose to act upon their right to exit, pursuant to the same agreements.

42

## 8.0 Financials

Financial projections for GSC Opportunities, L.P. have been created as a result of collaboration between the members of GSC Opp Management, LLC based on their experience and on national industry averages, trends and other statistics. Capital contributions required for the restaurant will come from EB-5 immigrant investors as well as Gold Star Chili, Inc. The amount required from each of these investment roles, as shown in Capitalization (Section 1.3), is dependent upon the successful acquisition of funds from each of the listed sources. The funds will be used to fulfill the projected capital budget requirements as explained in the Single Restaurant Financial Projections (Sec. 8.2). Adjustments to the amount of funds needed by each source may be necessary in the event of unforeseen circumstances. Allowances for that possibility have been addressed in the operating agreements between the two entities.

## 8.1 Industry Trends

National Numeric Industry Standards: The following table shows industry-standard benchmarks against which we have measured the projected financial requirements and performance of the Gold Star Chili restaurants.  Metrics and other industry information for key competitors can be found in Appendix 5.

| Metric | Benchmark | Range (+/-) | Gold Star Chili Financial Projections |
|---|---|---|---|
| **Space/Capacity** | | | |
| FOH / Seat (Sq. Ft.) | 15 | 5 | 13.5 |
| Seat Turnover / Day | 2 | 0.5 | 2.11 |
| Kitchen Sq. Ft. (%) | 30 | - | 30% |
| Total Sq. Ft. | 3,000 | 1,500 | 2,250 |
| **Employment (FTE)** | | | |
| FTE/ 100 Seats | 18 | 2 | 16.4 |
| FTE / 100 Daily Covers | 9 | 1 | 7.8 |
| **Sales ($)** | | | |
| Year Sales/ Sq. Ft. | 350 | 100 | 422 |
| Year Sales/ Seat | 10,000 | 2,000 | 8,193 |
| Avg. Year Sales / Employee | 46,000 | - | 50,000 |
| Median Year Sales / FTE | 63,000 | | 50,000 |
| Avg. Rev / Year | 600,000 | - | 950,000 |
| % Carryout | 50 | 20 | 46 |
| **Cost (%)** | | | |
| Prime Cost (Payroll + COGS) | 60 | 5 | 65.7 |
| Payroll Cost | 30 | 5 | 37.7 |
| COGS | 30 | 5 | 28 |
| Rent | 8 | 2 | 9.3 |
| Marketing | 2 | 1 | 4 |

Sources:

National Restaurant Association 2009/2010 Restaurant Industry Operations Report

 "IBISWorld Industry Report 72221 Fast Food Restaurants in the US," (April 2010).

RestaurantOwner.Com Industry Surveys- How Much Does it Cost to Open a Restaurant?, (Accessed 11/27/12)

44

## 8.2 Profit and Loss Projections

### 8.2.1 Single Restaurant Sample Year-1 Summary P&L Projections

# Gold Star Chili

### Annual Operating Projection - Summary
#### First Full Year of Operations

| | MONTHLY AVE | | ANNUAL | |
|---|---|---|---|---|
| **Sales:** | | | | |
| Food/Bev | $ 62,299 | 100.0% | $ 747,584 | 100.0% |
| TOTAL SALES | 62,299 | 100.0% | 747,584 | 100.0% |
| **Cost of Sales:** | | | | |
| Food/Bev | 17,444 | 28.0% | 209,324 | 28.0% |
| TOTAL COST OF SALES | 17,444 | 28.0% | 209,324 | 28.0% |
| **Gross Profit** | 44,855 | 72.0% | 538,261 | 72.0% |
| **Payroll:** | | | | |
| Salaries & Wages | 18,616 | 29.9% | 223,394 | 29.9% |
| Payroll Taxes | 1,820 | 2.9% | 21,841 | 2.9% |
| TOTAL PAYROLL | 20,436 | 32.8% | 245,235 | 32.8% |
| **PRIME COST** | 37,880 | 60.8% | 454,558 | 60.8% |
| **Controllable Costs** | | | | |
| Direct Operating Expenses | 2,754 | 4.4% | 33,050 | 4.4% |
| Marketing | 2,500 | 4.0% | 30,000 | 4.0% |
| Utilities | 1,850 | 3.0% | 22,200 | 3.0% |
| General & Administrative Expenses | 556 | 0.9% | 6,675 | 0.9% |
| Repairs & Maintenance | 250 | 0.4% | 3,000 | 0.4% |
| TOTAL CONTROLLABLE COSTS | 7,910 | 12.7% | 94,925 | 12.7% |
| **Non-Controllable Costs** | | | | |
| Occupancy Costs | 4,125 | 6.6% | 49,500 | 6.6% |
| Royalties | 3,115 | 5.0% | 37,379 | 5.0% |
| TOTAL NON-CONTROLLABLE COSTS | 7,240 | 11.6% | 86,879 | 11.6% |
| | | | | |
| **NET INCOME (EBITDA)** | 9,268 | 14.9% | 111,221 | 14.9% |
| Preferred Distribution | 1,363.64 | 2.2% | 16,363.64 | 2.2% |
| Depreciation and Amortization | 1,398.27 | 2.2% | 16,779.20 | 2.2% |
| | | | | |
| **NET INCOME BEFORE INCOME TAXES** | 6,507 | 10.4% | 78,078 | 10.4% |
| ADD BACK: | | | | |
| Occupancy Costs | 0 | 0.0% | 0 | 0.0% |
| ADD BACK: | | | | |
| Depreciation and Amortization | 1,398 | 2.2% | 16,779 | 2.2% |
| **CASH FLOW BEFORE INCOME TAXES** | 7,905 | 12.7% | 94,858 | 12.7% |
| Distributions- | | | | |
| Limited Partners | 5,059 | 8.1% | 60,709 | 8.1% |
| General Partner | 1,265 | 2.0% | 15,177 | 2.0% |
| TOTAL DISTRIBUTIONS | 6,324 | 10.2% | 75,886 | 10.2% |
| Taxes | 553 | 0.9% | 6,640 | 0.9% |
| **RETAINED EARNINGS** | 1,028 | 1.6% | 12,331 | 1.6% |

| KEY RATIOS: | |
|---|---|
| Sales Per Square Foot | $332 |
| Sales Per Seat | $6,445 |
| Sales to Investment | 1.0 |

### 8.2.2 Single Restaurant Sample 5-year P&L Projection

**Gold Star Chili**
5 Year Operating Projections

| | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Sales:** | | | | | | | | | | |
| Food/Bev | $ 747,584 | 100.0% | $ 762,536 | 100.0% | $ 777,787 | 100.0% | $ 793,342 | 100.0% | $ 809,209 | 100.0% |
| TOTAL SALES | 747,584 | 100.0% | 762,536 | 100.0% | 777,787 | 100.0% | 793,342 | 100.0% | 809,209 | 100.0% |
| **Cost of Sales:** | | | | | | | | | | |
| Food/Bev | $ 209,324 | 28.0% | 213,510 | 28.0% | 217,780 | 28.0% | 222,136 | 28.0% | 226,579 | 28.0% |
| TOTAL COST OF SALES | 209,324 | 28.0% | 213,510 | 28.0% | 217,780 | 28.0% | 222,136 | 28.0% | 226,579 | 28.0% |
| **Gross Profit** | 538,261 | 72.0% | 549,026 | 72.0% | 560,006 | 72.0% | 571,207 | 72.0% | 582,631 | 72.0% |
| **Payroll:** | | | | | | | | | | |
| Salaries & Wages | $ 223,394 | 29.9% | 227,861 | 29.9% | 232,419 | 29.9% | 237,067 | 29.9% | 241,808 | 29.9% |
| Payroll Taxes | $ 21,841 | 2.9% | 22,278 | 2.9% | 22,724 | 2.9% | 23,178 | 2.9% | 23,642 | 2.9% |
| TOTAL PAYROLL | 245,235 | 32.8% | 250,139 | 32.8% | 255,142 | 32.8% | 260,245 | 32.8% | 265,450 | 32.8% |
| **PRIME COST** | 454,558 | 60.8% | 463,649 | 60.8% | 472,922 | 60.8% | 482,381 | 60.8% | 492,028 | 60.8% |
| **Controllable Costs** | | | | | | | | | | |
| Direct Operating Expenses | $ 33,050 | 4.4% | 33,546 | 4.4% | 34,049 | 4.4% | 34,560 | 4.4% | 35,079 | 4.3% |
| Marketing | $ 30,000 | 4.0% | 30,450 | 4.0% | 30,907 | 4.0% | 31,370 | 4.0% | 31,841 | 3.9% |
| Utilities | $ 22,200 | 3.0% | 22,533 | 3.0% | 22,871 | 2.9% | 23,214 | 2.9% | 23,562 | 2.9% |
| General & Administrative Expenses | $ 6,675 | 0.9% | 6,775 | 0.9% | 6,877 | 0.9% | 6,980 | 0.9% | 7,085 | 0.9% |
| Repairs & Maintenance | $ 3,000 | 0.4% | 3,045 | 0.4% | 3,091 | 0.4% | 3,137 | 0.4% | 3,184 | 0.4% |
| TOTAL CONTROLLABLE COSTS | $ 94,925 | 12.7% | 96,349 | 12.6% | 97,795 | 12.6% | 99,261 | 12.5% | 100,750 | 12.5% |
| **Non-Controllable Costs** | | | | | | | | | | |
| Occupancy Costs | $ 49,500 | 6.6% | 50,243 | 6.6% | 50,996 | 6.6% | 51,761 | 6.5% | 52,537 | 6.5% |
| Royalties | $ 37,379 | 5.0% | 38,127 | 5.0% | 38,889 | 5.0% | 39,667 | 5.0% | 40,460 | 5.0% |
| TOTAL NON-CONTROLLABLE COSTS | $ 86,879 | 11.6% | $ 88,369 | 11.6% | $ 89,885 | 11.6% | $ 91,428 | 11.5% | $ 92,998 | 11.5% |
| **NET INCOME (EBITDA)** | 111,221 | 14.9% | 114,168 | 15.0% | 117,184 | 15.1% | 120,272 | 15.2% | 123,432 | 15.3% |
| Preferred Distribution | $ 16,364 | 2.2% | 16,364 | 2.2% | 16,364 | 2.1% | 16,364 | 2.1% | 16,364 | 2.0% |
| Depreciation and Amortization | $ 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.1% | 16,779 | 2.1% |
| **NET INCOME BEFORE INCOME TAXES** | $ 78,078 | 10.4% | $ 81,025 | 10.6% | $ 84,041 | 10.8% | $ 87,129 | 11.0% | $ 90,290 | 11.2% |
| **ADD BACK:** | | | | | | | | | | |
| Occupancy Costs | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% |
| **ADD BACK:** | | | | | | | | | | |
| Depreciation and Amortization | 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.2% | 16,779 | 2.1% | 16,779 | 2.1% |
| **CASH FLOW BEFORE INCOME TAXES** | $ 94,858 | 12.7% | $ 97,804 | 12.8% | $ 100,821 | 13.0% | $ 103,908 | 13.1% | $ 107,069 | 13.2% |
| Distributions: | | | | | | | | | | |
| Limited Partners | 60,709 | 8.1% | 62,595 | 8.2% | 64,525 | 8.3% | 66,501 | 8.4% | 68,524 | 8.5% |
| General Partner | 15,177 | 2.0% | 15,649 | 2.1% | 16,131 | 2.1% | 16,625 | 2.1% | 17,131 | 2.1% |
| TOTAL DISTRIBUTIONS | 75,886 | 10.2% | 78,243 | 10.3% | 80,656 | 10.4% | 83,127 | 10.5% | 85,655 | 10.6% |
| Taxes | 6,640 | 0.9% | 6,846 | 0.0% | 7,057 | 0.0% | 7,274 | 0.0% | 7,495 | 0.0% |
| **RETAINED EARNINGS** | 12,331.50 | 1.6% | 12,714.55 | 1.7% | 13,106.67 | 1.7% | 13,508.06 | 1.7% | $ 13,919 | 1.7% |

### 8.2.3 GSC Opportunities, L.P. Comprehensive 5-year Operating Projection

**GSC Opportunities, L.P.**
5- Year Comprehensive Operating Projections

| | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Sales:** | | | | | | | | | | |
| Food/Bev | $ 2,242,752 | 100.0% | $ 8,223,424 | 100.0% | $ 9,105,573 | 100.0% | $ 9,287,685 | 100.0% | $ 9,473,438 | 100.0% |
| TOTAL SALES | 2,242,752 | 100.0% | 8,223,424 | 100.0% | 9,105,573 | 100.0% | 9,287,685 | 100.0% | 9,473,438 | 100.0% |
| **Cost of Sales:** | | | | | | | | | | |
| Food/Bev | $ 627,972 | 28.0% | $ 2,302,563 | 28.0% | $ 2,549,562 | 28.0% | $ 2,600,552 | 28.0% | $ 2,652,563 | 28.0% |
| TOTAL COST OF SALES | 627,972 | 28.0% | 2,302,563 | 28.0% | 2,549,562 | 28.0% | 2,600,552 | 28.0% | 2,652,563 | 28.0% |
| **Gross Profit** | 1,614,780 | 72.0% | 5,920,861 | 72.0% | 6,556,011 | 72.0% | 6,687,133 | 72.0% | 6,820,876 | 72.0% |
| **Payroll:** | | | | | | | | | | |
| Salaries & Wages | $ 670,182 | 29.9% | $ 2,457,334 | 29.9% | $ 2,720,939 | 29.9% | $ 2,775,358 | 29.9% | $ 2,830,865 | 29.9% |
| Payroll Taxes | $ 65,523 | 2.9% | $ 240,251 | 2.9% | $ 266,023 | 2.9% | $ 271,344 | 2.9% | $ 276,771 | 2.9% |
| TOTAL PAYROLL | 735,705 | 32.8% | 2,697,585 | 32.8% | 2,986,962 | 32.8% | 3,046,702 | 32.8% | 3,107,636 | 32.8% |
| **PRIME COST** | 1,363,677 | 60.8% | 5,000,148 | 60.8% | 5,536,524 | 60.8% | 5,647,253 | 60.8% | 5,760,198 | 60.8% |
| **Controllable Costs** | | | | | | | | | | |
| Direct Operating Expenses | $ 99,150 | 4.4% | $ 363,550 | 4.4% | $ 401,062 | 4.4% | $ 407,078 | 4.4% | $ 413,184 | 4.4% |
| Marketing | $ 90,000 | 4.0% | $ 330,000 | 4.0% | $ 364,050 | 4.0% | $ 369,511 | 4.0% | $ 375,053 | 4.0% |
| Utilities | $ 66,600 | 3.0% | $ 244,200 | 3.0% | $ 269,397 | 3.0% | $ 273,438 | 2.9% | $ 277,540 | 2.9% |
| General & Administrative Expenses | $ 20,025 | 0.9% | $ 73,425 | 0.9% | $ 81,001 | 0.9% | $ 82,216 | 0.9% | $ 83,449 | 0.9% |
| Repairs & Maintenance | $ 9,000 | 0.4% | $ 33,000 | 0.4% | $ 36,405 | 0.4% | $ 36,851 | 0.4% | $ 37,505 | 0.4% |
| TOTAL CONTROLLABLE COSTS | $ 284,775 | 12.7% | 1,044,175 | 12.7% | 1,151,915 | 12.7% | 1,169,194 | 12.6% | 1,186,732 | 12.5% |
| **Non-Controllable Costs** | | | | | | | | | | |
| Occupancy Costs | $ 148,500 | 6.6% | $ 544,500 | 6.6% | $ 600,683 | 6.6% | $ 609,693 | 6.6% | $ 618,838 | 6.5% |
| Royalties | $ 112,137 | 5.0% | $ 411,169 | 5.0% | $ 455,278 | 5.0% | $ 464,384 | 5.0% | $ 473,672 | 5.0% |
| TOTAL NON-CONTROLLABLE COSTS | $ 260,637 | 11.6% | $ 955,669 | 11.6% | $ 1,055,961 | 11.6% | $ 1,074,077 | 11.6% | $ 1,092,510 | 11.5% |
| **NET INCOME (EBITDA)** | 333,663 | 14.9% | 1,223,432 | 14.9% | 1,361,173 | 14.9% | 1,397,161 | 15.0% | 1,433,998 | 15.1% |
| Preferred Distribution | $ 49,092 | 2.2% | $ 180,004 | 2.2% | $ 196,368 | 2.2% | $ 196,368 | 2.1% | $ 196,368 | 2.1% |
| Depreciation and Amortization | $ 56,982 | 2.5% | $ 208,934 | 2.5% | $ 227,928 | 2.5% | $ 227,928 | 2.5% | $ 227,928 | 2.4% |
| **NET INCOME BEFORE INCOME TAXES** | $ 227,589 | 10.1% | $ 834,494 | 10.1% | $ 936,877 | 10.3% | $ 972,865 | 10.5% | $ 1,009,702 | 10.7% |
| **ADD BACK:** | | | | | | | | | | |
| Occupancy Costs | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% | $ 0 | 0.0% |
| **ADD BACK:** | | | | | | | | | | |
| Depreciation and Amortization | $ 56,982 | 2.5% | $ 208,934 | 2.5% | $ 227,928 | 2.5% | $ 227,928 | 2.5% | $ 208,934 | 2.2% |
| **CASH FLOW BEFORE INCOME TAXES** | $ 284,571 | 12.7% | $ 1,043,428 | 12.7% | $ 1,164,805 | 12.8% | $ 1,200,793 | 12.9% | $ 1,218,636 | 12.9% |
| Distributions- | | | | | | | | | | |
| Limited Partners | $ 182,125 | 8.1% | $ 667,793 | 8.1% | $ 745,476 | 8.2% | $ 768,507 | 8.3% | $ 779,927 | 8.2% |
| General Partner | $ 45,531 | 2.0% | $ 166,948 | 2.0% | $ 186,369 | 2.0% | $ 192,127 | 2.1% | $ 194,982 | 2.1% |
| TOTAL DISTRIBUTIONS | $ 227,657 | 10.2% | $ 834,742 | 10.2% | $ 931,844 | 10.2% | $ 960,634 | 10.3% | $ 974,909 | 10.3% |
| Taxes | 19,920 | 0.9% | 73,040 | 0.0% | 81,536 | 0.0% | 84,055 | 0.0% | 85,305 | 0.0% |
| **RETAINED EARNINGS** | 36,994.23 | 1.6% | 135,646.45 | 1.6% | 151,424.71 | 1.7% | 156,103.06 | 1.7% | $ 158,423 | 1.7% |

## 8.3 Capital Budgets

### 8.3.1 Comprehensive Project Capital Budget

|  | Non- EB-5 | EB-5 | Total |
|---|---|---|---|
| Real Estate & Construction | 1,410,000 | 4,000,000 | 5,410,000 |
| FF&E | 816,000 | 695,000 | 1,511,000 |
| Professional Services | 600,000 | 144,000 | 744,000 |
| Organizational & Development | 84,000 | 684,000 | 768,000 |
| Pre-Opening Expenses | 90,000 | 162,000 | 252,000 |
| Working Capital & Contingency | 0 | 315,000 | 315,000 |
| Total | 3,000,000 | 6,000,000 | 9,000,000 |

EB-5 funds will be held in escrow pending the investors' I-526 approvals as described in the offering memorandum. Non-EB-5 funds will be used for the initial phases prior to the release of EB-5 funds from escrow. Uses include land and building, professional services and other soft costs. Actual amounts will vary depending on USCIS adjudication timelines.

### 8.3.2 Single Restaurant Sample Capital Budget

**Gold Star Chili**
**Capital Budget**

Cost Classification used to calculate depreciation & amortization

| | TOTAL COST | Detail | Building | Leasehold | Equipment | Start Up | Expense | Non-Ded. |
|---|---|---|---|---|---|---|---|---|
| **REAL ESTATE & CONSTRUCTION** | 450,833 | | | | | | | |
| Land & Building | | 282,500 | | | | | | 282,500 |
| Construction Contract | | 168,333 | 168,333 | | | | | |
| | | | | | | | | |
| **FURNITURE, FIXTURES & EQUIPMENT (FF&E)** | 125,917 | | | | | | | |
| Interior Finishes & Equipment - | 106,417 | | | 125,917 | | | | |
| Kitchen Equipment | | 57,917 | | | | | | |
| Dining Room Furniture | | 20,000 | | | | | | |
| Kitchen Smallwares | | 3,000 | | | | | 3,000 | |
| Security System | | 1,500 | | | 1,500 | | | |
| Music/Sound/Audio-Visual Systems | | 3,000 | | | 3,000 | | | |
| Cash Register / Point of Sale | | 15,000 | | | 15,000 | | | |
| Phone System | | 500 | | | 500 | | | |
| Office Equipment / Computer | | 2,000 | | | 2,000 | | | |
| Office Supplies | | 1,500 | | | | 1,500 | | |
| Interior Signs | | 2,000 | | | 2,000 | | | |
| Exterior Finishes & Equipment - | 19,500 | | | 19,500 | | | | |
| Landscaping | | 1,500 | | 0 | | | | |
| Exterior Signs & Decorations | | 15,000 | | | | | | |
| Parking Lot | | 3,000 | | | | | | |
| | | | | | | | | |
| **PROFESSIONAL SERVICES** | 62,000 | | | 62,000 | | | | |
| Architect & Engineering | | 6,000 | | | | | | |
| Legal (lease & Incorporation) | | 5,000 | | | | | | |
| Project Consultant | | 50,000 | | | | | | |
| Accounting & Tax | | 1,000 | | | | | | |
| | | | | | | | | |
| **ORGANIZATIONAL & DEVELOPMENT** | 64,000 | | | | | | | |
| Management Fee | | 50,000 | | | | | | 50,000 |
| Deposits (utilities, sales tax, etc.) | | 3,000 | | | | | | 3,000 |
| Insurance Binder (property, casualty, liability) | | 1,500 | | | | | 1,500 | |
| Building Permits | | 2,500 | | 2,500 | | | | |
| Other Licenses & Permits | | 1,000 | | 1,000 | | | | |
| Utility Deposits (gas, electric, water) | | 2,500 | | | | | | 2,500 |
| Change, Operating Banks & Petty Cash | | 2,500 | | | | | | 2,500 |
| Menus / Menu Boards | | 1,000 | | | | | 1,000 | |
| | | | | | | | | |
| **PRE-OPENING EXPENSES** | 21,000 | | | | 21,000 | | | |
| Construction Period Utilities | | 2,000 | | | | | | |
| Uniforms | | 2,000 | | | | | | |
| Opening Inventories - | | | | | | | | |
| Food | | 3,000 | | | | | | |
| Paper & Other Supplies | | 1,500 | | | | | | |
| Marketing - | | | | | | | | |
| Advertising | | 4,000 | | | | | | |
| Opening Parties | | 1,000 | | | | | | |
| Personnel - | | | | | | | | |
| Training | | 7,500 | | | | | | |
| | | | | | | | | |
| **CONTINGENCY** | 26,250 | 26,250 | | 26,250 | | | | |
| **TOTAL PROJECT COST** | **$ 750,000** | | **$ 168,333** | **$ 237,167** | **$ 24,000** | **$ 26,500** | **$ 1,500** | **$ 340,500** |
| | | | Building | Leasehold | Equipment | Start Up | Expense | Non-Ded. |

| Project Cost Per Square Foot | $333 |
|---|---|
| Project Cost Per Seat | $6,466 |

### 8.4 ROI and Equity Analysis

| Investor | Amount of Contribution | Expected ROI on Original Investment |
|---|---|---|
| Until Investor Capital is Returned* | | |
| GSC Opportunities, L.P. | $6 Million | 80% of cash distributions |
| Gold Star Chili, Inc. | $3 Million | 20% of cash distributions |
| After Investor Capital is Returned* | | |
| GSC Opportunities, L.P. | $6 Million | 20% of cash distributions |
| Gold Star Chili, Inc. | $3 Million | 80% of cash distributions |

These tables suggest the anticipated ROI.  They are intended to be a summary only. Please refer to the Offering Documents for clarification of equity and cash distributions.

*While GSC Opportunities, L.P. intends and will seek to return the capital of its limited partners, no return of capital or other return on investment is guaranteed.

## 8.5 Funds Disbursement and Controls

All funds will be invested in the New Commercial Enterprise (NCE), which is GSC Opportunities, L.P. for disbursement to its wholly owned subsidiary Job Creating Entities (JCEs). As the General Partner of GSC Opportunities, L.P. GSC Opp Management, LLC with Gold Star Chili, Inc. as its managing member will oversee and control the disbursement of funds from the NCE to the JCEs on a monthly basis once invested funds have been released from escrow. A draw process has been established and all relevant checklists and forms will be provided to the JCEs to facilitate the implementation of the draw process and timely disbursement of funds.

Each draw request shall include a master budget, updated investment plan, and hiring summary. In addition each draw submitted by a JCE must be accompanied by documentation that verifies expenditures proposed in the draw. For example if construction or renovation monies are included in the draw, relevant contracts, bids, and permits will be furnished by the JCE. If monies are marked for operational or working capital expenditures, these intended expenditures will be required to be similarly documented as applicable. Upon submission of the subsequent draw request, receipts, invoices, bank statements, and a summary of all activity related to the prior draw request will be required.

Draw requests will be submitted to GSC Opp Management. The management team consisting of representatives of various project stakeholders will have the authority to approve draw requests and thus approve the disbursement of funds from the L.P. to the JCEs. A copy of the draw process checklist is available in Appendix 6.

52

## Appendices

### Appendix 1: Targeted Employment Areas

(pending approval)

**Appendix 2: Sample Menu**



54

## Appendix 3: Location Maps

The following map shows 88 existing Gold Star Chili locations and the twelve new
Gold Star Chili restaurants that are proposed in this business plan. Existing locations
are shown with blue markers and proposed new locations are shown with red
markers. This map was created using Google Maps data and a Google Maps
application.



## Appendix 4: Real Estate Details

### Germantown, Ohio





**UC Area/ Clifton, Ohio 1**





## UC Area/ Clifton, Ohio 2





LoopNet – 200 West McMillan, Retail (Other), 200 West McMillan, Cincinnati, OH                    2/28/13 2:26 PM

Retail Property - Off Market

# 200 West McMillan
200 West McMillan, Cincinnati, OH 45211

| | |
|---|---|
| Price: | **$900,000** |
| Building Size: | 6,000 SF |
| Price/SF: | $150 |
| Property Type: | Retail |
| Property Sub-type: | Retail (Other) |
| Property Use Type: | |
| **Net Lease Investment with 1 years left on lease** | |
| Commission Split: | 6% |
| Cap Rate: | 5% |
| Tenancy: | Multiple |

Last Updated  232 days ago
Listing ID  17742134

No Photo

**Downtown Cincinnati, Ohio 1**



## 8 E. Fourth Street / Cincinnati, OH 45202

- Located near prime downtown corner of 4th and Vine Street in the heart of CBD

- Pedestrian Traffic >2,500 people per day

- Opportunity for signage for tenants

- Loading dock in alley way allows for flexibility for street-level tenants

- Retail space set up for restaurant use

- 5,200 SF of front Retail Space

- 6,100 SF of 2nd floor Office Space

- 3,000 SF of 3rd floor Office Space

- Office has elevator and separate entrance



For more information, contact:

Andrew Sellet
513-763-3053
andrew.sellet@cassidyturley.com

www.cassidyturley.com

221 E. Fourth St., 26th Floor
Cincinnati, OH 45202

cassidyturley.com



The information contained herein was obtained from sources we consider reliable. We cannot be responsible, however, for errors, omissions, prior sales, withdrawal from the market or change in price. Seller and broker make no representation as to the environmental condition of the property and recommend purchaser's independent investigation.

## AERIAL

8 E. Fourth Street / Cincinnati, OH 45202



## PROPERTY PHOTOS




Cassidy
Turley / Commercial
Real Estate Services

61

8 E. Fourth Street / Cincinnati, OH 45202

# DEMOGRAPHICS

**Summary Profile**
2000 - 2010 Census, 2011 Estimates with 2016 Projections
*Calculated using Proportional Block Groups*

**Cassidy Turley** / Commercial Real Estate Services

**Lat/Lon: 39.10003/-84.51238**

| 8 E 4th Street<br>Cincinnati, OH | | 1 Mile | 3 Miles | 5 Miles |
|---|---|---|---|---|
| **POPULATION** | 2011 Estimated Population | 16,079 | 133,330 | 291,966 |
| | 2016 Estimated Population | 15,949 | 132,938 | 282,618 |
| | 2010 Census Population | 15,966 | 133,238 | 293,171 |
| | 2000 Census Population | 16,035 | 145,359 | 324,112 |
| | Historical Annual Growth 2000 to 2011 | - | -0.8% | -0.9% |
| | Projected Annual Growth 2011 to 2016 | -0.2% | -0.1% | -0.6% |
| | 2011 Median Age | 38.88 | 37.81 | 36.94 |
| **HOUSEHOLDS** | 2011 Estimated Households | 7,964 | 58,099 | 125,369 |
| | 2016 Projected Households | 8,164 | 58,250 | 124,136 |
| | 2010 Census Households | 7,856 | 58,080 | 125,344 |
| | 2000 Census Households | 7,861 | 63,748 | 138,436 |
| | Historical Annual Growth 2000 to 2011 | 0.1% | -0.8% | -0.9% |
| | Projected Annual Growth 2011 to 2016 | 0.5% | 0.1% | -0.2% |
| **POPULATION BY RACE** | 2011 Estimated White | 49.9% | 66.4% | 65.4% |
| | 2011 Estimated Black or African American | 44.9% | 27.3% | 28.9% |
| | 2011 Estimated Asian & Pacific Islander | 2.3% | 2.4% | 2.0% |
| | 2011 Estimated American Indian & Native Alaskan | - | 0.1% | 0.1% |
| | 2011 Estimated Other Races | 0.7% | 1.0% | 1.0% |
| | 2011 Estimated Hispanic | 3.2% | 3.4% | 3.2% |
| **INCOME** | 2011 Estimated Average Household Income | $56,898 | $49,864 | $56,255 |
| | 2011 Esimated Median Household Income | 34,366.74 | 35,740.77 | 41,245.79 |
| | 2011 Estimated Per Capita Income | $32,976 | $23,753 | $25,475 |
| **EDUCATION (AGE 25+)** | 2011 Elementary | 4.0% | 6.5% | 5.5% |
| | 2011 Some High School | 14.3% | 15.3% | 14.8% |
| | 2011 High School Graduate | 33.1% | 33.3% | 34.0% |
| | 2011 Some College | 19.1% | 19.3% | 20.9% |
| | 2011 Associates Degree Only | 5.7% | 6.7% | 7.5% |
| | 2011 Bachelors Degree Only | 24.1% | 21.7% | 22.1% |
| | 2011 Graduate Degree | 18.5% | 15.3% | 14.4% |
| **BUSINESS** | Number of Businesses | 3,446 | 9,789 | 14,209 |
| | Total Number of Employees | 84,944 | 202,468 | 260,136 |
| | Employee Population per Business | 24.7 | 20.7 | 18.3 |
| | Residential Population per Business | 4.7 | 13.6 | 20.5 |

*This report was produced using data from private and government sources deemed to be reliable. The information herein is provided without representation or warranty.*

©2012, Sites USA, Chandler, Arizona, 480-491-1112    page 1 of 1    Demographic Source: Applied Geographic Solutions 8/2011, TIGER Geography



Cassidy Turley / Commercial Real Estate Services

8 E. Fourth Street / Cincinnati, OH 45202

## DEMOGRAPHIC MAP



*For additional information contact:*

Andrew Sellet
513-763-3053
andrew.sellet@cassidyturley.com

221 E. Fourth St., 26th Floor
Cincinnati, OH 45202



Cassidy Turley / Commercial Real Estate Services

**Downtown Cincinnati, Ohio 2**

FOR SALE

## 814 Plum Street
Cincinnati, Ohio 45202

*Price Reduction!*
**$290,000 Sale Price**
9,450 sq. ft. building

- 3,150 sq. ft. per floor
- Renovated in 1999
- Newly painted throughout
- Soaring 10' ceilings
- Convenient and affordable parking options across the street
- Immediate access to I-75, easy access to I-71 and I-471







For more information, contact:

**Joe Janszen**
joe.janszen@cassidyturley.com
513.549.3011

221 E Fourth St
26th Floor
Cincinnati, OH 45202

cassidyturley.com

**Cassidy Turley** / Commercial Real Estate Services

64

## First Floor Plan

PLUM STREET



CEILING HEIGHT: 9'-11"

Cassidy
Turley / Commercial
Real Estate Services

## Second Floor Plan



Cassidy / Turley  Commercial Real Estate Services

## Third Floor Plan



**Cassidy/Turley** Commercial Real Estate Services

**Loveland, Ohio**



| | |
|---|---|
| **Prepared for** | **Presented by Terry Chan** |
| 2/27/2013 | (513) 400-8533 |
| | terry.chan@midwesteb5.com |

**Properties for Sale**

| 1 | 700 Loveland Maderia Road, Loveland, OH 45140 |
|---|---|


No Photo Provided

**Property Details**

| | |
|---|---|
| Price | $395,000 |
| Building Size | 3,171 SF |
| Lot Size | 0.75 AC |
| Price/SF | $124.57 /SF |
| Property Type | Retail |
| Property Sub-type | Restaurant |
| Property Use Type | Vacant/Owner-User |
| Status | Active |

Property Notes

**Property Description**

Former Wings & Rings Restaurant orginally built in 1978 as a Hardee's Restaurant. The current owner converted it in 1995 to a BUffalo Wings & Rings Restaurant. The facility has been closed for a approximately 1 year. the building is in need or extensive repairs as well as the parking lot. The asking price includes all FF&E.

**Location Description**

Located in the heart of Loveland. Excellend location on a corner directly next to a brand new, double drive through McDonalds. The other side is a Kroger store.

©2013 Terry Chan

**Over the Rhine, Cincinnati, Ohio**



**Florence, Kentucky**



**Palomar, Lexington, Kentucky**





**Lexington, Kentucky**



74

## Greendale, Indiana

Hilsinger Management Co. LTD           **Craig Hilsinger** — (513) 598-1990

Land For Sale

# Tanners Creek Retail Complex
881 Eads Parkway, Lawrenceburg, IN 47025

| | |
|---|---|
| Price: | **$495,000** |
| Lot Size: | **1.20 AC** |
| Property Type: | Land |
| Property Sub-type: | Retail (land) |
| Zoning Description: | Retail |

Last Updated  13 days ago
Listing ID  14521204

**1 Lot Available**

| Lot 1 | Price: | **$495,000** |
|---|---|---|
| | Lot Size: | **1.20 AC** |
| | Price/AC: | $412,499.98 |
| | Lot Type: | Retail (land) |

## Highlights

- Great Exposure
- Across the Street from Lowe's
- Perfect for Resturant or Motel
- Near new Honda Plant

## Description

240 Feet of frontage on 50,000 plus cars per day Eads Parkway (Route 50) in Lawrenceburg, IN. This site is next door to a Brand New Arby's. Rapidly growing, Lawrenceburg is home to the Hollywood Casino, the busiest Riverboat Casino in the world. Usable area of the 2.4 acre site is 240 feet wide and 200 feet deep with connector road access to the singalized intersection of Route 50 and Tanners Creek Drive the Retail Center of the County and the primary shopping destination for four and a half counties. The intersection is the access point for Kroger, Lowe's, US Post Office, McDonalds, Steak & Shake, United Dairy Farmers, Blockbuster and others. Can divide for slight price adjustment.

Located at the intersection of Route 50 and Tanners Creek Drive in Lawrenceburg, IN. Accross the street from Kroger, Lowe's and at the same intersection as McDonalds, Steak & Shake, United Dairy Farmers and next door to a

New Arby's.

**Map** of 881 Eads Parkway, Lawrenceburg, IN 47025 (Dearborn County)



**Additional Photos**



Aerial Photo

Created 3/1/2006

## Appendix 5: Key Competitor Metrics and Industry Data

### McDonald's

**Income Statement for "Average" U.S. McDonald's Franchisee**
**(Per Traditional Store)**

| | Dollar Amount | % of Net Sales |
|---|---|---|
| Net Sales | $2,700,000 | 100.0% |
| Food Costs | $810,000 | 30.0% |
| Paper Costs | $108,000 | 4.0% |
| **Total Cost of Sales** | **$918,000** | **34.0%** |
| **Gross Profits** | **$1,782,000** | **66.0%** |
| Crew Payroll | $540,000 | 20.0% |
| Manager Payroll | $108,000 | 4.0% |
| Payroll Taxes | $54,000 | 2.0% |
| Advertising | $108,000 | 4.0% |
| Promotions | $13,500 | 0.5% |
| Outside Services | $27,000 | 1.0% |
| Linen | $5,400 | 0.2% |
| Operating Supplies | $27,000 | 1.0% |
| Maintenance & Repair | $40,500 | 1.5% |
| Utilities | $81,000 | 3.0% |
| Cash Over/Short | $2,700 | 0.1% |
| Miscellaneous | $13,500 | 0.5% |
| **Controllable Expenses** | **$1,020,600** | **37.8%** |
| **Profit After Controllables** | **$761,400** | **28.2%** |
| Rent & Fees | $391,500 | 14.5% |
| Legal & Accounting | $8,100 | 0.3% |
| Insurance | $54,000 | 2.0% |
| Taxes & Licenses | $27,000 | 1.0% |
| Miscellaneous Income/Expenses | $2,700 | 0.1% |
| Depreciation/Amortization | $94,500 | 3.5% |
| Interest Expense | $27,000 | 1.0% |
| Net Non-Product | $2,700 | 0.1% |
| **Total Non-Controllable Expenses** | **$607,500** | **22.5%** |
| **Store-Level Operating Income** | **$153,900** | **5.7%** |

Source: Janney Capital Markets

- In 2009 McDonalds registered over $31b in sales in the U.S.
- In 2009 there were a total of 13,980 McDonalds Locations in the U.S.
- Each McDonald's location averages $2.2mm in annual revenues
- Worldwide, McDonald's serves 46mm customers every day
- There are a total of 32,478 McDonald's restaurants worldwide
- On average each McDonald's restaurant serves 1, 416 customers per day
- The average check at McDonald's is approximately $4.25

**Kentucky Fried Chicken (KFC)**

- In 2009 KFC registered over 4.9b in sales in the U.S.
- In 2011 there were a total of 5,200 KFC locations in the U.S.
- Each KFC location averages $940k in annual revenues
- Worldwide, KFC serves 12mm customers per day.
- There are a total of 17,401 KFC restaurants world wide as of 2011.
- On average each KFC restaurant serves 690 customers per day
- The average check at KFC is approximately $3.75

**Pizza Hut**

- In 2009 Pizza Hut registered over $5b in sales in the U.S.
- In 2011 there were a total of 7,566 Pizza Hut locations in the U.S.
- Each Pizza Hut location averages $660k in annual revenues
- Worldwide, Pizza Hut serves 4mm customers per day.
- There are a total of 13,147 Pizza Hut restaurants world wide as of 2011.
- On average each Pizza Hut restaurant serves 304 customers per day
- The average check at Pizza Hut is approximately $6.00

**Appendix 6: Draw Process**

Disbursement of Funds into project from LP

1. Borrower submits loan draw forms G702/703 and related material
    a. Invoices
    b. Job creation reporting form
    c. Lien Waivers
    d. Use of funds from previous draw
2. Investment committee reviews materials (1 week) to check for completeness and compliance
    a. Economist
    b. Immigration counsel
    c. Loan administrator
3. Draws will be disbursed in order of complete packages received (partial requests not processed)
4. Funds disbursed at the end of the week from LP to borrowing entity

Documents Required

G702/703
Invoices
Receipts
Lien Waivers
Job creation reporting form
Use of funds from previous draw
Bank statements
Check register
I-9 copies
E-verify reports

 **GOLDLINK 美加金联移民**

**移民行业旗舰品牌**
成功率最高·免面试客户最多·服务品质最好

ISO9001质量体系认证    公安部首批资质认证    因私出入境协会常务理事单位    2012移民行业公信力品牌
加中贸易理事会会员    教育部留学资质认证    留学服务行业协会示范单位    2011最具品牌影响力移民机构

**传统的直投项目（比区域中心项目更具优势）**

# The Flavor of Cincinnati
## GSC餐饮连锁EB-5项目移民指南

13个 **直接** 就业机会

最快 **30天** 获得移民局 I-526 审批通过

**双重** 还款保障（带租约的房地产出售+3年累计运营利润的80%）

预计 **三年** 偿还EB-5投资本金

拥有 **48年** 悠久历史的著名快餐连锁品牌

**名额仅12位**
抢申热线
**400-610-6008**



Δ π EXHIBIT 3
Deponent Mason
Date 8/23 Rptr
WWW.DEPOBOOK.COM

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK 美加金联移民**

www.can-goldlink.com

名额仅**12**位 抢申热线：400-610-6008

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

## GSC 餐饮连锁项目优势

- 每个投资人至少可创造 13 个直接就业机会，大大超出美国移民局的要求；

- 美国移民局非常欢迎这类可提供直接就业机会的项目，对此类 EB-5 项目的 I-526 申请审批时间最快为 30 天左右；

- 该项目属于传统的直投项目，比区域中心项目更具优势；

- 双重还款保障：带租约的房地产出售+3 年累计运营利润的 80%；

- 预计三年偿还 EB-5 投资本金，其它项目一般为五年后偿还本金；

- 餐饮产业属于全美雇佣人数最多的前 5 名产业；

- GSC 将每季度为 EB-5 投资者提供创造就业机会的书面文件；

- GSC 品牌始于 1965 年，历史悠久。口味独特的辣肉酱配方已经成为辛辛那提风味的代名词；

- GSC 集团具有 48 年丰富的快餐连锁店运营经验。

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

成功率最高 · 免面试客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**
**美加金联移民**
www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd

名额仅 **12** 位 抢申热线：400-610-6008

京公境准字0001号 教外综资认字291号

## GSC 餐饮连锁项目简介

**项目概述：**

Gold Star Chili (GSC) 快餐连锁 EB-5 项目，由 GSC 集团开发，将在以辛辛那提集团总部为中心的 300 公里半径内发展 12 家连锁餐饮店，每个餐厅的规模预计在 200-250 平方米。GSC 项目共 12 位投资人计划创造至少 156 个就业机会，每位投资人保守计算可创造 13 个就业机会。GSC 集团将会连同 EB-5 投资者共同出资 900 万美元用于此 12 家餐饮店的房地产购买以及初期运营经费。预计 2 年内完成这 12 家餐饮店的建设并启动运营，3 年偿还 EB-5 投资本金。

Gold Star Chili 创始于 1965 年，是俄亥俄州辛辛那提市著名的口味独特的快餐连锁品牌。

**项目概况：**

投资名额：共 12 位投资人

可创就业：该项目可为每位投资人创造 13 个直接就业机会（不算间接就业机会）

总投资额：900 万美元，其中 GSC 集团投入 300 万美元，EB-5 资金占 600 万美元

投资方式：优先股

投资回报：每年 2%股息

投资周期：预计 3 年左右

工程周期：单店开工后 100 天左右投入运营，2 年内完成 12 家连锁店

还款方式：带租约的房地产出售 + 连锁店运营利润的 80%

本资料仅供参考

全国免费咨询热线：400-610-6008

工作日一线畅通：86-10-65264178

7x24小时移民专家热线：13671039588

地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室

邮政编码：100020

ISO9001质量体系认证

加中贸易理事会会员

2011年最具有品牌影响力移民机构

公安部首批资质认证

教育部留学资质认证

2012年移民行业公信力品牌

成功率最高 · 免面试客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**
美 加 金 联 移 民

www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

名额仅**12**位 抢申热线：400-610-6008

## GSC 餐饮连锁项目简介

### 1. 选择投资者人均创造就业机会高的项目——餐饮行业属于全美雇佣人数最多的前 5 名产业

**Top 50 Industries with the Largest Employment**

Displaying Records 1 - 25 of 50        Next 25 >        Show All Records

| # | Industry | Employment 2010 |
|---|---|---|
| 1 | Elementary and secondary schools; local | 7,429,900 |
| 2 | Full-service restaurants | 4,465,900 |
| 3 | General medical and surgical hospitals; private | 4,374,800 |
| 4 | Limited-service eating places | 4,001,400 |
| 5 | Employment services | 2,716,700 |
| 6 | Grocery stores | 2,463,600 |
| 7 | Offices of physicians | 2,315,800 |
| 8 | Colleges, universities, and professional schools; State | 2,020,900 |
| 9 | Management of companies and enterprises | 1,863,000 |
| 10 | Depository credit intermediation | 1,733,400 |
| 11 | Nursing care facilities | 1,660,800 |
| 12 | Colleges, universities, and professional schools; private | 1,592,400 |
| 13 | Department stores | 1,487,600 |
| 14 | Other general merchandise stores | 1,483,000 |
| 15 | Computer systems design and related services | 1,441,500 |
| 16 | Legal services | 1,113,700 |
| 17 | Home health care services | 1,080,600 |
| 18 | Clothing stores | 1,062,800 |
| 19 | Automobile dealers | 1,006,400 |
| 20 | Building material and supplies dealers | 1,001,200 |

原始资料来源: 美国劳动统计局 – 专业统计及就业预测办公厅 http://www.bls.gov/emp/

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

成功率最高 · 免面试客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**
美加金联移民

www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司

名额仅**12**位 抢申热线：400-610-6008

Beijing Goldlink Go-Abroad Consulting Co.,Ltd
京公境准字0001号 教外综咨认字291号

## GSC 餐饮连锁项目简介

**2. 选择无争议的直接就业机会的项目——每位投资人创造 13 个直接就业机会，保障了 I-829 100% 的通过率**

直接就业机会 ＋ 间接就业机会 ＋ 诱发的就业机会

**不固定，计算方案易变**

**GSC 计划创造至少 156 个就业，即每投资者保守计算可创造 13 个就业机会**

| GSC连锁店平均单店全职岗位安排 | 人数 |
|---|---|
| 店长 | 1人 |
| 领班 | 2人 |
| 厨师 | 2人 |
| 帮厨 | 3人 |
| 洗碗工（兼职） | 0人 |
| 服务员 | 4人 |
| 收银员 | 1人 |
| 平均单店全职岗位数总计 | 13人 |

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

**成功率最高 · 免面试客户最多 · 服务品质最好**

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**

美 加 金 联 移 民

www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

名额仅**12**位 抢申热线：400-610-6008

## GSC 餐饮连锁项目简介

# GSC 将每季度为 EB-5 投资者提供创造就业机会的书面文件

*GSC Opportunities LP*

## ILLUSTRATIVE SAMPLE

EB-5 Investor Job Creation Certification ——→ 就业机会证明

**To:** Mr. [INVESTOR NAME] ——→ 职员人名
**From:** GSC Opportunities LP
**Date:** 12/31/2013
**Re:** Investor Job Allocation ——→ 岗位

——→ 社会保险号码

This memo is to confirm the employment of the following individuals at GSC Opportunities LP. As of 12/31/2013, the following individuals are full time employees of the facility.

| | Name | Position | Social Security # |
|---|---|---|---|
| 1 | Gina Garrano | General Manager | XXX-XX-3291 |
| 2 | Alisa Valderrama | Crew Member | XXX-XX-5761 |
| 3 | BJ Penn | Steam Table | XXX-XX-8411 |
| 4 | Anderson Silva | Steam Table | XXX-XX-5193 |
| 5 | Jeff Shields | Prep Cook | XXX-XX-6685 |
| 6 | Royce Gracie | Busser | XXX-XX-1468 |
| 7 | Benson Henderson | Server | XXX-XX-7753 |
| 8 | Frank Edgar | Server | XXX-XX-1275 |
| 9 | Benson Henderson | Server | XXX-XX-5896 |
| 10 | Charles Lydell | Cashier | XXX-XX-7964 |

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

**成功率最高 · 免面试客户最多 · 服务品质最好**

传统的直投项目（比区域中心项目更具优势）

www.can-goldlink.com

名额仅 **12** 位 抢申热线：400-610-6008

**G GOLDLINK**
**美加金联移民**
北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

## 行业稳定

### 全美快速餐饮市场

快餐餐厅数量：30万家（占全美58.3%）

全年快餐业销售额：$1840亿美元（占全美50.8%）

资料来源：IBISWorld Report 2010

### 俄亥俄州餐饮市场



餐厅数量：约21,300家

全州餐饮行业年销售额：约$166亿美元（约全美4.6%）

资料来源：2010美国全国餐厅协会报告

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

成功率最高 · 免面试客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

**G** GOLDLINK
美加金联移民
北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

www.can-goldlink.com

名额仅 **12** 位 抢申热线：400-610-6008

## 品牌保障

### 成功餐饮连锁的特点



Gold Star Chili 快餐连锁创始于 1965 年，并成为俄亥俄州辛辛那提市独特口味的快餐连锁品牌。GSC 的美式辣肉酱 (Chili) 是早期美国拓荒者在生活中一种不可缺少的菜肴，有稳定的客户群，类似于天津的狗不理包子，上海的小汤包，武汉的热干面。Chili 餐饮发展至今已属于美国中部居民主食的一种选择，并有各种独特口味的做法，在全美各地被创造出来。每年美国还有一个 Chili 餐饮大赛来选出年度最佳 Chili。

GSC 与俄亥俄州和肯塔基州的许多知名企业建立了合作关系。目前，GSC 已经是辛辛那提国家橄榄球联盟队 Bengals、辛辛那提国际机场、辛辛那提大学拉普体育馆、辛辛那提儿童医院医疗中心、青少年联盟棒球队——莱克星顿传奇的官方指定的供应商。

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

**成功率最高 · 免面试客户最多 · 服务品质最好**

传统的直投项目（比区域中心项目更具优势）

www.can-goldlink.com

名额仅**12**位 抢申热线：400-610-6008

# GOLDLINK
## 美加金联移民
北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

## GSC 核心发展地区



覆盖俄亥俄州西南地区,肯德基州北部,以及印第安纳州东南地区

### 以辛辛那提市为中心的连锁发展分布

本资料仅供参考

蓝点：现有地点

红色：EB-5 投资地点

尚有 X 个点在邻州

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039
地址：北京市朝阳区 光华路22号 光
邮政编码：100020

认证 公安部首批资质认证
留学资质认证
机构 2012年移民行业公信力品牌

客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK 美加金联移民**

www.can-goldlink.com

名额仅 **12** 位 抢申热线：400-610-6008

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

**快速餐饮模式三个成功步骤：**



挑选上佳的地段
购买地产

整修店铺
并进行经营

出售地产并回租
继续经营

**双重保障的安全的 EB-5 投资还款方式**

本资料仅供参考

全国 | 带租约的房地产出售
（约 764 万美元） **+** 3 年运营利润 80% 累计
（约 150 万美元） 体系认证 公安部首批资质认证

工作 会会员 教育部留学资质认证

7x24小时移民专家热线：13671039588 2011年最受青睐品牌影响力移民机构 2012移民行业公信力品牌

地址 **直接购买房地产，为投资保值** 11层 1107室

邮政 已经签署购买意向书的部分地产 **成功率最高 · 免面试客户最多 · 服务品质最好**

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**
**美加金联移民**

www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd

名额仅**12**位 抢申热线：400-610-6008

京公境准字0001号 教外综资认字291号

1、申请人年满 21 周岁；

2、申请人无犯罪记录；

3、申请人需拥有 50 万美元以上的资产，可以是赠与、继承等方式，但必须是取自合法正当的途径。

注:申请人无需有学历、语言、经商或工作经验的背景。

本资料仅供参考

全国免费咨询热线：400-610-6008          ISO9001质量体系认证          公安部首批资质认证
工作日一线畅通：86-10-65264178          加中贸易理事会会员          教育部留学资质认证
7x24小时移民专家热线：136          　　　　　　　　　　　　　　2年移民行业公信力品牌
地址：北京市朝阳区 光华路22
邮政编码：100020                                                          · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**
**美加金联移民**

www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

名额仅 **12** 位 抢申热线：400-610-6008

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证                    公安部首批资质认证
加中贸易理事会会员                      教育部留学资质认证
2011年最具有品牌影响力移民机构        2012年移民行业公信力品牌

成功率最高 · 免面试客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

www.can-goldlink.com

名额仅 **12** 位 抢申热线：400-610-6008

**G GOLDLINK 美加金联移民**

北京美加金联出国咨询服务有限责任公司

Beijing Goldlink Go-Abroad Consulting Co.,Ltd
京公境准字0001号 教外综资认字291号

## GSC 餐饮连锁项目费用清单

| 收费项目 | 金额 |
|---|---|
| 服务费 | 一次付款：60000.00 人民币<br>分次付款：70000.00 人民币 |
| 投资款 | 500000.00 美元 |
| 律师费、项目管理费 | I-526、I-829 律师费 15000.00 美元<br>管理费 45000.00 美元 |
| I-526 申请费 | 1500.00 美元（每户家庭） |
| 翻译费 | 约 3000.00 人民币（根据申请人的材料、资产数额情况而不同） |
| 公证费 | 约 2000.00 人民币（根据申请人的材料、资产数额情况而不同） |
| NVC 签证费 | 405.00 美元（每人） |
| 体检费 | 约 3000.00 人民币（一家三口） |
| I-829 解除条件申请费 | 3750.00 美元<br>身份认证费 85.00 美元（每人） |

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

**成功率最高 · 免面试客户最多 · 服务品质最好**



传统的直投项目（比区域中心项目更具优势）

www.can-goldlink.com

名额仅**12**位 抢申热线：400-610-6008

**GOLDLINK**
**美加金联移民**

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

| 所需文件 |
|---|
| 主申请人的简历 |
| 全家出生证明公证 |
| 婚姻公证 |
| 全家无犯罪证明公证 |
| 主副申请人学历学位证复印件 |
| 全家身份证、户口簿、护照复印件 |
| 全家美国移民标准相片 |
| 公司的营业执照复印件 |
| 公司近3年财务报表复印件 |
| 房产证复印件、购房合同、发票、契税发票 |

本资料仅供参考

全国免费咨询热线：400-610-6008

工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671039588

地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证 公安部首批资质认证
加中贸易理事会会员 教育部留学资质认证
2011年最具有品牌影响力移民机构 2012年移民行业公信力品牌

**成功率最高 · 免面试客户最多 · 服务品质最好**

传统的直投项目（比区域中心项目更具优势）

www.can-goldlink.com

名额仅 **12** 位 抢申热线：400-610-6008

**GOLDLINK**
美加金联移民
北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264173
7x24小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证

2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

**成功率最高 · 免面试客户最多 · 服务品质最好**

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**
**美加金联移民**

www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综咨认字291号

名额仅 **12** 位 抢申热线：400-610-6008

**1、美国投资移民就业机会计算方式有哪些？**
答：美国移民法规定，每份投资移民申请必须创造至少 10 个就业机会。这 10 个就业机会包括直接就业机会、
间接就业机会、诱发就业机会。直接就业机会是按所在岗位就业的真实人数统计上报移民局即可，是无争议
的就业机会，对转永久绿卡有充分保证。间接就业机会、诱发就业机会是通过经济学家的一些计算公式计算
出的，是有争议的就业机会，对转永久绿卡存在风险。

**2、为什么创造直接就业机会的 EB-5 项目更具优势，审批速度更快？**
答：直接就业机会是按所在岗位就业的真实人数统计上报移民局，是真实的、毫无争议的，这种方式一目了
然，美国移民局非常欢迎创造直接就业机会的项目，所以 I-526 的审批速度很快。比如维尔兰特生物能源项
目，由于创造的是直接就业机会，并超出移民局所要求的 10 个就业数，因此该项目已有一个成功案例打破了
行业最快纪录——13 天获 I-526 审批通过。

而间接就业机会、诱发就业机会的计算公式虽然得到了美国移民局的认可，但计算方式众多，目前没有任何
权威的计算方法，美国移民局不得不聘用经济学家对每个区域中心创造的间接就业机会、诱发就业机会进行
重新计算和严格审查，造成区域中心申请周期长达 12 个月以上，以及某些区域中心夸大就业人数，导致申请
被拒。

**3、什么是直投项目，什么是区域中心项目？**
答：美国投资移民方式主要分为直接投资移民项目和区域中心投资移民项目，直投项目是传统的美国移民项
目，而区域中心项目则是"后来者"，是试点项目。直投项目是申请人将资金直接投入到创造就业机会的实体
里面，所创造的就业机会全部为毫无争议的直接就业机会。区域中心项目是申请人将资金通过移民局批准的
投资移民区域中心（Regional Center），间接的投入到创造就业机会的实体里，所创造的就业机会绝大多数为
间接就业机会或诱发就业机会。

以下转译自美国移民局官方网站：
网址：http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-6330/0-0-0-8263.html

**直投项目---即基础（非试点）项目：**
《移民和国际法案》第 203（b）(5)项规定每个财政年度最多有 10000 个签证名额签发给在美国投资创办全新
的商业企业或正在积极投资创办全新的商业企业的外国企业家（及他们的配偶和未婚的未成年的子女）；

本资料仅供参考

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24 小时移民专家热线：13671039588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

成功率最高 · 免面试客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

www.can-goldlink.com

名额仅 **12** 位 抢申热线：400-610-6008

**GOLDLINK** 美加金联移民

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

所指的全新商业企业可采用任何合法的商业模式，包括有限合伙企业，须有益于美国经济并且直接创造不少于 10 个全职工作给符合要求的雇员（即美国公民、永久居民及其他被授权合法工作的移民），房产等非商业活动则不符合要求。总的来讲，该法案规定投资额至少为 100 万美元。

区域中心---试点项目：
该项目最初于 1992 年实施。每年 10000 个 EB-5 签证名额中有 3000 个拨给在美国移民局制定的 "区域中心" 进行投资的外国人以促进经济发展、提高区域生产力、创造就业及增加国内资本投资。

**4、为什么直投项目的投资额有 100 万美金和 50 万美金？**
答：常规直投项目为 100 万美金。美国政府为了鼓励投资者去那些最需要创造就业机会的地区投资，在《移民和国际法案》第 203（b）(5)（B）项中规定：从 10000 个签证名额中选拔出 3000 个名额给在 "目标就业地区" 投资的外国人，该法案将这些 "目标就业地区" 定义为偏远（农村）地区或拥有高失业率的地区（TEA 地区）。目前，在这些地区投资的投资额为 50 万美金。

以上转译自美国移民局官方网站：
网址：http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-6330/0-0-0-8263.html

**本资料仅供参考**

**5、直投项目为什么比区域中心项目更具优势？**
答：直投项目创造的就业机会是毫无争议的直接就业机会，很受美国移民局的欢迎，这使得 I-526 审核周期大幅度缩短，比如维尔兹特生物能源项目已有一个成功案例，便创造了 13 天获 I-526 审批通过的行业最快纪录。

区域中心项目几乎都是间接、诱发的就业机会"混搭成功率最高 免面试客户最多权威的服务品质最好

美国移民局不得不聘用经济学家对每个区域中心创造的间接就业机会、诱发就业机会进行重新计算和严格审

全国免费咨询热线：400-610-6008 ISO9001质量体系认证 2全部首批投资认证
工作日缩短 比如维尔兹特生物能源项目已有 加州首家投资认证
7x24小时移民专家热线：13671039588 2011年最具品牌影响力移民机构 2012年移民行业公信力品牌 教局部学资质认证
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元 11层 1107室 成功率最高 免面试客户最多权威 服务品质最好
邮政编码：100020

传统的直投项目（比区域中心项目更具优势）

**GOLDLINK**
**美加金联移民**

www.can-goldlink.com

名额仅**12**位 抢申热线：400-610-6008

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,Ltd
京公境准字0001号 教外综资认字291号

本资料仅供参考

**——7、此项目是否坐落在"目标就业地区(TEA)"里？**

答：是的。每一个餐馆都位于 TEA 区域，故投资额为 50 万美元。

**8、GSC 餐饮连锁项目是不是一个区域中心的项目？**

答：否。GSC 项目是一个直接投资的 EB-5 项目，不在区域中心里面。

**9、GSC 餐饮连锁项目会产生多少就业机会？**

全国免费咨询热线：400-610-6008
工作日一线畅通：86-10-65264178
7x24小时移民专家热线：13671059588
地址：北京市朝阳区 光华路22号 光华路SOHO 2单元11层 1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

成功率最高 · 免面试客户最多 · 服务品质最好

传统的直投项目（比区域中心项目更具优势）

www.can-goldlink.com

名额仅**12**位 抢申热线：400-610-6008

**GOLDLINK**
**美加金联移民**

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co,.Ltd
京公境准字0001号 教外综资认字291号

**15、GSC餐饮连锁项目风险大吗？项目一旦失败，投资人能得到补偿吗？**

餐饮行业是全美雇佣人数最多的前5名产业，快速餐饮占全美餐饮市场的58.3%，销售额占全美餐饮的50.8%，行业稳定、风险小，无需担心项目会失败。

本项目还款方式是带租约的房地产出售，总购买价值680万美金，装修投入使用后最低价值为764万美金，投资人投资款会得到足够的保证。

全国免费咨询热线：400-610-6008
工作日在线咨询：86-10-65264178
7x24小时移民专家热线：13671039588
地址：北京市朝阳区光华路22号光华路SOHO 2单元 11层 1107室
邮政编码：100020

ISO9001质量体系认证
加中贸易理事会会员
2011年最具有品牌影响力移民机构

公安部首批资质认证
教育部留学资质认证
2012年移民行业公信力品牌

**成功率最高 · 免面试客户最多 · 服务品质最好**

本资料仅供参考

传统的直投项目（比区域中心项目更具优势）

**G GOLDLINK**
**美加金联移民**

www.can-goldlink.com

北京美加金联出国咨询服务有限责任公司
Beijing Goldlink Go-Abroad Consulting Co.,Ltd
京公境准字0001号 教外综资认字291号

名额仅**12**位 抢申热线：400-610-6008



全国免费
工作日
7x24小时
地址：北
邮政编码
教委主任 Mr.Jerryl.Chang 合影

总经理与美国国务卿希拉里之第现
任海湾基金总裁托尼•罗德姆合影



ISO9001质量
中贸易理事
品牌影响力

资质认证
资质认证
信力品牌

总经理与美国加州帝王市市
长 Mr.Mark Gran 合影



# Gold Star Chili, Inc.

*Corporate Restaurant Expansion Opportunity Through EB-5 Investment*



Midwest EB-5 Regional Center

Δ π EXHIBIT 4

Deponent Mason

Date 8/23 Rptr

WWW.DEPOBOOK.COM

## Gold Star Chili, Inc.



# The Flavor of Cincinnati.

Cincinnati-style chili has put Cincinnati on the nation's culinary map. It's a taste that has a reputation across the country. Gold Star Chili has been a staple of Cincinnati dining since its foundation in 1965 by Jordanian immigrant Frank Daoud and his three brothers. To this day, the spice blend that gives Gold Star Chili its unique flavor is a closely guarded secret that remains within the family. The brothers created a product to exacting specifications and perfected its preparation, and in doing so, created one of Cincinnati's most iconic brands.

Gold Star prepares chili from scratch daily to exacting quality standards, to ensure its restaurants have a consistently great-tasting product. Gold Star delivers chili fresh to the restaurants with its own distribution system so that the restaurants simply reheat the chili on site, knowing they are bringing their customers the best possible product.

Gold Star Chili, Inc. is committed to building profitable businesses for its restaurant partners, and has developed a restaurant model with streamlined operations, a simple and focused menu, and a one-of-a-kind brand identity, designed to deliver return on investment. Gold Star's success depends on your success, so you can rely on Gold Star's support from site selection, construction, purchasing and information technology, training, operations, and marketing. With over 90 locations in the region, Gold Star, Inc. is currently seeking new investment partners to open locations within a 300-kilometer radius of the Cincinnati-based commissary.

Gold Star is the official chili of:

    









# *Cincinnati*

"The Flavor of Cincinnati" refers to more than the savory taste of chili—it encompasses the culture and identity of one of America's great cities. Located in the Midwestern United States, 475 kilometers southeast of Chicago, Cincinnati operates as a hub of economic activity and educational progress. Within the metropolitan area of 2.1 million people, 370 Fortune 500 companies have operations in Cincinnati; nine of these call Cincinnati home. Macy's, Procter & Gamble, Kroger Co., Fifth Third Bank, AK Steel, and General Electric Aviation have headquarters in Cincinnati, in addition to the North American base of Toyota Motor Engineering and Manufacturing, located in nearby Erlanger, Kentucky. Major universities in the region include the University of Cincinnati, Xavier University, Miami University, and Northern Kentucky University, as well as two nationally acclaimed research hospitals, University of Cincinnati Medical Center and Cincinnati Children's Hospital Medical Center.

Along with a favorable economic climate and outstanding educational system, Cincinnati provides a high quality of life. Forbes magazine recently ranked Cincinnati the ninth best place in the nation to raise a family. The seasonal rhythms of local weather, combined with the many outdoor parks and recreation areas, make the city a pleasant place to live and work. The migration of 19th-century German immigrants colors the region's cultural heritage, commemorated by the largest annual Oktoberfest celebration outside of Germany. Cincinnati is also home to nationally acclaimed cultural institutions including the Cincinnati Symphony Orchestra, Cincinnati Ballet, and the Cincinnati Art Museum, among others. Cincinnati is a unique city whose diversity of residents and history give it a flavor all its own.





# *Midwest EB-5 Regional Center Management*



**Martin Lawler**  *Lead Immigration Counsel*

Martin J. Lawler is a California immigration lawyer with over thirty years experience. He is the author of "Professionals: A Matter of Degree," a treatise on business visas and permanent residence. In 2007, the Wall Street Journal published two of Lawler's opinion-page articles. Lawler was a guest on National Public Radio's Science Friday program, speaking about visas for scientists. Lawler has spoken at universities including Harvard, Stanford, San José State, and San Francisco State. He is a regular speaker at the American Immigration Lawyers Association (AILA) conferences, including the EB-5 Investor Visa conference. He has also lectured at the American Law Institute, the San Francisco Bar Association, and Innovation Norway. Lawler chaired AILA's H-1B visa committee, and was a member of AILA's EB-5 Investor Committee, 2008–2010. Lawler received the AILA Jack Wasserman Memorial Award for excellence in immigration litigation, and is also Martindale-Hubbell "A-rated," and listed in "Best Lawyers in America," the "Bar Register of Prominent Lawyers," and San Francisco Magazine's "Super Lawyers." With over 75 approval cases and a 100% success rate, Lawler is a nationally recognized expert in EB-5 immigration law. Lawler ensures that all Midwest EB-5 Regional Center (MERC) projects and applications comply with USCIS regulations, and guides the process to successful completion.



**Terry Chan**  *President, Midwest EB-5 Regional Center*

Terry Chan is one of the founders and the president of the Midwest EB5 Regional Center. Terry is responsible for guiding the team in the selection and structuring of projects, selection of investment partners, and overall operations. While ramping up operations at the Midwest EB-5 Regional Center, Terry was also one of the core team members at CincyTech USA, a public private partnership whose mission is to provide services for high-growth startup technology companies in Southwest Ohio. CincyTech does this through management assistance, seed capital investments and connections to partners who share a common mission. In his capacity at CincyTech, Terry was part of a team that has driven over $10 million in 30 companies and syndicated over $100 million. Those 30 companies have created over 200 direct jobs and over 500 indirect and induced job from the $10 million invested. Terry Chan brings his job creation expertise to the project, where he is responsible for tenant selection and managing and ensuring job creation. Prior to arriving in Cincinnati, Terry was a manager in the commercial finance and information technology divisions at General Electric. In that role, he was responsible for working with the commercial teams to maximize margins across a diverse product portfolio. Terry received his masters and bachelors degrees in finance and information technology from Carnegie Mellon University and attended high school at the Hong Kong International School. Terry currently sits on the board of several Ohio based companies including Zipscene, Wearcast, Source Labs and Batterii.

## *GSC Opportunities Operational Management Team*

### Mike Rohrkemper  *Chief Executive Officer*

Mike Rohrkemper, CPA, was appointed Chief Executive Officer of Gold Star Chili, Inc. in 2008.  Rohrkemper joined Gold Star from Kemper and Brown Business Consultants, where he provided management counsel for a variety of clients, including Gold Star Chili.  Rohrkemper brings more than 30 years of senior-level experience to Gold Star Chili. His background in finance and management includes CFO and directorship positions from 1993 to 2005 at Pomeroy IT Solutions Inc., and a partnership in the Cincinnati accounting firm of Rohrkemper Ossege & Combs Ltd. from 1991 through 2001. With the appointment of Rohrkemper, Gold Star, with an objective to invest in building brand awareness, also hired a marketing director to help expand deeper into the greater Cincinnati market, while also improving per-store performance.  Additionally, Rohrkemper facilitated the diversification of the Gold Star portfolio, including real estate.  Gold Star now owns a number of its franchised locations, invests in strip centers anchored by Gold Star restaurants, and includes other spaces that it leases to other businesses.

### Mike Mason  *Vice President, Operations and Franchise Development*

Mike Mason, serving as the Vice President of Operations and Franchise Development since 1991, oversees franchisee consulting and training, company store financials, quality assurance, and new product testing. Prior experience includes brand supervisor for GZK, the Dayton, Ohio, franchisee for Lee's Famous Recipe Chicken and Arby's Restaurants; district supervisor for Hardee's Food Systems Inc.; and co-founder of Video Ventures.

### Charlie Howard  *Vice President, Marketing and Brand Development*

Charlie Howard has been Vice President of Marketing and Brand Development since 2008. He is responsible for the planning, development, and implementation of all of Gold Star's marketing strategies, marketing communications, and public relations.  He directs the efforts of outside advertising and public relations agencies, and coordinates the strategic and tactical planning and execution of promotional programs with the company's franchise community. Prior to Gold Star, Mr. Howard was the Senior Director of Marketing and Communications, Cincinnati Museum Center.  Mr. Howard has 25 years of consumer, business-to-business, and non-profit branding, marketing communication, and marketing management experience with J. Malsh & Company, Didday & Branch, and Clopay Corporation.

## *Gold Star Locations*



## Capitalization and Exit Strategy

**EB-5 Investors**

**$10,000,000**

**Gold Star, Inc.**

**$5,000,000**



- Funding for the venture will be a combination of EB-5 immigrant investor funds and equity contribution from Gold Star Chili, Inc. 20 EB-5 immigrant investors will invest $10 million in GSC Opportunities, L.P., which will make equity investments in 20 Gold Star locations. Gold Star Chili, Inc. will invest $5 million total equity contribution in these 20 new locations. Gold Star's contribution of non-EB-5 capital represents 33% equity contribution in each of the restaurants. Capital will be used for both real estate and operational purposes. Capital infusion will be based on an equity investment model and will be governed in accordance with the organizational structure and the cost breakdown. Midwest EB-5 Regional Center (MERC) will oversee funding of the project on behalf of the Investors, and will disburse funds per monthly draw schedule submitted to MERC by the restaurant operators.

- GSC Opportunities, L.P. will seek to return capital to the investor Limited Partners after three years, or once the investors' I-829 applications have been approved by USCIS. If the market does not allow for the return of capital at the end of three years, GSC Opportunities, L.P. will have an additional two years to return capital. If capital cannot be returned within five years, Limited Partners will have the option to liquidate assets of GSC Opportunities, L.P. to recover their investment. GSC Opportunities, L.P. cannot guarantee any return of all or any portion of investment. MERC as the General Partner of the GSC Opportunities, L.P. will retain ownership and management interest respectively at rates and in capacities governed by the Operating Agreements until they so choose to act upon their right to exit, pursuant to the same agreements.



## Job Creation

Based upon accepted industry standards, analysis by MERC projects that each Gold Star Chili location will create 19 full-time positions. USCIS defines a full-time position as a minimum of 35 hours per working week with benefits. Some full-time positions will be subject to job sharing arrangements. Each employee will sign a document noting their understanding of the job sharing arrangement and will be eligible for benefits. Only 10 full-time positions are needed to satisfy the USCIS requirement for a $500,000 EB-5 investment, and for the investor to obtain lawful permanent residency. GSC Opportunities, L.P. expects to create approximately 19 full-time positions per $500,000 of EB-5 investment, totaling approximately 380 full-time positions. The 20 immigrant investors in this investment opportunity would only need to create a minimum of 200 full-time positions. The chart below shows the minimum number of full-time positions created by one Gold Star Chili location.

| Position | # Full-Time Positions | Pay Rate |
|---|---|---|
| General Manager | 1 | $40,000/yr |
| Assistant Manager | 2 | $28,000/yr |
| Steam Table Operator | 1 | $30,000/yr |
| Prep Cooks | 3 | $9.00/hr |
| Dishwashers | 2 | $7.50/hr |
| Servers | 5 | $3.50/hr + tips |
| Bussers | 2 | $4.30/hr + tips |
| Cashiers | 3 | $7.50/hr |
| Total | 19 | |

*Floorplans and Photos*







The Flavor of Cincinnati.

OPERATING AGREEMENT

OF

GSC OPP MANAGEMENT, LLC,

AN OHIO LIMITED LIABILITY COMPANY

EFFECTIVE AS OF MAY 7, 2013



Δ π EXHIBIT 5
Deponent Mason
Date 8/23 Rptr
WWW.DEPOBOOK.COM

LIND000072

## OPERATING AGREEMENT
## OF
## GSC OPP MANAGEMENT, LLC,

This Operating Agreement is effective as of this 7th day of May, 2013, by and between the Members whose signatures appear on the signature page hereof.

RECITALS:

WHEREAS, Articles of Organization for GSC OPP MANAGEMENT, LLC (the **"Company"**) were filed with the Secretary of State of the State of Ohio on February 28, 2013; and

WHEREAS, Mason Hill, LLC, a Member of the Company, ("**Mason Hill**") and Gold Star Chili, Inc. ("**Gold Star**") have developed a Business Plan for the opening and development of up to 6 new Gold Star franchise restaurants (the "**Project**") within the Dayton-Cincinnati-Lexington region of Southwest Ohio, Kentucky and Indiana region that are not included in any current territory of any current Gold Star franchisee; and

WHEREAS, Mason Hill caused GSC Opportunities L.P., an Ohio limited partnership ("**Project Owner**") to be formed and the Company is the sole General Partner of the Project Owner; and

WHEREAS, the Project Owner will be capitalized with an anticipated amount of $3,750,000 ("**Project Capitalization**") to be provided to the Project Owner by the Company (by and through its Members as set forth in Exhibit A to this Agreement) in the total value amount of $1,250,000 ("**GP Capitalization**") in return for a General Partnership Interest equal to 33.3% of the Project Owner and by 5 individuals investing as EB-5 limited partner investors ("**EB-5 Investors**") in the individual amount of $500,000 each and a total amount of $2,500,000 ("**EB-5 Capitalization**") in return for a Limited Partnership Interest equal to 66.7% of the Project Owner; and

WHEREAS, the Company's purpose is to serve as the General Partner of the Project Owner and to accomplish all aspects of the Project, including but not limited to raising the EB5 Capitalization, securing restaurant locations and operating the locations and will receive a management fee from the Project Owner as set forth on **Exhibit D** ("Management Fee"); and

WHEREAS, the Company will enter into a management agreement with Mason Hill, LLC or affiliate ("EB-5 Administrator") for the EB-5 Administrator to provide certain services related to the qualification of the EB-5 Investors and qualifying the Project for the EB-5 Investment Program, including but not limited to compliance with all rules and regulations set forth in applicable Federal law and all rules and regulations promulgated by the United States Citizenship and Immigration Services ("**USCIS Requirements**") and compliance with all applicable Federal and state securities laws ("**EB-5 Management Agreement**") which will provide for the Company to pay the EB-5 Administrator for its services thereunder as set forth in **Exhibit D**; and

WHEREAS, the Company will enter into a management agreement with Gold Star for Gold Star to provide certain services related to the operation and management of the restaurants within the Project, including but not limited to the final selection of sites, day to day operations of each restaurant, and

1

LIND000073

compliance with franchise agreements for each location ("**Gold Star Management Agreement**") which will provide for the Company to pay Gold Star for its services thereunder as set forth in **Exhibit D**; and

WHEREAS, in addition to the Management Fee, the Company may receive certain distributions from the Project Owner and the Members wish to have all funds received by the Company to be allocated and distributed as set forth in this Agreement.

WHEREAS, the Project Owner will create a separate, wholly owned disregarded subsidiary limited liability company to own each of the 6 franchised restaurants in the Project and may elect to do so for any real estate owned as part of the Project (each an "**Owner Subsidiary**"); and

NOW, THEREFORE, the Members agree as follows:

ARTICLE I

DEFINITIONS

The recitals and the associated definitions set forth therein are incorporated herein by reference. The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein);

(a)     The "Act" shall mean the Ohio Limited Liability Company Act.

(b)     "Capital Account" as of any given date shall mean the account mentioned for each pursuant to Section 8.4.

(c)     "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

(d)     "Capital Interest" shall mean the percentage interest of each Member set forth on **Exhibit A.**

(e)     "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

(f)     "Deficit Capital Account" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(i)     credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-l(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the

2

LIND000074

minimum gain attributable to any partner nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

(ii)    debit to such Capital Account the items described in Sections 1.704-l(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.7041(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(g)    "Distributable Cash" means all cash, revenues and funds received by the Company, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business, including but not limited to fees due and owing under the EB5 Management Agreement and the Gold Star Management Agreement; and (iii) such reasonable reserves as the Manager deems necessary in its sole and absolute discretion to the proper operation of the Company's business.

(h)    "Economic Interest" shall mean a Member's or other Person's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

(i)    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

(j)    "Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

(k)    "Majority Interest" shall mean one or more Membership Interests which taken together exceed fifty percent (50%) of the Membership Interests.

(l)    "Manager" shall mean one or more managers.  Initially, there shall be one (1) Manager, namely; GSC EB5 Investor LLC.  References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

(m)    "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become a Member.

(n)    "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the Capital Interest, and such other rights and privileges that the Member may enjoy by being a Member.

(o)    "Net Profits" and "Net Losses" shall mean for each taxable year of the Company an amount equal to the Company's net taxable income or loss for such year as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company and in accordance with Section 703 of the Code with the following adjustments:

3

LIND000075

(i)  Any items of income, gain, loss and deduction allocated to Members pursuant to **Exhibit B** shall not be taken into account in computing Net Profits or Net Losses of this Operating Agreement;

(ii)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits and Net Losses (pursuant to this definition) shall be added to such taxable income or loss;

(iii)  Any expenditure of the Company described in Section 705(a)(2)(B) of the Code and not otherwise taken into account in computing Net Profits and Net Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

(iv)  In the event the value of any Company asset is adjusted pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits and Net Losses;

(v)  Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the value of the asset on the Company's books, notwithstanding that the adjusted tax basis of such asset differs from such value;

(vi)  In the event that Company property is reflected on the Company's books at a value that differs from its tax basis, then Company income, gain, loss and deduction shall (in accordance with Treasury Regulation §1.704-1(b)(2)(iv)(g)) include Company income, gain, loss and deduction determined by reference to the value of such property on the Company's books, but shall exclude income, gain, loss and deduction determined by reference to the value of such property as determined for income tax purposes; and

(vii)  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Membership Interest or Economic Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses.

(p)  "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

(q)  "Person" shall mean an individual, a general partnership, a limited liability partnership, a limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation, or any other legal entity.

4

LIND000076

(r)    "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

ARTICLE II

FORMATION OF COMPANY

2.1    Formation.  On February 28, 2013, Mason Hill, LLC organized an Ohio Limited Liability Company by executing and delivering Articles of Organization to the Secretary of State of the State of Ohio in accordance with and pursuant to the Act.

2.2    Name.  The name of the Company is **GSC OPP MANAGEMENT, LLC.**

2.3    Principal Place of Business.  The principal place of business of the Company shall be 650 Lunken Park Drive, Cincinnati, Ohio 45226.  The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.4    Registered Office and Registered Agent.  The Company's registered office shall be at the office of its registered agent at 650 Lunken Park Drive, Cincinnati, Ohio 45226, and the name of its registered agent at such address shall be Michael E. Rohrkemper.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Ohio pursuant to the Act.

2.5    Term.  The term of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Act.

ARTICLE III

BUSINESS OF COMPANY

3.1    Permitted Businesses.  The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

(a)    To acquire, hold, sell, assign, transfer, pledge and otherwise deal with and own an interest in the Project Owner, and to serve as the Project Owner's sole general partner and to perform all tasks of the general partner of the Project Owner pursuant to a certain Limited Partnership Agreement dated May 7, 2013 ("Limited Partnership Agreement"), including but not limited to performing some of those duties by entering into the EB5 Management Agreement and the Gold Star Management Agreement.

5

LIND000077

(b)     To exercise all powers enumerated in the Act necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

## ARTICLE IV

### NAMES OF MEMBERS

The names and addresses of the Members are set forth in **Exhibit A**.

## ARTICLE V

### MANAGEMENT OF COMPANY

5.1     Management.

(a)   The business and affairs of the Company shall be managed by the Manager or Managers, appointed from time to time by the Members.   The Company shall initially have one (1) Manager. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of Members holding a Majority Interest of the Membership Interests. A Manager shall hold office until the next annual meeting of Members or until his successor shall have been elected and qualified or until his earlier death, resignation or removal.   Managers need not be residents of the State of Ohio or Members of the Company.   In the event there is more than one Manager, such Managers shall act only by unanimous vote of all Managers.   The Company shall have a President, a Vice President and such other officers as may be deemed necessary, each or any of whom may be appointed by the Manager.   The same individual may simultaneously hold more than one office in the Company.   Unless otherwise provided in the resolution of election or appointment, each officer shall hold office until such officer resigns or is removed by the Manager.   Each officer of the Company has the authority and shall perform the duties prescribed by the Manager.   The Manager may remove any officer at any time with or without cause.   The initial officers are listed on **Exhibit C**.   The Manager shall have full authority to manage the affairs of the Company in accordance with the Act and this Operating Agreement.

(b)   The business and affairs of the Company shall be managed by its Manager.  The Manager shall direct, manage and control the business of the Company to the best of its ability.   Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.   Unless otherwise provided, the unanimous consent of all Managers is required to authorize and/or approve any action.

5.2        Indemnification.

6

LIND000078

(a)  Each person who was or is a Member, Manager, or agent of the Company, or is or was serving at the request of the Company as a director, officer, partner, trustee, manager, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified by the Company to the full extent permitted by the law of the State of Ohio against any liability or loss (including attorneys' fees) reasonably incurred by such person in such capacity or arising out of acting in such capacity.

(b)  Expenses (including attorneys' fees) incurred by a Member or Manager in defending any civil, criminal, administrative, or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written agreement by or on behalf of such Member or Manager to repay such amount if it shall ultimately be determined that he, she or it is not entitled to be indemnified by the Company as authorized in this Section 5.2. Such expenses (including attorneys' fees) incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Manager deem appropriate.

5.3    Certain Powers of Manager.

(a)  Without limiting the generality of Section 5.1, the Manager shall have power and authority, on behalf of the Company to do any and all of the following, and in doing so, may delegate such powers and authorities to any such officers of the Company as the Manager deems prudent:

(i)  To acquire property from any Person as the Manager may determine. The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(ii)  To borrow money for the Company from banks, other lending institutions, the Manager, Members, or affiliates of the Manager or Members on such terms as the Manager deems appropriate, and in connection therewith, provided, however, the Manager must obtain the prior written consent of all Members to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager;

(iii)  To purchase liability and other insurance to protect the Company's property and business;

(iv)  To hold and own any Company real and/or personal properties in the name of the Company;

(v)  To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

7

LIND000079

(vi) To sell or otherwise dispose of all or substantially all of the assets of the Company, except for the general partnership interest in the Project Owner, as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(vii) To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; deeds; options; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company;

(viii) To execute on behalf of the Company and to take all actions on behalf of the Company as the general partner of the Project Owner, including but not limited to all actions authorized under the Limited Partnership Agreement, execution of the EB5 Management Agreement, the Gold Star Management Agreement, all documents necessary to form Subsidiary Owners, and to execute franchise agreements with Gold Star with 5% royalty and 4% marketing fees, and comply with all franchise requirements and for the Project Owner to guaranty such franchise agreement.

(ix) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(x) To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager may approve; and

(xi) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized or permitted to do so by this Operating Agreement, or by the Manager, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member or officer shall have any power or authority to bind the Company unless the Member or officer has been authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

5.4    Restrictions on Authority of the Manager(s).

(a) The Manager shall not have the authority to, and covenants and agrees that it shall not, do any of the following acts without the unanimous consent of the Members:

(i) Cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 3.1 hereof;

8

LIND000080

(ii)  Knowingly do any act in contravention of this Operating Agreement;

(iii)  Knowingly do any act which would make it impossible to carry on the ordinary business of the Company or the Project Owner, except as otherwise provided in this Operating Agreement; and

(iv)  Cause or permit the Project Owner to invest or expend any funds for additional Gold Star Chili franchises in excess of the 6 set forth in the Business Plan if such funds or a portion thereof include amounts held by the Project Owner for Limited Partner distributions, provided such consent will not be unreasonably withheld.

(v)  Cause the Project Owner to exercise its rights to purchase the Limited Partners' Units pursuant to Section 2.4 of the Limited Partnership Agreement.

5.5  Standard of Care.  A Manager shall perform his duties as Manager in good faith, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, willful misconduct, knowingly breaching this Agreement or a wrongful taking by the Manager. In performing his or her duties, a Manager shall be entitled to rely upon such information, opinions, reports, or statements, including financial statements or other financial data, presented or prepared by (a) any of the Company's other Managers, officers, Members or employees who such Manager reasonably believes are reliable and competent in the matters prepared or presented, or (b) any other Person, including without limitation lawyers or accountants, as to matters which such Manager reasonably believes are within such Person's professional or expert competence.

5.6  Limitation of Liability.  A Manager shall not be personally liable to the Company in monetary damages for breach of a duty to the Company unless it is proved by clear and convincing evidence in a court of competent jurisdiction that his or her action or failure to act (a) was not in good faith, (b) was undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company, (c) resulted in an improper personal benefit to such Manager or any of his or her Affiliates at the expense of the Company, (d) constituted fraud or deceit, or (e) was a knowing violation of law.

5.7  Managers and Members Have No Exclusive Duty to Company. The Manager shall not be required to manage the Company as its sole and exclusive function and it (and any Manager and/or Member) may have other business interests and may engage in other activities in addition to those relating to the Company. It is acknowledged that the Manager is a wholly owned subsidiary of Gold Star Chili, Inc. and as a result, both the Manager and Gold Star Chili, Inc. are permitted to continue with their normal business operations of being the franchisor for the Gold Star Chili restaurants and being an owner and operator of Gold Star Chili restaurants. The Member, Mason Hill, LLC and its principal owners and affiliates each will enter into a specific non-competition agreement satisfactory to the Manager that prohibits such parties from competing with the Limited Partnership or Gold Star Chili, Inc. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or

9

participate in such other investments or activities of the Manager and/or Member or to the income or proceeds derived therefrom. Neither the Managers nor any Member shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture except as set forth in Sections 5.5 and 5.6 or in violation of any separate non-compete agreements.

5.8     Bank Accounts. The Manager may from time to time open bank accounts in the name of the Company. The Manager may authorize Mason Hill to open additional accounts and when it does, the Manager and Mason Hill shall mutually agree on a simple and efficient method of obtaining from each other prompt approval and/or pre-approval for all authority to take action with regard to such accounts so that Company expenses will be paid in a timely and expedited fashion.

5.9     Resignation. A Manager of the Company may resign at any time by giving written notice to the Members of the Company at which time the Members shall select a successor Manager. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.10    Removal. In the event GSC EB-5 Investor, LLC is serving as the Manager of the Company, and permits a default by Gold Star Chili, Inc. under the Gold Star Management Agreement to continue beyond the applicable cure period, if any, Mason Hill, LLC shall have the right to remove GSC EB-5 Investor, LLC as the Manager and appoint the Manager of its sole choice. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.11    Vacancies. Any vacancy occurring for any reason in the number of Managers shall be filled by the affirmative vote of the Members holding a Majority Interest of the Membership Interests. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of the Members holding a Majority Interest. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until his successor shall be elected and shall qualify, or until his earlier death, resignation or removal.

5.12    Right to Rely on the Managers.

(a) Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

(i) The identity of any Manager, officer or any Member;

(ii) The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by any Manager or officer or which are in any other manner germane to the affairs of the Company;

10

(iii) The Persons and/or officers who are authorized to execute and deliver any instrument or document of the Company including any such deeds, mortgages and related documents; or

(iv) Any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member or officer.

## ARTICLE VI

## RIGHTS AND OBLIGATIONS OF MEMBERS

6.1     Limitation of Liability.  Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.  In furtherance of the foregoing, none of the Members, Managers, officers or advisory board members of the Company shall be personally liable to satisfy any debt, obligation or liability of any kind of the Company solely by reason of being a Member, Manager, officer or advisory board member.

6.2     Company Books.  The Company shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents. Upon reasonable request, each Member and Economic Interest Owner shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's and Economic Interest Owner's expense.

6.3     Priority and Return of Capital.  Except as may be expressly provided in Article VIII, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

6.4     Voting.  Notwithstanding anything contained herein to the contrary, when acting on matters subject to the vote of the Members, notwithstanding that the Company is not then insolvent, the Members and the Manager shall take into account the interest of the Company's creditors, as well as those of the Members.

6.5     Preemptive Rights.  Each Member have pre-emptive rights to subscribe for or to purchase any Membership Interest of Company of any class, whether such Membership Interest or such class be now or hereafter authorized.

6.6     Loans to Company.  All funds provided to the Company by a Member other than as a contribution of capital made in accordance with Article VIII, advances previously made by GSC EB5 Investor LLC for the Palomar and UK locations, and any loans from a member made in accordance with Section 5.3(a)(ii), shall be approved by the unanimous approval of the Members and treated as a loan which shall not enlarge the Member's Membership Interest in the Company but shall be a debt due from the Company to such Member.  Any loans made by Member shall bear interest at the Applicable Federal Rate in effect at the time of the loan, provided that if such funds are borrowed from a third party institution by the Member, the rate shall be equal to the rate charged to the loaning Member by such third party institution..

11

LIND000083

Such loan shall constitute a liability of the Company and shall be repaid from Company funds subsequent to any payments of any operating expense but prior to any distributions under Article VIII.

      6.7     Confidentiality and Other Restrictions.  Mason Hill agrees that upon the execution of a Franchise Agreement for any restaurant location by the Project Owner or any of its subsidiaries, that Mason Hill and each of its members shall be obligated to execute an agreement containing the non-competition, confidentiality provisions contained in Sections 11 and 12 of Gold Star Chili, Inc.'s standard franchise agreement.  Mason Hill agrees that this is a material inducement to GSC EB5 Investments LLC entering this Operating Agreement and Gold Star Chili, Inc. entering into any franchise agreement.

ARTICLE VII

MEETINGS OF MEMBERS

      7.1     <u>Special Meetings</u>.  Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Member.

      7.2     <u>Place of Meetings</u>.  The Members may designate any place, either within or outside the State of Ohio, as the place of meeting for any meeting of the Members.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Manager in the State of Ohio.

      7.3     <u>Notice of Meetings</u>.  Except as provided in Section 7.4, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten nor more than fifty days before the date of the meeting, either personally or by mail, by or at the direction of the person calling the meeting, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the Company, with postage thereon prepaid.

      7.4     <u>Meeting of all Members</u>.  If all of the Members shall meet at any time and place, either within or outside of the State of Ohio, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

      7.5     <u>Quorum</u>.  Members holding 100% of the Membership Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members.

      7.6     <u>Manner of Acting</u>.  If a quorum is present, the affirmative vote of Members holding a Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, the Articles of Organization, or this Operating Agreement.

      7.7     <u>Waiver of Notice</u>.  When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

      7.8     <u>Action Without A Meeting</u>.  Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more consents describing the action taken, signed by such Members as would be required for approval at a meeting of Members if all Members were present and voting.

12

LIND000084

ARTICLE VIII

CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.1     Members' Capital Contributions.  Each Member's initial Capital Contribution is set forth in **Exhibit A**.

8.2     Additional Contributions.  To the extent unanimously approved by the Members, from time to time, the Members shall make additional Capital Contributions which shall be pro rata to all Members in accordance with the Capital Interests of the Members as set forth on **Exhibit A**.

8.3     No Withdrawal.  Except as provided in Article XI, no Member shall withdraw any part of his Capital Account without the consent of Members holding 100% of the Membership Interests.

8.4     Capital Accounts.

(a)  A separate Capital Account will be maintained for each Member.  Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of Net Profits; (4) any items in the nature of income and gain which are specially allocated to the Member pursuant to Paragraphs (a), (b), (c), (d), (e), (f), (g), and/or (h) of **Exhibit B**; and (5) allocations to such Member of income described in Section 705(a)(1)(B) of the Code.  Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of expenditures described in Section 705(a)(2)(B) of the Code; (4) any items in the nature of deduction and loss that are specially allocated to the Member pursuant to Paragraphs (a), (b), (c), (d), (e), (f), (g), and/or (h) of **Exhibit B**; and (5) allocations to the account of such Member of Net Losses.

(b)  The manner in which Capital Accounts are to be maintained pursuant to this Section 8.4 is intended to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.  If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.4 should be modified in order to comply with Section 704(b) of the Code and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.4, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(c)  Except as otherwise required in the Act (and subject to Section 8.2), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

13

LIND000085

ARTICLE IX

ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.1    Allocations of Profits and Losses from Operations.  Except as provided in **Exhibit B**, the Net Profits and Net Losses of the Company for each fiscal year will be allocated in accordance with the Capital Interests set forth on **Exhibit A**.

9.2    Distributions.  All distributions of Distributable Cash shall be made to the Members in the same manner as Net Profits and Net Losses are allocated pursuant to Section 9.1.  In the event of a refinancing of any debt of the Company or a sale or other disposition of Company property which does not result in a termination of the Company, any Net Cash From Refinancing (as defined herein) or net proceeds from such disposition that the Manager determines is available for distribution shall be distributed to the Members, not later than ninety (90) days after the refinancing or disposition, in the same manner as Net Profits and Net Losses are allocated pursuant to Section 9.1,.  Any proceeds from the sale of Company property which results in a termination of the Company shall be distributed in accordance with Article XV.

9.3    Accounting Principles.  The profits and losses of the Company shall be determined in accordance with accounting principles applied on a consistent basis using the method of accounting selected by the Manager.  It is intended that the Company will elect those accounting methods which provide the Company with the greatest tax benefits.

9.4    Interest On and Return of Capital Contributions.  No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein.

9.5    Accounting Period.  The Company's accounting period shall be the calendar year.

9.6    Election Under Section 754.  The Company may elect, pursuant to Section 754 of the Code, to adjust the basis of Company property when a Member sells his Membership Interest.  To the extent that any adjustments to the tax basis of any Company asset is made pursuant to Sections 734(b) or 743(b) of the Code as a result of such an election, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulation § 1.704-(b)(2)(iv)(m).

ARTICLE X

DEATH; WITHDRAWAL

10.1    Withdrawal.  A Member shall be permitted to withdraw from the Company without the unanimous approval of the remaining Members by providing at least sixty (60) days prior written notice of the effective date of its withdrawal.

10.2    Continuation of the Company.  Upon the death, expulsion, bankruptcy, or withdrawal of a Member (a "**Withdrawal Event**"), remaining Members shall have the right to continue the Company's business under its present name following the Withdrawal Event, provided they unanimously elect to

14

purchase the interest of such Member and continue the business of the Company. The dissolution of a Member shall not be a Withdrawal Event and any person receiving a dissolved Member's interest in the Company shall be Economic Interest Holders unless the remaining Members consent in writing to such parties becoming Members. The election to purchase the interest of such Member shall be exercised by written notice (**"Purchase Notice"**) delivered within ninety (90) days after the effective date of the Withdrawal Event or if such Member is deceased or adjudicated incompetent, the appointment of the personal representative of a deceased or incompetent Member. Such Purchase Notice may be delivered in person or may be mailed by registered or certified mail, postage prepaid, to the last known address of the withdrawing Member or to the personal representative of the deceased or incompetent Member.

     10.3    <u>Method of Purchase</u>. The remaining Members may upon their unanimous consent, cause the Company to purchase the interest of such Member within one year of the Withdrawal Event at in an amount equal to the Capital Account of such Member as of the date of the Withdrawal Event.

ARTICLE XI
INTENTIONALLY OMITTED

ARTICLE XII

<u>TERMS OF PAYMENT UPON A WITHDRAWAL EVENT</u>

     12.1    <u>Payments to a Withdrawing Member</u>. When the Membership Interest of the Member causing the Withdrawal Event is purchased, payment for the value of his Membership Interest in the Company, as determined under Article XI, shall be paid, at the option of the Company over a period of not more than one (1) year beginning no later than four (4) months after the election to purchase the Membership Interest.

     12.2    <u>Interest on Payments</u>. No interest shall be paid on the payments provided in this Article if the payments are made within (6) months after the Withdrawal Event. Any amount not paid within six (6) months after the Withdrawal Event shall thereafter bear interest on the unpaid balance thereof at a rate equal to the applicable federal rate under Section 1274(d)(2) of the Code, or any similar successor provision of law.

     12.3    <u>Income Tax Incidents of Payments</u>. It is the intention of the parties that all payments described in Article X or Article XI to a Member causing a Withdrawal Event, to the personal representative or beneficiary of a deceased Member, or to an incompetent Member shall constitute payment for his Membership Interest in Company property to the extent of such Member's Capital Account as adjusted pursuant to Section 11.3, and to that extent shall be considered a distribution by the Company under Section 736(b) of the Code.

ARTICLE XIII

ADMISSION OF NEW MEMBERS;
<u>TRANSFERABILITY OF A MEMBERSHIP INTEREST</u>

15

LIND000087

13.1     <u>Admission of New Members Other Than Upon Sale of a Membership Interest</u>.  Subject to the provisions of Section 13.2, new Members may be admitted to the Company at the beginning of each Company year by a unanimous vote of the Members.  In such case, a supplemental agreement shall be executed by all the Members and by the new Member setting forth (a) the amount of Company capital and the allocation thereof among the Members, (b) the allocation among all of the Members of items of income, gain, loss, deduction, or credit as specified in Section 9.1, and (c) a statement that all Members shall be bound by this Operating Agreement as amended by the supplemental agreement.  Each new Member shall pay in cash an amount determined by multiplying his share of the capital of the Company, as set forth in the supplemental agreement, by the total value of the Members' Membership Interests as determined in Article XII as of the date of admission of the new Member to and among the existing Members allocated according to the ratio of their Capital Accounts prior to the admission of the new Member.  If the new Member shall so request in writing within ten (10) days of his admission as a Member, the Members shall join with the new Members in causing the Company to file an election under Section 754 of the Code to adjust the basis of the Company property.

13.2     <u>Sale of Membership Interest</u>.  No Member shall sell, assign, transfer, or otherwise dispose of all or part of his Membership Interest except in compliance with the following provisions:

(a)     If a Member desires to sell, convey, assign, transfer, pledge or otherwise dispose of any or all of his Membership Interest and shall solicit or receive a <u>bona fide</u> offer from a third party (who may be another Member) to acquire such Membership Interest that such Member desires to accept (an "**Offer**"), then such Member shall promptly, but in any event not more than ten (10) business days after receipt of the Offer, give the Company and the other Members written notice of the Offer (the "**Notice**").  The Notice shall specify:  (i) the size of the Membership Interest that is the subject of the Offer (such Membership Interest being hereinafter referred to as the "**Offered Interest**"); (ii) the identity, residence address and resume of the proposed acquirer of the Offered Interest and of each person that will have a beneficial interest in the Offered Interest pursuant to the Offer; (iii) the price for the Offered Interest contained in the Offer, including a detailed description of the terms of payment and of any non-cash consideration to be received by such Member pursuant to the Offer (the "**Offer Price**"); and (iv) the proposed time and date of closing of the Offer purchase transaction.  During the period commencing on the date the Company receives the Notice and ending thirty (30) days thereafter (the "**Company Option Period**"), the Company shall have the exclusive right (but not the obligation) to acquire the Offered Interest for the Offer Price.  The Company may exercise its option by delivering, within the Company Option Period, to the Member who has given Notice and to the other Member a writing stating that the Company has elected to acquire the Offered Interest pursuant to this Section 13.2(a) (the "**Notice of Company Option Exercise**").  The Notice of Company Option Exercise shall stipulate a closing date for the Company's acquisition of the Offered Interest that shall not be later than ninety (90) days after the date on which the Company received the Notice.

(b)     If the Company Option Period shall have expired without the election by the Company to acquire the Offered Interest, then, for a period of thirty (30) days commencing thirty-one (31) days after the date on which the Company received the Notice (the "**Member's Option Period**"), the Members other than the Member who has given the Notice shall have the exclusive right (but not the obligation) to acquire the Offered Interest for the Offer Price.  Said Members may exercise this option by delivering, within the Member's Option Period, to the Member who has given the Notice and to the Company a writing stating that such Members have elected to acquire the Offered Interest pursuant to this

16

Section 13.2(b) (the "**Notice of Member's Option Exercise**").  The Notice of Member's Option Exercise shall stipulate a closing date for the acquisition of the Offered Interest that shall not be later than one hundred twenty (120) days after the date on which the Company received the Notice.  To the extent that, hereafter, the number of Members total more than two, the option contained in this clause (b) shall be a pro rata option of each Member other than the Member desiring to sell any or all of his Membership Interest.

        (c)     If, but only if, the Company Option Period and the Member's Option Period shall have expired without the election by the Company or the Members other than the Member who has given the Notice, respectively, to acquire the Offered Interest, then, upon receipt by the Company of a written instrument in form and substance satisfactory to the Company pursuant to which the party (or parties) to whom the Offer Interest are to be transferred pursuant to the Offered agree to be bound as a Member under this Operating Agreement, the Member shall be free to transfer the Offered Interest to said party (or parties) on the exact terms and conditions set forth in the Offer.  Any variation of or amendment, modification or supplement to such terms and conditions in the Offer shall be deemed to create a new offer subject to the provisions of Sections 13.2(a) and 13.2(b).

        (d)     The Member who shall have given the Notice shall not, and representatives of such Member serving as Manager or on the Company's advisory board, if any, shall not, participate in any deliberations with respect to the exercise of the Company's option to acquire the Offered Interest.  If the Offer Price shall include non-cash consideration, either of the Company or the Member other than the Member giving the Notice, as the case may be, shall have the right (but not the obligation) to substitute cash in an amount equal to the approximate value of the non-cash consideration.

      13.3    <u>Investment Intent</u>.  Each Member, by signing this Operating Agreement, acknowledges that the Membership Interest of such Member will be acquired for investment for its own account, not as a nominee or agent, and not with a view to the resale or distribution thereof.  Each Member acknowledges that no Membership Interest has been registered under the Securities Act of 1933, as amended (the "**Act**") and, therefore, if the Membership Interests are deemed to be securities, in addition to the restrictions contained in Section 13.2 hereof, no Membership Interest may be resold unless subsequently registered under such Act or unless an exemption from such registration is available.  Each Member, other than the two initial Members, represents and warrants that he is either an "accredited investor," as that term is defined in Regulation D promulgated under the Act or has such knowledge, experience and sophistication in the areas in which the Company intends to do business so as to be in a position to understand the risks associated with investment in the Company and bear the loss of such investment.  Each Member acknowledges that he/it has been provided the opportunity to ask questions of and receive answers concerning Company.  Each Member has conducted his/its own investigation of Company and is prepared to bear the financial risks of an investment therein for an indefinite period of time.

ARTICLE XIV

OPTION TO PURCHASE
<u>GSC EB5 INVESTOR LLC MEMBERSHIP INTEREST</u>.

17

14.1     Provided Mason Hill has not been in default of this Agreement or the EB5 Management Agreement Mason Hill shall have the option, which shall not expire, to purchase all but not less than all of GSC EB5 Investor LLC's Membership Interest in the Company ("Mason Option"), at any time after the Project Owner's limited partners have received their respective permanent residency statuses, all applicable USCIS Regulations related to the Project have been satisfied and the EB5 Investors' interests in the Project Owner have been purchased by the Project Owner pursuant to Section 2.4 of the Limited Partnership Agreement ("Option Commencement Date"). Mason Hill shall exercise it's rights under this Section by delivering written notice to the GSC EB5 Investor LLC at least thirty (30) days prior to the date specified by Mason Hill in such notice as the closing date for such purchase ("Buyout Date").

18

LIND000090

14.2    The purchase price for the GSC EB5 Investor LLC's Membership Interest ("Buyout Price") shall be the amount determined as if the Project Owner is sold at fair market value (as hereinafter determined) and the proceeds distributed to the partners of the Project Owner and such amount received by the Company multiplied by the GSC EB5 Investor LLC's percentage of total membership interests owned.

14.3    The fair market value of the Project Owner shall be determined by agreement between the Members. Such fair market value shall either be agreed upon between the parties or, if they are unable to agree, then determined by a single appraiser acceptable to both parties. If, within thirty (30) days following the Manager's notice of exercise of the option, the parties have not reached agreement on fair market value or on a single appraiser to determine fair market value, then either party may demand arbitration to be conducted by three appraisers, one appointed by each party and the third appointed by the first two. If the third appraisal is less than either of the first two, then the fair market value shall be the average of the two lowest appraisals. If the third appraisal is greater than the first two, then the fair market value shall be the average of the two highest appraisals. If the third appraisal falls between the previous two appraisals, the fair market value shall be the value established by the third appraisal. Each appraiser shall be experienced in the valuation of operating businesses in the retail and restaurant industry. If either party shall demand arbitration, such demand shall be in writing and shall name the appraiser designated by such party. If the other party shall fail to name its appraiser within ten (10) days following such demand for arbitration, and if such failure shall continue for five (5) days after the other party shall have received notice demanding such appointment, then the first appraiser may appoint the third, and the two of them will appoint the second. The proceedings of such appraisers shall conform to the rules of the American Arbitration Association, as far as appropriate, and its decision shall be final and binding. The expense of the appraisals shall be paid by the Company.

14.4    The Buyout Price shall be paid in cash to GSC EB5 Investor LLC on the Buyout Date. GSC EB-5 Investor, LLC and Mason Hill shall execute and deliver all documents and instruments of assignment deemed necessary or appropriate for the consummation of such sale of Membership Interests. All agreements and obligations of the Project Owner, including any franchise agreements with Gold Star shall remain in full force and effect after the sale of interests pursuant to this section.

14.5 In the event Mason Hill has failed to exercise its Mason Option on or before a date which is five (5) years after the Option Commencement Date then GSC EB5 Investor LLC shall have the option, which shall not expire, to purchase all but not less than all of Mason Hill's Membership Interest in the Company on the same terms and conditions set forth for the Mason Option above and all but not less than all of Mason Hill's limited partnership interests in the Project Owner for fair market value determined in accordance with this paragraph 14 (but such determination of value shall be separate from the value of the Membership Interest in the Company).

ARTICLE XV

DISSOLUTION AND TERMINATION

15.1    Dissolution.

(a)    Except as otherwise provided herein, the Company shall be dissolved upon the occurrence of any of the following events:

19

LIND000091

(i) the written agreement of all the Members; or

(ii) the occurrence of a Withdrawal Event, unless, subject to Article XI, the business of the Company is continued by the consent of a unanimous vote of the remaining Members within 90 days after the Withdrawal Event and there is at least one remaining Member. Notwithstanding anything contained herein to the contrary, the Company shall continue and not dissolve whether as a consequence of the bankruptcy or insolvency of one or more of the Members, or otherwise, but the Company shall continue as long as there remains a solvent Member.

(b) Except as expressly permitted in this Operating Agreement, a Member shall not voluntarily resign or take any other voluntary action which directly causes a Withdrawal Event.

15.2 <u>Effect of Filing of Certificate of Dissolution</u>. Upon the filing by the Secretary of State of a certificate of dissolution, the Company shall continue its existence until the winding up of its affairs is completed.

15.3 <u>Winding Up, Liquidation and Distribution of Assets</u>.

(a) Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(i) Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members unanimously elect to receive distributions of any assets in kind),

(ii) Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are also creditors, and

(iii) Distribute the remaining assets in the following order:

(1) If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members holding 100% of the Membership Interests. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to Article XII to reflect such deemed sale.

(2) The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-l(b)(2)(ii)(b)(2) of the Treasury Regulations.

20

(c)  Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Treasury Regulations, if any Member or Economic Interest Holder has a negative balance in his Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member or Economic Interest Holder shall have no obligation to make any Capital Contribution, and the negative balance of such Capital Account shall not be considered a debt owed by such Member or Economic Interest Holder to the Company or to any other person for any purpose whatsoever.

## ARTICLE XVI

### MISCELLANEOUS PROVISIONS

16.1  Notices.  Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement.  Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

16.2  Application of Ohio Law.  This Operating Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Ohio, and specifically the Act.

16.3  Waiver of Action for Partition.  Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

16.4  Amendments.  This Operating Agreement may not be amended except by the written agreement of Members holding 100% of the Membership Interests.

16.5  Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

16.6  Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

16.7  Counterparts.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

16.8  Tax Matters Partner.  GSC EB5 Investor LLC shall serve as the tax matters partner as defined in Section 6231(a) of the Code, until such time that it resigns or is removed by vote of the Members

21

holding a Majority Interest. Upon such resignation or removal, a new tax matters partner shall be selected by unanimous vote of the Members holding a Majority Interest.

16.9    Arbitration. All claims, demands, disputes, controversies and differences that may arise between or among any of Members, Managers and/or Company concerning any issue relating to the interpretation or enforcement of this Operating Agreement or relating to the rights or liabilities of any of Members, Managers and/or Company under this Operating Agreement, any management agreement, or cross indemnification agreement, shall be exclusively determined and settled by arbitration ("**Arbitration**") on the following terms:

(a)    Any party to such claim, demand, dispute, controversy or difference may, by written notice to all other parties to such claim, demand, dispute, controversy or difference, appoint an arbitrator who shall be a person experienced in serving as an arbitrator under the rules of the American Arbitration Association ("**AAA**"). Each other party to such claim, demand, dispute, controversy or difference shall, by written notice, within 10 days after receipt of such notice by the first party, appoint another arbitrator who shall have the same qualifications and, in default of any such appointment by any of such other parties, the first arbitrator appointed shall be the sole arbitrator.

(b)    If more than one arbitrator has been appointed in accordance with Section 16.9(a), but such number of arbitrators is an even number, such arbitrators shall, if possible, agree upon one more arbitrator with the same qualifications and shall appoint him/her by written notice signed by each of the initial arbitrators with a copy mailed to each party to the claim, demand, dispute, controversy or difference within 10 days after the appointment of the last of the initial arbitrators to be appointed. If such 10 day period has elapsed without notice of appointment of the additional odd-numbered arbitrator, then any one or more parties to the claim, demand, dispute, controversy or difference may, in writing, request any Hamilton County, Ohio, Circuit Court Judge to appoint a third arbitrator.

(c)    In lieu of the foregoing, the parties to such claim, demand, dispute, controversy or difference may agree upon a single arbitrator who shall serve as the sole arbitrator for all purposes of this Section 16.9.

(d)    Within 30 days after the multiple arbitrators or single arbitrator are appointed as provided for above, such arbitrators or arbitrator shall hold an arbitration hearing in Cincinnati, Ohio. At the arbitration hearing, the laws of evidence of the State of Ohio shall apply, and the arbitrators or arbitrator shall allow each party to present that party's case, evidence and witnesses, if any, in the presence of the other party or parties, and shall render an award, including a provision for payment of costs and expenses of arbitration to be paid by one or more parties to the claim, demand, dispute, controversy or difference, as the arbitrator or arbitrators deem just.

(e)    The award of the majority of the multiple arbitrators, or the award of the sole arbitrator, shall be binding on the parties to this Agreement, with no right to appeal with respect to any questions of law or any other issue to any court, and judgment may be entered on such award in any court having jurisdiction.

(f)    The parties request that the arbitrators or arbitrator include in the award explicit provision for the payment of all arbitration costs and expenses, including, without limitation, reasonable attorneys' fees and other costs and expenses incurred by the parties, on terms and conditions that the

22

arbitrators or arbitrator deem just.  If the award does not include a complete determination with respect to such costs for any reason, then except to the extent otherwise provided by the award (i) the costs and expenses of the arbitration with respect to any arbitrator shall be borne by the party appointing that arbitrator, (ii) the costs and expenses of the arbitration with respect to any odd-numbered arbitrator appointed by the arbitrators or the sole arbitrator appointed by the parties if there shall be only one arbitrator, as the case may be, shall be evenly divided among all parties to such claim, demand, dispute, controversy or difference, and (iii) each party to such claim, demand, dispute, controversy or difference shall otherwise bear such party's own costs and expenses, including, without limitation, attorneys' fees.

(g)    Except where in conflict with the terms of this Section 16.9, the rules and procedures of AAA shall govern the arbitration proceedings.

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement constitutes the Operating Agreement of Company adopted by the Members of the Company as of the date first written above.

**MEMBERS:**

**GSC EB5 INVESTOR LLC**

By: _Michael E Rohrkemper_
Title: Michael E. Rohrkemper, Manager

**Mason Hill, LLC**

By: _____
Title: Gary Chan, Authorized Member

23

LIND000095

575459v1

24

LIND000096

## EXHIBIT A

| Initial Members | Initial Capital Contribution | Allocation of Profits and Losses | Capital Interest |
|---|---|---|---|
| GSC EB5 Investor LLC<br>650 Lunken Park Drive<br>Cincinnati, Ohio 45226 | $1,212,500* | 97.00% | 97.00% |
| Mason Hill, LLC<br>1021 Delta Avenue<br>Cincinnati, OH  45208 | $37,500* | 3.00% | 3.00% |

\*       contributions will be made on a schedule as the capital is required per the following schedule

| GSC Opp Management Equity Contribution Plan | Date | GSC EB5 Investor LLC<br><br>97% Member | Mason Hill LLC<br><br>3% Member | | | | |
|---|---|---|---|---|---|---|---|
| development to date | 4/15/13 | $30,000 | $37,500 (in kind donation for costs of EB5 offering) | | | | |
| Completion of offering documents | 6/1/13 | $20,000 | | | | | |
| EB5 Investor subscription to the Project Owner | 7/1/2013 | $20,000 | | | | | |
| Admission of EB5 Investors to Project Owner and release of EB5 Investor funds to Project Owner | 8/1/2013 | $1,142,500# | | | | | |
| | | | | | | | |
| | | | | | | | |
| Total Capital | | $1,212,5000 | $37,500 | | | | |
| | | | | | | | |

# GSC EB5 Investor LLC shall make the $1,142,500 capital contribution to the Company ratably with contributions made by the EB5 Investors to the Project Owner and may include sums expended in advance to secure locations for the Project, other project expenses including franchise fees and royalty fees.

25

**EXHIBIT B**

Special Allocations to Capital Accounts
and Certain Other Income Tax Allocations

Notwithstanding Section 9.1 hereof:

(a)    If there is a net decrease in "Company minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(d)) for a fiscal year, then, subject to the last paragraph of this **Exhibit B**, there shall be allocated to each Member items of income and gain for that year equal to that Member's share of the net decrease in minimum gain (within the meaning of Treasury Regulations Section 1.704-2(g)(2)). The foregoing is intended to be a "minimum gain chargeback" provision as described in Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in all respects in accordance with that Treasury Regulations Section.

If during a fiscal year there is a net decrease in partner (Member) nonrecourse debt minimum gain (as determined in accordance with Treasury Regulations Section 1.704-2(i)(3)), then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, any Member with a share of that nonrecourse debt minimum gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the fiscal year shall, subject to the last paragraph of this **Exhibit B**, be allocated items of income and gain for that year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in such nonrecourse minimum gain. The foregoing is intended to be the "chargeback of partner (Member) nonrecourse debt minimum gain" required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with that Treasury Regulations Section.

The allocations set forth in the two preceding paragraphs of this **Exhibit B** shall be subject to (1) the exceptions set forth in Treasury Regulations Section 1.704-2(f)(2) and (f)(3), and (2) any exceptions provided by the Commissioner of the Internal Revenue Service ("**Commissioner**") pursuant to Treasury Regulations Section 1.704-2(f)(5) (except that if the Company shall have any discretion as to an exception set forth pursuant to Treasury Regulations Section 1.704-2(f)(5), the Manager may exercise such discretion on behalf of the Company), and (3) any exceptions set pursuant to Treasury Regulations Section 1.704-2(i)(4) including exceptions that such Treasury Regulations Section incorporates by reference to those provided pursuant to Treasury Regulations Section 1.704-2(f)(2) and (f)(3) and including exceptions provided by the Commissioner pursuant to the Commissioner's authority provided by analogy to Treasury Regulations Section 1.704-2(f)(5) (and subject to the Manager's exercise of any Company discretion as to these exceptions). The Manager shall, if the application of the minimum gain chargeback requirements would cause a distortion in the economic arrangement among the Members, ask the Commissioner to waive the minimum gain chargeback requirements pursuant to Treasury Regulations Sections 1.704-2(f)(4) and 1.704-2(i)(4).

(b)    If during any Fiscal Year of the Company a Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), which causes or increases a deficit balance in the Deficit Capital Account, there shall be allocated to the Member items of income and gain (consisting of a pro rata portion of each item of Company income,

26

including gross income, and gain for such year) in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. The foregoing is intended to be a "qualified income offset" provision as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d), and shall be interpreted and applied in all respects in accordance with such Regulation.

(c)     If the allocation of any item of loss or deduction for any Fiscal Year pursuant to Section 9.1 would cause or increase a deficit balance in the Deficit Capital Account of any Member as of the end of such Fiscal Year, then, to the extent the allocation of such item of loss or deduction would have such effect, it shall instead be allocated (i) first, among those Members having positive balances in their Deficit Capital Accounts as of the end of such Fiscal Year in proportion to the positive balances in their respective Deficit Capital Accounts, and (ii) thereafter, as provided in Section 9.1.

(d)     Notwithstanding anything to the contrary in this **Exhibit B**, any item of deduction, loss, or Section 705(a)(2)(B) of the Code expenditure that is attributable to "partner (Member) nonrecourse debt" shall be allocated in accordance with the manner in which the Members bear the economic risk of loss for such debt (determined in accordance with Treasury Regulations Section 1.704-2(i)).

(e)     Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in the same manner as Net Profit or Net Loss is allocated for such period.

(f)     All recapture of income tax deductions resulting from sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(g)     Any credit or charge to the Capital Accounts of the Members pursuant to Sections (a), (b), (c), (d), and/or (e) of this **Exhibit B** hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.1 and 9.2 (a), (b), (c), (d), and/or (e) and shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of Article IX if the special allocations required by Sections (a), (b), (c), (d), and/or (e) of this **Exhibit B** had not occurred.

LIND000099

## **EXHIBIT C**

<u>Officers</u>

Michael E. Rohrkemper   - President

Michael Mason          - Vice President

28

LIND000100

**Exhibit D**

**Management Fees**

29

LIND000101

**From:** Roger David
**Sent:** Fri Jul 31 15:36:25 2015
**To:** Gary Chan; Terry
**Cc:** Tom Fisher; Mike Rohrkemper
**Subject:** Notice
**Importance:** High
**Attachments:** Notice of Termination of Partnership EB5.pdf

Terry,

Per our phone conversation as a safety measure.

Roger



Δ π EXHIBIT  6
Deponent Mason
Date 8/23  Rptr
WWW.DEPOBOOK.COM

GSC000270

# GSC EB5 Investor LLC

650 Lunken Park Drive
Cincinnati, Ohio 45226

July 31, 2015

VIA CERTIFIED MAIL AND EMAIL :

Mason Hill, LLC
Attn: Gary Chan
11285 Grooms Road
Cincinnati, Ohio 45242
Gary.chan@jardinhill.com
Terry.chan@jardinhill.com

Chen Baoyang
C/O Mason Hill, LLC

Liu Jihong
C/O Mason Hill, LLC

Yin Lijun
C/O Mason Hill, LLC

Yu Jing
C/o Mason Hill, LLC

Zhao Junru
C/O Mason Hill LLC

RE: DISSOLUTION OF GSC OPPORTUNITIES, L.P.

Mr. Chan,

GSC EB5 Investor LLC ("Manager") is the Manager of GSC Opp Management LLC, an Ohio limited liability company ("General Partner") whose members are the Manager and Mason Hill, LLC ("Mason Hill") pursuant to an operating agreement effective May 7, 2013 ("Operating Agreement"). GSC Management is the general partner and currently the only admitted limited partner of GSC Opportunities, L.P., an Ohio limited partnership ("GSC Opportunities") pursuant to an Agreement of Limited Partnership effective May 7, 2013 ("LP Agreement"). Except as otherwise set forth in this letter, all capitalized but undefined terms shall have the same meaning as set forth in the LP Agreement.

GSC Opportunities was formed more than two years ago for the purpose of investing in Gold Star Chili restaurant franchises in Targeted Employment Areas in the Dayton-Cincinnati-Lexington region of Southwest Ohio, Kentucky and Southeast Indiana pursuant to the Business

GSC000271

Plan attached to the LP Agreement. The individuals listed above, Chen Baoyang, Liu Jihong, Yin Lijun, Yu Jing and Zhao Junru (collectively the "Proposed Investors") have under the sole guidance and direction of Mason Hill, submitted $500,000 to an escrow account and submitted EB-5 applications for admission to the United States under USCIS EB-5 guidelines. Pursuant to the LP Agreement, the Proposed Investors are not Limited Partners until the approval of the initial EB-5 applications by the USCIS. Unfortunately, as of the date of this letter, the USCIS has not made a determination regarding the EB-5 application for the Business Plan or any of the Proposed Investors.

The Manager, by its sole member, Gold Star Chili, Inc., has continued to seek new locations and open and operate locations pursuant to the Business Plan, however, with no foreseeable decision from USCIS to approve the EB-5 application for the Business Plan or any of the Proposed Investors, the Manager has made a determination that it cannot continue to proceed with the Business Plan without the additional $2,500,000 USD to be provided by the Proposed Investors' admission as Limited Partners. The delay has made it practically impossible for the Manager to secure adequate locations for the additional Gold Star Chili franchise locations as it cannot sign leases and expend funds with no guaranty that the additional $2,500,000 USD to be provided by the Proposed Investors will be available for the Business Plan. As a result of the USCIS's failure to approve the EB-5 application for the Business Plan or any of the Proposed Investors, the Manager on behalf of the General Partner (which is also currently the sole limited partner of GSC Opportunities) hereby terminates GSC Opportunities. Further, upon the final dissolution of GSC Opportunities, the Manager will withdrawal from the General Partner pursuant to Section 10.1 of the Operating Agreement.

While we understand this is not the result the parties hoped would occur when this project was started over two years ago, the Manager believes it has no other option due to the delays in funding caused by the USCIS inaction. The Manager is providing this notice to you and the Proposed Investors so that you may work to find other investments for in which they may participate. We will work with you to smoothly transition such activities and will forward a plan of dissolution for the General Partner and GSC Opportunities shortly.

Sincerely,

GSC EB5 Investor LLC


_____

Roger David, Manager

**From:** Rolon, Connie

**Sent:** Thu Sep 03 18:03:21 2015

**To:** jacquelyn.chan@clearwaterhg.com

**Cc:** Montoya, Claudio; Terry.h.chan@gmail.com; Mike.mason@clearwaterhg.com

**Subject:** NEW SBA LOAN - RG Liberty Way, LLC dba Rodizio Grill 4614004024

**Importance:** High

**Attachments:** Exhibit A Due Diligence Checklist RG Liberty Way, LLC.pdf; Exhibit B Construction Checklist RG Liberty Way, LLC.pdf; Exhibit C Cash Injection Requirements - RG Liberty Way, LLC.pdf; Exhibit D Life Insurance Instructions - RG Liberty Way, LLC.pdf; Exhibit E Required Insurances - RG Liberty Way, LLC.pdf; DRAFT Landlord's Waiver and Consent RG Liberty Way, LLC.doc; SBA 601.pdf; IRS Form W9.pdf

Good Afternoon,

Congratulations on your loan approval with The Bancorp Bank! I will be guiding you through the due diligence and closing process here at The Bancorp Bank. In order to view your due diligence checklist, you must log into our borrower portal at **https://gglportal.thebancorp.com**. It will take you to the screen below:



Δ π EXHIBIT 7
Deponent Mason
Date 8/23 Rptr
WWW.DEPOBOOK.COM

BWS022147



To log on to the portal, please enter your loan number, which is **4614004024.** *Your initial password is the reference number located on your accepted Commitment Letters. Be sure that you input "tbbk" in all lowercase letters following by the number.* Once logged on, the portal will ask you to change your password. After changing your password, you will be taken to the Customer Welcome screen. Click on the "Documentation Checklist" tab to view a list of items needed in order to close your loan. For your convenience, we have attached the initial checklist to this email for your reference. After our call, you must log onto this website in order to see updates on your documentation checklist. Items on the checklist will be updated once a week, and I will correspond with you when the checklist has been updated so that you may review. We must have all items completed on the checklist five days prior to scheduling a closing. Please be sure that you use the attached checklist for our call so that we are looking at the same format as the checklist in the portal prints differently.

BWS022148

**We have tentatively targeted a closing for November 3, 2015, which means all items would need to be received, reviewed and approved by the Bank by the latest, October 27, 2015 in order to meet this deadline.**

**If all items are not received by October 27, 2015,  the target closing date of November 3, 2015, will be reset.**  However, if all items are received prior to the dates above, we can schedule a closing earlier, not sooner than five business days after receipt and acceptable review of the last item.  The target closing date will be discussed further during our phone call.

There are a few items referenced on the checklist that I have attached to this email in order for you to start working on or for reference:

- DRAFT Landlord Waiver and Consent – Please forward this DRAFT form onto the Landlord for review and provide my name, number and email address if they have any questions about our requirements and/or propose changes. A final/completed version will be required for signing.
- SBA Form 601- You should complete the Applicant section and sign and forward to your General Contractor assigned to work on your project; which will sign as Subrecipient.
- IRS Form W9 – General Contractor to complete and sign.

*Please let me know when is a good time for us to go over this checklist on Tuesday, September 8th and I will setup a conference call.*

Best regards,

**Connie Rolon**
SBA Loan Administrative Officer II
Government Guaranteed Lending
**The Bancorp**

+1 312.416.6804 (o)
+1 312.532.4126 (c)
+1 302.791.5704 (f)

58 Hilltop Drive
Bourbonnais, IL 60914

thebancorp.com

This message (including any attachments) is confidential and may be privileged and is to be used by the intended recipient only.  If you have received this message in error, please notify the sender immediately and promptly destroy any record of this email.  Nothing in this email, nor any action or inaction by The Bancorp, Inc., or any of its subsidiaries or affiliates (collectively, "The Bancorp"), shall be deemed a waiver of any of The Bancorp's rights, remedies or covenants by or against any party under any agreement, document or instrument or under applicable law.

BWS022149

17090



GENERAL ELECTRIC CREDIT UNION
10485 READING ROAD
CINCINNATI, OH  45241

BOARDWALK FRIES OPPORTUNITIES, LP OR GARY CHAN

11285 GROOMS RD
CINCINNATI, OH 45242

DIRECT INQUIRIES TO THE ADDRESS SHOWN
BELOW AFTER THE WORDS SEND INQUIRIES TO:

OR YOU MAY CALL   513-243-4328
MEMBER NUMBER:        0003690910

SOCIAL SECURITY NO:        ON FILE

STATEMENT PERIOD   FROM   TO
10/07/2015   12/31/2015

| POSTING DATE | (EFFEC) DATE | TRANSACTION DESCRIPTION | TRANSACTION AMOUNT | PAYMENTS CREDITS OR DEBITS | INTEREST | FEES | BALANCE OR TOTAL |
|---|---|---|---|---|---|---|---|
| | | S000 ***** REGULAR SHARE ACCOUNT ******** | | | | | |
| | | STATEMENT PERIOD: | | | | | |
| | | BEGINNING DATE    10/07/2015 | | | | | |
| | | ENDING DATE    12/31/2015 | | PREVIOUS BALANCE | | | 000 |
| 1013 | 1013 | NEW ACCOUNT DEPOSIT-CRDT OH WIRE IN | 45000000 | | | | 45000000 |
| 1013 | 1013 | DEPOSIT-CRDT OH WIRE IN | 45000000 | | | | 90000000 |
| 1013 | 1013 | DEPOSIT-CRDT OH WIRE IN | 45000000 | | | | 135000000 |
| 1013 | 1013 | DEPOSIT-CRDT OH WIRE IN | 45000000 | | | | 180000000 |
| 1013 | 1013 | DEPOSIT-CRDT OH WIRE IN | 45000000 | | | | 225000000 |
| 1013 | 1013 | DEPOSIT-CRDT OH WIRE IN | 45000000 | | | | 270000000 |
| 1013 | 1013 | DEPOSIT-CRDT OH WIRE IN | 45000000 | | | | 315000000 |
| 1016 | 1016 | WITHDRAWAL TRANSFER-0003690910 S130 | -90000000 | | | | 225000000 |
| | | TO OPEN PREMIUM CHECKING | | | | | |
| 1030 | 1030 | WITHDRAWAL TRANSFER-0003690910 S120 | -150000000 | | | | 75000000 |
| 1031 | 1031 | DEPOSIT DIVIDEND | 11630 | | | | 75011630 |
| 1130 | 1130 | DEPOSIT DIVIDEND | 6165 | | | | 75017795 |
| 1231 | 1231 | DEPOSIT DIVIDEND | 6371 | | | | 75024166 |
| | | | | NEW SHARE BALANCE | | | 75024166 |
| | | DIVIDEND PERIOD 10/07/2015 TO 12/31/2015 | | | | | |
| | | DIVIDEND EARNED | 24166 | | | | |
| | | ANNUAL PERCENTAGE YIELD EARNED | 0.10% | | | | |
| | | AVERAGE DAILY BALANCE | 102586610 | | | | |
| | | DIVIDENDS YEAR TO DATE | 24166 | | | | |

24166  ← YEAR TO DATE EARNINGS

SEND INQUIRIES TO:



Δ π EXHIBIT  8
Deponent Mason
Date 8/23 Rptr
WWW.DEPOBOOK.COM

2/22/2018                                    Vision Archive Print

BOARDWALK FIELD OPPORTUNITIES, LLP                                    13-7682/2420

                                              10/16/15
                                                        Date

PAY to the
order of    JARDIN HILL, LLC                          $ 350,000.00

THREE HUNDRED FIFTY THOUSAND ONLY ———— Dollars

General Electric Credit Union
10485 Reading Road
Cincinnati, Ohio 45241

For   MANAGEMENT FEES                                              MP

⑆242076821⑆  13000369091010⑈  101

Date:10-20-2015 Sequence:90144854 CUID:242076821 Serial:101 Account:130003690910 Amount:$350,000.00
TranCode:0 WorkType:MSDS RetCd:0 RetDt:-

>042200910< 20151019
First Financial Bank
56302  21

Date:10-20-2015 Sequence:90144854 CUID:242076821 Serial:101 Account:130003690910 Amount:$350,000.00
TranCode:0 WorkType:MSDS RetCd:0 RetDt:-

2/22/2018          Vision Archive Print



BOARDWALK FINES OPPORTUNITIES, LP.

13-7682/2420

10/16/15 Date

PAY to the order of ML BARNARD _____ $ 500,000.00

FIVE HUNDRED THOUSAND ONLY _____ Dollars

General Electric Credit Union
10485 Reading Road
Cincinnati, Ohio 45241

For DEPOSIT FOR CONSTRUCTION

⑈242076821⑈ 130003690910⑈ 102

Date:10-20-2015 Sequence:90281630 CUID:242076821 Serial:102 Account:130003690910 Amount:$500,000.00
TranCode:0 WorkType:MSDS RetCd:0 RetDt:-

For Deposit Only
ML BARNARD INC
1180002362902
2015-10-19

Date:10-20-2015 Sequence:90281630 CUID:242076821 Serial:102 Account:130003690910 Amount:$500,000.00
TranCode:0 WorkType:MSDS RetCd:0 RetDt:-



**ML Barnard, Inc.**
DESIGN - BUILD CONSTRUCTION

Office: 513-843-1777
Fax: 513-843-1757
3229 Omni Drive
Cincinnati, OH 45245
www.mlbarnard.com

## Invoice

**Customer:** Clearwater Hospitality Group          **Date:** 10/28/2015
11285 Grooms Rd.          **Invoice Number:** 2015129
Cincinnati, OH 45242

**Attn:** Mike Mason
**Project #** 201520          **Project Name:** Rodizio Grill Design Build Fees

**Description:**
Architectural, Design-Build, Landlord Consulting and Liberty Center Management Fees

| | |
|---|---|
| **Total Cost** | $ 141,201.70 |

Δ π **EXHIBIT** 9
Deponent Mason
Date 8/23 Rptr.
WWW.DEPOBOOK.COM

BWS016287



Butler County, Ohio
Board of Commissioners
**Department of Development**
**Building and Zoning Division**

**Commissioners**
Donald L. Dixon - Cindy Carpenter - T.C. Rogers

## TEMPORARY CERTIFICATE OF OCCUPANCY

*Permit Number:*  BLD-CN15-02647

*Applicant* ALBERT FEEDERS

Permit Description    TENANT FINISH

*This is to certify that this building,*

*Located at:*  7630  GIBSON ST

*Township of:*  LIBERTY

This is a Temporary Certificate of Occupancy for RODIZIO. There are items that must be completed before the official Certification of Occupancy may be issued

The Conditions are as follows:

   ** A Final Building Inspection must be obtained from the Butler County Building Department.

   ** A Final Zoning Inspection must be obtained from Liberty Township.

   ** A Final Electric Inspection must be obtained from the Butler County Building Department.

   ** No food shall enter the premises without the approval of the Butler County Health Department.

   ** The public is not permitted to enter the premises.

   ** This only allows employees to clean, stock and train.

   ** Hvac smoke test and fire alarm must be re tested before final Certificate of Occupancy is issued.

*This Temporary Certificate of Occupancy expires on*
*11/20/2015*
Today's Date: 10/20/2015

Dennis Dickard
Chief Building Official
BO# 367

*Butler County Administrative Center  130 High Street  Hamilton, Ohio 45011-2759*

BWS016288

# General Electric Credit Union

## OUTGOING WIRE TRANSFER REQUEST

Date __11/2/15__ Time __2:40__ Amount $ __300,000__

For accounting personnel only; if applicable, verified with member __SC__
(If wire exceeds $10,000.00, is suspicious, is faxed, or international)

Receiving Financial Institution __FIRST FINANCIAL BANK__

ABA (Routing) No. __042200970__

Beneficiary Name __JARDIN HILL, LLC__

Beneficiary Address (Required) __11285 GROOMS ROAD, BLUE ASH, OH 45242__

Beneficiary Account No. __5312394898__

Final Credit: (if necessary) _____

Final Credit Address: _____

Additional Information _____

### For International Wires Only

International Financial Institution Name _____

International Information (IBAN, SWIFT, etc.) _____

Purpose of Wire (Required by Foreign Countries) _____

### Member Information

Member Account to be charged __36A0910-130__ Fee __$20__

By order of _____ __Terry Chan__
(Member's Signature; By signing this form I accept responsibility for the information written on this form. If the wire has to be resent, I will again be charged the wire fee)

Home Phone _____ Work Phone __513-258-2216__ Cell Phone __513-384-1885__

Approved By: _____
(Credit Union Personnel)

### For Accounting Department Use Only

Wire Input & Posted By: __VB__      Wire Verification: __SC__

Institution OFAC: __SC__      Beneficiary OFAC: __SC__

Δ π EXHIBIT __10__
Deponent __Mason__
Date __8/23__ Rptr ____
WWW.DEPOBOOK.COM

Revised 11/2013

# General Electric Credit Union

## OUTGOING WIRE TRANSFER REQUEST

Date ___11/2/15___ Time ___2:30___ Amount $ ___150,000___

For accounting personnel only; if applicable, verified with member ___SC___
(If wire exceeds $10,000.00, is suspicious, is faxed, or International)

Receiving Financial Institution ___FIRST FINANCIAL BANK___

ABA (Routing) No. ___042200 910___

Beneficiary Name ___JARDIN HILL, LLC___

Beneficiary Address (Required) ___11285 GROOMS ROAD, BLUE ASH, OH 45842___

Beneficiary Account No. ___531 233 4898___

Final Credit: (if necessary) _____

Final Credit Address: _____

Additional Information ___TRAVEL, RESEARCH, CONCEPT DEVELOPMENT___

### For International Wires Only

International Financial Institution Name _____

International Information (IBAN, SWIFT, etc.) _____

Purpose of Wire (Required by Foreign Countries) _____

### Member Information

Member Account to be charged ___7090910 -130___ Fee ___∅___ oKyh 11/2/15

By order of ___[signature]___ Terry Chin
(Member's Signature;  By signing this form I accept responsibility for the information written on this form.  If the wire has to be resent, I will again be charged the wire fee)

Home Phone _____ Work Phone ___513·258·2216___ Cell Phone ___513·384·7835___

Approved By: ___[signature]___
(Credit Union Personnel)

### For Accounting Department Use Only

Wire Input & Posted By: ___VB___ Wire Verification: ___SC___

Institution OFAC: ___SC___ Beneficiary OFAC: ___SC___

Revised 11/2013

# General Electric Credit Union

## OUTGOING WIRE TRANSFER REQUEST

Date _11/2/15_    Time _2:30_    Amount $ _250,000_

For accounting personnel only; if applicable, verified with member _BC_
(if wire exceeds $10,000.00, is suspicious, is faxed, or international)

Receiving Financial Institution _First Financial Bank_

ABA (Routing) No. _04 2200 910_

Beneficiary Name _Jardin Hill, LLC_

Beneficiary Address (Required) _11285 Grooms Road, Blue Ash, OH 45242_

Beneficiary Account No. _531 233 4898_

Final Credit: (if necessary) _____

Final Credit Address: _____

Additional Information _Mgmt. Fee_

### ─────── For International Wires Only ───────

International Financial Institution Name _____

International Information (IBAN, SWIFT, etc.) _____

Purpose of Wire (Required by Foreign Countries) _____

### Member Information

Member Account to be charged _3009 0910-130_    Fee _0_    _ok TM 11/2/15_

By order of _____
(Member's Signature; By signing this form I accept responsibility for the information written on this form. If the wire has to be resent, I will again be charged the wire fee)

Home Phone _____    Work Phone _513·258·2216_    Cell Phone _513·384·7835_

Approved By: _Amy S. Monk_
(Credit Union Personnel)

### For Accounting Department Use Only

Wire Input & Posted By: _VB_    Wire Verification: _BC_

Institution OFAC: _BC_    Beneficiary OFAC: _BC_

Revised 11/2013

# General Electric Credit Union

## OUTGOING WIRE TRANSFER REQUEST

Date _11/2/15_  Time _2:30_  Amount $ _300,000_

For accounting personnel only; if applicable, verified with member _SC_
(If wire exceeds $10,000.00, is suspicious, is faxed, or international)

Receiving Financial Institution _FIRST FINANCIAL BANK_

ABA (Routing) No. _042200910_

Beneficiary Name _JARDIN HILL, LLC_

Beneficiary Address (Required) _11285 GROOMS ROAD, BLUE ASH, OH 45940_

Beneficiary Account No. _531 233 4898_

Final Credit: (if necessary) _____

Final Credit Address: _____

Additional Information _LEASE DEPOSITS_

### For International Wires Only

International Financial Institution Name _____

International Information (IBAN, SWIFT, etc.) _____

Purpose of Wire (Required by Foreign Countries) _____

### Member Information

Member Account to be charged _3690910-130_  Fee _Ø_   _OK JP 11/2/15_

By order of _[signature]_
(Member's Signature;  By signing this form I accept responsibility for the information written on this form.  If the wire has to be resent, I will again be charged the wire fee)

Home Phone _____  Work Phone _513.258.2216_  Cell Phone _513.284.7885_

Approved By: _[signature]_
(Credit Union Personnel)

### For Accounting Department Use Only

Wire Input & Posted By: _VB_   Wire Verification: _SC_

Institution OFAC: _SC_   Beneficiary OFAC: _SC_

Revised 11/2013

# General Electric Credit Union

## OUTGOING WIRE TRANSFER REQUEST

Date __11/2/15__    Time __0:30__    Amount $ __300,000__

For accounting personnel only; if applicable, verified with member __SC__
(If wire exceeds $10,000.00, is suspicious, is faxed, or international)

Receiving Financial Institution __FIRST FINANCIAL BANK__

ABA (Routing) No. __042 200 910__

Beneficiary Name __JARDIN HILL, LLC__

Beneficiary Address (Required) __11285 GROOMS ROAD, BLUE ASH, OH 45242__

Beneficiary Account No. __531 233 4898__

Final Credit: (if necessary) _____

Final Credit Address: _____

Additional Information _____

### For International Wires Only

International Financial Institution Name _____

International Information (IBAN, SWIFT, etc.) _____

Purpose of Wire (Required by Foreign Countries) _____

### Member Information

Member Account to be charged __7690910 -130__    Fee __∅__    OK NB 11/2/15

By order of __[signature]__ __Terry Chan__
(Member's Signature;  By signing this form I accept responsibility for the information written on this form. If the wire has to be resent, I will again be charged the wire fee)

Home Phone _____  Work Phone __513·258·2216__ Cell Phone __513·384·7835__

Approved By: __[signature]__
(Credit Union Personnel)

### For Accounting Department Use Only

Wire Input & Posted By: __NB__    Wire Verification: __SC__

Institution OFAC: __SC__    Beneficiary OFAC: __SC__

Revised 11/2013

# LINDHORST & DREIDAME

### A LEGAL PROFESSIONAL ASSOCIATION

JAMES L. O'CONNELL
JAY R. LANGENBAHN (1)
JAMES H. SMITH III
MICHAEL F. LYON
THOMAS E. MARTIN
JAMES F. BROCKMAN
BARRY F. FAGEL (1)
BRADLEY D. McPEEK
DAVID E. WILLIAMSON (1)
CHRISTOPHER H. HURLBURT (1)
MATTHEW C. CURRAN
MATTHEW A. MIKHAIL (1)
MATTHEW J. KARAS

312 WALNUT STREET, SUITE 3100
CINCINNATI, OHIO 45202-4048
TELEPHONE: (513) 421-6630
FACSIMILE: (513) 421-0212
WWW.LINDHORSTLAW.COM

AMBROSE H. LINDHORST 1913-1997
ROBERT F. DREIDAME 1914-1978
WILLIAM J. WALSH 1919-1996
LEO J. BRESLIN 1928-2000

_____

(1) ALSO ADMITTED IN KENTUCKY

### WRITER'S DIRECT DIAL

(513) 345-5769
tmartin@lindhorstlaw.com

April 13, 2016

Fred Voigtmann, Esq.
Pan-Pacific Immigration Law Group
1875 Century Park East, Ste. 700
Los Angeles, CA 90067

      In re: GSC Opportunities, L.P.
           Our File No.: 005543/0001

Dear Mr. Voigtmann:

      I am writing in response to your request to Gary Chan and Terry Chan for a project update and financial report for GSC Opportunities, L.P. ("Partnership") on behalf of the individuals who have subscribed to purchase limited partnership interests in the Partnership.

      Our client has advised us that your clients' funds remain in escrow and have not been distributed to the Partnership. The reason for this inactivity is that the Partnership's general partner, GSC Opp Management, LLC, controlled by Gold Star Chili, Inc., has decided to no longer participate in the Partnership and the proposed activities described in the Private Placement Memorandum for it.

      Gold Star Chili, Inc. was to provide the Partnership with locations for development of Gold Star Chili franchises and capital for development. It decided, subsequent to receipt of your client's subscriptions, that it would not provide any sites for development or follow-up with the commitments it made in the Partnership Agreement. The decision to withdraw from the Partnership has left the General Partner, with Mason Hill, LLC, as the only active member, with limited choices. At this point in time, our client believes the options are as follows:

      1.    Terminate the Partnership and return all money to the investors to allow them to pursue other opportunities; or

      2.    Utilize the funds in the Partnership to invest in restaurants other than Gold



Δ π EXHIBIT _11_
Deponent _Mason_
Date _8/23_ Rptr____
WWW.DEPOBOOK.COM

LIND000272

Fred Voightmann, Esq.
April 13, 2016
Page 2


     2.     Utilize the funds in the Partnership to invest in restaurants other than Gold Star Chili franchises pursuant to a business plan similar to another project involving entities affiliated with Terry and Gary Chan in the management of the limited partnership.

     The Partnership is prepared to act in the manner your clients choose. If any of them wish to rescind their subscription and receive a refund of the subscription price, the General Partner will have the escrow agent return their funds. If any of the investors are interested in continuing in the Partnership to invest in other restaurants, Terry and Gary Chan have suggested the model described in Buffalo Wings & Rings Pittsburgh Opportunities, L.P. A copy of the Private Placement Memorandum, Limited Partnership Agreement, Subscription Documents and Business Plan for that project are attached. USCIS has approved the I-526 Petition of a limited partner/investor in this project.

     Also attached is a description of the legal proceedings that involve Terry Chan and Gary Chan and should be considered by your clients in making their decision.

     After consulting with your clients, please let me know which of them would like to rescind their subscription and which would prefer to move forward with the Partnership investing in the Buffalo Wings & Rings restaurants. The General Partner will prepare and forward to you appropriate documentation to implement your client's choice.

     Please note, as we are not immigration counsel, we offer no opinion on the impact of either of these courses of action upon the status of your clients with USCIS. There is no assurance that investing in these other restaurants will result in the creation of sufficient jobs to remove their conditional status.

     If you have any questions or would like to discuss these matters further, please contact me at your convenience.

                Sincerely,

                LINDHORST & DREIDAME

                Thomas E. Martin

TEM/mh
Enc.

cc:    Gary Chan
       Terry Chan
       (via email)

## LEGAL PROCEEDINGS

On November 15, 2015, ten limited partners ("Plaintiffs") of KRC Fund I, LP, an Ohio limited partnership (the "KRC Fund") filed a Complaint in the United States District Court for the Southern District of Ohio Western Division at Cincinnati, Ohio against Terry Chan, Gary Chan (the "Chans") and Kentucky Regional Center, LLC, a Kentucky limited liability company doing business as Midwest EB-5 Regional Center ("MERC") together with certain other named defendants (collectively, the "Defendants"). The Complaint alleges claims against the Chans, MERC and the other Defendants for breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, piercing the corporate veil, gross mismanagement, embezzlement and self-dealing of KRC Fund assets and violations of the Securities and Exchange Act of 1934 for fraud, misrepresentation and deception.

The Plaintiffs allege that the money invested by them as limited partners was improperly utilized by the Defendants in violation of the Private Placement Memorandum utilized by the KRC Fund. The Plaintiffs seek compensatory and punitive damages against the Defendants in excess of $5,000,000.00. The Chans were the owners of MERC during the period that some of the claims alleged in the Complaint arose, and the Plaintiffs are seeking to pierce the corporate veil of MERC to recover against the Chans individually. The Complaint alleges that other Defendants purchased MERC from the Chans in January, 2014.

The Plaintiffs further allege that, while nine of them had their I-526 Applications approved, based on the activities of the Defendants, MERC was subsequently terminated as a regional center and the Plaintiffs' petitions were denied and/or their I-526 approvals were revoked.

Terry Chan is the husband of Jacquie Chan, the sole owner of Clearwater Hospitality Group, LLC, which controls the Partnership through its ownership of Lumen Point Capital Fund, LLC and RG MGMT, LLC, the general partner of the Partnership. Gary Chan is Terry Chan's brother and the brother-in-law of Jacquie Chan. The Chans are actively involved in the management and operations of the Partnership and its subsidiaries. The Chans filed a Motion to Dismiss the Complaint on January 25, 2016. The Chans deny the allegations contained in the Complaint and intend to defend against all of the claims of the Plaintiffs.

614155

LIND000274

**From:** Lickfield, Richard
Sent: Tue Jun 28 10:58:38 2016
**To:** Terry Chan; jacquie@clearwaterhg.com; Mike Mason; Steve Schott
**Cc:** Langan, Geoffrey; Mike Brown
**Subject:** FW: Rodizio Grill Lease Comments
Importance: Normal
**Attachments:** MiRodizioGrill LSE v2.doc; MiRodizioGrill LSE v2 comp to v1.doc

Good morning,

I just wanted to touch base after we received and had a chance to review and comment on Mike's lease comments. Overall they seemed fairly minimal and we should be able to get through them in a call or meeting.

I spoke with Terry last week regarding the plan to roll these stores out. Based on our discussion with Debora, funds to complete the build outs for the three Boardwalk Fries locations are available immediately while Rodizio Grill funding may be held up in the EB-5 process for some time. We want to complete all these deals and have confidence in your ability to make it happen, so the thought is to get the Boardwalk Fries locations going ASAP since the spaces are immediately available, and to gradually roll out the three Rodizio Grill locations as funds are demonstrated to be available for completion of the buildout bridging the gap between Pyramid's investment into the deals and the cost to get open and operating. We'd like to see this happen in the following order: 1. Poughkeepsie 2. Middletown 3. Holyoke. Please let me know your thoughts on this.

I also wanted to confirm that the couple comments on the lease that materially changed the business points of the deal were oversights based on Mike working off the initial letter of intent and it is not the intention to change the terms from the final form that was presented and approved by our real estate committee. These include: 1. Increasing the cash allowance 2: Altering the percentage rent structure and 3: the negotiated monthly compactor charge.

I'd like to try and get something scheduled to finalize the remaining open lease form items, either a call later this week or a meeting in Cincinnati with me and our attorney, Geoff. Once we have an agreed upon form, it should be a simple process of determining how we're all comfortable scheduling delivery and opening of the unit. Please suggest what is convenient for your group. A call anytime this week is fine and we're available any day next week to come to you.

Thank you,

Rich Lickfield
Pyramid Management Group
315-530-7574

---

**From:** Langan, Geoffrey
**Sent:** Thursday, June 23, 2016 1:54 PM
**To:** 'mbrown@beckman-weil.com' <mbrown@beckman-weil.com>
**Cc:** Lickfield, Richard <RichardLickfield@pyramidmg.com>
**Subject:** Rodizio Grill - Crystal Run

Tenant's comments to the lease for Rodizio Grill at Galleria at Crystal Run have been reviewed and discussed internally. Attached is a redraft of the Lease which includes the changes agreeable to Landlord. I've also attached a blackline compared to the first version. Note that some of the requested changes have been incorporated conceptually but through alternate language. Please review and let me know if you have any questions. Thanks.

Geoff



△ π EXHIBIT 12
Deponent Mason
Date 8/23 Rptr
WWW.DEPOBOOK.COM

BWS014583

*Geoffrey J. Langan*
*Real Estate Counsel*
Pyramid Management Group, LLC
4 Clinton Square
Syracuse, NY 13202
Telephone: (315) 634-7711
Fax: (315) 472-4035

If you are not the intended recipient, or received this electronic mail transmission in error, be aware that any disclosure, copying, distribution or use of this information is prohibited. Further, please be advised that the content of this email or the submission of any attachment for review, negotiation or signature does not constitute an offer, acceptance, contract, lease or other legally binding obligation or agreement.

BWS014584

 **STEINER**

July 12, 2016                                    via Federal Express


RG Liberty Way, LLC
d/b/a Rodizio Grill
11285 Grooms Road
Cincinnati, OH 45242

RE:   Lease Agreement dated April 30, 2015 (the "Lease") between Clearwater Hospitality Group,
      LLC ("Tenant") and Sublease Agreement dated September 30, 2015 between Clearwater
      Hospitality Group, LLC and RG Liberty Way, LLC and Liberty Center, LLC ("Landlord")

Dear Tenant:

You are hereby notified that RG Liberty Way, LLC d/b/a Rodizio Grill is in default of the Lease
Agreement in that it has failed to pay Minimum Rent (Base Rent), as well as other charges due
under the Lease Agreement for the space known as S-110 at 7630 Gibson Street, Liberty, OH 45069
at Liberty Center. RG Liberty Way, LLC d/b/a Rodizio Grill currently owes Liberty Center, LLC
**$84,325.01.**

Pursuant to Article 19 of the Lease Agreement, RG Liberty Way, LLC d/b/a Rodizio Grill is formally
placed on notice that if the above referenced sum is not paid, in full, to Steiner Real Estate Services,
LLC as Managing Agent for Liberty Center, LLC within 10 days of the date of this Notice, we will be
forced to exercise remedies provided under Article 19 of the Lease Agreement, including legal action
to re-gain possession of the Premises. Please notice that, regardless of any action taken to re-take
possession, RG Liberty Way, LLC d/b/a Rodizio Grill shall remain liable for all arrears and additional
sums as they come due and owing.

Sincerely,

*Sharon Kondracki*

Sharon Kondracki
Lease & Tenant Administration Manager


cc:   Clearwater Hospitality Group, LLC, 11285 Grooms Road, Cincinnati, OH 45242
      Darlene Rector, Vice President Lease and Tenant Administration, Steiner + Associates
      David Eidelberg, Esq., Ulmer Berne

Δ π EXHIBIT _13_
Deponent _Mason_
Date _8/23_ Rptr. _____
WWW.DEPOBOOK.COM

BWS014212

| Database: | STEINER | | Aged Delinquencies | | | Page: | 1 |
|---|---|---|---|---|---|---|---|
| Report ID: | ALT_AGEDELWD | | Steiner + Associates | | | Date: | 7/12/2016 |
| | | | Liberty Center - Retail | | | Time: | 01:40 PM |
| | | | Date: 7/12/2016 | | | | |

| Inv Date | Category | Description | Source | Amount | Current | 30 | 60 | 90 | 120 |
|---|---|---|---|---|---|---|---|---|---|

**LTCR-ST2714**    **Rodizio Grill**        Master Occupant Id: LTCRODI1-1    Day Due:   1   Delq Day:   10
           Debora Myree         S-110   Current            Last Payment:   6/28/2016   42,260.27
           (513) 808-4952         debora.myree@clearwaterhg.com

| Inv Date | Category | Description | Source | Amount | Current | 30 | 60 | 90 | 120 |
|---|---|---|---|---|---|---|---|---|---|
| 5/15/2016 | ELE | 04/15/16-05/15/16 | CH | 2,778.10 | 0.00 | 2,778.10 | 0.00 | 0.00 | 0.00 |
| 5/15/2016 | WTR | 04/15/16-05/15/16 | CH | 1,349.37 | 0.00 | 1,349.37 | 0.00 | 0.00 | 0.00 |
| 6/1/2016 | BASE | AUTOCHRG @T6/30/2016 | CH | 23,070.83 | 0.00 | 23,070.83 | 0.00 | 0.00 | 0.00 |
| 6/1/2016 | CTOC | AUTOCHRG @T6/30/2016 | CH | 10,546.67 | 0.00 | 10,546.67 | 0.00 | 0.00 | 0.00 |
| 6/1/2016 | INS | AUTOCHRG @T6/30/2016 | CH | 230.71 | 0.00 | 230.71 | 0.00 | 0.00 | 0.00 |
| 6/1/2016 | MKT | AUTOCHRG @T6/30/2016 | CH | 659.17 | 0.00 | 659.17 | 0.00 | 0.00 | 0.00 |
| 6/1/2016 | TAX | AUTOCHRG @T6/30/2016 | CH | 3,625.42 | 0.00 | 3,625.42 | 0.00 | 0.00 | 0.00 |
| 6/15/2016 | ELE | 05/15/16-06/15/16 | CH | 2,765.44 | 2,765.44 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6/15/2016 | WTR | 05/15/16-06/15/16 | CH | 1,141.50 | 1,141.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6/30/2016 | NSF | NSF | CH | 25.00 | 25.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2016 | BASE | AUTOCHRG @T7/31/2016 | CH | 23,070.83 | 23,070.83 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2016 | CTOC | AUTOCHRG @T7/31/2016 | CH | 10,546.67 | 10,546.67 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2016 | INS | AUTOCHRG @T7/31/2016 | CH | 230.71 | 230.71 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2016 | MKT | AUTOCHRG @T7/31/2016 | CH | 659.17 | 659.17 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2016 | TAX | AUTOCHRG @T7/31/2016 | CH | 3,625.42 | 3,625.42 | 0.00 | 0.00 | 0.00 | 0.00 |
| | BASE | Base Rent | | 46,141.66 | 23,070.83 | 23,070.83 | 0.00 | 0.00 | 0.00 |
| | CTOC | Operating Contribution | | 21,093.34 | 10,546.67 | 10,546.67 | 0.00 | 0.00 | 0.00 |
| | ELE | Electricity | | 5,543.54 | 2,765.44 | 2,778.10 | 0.00 | 0.00 | 0.00 |
| | INS | Insurance | | 461.42 | 230.71 | 230.71 | 0.00 | 0.00 | 0.00 |
| | MKT | Marketing Contribution | | 1,318.34 | 659.17 | 659.17 | 0.00 | 0.00 | 0.00 |
| | NSF | NSF Fee | | 25.00 | 25.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | TAX | Taxes and Assessments | | 7,250.84 | 3,625.42 | 3,625.42 | 0.00 | 0.00 | 0.00 |
| | WTR | Water | | 2,490.87 | 1,141.50 | 1,349.37 | 0.00 | 0.00 | 0.00 |
| **Rodizio Grill Total:** | | | | **84,325.01** | **42,064.74** | **42,260.27** | **0.00** | **0.00** | **0.00** |
| | BASE | Base Rent | | 46,141.66 | 23,070.83 | 23,070.83 | 0.00 | 0.00 | 0.00 |
| | CTOC | Operating Contribution | | 21,093.34 | 10,546.67 | 10,546.67 | 0.00 | 0.00 | 0.00 |
| | ELE | Electricity | | 5,543.54 | 2,765.44 | 2,778.10 | 0.00 | 0.00 | 0.00 |
| | INS | Insurance | | 461.42 | 230.71 | 230.71 | 0.00 | 0.00 | 0.00 |
| | MKT | Marketing Contribution | | 1,318.34 | 659.17 | 659.17 | 0.00 | 0.00 | 0.00 |
| | NSF | NSF Fee | | 25.00 | 25.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | TAX | Taxes and Assessments | | 7,250.84 | 3,625.42 | 3,625.42 | 0.00 | 0.00 | 0.00 |
| | WTR | Water | | 2,490.87 | 1,141.50 | 1,349.37 | 0.00 | 0.00 | 0.00 |
| **Grand Total:** | | | | **84,325.01** | **42,064.74** | **42,260.27** | **0.00** | **0.00** | **0.00** |

BWS014213



**SHARON KONDRACKI**
LEASE AND TENANT
ADMINISTRATION MANAGER
skondracki@steiner.com

**STEINER + ASSOCIATES**
4016 Townsfair Way, Suite 201
Columbus, OH 43219
+1 614.414.7300  +1 614.416.8302 direct
www.steiner.com

BWS014214

From: Gary Chan

Sent: Wed Jul 27 14:22:29 2016

To: Kristen Myers

Cc: Terry Chan

Subject: Fwd: Meeting Request: To Discuss State of The Business

Importance: Normal

Attachments: 20160725100705930.pdf

--
**Gary Chan | Clearwater Hospitality Group**
11285 Grooms Rd. | Cincinnati, OH 45242
Main: (513) 808-4986 | Fax: (513) 360-4311
Mobile: (513) 384-7835
Email: gary.chan@clearwaterhg.com

*This e-mail transmission contains information that is intended to be privileged and confidential. It is intended only for the addressee named above. If you receive this e-mail in error, please do not read, copy or disseminate it in any manner. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please reply to the message immediately by informing the sender that the message was misdirected. After replying, please erase it from your computer system. Your assistance in correcting this error is appreciated.*


Begin forwarded message:

**From:** Debora Myree <debora.myree@clearwaterhg.com>
**Subject: Fwd: Meeting Request: To Discuss State of The Business**
**Date:** July 25, 2016 at 10:07:35 AM EDT
**To:** Jacquelyn Chan <jacquelyn.chan@clearwaterhg.com>, Terry Chan <terry.chan@clearwaterhg.com>, Gary Chan <gary.chan@clearwaterhg.com>


**Debora Myree | Clearwater Hospitality Group**
11285 Grooms Rd. | Cincinnati, OH 45242
Main: (513) 808-4952 | Fax: (513) 360-4311
Mobile: (513) 675-6954
Email: debora.myree@clearwaterhg.com


*This e-mail transmission contains information that is intended to be privileged and confidential. It is intended only for the addressee named above. If you receive this e-mail in error, please do not read, copy or disseminate it in any manner. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please reply to the message immediately by informing the sender that the message was misdirected. After replying, please erase it from your computer system. Your assistance in correcting this error is appreciated.*


Begin forwarded message:

**From:** officescanner@clearwaterhg.com
**Subject: Meeting Request: To Discuss State of The Business**
**Date:** July 25, 2016 at 10:07:06 AM EDT
**To:** "Debora Myree" <debora.myree@clearwaterhg.com>, "Mike Mason" <mike.mason@clearwaterhg.com>



Δ π EXHIBIT 14
Deponent Mason
Date 8/23 Rptr.
WWW.DEPOBOOK.COM

BWS023633

This E-mail was sent from "RNP002673A996D1" (MP C2003).

Scan Date: 07.25.2016 10:07:05 (-0400)
Queries to: officescanner@clearwaterhg.com

BWS023634



July 25, 2016

Dear Principals,

Due to recent financial challenges facing Clearwater Hospitality Group, we feel an urgency to revisit corporate strategy and as key leaders, become transparent regarding the state of the business to employees and business partners. We are committed to Clearwater's core values and as such, believe it is our fiduciary duty to uphold ethical and legal business practices. We have concerns about recent cash management activities initiated outside of our knowledge or control. We believe employee payroll, compliance and reporting to be one of the highest priorities of any company. We request a conference call with the Principals to discuss steps for resolution of the following critical issues:

- 7/22/16- Withheld hourly employee pay and tips due to NSF (RISK: Department of Labor violation);
- 7/22/16- Withheld Manager pay due to NSF (RISK: loss of "exempt" status for management employees);
- 7/15/16- Defaulted on ADP Direct Deposits due to NSF in RGO I; CHG and JH accounts;
  - o RISK #1- ADP account access suspended (RGO I; CHG and JH)
  - o RISK #2- Direct Deposit Feature suspended on RGO I due to 2nd occurrence;
  - o RISK #3- No tax deposits being made for FICA; FUTA; State/Local Withholding which could ultimately result in audits, penalties and interest
  - o RISK #4- Cannot track employee hours for ACA Compliance (e.g. needed to complete IRS Forms 1094/1095)
  - o RISK #5- ADP Workforce Now implementation/Upgrade suspended (e.g. A must for businesses with 50 or more employees)
- American Funds- Employee 401k Contributions not made due to NSF (e.g. 7/15/16; 7/22/16 payrolls)
  - o RISK #6- Lost earnings to employees must be reported on IRS Form 5330;
  - o RISK #7- Must pay Excise Tax to IRS (e.g. 15% of lost earnings)
- Humana- Employer/Employee medical deductions not paid due to NSF
  - o RISK: If past due bill not paid by 8/1/16 Plan will be terminated
- Other risk factors:
  - o RISK #8- Expense reimbursement checks returned due to NSF;
  - o RISK #9- Vendor payments returned due to NSF risking our company's credit worthiness for RGLW as well as future restaurants;
  - o RISK #10- Reputation Management around employees discussing pay issues via social media.

We respectfully request a meeting and/or conference call with Jacquelyn Chan, Terry Chan and Gary Chan for Monday, July 25, 2016 at 4:00 PM EST.

Sincerely,

Michael Mason,
Chief Operations Officer

Debora Myree,
Director of Finance

**11285 Grooms Road, Cincinnati, Ohio 45242**
**513-808-4986          Fax 513-360-4311**

BWS023635

**Melissa Herald**

**From:** Thomas Martin
**Sent:** Wednesday, July 27, 2016 3:37 PM
**To:** fred@panpacificimmigration.com
**Subject:** GSC Opportunities, L.P.
**Attachments:** SKMBT_75116072714350.pdf

Dear Fred:

Please see the attached letter concerning GSC Opportunities, L.P.  Thank you.

Thomas E. Martin, Esq.
LINDHORST & DREIDAME
312 Walnut Street, Suite 3100
Cincinnati, OH  45202-4048
(513) 421-6630
(513) 421-0212 (fax)
tmartin@lindhorstlaw.com

1



LIND000372

# LINDHORST & DREIDAME

### A LEGAL PROFESSIONAL ASSOCIATION

JAMES L. O'CONNELL
JAY R. LANGENBAHN (1)
JAMES H. SMITH III
MICHAEL F. LYON
THOMAS E. MARTIN
JAMES F. BROCKMAN
BARRY F. FAGEL (1)
BRADLEY D. McPEEK
DAVID E. WILLIAMSON (1)
CHRISTOPHER H. HURLBURT (1)
MATTHEW C. CURRAN
MATTHEW A. MIKHAIL (1)
MATTHEW J. KARAS

312 WALNUT STREET, SUITE 3100
CINCINNATI, OHIO 45202-4048
TELEPHONE: (513) 421-6630
FACSIMILE: (513) 421-0212
WWW.LINDHORSTLAW.COM

AMBROSE H. LINDHORST 1913-1997
ROBERT F. DREIDAME 1914-1978
WILLIAM J. WALSH 1919-1996
LEO J. BRESLIN 1928-2000

**WRITER'S DIRECT DIAL**

(1) ALSO ADMITTED IN KENTUCKY

(513) 345-5769
tmartin@lindhorstlaw.com

July 27, 2016

**VIA EMAIL**
fred@panpacificimmigration.com

Fred Voigtmann, Esq.
Pan-Pacific Immigration Law Group
1875 Century Park East, Ste. 700
Los Angeles, CA 90067

      In re:  GSC Opportunities, L.P. (the "Partnership")
             Our File No.: 005543/0001

Dear Fred:

    Over 3 months have elapsed since our initial notification. Given the amount of time required to build and open a restaurant for a Buffalo Wings & Rings location, it is important that your clients make a decision as soon as possible, but no later than August 10, 2016, about whether to rescind or continue their investment in the Partnership. Our clients are concerned that the approval of their I-526 petitions was over a year ago and would like to leave enough time to create the jobs necessary to support their application. There are currently imminent time sensitive opportunities at the table to build two Buffalo Wings & Rings locations that would create at least 100% more jobs than required by USCIS. We anticipate that each restaurant will create approximately 35 jobs.

    Our clients have sought and received advice from immigration counsel that a change in the Partnership's brand of restaurant is not a material change under the USCIS Regulations. However, you and your clients should make your own determination in that regard.

    As I indicated in my earlier correspondence, Gold Star Chili, Inc. will not continue as a member of the General Partner of the Partnership and will not provide any economic contributions or support to these Buffalo Wings & Rings Restaurants. To the extent the funds from the Limited Partners ($1,500,000.00) are not sufficient to successfully complete and open the restaurants, the only remaining Member of the General Partner, Mason Hill, LLC, would have to provide the resources to complete and open the locations. The intent

LIND000373

Fred Voightmann, Esq.
July 27, 2016
Page 2

at this time is for the Partnership to invest in wholly owned subsidiaries that would operate two restaurant sites.

Because of the time constraints involved, if any of your clients wish to rescind their investment, notification must be received no later than August 10, 2016.  Otherwise, the General Partner will proceed as indicated above with investments in Buffalo Wings & Rings restaurant locations.

Please contact me if you have any questions or if you would like any additional information concerning the proposed activities of the Partnership.

Very truly yours,

LINDHORST & DREIDAME

Thomas E. Martin

TEM/mh
Enc.

619353